# Exhibit A

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - - - -

5    MARILYN LEE,                    )    Case No.

6              Plaintiff,            )    C07 2540 SBA

7    V.                              )

8    JOHN E. POTTER, POSTMASTER GENERAL, )

9              Defendant.            )

10   - - - - - - - - - - - - - - - - - -

11

12              DEPOSITION OF MARILYN LEE

13              WEDNESDAY, JANUARY 2, 2008

14

15

16

17

18

19

20

21                  BEHMKE REPORTING & VIDEO SERVICES

22       BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23                  160 SPEAR STREET, SUITE 300

24              SAN FRANCISCO, CALIFORNIA 94105

25                      (415) 597-5600

1

1
2
3
4
5
6
7
8
9        Deposition of MARILYN LEE, taken on behalf of
10   DEFENDANT, at 150 S. Almaden Boulevard, 9th Floor, San
11   Jose, California, commencing at 10:16 A.M., WEDNESDAY,
12   JANUARY 2, 2008, before Christine L. Jordan, Certified
13   Shorthand Reporter No. 12262, pursuant to Notice.
14
15
16
17
18
19
20
21
22
23
24
25

2

1          Is this the final agency decision?

2      MS. LEE:  It's the decision of Equal Employment

3  Opportunity.

4      MR. SCHARF:  The EEOC, okay.  So we'll call this

5  the decision of the EEOC.

6          (Defense Exhibit C was marked for

7          identification.)

8      MR. SCHARF:  And it says here that you are

9  alleging that you feel you were discriminated against

10  on the basis of race, Asian; sex, female; disability,

11  stress; and reprisal for prior protected EEO

12  activity.

13  BY MR. SCHARF:

14      Q.   Are you alleging those things?

15      A.   Yes.

16      Q.   Is the most significant basis of your

17  alleged discrimination that you feel that you were

18  retaliated against when you -- as a result of you

19  signing a petition that resulted in the removal of

20  three PIS managers?

21      A.   Yes.

22      Q.   So that's the essence of your claim, that

23  you feel that your employer retaliated against you

24  for being involved in the petition?

25      A.   Yes.

18

1      A.    No.

2      Q.    And they forced you to take it?

3      A.    Yes.  Not forced me.  They asked me.

4      Q.    Okay.  Did you take it?

5      A.    Yes.

6      Q.    Why did you -- so you accepted it?

7      A.    Yes.

8      Q.    You could have said no?

9      A.    I did say no.

10     Q.    Initially?

11     A.    Yes.

12     Q.    How many times did you say no?

13     A.    I just -- first time I said no.  And then he

14  just kept asking me and asking me, and he's my INC.

15     Q.    How many times did he ask you before you

16  said yes?

17     A.    The fourth time.

18     Q.    Okay, the fourth time you said yes?

19     A.    Yes.

20     Q.    So you said no three times?

21     A.    Yes.

22     Q.    And on the fourth time you said yes?

23     A.    Yes.

24     Q.    Why did you say yes the fourth time?

25     A.    Because I knew that he was asking me, and

1    I've always been very accommodating to the Service.
2    I was also asked to do -- to help out on confidential
3    funds.  I was on that project also, and I was very
4    good at it.  And I can do -- I picked up many other
5    tasks.
6        Q.   So you were ready to try it?
7        A.   Yes.
8        Q.   See if it was a fit?
9        A.   Yeah.
10       Q.   All right.
11            You told me that you believed Atkins knew
12   about your -- we'll call it your EEO activity, for
13   lack of a better word -- that he knew of your EEO
14   activity because of a statement in his affidavit in
15   the administrative file that you allegedly told him
16   that he -- about it?
17       A.   Yes.
18       Q.   Do you have any other reason to believe that
19   he knew about it?
20       A.   Yes.
21       Q.   Go ahead.
22       A.   I know --
23       Q.   What other evidence are you aware of that
24   causes you to believe, other than his own affidavit,
25   that he was aware of your signing the petition and

46

1    Q.    Okay.  Heath to McDermott.

2         And what did it say?

3    A.    It said that he selected Atkins and that he

4    has apprised Atkins of the situation in

5    San Francisco.

6    Q.    Did that e-mail say specifically that you

7    were a signatory to a petition and/or participated in

8    a meeting with managers regarding that petition?

9    A.    No.

10   Q.    Okay.

11        Is there any other evidence that you're

12   aware of that leads you to believe that Atkins knew

13   that you had signed the petition and participated in

14   the meeting other than the two things that you

15   mentioned?  You mentioned the e-mail and his

16   affidavit.

17   A.    His actions.

18   Q.    Okay.

19        Can you be specific?  What specific actions

20   did he take -- for example, did he ever tell you that

21   he was aware of the -- of your activity?  What

22   actions do you mean?

23   A.    When I asked to be returned or removed from

24   the supervisory position.

25   Q.    Oh, he said no.  You're inferring from his

```
 1   action that it's because of retaliation, right?
 2        A.    (Nodding head.)
 3        Q.    Correct?
 4        A.    Yes.
 5        Q.    You have to use words like "yes" or "no."
 6        A.    Yes.
 7        Q.    You're concluding, because you can't think
 8   of any other reason why he didn't return you to that
 9   old job, that therefore it must have been in
10   retaliation because of the petition?
11        A.    Yes.
12        Q.    You're inferring therefore that he must have
13   known about you signing the petition?
14        A.    Yes.
15             And, also, when the petition -- after the
16   petition, Chief Heath sent his two managers while
17   this investigation was going on.  And that was
18   Wisniewski and Donnelly.
19        Q.    I have no idea what you're talking about,
20   Wisniewski.
21             And how does that show that Atkins knew that
22   you signed the petition?
23        A.    I'm getting there.
24        Q.    Okay.
25        A.    Okay.
```

49

1      A.    Yes.  I was --

2      Q.    When did you become supervisor?

3      A.    June 2004.

4      Q.    And then when did you separate?

5      A.    July.

6      Q.    Of what year?

7      A.    2005.

8      Q.    Okay.

9            So, I'm sorry, something about the Monterey

10     conference leads you to believe that Atkins knew of

11     your prior activity?

12     A.    Yes.

13     Q.    What about the Monterey conference?

14     A.    There was postings of Investigative Analyst

15     that had just came out, and there were high levels.

16     I was given training as Investigative Analyst for

17     OWCP on that desk, and I really liked it.

18           So that -- there was a deadline for the

19     position, the Investigative Analyst that Friday that

20     the conference ended.  So the conference ended, and I

21     was in the office on Sunday working to meet all the

22     expenses to -- and to submit it to headquarters.

23           And I talked to Atkins that day and I asked

24     him, I said, "Do you know if there's any more

25     Investigative Analysts positions going to be made

1    mean when you say "convoluted"?

2        A.    There was a lot.  I'm trying to --

3        Q.    Okay.  I'm focusing on a very discrete

4    issue, and that is, their actual knowledge during

5    this one-year timeframe.  We're talking about

6    June 2004 through July 2005 when you want to get

7    transferred and these decision-makers were not

8    allowing you --

9        A.    Okay.

10        Q.    -- to transfer you back to your secretary

11    position.

12              What evidence you're aware of, either verbal

13    statements, documents, or any other evidence you're

14    aware of that leads you to believe that they actually

15    knew that you signed the petition and participated in

16    meetings with managers investigating that petition.

17              This is your --

18              (Interruption at the door.)

19        MR. SCHARF:  Come on in.

20              Off the record.

21              (Off the record from 11:05 a.m. to

22              11:14 a.m.)

23        MR. SCHARF:  Back on the record.

24    BY MR. SCHARF:

25        Q.    We're talking about evidence you're aware of

1    that leads you to believe that Atkins, Heath, Diaz

2    and Castor were actually aware that you signed the

3    petition and/or participated in a meeting with

4    managers investigating that petition during the

5    timeframe where you were requesting reassignment to

6    your old position of being a secretary.

