# Exhibit B

WILLIAM ATKINS - APRIL 18, 2008

```
 1

 2

 3                UNITED STATES DISTRICT COURT

 4            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 5                   SAN FRANCISCO DIVISION

 6

 7  MARILYN LEE,                    )
                                    )            Case No.
 8                   Plaintiff,     )        C07 254 SBA
          vs.                       )
 9                                  )           Volume I
    JOHN E. POTTER, UNITED STATES   )
10  POSTMASTER GENERAL,             )
                                    )
11                                  )     Pages 1 thru 214
                     Defendant.     )
12  _____)

13

14                      Deposition of

15                     WILLIAM ATKINS

16                     April 18, 2008

17

18

19  Reported By:

20  CYNTHIA J. POLISERI CSR # 11448

21  -----------------------------------------------------------

22              JAN BROWN & ASSOCIATES

23            CERTIFIED SHORTHAND REPORTERS

24  701 Battery St., 3rd Floor, San Francisco, California 94111

25              (800) 522-7096  (415) 981-3498
```

COPY

1

1    A.    Until September 1998.

2    Q.    And then where did you go?

3    A.    I went to Seattle.

4    Q.    And were you still a team leader in Seattle?

5    A.    I became an assistant inspector in charge in Seattle.

6    Q.    And then how long did you work as an assistant

7          inspector in charge?  First of all, did you have the

8          assistant inspector in charge position upon arriving

9          in Seattle in September of 1998?

10   A.    Yes.

11   Q.    How long did you work there?

12   A.    Until September 2003.

13   Q.    And then in September of 2003, you came to San

14         Francisco, correct?

15   A.    Correct.

16   Q.    How did you obtain the position in San Francisco?

17   A.    The chief postal inspector promoted me.

18   Q.    Who was that?

19   A.    Lee R. Heath, H-E-A-T-H.

20   Q.    And where was Heath located at the time you got this

21         promotion?

22   A.    Washington, DC.

23   Q.    Did you know Mr. Heath prior to September 2003?

24   A.    Yes.

25   Q.    When did you first meet with Heath?

13

WILLIAM ATKINS - APRIL 18, 2008

1           kept the same title?

2    A.     She bid on the same job in San Francisco and got it,

3           so she transferred as an admin specialist.

4    Q.     How soon before you came here did Castor come, if you

5           know?

6    A.     It was at least a year.  I don't recall exactly.

7    Q.     And then she reported to you both in Seattle and then

8           also in San Francisco when you came here?

9    A.     Yes.

10   Q.     Were you a social friend with Sheilah Castor?

11   A.     No.

12   Q.     Has she ever been to your house or visited socially?

13   A.     She has once at a party I had.

14   Q.     Did Sheilah Castor tell you anything about San

15          Francisco before you arrived since she had come here

16          first?

17   A.     I don't recall that she did.

18   Q.     And AIC Gamache, G-A-M-A-C-H-E, do you know who that

19          is?

20   A.     Yes, I do.

21   Q.     Who is that?

22   A.     He was one of the AICs in San Francisco before I got

23          here.

24   Q.     And was he removed from his position, if you know?

25   A.     He was not.  No, he was not.

                                                              21

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   And was he your predecessor?

2   A.   No.

3   Q.   What was he in San Francisco?

4   A.   I don't know.

5   Q.   Prior to your being here?

6   A.   Yes.

7   Q.   Did anyone ever tell you that Gamache had been

8        removed from his position in San Francisco?

9   A.   No.

10  Q.   And do you know a person named Nedd, N-E-D-D?

11  A.   Yes, I do.

12  Q.   Who is that?

13  A.   She was the other AIC in San Francisco prior to my

14       arriving.

15  Q.   And do you know if she was removed from her position?

16  A.   She was not removed.

17  Q.   Do you know what circumstances led to her leaving San

18       Francisco?

19  A.   She got a promotion.

20  Q.   Where to?

21  A.   Washington, DC.

22  Q.   Who was the inspector-in-charge right before your

23       arrival here?  Do you know?

24  A.   Allan Kiel, K-I-E-L.

25  Q.   Did you know Allan Kiel before you came to San

22

1          Francisco?

2    A.    Yes.

3    Q.    And how long did you know Allan Kiel?

4    A.    Ten years.

5    Q.    Did you talk to Allan Kiel at all before you had your

6          position in San Francisco?

7    A.    No.

8    Q.    And do you know the circumstances how Kiel left San

9          Francisco?

10   A.    No.

11   Q.    You don't know if he retired or transferred?

12   A.    I know he retired.

13   Q.    When did he retire?

14   A.    I believe it was June of 2003.

15   Q.    Do you know why he retired in June of 2003?

16   A.    No, I do not.

17   Q.    Do you know if his retirement was voluntary or

18         involuntary?

19   A.    Don't know.

20   Q.    Did anyone ever tell you that Kiel was forced to

21         resign or forced to retire?

22   A.    No.

23   Q.    No one ever told you that?

24   A.    Nope.

25   Q.    Were Nedd and Kiel and Gamache all serving in San

                                                              23

WILLIAM ATKINS - APRIL 18, 2008

1          Francisco at the same time or different times, if you
2          know?
3     A.   There were all there at the same time before I
4          arrived.
5     Q.   And all three managers left prior to your arrival,
6          correct?
7     A.   Correct.
8     Q.   Have you ever known three managers to all leave their
9          positions from one division before?
10    A.   I can't think of an example, no.
11    Q.   Did you ever have any conversations with Heath about
12         these three individuals, Nedd and Kiel and Gamache?
13    A.   I don't believe I did, no.
14    Q.   Do you know if you ever looked at any surveys that
15         had been sent to employees in the San Francisco
16         division shortly after you arrived?
17    A.   I do not.
18    Q.   I don't know that you have this.  I think there's
19         some other documents you wanted from Marilyn's
20         deposition, and I'm putting that together.
21             I'd like to show you -- we might as well mark
22         this as Plaintiff's 1.
23                          (Whereupon a letter dated May 28, 2003
                            attached to an employee evaluation
24                          form was marked for identification as
                            Plaintiff's Exhibit No. 1.)
25

                                                              24

1    Q.    Do you know if anyone had made any complaints about

2          the selection?

3    A.    I don't remember specifics, no.

4    Q.    Do you recall anything generally?

5    A.    There's always a grumbling when someone gets promoted

6          and someone doesn't.  I don't remember who did the

7          grumbling and what was said, but that's typically

8          done in the inspection service.

9    Q.    So you were aware that some people were unhappy about

10         it?

11   A.    Well, you're saying unhappy; I say grumbling.  I

12         don't know that anyone was unhappy.  They were

13         grumbling.

14   Q.    Who was grumbling?

15   A.    I don't recall.

16   Q.    Did you ever talk to Marilyn Lee about Wanda Smith?

17   A.    Um, if I did, I don't remember.

18   Q.    Did you ever make comments to anyone in the San

19         Francisco division that they were not to cooperate or

20         work with the OIG?

21   A.    No, I did not.

22   Q.    You said that you were told, I guess, three things;

23         that it was an unhappy division, there was bad morale

24         and bad management about San Francisco.

25              Were you told also that --

26

WILLIAM ATKINS - APRIL 18, 2008

```
 1                   MR. SCHARF:  And decreased productivity.

 2                   MR. BACON:  And what was the other?

 3                   MR. SCHARF:  I have his testimony as

 4         including low or decreased productivity.  Unhappy,

 5         low morale, low or decreased productivity and bad

 6         management.

 7                   MR. BACON:

 8    Q.   Is that correct?

 9    A.   That's correct.

10    Q.   Yeah, thank you.  Were you aware of anyone

11         complaining that it was a hostile work environment in

12         San Francisco?

13                   MR. SCHARF:  I'm going to object on the

14         grounds that "hostile work environment" is ambiguous.

15         Do you mean it in the EEO sense?

16                   MR. BACON:  Yes.

17                   MR. SCHARF:  In the legal sense?

18                   MR. BACON:  Yes.

19                   MR. SCHARF:  And then we're assuming that

20         the witness is not a lawyer, understands what -- how

21         the Ninth Circuit has defined "hostile work

22         environment," what are the elements constituting a

23         hostile work environment.  So I'm not so sure that

24         the witness is competent to answer that question

25         because he may not know how we, as lawyers, are
```

                                                        27

WILLIAM ATKINS - APRIL 18, 2008

1       defining that phrase.  Can you define it for him?

2              MR. BACON:  I would define it listed in the

3       EEO rules and regulations that you mentioned earlier.

4   Q.  Have you ever heard the phrase "hostile work

5       environment" before?

6   A.  Yes.

7   Q.  What does a hostile work environment mean to you?

8       What is the definition of that according to your

9       understanding?

10             MR. SCHARF:  Objection, calls for

11      speculation.  You can answer.

12             THE WITNESS:  I can answer?

13             MR. SCHARF:  You can.

14             THE WITNESS:  A situation that causes stress

15      and anxiety based on arbitrary or ineffective

16      management style or technique.

17             MR. BACON:

18  Q.  And had anyone ever told you that there were people

19      complaining that San Francisco was a hostile work

20      environment for them?

21  A.  Uh, I probably have heard that, yes.

22  Q.  And do you know who was complaining about that or who

23      you heard it from, either one?

24  A.  I don't remember specifically, but a lot of people

25      felt that it was probably a tense division.

28

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   Were there a lot of EEO complaints in San Francisco

2        at the time you arrived?

3   A.   I don't know how many EEO complaints that they had.

4   Q.   As the inspector in charge, would you be apprised of

5        that fact or those statistics, or would that be

6        something that would not have necessarily come to

7        your attention?

8   A.   The EEOs that come to my attention are ones that

9        happened after I became inspector in charge, but

10       quite frankly I don't keep track of the number then.

11       That's something that my legal counsel does.  So, no,

12       I -- I don't know.

13  Q.   Was Marion Post at the San Francisco division when

14       Marilyn Lee was detailed as an administrative center

15       supervisor?

16  A.   I don't recall.

17  Q.   What was Marion Post's position with the San

18       Francisco division?

19  A.   She was an assistant inspector in charge, and she was

20       acting inspecting -- assistant inspector in charge

21       prior to that.

22  Q.   Do you know if Marion Post filed an EEO or any

23       complaint that named you as a discriminating

24       official?

25  A.   I believe she did.

                                                          29

1          signed in San Francisco before you arrived in San

2          Francisco?

3   A.     Yes.

4   Q.     Who told you about the petition?

5   A.     I believe it was probably Mike Ahern.

6   Q.     And how soon before you came to San Francisco were

7          you told by Mike Ahern about this petition?

8   A.     Once I got the promotion and showed up in San

9          Francisco, it was sixty days.  So sometime in that

10         60-day period.

11  Q.     What did he say about the petition, Mr. Ahern?

12  A.     He did not have a lot of detail about the petition,

13         just that a group of employees signed a petition

14         indicating there were poor -- there was poor

15         management, poor morale in the San Francisco

16         division.  And they wanted it looked into.

17  Q.     Was Wanda Smith mentioned at all in conjunction with

18         that petition?

19  A.     No names were mentioned in association with that

20         petition.

21  Q.     Well, you say he told you "a group of employees."

22         How did he know it was a group of employee as opposed

23         to one employee?

