# Exhibit C

KATHLEEN MARY O'LEARY - MAY 22, 2008

1            UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    --oOo--

4  MARILYN LEE,

5            Plaintiffs,

6       vs.                        No. C-07-2540 SBA

7  JOHN E. POTTER, UNITED STATES
   POSTMASTER GENERAL, UNITED
8  STATES POSTAL SERVICE,
   (CAPITAL METRO AREA), AGENCY,
9  UNITED STATES OF AMERICA,

10            Defendants.
   _____/

11

12

13              DEPOSITION OF

14            KATHLEEN MARY O'LEARY

15            Thursday, May 22, 2008

16

17

18

19  REPORTED BY:                    COPY

20  DEBRA J. SKAGGS, CSR 7857

21  -----------------------------------------------------

22            JAN BROWN & ASSOCIATES
           CERTIFIED SHORTHAND REPORTERS
23            701 Battery Street, 3rd Floor
           San Francisco, California 94111
24              (415) 981-3498

25

1

1  he contacted you about the petition?

2  A.         He wanted to know what was going on.

3  Q.         What did you tell him?

4  A.         Everything that I knew that was going on.

5  Q.         And can you briefly describe the -- what was

6  going on as far as the different issues you were

7  concerned about?

8  A.         There was a power struggle at that point in

9  time.  We had an inspector in charge, Alan Kiel, who was

10 the inspector in charge in name only.  The division was

11 really run by the -- one of the assistant inspectors in

12 charge, who was Julianna Nedd.  And she pretty much

13 wiped out -- Inspector Greg Cabashi was the other

14 assistant inspector in charge.  Julianna played

15 favorites.  If you were in her -- on her good list --

16 and this was across the board.  Because the 60 people

17 that signed this were a combination of inspectors,

18 support personnel, and postal employees.

19         So it was every facet of the inspection

20 service personnel in San Francisco division that signed

21 this petition.  It wasn't relegated to a small group or

22 only one kind of grouping within the inspection service.

23         But if you were on Julianna's "A" list, you

24 got the cream of the crop.  If you were not on her "A"

25 list, you got harassed.  And it was -- it was very

40

 1  punishing.  There were favoritism things going on.

 2          Wanda, for instance, Wanda Smith --

 3  Q.        Did you talk about Wanda Smith with him in

 4  that meeting when you said all the issues?

 5  A.        Yes, because she was -- she was -- and it

 6  wasn't about the job at that time, because I'm not

 7  really sure that it was posted at that time.

 8          But my recollection is that they had taken

 9  Wanda out of her position as -- what were we called.

10  God, I can't remember what we were called.  Operation

11  support analysts, or whatever that title was.  They had

12  taken her out of her position and given her this really

13  cushy job working up with the leadership of the

14  division, which was Inspector in Charge Kiel, Assistant

15  Inspector in Charge Nedd, and Assistant Inspector in

16  Charge Gamache.

17          And, as a result, I not only had my two teams;

18  I picked up her two teams.  So I was supporting almost

19  40 inspectors, and she was waltzing around doing

20  nothing.  It was just terribly unfair.  And that was one

21  issue relating to Wanda.

22  Q.        Do you know if Julianna Nedd assisted Wanda

23  Smith in getting her promotion that was in issue?

24  A.        Rumor around the office was that Julianna had

25  written Wanda's 991.  Wanda used to work for me, and I

41

1 | That was their function.

2 | Then slowly over the years they started taking

3 | over investigating internal crimes and they were

4 | investigating -- then they became the security gurus,

5 | and -- so they were just taking more and more of the

6 | jobs that the inspection service had been doing for

7 | years -- like, since Ben Franklin -- and they were --

8 | when they pulled over a function to the OIG, they also

9 | pulled over the compliment, and our compliment was

10 | shrunk.  Our compliment being the inspection service.

11 | Q.       So if somebody was to say there was a rift

12 | between the OIG and the inspection service, would that

13 | be an accurate comment?

14 | A.       Yes.

15 | MR. BACON:  How are you doing?  Do you need a

16 | break?

17 | THE WITNESS:  No.  But if you have water, I'd

18 | love it.

19 | MR. SCHARF:  How much more do you have?

20 | MR. BACON:  I probably have another half hour

21 | to finish.

22 | MR. SCHARF:  Okay.  Well, so much for the

23 | promise of getting her in and out in an hour, but --

24 | MR. BACON:  Yeah, well --

25 | MR. SCHARF:  Let's go for it, then.

