# Exhibit D

```
1              IN THE UNITED DISTRICT COURT OF THE STATE OF CALIFORNIA
2                          IN THE NORTHERN DISTRICT
3
4   MARILYN LEE,                    )
                                    )
5        Plaintiff,                 )
                                    )
6                                   )
         vs.                        )   Case No. C-07-2540SBA(e
7                                   )
                                    )   Volume 1
8   JOHN E. POTTER, UNITED STATES   )
    POSTMASTER GENERAL, UNITED      )   Pages 1 thru 85
9   STATES POSTAL SERVICE (Capital  )
    Metro Area) AGENCY, UNITED      )
10  STATES of AMERICA,              )
                                    )
11                                  )
         Defendants.                )
12                                  )
                                    )
13  _____)
14
15                          Deposition of
16                          KAYCEE GRAHAM
17                          May 29, 2008
18
19  Reported by:
20  Colleen Alvarado CSR # 11987                    COPY
21  ----------------------------------------------------------
22                       JAN BROWN & ASSOCIATES
23                    CERTIFIED SHORTHAND REPORTERS
24  701 Battery Street, 3rd Floor, San Francisco, California 94111
25                          (415) 981-3498

                                                              1
```

1  Q   What level was Ms. Ng?
2  A   Ms. Ng was a level 11.
3  Q   Did any employees ever tell you that they were afraid of
4      Mr. Atkins?
5  A   No, sir.
6  Q   Did you know Mr. Atkins was asked to retire?
7  A   No, sir.
8  Q   Did you know Mr. Atkins had a retirement party?
9  A   No, sir.
10 Q   Did you ever hear that Marion Post had filed a complaint
11     against Mr. Atkins?
12 A   No, sir.
13 Q   Do you know who else held this position that Marilyn Lee
14     had besides more Barbara Mendes and Ms. Ng?
15 A   After she left?
16 Q   After Marilyn Lee left, yes.
17 A   No, sir.
18         MR. BACON:  I have no further questions.
19         MR. SCHARF:  I have a some questions.
20
21              EXAMINATION BY MR. SCHARF
22         MR. SCHARF:
23 Q   With respect to the organizational chart, which was an
24     exhibit, did you actually supervise any person within the
25     team direct support group?

72

1  A    No, sir.
2  Q    Did you actually supervise any person with respect to the
3       domicile support group?
4  A    No, sir.
5  Q    And were you surprised by Marilyn's departure?
6  A    Yes, sir.
7  Q    Did you have a conversation with Mr. Atkins as to whether
8       you should be placed in the position of supervisor?
9  A    No, sir.
10 Q    Was that conversation before Marilyn was placed in that
11      position?
12 A    Yes, sir.
13 Q    Can you tell us a little about that conversation?
14 A    We discussed who would be best suited for that position.
15 Q    Was there any conversation -- did you have any
16      conversations about whether you were qualified to serve as
17      supervisor?
18 A    Yes.  I told him that if he wanted me in that position, I
19      would go to that position.  I did not feel it was a good
20      position for me, to which he agreed.
21 Q    And that's because of what you told us about your
22      communication issues?
23 A    Yes, sir.
24 Q    Okay.  Now, you worked as Mr. Atkins' secretary?
25 A    Correct.

73

| | | |
|---|---|---|
| 1 | Q | And you worked as Mr. Atkins' secretary from the point |
| 2 | | that Marilyn was assigned to be the supervisor -- |
| 3 | | correct? -- when you started, you started after -- |
| 4 | | immediately after she was assigned to be supervisor? |
| 5 | A | Our jobs were -- the details were at the same time. She |
| 6 | | was detailed to the administrative support supervisor, I |
| 7 | | was detailed to the IM secretary position. |
| 8 | Q | So you both started those positions at roughly the same |
| 9 | | time? |
| 10 | A | Correct. |
| 11 | Q | Then you continued to serve as his secretary throughout |
| 12 | | the period when Marilyn was serving as supervisor? |
| 13 | A | Yes. |
| 14 | Q | And during that period of time you had daily contact with |
| 15 | | Mr. Atkins? |
| 16 | A | Yes. |
| 17 | Q | And did you ever hear him make any statements about |
| 18 | | Marilyn that you construed to be either discriminatory or |
| 19 | | retaliatory?  For example, any statement that evidenced |
| 20 | | that he was angry or upset with her for signing a |
| 21 | | petition, for participating in a petition interview, or |
| 22 | | that he wanted to punish her for those activities? |
| 23 | A | No, sir. |
| 24 | Q | And did he ever make any statements to you while you |
| 25 | | worked as his secretary that he was even aware that she |