7            We've already talked about Atkins, and we're

8    now talking about Heath.  What evidence are you aware

9    of that Heath knew of your involvement in those

10   activities?

11       A.   Okay, when -- there was an -- Heath came out

12   with Atkins to the division and made an announcement

13   and said that -- in general terms that we should not

14   cooperate with the OIG.  Okay.  And that was

15   memorialized in team leader notes and everything,

16   we're not supposed to help them out in any way.

17       Q.   Why does that lead you to believe that Heath

18   knew that you signed the petition?

19       A.   Well, when I found a detail with the OIG and

20   Atkins approved it, it was later rescinded and after

21   I told everybody that I was ecstatic working with the

22   OIG, it is something I want to do, it's higher level,

23   it's a promotion, it's very much --

24       Q.   Was that rescinded because of the debate who

25   would pick up your salary?

1    A.    Yes.   That's what they told me.

2    Q.    You're inferring from the fact that your

3    reassignment was cancelled, that it must be because

4    of retaliation?

5    A.    Well, I read in the notes too that they

6    went -- the two DCIs were -- had to go to the chief

7    to get approval for this OIG detail.  And that's when

8    they decided not -- you know, to cancel it.

9          And I find that very, very hard -- so that

10   he -- the chief knew.  He had to.  Because at the --

11   the managers at my meeting had to speak to him, had

12   to speak to Chief Heath directly.

13   Q.    So you're inferring from the fact that your

14   reassignment was cancelled, allegedly over a salary

15   dispute, but you believe that the real reason was

16   that they knew that you signed that petition and were

17   retaliating against you?

18   A.    And then to pour salt over it by going with

19   the OIG.

20   Q.    So you're inferring that from the fact that

21   they wouldn't reassign you, because you can think of

22   no other reason why they would do that?

23   A.    Exactly.

24   Q.    All right.

25         Would it be fair to say you don't have

60

1    direct evidence in the form of verbal statements from

2    them to you or to others or documents in which they

3    admitted knowing, other than their affidavits in the

4    administrative agency, but, rather, your evidence is

5    circumstantial derived from the fact that you can

6    think of no other reason why they wouldn't reassign

7    you other than the fact that they must be retaliating

8    against you.

9         Is that a fair statement of the nature of

10   your belief as to why these people must have known?

11        A.    No.

12        Q.    What other direct evidence do you have?

13        A.    There were -- other than myself, there were

14   four other ladies who had supervisory experience who

15   could have actually replaced me at any time.

16        Q.    Who were they?

17        A.    That was Katie O'Leary, who was white, who

18   has been detailed to the Post Office and was paid by

19   my unit.  There was Anita Cabano, there was Barbara

20   Mendes, and there was Kaycee Graham.

21        And those are the ones that have marked

22   supervisory experience, and they were our official

23   supervisors.

24        Q.    Were you told that one of the reasons that

25   they could not reassign you is they couldn't find a

1    suitable replacement?

2        A.    Yes.

3        Q.    And you feel that that was not accurate

4    because you felt Katie and these three -- and what's

5    her -- Amelia?

6        A.    Anita.

7        Q.    Anita?

8        A.    Cabano.

9        Q.    Barbara?

10        A.    Barbara Mendes.

11        Q.    And Carrie?

12        A.    Kaycee.

13        Q.    I can't read my own writing.

14              And Kaycee were qualified to do the

15    supervisor job?

16        A.    After all, they were official supervisors.

17        Q.    Okay.

18              Are you -- were they already in supervisory

19    jobs?

20        A.    At one -- yes, at one point.

21        Q.    No, at the point that you felt that they

22    could take over for you, didn't they already have

23    supervisory jobs that they were doing?

24        A.    No.

25        Q.    What were they doing?

1    A.    Kaycee was -- replaced me for a little while

2    as a secretary.

3    Q.    Are they all secretaries?

4    A.    No.

5    Q.    So Kaycee was a secretary.

6          What was Barbara doing?

7    A.    She -- they created another supervisory

8    position, and she created -- she was supervising the

9    field support.

10   Q.    So she was a supervisor?

11   A.    Yes.

12   Q.    Okay.

13         So you're saying she should leave one job

14   being a supervisor and take over your job as a

15   supervisor?

16   A.    She did eventually.

17   Q.    She was your replacement?

18   A.    Yes.

19   Q.    And then Anita?

20   A.    Anita Cabano.

21   Q.    What was her job at this time?

22   A.    She was detailed to the Forfeiture

23   Specialist.

24   Q.    And then Katie?

25   A.    Katie was the one at the Post Office.

1    Q.    Okay.

2          Do you have any other reasons to believe

3    that when they said that there weren't any suitable

4    replacements for you, that that was not accurate,

5    other than the fact that you felt there were four

6    other ladies with supervisory experience that could

7    have done that job for you?

8    A.    Yes.  They could have posted it and

9    requested other people to take on the position.

10   Q.    Okay.

11   A.    They never did.  They never offered it.

12   Q.    So any other direct evidence that Heath or

13   Diaz or Castor knew of your allegedly protected

14   activity, other than what you've already told me

15   about?

16   A.    Castor, like I said, I think I told you,

17   Castor said in her affidavit that she knew.

18   Q.    Yeah.  You don't have to tell me -- I have

19   their affidavits.

20          Other than what they say in their

21   affidavits, do you have any other direct evidence --

22   you know what I mean by "direct evidence"?  An

23   admission by them, either verbal or written, in which

24   they acknowledged knowing about your signing the

25   petition and participating in the meeting during the

```
 1    timeframe where they weren't allowing you to return
 2    to your secretary position.
 3            Do you have any other --
 4       A.    No.
 5       Q.    -- direct evidence?
 6       A.    No.
 7       Q.    So, really, what you're saying is that you
 8    have their affidavits, correct --
 9       A.    Yes.
10       Q.    -- where they make some statements that lead
11    you to believe that they had knowledge, correct?
12       A.    (Nodding head.)
13       Q.    And you're also inferring from the fact that
14    they would not reassign you, which leads you to
15    believe that it must be as a result of retaliation?
16       A.    (Nodding head.)
17       Q.    Those are the two real pieces of evidence
18    that you have that lead you to believe that they
19    knew --
20       A.    Uh-huh.
21       Q.    -- that you had signed the petition and
22    spoke to managers?
23       A.    Yes.
24       Q.    Got it.  All right.  So let's talk about
25    some other issues.
```

1          We began the deposition -- believe it or

2   not, I haven't actually begun my outline.  I was sort

3   of going with the flow of what you seemed to want to

4   talk about and topics that came up.

5          Before I digress, we were actually going

6   through the Dr. Strassberg statement, and you had

7   told me the reasons why you felt that the agency

8   humiliated you, lied to you, and took away your

9   dignity.

10         Have you now told me what they did that

11  caused you to have those feelings?

12     A.    No, there's more.  There's a lot more

13  throughout the detail.

14     Q.    Okay.  Well, why don't you focus on the main

15  things.  You don't have to repeat anything you've

16  told me.  The court reporter -- I remember, the court

17  reporter has it down so don't feel you need to

18  repeat.

19         But can you tell me anything else that they

20  did that you -- that caused you to feel humiliated,

21  lied to, and stripped of your dignity, anything else?

22     A.    They saw me in pain.

23     Q.    Well, you've said that.  You don't have to

24  repeat that.