24              MR. SCHARF:  How did he, Ahern, know?

25              MR. BACON:  Yeah.

                                                            31

WILLIAM ATKINS - APRIL 18, 2008

```
 1              MR. SCHARF:  Objection, calls for
 2        speculation.
 3              MR. BACON:
 4   Q.   If you know.  Did he tell you how he knew it was a
 5        group of employees?
 6   A.   I didn't ask; he didn't say.
 7   Q.   Did you ask who any of the individuals were that had
 8        signed the petition?
 9   A.   No.
10   Q.   Did you ever ask anyone who had signed the petition?
11   A.   No.
12   Q.   Did you ever see the petition?
13   A.   No.
14   Q.   Did Mr. Ahern tell you why he was telling you about
15        the petition?
16   A.   He told me because he wanted to give me a background
17        on some of the issues that involved the division,
18        some of the things I would be walking into and some
19        of the things I needed to address as the new
20        inspector in charge.
21   Q.   What were some of the issues that you learned in your
22        discussion with Ahern that you would have to face
23        coming to San Francisco?
24   A.   Like I said, bad employee morale, bad productivity,
25        inefficient management practices, all of those
```

                                                              32

```
 1          things.
 2    Q.    Did you ever have any discussions with Marion Post
 3          about the petition?
 4    A.    No.
 5    Q.    Did you ever have any discussions with Marion Post
 6          about Marilyn Lee's OIG detail?
 7    A.    I don't even know if she was there.  I don't recall.
 8          Possibly.  If she was there, probably 'cause she
 9          would have been working for me.
10    Q.    You don't have any independent recollection of ever
11          discussing that with her?
12    A.    No.
13    Q.    Have you ever talked to Marion Post about Marilyn Lee
14          filing a stress claim or an EEO claim?
15    A.    If she was there during that time, then I would have
16          talked to her because it would have been her
17          responsibility.
18    Q.    Again, you don't have any recollection as you sit
19          here today?
20    A.    I don't recall who was AIC at which time, and I don't
21          remember what exact dates we're even talking about.
22    Q.    Did you ever tell Marion Post that you could not
23          trust Marilyn Lee to be your secretary?
24    A.    No, I did not say that.
25    Q.    Did you ever tell anyone that you could not trust
```

33

WILLIAM ATKINS - APRIL 18, 2008

```
 1           Marilyn Lee to be your secretary?
 2   A.    No, I didn't.
 3   Q.    Did anyone ever suggest to you or talk to you about
 4         removing Marilyn Lee as your secretary?
 5   A.    No.
 6   Q.    Prior to coming to San Francisco, you had not met
 7         Marilyn Lee, correct?
 8   A.    I may have met her just at a training session or
 9         something, but I don't recall.  I didn't know her.
10   Q.    How did she perform as a secretary?
11   A.    Very good.
12   Q.    Were you satisfied with her work?
13   A.    Yes, I was.
14   Q.    How would you rate her as an employee, as a
15         secretary?  Did you give her an evaluation?
16   A.    Yes, I did.
17   Q.    This would be, I guess, Number 2.
18
19                    (Whereupon a year-end evaluation dated
                       November 5, 2004 was marked for
20                     identification as Plaintiff's Exhibit
                       No. 2.)
21
22           MR. SCHARF:  Let's give him time to read it.
23           MR. BACON:  Just let us know when you finish
24         reading it.
25
```

                                                            34

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | A. | It's my opinion. |
| 2 | Q. | But you don't have any medical training, do you? |
| 3 | A. | No, I don't. |
| 4 | Q. | Did you ever consult with any doctors at all about |
| 5 | | seeing Marilyn Lee tear up and cry and so forth? |
| 6 | A. | No. |
| 7 | Q. | You say "Marilyn has proved" -- this is in the second |
| 8 | | paragraph.  "Marilyn has proved she can address |
| 9 | | significant problem areas and come up with equitable |
| 10 | | solutions." |
| 11 | | What problems area did she address, and what did |
| 12 | | she come up with? |
| 13 | A. | Morale issues; she solved morale issues. |
| 14 | | Organizational issues; she reorganized more equitable |
| 15 | | distribution of the workload.  She just came up with |
| 16 | | better ways to do the job that was more fair to the |
| 17 | | employees, and they appreciated that. |
| 18 | Q. | Were you appreciative of what she did and how she |
| 19 | | worked? |
| 20 | A. | Yes. |
| 21 | Q. | So why didn't you consider her request to be returned |
| 22 | | to the secretary position? |
| 23 | A. | I did consider it. |
| 24 | Q. | How did you consider it? |
| 25 | A. | I considered my options as to her replacement and how |

46

```
 1            the division would suffer if I did take her out of
 2            that position, and I could not afford to do that.
 3     Q.     Now, I want to understand here, and again on the
 4            third paragraph -- at the time you wrote this, you
 5            say that she took over this at your personal request.
 6                 What do you mean by that in context of your
 7            earlier clarification?  What was your personal
 8            request that you were talking about there?
 9     A.     My personal request was that, if you want a
10            promotional opportunity, here it is.  This is the
11            job.
12     Q.     And then what did you mean at the time you wrote it
13            when you said, "and not because it was a position she
14            desired"?
15     A.     Like I said, she had reservations about supervising
16            people.
17     Q.     Didn't she tell you she didn't want to take the
18            supervisory position?
19     A.     I left it up to her.
20     Q.     Well, was it a request, or was it a mandate from you
21            to take this position?
22     A.     A request is not a mandate.
23     Q.     I said, is it a request, or is it a mandate?
24     A.     It was a request.
25     Q.     So it wasn't a mandate.  So why would you not
```

47

```
 1                    MR. BACON:
 2   Q.    I want to know why, if it's not a mandate, that you
 3         mandated she stay in the position?
 4   A.    I answered that question.  I talked with my
 5         administrative supervisor.  I discussed it with
 6         everybody involved, and we all came to the
 7         realization that there was just nobody to replace
 8         her.  I explained that to Marilyn.  There was nobody
 9         competent to replace her.  I was not going to leave
10         that very valuable position open when I had a
11         competent replacement as her secretary.  That would
12         leave me vulnerable.  I could not do that.
13   Q.    Well, it left you vulnerable later on, correct, when
14         she was removed from the position?
15                    MR. SCHARF:  Objection, argumentative.  You
16         can answer.
17                    THE WITNESS:  I couldn't foresee that.
18                    MR. BACON:
19   Q.    Maybe her behavior wasn't manipulative then, right?
20                    MR. SCHARF:  Objection, argumentative.  You
21         definitely don't need to answer that question.
22                    MR. BACON:
23   Q.    Why do you say she was manipulative?
24   A.    Because she would only cry when she wanted something.
25   Q.    How many times did you see her crying during this
```

49

```
 1        three- or four-month period that she had first
 2        started working as a supervisor?
 3   A.   I don't think I did.
 4   Q.   Did you talk to her at all during that three or four
 5        months while she was working as a supervisor?
 6   A.   Absolutely.
 7   Q.   How many times a day would you talk to her?
 8   A.   I can't give you a number, but I'd stop by daily.
 9   Q.   Who was the administrative supervisor you mentioned
10        that you talked to about this?
11   A.   Sheilah Castor.
12   Q.   Did Sheilah Castor tell you that she saw Marilyn Lee
13        exhibiting signs showing severe stress on the job?
14   A.   She did not say that, no.
15   Q.   She never said that to you?
16   A.   She did not.
17   Q.   How many EEOs were filed naming you as a
18        discriminating official while you were in San
19        Francisco?
20   A.   I don't know.
21   Q.   More than ten?
22   A.   I don't know.  I doubt it.  I don't think so.
23   Q.   How many EEOs were filed against you naming you as a
24        discriminating official in your whole career?
25   A.   I'm sorry?
```

50

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    During your whole career.

2    A.    I don't know that number either.

3    Q.    Were there a high amount of EEOs in San Francisco

4          according to your discussions with Ahern and Heath

5          prior to taking the job?

6                MR. SCHARF:  Objection, the word "high" is

7          ambiguous.  You can answer.

8                THE WITNESS:  They said there was a -- they

9          used the word "high," but I don't know what the

10         number is.

11               MR. BACON:

12   Q.    Who in particular told you that there was a high

13         number of EEOs in San Francisco?

14   A.    Either Ahern or Heath.

15   Q.    Have you ever filed an EEO yourself?

16   A.    No.

17   Q.    And Marilyn Lee filed a stress claim while you were

18         the person in charge in the San Francisco division,

19         correct?

20   A.    That's correct.

21   Q.    And were you apprised of that stress claim?

22   A.    Yes.

23   Q.    Who told you about it?

24   A.    Probably Ed Lawee.

25   Q.    And when you were told by Ed Lawee about the stress

51

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | | claim of Marilyn Lee, what was your response? |
| 2 | | MR. SCHARF:  Since Ed is agency counsel, I'm |
| 3 | | going to instruct the witness not to testify as to |
| 4 | | any statements he made to Ed or that Ed made to him. |
| 5 | | Independent of that privileged and confidential |
| 6 | | conversation, you may answer the question. |
| 7 | | THE WITNESS:  What was my reaction? |
| 8 | | MR. BACON: |
| 9 | Q. | Yeah. |
| 10 | A. | Was that the question?  I was surprised. |
| 11 | Q. | Why? |
| 12 | A. | Because I was unaware that things had gotten to that |
| 13 | | point. |
| 14 | Q. | And what do you mean when you say "things had gotten |
| 15 | | to that point"?  To what point? |
| 16 | A. | She's alleging she was stressed.  I didn't realize |
| 17 | | she was stressed.  So it was a surprise to me. |
| 18 | Q. | Did anyone else file any stress claims while you were |
| 19 | | in San Francisco other than Marilyn Lee? |
| 20 | A. | I don't think so. |
| 21 | Q. | Do you know who Spencer Chew was? |
| 22 | A. | I know the name. |
| 23 | Q. | Did he ever file an EEO to your knowledge? |
| 24 | A. | Against me? |
| 25 | Q. | Against anyone in San Francisco? |

52

WILLIAM ATKINS - APRIL 18, 2008

```
 1   Q.   And what's his responsibilities, just briefly, as the
 2        chief legal counsel?
 3   A.   All of the legal representatives in the field report
 4        to him, and I really -- I think he helps make policy
 5        and procedures for the inspection service.
 6   Q.   Was he out here in San Francisco at all at any time
 7        to assist you either when you first came out or
 8        during the time you served in San Francisco?
 9   A.   He's been out several times.
10   Q.   And then at one point you had also assigned Marilyn
11        Lee to an OIG detail.  Do you recall that?
12   A.   She was never assigned to an OIG detail.
13   Q.   Now, what word would you put there to say she was
14        what to the OIG detail?
15   A.   I don't understand what you're saying.
16   Q.   Well, did you ever tell her that she was going to be
17        placed in an OIG detail?
18   A.   I agreed with the SIC for the OIG that she could go
19        on that detail, yes.
20   Q.   And what is that called, detailing the person?  Or
21        what word do you use?
22   A.   We use detail because it was outside the agency.
23   Q.   Did you ever contact anyone at headquarter management
24        regarding Marilyn Lee's OIG detail?
25   A.   Yes, I did.
```

62

1    Q.    And who did you contact?

2    A.    My boss.

3    Q.    Mr. Ahern?

4    A.    I -- I don't know if it was Mike Ahern at that time

5          or if it was Tom Brady.  I don't recall.

6    Q.    And why did you contact them about that?

7    A.    To ensure that I was following proper procedures with

8          OIG details.  They had specific guidelines as to how

9          that was supposed to work, so I had to check to make

10         sure I was following those guidelines.

11   Q.    What did they tell you?

12   A.    Told me I couldn't do it unless the OIG picked up her

13         hours.

14   Q.    And when you say "picked up her hours," you mean the

15         other agency has to pay for it?

16   A.    They had to pay her salary.

17   Q.    Have you ever had occasion while you were in San

18         Francisco where someone was detailed to another

19         agency and San Francisco actually paid for the

20         detail?

21              MR. SCHARF:  While he was working in San

22         Francisco?

23              MR. BACON:  Correct.

24              THE WITNESS:  No.

25

                                                          63

1                    MR. BACON:

2    Q.    Did Marilyn Lee ever tell you she wanted to be

3          returned to the secretary position?

4    A.    Yes.

5    Q.    And I apologize if I asked, but I think you said

6          three to four months she didn't like being

7          supervisor.  Would you say it's three or four months

8          into it the first time she complained about being a

9          supervisor?

10   A.    As I recall.

11   Q.    Did you ever contact anyone at headquarter management

12         regarding Ms. Lee's request to be removed from the

13         supervisory position?

14   A.    No.

15   Q.    Why did you not report this to anyone in upper

16         management?

17   A.    It was my decision to make.

18   Q.    But you had earlier said that you contacted them to

19         make sure you were following the rules and

20         regulations.  Why didn't you contact them in this

21         instance when she had asked to be returned?

22   A.    Like I said, we had new specific rules as to details

23         with the OIG, and I wanted to make sure those rules

24         were followed.