53

```
 1  Q.        I guess.

 2  A.        Probably not.

 3            Did it make sense to you?

 4            MR. BACON:  I have no further questions.

 5                 EXAMINATION BY MR. SCHARF

 6            MR. SCHARF:  Q.  Okay.  I have about 20

 7  minutes of questions.  Shall we proceed?

 8            First of all, thank you for coming.  The

 9  record should reflect that you did not receive a

10  subpoena; is that correct?

11  A.        That is correct.

12  Q.        So you are here voluntarily at the request of

13  the attorneys.

14  A.        That's correct.

15  Q.        Have you spoken, before today, with Marilyn's

16  attorney?

17  A.        No.

18  Q.        And you have spoken with Marilyn about this

19  case?

20  A.        She's asked me for a couple of documents

21  through email.

22  Q.        Okay.  And so you've helped her by giving her

23  those documents?

24  A.        That's correct.

25  Q.        And those are the same documents that her
```

                                                        69

1   attorney produced as exhibits today during your

2   deposition?

3   A.        Yes, Exhibit 9 and Exhibit 8.

4   Q.        Okay.  So have you helped Marilyn with her

5   case in other ways other than coming here voluntarily to

6   share your testimony with us and by providing her with

7   documents?

8   A.        No.

9   Q.        Are you friends with Marilyn?

10  A.        Oh, we're friendly.  I would not say best

11  buddies.

12  Q.        Have you ever socialized outside of work?

13  A.        I don't think so.

14  Q.        Okay.  And you've known her for almost 25

15  years?

16  A.        Yes.

17  Q.        Have you ever seen her cry?

18  A.        Yes.

19  Q.        Did you ever see her cry before she became the

20  secretarial supervisor?

21  A.        No.

22  Q.        Okay.  Now, you were detailed to the postal

23  service, correct?

24  A.        Correct.

25  Q.        And Marilyn wanted to be detailed, as far as

70

1 | you understand, to OIG; is that correct?

2 | A.        That's correct.

3 | Q.        So, different entity.

4 | A.        Correct.

5 | Q.        Okay.  And you've described that there was a

6 | rift or a negative relationship between PIS, where you

7 | were employed, and the OIG, where Marilyn wanted to be

8 | deployed --

9 | A.        Correct.

10 | Q.        -- right?

11 |         So would it be fair to say that there was a

12 | better relationship between PIS and the postal service

13 | where you were deployed, as opposed to PIS and OIG where

14 | Marilyn wanted to be deployed?

15 | A.        Correct.

16 | Q.        So there may be political relationship reasons

17 | that explain why PIS was ready to pick up your salary

18 | when -- if you were deployed -- when you were deployed

19 | at the postal service, whereas PIS may be less

20 | enthusiastic about picking up Marilyn's salary if she

21 | were to be deployed to OIG.  Political issues.

22 | A.        Could be.

23 | Q.        Okay.  Now, your detail to postal service

24 | occurred before Atkins was appointed INC in

25 | September 2003, correct?

71

1  A.        That's correct.

2  Q.        So your detail preexisted Atkins's

3  appointment.

4  A.        Correct.

5  Q.        And your detail to the postal service, was

6  that approved by INC Kiel?

7  A.        Correct.

8  Q.        And Kiel retired in July of 2003.

9  A.        I believe that was the date, yes.

10 Q.        Is it your understanding that he retired

11 because of performance problems?

12 A.        Yes.

13 Q.        And fall-out from the February 2003 petition?

14 A.        Yes.

15 Q.        Okay.  The petition that you signed.  Is it

16 your understanding that that resulted in a change in

17 management?

18 A.        Yes.

19 Q.        And as a result of that change in management,

20 Atkins was appointed the new INC?

21 A.        Yes.

22 Q.        So Atkins got this job because of that

23 petition?

24 A.        As far as I know.

25 Q.        All right.  He benefited.  Atkins benefited

72

1   from the petition.

2   A.        Yeah.

3   Q.        All right.  Have you ever had any

4   conversations with Atkins about who was paying your

5   salary when you were deployed to the postal service?

6   A.        No.

7   Q.        You testified that he possibly was aware that

8   PIS was paying your salary because PIS is on the payroll

9   documents, including the exhibit that you saw.  But I

10  think you testified today that's probably not the kind

11  of document that he would look at on a daily basis.