74

|   |   |   |
|---|---|---|
| 1 |   | had signed the petition or participated in a |
| 2 |   | petition-related interview? |
| 3 | A | No, sir. |
| 4 | Q | Now, how many people did Marilyn supervise when she was |
| 5 |   | serving as center supervisor, roughly? |
| 6 | A | Roughly five or six, I believe. |
| 7 | Q | And where were these people located in relation to where |
| 8 |   | you were? |
| 9 | A | In relation to my work, they were down the hall. |
| 10 | Q | And you knew who these people were? |
| 11 | A | Yes, sir. |
| 12 | Q | They were your friends? |
| 13 | A | They have any coworkers. |
| 14 | Q | And had contact with them? |
| 15 | A | Yes, sir. |
| 16 | Q | Did you ever hear them complain about Marilyn -- let me be |
| 17 |   | more specific. |
| 18 |   | Did you ever hear them complain that Marilyn was |
| 19 |   | an ineffective or bad supervisor? |
| 20 | A | No, sir. |
| 21 | Q | There was some questioning to you about Marilyn and |
| 22 |   | leaving because of stress. I want to find out about this |
| 23 |   | a little bit more. |
| 24 |   | For my next question I'm not talking about normal |
| 25 |   | work-related stress that we all experience, and I'm sure |

```
1      you're experiencing right now during this deposition.
2      I'm talking about stress that constitutes anxiety,
3      depression, or serious mental illness -- that kind of
4      level of stress.
5           Did you ever form an opinion that Marilyn, prior
6      to her departure, suffered from that kind of serious
7      mental illness?
8   A  No.
9   Q  You were asked questions about offering her a diversity
10     training program.
11          Was that in your opinion a positive thing or a
12     negative thing that you were offering her that
13     opportunity?
14  A  It's a positive thing whenever you're offered a training
15     opportunity.
16  Q  And was there anything going on or expected to be going on
17     with respect to the organization or reorganization of the
18     department that could explain why that would be a positive
19     thing?
20  A  Because there was information coming down that there would
21     be a reduction in force or a RIF is what they called it.
22     There were people who were scrambling to get training and
23     other types of things to put on their application.
24  Q  So would asking for an assignment that gives one
25     additional supervisory experience, is that a positive -- a
```

76

```
 1         helpful thing?
 2   A     Yes, sir.
 3   Q     And explain to us how would that help an employee in light
 4         of a potential reduction in force?
 5   A     Any -- anything you could put on your application that
 6         shows you have training or supervisory responsibility,
 7         it's all a positive information to go on an application.
 8   Q     Because it could help somebody survive a reorganization?
 9   A     Yes, it could.
10   Q     That would include the opportunity of the diversity
11         liaison training program?
12   A     Correct.
13   Q     Just a few more questions.  You began the deposition by
14         talking about a conversation that you had with Mr. Atkins
15         where you learned that Marilyn had requested to be
16         returned to her position as secretary.  Then you said
17         something about you offered.  He said I appreciate the
18         offer, but things are going well.
19               Is that what your wording is?  That Atkins told
20         you that he was not going to return her to the secretary
21         position because things were going well?
22   A     That's correct.
23   Q     I want to flush out that issue a little bit more.  From
24         your perspective as serving as Atkins' secretary, were
25         things going well?
```