25     A.    And people came up to them, reported and

66

```
 1    they did nothing.
 2         Q.   Okay.  So they ignored your requests to --
 3    for reassignment.  And you've told me about that.
 4              Is there anything else?
 5         A.   And other people saw me in pain and
 6    reported.
 7         Q.   To?
 8         A.   To management.
 9         Q.   To these people?
10         A.   Yes.
11              And they did nothing.
12         Q.   And who were the people that you're
13    referring to that reported to management that you
14    were in pain?
15         A.   Their lawyer, Ed Lowrey, went up to Sally
16    Diaz and told them -- they have documentation of
17    that -- told her how distressed I was.
18         Q.   Okay.
19              The agency lawyer spoke to Sally Diaz?
20         A.   And they did nothing.
21         Q.   Was this while you were still being a
22    supervisor?
23         A.   Yes.
24         Q.   Okay.
25         A.   Same with Sheilah Castor --
```

```
 1        Q.    Who --

 2        A.    -- the --

 3        Q.    The agency lawyer went up to Sheilah?

 4        A.    No, the -- Sheilah --

 5        Q.    Went up to who?

 6              The Administrative Specialist spoke to who?

 7        A.    Also spoke to Atkins and said that -- and

 8   even admitted in her affidavits that I closed down.

 9   I -- and they did nothing.  They were -- all the

10   symptoms were there.  They did nothing.

11        Q.    Did you share -- let me ask you this:  Were

12   you trying to be professional while you were being a

13   supervisor?

14        A.    Yes.

15        Q.    So you were trying hard not to break down in

16   front of them?

17        A.    Yes.

18        Q.    You were keeping it inside?

19        A.    Yes.

20        Q.    That must have been very painful for you?

21        A.    Yes.

22        Q.    Until finally, it just finally exploded?

23        A.    Yes.

24        Q.    And was that -- did it all come out during

25   that conversation where you spoke to somebody where
```

```
 1   you said, "What do I have to do, hurt myself and

 2   leave a note"?

 3       A.   No.  I kept -- every chance I got, I spoke

 4   to Sheilah Castor and Sally Diaz and Bill Atkins and

 5   asked to be removed.

 6       Q.   Okay.  You were keeping, though --

 7       A.   It was just keep --

 8       Q.   Okay.

 9            You were making requests to -- for you to be

10   transferred back to your old position.  But the

11   distraught, the pain, the mental anguish, the stress

12   you were experiencing, you were keeping that inside

13   because you were trying to be professional?

14       A.   Yes.

15       Q.   When was it that you finally let everybody

16   know the degree to which you were stressed out by

17   the -- performing the supervisor job?

18       A.   I asked Sheilah Castor to meet with me.  She

19   was at that time out of the office.  I did not know

20   she was on a detail then.  And I left a message.

21            I told her I was in a hostile environment

22   and I needed to be removed from the supervisory

23   position.

24       Q.   Do you recall when that meeting was?

25       A.   That was sometime in June.
```

BEHMKE REPORTING & VIDEO SERVICES
(415) 597-5600

1    management the extent of your mental distress because

2    you were trying to be professional; is that fair to

3    say?

4        A.    No.    They knew.    I was in tears each and

5    every time.    It got worse.

6        Q.    Okay.

7            How many times did you request during that

8    year to be reassigned to being a secretary?

9        A.    Oh, God, so many times.

10       Q.    Can you give me a number?    Give me an

11   estimate.    A rough estimate, ballpark estimate?

12       A.    I know every month I went to Sheilah Castor

13   at least once.    I know more than that.

14       Q.    So that would be 12, every month.    So at

15   least -- you made at least monthly requests,

16   sometimes more than once a month?

17       A.    Yes.

18       Q.    So more than 12 requests?

19       A.    (Nodding head.)

20       Q.    And they gave you different reasons -- they

21   gave you reasons as to why they were not --

22       MR. BACON:    Is that another yes?

23   BY MR. SCHARF:

24       Q.    Is that yes?

25       A.    Yes.

1    BY MR. SCHARF:

2        Q.    Was there a need for a competent supervisor

3    in the Administrative Support Center?

4        MR. BACON:    If you know.

5        THE WITNESS:    Yes.

6        MR. SCHARF:    Okay.    Very good.

7    BY MR. SCHARF:

8        Q.    Next sentence, "Management also testified

9    that it wanted to offer Complainant a detail that

10   would give her some supervisory experience."

11       A.    Okay, they did.

12       Q.    Did you want some supervisory experience to

13   build your resumé and develop your qualifications in

14   order to get promoted?

15       A.    Yes.

16       Q.    Okay.

17            And is it true that one of the reasons they

18   offered the job to you is to give you some of that

19   experience?

20       A.    Yes.

21       Q.    And is it true that one of the reasons that

22   you initially accepted it, you know, before you

23   realized it was a bad fit, was that it gave you some

24   of the supervisory experience that you wanted in

25   order to build your resumé to enhance your potential

1    for promotion?

2        A.    Yes.

3        Q.    Okay.  Very good.

4              Next sentence, "Management further testified

5    that it denied Complainant's request to be reassigned

6    out of that position because she was doing an

7    excellent job."  We'll stop there.

8              Do you feel you were doing an excellent job?

9        A.    No.

10       Q.    Do you feel you were doing a competent job?

11       A.    I -- yes, I guess.  Yes, I guess.

12       Q.    Okay.

13       A.    But it cost my health.

14       Q.    Okay.

15             You were trying to do an excellent job?

16       A.    Yes.

17       Q.    You've been an employee for a long time?

18       A.    Twenty-five years.

19       Q.    Yes.

20       A.    An exemplary --

21       Q.    And you took your job seriously?

22       A.    Yes.

23       Q.    And when somebody gives you a project, you

24   want to give it your best?

25       A.    Yes.

1    Q.    Okay.

2          Do you feel that you performed better -- I

3    understand that you were suffering and it was causing

4    you stress and anxiety.  But do you feel you were

5    performing better than your predecessor?

6    A.    From Anita?

7    Q.    Yeah.

8    A.    Anybody would.

9    Q.    Couldn't be worse?

10   A.    Anybody would.  I'm sorry.

11   Q.    Very good.

12         The agency also noted that, "It could not

13   reduce the effectiveness and operational efficiency

14   of the division just to cater to your preferences."

15         How do you feel about that statement?

16   A.    They went against the regulations, number

17   cne.  If I had never went on this detail, they would

18   have found another alternative.

19   Q.    I don't know what you meant by that.

20         First of all, what regulation are you

21   talking about?  What regulation did they violate?

22   A.    They violated the ELM.

23   Q.    What does that say?

24   A.    Employee Labor Manual.

25   Q.    What provision?  Paraphrase it.

1    A.    Yes.

2    Q.    And as a result of that fitness-for-duty

3    examination, the doctor found you shouldn't be a

4    supervisor; is that right?

5    A.    Yes.

6    Q.    Are you -- do you have any complaint about

7    them scheduling you for that medical examination?

8    A.    Yes, I do.

9    Q.    Okay.  Aren't you in fact relying on that

10   doctor as part of your case?

11   A.    Well, it's not that; it was how they did it.

12   Q.    Okay.  Well, I mean, but in terms of the

13   evidence, it supports your claim.  Isn't one of your

14   key pieces of evidence the report from the doctor

15   that conducted the fitness-for-duty examination?

16   A.    Yes.

17   Q.    Because you feel his report supports your

18   conclusion that psychologically you were not capable

19   of performing the supervisor job?

20   A.    Yes.

21   Q.    Okay.

22         So at least, in retrospect, that decision

23   gave you evidence that helps your case?

24   A.    Yes.

25   Q.    But you criticize management for scheduling

                                                              90

1    that examination?

2        A.    Yes.

3        Q.    Now, it's not the fact that they scheduled

4    but the way they went about it that --

5        A.    Yes.

6        Q.    Okay.

7              Tell me about that.  What was it about the

8    way they went about scheduling that you feel was

9    unfair or unlawful?