25   Q.    Did you ever discuss with any manager the fact that

                                                              64

WILLIAM ATKINS - APRIL 18, 2008

1        making this request of you?

2  A.   That's correct.

3  Q.   Didn't Inspector Hang tell you why he was making the

4        request?

5  A.   Yes, he did.

6  Q.   What did he say?

7  A.   He said Marilyn Lee had called him and asked him to

8        intercede for her.

9  Q.   Did he say he had seen her exhibiting any signs of

10       stress?

11  A.   No.

12  Q.   Did he tell you that Marilyn Lee had made the request

13       of him because she was very stressed in her position?

14  A.   No.

15  Q.   Did you ever tell Mr. Wisniewski that Marilyn Lee was

16       detailed as the administrator center supervisor?

17  A.   No.

18  Q.   Same question with reference to Donnelly.

19          Did you ever tell Donnelly?

20  A.   No.

21  Q.   Was Marilyn Lee ever sent to any supervisory training

22       prior to being reassigned as a supervisor?

23  A.   Prior to being reassigned?

24  Q.   Yes.

25  A.   Not by me.

66

WILLIAM ATKINS - APRIL 18, 2008

1      those employees who were not producing --

2  A.   I do not know.

3  Q.   But wouldn't that be important to know, if you're

4       going to make a proper assignment, whether the person

5       was actually qualified and prepared for the job?

6  A.   Not in this instance.

7  Q.   Why not?

8  A.   Because in this instance I had four people to choose

9       from.  And I knew all four of them very well.  And

10      she was -- she had the inter-personal skills; she had

11      the organizational skills; and she had the knowledge

12      of the inspection service much and far superior to

13      the other three.  So given that she had all of these

14      other factors that the other three didn't possess,

15      even without supervisory skills, she was still going

16      to be better, I felt, than the other three.

17 Q.   Just so we're clear, you said she was better than the

18      other four, did you say?

19 A.   Three.  There were four total.

20 Q.   What are the names of the other people you're talking

21      about?

22 A.   Anita Cabano, Kaycee Graham, and I forgot the third.

23      I forget the third name.

24          MR. SCHARF:  If you want us to help, we can

25      figure it out.

68

```
 1                    MR. BACON:  No, I --
 2   Q.   Would Mendez be the other person?
 3   A.   Yes, it is.
 4   Q.   What about Sheilah Castor?
 5   A.   What about Sheilah Castor?
 6   Q.   Was she also eligible for that position?
 7   A.   No.
 8   Q.   Why not?
 9   A.   She was a level 21.
10   Q.   Okay.  Starting with Cabano, why would she not be
11        qualified for that job?
12   A.   She was autocratic and dictatorial.
13   Q.   In fact, she was in the position prior to you putting
14        Marilyn Lee in it, correct?
15   A.   That's correct.
16   Q.   How long had she been in that position, if you know?
17   A.   I don't know.
18   Q.   Why do you say she was autocratic?
19   A.   Because she was.  I'm her supervisor.
20   Q.   Did anyone ever accuse you of being autocratic?
21   A.   No.
22   Q.   What about Kaycee Graham?  Why was she not available
23        for that position?
24   A.   Same description.
25   Q.   She was also autocratic?
```

69

WILLIAM ATKINS - APRIL 18, 2008

1  A.    And dictatorial.

2  Q.    And dictatorial?

3  A.    Correct.

4  Q.    Did you dictate to Marilyn Lee that she had to stay

5        in that position when she complained to you three or

6        four months into working in it?

7  A.    Yes, I did.

8  Q.    So it could be claimed that you're dictatorial,

9        couldn't it?

10            MR. SCHARF:  Objection, argumentative.

11       Don't answer the question.  Next question.

12            MR. BACON:

13 Q.    Why is Kaycee Graham and Ms. Cabano somehow

14       dictatorial?  Give me a example of why they're

15       dictatorial in your view.

16 A.    Their management style consists of, "You will do

17       this.  You will do that.  You will not ask questions,

18       and I don't have to give you reasons."  They didn't

19       listen to input.  They didn't think of better ways to

20       do things, and they were insensitive to the needs of

21       their employees.

22 Q.    You don't think you were insensitive to the needs of

23       Marilyn Lee when she asked to be put back to the

24       secretary position?

25            MR. SCHARF:  Objection, argumentative.  You

                                              70

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | | can answer that. |
| 2 | | THE WITNESS:  No, I don't. |
| 3 | | MR. BACON: |
| 4 | Q. | And then why is Mendez -- why was Mendez not |
| 5 | | qualified for that position as a supervisor? |
| 6 | A. | 'Cause she's basically a basic incompetent. |
| 7 | Q. | So you had a lot of people working under you who were |
| 8 | | autocratic, dictatorial and incompetent.  Is that |
| 9 | | your testimony? |
| 10 | A. | I'd say those three, yes. |
| 11 | Q. | Anyone else that would fit those descriptions of |
| 12 | | people who worked in San Francisco at the time you |
| 13 | | were there? |
| 14 | A. | Nobody comes to mind. |
| 15 | Q. | Do you know if Donnelly ever intended -- strike that. |
| 16 | | After Marilyn Lee became a supervisor, did you |
| 17 | | offer training for supervisory work then? |
| 18 | A. | I don't believe while she was supervisor any |
| 19 | | supervisory training came available. |
| 20 | Q. | So you don't have any knowledge of Marilyn Lee ever |
| 21 | | attending any supervisory training courses? |
| 22 | A. | I do not. |
| 23 | Q. | Did you ever have any discussions with Donnelly about |
| 24 | | supervisory training? |
| 25 | A. | No. |

71

WILLIAM ATKINS - APRIL 18, 2008

1  Q.  Did Donnelly ever ask you if Marilyn was reassigned
2      as a supervisor?
3  A.  Donnelly wasn't even in the division.  Donnelly was
4      gone before I got there.
5  Q.  Did you have any discussions with Donnelly at all
6      while Marilyn Lee was working for you?
7  A.  No, I don't think so.
8  Q.  Did your bosses at all suggest removing Marilyn Lee
9      as a secretary?
10 A.  No.
11 Q.  Where did the idea come to remove Marilyn Lee from
12     the secretary position?
13 A.  Marilyn Lee approached me and asked for an
14     opportunity to expand her resume so that she would be
15     more promotable, more competitive in the higher-level
16     opportunities that she knew were coming down the
17     road.  I told her that the only opportunity I had for
18     her was this supervisory job, to think about it and
19     let me know what she decided.  I was not going to
20     place her in a job unless she agreed to go.  I could
21     have, but I did not.
22 Q.  You said in the evaluation you wrote, which is
23     Exhibit 2, that she had -- her strength was her
24     supervisory abilities.
25        Why did you say that?  Why do you say that she

72

WILLIAM ATKINS - APRIL 18, 2008

```
 1        had -- her strength was supervisory abilities?
 2  A.    For the reasons that I've already given you.  She
 3        improved morale; she improved effectiveness; and she
 4        was more efficient in her operation which is exactly
 5        what I had asked her to do.
 6  Q.    Did anyone ever tell you that they did not trust
 7        Marilyn Lee as a secretary?
 8  A.    No.
 9  Q.    Were you given any awards during the time you were in
10        San Francisco?
11  A.    Was I?
12  Q.    Yes.
13  A.    Uh, yeah, I guess so, yes.
14  Q.    What awards did you get?
15  A.    I got a Bose radio from the deputy chief.
16  Q.    And who was the deputy chief?
17  A.    Tom Brady.  That's about it.  That's all I recall.
18  Q.    Did anyone ever accuse you of causing stress to
19        Marilyn Lee?
20              MR. SCHARF:  Other than Marilyn and her
21        stress claim?
22              MR. BACON:
23  Q.    Yes.
24  A.    No.
25  Q.    Was anyone ever reprimanded or disciplined in any way
```

73

WILLIAM ATKINS - APRIL 18, 2008

1   after Marilyn Lee filed her stress claim?  In other

2   words, was anyone ever criticized for not doing

3   something or failing to do something regarding

4   Marilyn Lee's stress claim?

5 A.  No.

6     MR. SCHARF:  I don't -- I'm sorry.  You may

7   understand the question.  I didn't get that question.

8   As a result --

9     MR. BACON:  Yes.

10     MR. SCHARF:  -- has anybody punished or

11   retaliated against -- as a result of Marilyn's filing

12   her stress claim?

13     MR. BACON:  Yes.

14     MR. SCHARF:  I don't think that's what you

15   said, but --

16     THE WITNESS:  That's what I thought he meant

17   too.

18     MR. SCHARF:  Okay.

19     THE WITNESS:  No, nobody was.

20     MR. BACON:  Okay.

21 Q.  Now, I've asked you I think already about the

22   petition discussions you had prior to coming to San

23   Francisco.

24    After you came to San Francisco, did you have any

25   discussions with anyone regarding the petition?

                                 74

WILLIAM ATKINS - APRIL 18, 2008

1   A.    Just one.

2   Q.    Who was that?

3   A.    Marilyn Lee.

4   Q.    So during the whole time you were in San Francisco,

5         you never discussed with anyone, other than Marilyn

6         Lee, about this petition.  Is that your testimony?

7   A.    That's correct.

8   Q.    Did you ever hear Mr. Kiel say he knew who had signed

9         the petition?

10  A.    I never saw Mr. Kiel, never talked to Mr. Kiel.

11  Q.    Did you ever hear from anyone else that Mr. Kiel had

12        approached Marilyn Lee about signing the petition?

13  A.    Yes, I heard it from Marilyn Lee.

14  Q.    Anyone else did you hear it from?

15  A.    No.

16  Q.    Did you do anything to inquire as to whether

17        Marilyn's statement was correct or not, whether

18        Mr. Kiel had inquired of her about the petition?

19  A.    No.

20  Q.    And when you talked about the petition before you

21        came to San Francisco, did anyone ever tell you that

22        they were upset about the petition or concerned about

23        the petition?

24  A.    I don't understand what you mean by "concerned."

25  Q.    Well, did anyone ever say that the petition raised

                                                            75

WILLIAM ATKINS - APRIL 18, 2008

```
 1             concerns for them about the issues contained in the
 2             petition?
 3    A.       They were obviously upset about the concerns that
 4             they didn't want those concerns to exist, but they
 5             were glad to be notified of those concerns so they
 6             could deal with them.
 7                     MR. SCHARF:  I need to take a break, okay?
 8
 9                          (Off the record at 11:47 a.m. and
10                           back on the record at 11:53 a.m.)
11
12                     MR. BACON:
13    Q.       Was there any discussion about whether the petition
14             played any role in the prior managers leaving San
15             Francisco?
16    A.       Yes.
17    Q.       What was that?
18    A.       That it was a factor in their at least recognizing
19             that there was a situation in San Francisco, and I
20             think it helped initiate this interest in resolving
21             those problems.
22    Q.       When you say that Marilyn Lee told you that she had
23             signed the petition, did she tell you what the
24             petition was about?
25    A.       I think she just assumed I already knew.  I don't
```

76

1    think she explained what the petition was, but I knew

2    what she was talking about.

3  Q.  What was she talking about that you knew?

4  A.  The petition that we were just discussing about prior

5    management.

6  Q.  Did she mention anything about Wanda Smith being

7    selected for a position as part of the petition?

8  A.  I don't recall anything about Wanda Smith.  I didn't

9    even know Wanda Smith at that time, so if she

10   mentioned it, it wouldn't have stuck in my head.

11  Q.  You don't recall whether she did or not?

12  A.  I do not recall.

13  Q.  Did you ever ask her in those discussions why she had

14   signed this petition?

15  A.  No, she volunteered the information.

16  Q.  What did she say as to why she signed it?

17  A.  It was kind of a -- it wasn't really a concise direct

18   reason, but I think it boiled down to that things had

19   just become intolerable morale-wise in the division,

20   and things were so inefficient and a lot of

21   favoritism going on that she felt like she had to

22   speak up.

23  Q.  Did you ever learn from anyone that there were

24   complaints about the selection of Wanda Smith for her

25   position?