12            Was that your testimony today?

13  A.        I doubt that he would look at it on a daily

14  basis, but I am sure he was aware that the inspect -- I

15  was an inspection service employee.  In fact, I know for

16  a fact that he knew that because I ran into him on

17  several different occasions.

18  Q.        Okay.  Do you have any -- did you have any

19  conversations with Atkins about why Marilyn -- why PIS

20  would not pick up Marilyn's salary for her detail to

21  OIG?

22  A.        No.

23  Q.        Do you have any personal knowledge as to who

24  within PIS made the decision not to pick up Marilyn's

25  salary to support her detail to OIG?

73

1  A.          No.

2  Q.          So you don't know whether it's Atkins or upper

3  management.   Somebody higher than Atkins.

4  A.          That's correct.

5  Q.          Okay.  I take it that -- oh, you know, the

6  record should also reflect that we spoke before the

7  deposition, correct?

8  A.          Correct.

9  Q.          Regarding the scheduling of the deposition.

10 A.          Correct.

11 Q.          And I communicated the attorney's request that

12 you come to the deposition to share testimony.

13 A.          Correct.

14 Q.          And I offered to prepare you for the

15 deposition and defend you at the deposition, and you

16 politely declined my offer.

17 A.          That is correct.

18 Q.          Okay.  Fair enough.

19             And I certainly have never told you anything

20 to say in this case other than to tell the truth.

21 A.          That's correct.

22 Q.          Okay.  Now, I take it that you feel that PIS

23 treated you unfairly with respect to a number of issues.

24 A.          Correct.

25 Q.          And what would be the top three issues that

74

1  you -- that you would consider PIS's treatment of you to

2  be unfair?  With --

3  A.        Top three?

4  Q.        Top three.

5            The five-level demotion or --

6  A.        Yeah, the demotion.  And I believe I stated it

7  at one point in EEO proceedings that we had

8  recently -- we, the inspection service, had recently

9  relieved the postmaster of his postmaster duties and

10 level.  And -- because he was caught stealing.  And

11 they -- he was given a two-level demotion.

12           I was not stealing, nor did I get caught doing

13 anything illegal, and I got a five level.

14 Q.        Yeah, and I don't want to get into who was

15 right or who was wrong.  I'm just curious as to --

16 A.        That was one.

17 Q.        I'm just curious as to things that caused you

18 to feel negative thoughts about PIS.

19           One was that five-level demotion.  Another one

20 was the circumstances of your retirement?

21 A.        Not nearly.  That isn't even --

22 Q.        Another one is you felt that your heart

23 problems and surgeries were job-related and they would

24 not give you back your sick time.

25 A.        Correct.

75

1  Q.        That's one of the top three?

2  A.        Oh, that's number one.

3  Q.        And you didn't get that job that Wanda

4  ultimately got.  Would you put that at the top three?

5  A.        Yeah.

6  Q.        Okay.  All right.

7  A.        May I also --

8  Q.        You still feel, to this day, that PIS treated

9  you unfairly.

10  A.        Yes, I do.

11  Q.        Okay.  Now --

12  A.        May I also, since you asked, I would --

13  Q.        You could add a fourth, if you want.

14  A.        I'll add four and five, probably six and

15  seven.

16          I was told -- and I will go back to -- and I

17  won't say who said it.  But somebody very high up in the

18  organization, in another part of the country, told me

19  that if I initially made my EEO complaint valid and I

20  filed it, that I would spend the rest of my career with

21  the postal service paying for that decision.

22          And he asked me, at that time, how many years

23  I had left.  And I told him.  I believe at the time it

24  was 12 or 13.  And he said they are going to be

25  miserable years.

76

KATHLEEN MARY O'LEARY - MAY 22, 2008

1            As a result, I applied -- in addition to the

2   job regarding Wanda, another position came open.  And

3   that was for -- oh, God, what was -- physical --

4   physical securities specialist.

5            The person who ended up getting the job wasn't

6   even in the original package.  Didn't get an interview.

7   And then, two weeks later, he was given an interview and

8   subsequently got the job.  He, himself, told me I should

9   file an EEO because of that.

10           Additionally --

11  Q.       I am interested in hearing the five, six, and

12  seven, but if you can do it in just a few sentences a

13  piece.

14  A.       Okay, fine.

15           That same job opened up again for another

16  position.  I was told by somebody who was on the panel

17  that I was the most qualified person on the panel --

18  on -- of the packet.  And I did -- I got a three-minute

19  interview on the phone that was cursory.  And the person

20  who got the position ended up being the biggest wuss and

21  washout.