JAN BROWN & ASSOCIATES (415) 981-3498

1  A     Yes.
2  Q     You were comfortable in that role?
3  A     Yes.
4  Q     He seemed to be comfortable with you serving in that
5        capacity?
6  A     Yes.
7  Q     Okay. And his office was functioning smoothly as far as
8        you could tell?
9  A     Correct.
10 Q     Okay. Now, from your perspective Marilyn's job as
11       supervisor, I understand she didn't actually supervise
12       you, but she supervised these other five people and you
13       had contact with them.
14              Did you feel that things were going well as to
15       Marilyn's new position as a supervisor?
16 A     Yes.
17 Q     So when he said to you things were going well and he did
18       not want to make a move because it would be disruptive,
19       did you agree or disagree with that?
20 A     I agree.
21 Q     You agreed? You thought that things were going well?
22 A     Yes, sir.
23              MR. SCHARF: That's all.
24
25              FURTHER EXAMINATION BY MR. BACON

78

```
 1        be removed from the secretary position and put in that
 2        supervisor position, did she?
 3   A    No, sir.
 4             MR. BACON:  I have no further questions.
 5             MR. SCHARF:  Let me take one break for a second.
 6
 7             MR. BACON:  Not the consultations.
 8
 9             (Attorney Client conference)
10
11             FURTHER EXAMINATION BY MR. SCHARF
12             MR. SCHARF:  I just have one question.
13   Q    You mentioned that you heard from Marilyn and others that
14        she had requested a supervisor-type position.
15             Is it your testimony that she had made some
16        general statements wanting some sort of a position, but
17        this particular position she didn't specifically
18        request?
19             MR. BACON:  Objection.  Misstates her testimony.
20        She said she never heard Marilyn Lee make that question.
21             MR. SCHARF:
22   Q    But here's the problem.  And I'm not trying to put words
23        in your mouth.  I'm just trying to understand how do you
24        reconcile your testimony that you said earlier today that
25        you had heard Marilyn -- that Marilyn had requested a
```

82

1           supervisor-type detail to enhance her resume, but your
2           testimony a few minutes ago that she didn't request this
3           specific supervisor assignment.
4                   How do you reconcile those two portions of the
5           testimony?  Are they inconsistent?
6    A      No.
7    Q      Explain.
8    A      Because she requested to have a job with supervisory
9           responsibility.  She did not specifically request that
10          job.
11                  MR. SCHARF:  Okay.  That's all I have.
12
13                  FURTHER EXAMINATION BY MR. BACON
14                  MR. BACON:
15   Q      What do you recall her actually saying about supervision?
16          Do you have any recollection that Marilyn Lee asked for
17          any assignment -- any other assignment that required
18          supervision?
19   A      Like I said, I recall her requesting either from her or
20          Mr. Atkins or Ms. Castor that she had requested a job with
21          supervisory responsibility to enhance her employee
22          attributes on her application.
23   Q      You're under oath?
24   A      Correct.
25   Q      Do you have any recollection as to when you ever heard

```
 1  STATE OF CALIFORNIA      ) SS
 2            I do hereby certify that the witness in
 3  the foregoing deposition was by me duly sworn to
 4  testify to the truth, the whole truth, and nothing
 5  but the truth in the within-entitled cause; that
 6  said deposition was taken at the time and place
 7  therein stated; that the testimony of said witness
 8  was reported by me, a certified shorthand reporter
 9  and a disinterested person, and was under my
10  supervision thereafter transcribed into typewriting,
11  and when so transcribed was carefully read to or by
12  the said witness, and, being in every desire, was
13  thereafter by the said witness duly subscribed; that
14  if unsigned by the witness, signature has been
15  waived in accordance with stipulation between
16  counsel for the respective parties.
17            And I further certify that I am not of
18  counsel or attorney for either or any of the parties
19  to said deposition nor in any way interested in the
20  outcome of the cause named in said caption.
21            IN WITNESS WHEREOF, I have hereunder subscribed my
22       hand this 16th day of June 2008.
23
24                           _____
                                  COLLEEN ALVARADO
25                             Certified Shorthand Reporter
```

85