10       A.    They knew all this time that I was under

11   stress.  It had come to a point that I had said those

12   words that I was being sent for duty for fitness, and

13   they didn't send it to me right away (sic).

14             And I know -- as a secretary I have

15   scheduled fitness-for-duty examinations.  I have a

16   list; fitness-for-duty exams, you put them right

17   away.

18       Q.    Okay.  So your complaint, really, is that

19   they should have scheduled it earlier?

20       A.    Yes.

21       Q.    And --

22       A.    They scheduled it --

23       Q.    And your other complaint is that they

24   probably didn't need it because they should have

25   known psychologically you were suffering.  Those are

1    your two complaints regarding the fitness-for-duty

2    examination issue?

3        A.    Yes.

4            And they also -- what really gets me mad is

5    that I filed for stress, and then they send those

6    comments and try to say that I was stressed out.

7        Q.    Okay.

8            What are we talking about?

9        A.    On my stress claim.

10       Q.    You filed a workers comp claim for stress?

11       A.    And they made those comments.

12       Q.    Okay.  But before we get there, let's sort

13   of develop the context so that whoever reads this

14   transcript will understand what you're talking about.

15           You filed a workers comp claim for stress,

16   correct?

17       A.    Yes.

18       Q.    Who suggested that, by the way?  Did

19   somebody tell you to do that -- a doctor, a lawyer, a

20   friend?

21       A.    Let me tell you what happened, is once they

22   put me on admin leave and they locked me out of my

23   computer and walked me out the door with my things in

24   tow, that was humiliating.  It's like I did something

25   wrong.

92

1          But you feel capable, qualified and able to

2   perform the job of secretary during the year when you

3   were requesting transfer, after that year and even to

4   now, true?

5       A.   Yes.

6       MR. SCHARF:  Okay.

7          And, Dan, you're stipulating that she's not

8   disabled for some --

9       MR. BACON:  Yes.  That's correct.

10      MR. SCHARF:  Okay.

11      MR. BACON:  And just so I can explain in the

12  record if someone reads it, is the EEO was -- before

13  I was hired was all one claim of discrimination so I

14  appealed the whole thing.  However, we stipulate to

15  dismiss the disability portion of the discrimination

16  complaint.

17      MR. SCHARF:  Fair enough.

18  BY MR. SCHARF:

19      Q.   It sounds like from your conversation today

20  that your claim is really a retaliation claim

21  stemming from your belief that the people were

22  denying your request to become -- to go back to being

23  a secretary as punishment for you signing the

24  petition and participating in that petition-related

25  mediation, correct?

                                                      95

1      A.    Yes.

2      Q.    Okay.

3            But, you know, just to clean it up, you also

4      have some allegations that the management

5      discriminated against you on the basis of race,

6      Asian; sex, female; disability, stress.

7            Do you have any direct evidence to support

8      any of those peripheral claims?

9      A.    No, I don't think so.

10     Q.    Okay.

11           We're really talking retaliation?

12     A.    Yeah.

13     Q.    Got it.

14           So let's -- so anyway, so you made this --

15     you were about to tell me who suggested you file the

16     workers comp claim.  Was there a person that

17     suggested you do that?

18     A.    Yes.

19     Q.    Who was that?

20     A.    When I came home from admin leave, they read

21     me the admin letter.  And it didn't -- I just broke

22     down when I read that admin letter because they

23     addressed me as a supervisor, and that really just

24     tore my heart out.

25     Q.    How did they address you as a supervisor?

```
 1        Q.    So you filed the workers comp claim?
 2        A.    Yes.
 3        Q.    And it was accepted?
 4        A.    Yes.
 5        Q.    And then they put you on temporary
 6   disability?
 7        A.    Yes.
 8        Q.    And because of your dependent situation,
 9   your compensation was 75 percent of your salary?
10        A.    Yes.
11        Q.    Tax free?
12        A.    Yes.
13        Q.    Do you recall what you were netting before
14   you went on workers comp disability, what was your
15   take-home pay, you know, either monthly or every two
16   weeks?
17        A.    I think it was -- monthly was maybe 24.
18        Q.    $2,400?
19        A.    Yes.
20        Q.    Take home, net?
21        A.    Yeah, net.
22        Q.    And now what is it under the 75 percent
23   tax --
24        A.    It's 3,000.
25        Q.    So you're actually making more net now?
```

BEHMKE REPORTING & VIDEO SERVICES
(415) 597-5600

1      A.    Yes.

2      Q.    Can I ask you a question, and will you be

3  honest?

4      A.    Yes.

5      Q.    Was one of the reasons why you haven't tried

6  harder to find another job was because you're

7  actually making more money now than -- net than you

8  were when you were actually working full time?

9      A.    No.  No.

10      Q.    Really?

11      A.    The reason is, is because I need to get this

12  over with.

13      Q.    Okay.  So you feel --

14      A.    Because I can -- if you were to ask me for

15  the real truth, I could have played this on, take

16  this disability.  But, no.  I want this over with and

17  I want what's ...

18      MR. SCHARF:  Okay.  Let me go off the record for

19  just one second.

20            (Off the record from 11:54 a.m. to

21            11:56 a.m.)

22      MR. SCHARF:  Let's go back on record.

23  BY MR. SCHARF:

24      Q.    If I understand what you're saying, the real

25  reason why you have not found alternative employment

1    Q.   Okay.

2         And then it would seem to follow that of

3    just the signatories, to your knowledge, you're the

4    only one that was retaliated against?

5    A.   Yes.

6    MR. SCHARF:  Okay.  All right.

7         I'm going to take a break.  Let's get a

8    very, very fast lunch and then we'll reconvene.

9    We'll probably have about 90 minutes left, and we'll

10   be done by 2:00 as scheduled.

11        Does that sound okay?

12   MR. BACON:  Yeah.

13   MR. SCHARF:  Are you okay with that?

14   THE WITNESS:  Yes.

15   MR. SCHARF:  And we will stay as long as you

16   want.  I'm free all day, and I can go all night, as

17   long as you feel you need to go.

18        So let's go off the record.

19        (Lunch recess was taken from 12:26 p.m. to

20        1:33 p.m.)

21

22

23

24

25

126

1      A.    I told them this was like babysitting.

2  These people don't -- you know, don't do their jobs.

3      Q.    You gave them the same reasons you just gave

4  me as to why the job was frustrating and

5  dissatisfying?

6      A.    Uh-huh.

7      MR. BACON:  Is that a yes?

8      THE WITNESS:  Yes.

9  BY MR. SCHARF:

10     Q.    And it wasn't until almost a year into that

11 job that you then shared with them the psychological

12 stress that you were experiencing?

13     A.    Yes.

14     Q.    Got it.

15           All right.  Now, did you receive any awards

16 or accolades from any of the decision-makers during

17 the year that you were working as a supervisor?

18     A.    Yes.

19     Q.    Could you tell me about --

20     A.    That was in October 2004.

21     Q.    What did you receive in October of 2004?

22     A.    I received one of the highest division merit

23 awards because I also did awards, too.  And that was

24 12 percent plus a thousand dollars merit.  And that

25 was based, from what I -- from my write-up, as half

1    of a year as an excellent secretary and half of a

2    year -- and the other half, latter half, as a

3    supervisor.

4        Q.    Okay.

5        A.    And that's when I asked that I wanted to

6    be -- you know, to return as a secretary.

7        Q.    Okay.

8              So it was based on outstanding performance

9    for that entire year?

10       A.    Exactly.

11       Q.    Half as a secretary and half as a

12    supervisor?

13       A.    Yes.

14       Q.    Okay.

15             And who gave you that award?

16       A.    Atkins.

17       Q.    Of the four decision-makers that you

18    mentioned, was the person that had the most power to

19    determine your fate as to whether you should be

20    reassigned to secretarial duties, was that Atkins?