77

WILLIAM ATKINS - APRIL 18, 2008

```
 1   Q.   Are you saying that all of her EEO filings lack
 2        merit?
 3   A.   Excuse me?
 4   Q.   Are you saying that all of her EEO filings lack
 5        merit?
 6             MR. SCHARF:  Objection, calls for
 7        speculation.  Calls for a legal conclusion.
 8             THE WITNESS:  Do you want me to answer?
 9             MR. SCHARF:  Sure.
10             THE WITNESS:  I would say most of them have
11        been overturned, yes.
12             MR. BACON:
13   Q.   Were you aware of a meeting that Marilyn Lee had
14        regarding this petition?
15   A.   Not unless she told me about it.
16   Q.   Well, as you sit here today, what's your
17        recollection?  Do you recall any discussion or
18        knowledge of that meeting?
19             MR. SCHARF:  And independent of anything
20        learned from counsel to prepare for this deposition,
21        obviously.
22             MR. BACON:
23   Q.   Yes.
24   A.   I don't recall, no.
25   Q.   So you weren't aware that Marilyn Lee had met with
```

80

WILLIAM ATKINS - APRIL 18, 2008

1      certain individuals in management about the petition

2      issue?

3   A.  No.

4   Q.  Do you know who James Birch was?

5   A.  Yes, I do.

6   Q.  Who was James Birch?

7   A.  He was the ombudsman.

8   Q.  What's the ombudsman?

9   A.  A ombudsman is an executive at headquarters who is in

10     a position that reports only to the chief.  He takes,

11     gathers information from the field regarding

12     disgruntled employees or people with grievances or

13     people that want to talk about situations in the

14     division that they can't go to management with, and

15     he attempts to resolve them through various methods.

16  Q.  And did you ever have any discussions with Mr. Birch?

17  A.  No.

18  Q.  So he never informed you of agreements that had been

19     made on behalf of Marilyn Lee?

20  A.  No.

21  Q.  I'd like to mark -- I think we're at 4.

22

23                      (Whereupon a page of emails dated June
                        13, 2003 was marked for identification
24                      as Plaintiff's Exhibit No. 4.)

25

                                                              81

WILLIAM ATKINS - APRIL 18, 2008

1   A.   No.

2   Q.   In your discussions with Marilyn Lee, did Wanda

3        Smith's name ever come up at all?

4   A.   I don't remember.

5   Q.   I think you said earlier you don't recall anyone

6        talking about Wanda Smith; is that correct?

7   A.   Nobody specifically, no.

8   Q.   Did anyone ever tell you that they did not want Lee

9        to remain in the position as a secretary?

10  A.   No.

11  Q.   At the time -- strike that.

12       When did Marilyn Lee leave the postal service?

13  A.   Leave the postal service?

14  Q.   Yes.

15  A.   July 2005, I believe.

16  Q.   And what were the circumstances?  As you sit here

17       today, do you recall how Marilyn Lee left the postal

18       service?

19  A.   I wasn't present when she left the postal service.

20       Are you talking about the instances that involved

21       what happened the day that she left?

22  Q.   Yes.

23  A.   She had had a conversation with acting inspector in

24       charge Sally Diaz wherein she said she was stressed

25       out and thinking about hurting herself, and she was

90

WILLIAM ATKINS - APRIL 18, 2008

1           going to leave a note blaming it all on me.

2              Ms. Diaz repeated the conversation to me later.

3           I immediately undertook an effort to get her for a

4           fitness-for-duty examination.  The letter was drawn

5           up with assistance of legal counsel, and it was

6           presented to her by ASE Rob Bethel.

7  Q.  Did the agency have a list of physicians that could

8           be used for fitness-for-duty exams?

9  A.  Yes.

10  Q.  Did you consult that list at the time you were

11          advised by Sally Diaz of her comments?

12  A.  I did not personally.

13  Q.  Was any attempt made to have Marilyn Lee evaluated

14          prior to her being removed from her position?

15  A.  No.

16  Q.  Why not?

17  A.  When someone's threatening possible suicide, then

18          it's prescribed.  The action I took was prescribed.

19  Q.  Well, you know, a lot of times we say, "Gee, I could

20          shoot that guy for something they said," and, of

21          course, we have no intention of doing such an act.

22             Tell me specifically, the best you can recall

23          what Sally Diaz heard Marilyn Lee saying that you

24          interpreted as a suicide threat?

25  A.  She said that she's stressed out by this assignment,

                                                         91

1      that she's been thinking about hurting herself, and

2      that she's going to leave a note that blames me for

3      her death.

4   Q.  Did you do anything to attempt to verify these

5      comments yourself by talking to Marilyn Lee?

6   A.  No.

7   Q.  Why not?

8   A.  Because that's -- I talked to legal counsel, and we

9      did what we did based on advice from legal counsel.

10  Q.  Well, since you already considered her a manipulative

11     employee, why would you think this is not

12     manipulation in this instance?

13  A.  I can't determine intent.  When an employee issues

14     forth those particular words, I have to take them

15     seriously, whoever it is.

16  Q.  But you didn't take the crying seriously, though,

17     when you saw her before, did you?

18         MR. SCHARF:  Objection, argumentative,

19     mischaracterizes his prior testimony.  You can

20     answer.

21         THE WITNESS:  Yes, I took them seriously.

22         MR. BACON:

23  Q.  So why didn't you have her evaluated for a

24     fitness-for-duty exam when you saw her crying many

25     months earlier?

92

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | A. | As I explained, we discussed -- each time that I saw |
| 2 | | it happen, I'd bring her into my office.  We would |
| 3 | | spend a considerable amount of time and considerable |
| 4 | | amount of Kleenex on her tears to discuss what issues |
| 5 | | were bothering her.  And she seemed better when she |
| 6 | | left, and she seemed to be over whatever incident had |
| 7 | | caused her crying episode. |
| 8 | Q. | How would you describe Marilyn Lee's performance |
| 9 | | overall as an employee of the postal service during |
| 10 | | your tenure in San Francisco? |
| 11 | A. | She was a good employee. |
| 12 | Q. | Does the comment that she's manipulative seem |
| 13 | | consistent with some someone who's a good employee or |
| 14 | | is that inconsistent? |
| 15 | A. | No, I don't think it's inconsistent. |
| 16 | Q. | How long from the day that Marilyn Lee was removed |
| 17 | | from the postal service until the time there was a |
| 18 | | fitness-for-duty exam?  Do you know? |
| 19 | A. | I have no idea. |
| 20 | Q. | Were you concerned? |
| 21 | A. | It wasn't something that I got involved with. |
| 22 | Q. | Were you concerned? |
| 23 | A. | Of course I was concerned. |
| 24 | Q. | Did you call her and check on her at all after she |
| 25 | | was removed from this service? |

93

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   And you can't cite any procedure or rule that says

2        any inspection service employees can be reassigned by

3        management in its discretion?

4   A.   I can't cite it, no.

5                 MR. SCHARF:  Why don't we take a little

6        break?  We'll be back in a minute.

7

8                      (Off the record at 12:33 p.m. and

9                       back on the record at 12:37 p.m.)

10

11                     (Whereupon a complaint for damages was
                        marked for identification as
12                      Plaintiff's Exhibit No. 5.)

13

14                MR. SCHARF:  Let's go back on the record.

15                MR. BACON:

16  Q.   Counsel has just stated that you want to clarify or

17       change your answer somehow -- can you.

18                MR. SCHARF:  I said "clarify," not "change"

19       his testimony about the manual.

20                THE WITNESS:  Could you read my answer back

21       to me?

22                     (Record read as requested.)

23

24                MR. BACON:  Let me go back and I'll --

25  Q.   I had asked you earlier about the employee labor

                                                            104

WILLIAM ATKINS - APRIL 18, 2008

1    manual regulations and rules regarding people being

2    put in temporary positions, and your answer was that

3    it did not apply because it did not apply to

4    inspection service employees.

5        Do you wish to clarify that?

6    A.    Yes, I do.

7    Q.    What?

8    A.    The clarification would be that the citation that you

9    stated does not specifically apply to the inspection

10   service because these employees are EAS employees,

11   and they're not whatever the postal service is at

12   that time.   There are very clear rules in the ENLM

13   that allow me to transfer my EAS employees to any

14   comparable position.

15   Q.    And do those rules require you to fill out paperwork

16   in order to do that?

17   A.    No, I don't believe they do.

18   Q.    So if you say that the agency has a need and you make

19   assignments, whether they're temporary or not,

20   there's no requirement to fill out any paperwork?

21   A.    That's correct.

22   Q.    So when someone is removed from a position and

23   reassigned, if there's no paperwork to reflect that,

24   how do you -- how do you account for the person being

25   paid in a different position or being recognized in

105

WILLIAM ATKINS - APRIL 18, 2008

```
 1          reassignment could lead to a permanent reassignment?

 2   A.     I don't know.  I don't recall.

 3   Q.     Did you use the word "reassignment" when you first

 4          talked to Marilyn Lee about taking this supervisory

 5          position?

 6   A.     I don't remember.

 7   Q.     If someone is reassigned, does that imply that it's

 8          temporary or permanent, or do you use some other word

 9          to limit the reassignment somehow or to be more

10          specific about the reassignment?

11   A.     Once again, it's at the needs of the division as to

12          whether things become permanent or they're temporary.

13          Employees -- EAS employee do not have retreat rights.

14          They do not have a right for the particular job that

15          they're in.  They can be moved at my discretion; they

16          can be left at the old position.  It depends on

17          management and the needs of the division.

18   Q.     Well, eventually Marilyn Lee was removed at your

19          direction, correct?

20   A.     She was not removed.

21   Q.     I thought she was -- hmm, so the day she left, the

22          last day she was there, how was it that she left the

23          postal service that day?

24   A.     You switched gears on me.  I wasn't there.  I can't

25          tell you the specifics of what happened.
```

108

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   Did you approve or know of her being escorted out of
2       the service that day?

3   A.   Yes.

4   Q.   And you approved of it even though you were not
5       there?

6   A.   Once again, there are prescribed ways of planning
7       situations like this.  And as far as I know, the
8       prescribed methods of handling it were followed.

9   Q.   Where were you at the time that she was there the
10      last day?

11   A.   I don't remember.

12   Q.   Did you know the day before or any time before that
13      day that she was going to be escorted out?

14   A.   When Sally Diaz told me of the conversation, my first
15      phone call was to legal.  And I was advised,
16      according to them, as to the steps to take.

17   Q.   Did you ever use the word -- when Marilyn Lee was
18      reassigned as a supervisor, did you ever use the
19      phrase "transferred to the supervisor position"?

20   A.   I don't know.

21   Q.   Does that have any significance in the postal service
22      if someone's transferred as opposed to reassigned?

23   A.   No, it doesn't.

24   Q.   How many times would you say Marilyn Lee complained
25      to you?  I think you said it was initially after

WILLIAM ATKINS - APRIL 18, 2008

```
 1   A.   You've asked that five times, and I've told you no
 2        the other four, no.
 3   Q.   She never brought that up?
 4   A.   If she did, I don't remember.
 5   Q.   Did Sheilah Castor tell you that she had complaints
 6        from Marilyn Lee about staying in that supervisory
 7        position?
 8   A.   Complaints?  Yes, she did.
 9   Q.   And what did Sheilah Castor tell you about Marilyn
10        Lee's complaints?
11   A.   Just that she was complaining about being a
12        supervisor.  She didn't want to be a supervisor.
13   Q.   Did Sheilah Castor tell you that she saw signs of
14        stress from Marilyn Lee?
15   A.   No.
16   Q.   And when you had this discussion with Diaz, did
17        Ms. Diaz tell you that Marilyn Lee had complained
18        prior to her about being in the supervisory position?
19   A.   Marilyn complained to everybody, yes.
20   Q.   When you say she complained to everybody, did she
21        complain to everybody about being in the supervisory
22        position?
23   A.   Yes.
24   Q.   Doesn't it sound like she was unhappy in that
25        position?
```

                                                          111

WILLIAM ATKINS - APRIL 18, 2008

1  Q.  Do you know if Cabano was ever given an award during

2      the time that you were in the San Francisco division?

3  A.  I don't remember.

4  Q.  Do you know if Kaycee Graham had ever received an

5      award while she was a supervisor in San Francisco?