22           And I was told that my -- I had marked myself

23  way back when.  In 2000, I had filed that first EEO, and

24  it was going to be like that forever.  And do you know

25  what?  It was right.  It was like that forever.

77

```
 1  Q.        Did they do anything else?  Did PIS do
 2  anything else that you thought was unfair, other than
 3  the four or five items and issues that you talked about?
 4  A.        Oh, yes.
 5            When I came back from having the bypass -- I
 6  had a triple bypass and I had a lot of complications.  I
 7  wasn't even back a week.  They transferred me,
 8  transferred me, to Pasadena, California.
 9            And I gave them a letter from my doctor saying
10  I got this major condition going that, you know, I'm
11  going to the doctor's office, like, every day, and I'm
12  on cardiac rehab, and all this other stuff.  And they
13  said too bad.  And I said I can't report.
14            And they gave me a report date of whatever it
15  was.  And when I didn't show up, knowing full well that
16  I couldn't, they made me AWOL.
17  Q.        Now, in any of these incidents that you've
18  described today over the last couple of hours that you
19  feel constituted unfair treatment by PIS, was Atkins the
20  decision-maker with respect to any of those issues?
21  A.        No, he wasn't.
22  Q.        Okay.  Have you ever had any negative
23  interaction with Atkins?
24  A.        Actually, no.  I've had a really good working
25  relationship with him, but I worked with him after '95
```

78

1  when he was in my territory.

2  Q.        Okay.  Have you ever heard him make a

3  statement that you consider to be inappropriate, such as

4  a discriminatory or retaliatory remark?

5  A.        There have been off-the-cuff remarks, yeah.

6  Q.        What about with respect to retaliation.  A

7  statement -- have you ever heard Atkins make a statement

8  that you considered to be retaliatory?

9  A.        No.  In my relationship with him, no.

10  Q.       Okay.  And your knowledge of how Atkins

11  treated Marilyn comes exclusively from conversations

12  that you've had with Marilyn where she's told you about

13  things that she's experiencing.

14  A.        Correct.

15  Q.        Okay.  Now, you signed this petition --

16  A.        Uh-huh.

17  Q.        -- correct?

18          MR. BACON:  Is that a "yes"?

19          THE WITNESS:  Yes.  I'm sorry.

20          MR. SCHARF:  Q.  You were 1 of 59?

21  A.        I was 1 of 60.

22  Q.        1 of 60 signatories to the petition.

23  A.        That is correct.

24  Q.        Okay.  And you were aware that by signing the

25  petition that somebody was going to read the petition

79

1  and see the signatories to see how many people signed
2  it.
3  A.        Yes.
4  Q.        Right.  And what was your understanding of who
5  the -- who you anticipated would read the petition and
6  see the signatories to the petition?
7  A.        Inspector Birch.
8  Q.        Okay.  And you were asked today whether you
9  felt you were retaliated against for signing the
10  petition, and you answered it in a very interesting way.
11  You didn't actually say yes.  You said:  I believe I was
12  retaliated for what I said.  For speaking my mind.
13        And -- yes?  You remember that testimony?
14  A.        Correct.
15  Q.        And were you referring to your conversation
16  with Birch?  That long telephone conversation with
17  Birch?
18  A.        No, I don't feel I was.
19  Q.        What were you referring to?
20  A.        I feel that -- since 1999 -- I had a
21  reputation from Washington DC, inspection service
22  people, of speaking my mind.  And I would always preface
23  everything that was asked of me with:  Do you want me to
24  say what I think you want to hear, or do you want what
25  I'm really feeling.  And I always got the response:  You

80

1  always say what you feel.

2  Q.        So when you answered his question that you

3  felt retaliated against, you were talking about your

4  conduct that predated you signing the petition.

5  A.        Mine -- mine personally, yes.

6  Q.        And if I just asked you this specific

7  question:  Do you feel that you were retaliated against

8  because of the act of signing the petition and being

9  1 of 60 signatories to that petition, would your answer

10 be no?

11 A.        No, I feel that there was -- I believe that in

12 the administration's mind, that every one of those 60

13 people were accused of being not loyal to the

14 administration.

15 Q.        But my question is retaliation.  You know what

16 I mean by retaliation.  Where an employer does something

17 adverse.  Like, denies a promotion or demotes somebody.

18 Some sort of adverse action.

19         Did any adverse employment action -- did you

20 suffer any adverse employment action by virtue of you

21 signing the petition, to your knowledge?