21       A.    Yes.

22       Q.    Did you receive any awards during that year

23    when you worked as a supervisor besides that

24    12-and-a-half percent merit award in October of 2004?

25       A.    I don't think so.  I --

1    Q.    Did Atkins praise you at all during the --

2    you mentioned at some point you stopped speaking to

3    him?

4    A.    Yes.

5    Q.    Okay.

6          Was he complimentary to you at any point

7    during that year?

8    A.    This was the last time we spoke, after my

9    evaluation was in October.  And he told me that he

10   needed me to stay in that position.  After that, I

11   think I had one meeting with him to talk about one of

12   the support people, had problems with her, and he

13   supported me on that decision.  And then after that,

14   he never talked to me again.

15   Q.    Did you ever ask him why -- whether he

16   thought your work relationship was deteriorating and,

17   if so, what was contributing to that?  Did you ever

18   raise that with him?

19   A.    I had a -- I asked to have a meeting with

20   him.

21   Q.    But you never met him?

22   A.    We did.

23   Q.    What did you tell him?

24   A.    They -- they -- they knew that ahead of time

25   what I think -- I surmise what the meeting was going

138

1    to be about, to be removed as a secretary.  He

2    brought in Kaycee Graham as a witness.  I was

3    surprised because he called me in his office because

4    I asked for a meeting with him.  And Kaycee Graham

5    decided to stay in.

6         I -- he did not offer me if I wanted a

7    witness on my behalf.  I was surprised, and I didn't

8    feel comfortable having her as a witness and not

9    having one.

10    Q.   Did he say that Kaycee is there so that

11    there would be an independent witness to what was

12    discussed?  Did he actually say that?

13    A.   No.  But I remember this.  And when he came

14    to the division, he pointed out several things.

15         One was that there were too many EEOs filed

16    in the division, and he didn't want another one

17    filed.  He implied that, and he said that to the

18    entire division.

19    Q.   Okay.  Now --

20    A.   And if there was going to be any

21    discrepancies or problems, he wanted you to first

22    discuss it with your supervisor and to have a

23    witness.

24    Q.   So what was the -- what did you discuss

25    during this witness -- I mean during this meeting

1    with Atkins?

2        A.    I told him that I do not want to be a

3    supervisor.

4        Q.    And what did he say?

5        A.    He said he needed me there, he says, and he

6    said -- told me to -- he told me that --

7        Q.    Did he tell you why he felt he needed you

8    there?

9        A.    No.

10            He says, "Be patient."

11       Q.    Did you -- when you -- when he -- do you

12   believe that he believed that he needed you there?

13       A.    No.

14       Q.    Why do you think he was lying when he said

15   that?

16       A.    Kaycee Graham was right there.  She was a

17   prior -- a supervisor.  He could just put me back in

18   my position, and she could have gone back out there

19   as a supervisor.

20       Q.    Okay.

21            And what was her job at the time?

22       A.    She was in my secretary -- in my position.

23       Q.    Did she want to be a supervisor?

24       A.    It doesn't matter.  She applied for the

25   position, and her title is a supervisor.

                                                        140

1    interim INC, which was then Wisniewski.

2         Q.   And of the four people that participated in

3    that meeting, to your knowledge, you were the only

4    one that was retaliated against?

5         A.   I don't understand.

6         Q.   Well, when I asked you for, you know, the 49

7    signatories who, to your knowledge, was the victim of

8    retaliation, you mentioned you and then the ring

9    leader, for lack of a better word.

10        A.   Yeah.

11        Q.   And then -- and when I asked you, So which

12   of the signatories participated in the follow-up

13   meeting --

14        A.   I don't know.  I have no idea.

15        Q.   Oh, you don't know how many?

16        A.   No, I don't know.

17        Q.   Do you have a general idea of the number?

18        A.   No, I don't know.

19        Q.   Okay.

20        A.   What I was --

21        Q.   So, then, would it be fair to say that, to

22   your knowledge, you're the only person that

23   participated in the follow-up meeting that was the

24   victim of retaliation?

25        A.   Yes.

1    questions.  These are facts that we believe to be

2    true, and I just -- I'm -- rather than asking you a

3    whole detailed set of requests for admissions, I'm

4    going to take you through these sentences and ask

5    you, to your knowledge, is it true, not true or you

6    don't know.

7        A.    Okay.

8        Q.    So what I'm looking for is either, yes, it's

9    true; no, that's not true; or, I don't know.  I don't

10   have personal knowledge.

11       A.    Uh-huh.

12       Q.    Okay.

13            You began employment with the U.S. Postal

14   Service on February 9th, 1980?

15       A.    February?  Pretty much is true.

16       Q.    Okay.

17            As a Senior Stenographer in the Office of

18   the Regional Chief Inspector for the Western Region?

19       A.    I think that was the name of it, yeah, true.

20       Q.    You became a Senior Secretary, EAS 14,

21   assigned to the San Francisco Division of U.S.

22   Inspection Service, having been promoted on

23   April 4th, 1992?

24       A.    I don't remember; but, yes.

25       Q.    Sounds about right?

1    A.    Yeah.

2    Q.    And you remained in that position during the

3    relevant time we've been talking about today?

4    A.    Uh-huh.

5    MR. BACON:  Is that a yes?

6    THE WITNESS:  Yes.

7    BY MR. SCHARF:

8    Q.    At one point you were the secretary to the

9    Division Inspectors in charge?

10    A.    Yes.

11    Q.    Although, you had been -- I'll try to just

12    hit the stuff that's relevant.

13        Your assignment to the -- as the Supervisor

14    of the Administrative Center was a lateral move?

15    A.    Yes.  It was -- well, that's -- I take that

16    back.  It wasn't an assignment; it was a detail.

17    Q.    Okay.

18        But it was a lateral?

19    A.    Yes.

20    Q.    Meaning, it didn't increase your grade level

21    or your pay?

22    A.    Yeah.

23    Q.    Okay.

24        You were placed on administrative leave

25    effective July 18th, 2005?

149

1        A.    Yes.

2        Q.    You filed a claim -- workers comp claim for

3    stress on August 10th, 2005?

4        A.    I believe so, yes.

5        Q.    And that claim was accepted by the

6    Department of Labor's Office of Workers Comp Programs

7    on February 4th, 2006?

8        A.    I believe so.  It was accepted; I don't know

9    the date.

10       Q.    Okay.  That's fine.  Those are fair answers.

11             And you're currently on extended leave?

12       A.    (Nodding head.)

13             No, not extended.

14       Q.    What's your status, temporary total

15    disability?

16       A.    Yeah.

17       Q.    Is it your understanding you can remain on

18    temporary total disability indefinitely?

19       A.    No.  My understanding, it's my doctors.

20       Q.    Okay.

21             So is it your understanding you can remain

22    in your current status, temporary total disability,

23    for as long as your doctors sign off on that and

24    recommend that?

25       A.    Yes.

1     Q.   Okay.

2          In February 2003 a petition was distributed

3     among employees of the San Francisco division of the

4     Postal Inspection Service.  That's the petition --

5     A.   Yes.

6     Q.   -- we've been talking about.

7          And that petition complained of general

8     management style -- of the general management style

9     of the Inspector in Charge, Allen Kiel?

10    A.   Yes.

11    Q.   Okay.

12         And also two of his assistants, Greg

13    Gamache, G-R-E-G G-A-M-A-C-H-E, and Juliana Nedd,

14    N-E-D-D?

15    A.   Yes.

16    Q.   And you were 1 of 49 signatories to the

17    petition?

18    A.   Yes.

19    Q.   And the petition also addressed the low

20    morale in the division?

21    A.   Yes.

22    Q.   And the petition requested an independent

23    investigation?