6  A.  She wasn't a supervisor in San Francisco.

7  Q.  Where was she at?

8  A.  She was in Oakland.

9  Q.  Do you know if she was ever given an award in

10     Oakland?

11 A.  Um, she wasn't there very long, and I don't believe I

12     did.  No, I don't recall.

13 Q.  Did she work in San Francisco at all or just Oakland?

14 A.  I brought her to San Francisco.

15 Q.  Do you know if she had been given any award as an

16     employee while she was still in San Francisco?

17 A.  I believe she got one in San Francisco as my

18     secretary.

19 Q.  What was it for?

20 A.  Performance.

21 Q.  Why did you give Kaycee Graham an award for

22     performance?

23 A.  Because she had performance, good performance.

24 Q.  Was she a better performer than Marilyn Lee?

25 A.  In some ways she was better; in some ways she wasn't

                                                        118

1      better.

2  Q.   Did you ever nominate Marilyn Lee for any award while

3      she was your secretary?

4  A.   Yes, I did.

5  Q.   What awards did you not nominate her for?

6  A.   I don't recall.

7  Q.   Did she get the award?

8  A.   Yes.

9  Q.   What was the award?

10  A.  I just said I don't recall.

11  Q.  Okay.  You mentioned three employees that you didn't

12      feel were competent.  And you said O'Leery was not

13      available.  Was O'Leery competent to be a supervisor?

14  A.  I don't know anything about Ms. O'Leery.

15  Q.  And is the administration center supervisor level the

16      same pay level as the secretary position?

17  A.  Yes, it is.

18  Q.  Does the secretary position get overtime pay, or did

19      it?

20  A.  I think all 14s can get overtime pay, yeah.

21  Q.  How about the administration center supervisor

22      position?  Did that get overtime pay?

23  A.  I believe so.

24  Q.  I've asked you, and you've mentioned several names.

25      Is there anyone who came to you and said that Marilyn

119

1          Lee seemed very emotionally upset that you haven't

2          mentioned already?

3     A.   Not that I recall.

4     Q.   Did you ever threaten Marilyn Lee with

5          insubordination?  I mean that she would be considered

6          insubordinate if she continued to ask to be returned

7          to her secretary position?

8     A.   I don't recall that, no.

9     Q.   Did you ever make the threat of charges of

10         insubordination at any time to Marilyn Lee during the

11         time you were in San Francisco?

12    A.   I don't threaten people.

13    Q.   Did you ever say that you were going to consider her

14         insubordinate for any of her actions at any time

15         while you were in San Francisco?

16    A.   Marilyn Lee got insubordinate in her conversation.

17         She was disrespectful.  I don't remember if I said

18         the word insubordinate, but she was disrespectful.

19    Q.   Why would you say she was disrespectful?

20    A.   The way she spoke with me.

21    Q.   How did she speak that was disrespectful?

22    A.   With a lack of respect.

23    Q.   Like how?  Can you give my an example --

24    A.   No.

25    Q.   -- of what she said?

120

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    Did you have the authority to return Marilyn Lee to
2          the secretary position?
3    A.    Yes.
4    Q.    Under what authority?
5    A.    I'm the head official, head management official at
6          division headquarters.
7    Q.    So even if you had put her in that position
8          permanently, you have the authority to remove her and
9          put her back into another position?
10   A.    Yes.
11   Q.    So your refusal to put her back in the secretary
12         position was not as a result of any lack of authority
13         on your part, correct?
14   A.    I did not put her back in her job because of the
15         needs of the division.
16   Q.    But it's not because of any lack of authority,
17         correct?
18   A.    I told you.  I had the authority to do that, yes.
19   Q.    Would you have also had the authority to remove the
20         secretary who replaced Marilyn Lee?
21   A.    Refresh my memory.
22   Q.    After Marilyn Lee comes into the supervisory
23         position, you replaced her secretary position with
24         someone else?
25   A.    Okay.

                                                        122

WILLIAM ATKINS - APRIL 18, 2008

```
 1   Q.   Would you have had the authority to reverse that and
 2        take that person out of that position?
 3   A.   I went through four or five or six secretaries during
 4        my four years in San Francisco.
 5   Q.   So I take it that you would still have the authority
 6        to --
 7   A.   Yes.
 8   Q.   -- move them?  How many years were you in San
 9        Francisco again?  Four?
10   A.   Uh, four and a half.
11   Q.   Was Marilyn Lee the person who held the secretary
12        position the longest?
13   A.   No, I don't think so.
14   Q.   How would you rate her as a secretary compared to
15        these other four, five or six?
16   A.   Marilyn had certain knowledge the others didn't.  But
17        overall, the job of the other two, the two main ones
18        were on a par.
19   Q.   And who are these other people that were --
20   A.   Kaycee Graham and Anita Cabano.
21   Q.   And as far as authority goes, when someone would be
22        detailed to another agency like the OIG you also had
23        authority to offer those detailed assignments?
24   A.   Yes, but I do need agency approval to do that.
25   Q.   When you say "agency approval," are you talking just
```

123

WILLIAM ATKINS - APRIL 18, 2008

```
 1            to the postal agency or the other agency as well as
 2            cooperating?
 3    A.      By boss.
 4    Q.      And then I assume that, like in the instance where
 5            she had been offered the OIG detail, you had to have
 6            an agreement from the other side as well where she
 7            was going to be detailed, correct?
 8    A.      They wanted her, and I agreed to send her.  My bosses
 9            said no.
10    Q.      Had your bosses, to your knowledge, ever detailed
11            someone out and actually paid for the detail?
12    A.      I don't know.
13    Q.      Did your bosses tell you why she couldn't stay in the
14            OIG detail assignment?
15    A.      Yes.
16    Q.      What did they say?
17    A.      Because the OIG would not pay her salary.
18    Q.      Who was that that told you that?  Ahern or Brady?
19    A.      I think it was Brady.
20    Q.      And I think you said it in your statement -- I
21            haven't been through that yet, but it's your
22            testimony that you didn't see any evidence of stress
23            of Marilyn Lee both in the secretary position and the
24            supervisory position; is that correct?
25    A.      What I said is I've seen her in tears on occasions,
```

124

```
 1            but that was through the entire four years I was in
 2            San Francisco, three years I was in San Francisco.
 3     Q.     Did you ever approach Marilyn Lee about investigative
 4            analyst training in St. Louis?
 5     A.     I don't remember if I approached her or she
 6            approached me.
 7     Q.     Well, was Marilyn Lee eventually sent to St. Louis
 8            for investigative analyst training?
 9     A.     Yes, she was.
10     Q.     Why did you send her for that training?
11     A.     It was a developmental opportunity.
12     Q.     Was this investigative analyst training posted or
13            offered to anyone else in San Francisco?
14     A.     No.
15     Q.     Why not?
16     A.     'Cause I wanted her to have it.
17     Q.     Did you not want any others to have it?
18     A.     I wanted everybody to have it, but I've got one
19            position, so I had to pick and choose.
20     Q.     In other words, you only had one person you could
21            send?
22     A.     I could send one person.
23     Q.     Did any other employees complain when Marilyn Lee was
24            the employee that was sent to St. Louis for that
25            training?
```

125

WILLIAM ATKINS - APRIL 18, 2008

1   A.   Oh, yeah, just once.

2   Q.   You said before that Marilyn was insubordinate and

3        disrespectful.  Was she also -- do you consider that

4        rudeness, I think you said.  I'm not sure.

5   A.   That's another word for it.

6   Q.   Did you ever tell Ms. Castor that Marilyn Lee was

7        rude?

8   A.   Yes.

9   Q.   Why?  Why did you tell her that?

10  A.   Because that's her employee.

11  Q.   Did you ever tell Marilyn Lee that she was rude?

12  A.   Yes.

13  Q.   What did she say in response to that when you told

14       her that?

15  A.   I don't recall.

16  Q.   Have you ever been asked by any other employee during

17       your tenure anywhere in the postal service to be

18       returned to a previous position such as what Marilyn

19       Lee did?

20  A.   No, I don't believe so.

21  Q.   Did Marilyn Lee ever tell you in her conversation

22       with you that she felt she was in a hostile work

23       environment?

24  A.   No.

25  Q.   Did anyone else tell you that Marilyn Lee had

128

WILLIAM ATKINS - APRIL 18, 2008

1        complained about her work situation because it was a

2        hostile work environment?

3  A.    No.

4  Q.    Do you recall a meeting you had with Marilyn Lee

5        sometime around April of 2005 wherein each of you had

6        a witness there at a meeting?

7  A.    Refresh my memory.

8  Q.    This would have been with Kaycee Graham, and -- I'm

9        sorry.  I'll rephrase that.

10            In a meeting that you had with Marilyn Lee where

11       Kaycee Graham was the witness that you had present at

12       the meeting?

13 A.    I remember the meeting with the three of us, yeah.  I

14       don't remember the content.

15 Q.    Do you remember what the meeting was about?

16 A.    No.

17 Q.    And do you recall why you or how it was you chose

18       Kaycee Graham to be the witness in the meeting?

19 A.    I don't remember what the meeting was about.

20 Q.    Were you upset that Marilyn Lee was complaining, as

21       you say, to everyone else about being in the

22       supervisory position?

23 A.    I was upset that she was unhappy.

24 Q.    Did you ever tell Marilyn Lee that you felt that she

25       had turned on you --

                                                          129

WILLIAM ATKINS - APRIL 18, 2008

```
 1   Q.   You said earlier that you felt Marilyn Lee was
 2        insubordinate and disrespectful.  Did you ever say
 3        that you were going to given here a written reprimand
 4        or document her at all for insubordination?
 5   A.   No.
 6   Q.   Did you ever tell Marilyn Lee to stop crying when she
 7        was crying in your presence?
 8   A.   I don't think I'm quite that insensitive, no.
 9   Q.   Well, it wouldn't be insensitive if she was simply
10        being manipulative, would it?
11   A.   I --
12             MR. SCHARF:  Objection, argumentative.  You
13        don't need to answer that question.
14             MR. BACON:  It's not an argumentative
15        question.
16             MR. SCHARF:  It's a statement; it's not even
17        a question.
18             MR. BACON:
19   Q.   Did you ever talk to Ms. Diaz about the secretary
20        position being upgraded?
21   A.   I don't know.
22   Q.   Did you ever talk to Ms. Diaz about Marilyn Lee being
23        put in the supervisory position?
24   A.   I don't recall.
25   Q.   Did you ever offer Marilyn Lee a diversity detail of
```

134

1         one week?

2    A.   I think so, yes.

3    Q.   What does that involve?  What's a diversity detail?

4    A.   I don't know.  I didn't go to it.

5    Q.   What is diversity deal with?  Is that EEO issues or

6         do you know at all?

7    A.   I don't know the course content.

8    Q.   Was Marilyn Lee ever offered to work elsewhere for

9         six months?

10   A.   You'll have to clarify that.

11   Q.   Did you ever offer Marilyn Lee a six-month assignment

12        anywhere else?

13   A.   To where?

14   Q.   To anywhere?

15   A.   I don't remember, no.

16   Q.   Do you know who Ken Jones is?

17   A.   Yes.

18   Q.   Who's Ken Jones?

19   A.   Deputy chief postal inspector.

20   Q.   Did you ever offer Marilyn Lee a six-month assignment

21        in Washington, DC?

22   A.   What was the assignment?

23   Q.   Any assignment?

24   A.   I don't recall.

25   Q.   And you mentioned earlier that Marilyn Lee had been

                                                        135

WILLIAM ATKINS - APRIL 18, 2008

1  Q.  Were you afraid that because Marilyn Lee had talked
2      to these other managers, and I guess everyone else as
3      you say, about not wanting to be a supervisor that
4      somehow you felt that you couldn't have someone
5      working for you as a secretary because, you know,
6      they couldn't be trusted or there would be an issue?
7  A.  No.
8  Q.  And when you evaluated Marilyn Lee's performance in
9      2004, did you give Marilyn Lee a far exceed merit in
10     2004, or do you remember at all?
11 A.  I don't remember what I gave her.
12 Q.  Did Marilyn Lee get a monetary award in 2004, if you
13     know?
14 A.  I think so.
15 Q.  Why?
16 A.  Why?
17 Q.  Yeah.
18 A.  Performance.
19 Q.  And that was the year she was performing both as a
20     secretary and then later as a supervisor in 2004?
21 A.  I believe so.
22 Q.  What was Marilyn Lee's last mid-year merit evaluation
23     in the following year, 2005, if you remember?
24 A.  I don't know.  Sheilah Castor would have done that.
25 Q.  Do you know how her performance was rated as a

137

WILLIAM ATKINS - APRIL 18, 2008

1             supervisor?  I think it was excellent, good, fair,

2             satisfactory or unsatisfactory?