22 A.        Well, the Wanda thing could have been because

23 Julianne was the one who saw the names on the petition

24 as well as everybody else, I guess.

25 Q.        Did Wanda sign the petition, do you know?

81

1   A.          No, I don't believe she did.

2   Q.          Now -- okay.  You wanted the deployment to the

3   postal service?

4   A.          Yes.

5   Q.          The deployment.  The detail.

6   A.          Yes.

7   Q.          Okay.  And that occurred after you signed the

8   petition?

9   A.          Yes.

10              But also, may I add, that the person

11  who -- and I can't remember her name that was handling my

12  EEO at that time regarding the Wanda EEO -- called me and

13  said to me on the phone:  If Inspector Kiel signs your

14  detail and let's you go to the detail at the postal

15  service, will you not sign the EEO?  And I said:  Hm.

16              And then I emailed her back because my word

17  and her word saying this was actually what had taken

18  place was of no use.  And I tried to get her to email

19  it, and then she rescinded on that.

20  Q.          Here is the point I'm trying to make.

21              You sign a petition; just like Marilyn and 58

22  other people, correct?

23  A.          Correct.

24  Q.          And she's claiming in this case, because she

25  signed the petition and participated in an interview

                                                            82

1  following up on the petition, that Atkins wouldn't

2  reassign her back to her old job and kept her as a

3  supervisor.

4          You understand that that's the argument she's

5  making in this case?

6  A.        Uh-huh, uh-huh.

7          MR. BACON:  Is that a "yes"?

8          THE WITNESS:  Yes.  I'm sorry.

9          MR. SCHARF:  Q.  Now you signed that

10 petition, right?

11 A.        Yes.

12 Q.        You wanted to get detailed to OIG.  I mean,

13 sorry.  To postal service.  Correct?

14 A.        Correct.

15 Q.        Kiel approved that, correct?

16 A.        Correct.

17 Q.        In other words, didn't retaliate, didn't

18 punish you for signing the petition but authorized you

19 to get the detail that you wanted, correct?

20 A.        Kiel was getting rid of me.  I was getting out

21 of his hair.

22 Q.        And then --

23 A.        It was a benefit for him to send me away.

24 Q.        Okay, but then Atkins became the INC, correct?

25 A.        Correct.

                                                    83

1  Q.        And Atkins, you said, had the authority, or

2  the power, to pull you away from your detail.

3  A.        He could have.

4  Q.        Right.  But he didn't.

5  A.        But I had a good relationship with him from

6  our days when he was back in Chicago.

7  Q.        Okay.  Do you think that Marilyn had a bad

8  relationship with him?

9  A.        I don't think it was as good as the

10 relationship I had with him.

11 Q.        You think that -- from your conversations with

12 Marilyn, did you ever form the opinion that Atkins was

13 not giving back -- giving her back her old job because

14 she signed the petition?  Did that thought even cross

15 your mind?

16 A.        I don't know that it did, no.

17 Q.        No.

18           And was your thought that maybe the reason why

19 Atkins is not giving Marilyn what she wants, or as

20 Atkins is letting you stay in your assignment and your

21 detail, is because maybe you have a better relationship

22 with Atkins than Marilyn does?

23 A.        But that's not fair.  If it works for one

24 person, then it should work for everybody.  And that's

25 why we -- that's part of why this --

84

1   Q.          But we're not here --

2               MR. BACON:  Let her finish.

3               MR. SCHARF:  Go ahead.

4               THE WITNESS:  That's part of why this

5   petition, wherever it was, was written in the first

6   place.

7               Just because I have a better relationship than

8   you do, we shouldn't be treated differently.  If you

9   have this opportunity, then I should have this

10  opportunity if I have the ability to have that.  And the

11  favoritism shouldn't be a part of it.  And if it is,

12  then that's wrong.

13              MR. SCHARF:  Q.  But they're not suing

14  because this was an unfair decision.  They're suing

15  because they think it's an unlawful employment

16  discrimination in that Atkins retaliated against

17  her.  Punished her by keeping her in that supervisor

18  position because she signed the petition and --

19              MR. BACON:  That's a statement; it's not a

20  question.

21              MR. SCHARF:  Q.  I know.

22              And participated in the follow-up interview.

23              Do you have any personal knowledge that

24  supports her claim in this case that Atkins punished her

25  because she signed the petition and participated in a

85

1   follow-up interview?