24    A.   Yes.

25    Q.   And you were, in fact, interviewed regarding

 1    those matters in June of 2003?

 2        A.    Yes.

 3        Q.    And you mentioned that the petition resulted

 4    in reassignments, in certain reassignments; both

 5    assistants in charge were given other duties?

 6        A.    Yes.

 7        Q.    Nedd was sent to Inspection Service

 8    headquarters in Washington, D.C.?

 9        A.    Yes.

10        Q.    And Gamache was reassigned as Performance

11    Manager?

12        A.    Yes.

13        Q.    And ultimately retired in 2005?

14        A.    Uh-huh.

15        Q.    And Kiel, he actually retired in -- on June

16    30th, 2003?

17        A.    Yes.

18        Q.    And then Wisniewski, W-I-S-N-I-E-W-S-K-I, he

19    filled in on an interim basis?

20        A.    Yes.

21        Q.    And then, what, did Donnelly replace him?

22        A.    No.  Donnelly also replaced one of the

23    managers, either Nedd or Gamache.

24        Q.    Okay.  So Donnelly replaced Nedd or Gamache?

25        A.    Yeah.

                                                          152

1    Q.   And then when Kiel retired, Wisniewski

2    became acting INC?

3    A.   Well, during the investigation, I guess, so

4    Allen Kiel was there.  But Wisniewski became the

5    interim INC.

6    Q.   Okay.

7         So Kiel's permanent successor was Atkins?

8    A.   Yes.

9    Q.   And he arrived, what, in September 2003,

10   late 2003?

11   A.   Somewhere around there.

12   Q.   Where was he from, Seattle?

13   A.   Yes.

14   Q.   Is it true that Atkins did not have prior

15   involvement with the management of the San Francisco

16   division before he was -- before he arrived in

17   September 2003?

18   A.   I don't know.

19   Q.   You think from Seattle he was involved with

20   management with the San Francisco --

21   A.   I have no idea.

22   Q.   So you don't know.

23        I don't know -- if you don't know the answer

24   or don't recall the answer, it's okay to say, "I

25   don't know," or, "I don't recall."

153

1    good records on -- or did not keep records for two

2    years.

3           And so when I told her to update those

4    records of the two years, she took her sweet time

5    about it.  And that made me nervous because if there

6    was ever an audit, I'd be held responsible that these

7    records were not updated properly --

8        Q.   Okay.

9        A.   -- and timely.

10       Q.   I understand the supervisory

11   responsibilities were stressful, correct?

12       A.   Yes.

13       Q.   But the workload was manageable or

14   unmanageable?

15       A.   Well, I made it manageable because I had two

16   people.

17       Q.   Got it.

18            Now, you had a merit review in June of 2005?

19       A.   Yes.

20       Q.   That was with your immediate supervisor,

21   Sheilah, S-H-E-I-L-A-H, Castor, C-A-S-T-O-R?

22       A.   Yes.

23       Q.   When she was the level 21 Admin Specialist?

24       A.   Yes.

25       Q.   Was that an emotional meeting for you?

```
 1       A.    Yes.

 2       Q.    Did you cry?

 3       A.    Yes.

 4       Q.    Was that the first time you cried --

 5       A.    No.

 6       Q.    -- in dealing with Sheilah?

 7       A.    Yes.

 8       Q.    All right.

 9             And you requested during that merit

10    interview that you be relieved of your supervisory

11    responsibilities --

12       A.    Yes.

13       Q.    -- and returned to your old position?

14       A.    Yes.

15       Q.    Okay.

16             Did you talk during that -- at that meeting,

17    did you actually talk about your health?

18       A.    I didn't have to.

19       Q.    Fair enough.

20       A.    It was very clear.

21       Q.    Because you were overcome by emotion?

22       A.    Yes.

23       Q.    All right.

24             Did Castor assure you during that meeting

25    that your performance as a supervisor was held in
```

159

1  high regard by managers?

2     A.   No.

3     Q.   Did she assure you you were needed to

4  supervise the Administrative Center?  Did she tell

5  you she needed to do that or that management needed

6  you in that role as supervisor?

7     A.   Yes.

8     Q.   Okay.

9        And so she denied the request?

10     A.   Yes.

11     Q.   To your knowledge, did Castor know that you

12  were a signatory to the petition?

13     A.   Say that ...

14     Q.   Yeah.

15        To your knowledge, did Castor know that you

16  had signed the petition when you met with her on

17  June 19th, 2005?

18     A.   I believe so, yes.

19     Q.   Do you have any direct evidence of that?

20     A.   No.

21     Q.   Do you have any direct evidence that, when

22  Castor met with you on June 19th, 2005, and denied

23  your request, that she was aware of your

24  participation in the June 2003 meeting?

25     A.   No.

BEHMKE REPORTING & VIDEO SERVICES
(415) 597-5600

1    Q.    Did Atkins recommend you for various

2  coursework in order to further develop your

3  management and leadership qualities?

4    A.    Yes.

5    Q.    Did he send you to the investigative analyst

6  training in St. Louis held in July 2004?

7    A.    Yes.

8    Q.    And you were the only San Francisco division

9  support employee allowed to attend that?

10    A.    Yes.

11    Q.    That was an honor to be recruited for and

12  sent to that training program?

13    A.    Let me explain that.

14    Q.    Go ahead.

15    A.    That division had so many spots already

16  paid, and they had one open spot.  So they did poll

17  their Inspectors in Charge, and Mr. Atkins decided to

18  send me.  However --

19    Q.    Did you want to go?

20    A.    Of course.

21         And as investigative analyst, I thought that

22  was a great job.  I would have liked to have done

23  that.

24    Q.    And as another developmental opportunity,

25  did management send you in May 2005 to a diversity

1    liaison training?

2        A.    Yes.  But let me explain that.

3            Going back to that investigative analyst,

4    other people were sent, not to St. Louis.  And I paid

5    for them with my credit -- I was also the credit card

6    holder for the division.  So other people got trained

7    for that investigative training also.

8            So not necessarily in St. Louis, but they

9    received the training.  So I was not the only one who

10   received that training.

11       Q.    The point I was wondering about is so that

12   during this year you were acting as supervisor, not

13   only were you getting compliments and you received a

14   monetary award, you were also being afforded other

15   leadership opportunities?

16       A.    For the diversity?

17       Q.    Well, for all these things we've been

18   talking about -- the investigative analyst training,

19   the diversity liaison training.

20       A.    I don't think -- that didn't have any

21   supervisory duties with it.

22       Q.    But aren't these things that you wanted to

23   do in order to further develop your resumé and

24   develop your skills so you could get that promotion?

25       A.    Yes.

1      Q.   So management was supporting you during this

2    year?

3      A.   Yes.

4      Q.   By providing you with the opportunities you

5    were seeking?

6      A.   Yes.

7      Q.   And benefiting from them?

8      A.   Yes.

9      Q.   Got it.

10          And, in fact -- and I think you mentioned in

11   December 2004 Atkins gave you that special

12   achievement award and cash award?

13     A.   Yes.

14     Q.   And isn't it true that's only given to a few

15   support employees?

16     A.   Yes.

17     Q.   Okay.

18     A.   But I also did a lot.

19     Q.   Well, you were earning it.

20     A.   Yes.

21     Q.   Because you were making that -- the

22   Administrative Center better than it was before you

23   got there?