3    A.    She worked for Sheilah Castor.  I don't know.

4    Q.    When you had your discussions with Marilyn Lee about

5             the supervisory position, did you talk with her at

6             all about her rating or performance?  In other words,

7             were you telling her, "Look, you're rated high.

8             You're going to be rated high," or anything like

9             that?

10   A.    I didn't.  That wasn't discussed I don't think.

11   Q.    You never told her she could would get a higher

12             rating if she stayed on as a supervisor?

13   A.    No.

14   Q.    Did Marilyn Lee ever receive any unsatisfactory

15             review at all during the time she worked there to

16             your knowledge?

17   A.    I'm sorry?

18   Q.    Did she ever receive an unsatisfactory rating for her

19             performance at all while she was -- while you were in

20             San Francisco?

21   A.    No.

22   Q.    Did you ever tell anyone in management at the postal

23             service that you did not want Lee to be back in the

24             secretary position?

25   A.    No.

138

WILLIAM ATKINS - APRIL 18, 2008

```
 1              in the division, flows through her.
 2    Q.   Did you ever talk to Marilyn Lee about this
 3         administrative specialist position at all?
 4    A.   I don't believe I did.
 5    Q.   And being in that administrative center supervisor
 6         position, would that have prepared her or helped her
 7         in getting the administrative specialist position?
 8    A.   Might have.
 9    Q.   How?
10    A.   Gives her experience with the financial and other
11         aspects of running a division and the supervisor
12         experience.
13    Q.   Did Sheilah Castor ever make any comments to you
14         about this administrative center supervisor position
15         as to whether -- anything at all critical about that
16         position?
17    A.   About the position or the person in it?
18    Q.   The position?
19    A.   I don't know really what you're saying.
20    Q.   Well, if Kaycee Graham was detailed to the
21         administrative specialist position in Castor's
22         absence, why wasn't Marilyn Lee returned as a
23         secretary at that time?
24    A.   'Cause I still didn't have a supervisor.  It's easy
25         to fill a secretary job; it's not easy to fill a
```

144

1           supervisor job.

2    Q.     Would you say you had trouble keeping a secretary in

3           the position, or is that --

4    A.     Not at all.

5    Q.     -- amount of turnover you had normal?

6    A.     I would say so.

7    Q.     You would say it's normal?

8    A.     Normal.

9    Q.     Besides the administrative specialist position, is

10          there any other higher level support supervisory

11          position in the San Francisco division inspection

12          service that existed at that time?

13   A.     Not in the division, no.

14   Q.     Where would they exist?

15   A.     Headquarters.

16   Q.     And do you know what unit paid for Katie O'Leery's

17          detail to the post office?

18   A.     No.

19   Q.     You don't know whether it's --

20   A.     I don't know anything about Katie O'Leery.

21   Q.     So you don't know how long her detail was and all

22          that?

23   A.     No.

24   Q.     Did you know that the inspection service paid for

25          O'Leery's detail to the post office?

                                                           145

1    A.    I have no idea.

2    Q.    Before you came to San Francisco, were you ever

3          apprised of any specific personnel issues for the

4          division employees?

5    A.    Only -- no, not specific.

6    Q.    I mean, other than the general stuff you said

7          earlier?

8    A.    No.

9    Q.    So we talked about other people that I've asked you

10         about whether they could have taken the supervisory

11         position.  You mentioned O'Leery, Cabano, Mendez and

12         Graham.  Was there anyone else that could possibly

13         have been put in the supervisory position?

14   A.    I did not mention O'Leery.

15   Q.    I mentioned O'Leery.

16   A.    And the answer is no.

17   Q.    And while you were the inspector in charge in San

18         Francisco, of those four names, O'Leery, Cabano,

19         Mendez and Graham, didn't they all receive awards

20         while you were the inspector in charge?

21   A.    O'Leery did not work for me.

22   Q.    Did the others receive awards?

23   A.    I don't know about Mendez.

24   Q.    How about Cabano and Graham?

25   A.    They did.

                                                        146

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | Q. | And those were awards that were authorized by you? |
| 2 | A. | All awards are authorized by me. |
| 3 | Q. | Why would you give awards to Graham and Mendez when |
| 4 | | you said they were autocratic and dictatorial and |
| 5 | | incompetent? |
| 6 | A. | As I told you, they couldn't supervise.  They had |
| 7 | | other significant qualities that helped the division |
| 8 | | operate smoothly. |
| 9 | Q. | Did Mendez eventually take over the position that |
| 10 | | Marilyn Lee had of the administration center? |
| 11 | A. | I think so.  I don't know.  I really don't know. |
| 12 | Q. | Why would you put her in that position also again if |
| 13 | | she was incompetent? |
| 14 | A. | Down to zero.  Somebody has to be there. |
| 15 | Q. | But it's your testimony that it was critical to the |
| 16 | | division that Marilyn Lee remain as the |
| 17 | | administrative center supervisor.  Is that your |
| 18 | | testimony? |
| 19 | A. | It was critical to the division. |
| 20 | Q. | What would you have done -- you may not be able to |
| 21 | | answer this, it may be too speculative. |
| 22 | | But, did you have any thoughts of who you would |
| 23 | | put in the position if Marilyn Lee had declined the |
| 24 | | supervisory position? |
| 25 | | MR. SCHARF:  Objection.  Whenever somebody |

147

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | | that support position if the OIG detail had gone |
| 2 | | forward, if you know? |
| 3 | A. | She requested the detail. |
| 4 | Q. | And I think you said this, but when you initially |
| 5 | | approved the OIG detail for Marilyn Lee, you didn't |
| 6 | | see any problem with it going through and Marilyn |
| 7 | | working there? |
| 8 | A. | Correct. |
| 9 | Q. | How did you first become aware of Marilyn Lee's |
| 10 | | request for the detail to IG? |
| 11 | A. | I believe Marilyn Lee talked to the OIG before she |
| 12 | | had mentioned anything to me, and then the OIG came |
| 13 | | to me and asked for her to be detailed to her office. |
| 14 | Q. | Did you talk to the headquarters manager regarding |
| 15 | | Lee's OIG detail? |
| 16 | A. | Eventually. |
| 17 | Q. | When you say "eventually," before -- after she was |
| 18 | | going to be detailed, but before you found out about |
| 19 | | the monetary issue, or after you found out about the |
| 20 | | monetary issue? |
| 21 | A. | We had had a verbal agreement for the detail prior to |
| 22 | | any actual sending -- sending her out, I found out |
| 23 | | she couldn't go, so she never actually went on the |
| 24 | | detail. |
| 25 | Q. | And then as far as her IG detail, what's the word you |

165

JAN BROWN & ASSOCIATES (800) 522-7096 (415) 981-3498

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   And the decision to eventually cancel the detail was
2        made by whom, the OIG because they said they couldn't
3        pay for it or within your agency?
4   A.   Well, the stipulation was that they had to pay, and
5        she said they wouldn't pay.  So my instruction was if
6        they don't pay, she doesn't go.
7   Q.   When you first detailed her to the OIG, was it clear
8        at the outset who was to pay for it, or was that
9        unclear?
10  A.   She was never detailed on the OIG.
11  Q.   When it was decided to detail her to IG, was it
12       clear --
13  A.   It was an issue that I hadn't -- we didn't discuss
14       because I didn't realize it was an issue.
15  Q.   So the issue of who would pay for it wasn't discussed
16       at the outset?
17  A.   No, it was not.
18  Q.   So was it only -- I think you said Mr. Brady.  Is
19       that the only person who told you about the OIG
20       detail not going to --
21  A.   He was my boss.
22  Q.   Did you have any discussions with anyone else about
23       that IG detail from Marilyn Lee other than him?
24  A.   Not any superiors, no.
25  Q.   Who else did you talk to about it after it was known

167

| | | |
|---|---|---|
| 1 | | that it was going to be canceled? |
| 2 | A. | I always talk with my AICs. |
| 3 | Q. | With your what? |
| 4 | A. | My assistant inspectors-in-charge? |
| 5 | Q. | Who are those that you talked to about this? |
| 6 | A. | I don't know that I did, but on most subjects, we all |
| 7 | | talk.  I try keep them in the loop of what's going |
| 8 | | on. |
| 9 | Q. | Have you ever heard of the PMG Potter video? |
| 10 | A. | There's hundreds of them. |
| 11 | Q. | One that was on building positive relationships with |
| 12 | | the OIG? |
| 13 | A. | Sounds familiar. |
| 14 | Q. | Were all employees required to view that video? |
| 15 | A. | Okay. |
| 16 | Q. | Were they? |
| 17 | A. | I can't say for sure. |
| 18 | Q. | Were there any strained relations or difficulties |
| 19 | | between the IG and the inspection service? |
| 20 | A. | As an agency, yes. |
| 21 | Q. | What were they? |
| 22 | A. | It was an upper-level management thing, political. |
| 23 | Q. | Why do you say it was political? |
| 24 | | MR. SCHARF:  I'm going to -- unless you have |
| 25 | | personal knowledge or involvement in those political |

168

1          issues, I would advise you, do not speculate.

2                    THE WITNESS:   Okay.

3                    MR. BACON:

4     Q.   What were the political factions or issues?

5     A.   I don't know them.

6     Q.   Why did you say it was political?

7     A.   Because that's the story we heard, that it was

8          political.   But it wasn't my fight.

9     Q.   Who did you hear that from, that it was political?

10    A.   I don't know.

11    Q.   Did you ever tell anyone in the San Francisco

12         division to not be cooperative with the OIG?

13    A.   Absolutely not.

14    Q.   Did you work and cooperate with the IG on a regular

15         basis?

16    A.   Daily basis.

17    Q.   I mean, theoretically, the inspector general and the

18         inspection service are really working in a

19         partnership, right?

20    A.   Yes, they are.

21    Q.   And we had talked about Mr. Katz.   Was his supervisor

22         then Chief Heath?

23    A.   Yes.

24    Q.   Do you recall a conference in Monterey, California

25         wherein there were concerns later about the expenses

169

1             When Marilyn Lee was placed on administrative

2        leave, and I have the dates of July 18th, 2005.

3             Does that sound about right?

4    A.   Sounds about right.

5    Q.   It was your decision ultimately to put her on

6        administrative leave, correct?

7    A.   Ultimately it's my decision.

8    Q.   And that was based on Sheilah Castor and -- Sally

9        Diaz, is it?

10   A.   Sally.

11   Q.   And it was based on their input they gave you,

12       correct?

13   A.   Her input, Sally Diaz's input.

14   Q.   Whose idea was it to put her on administrative leave

15       as opposed to recommending she go to EAP or simply go

16       for a fitness-for-duty exam?

17   A.   Inspection service has standard procedures.  When

18       someone threatens suicide, they put them on

19       administrative leave immediately.  I talked it over

20       with the legal people and procedures were followed as

21       far as I noted in the letter.

22   Q.   Are you aware that Marilyn Lee has testified in this

23       case that she did not threaten to hurt herself?  She

24       simply said that, "What do you have to do, threaten

25       to hurt yourself before you get anyone's attention?"