2   A.        No, I don't.  But let me also say that Alan

3   Kiel and I had had a good working relationship before he

4   got to the division where he became the inspector in

5   charge.  I never did anything to him, but I do believe,

6   because it's been a way of life at the inspection

7   service, that it didn't matter whether Atkins did

8   anything, or she did anything to Atkins, or she did it

9   to Kiel, or she did it to Gamache, or she did it to

10  anybody.

11           I believe that it comes down from on high.

12  And they are told -- I really believe that.  Because I

13  never did anything to Kiel.  I had been a direct report

14  to him.  And I hadn't seen him in years.  And when he

15  left, we were really not great friends, but we were

16  cordial to one another.  And then I am the big, bad,

17  ugly -- I'm the lousiest employee he's ever had.  What

18  did I do?  I never did anything to him.

19           But it came down from on high because that's

20  how this organization works.

21  Q.        You have some strong feelings about this.

22  A.        You betcha I do.  Because I have not only seen

23  it with me, with her -- excuse me.  I have seen it with

24  a number of other people.

25  Q.        Can you give me the name of any one of the

86

1  signatory -- of the 60 signatories to the petition who

2  you believe, and have personal knowledge to support that

3  belief, suffered an adverse employment action in

4  retaliation to their petition?  Signing the petition or

5  participating in a follow-up interview from that

6  petition?

7  A.        Yeah, I can see their face.  Sorry?

8            She's a blond inspector.

9            MR. SCHARF:  I don't need you to help her.

10           MR. BACON:  No, no.

11           MR. SCHARF:  Q.  But I need you to tell

12 me, of those 60 people, can you give me a name of

13 somebody that you have personal knowledge suffered

14 an adverse employment action which was retaliatory

15 from that person signing the petition or

16 participating in the petition process.

17           Can you give me that person's name?

18 A.        Judy McDermott.

19 Q.        Okay.  Was she the person that put together

20 the petition?

21 A.        I can't remember for sure, but I think maybe

22 she was.

23 Q.        Okay.  So -- you were just a signatory.

24 A.        Correct.

25 Q.        Right?

87

1             And as far as you know, Marilyn was just a

2    signatory.

3    A.        Correct.

4    Q.        Judy was the ring leader.

5    A.        I don't know that for a fact.

6    Q.        You've heard that.

7    A.        My memory tends to lean in that direction, but

8    I don't know that for a fact.

9    Q.        Can you give me -- other than Judy, can you

10   give me the name of any other person that was just a

11   signatory, that you have personal knowledge, that

12   supports the belief that they suffered adverse

13   employment action because they were retaliated against

14   for signing the petition?  For participating in the

15   petition process?

16   A.        Give me a minute.  Let me go through the

17   people.

18   Q.        Anybody other than Judy.

19   A.        Off the top of my head -- but I don't have --

20   I need to see -- it's been two years since I've been

21   working.  I don't remember all the people.  I need to

22   see a list of the names.

23             But off the top, she's probably the only one I

24   can think of.

25   Q.        Okay.  Thank you.  Thank you for that.

88

1           Now, you have not been a secretary, have you?

2    Are you trained as a secretary?

3    A.        When I started as a casual, that's what I was.

4    But not very well.

5    Q.        Okay.  And that is why you felt that it

6    wouldn't be a particularly good fit for you to be the

7    supervisor of that secretarial pool?

8    A.        No, I wouldn't like it.  I would have done a

9    really good job, but I wouldn't have liked it.

10   Q.        Okay.  So you wouldn't have applied for it?

11   A.        More than likely, no.  But if it was a

12   question of getting a grade back, I would have gone for

13   it.

14   Q.        Now, at the time that Marilyn was assigned to

15   the supervisor position, you were on your detail to the

16   postal service, correct?

17   A.        Correct.

18   Q.        And you were doing good work there?

19   A.        Correct.

20   Q.        And they were happy?  The postal service was

21   happy with your work?

22   A.        Yeah, I think the three awards kind of say

23   that, uh-huh.

24   Q.        And because of all of this mistreatment that

25   you've testified about, you were glad to be away from

89

1  the PIS.

2  A.        Yes, I was.

3  Q.        Okay.  So -- and you were -- physically you

4  were in a different location.

5  A.        Correct.

6  Q.        So, maybe not legally, but in a practical

7  sense, you were neither interested nor available to take

8  that particular job.  The supervisor job.