24     A.   No.   I also did the division conference.   I

25   also chaired that.  I mean, you know, just --

1    Q.    Is that part -- if you were a secretary,
2  would you be chairing that?
3    A.    No.
4    Q.    So that was part of your new
5  responsibilities as a supervisor?
6    A.    No.  No.  I was a secretary still.
7    Q.    Okay.
8    A.    And I was very good at it.  And I guess I
9  knew the responsibilities of holding a conference.
10    Q.    In your opinion -- do you know what the word
11  "fungible" means?
12    A.    No.
13    Q.    Do you know what -- in your opinion, do you
14  think that it's easier to find someone to be a
15  competent secretary than it is to find someone to be
16  a competent manager?  In other words, do you agree
17  that good managers are harder to find --
18    A.    Yes.
19    Q.    -- than good secretaries?
20    A.    Yes.
21    Q.    And would you agree that your secretarial
22  duties were more easily absorbed by others than it
23  would for management to find a replacement for you as
24  a supervisor?
25    A.    Yes, but I did not want to become a

166

1    supervisor.

2        Q.    I know.  It was your personal preference not

3    to be a supervisor?

4        A.    Yes.

5        Q.    But management felt that it was -- you were

6    needed there as part of -- it was good for the whole,

7    good for the team?

8        A.    It was not good for my health.

9        Q.    Not good for you.  Is that really what this

10   case comes down to, management put you in a position

11   that you didn't want and it was stressing you out

12   because management felt it was better for the

13   organization?

14       A.    No.  It was because of retaliation.

15       Q.    And you feel that it was because of

16   retaliation, because you can think of no other reason

17   why they would not honor your request?

18       A.    Exactly.

19       Q.    Because you were a 25-year employee and a

20   valued employee?

21       A.    You don't do that to your valued employee,

22   by telling them go find another job or another

23   detail.

24       Q.    That's why you came to the subjective

25   opinion that it must be retaliation, because you

1    can't think of any other legitimate reason.  Is that

2    really what the case comes down to?

3         A.    Yes.

4         Q.    Did Atkins ever tell you that while you

5    performed -- well, while in your position as

6    secretary, your replacements also performed as well?

7    Did he ever tell you that, make that statement, "Hey,

8    you were a good secretary, but the people that

9    replaced you, they were good secretaries"?

10        A.    He said that in his affidavit.

11        Q.    Did he ever tell you that verbally?

12        A.    What he told me verbally, Kaycee was not as

13   good as I was.  And after I left and they made some

14   changes, Kaycee was no longer his secretary.  So that

15   says a lot.  He had another secretary.

16        Q.    Okay.

17             So do you believe that your successors were

18   not as good as you as being secretaries?

19        A.    I know they were not good as me.

20        Q.    Who was your successor as a supervisor?

21        A.    Barbara Mendes.

22        Q.    How long did she last?

23        A.    She lasted until the RIF.

24        Q.    Okay.

25             Do you think, in your opinion, she was as

 1    good as you were?
 2        A.    I think she is -- yes, I think she was a
 3    very good supervisor, in my opinion.
 4        Q.    Okay.
 5              Do you feel -- and you felt -- I think
 6    you've told me this already.
 7              Do you feel you outperformed your
 8    predecessor when you were supervisor, in other words,
 9    that you were performing at a higher level, better
10    level than the person you were replacing?
11        A.    Of course.  Yes.
12        Q.    All right.
13              Did you ever tell Atkins about your
14    deteriorating mental state?
15        A.    No, because he never spoke to me --
16        Q.    Okay.
17        A.    -- except that one time when I told him I
18    was very unhappy and then again when I told him I
19    need to be removed.
20        Q.    What is meant by a "bid position"?
21        A.    Well, that was a wrong term I used because I
22    thought the bid position applied to an Inspection
23    Service, and it's not.  A bid position only applies
24    to a Postal Service.
25        Q.    So there are no bid positions among the

1    Inspector Services' clerical staff?

2        A.    Exactly.  However --

3        Q.    So you were mistakenly characterizing your

4    secretarial assignment as a bid position?

5        A.    It's considered a job of record.

6        Q.    Got it.

7              The Inspection Service support positions are

8    filled by EAS executive and administrative support?

9        A.    I'm sorry?

10       Q.    Is it true the Inspection Service support

11   positions are filled by executive and administrative

12   support nonbargaining unit?

13       A.    It's a nonbargaining unit, yes.

14       Q.    The employees?

15       A.    Yeah.

16       Q.    Yes?  Okay.

17             And is it true reassignments within the

18   Inspection Service are routine?

19       A.    Sorry?

20       Q.    Is it true that reassignments within the

21   Inspection Service are routine as EAS employees are

22   subject to periodic reassignments necessitated by the

23   changing needs of the division?  Is that a true

24   statement?

25       A.    Yes.

1        Q.    And is it also true -- do you know anything

2    about the Employee and Labor Relations Manual?

3        A.    Yes.

4        Q.    Do you know anything about Section 353.21?

5        A.    I don't know exactly.

6        Q.    Were you aware -- if you don't know, it's

7    okay to say, "I don't know" -- that that provision of

8    that manual provided, quote, "authorized management

9    officials may reassign nonbargaining employees

10   without following regular competitive procedures,"

11   end quote?

12       A.    I'm aware of that.

13             However, before that, before this detail,

14   remember, I met with the managers and specifically

15   told them I do not want to be reassigned, transferred

16   or demoted or retaliated in any way.  Because I knew

17   that they would try something like that.

18       Q.    How did you know that?

19       A.    Because of prior actions from Inspection

20   Service.  I've seen them do that.

21       Q.    Now, you've named some employees who had

22   been returned to positions held prior to details?

23       A.    Yes.

24       Q.    Were those EAS 11 operations technicians?

25       A.    I can't remember which ones.  You'll have to

```
 1    everybody who understood knew I was on that detail.

 2    That's why I gave you that new document.

 3        Q.    Okay.

 4              Let's talk a little bit more about that

 5    conversation with Sally Diaz.  Was that on July 13th,

 6    2005?

 7        A.    I -- it's either the 12th or 13th.  It's

 8    around there.

 9        Q.    July 2005?

10        A.    Yeah.

11        Q.    And you expressed your unhappiness with your

12    current assignment and management's decision not to

13    allow you to return to your prior job?

14        A.    That was one of many conversations I had

15    with her.

16        Q.    And that's what the conversation where

17    you -- do you recall saying, and I'm going to

18    actually quote, this is what Sally thinks that you

19    said.  You tell me if these are not the words that

20    you used.

21              Quote, "What do I have to do?  Do I have to

22    hurt myself to make it clear that I have to be

23    removed from the supervisory position," end quote.

24        A.    That's pretty close.

25        Q.    Yeah, it's pretty close.
```

174

1        And do you also remember remarking that you

2   would leave a letter behind that it was Atkins's

3   fault?

4        A.    No.

5        Q.    Okay.

6              Do you remember saying something that you

7   would blame Atkins?

8        A.    Yes.

9        Q.    And you don't remember anything about a

10  letter --

11       A.    No.

12       Q.    -- talking about --

13       A.    I probably would have said I would leave it

14  in writing because I had to file a EEO or stress or

15  something.  But I didn't mean like in a letter.

16       Q.    So there was a --

17       A.    It was not suicidal intent.

18       Q.    No, I understand.

19             You've never been suicidal?

20       A.    No.

21       Q.    You've never contemplated suicide?

22       A.    No.

23       Q.    You were just choosing those words for

24  dramatic effect?

25       A.    No, out of frustration.  I don't know if

175

1   it's dramatic, but it was frustrating.  I went to

2   every level manager.

3        Q.   Was it a cry for help?

4        A.   Yes.

5        Q.   Okay.

6             It was a different way of communicating what

7   you had been trying to tell management for the year

8   before?

9        A.   I'm not sure what you mean by that.

10       Q.   Okay.

11            Now, did Diaz initially offer to withhold

12  reporting those comments to management?  What did

13  Diaz tell you about whether she would tell management

14  or not tell management regarding the statement, "What

15  do I have to do, do I have no hurt myself," did she

16  ever make you any promises about that?