                                                          172

WILLIAM ATKINS - APRIL 18, 2008

```
 1              THE WITNESS:  It wasn't something that I
 2        even thought through.  It's when the words are used,
 3        the actions are mandatory.  I didn't even have
 4        latitude in the issue.  It had to be done.
 5            If somebody indicates an intent to harm
 6        themselves, whether kidding or not, it's like yelling
 7        "bomb" in an airport.  It's not considered kidding.
 8        It considered serious, and we take them seriously,
 9        and it's for the employee's protection and our own.
10              MR. BACON:
11   Q.   Hadn't Marilyn Lee told you before she was put on
12        administrative leave that she was very stressed in
13        being a supervisor?
14   A.   She did not tell me she was stressed.
15   Q.   And you say you had no choice in the matter and there
16        were these rules, did you discuss with your
17        supervisor at all about this situation prior to
18        making the decision to put her on administrative
19        leave?
20   A.   I talked to Ed Lawee, talked to Larry Katz.  I talked
21        to my supervisor, yes.
22   Q.   And what supervisor are you referring to?
23   A.   Tom Brady.
24   Q.   Do you know if Mr. Katz or Mr. Lawee or Mr. Brady
25        verified the statement that was allegedly made by
```

174

WILLIAM ATKINS - APRIL 18, 2008

1       Marilyn Lee that was considered suicidal?

2   A.  There was no way to verify a statement between two

3       people.

4   Q.  Well, do you know if they asked her if she made the

5       statement?

6   A.  This was my AIC.  This is a person who's in that

7       position because she's in a position of trust whose

8       suggestions and whose impressions I trust.  I -- of

9       course I believed her.

10  Q.  You also have testified in this action here that you

11      had trust in Marilyn Lee?

12  A.  Yes, I did.

13  Q.  And I asked you about that?

14  A.  Yes, I did.

15  Q.  So why would you not take some steps to verify what

16      Marilyn Lee had said?

17  A.  I took agency-prescribed steps.

18  Q.  What were those?

19  A.  The steps that happened.

20  Q.  What steps were those?

21  A.  The steps that we've been talking about.  She was put

22      on administrative leave and she was escorted out of

23      the building for her own protection and for her own

24      safety and for ours.

25  Q.  And when Marilyn Lee was placed on administrative

175

WILLIAM ATKINS - APRIL 18, 2008

```
 1          leave, was it just Diaz who was there with her at
 2          that time, or do you know?
 3    A.    During the conversation?
 4    Q.    Yeah.  No, the next day when she was placed on
 5          administrative leave.  Do you know who actually --
 6    A.    Sally Diaz.
 7    Q.    Sally Diaz.  Anyone else present with her?
 8    A.    I -- I don't know.  I don't know if Rob Bethel was or
 9          not.
10    Q.    But after you had this report from Sally Diaz and
11          Sheilah Castor, you had no direct contact with
12          Marilyn Lee before deciding to put her on
13          administrative leave; is that correct?
14    A.    That's correct.
15    Q.    What was stated in the workplace the next day as to
16          why Marilyn Lee was not in the workplace?
17    A.    Nothing was stated by me.  I don't discuss personnel
18          issues with the division.
19    Q.    Well, was there some kind of announcement or
20          statement as to her status at that point?
21    A.    Probably, but I don't remember what it was.
22    Q.    Did you ever reach a conclusion as to whether or not
23          Marilyn Lee was suffering stress from being in a
24          supervisory position?
25    A.    I'm not a physician.  I don't know.
```

176

WILLIAM ATKINS - APRIL 18, 2008

```
 1    Q.   Did you seek a physician's input prior to making the
 2         decision to put her on administrative leave?
 3    A.   No.
 4    Q.   Why not?
 5    A.   Because it's not the prescribed policy of the
 6         inspection service.
 7    Q.   Isn't the prescribed policy to use the list, pull one
 8         of the physicians from the list, to evaluate an
 9         employee to see if they're fit to work?
10    A.   That's the second.  First you get them out of the
11         building and put them on administrative leave.  Then
12         you send them to a physician.
13    Q.   How do you know that they should be taken out of the
14         building if you don't know what their real condition
15         is?
16    A.   That's what you'd send them to the doctor to find
17         out.
18    Q.   And, in fact, it was found by the U.S. Department of
19         Labor that she had suffered stress from being in this
20         supervisory position, correct?
21    A.   That's my understanding.
22    Q.   Do you disagree with that DOL decision?
23    A.   I don't have an opinion.
24    Q.   Did anyone question you at all about Marilyn Lee
25         after she was put on administrative leave?
```

177

1   A.   Most people don't question the inspector in charge.

2   Q.   I take that as a no?

3   A.   That's a no.

4   Q.   Did you ever tell anyone in the agency at all that

5        Marilyn Lee was removed from the office -- or after

6        Marilyn Lee was removed from the office, that she was

7        out on stress?

8   A.   Don't remember.

9   Q.   Were you asked for -- were you questioned or asked at

10       all about the stress claim that Marilyn Lee had

11       filed?

12  A.   By whom?

13  Q.   By any Department of Labor investigators?

14  A.   I don't believe I was.

15  Q.   Do you know how long it took the office to schedule a

16       doctor to see Marilyn Lee to see what her medical

17       condition was?

18  A.   No.

19  Q.   Do you know it was nearly a month?

20  A.   No, I don't know that.

21  Q.   And as far as procedure, was it procedure to lock

22       Marilyn Lee out of her computer or access to her

23       computer?

24  A.   Yes.

25  Q.   Why is that?

178

WILLIAM ATKINS - APRIL 18, 2008

1   A.   Because you don't want employees that have issues,

2        medical issues or whatever, having access to

3        sensitive government documents.

4   Q.   So you also felt that there was an issue of her

5        trustworthiness as an employee?

6   A.   Following directions.

7   Q.   From whom?

8   A.   These are policies of the inspection service.

9   Q.   What policy are you referring to?

10  A.   I'm referring to the policies that have to do if

11       someone says they're going to commit suicide.

12  Q.   Can you tell me in reference, in particular what

13       chapter, what manual or whatever you're referring to?

14  A.   No, I don't have a list of those.

15  Q.   You made the decision ultimately to lock her out of

16       her computer though, correct?

17  A.   No, I did not.

18  Q.   Who did?

19  A.   I have no idea.

20  Q.   But you're saying it was proper procedure to do that?

21  A.   Normally that's what's done.

22  Q.   Was she locked out of her computer to prevent her

23       from accessing emails and other documents that would

24       support her EEO or stress claim?

25  A.   I don't even know who did it.  I don't know when it

                                                        179

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | | was done.  I didn't even know it was done. |
| 2 | Q. | Do you know if anyone deleted information from her |
| 3 | | computer? |
| 4 | A. | I have no knowledge on that subject. |
| 5 | Q. | Do you know what happened to her computer? |
| 6 | A. | No. |
| 7 | Q. | Do you know who it was who issued the order for |
| 8 | | Marilyn Lee to be locked out of her computer system? |
| 9 | A. | I said no. |
| 10 | Q. | So it wasn't you? |
| 11 | A. | Correct. |
| 12 | Q. | Do you know of anyone accessing Judy McDermott's |
| 13 | | computer after Marilyn Lee had filed her EEO? |
| 14 | A. | No, I don't. |
| 15 | Q. | You also said in your year-end evaluation of Marilyn |
| 16 | | Lee that she turned the section around and increased |
| 17 | | productivity and practically eliminated dissent. |
| 18 | | What did she do to achieve that? |
| 19 | A. | I thought we discussed this.  I don't know.  She |
| 20 | | developed procedures and practices that made it more |
| 21 | | efficient.  There was a more equitable workload |
| 22 | | distribution.  People were treated better 'cause they |
| 23 | | weren't barked at.  Problem employees were addressed |
| 24 | | and good employees were rewarded.  These are the |
| 25 | | things she brought to the job. |

180

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    In fact, you had nothing to recommend for her

2          improvement, correct?

3    A.    Yes.   True.   She'd denounce any job.

4    Q.    But yet you didn't -- she didn't convince you that

5          she was not performing well personally as a

6          supervisor when she had these discussions with you

7          five or six times?

8    A.    There were never performance issues in our

9          discussions.   It was always, "I want to go back and

10         be secretary."

11             She wasn't having discussions with me because of

12         performance issues.   She did a great job.

13   Q.    Well, didn't she tell you she was having trouble

14         being supervisor and that's why she wanted to be

15         returned?

16   A.    Marilyn doubted her own abilities, but that didn't

17         mean she wasn't doing a good job.   She was doing a

18         good job.   I'm one who is supposed to evaluate

19         performances, as all of those things listed in her

20         evaluation.   The fact that she didn't recognize her

21         abilities -- you know, I tried to work with her and

22         convince her that she was a good supervisor, and she

23         was.

24   Q.    Did she ever recommend to you that some of the

25         employees she supervised should be terminated?

                                                         181

WILLIAM ATKINS - APRIL 18, 2008

1          until it was decided to move Kaycee Graham into the
2          position."
3               What position are you talking about?
4     A.   Secretary position.
5     Q.   So you're claiming that Marilyn didn't complain about
6          not wanting to be a supervisor until Kaycee Graham
7          had actually been put in the secretary position?
8     A.   What I'm saying is that the two incidents coincided.
9     Q.   Then you say "These two individuals dislike each
10         other intensely"?
11    A.   M-hm.
12    Q.   "And I believe jealousy might have been a significant
13         motivation."
14              What caused you to conclude that these two
15         individuals dislike each other intensely?
16    A.   Input from my supervisors and general observations on
17         my part.
18    Q.   What did your supervisor say that caused you to
19         believe that they intensely disliked each other?
20    A.   That they hated each other.
21    Q.   Who told you that?
22    A.   Sheilah.
23    Q.   Anyone else tell you that?
24    A.   I don't recall.
25    Q.   You said from your observations they hated or they

                                                      186

```
 1            disliked each other intensely.  What did you see that
 2            caused you to conclude that?
 3    A.      They avoided each other whenever possible.  They
 4            spoke to each other only whenever necessary, and they
 5            just didn't cooperate as a team.
 6    Q.      Why do you say -- you use the word "jealousy" as
 7            being the motivation.  Why do you say that?
 8    A.      Because the inspector in charge secretary is
 9            considered a primo position because you're in on all
10            the decision-making processes and all the juicy
11            information that goes in between.  So you've got
12            inside knowledge, so it's considered a desired
13            position.
14    Q.      So then you could understand why Marilyn wanted to go
15            back to the secretary position, then?
16    A.      I always understood why she wanted to go back.
17    Q.      You did?
18    A.      Of course.
19    Q.      So you understood that she wanted to go back because
20            she was being stressed as a supervisor?
21    A.      No.
22    Q.      So the next sentence on the next page says "Marilyn
23            never told me the stress of supervising seven people
24            was too much for her.  She simply repeated over and
25            over that she wanted her old job back."
```

187

WILLIAM ATKINS - APRIL 18, 2008

```
 1              Is it your testimony that she never told you why
 2         she wanted her old job back?
 3    A.   She said she didn't want to supervise.
 4    Q.   But she never told you why she didn't want to
 5         supervise?
 6    A.   "I don't like supervising."
 7    Q.   Did she tell you any specifics as to why she didn't
 8         like supervising?
 9    A.   Probably, but I don't remember.
10    Q.   And then your statement, you didn't have a qualified
11         individual available, you've already discuss all that
12         previously, correct?
13    A.   Yes.
14    Q.   And then the third paragraph on the second page says
15         "Marilyn also alleges that I kept her from a detail
16         assignment with the office of the inspector general.
17         This is patently false."
18              Are you saying that this is patently false for
19         the reasons you previously testified to about the
20         money, or was there something else in this comment?
21    A.   No, she firmly believed and she believes to this day
22         that I kept her from that detail, and that's not
23         true.  I did not keep her from the detail.  I
24         recommended her for it.
25    Q.   Well, what was the budget like?  Why could you not
```

188

WILLIAM ATKINS - APRIL 18, 2008

```
 1           Exhibit 3.  Exhibit 3, you've reviewed that already,
 2           correct?
 3    A.     Yes, I have.
 4    Q.     Look at -- I think it's page 7, number four.  It says
 5           "I am unaware of any medical condition suffered by
 6           Ms. Lee until she filed a work-related stress claim
 7           in mid-August, 2005 after she was placed on
 8           administrative leave on July" --
 9    A.     What page are you on?
10    Q.     Page 7.
11    A.     My page 7 doesn't say that.
12    Q.     Oh, I'm looking at the actual bottom here because
13           there's like 20 pages, but they have different
14           numbers on it.  So just go seven pages in from the
15           beginning.
16               I just want to be clear.  Your testimony is that
17           the crying and the things that you witnessed did not
18           alert you to any medical condition, and you didn't
19           realize there was any medical condition suffered by
20           Ms. Lee until after she was gone?
21    A.     I was concerned that she was crying at work, and
22           that's why I took the time to spend many, many
23           sessions with her to discuss the issues.  And once we
24           discussed the issues, I was confident that she was
25           feeling better about the situation.  So, no, I did
```