9  A.        I wasn't interested, but -- may I just refer

10 back to a previous instance where I had been on this

11 detail on another one of the three details that I did to

12 this position.  And one of the EAS11s was going to

13 retire, so they pulled me back, because it was

14 mandatory, and they had nobody else.  They had to pull

15 me back.  And she didn't put her papers in for another,

16 I don't know, eight months, and she didn't retire for

17 another couple after that.

18          But it was important that I get back to

19 replace her.  She sat twiddling her thumbs asking for

20 stuff to do.  So could they have left me there then?

21 Yeah, they could have.

22          It depends on what they want to do.  It

23 doesn't -- we're not talking about life or death.  It's,

24 like, if you've ticked somebody off, you're on the list.

25 And you're on the list until the day you leave.  And

90

```
 1  that -- and I'm not making it up.  I'm serious.
 2  Q.        Do you have personal knowledge that Marilyn
 3  ticked off Atkins in any way?
 4  A.        No, I don't.  I wasn't there.
 5  Q.        Okay.  Let me ask you.  I've just got to get a
 6  chronology.
 7            When was your first EEO complaint?
 8  A.        I believe -- it was sometime after 2000.
 9  Q.        Like --
10  A.        Either late 2000 or early 2001.
11  Q.        And who was the alleged discriminator, the
12  person that you considered the decision-maker that you
13  were challenging?
14  A.        Kathy Paramore and Alan Kiel.
15  Q.        And what kind of discrimination were you
16  alleging?  Racial discrimination, retaliation for
17  speaking your mind over the years?  What was the nature
18  of the charge or discrimination?
19  A.        You know, I can't --
20  Q.        Like, if it were an African American, it would
21  be racial discrimination; or a woman over 40 could be
22  gender or age.
23  A.        It was age discrimination.
24  Q.        Okay, so, it was the primary -- or the
25  gravamen of that complaint.  The major part.
```

91

1   A.        Yes.

2   Q.        You know what gravamen means?

3   A.        Yes.

4   Q.        Okay.  And age-related?

5   A.        Age-related.

6   Q.        Okay.  And that was the one about the not

7   giving back your sick time.

8   A.        In addition to -- yes.  In addition to, I was

9   the only one in the country that had the job taken away

10  from me.

11  Q.        Got it.

12            And now the second EEO complaint.  What time

13  frame was that?

14  A.        It was either late 2002 or early 2003.  I

15  think it was late 2002.

16  Q.        Okay.  And who was the decision-maker or the

17  discriminator?

18  A.        Alan Kiel.

19  Q.        Okay.  And what was the -- that was the one

20  involving the position that Wanda got that you didn't

21  get.

22  A.        Correct.

23  Q.        And what kind of discrimination were you

24  alleging?

25  A.        Retaliation.

                                                    92

1  Q.        Retaliation for what?

2  A.        For filing a former EEO complaint.

3  Q.        Oh, for the first EEO.  Okay.

4           And then did you ever file an EEO complaint

5  alleging discrimination or retaliation stemming from

6  your signing the petition?

7  A.        No, I didn't.

8  Q.        So both of your EEO complaints predated

9  Atkins's assignment?

10 A.        Correct.

11          MR. SCHARF:  Okay.  Those are all the

12 questions I have.

13              FURTHER EXAMINATION BY MR. BACON

14          MR. BACON:   Q.  Do you feel that your

15 signing this petition contributed to the inspection

16 services action of not promoting you?

17 A.        Yes.

18 Q.        Why?

19 A.        It was one of many things.  As I stated, if

20 you spoke out against them, which I initially did back

21 in 1999, I had marked myself.  And I was told that I was

22 going to do that by someone in the upper echelon of the

23 postal inspection service, in another district, in

24 another territory far, far away from here.

25          I was told:  If you do this, you realize the

93

```
 1  you are blatantly lying.  And they flew people out to do
 2  this.
 3  Q.        Let me ask you.  You mentioned about the
 4  signatures on the petition and the numbers.  How did you
 5  know who would sign the petition?  Did you actually see
 6  the petition with all the signatures on it?
 7  A.        I saw whoever had -- I guess whoever had -- my
 8  recollection is I saw whoever had signed ahead of me.
 9  But I knew -- and I didn't see who signed behind me.
10  But I knew the number from when I talked to Birch.
11  Q.        Oh, it was Mr. Birch that told you how many
12  people had signed it?
13  A.        Yeah.
14  Q.        How did you learn that Marilyn Lee had signed
15  the petition?
16  A.        I think Marilyn told me.
17            MR. BACON:  I have nothing further.
18            FURTHER EXAMINATION BY MR. SCHARF
19            MR. SCHARF:  Q.  Okay.  When Mr. Bacon
20  asked you whether you felt that you signed the
21  petition and it was one of the reasons why you
22  didn't get promoted, that's just a feeling you got.
23  A.        As opposed to somebody writing it down and
24  saying --
25  Q..       As opposed to you --
```

99

1  A.          -- you're not getting this because you signed

2  this petition?  Yeah.