17       A.   She said -- she came back to me the next day

18  and said, "You know, that comment that you made," she

19  goes, "I" -- something; I can't recall the words, but

20  she has to report it to management.

21            And I says, "You know," I says, "Why?"  I

22  goes, "We" -- you know, I said, "I'm going to my

23  doctor this week.  I'm going to get a medical note

24  telling her if I'm under stress to remove me from the

25  position of supervisor."  She told me that's not

176

1    reassignment?

2         A.    It did.  Yes.

3         Q.    Okay.  All right.

4               Anyway, so as a result of all of this, two

5    days later, so that would be like Monday --

6         A.    Uh-huh.

7         Q.    -- July 18th, you were placed on

8    administrative leave?

9         A.    Yes.  She told me she and Atkins were going

10   to see me on Monday.

11        Q.    Okay.

12               And they gave you a letter to that effect?

13        A.    Yes.

14        Q.    And the letter referred to the events that

15   we're talking about?

16        A.    Yes.

17        Q.    And it also stated that your stress --

18        A.    But it never mentioned what I said.

19        Q.    Did it -- did the letter tell you that your

20   stress allegations would be reviewed?

21        A.    Yes.

22        Q.    And did they also tell you about the

23   Employee Assistance Program?

24        A.    Yes.  We did mention --

25        Q.    Did you take advantage of that program?

183

1    A.    No.

2    Q.    How come?

3    A.    I've been with the agency too long to know

4  that the EAP program works along the side or is

5  biased for the agency.

6    Q.    Okay.

7         Then somebody informed you you'd be

8  scheduled for a fitness-for-duty examination?

9    A.    They -- in the letter it said that.

10    Q.    Yeah, okay.

11         Oh, Bethel.  Bethel signed the letter for

12  Atkins?

13    A.    Yes.

14    Q.    And in the letter it said that you're going

15  to be scheduled for a fitness-for-duty examination?

16    A.    Yes.

17    Q.    And then on August 10th, 2005, you filed

18  your workers comp claim for work-related stress?

19    A.    Yes.

20    Q.    And on August 16th, 2005, Atkins sent you a

21  letter informing you that, "based on recent events,

22  management had become concerned that her

23  psychological distress may interfere with her ability

24  to continue as operations coordinator"?

25    A.    I received so many of these, I'm sorry.

1       A.    -- and going against my stress claim.  I

2    cannot believe what they say until I got a letter

3    from the Department of Labor saying they validate my

4    claim, so whatever the agency said or sent me that

5    letter, I'm sorry.

6       Q.    That's okay.  That's okay.  I just want to

7    understand the full extent of your grievance.

8       A.    If they really thought I was stressed, they

9    would support it.  But it took that long and all that

10   stress and all that nasty comments.

11      Q.    And you're doing a really good job at

12   expressing both emotionally and logically the nature

13   of the claims you're making.  You're doing a good

14   job.  I know it's hard.  We're almost done.  Thanks

15   for your patience.

16          So anyway, the fitness-for-duty examination

17   was -- went forward?

18      A.    Yes.

19      Q.    And that was with Dr. Brodski,

20   B-R-O-D-S-K-I?

21      A.    Yes.

22      Q.    And she diagnosed you with adjustment

23   disorder?

24      A.    It was a he.

25      Q.    Okay.

186

1          He diagnosed you with adjustment disorder

2     with depression?

3          A.    Yes.

4               I'm sorry, which doctor was this one?

5          Q.    What did Brodski -- do you recall what

6     Brodski diagnosed you with?

7          A.    1 first went to the agency doctor.  I don't

8     know which -- in the Postal Service.  I don't know if

9     it was Brodski.

10         Q.    Do you remember what the agency doctor

11    diagnosed you with?

12         A.    I have no idea.  I can't remember.  I'm

13    sorry.  This is the agency -- maybe this is the

14    doctor after the agency doctor.

15         MR. BACON:  You mean who the Department of Labor

16    sent you to after you had been evaluated by the

17    agency doc?

18         THE WITNESS:  We have an internal doctor in the

19    Postal Service.

20         MR. BACON:  Right.

21         THE WITNESS:  And I made a visit with him.

22         MR. SCHARF:  1t's okay.  We have the report.

23         THE WITNESS:  Yeah.

24         MR. SCHARF:  It's not that important that you

25    remember what's in the report or not.

1    BY MR. SCHARF:

2        Q.    In October of 2005, did you request to

3    return to work and be reassigned out of the

4    supervisory position?

5        A.    October?

6        Q.    So this is after the doctor appointment, the

7    fitness-for-duty examination.  Do you remember in

8    October of 2005 --

9        A.    Filing an EEO?  In my filing for EEO?  I

10   think.

11       Q.    Yeah, I'm not sure whether it was in

12   connection with EEO --

13       A.    Yeah.

14       Q.    -- or some other request.

15       A.    It had to be because I was thinking I

16   want --

17       Q.    Even after this.  So you're actually off

18   work at this point?

19       A.    Uh-huh.

20       Q.    Right?  Correct?

21       MR. BACON:    Yes?

22       THE WITNESS:    Yes.

23   BY MR. SCHARF:

24       Q.    And you're getting treatment, correct?

25       A.    I started to get treatment, yes.

1        Q.    Okay.

2              And even during this timeframe you were

3    asking to be reassigned back to your -- a secretary

4    position?

5        A.    Yes, because I was humiliated.

6        Q.    Okay.

7              And management offered a detail to the

8    Office of Inspector General?

9        A.    No, no, no.  No.  This is --

10       Q.    Did I mess up the timeframe?

11       A.    Yeah, you messed up the timeframe.

12       Q.    I'm not saying I know everything.

13             Did management offer you a detail to the

14   Office of Inspector General?

15       A.    No.

16       Q.    Okay.

17       A.    I found that.

18       Q.    Oh, you found it yourself?

19       A.    Yes.  Remember --

20       Q.    And you were trying to get them to do it,

21   to -- to detail you out to the Office of Inspector

22   General?

23       A.    Yes.

24       Q.    But they never did because of they were

25   unwilling to pay your salary?

1      A.    Yes.

2      Q.    Got it.

3      A.    But that was before.

4      Q.    Okay.  I understand.

5      A.    Before I filed stress and all.

6      Q.    Okay.  All right.  We've talked about

7    probably more than we needed to.  The chronology of

8    the events leading up to your -- the facts leading up

9    to the claims that you're making in this case.  We

10   haven't really talked too much about your damage

11   claims.

12           I take it you're making a claim for stress

13   in this case, compensation for your stress?

14     A.    Yes.

15     Q.    And that would include medical bills?

16     A.    Well, it's been taken care of by DOL, but I

17   want continued care.

18     Q.    Tell me what in terms of what you're looking

19   for out of this lawsuit.  Do you want to go back to

20   this agency?

21           Not really?

22     A.    No.

23     Q.    I mean -- and you told Dr. -- I think you

24   told Dr. Strassberg you don't want to go back there?

25     A.    No.

1          CERTIFICATE OF REPORTER

2

3          I hereby certify that the witness in the

4    foregoing deposition, MARILYN LEE, was by me duly

5    sworn to testify to the truth, the whole truth and

6    nothing but the truth, in the within-entitled cause;

7    that said deposition was taken at the time and place

8    herein named; that the deposition is a true record of

9    the witness's testimony as reported by me, a duly

10   certified shorthand reporter and a disinterested

11   person, and was thereafter transcribed into

12   typewriting by computer.

13          I further certify that I am not interested

14   in the outcome of the said action, nor connected with

15   nor related to any of the parties in said action, nor

16   to their respective counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18   hand this 13th day of January, 2008.

19

20

21

22   _____

23   CHRISTINE   L. JORDAN, CSR #12262

24   STATE OF CALIFORNIA

25