192

```
 1            not think that there was -- some people cry; some
 2            people don't cry.  If I thought there was a medical
 3            condition, I would have sent her for a
 4            fitness-for-duty.
 5   Q.       Look at the bottom paragraph of that same page.  You
 6            say "It was not canceled" -- this is about the OIG
 7            detail.
 8                You said "It was not canceled as a result of her
 9            signing a petition.  It was canceled because the IG
10            special in charge, S-I-C, refused to assume Ms. Lee's
11            salary."
12                Who is the SIC you're referring to there?
13   A.       Anita Davidson.
14   Q.       And let me ask you this, since you've reviewed this
15            document in preparation for your deposition, is there
16            anything in this document, Exhibit 3, that you
17            consider to be inaccurate?
18                    MR. SCHARF:  Objection, calls for a
19            narrative.  It's a very long document, and there's no
20            way that he can be reasonably expected to remember
21            every single sentence which he didn't even review
22            today.  If there's a particular section that you want
23            to --
24                    MR. BACON:  Let me just rephrase.
25                    MR. SCHARF:  -- draw his attention to.
```

| | | |
|---|---|---|
| 1 | | Maybe you'll have some follow-up questions.  Then |
| 2 | | we'll take a break.  Then the very last we'll do is |
| 3 | | figure out an efficient way to address your issue |
| 4 | | regarding the accuracy of the declaration. |
| 5 | | Okay, my questions. |
| 6 | | --oOo-- |
| 7 | | EXAMINATION BY MR. SCHARF: |
| 8 | Q. | Was the first time you heard or learned that the |
| 9 | | plaintiff signed the petition was when she, herself, |
| 10 | | volunteered that information to you during the first |
| 11 | | week or so after she became your secretary? |
| 12 | A. | Yes. |
| 13 | Q. | You've testified about awards and opportunities that |
| 14 | | you've provided her.  Let me see if we can make a |
| 15 | | list. |
| 16 | A. | Okay. |
| 17 | Q. | One of them was the supervisor role? |
| 18 | A. | Correct. |
| 19 | Q. | And another one was the investigative analyst |
| 20 | | training in St. Louis? |
| 21 | A. | Correct. |
| 22 | Q. | And another one, you mentioned something about |
| 23 | | diversity.  Was that diversity liaison training? |
| 24 | A. | I believe it was, yes. |
| 25 | Q. | Did you ever give her a special achievement award? |

205

WILLIAM ATKINS - APRIL 18, 2008

1    A.    Every year.

2    Q.    Did you give her a cash award?

3    A.    Yes.

4    Q.    There was some testimony about a corner office.

5          Where was her office when she was secretary?

6    A.    It was in a cubicle out of my door.

7    Q.    And then at some point she was assigned to a corner

8          office?

9    A.    Correct.

10   Q.    And did the corner office have a view?

11   A.    Yes.

12   Q.    What was this view off?

13   A.    Downtown San Francisco.

14   Q.    Why was she assigned to a corner office?

15   A.    She came to me and told me that in her cubicle people

16         were looking over her shoulder and confidential

17         information, and that she didn't have enough security

18         out there, and she wanted to get into a office.  So I

19         converted a conference room that we currently had

20         that was basically unused into an office, and we

21         moved her into it.

22   Q.    At all relevant times, she was a Level 14?

23   A.    Yes.

24   Q.    And as part of being a Level 14, is it expected that

25         a Level 14 person may be assigned to supervisory

206

WILLIAM ATKINS - APRIL 18, 2008

| | | |
|---|---|---|
| 1 | | responsibilities? |
| 2 | A. | Level 14 is a supervisory level. |
| 3 | Q. | And so this is not a situation where she was promoted |
| 4 | | to a harder job involving greater responsibilities |
| 5 | | without an increase in compensation? |
| 6 | A. | No. |
| 7 | Q. | Her compensation for Level 14 included supervisory |
| 8 | | responsibilities? |
| 9 | A. | That level was established as a supervisory level. |
| 10 | Q. | Now, this was a lateral reassignment when you |
| 11 | | assigned her from secretary to supervisor? |
| 12 | A. | Yes, it was. |
| 13 | Q. | Have you made other lateral reassignments while you |
| 14 | | were working in San Francisco? |
| 15 | A. | Yes, I have. |
| 16 | Q. | About how many? |
| 17 | A. | Several dozen. |
| 18 | Q. | And the attorney -- Plaintiff's attorney asked you |
| 19 | | questions about, you know, were you aware that she |
| 20 | | was experiencing stress.  Let me use a different |
| 21 | | word. |
| 22 | | When was the first time that you learned that she |
| 23 | | may have experienced serious mental health issues? |
| 24 | A. | When she made those comment to Sally Diaz. |
| 25 | Q. | And prior to you becoming aware of her statement |

207

1       about suicide -- or as the Plaintiff's attorney

2       refers to it as a statement involving words about

3       harming herself -- prior to you learning of that

4       statement, did you believe that plaintiff had serious

5       mental health issues as a result of her work in the

6       supervisor job?

7  A.    No, I did not.

8  Q.    Did your decision to laterally reassign her to the

9       supervisor job have anything to do with her

10      petition-related activities?

11  A.    I did not care about that petition.  It had nothing

12      to do with that petition.

13  Q.    Did your decision to keep her in the supervisor job

14      have anything to do with her petition-related

15      activities?

16  A.    Absolutely not.

17  Q.    Did the agency's decision -- I guess you testified it

18      was a superior -- was it the agency's decision to not

19      permit her to go on detail to OIG unless OIG picked

20      up her salary?  Did that have anything to do with her

21      petition or petition-related activities?

22  A.    The individual who made the decision wouldn't have

23      even known she was involved with it.

24  Q.    And did the ultimate decision to place her on

25      administrative leave have anything to do with her

208

1    petition-related activities?

2    A.    Absolutely not.

3    Q.    And just in terms of terminology, is there a

4          difference between being placed on administrative

5          leave and actually removed from employment?

6    A.    Yes, there is.

7    Q.    And was she removed from employment, or was she

8          placed on administrative leave?

9    A.    She was placed on administrative leave.

10               MR. BACON:    Those are the questions I had.

11                    --oOo--

12    FURTHER EXAMINATION BY MR. BACON:

13    Q.    What has greater responsibilities to the job, the

14          secretary job or the supervisory administrative

15          center job?

16    A.    It's different work.    I mean, it's essential that the

17          secretary job be filled by somebody competent because

18          I have a lot of correspondence that goes through

19          there, and a lot of important things happen.    But on

20          the other hand, the supervisor job has its own

21          important aspects.    It's difficult to compare the

22          two.

23    Q.    You said earlier today that the secretary job was

24          easier to fill, and the other job was not.

25               What did you mean by that?

209

WILLIAM ATKINS - APRIL 18, 2008

1    A.    Because the secretary job does not have supervision.

2          It's typing; it computer; it's filing.  Those are

3          easier skills to teach than the supervisory skills.

4    Q.    So the supervisory position was a more difficult job

5          to do, correct, than the secretarial job?

6    A.    It wasn't more difficult.  It required different

7          skills.

8    Q.    Skills that she didn't have, correct?

9    A.    Skills she did have.

10   Q.    I thought you testified earlier she had no

11         supervisory training prior to being put in the

12         position?

13   A.    Just because you don't have training, doesn't mean

14         you don't have supervisory skills.  She had

15         supervisory skills.

16   Q.    And as you sit here today, you don't know, in fact,

17         what Marilyn Lee said to Ms. Diaz, do you?  All you

18         know is what Ms. Diaz told you what Marilyn Lee said,

19         correct?

20   A.    That's correct.

21   Q.    And you said you did not care about the petition.

22         Did you care about the issues that were addressed in

23         the petition at all, or did you not care about that

24         either?

25   A.    I did not care about that either.

210

WILLIAM ATKINS - APRIL 18, 2008

```
 1  Q.    And you mentioned the difference between
 2        administrative leave and removal.  What would have
 3        been the difference -- what would have happened
 4        differently if she had simply been removed?
 5  A.    It's the same as being fired.
 6              MR. BACON:  Okay.  I'm just needing that --
 7              MR. SCHARF:  Yeah, I'm going to help you
 8        with that.
 9                         --oOo--
10  FURTHER EXAMINATION BY MR. SCHARF:
11  Q.    When you said that you did not care about the
12        petition or the issues that resulted in that
13        petition, were you referring to the decisions that
14        you made to laterally reassign the plaintiff to the
15        supervisor position and to not reassign her back to
16        her old position?
17  A.    That document was not a basis for my actions.
18  Q.    So you reviewed your administrative declaration in
19        preparation for today's deposition?
20  A.    Yes.
21              MR. BACON:  And that's Exhibit 3 you're
22        referring to?
23              MR. SCHARF:  Right.
24  Q.    When did you review it?
25  A.    This past week.
```

211

1   Q.   Can you give me -- how many days ago was that?

2   A.   Two to three days.

3   Q.   And how many times did you read it total?

4   A.   Two or three times.

5   Q.   About how much time did you spend on it?

6   A.   Couple of hours.

7   Q.   When you signed your -- strike that.

8        Is that your signature on -- let me get to the

9        right page.

10                    MR. BACON:  13.

11                    MR. SCHARF:

12  Q.   On 13 of 20, is that your signature?

13  A.   Yes, it is.

14  Q.   And when you signed that document, did you understand

15       that you were declaring under penalty of perjury that

16       the information in your declaration was true and

17       correct?

18  A.   Yes, I did.

19  Q.   And you signed that on December 13th, 2005?

20  A.   Yes, I did.

21  Q.   And you've been asked an awful lot of questions

22       concerning the issues that you covered in this

23       declaration today?

24  A.   Yes.

25  Q.   Let me ask you this.  When you reviewed this

212

1      declaration a few days ago, did anything significant

2      jump out, any significant inaccuracies jump out at

3      you when you read that document that you want to take

4      the opportunity to correct or clarify today?

5   A.  No, just that I had forgotten all the dates.  The

6      dates I had forgotten, but the facts as spoken are

7      accurate.

8              MR. SCHARF:  Does that not -- that is all I

9      do when I ask witnesses questions about their

10     declarations.  Is that not sufficient, Counsel?

11             MR. BACON:  That's all I was trying to do.

12     Thank you for doing that.

13             MR. SCHARF:  So this concludes the

14     deposition.

15             MR. BACON:  This concludes the deposition.

16             MR. SCHARF:  Excellent.

17             MR. BACON:  Thank you very much for coming.

18

19                 (Whereupon the deposition was

20                  concluded at 3:42 p.m.)

21

22

23

24     _____

25                 William Atkins

                                                        213

1   STATE OF CALIFORNIA )   SS.

2           I do hereby certify that the witness in the
3   foregoing deposition was by me duly sworn to testify to the
4   truth in the within-entitled cause; that said deposition
5   was taken at the time and place therein stated; that the
6   testimony of said witness was correctly reported by me, a
7   certified shorthand reporter and a disinterested person,
8   and was under my supervision thereafter transcribed and
9   when so transcribed was carefully read to or by the said
10  witness, and, being in every desire, was thereafter by the
11  said witness duly subscribed; that if unsigned by the
12  witness, signature has been waived in accordance with
13  stipulation between counsel for the respective parties.

14          And I further certify that I am not of counsel or
15  attorney for either or any of the parties to said
16  deposition nor in any way interested in the outcome of the
17  cause named in said caption.

18          IN WITNESS WHEREOF, I have hereunto set my hand
19  and affixed my seal of office this 4th day of  May        ,
20  2008.

21

22                          _____
                            Cynthia J. Poliseri
23                          Certified Shorthand Reporter

24

25