3  Q.          I mean a subjective gut feeling as opposed to

4  actually having evidence that the decision-maker did not

5  promote you because you signed the petition.  Just sort

6  of a gut feeling you got.

7          MR. BACON:  That misstates her testimony.

8  She's talking about how they lied.  That's what she was

9  going into.

10          MR. SCHARF:  No, I'm referring to her

11  statement that -- is it your feeling -- or when she

12  testified that it's her feeling that one of the reasons

13  that she didn't get her promotion was because she signed

14  the petition.

15  Q.          Do you remember that testimony?

16  A.          I think that was part of it, yes.

17  Q.          Okay.  Who was the decision-maker that didn't

18  give you the promotion that you feel --

19  A.          Which one?  There were several.

20  Q.          Well, these would be decision-makers after you

21  signed the petition.

22  A.          Alan Kiel, Alan Kiel, Alan Kiel.

23  Q.          Okay.  And --

24  A.          But you also remember -- oh.  You also need to

25  remember that this petition, the chief knew about it

                                                    100

1  because of the ombudsman that had to report to him; the

2  ombudsman being Jim Birch.

3        And knowing how D.C. operates, I would lay

4  money on the fact that all the deputies knew and all the

5  upper echelon back in D.C. knew.  Because you don't get

6  rid of three people in one division, all in leadership,

7  and not have an explanation as to why.  That has never

8  happened before, ever, in any division anywhere in the

9  country.

10        MR. SCHARF:  Okay.  Those are all the

11  questions I have.

12        Do you have anything more?

13        MR. BACON:  I just have one.  I want to mark

14  this email from the chief.  It was after you left, but I

15  want to mark it and call your attention to a sentence on

16  the second page.

17                    (Plaintiff's Exhibit 13 marked

18                     for identification.)

19            FURTHER EXAMINATION BY MR. BACON

20        MR. BACON:  Q.  Looking at Exhibit 13.  If

21  you'll take a look at the second page in the middle,

22  it says:  Our focus for 2007.  And the Chief Postal

23  Inspector, Alexander Lazaroff says:  We will

24  eliminate the rift with the OIG.  It has become an

25  obsession that distracted us from our real mission.

1              And my question is, wasn't it pretty much

2    accepted as a reality that there was a large rift between

3    the inspection service and OIG?

4    A.        Yes.

5              MR. BACON:   I have no further questions.

6              MR. SCHARF:   Thank you very much for coming

7    in.

8              THE WITNESS:   You're welcome.

9              MR. SCHARF:   Off the record.

10                        ---oOo---

11             (The Deposition concluded at 4:36 p.m.)

12                        ---oOo---

13

14

15    _____

16                   KATHLEEN MARY O'LEARY

17

18

19

20

21

22

23

24

25

                                                        102

1  STATE OF CALIFORNIA )    SS.

2           I, DEBRA J. SKAGGS, CSR No. 7857, a Certified

3  Shorthand Reporter, do hereby certify that the witness in

4  the foregoing deposition was by me duly sworn to testify

5  to the truth, the whole truth, and nothing but the truth

6  in the within-entitled cause; that said deposition was

7  taken at the time and place therein stated; that the

8  testimony of said witness was reported by me, a Certified

9  Shorthand Reporter and a disinterested person, and was

10 under my supervision thereafter transcribed into

11 typewriting, and when so transcribed was carefully read

12 to or by the said witness, and, being in every desire,

13 was thereafter by the said witness duly subscribed; that

14 if unsigned by the witness, signature has been waived in

15 accordance with stipulation between counsel for the

16 respective parties.

17          And I further certify that I am not of counsel

18 or attorney for either or any of the parties to said

19 deposition nor in any way interested in the outcome of

20 the cause named in said caption.

21          IN WITNESS WHEREOF, I have hereunto set my

22 hand and affixed my signature this 4th day of June,

23 2008.

24 _____
   DEBRA J. SKAGGS, CSR No. 7857

25

                                        103