# Exhibit G

 

January 2003

Inspector Birch:

We, the undersigned, are concerned about the negative morale in the Division, which appears to be a result of management decisions based on personal agendas and biases, rather than the best interests of the Division and its employees. Numerous management decisions appear to lack consideration of: Division resources, territory constraints, budgetary concerns, the realistic need for certain teams in the Division, fair and impartial treatment of employees, and treating employees with dignity and respect. We do not feel that employees are valued and respected for their knowledge and experience, nor can we freely express an opinion which differs from management, without fear of retaliation.

We respectfully request an independent investigation into the underlying reasons for the low morale, and the less than optimum working conditions in Division. We believe many people agree with our concerns but are afraid to come forward. We request that our names remain confidential, but will willing speak to someone regarding our specific knowledge of conditions and behavior in this Division which have contributed to the negative climate.

<u>SIGNATURE</u>                                      <u>PRINTED NAME</u>

*Maulyn Lee*                                       Marilyn Lee

San Francisco Division

EXHIBIT Pit. 10
                    Deft.            For Identification
Consisting of ___1___ Pages
Witness _____
Date 5-22-08
Debra J. Skaggs CSR 7857

Exhibit __×__
Page __1__ of __1__

pg. 3 of  5

Exhibit 5A

# Exhibit H



## Marilyn Lee – FY 2004 Yearend Evaluation
## November 5, 2004

Marilyn served approximately half the year as my personal secretary, then volunteered to serve as the ISOC for the remainder of the FY. This move was required because of significant personnel issues and conflicts in the admin center that needed to be addressed. Marilyn took over that supervisory role and was able to turn the section around while increasing productivity and practically eliminating dissent.

Marilyn's strength is in her supervisory abilities. I cannot understate this observation, because even though she was an excellent secretary, Marilyn has proved she can address significant problem areas and come up with equitable solutions. The morale of the admin staff, their ability to work as a team, and their subsequent improvement in productivity are directly attributable to Marilyn's interpersonal and supervisory abilities.

Marilyn took over her supervisory duties at my personal request, and not because it was a position she desired. Subsequently, Marilyn has proven herself to be indispensable to the organization in this role. I have nothing but high praise for her contributions as secretary, but the additional responsibility and scope of her new assignment really pinpointed Marilyn's strengths. I have no recommendations for Marilyn's improvement during FY 2005. I will continue to recommend Marilyn for various training and educational courses in order to more firmly develop her leadership and management qualities while enabling her to become more and more competitive for more challenging assignments.

W. P. Atkins

**W.P. Atkins**
**Inspector in Charge**
**San Francisco Division**

Exhibit __8__
Page __1__ of __1__

# Exhibit I



**MARILYN N. LEE**
**EEO FILE # 66-000-0053-05**

## INVESTIGATIVE QUESTIONS FOR WILLIAM ATKINS

Note: In order to ensure your affidavit is clear and detailed, you must answer every question and every subpart of every question. If you cannot answer a question, state why you cannot answer. You may give approximations, but only when you cannot be more specific and only when you indicate that your answer is an approximation.

1. State the following information:
   a. Your complete name
   b. Your race
   c. Your sex
   d. Your job title
   e. Your supervisory relationship to the complainant, Marilyn N. Lee, in June and July 2005

2. You have the right to representation. If you are waiving this right, please state so. If you have a representative, indicate the following information:
   a. Name of your representative
   b. Title
   c. Complete address
   d. Telephone number (please include area code)

3. Are you aware of the complainant's race and/or sex? If so, how did you become aware and when?

4. Are you aware of the complainant's medical condition(s)? If so, how did you become aware and when?

5. Are you aware of the complainant's participation in prior protected activity? If so, how did you become aware and when? Were you involved in this prior protected activity? If so, what was your involvement and when were you involved?

**Accepted Issue #1: Signed a petition which resulted in the removal of three USPIS managers**

6. Were you aware that the complainant signed a petition in 2003, which allegedly resulted in the removal of three USPIS managers? If so, how did you become aware and when?

7. Did you have any involvement in the complainant signing the petition? If so, what was your involvement and when?

Affidavit _D_
Page _1_ of _2C_

WILLIAM ATKINS  **AFFIDAVIT QUESTIONS** #66-000-0053-05    2

8. If you were involved in this issue, were you subsequently involved in any action or incident that was influenced by the knowledge of the complainant signing the petition? Did this result in an adverse action for the complainant? If so, what, when did it occur and who was responsible? Was the complainant's IG detail cancelled as a result? If so, why, who was responsible and when did this occur? Was the complainant removed from her secretary position as result? If so, why, who was responsible and when did this occur?

**Accepted Issue #2: Participated in a meeting with managers investigating the petition**

9. Were you aware the complainant participated in a June 2003 meeting with management investigating the petition? How did you become aware of the meeting and when?

10. Were you involved in the June 2003 meeting between the complainant and management? If so, how were you involved?

11. If you were involved in this issue, were you subsequently involved in any action or incident that was influenced by the knowledge of the complainant participating in the meeting with management? Did this result in an adverse action for the complainant? If so, what, when did it occur and who was responsible? Was the complainant's IG detail cancelled as a result? If so, why, who was responsible and when did this occur? Was the complainant removed from her secretary position as result? If so, why, who was responsible and when did this occur?

**Accepted Issue #3: Denied request to be placed back in bid job**

12. Were you involved in denying the complainant's request to be placed back on her bid job (i.e., secretary) on June 19, 2005? If so, what was your involvement and when were you involved? Did you concur with this decision? If so, why did you concur with this decision?

13. The complainant alleges you allowed her physical and mental health to deteriorate due to stress when you intentionally would not allow her to be removed from her supervisor job and/or return to her bid job. Please respond. Were you involved in this? If so, what was your involvement and when? Did the complainant request, from you, to be placed back on her bid job (i.e., secretary)? Did she inform you that she did not wish to be a supervisor? If so, what was her reason for this?

14. The complainant alleges you did not want her to return to a secretary position due to her role in (1) signing a petition in February 2003 and (2) meeting with management in June 2003, regarding the petition. Please respond. Did you not allow the complainant's removal from her supervisory job and return to a secretary job as a result of her 2003 involvement with the petition? If so, why? Did you tell the complainant you could not allow an employee to "turn on you" or gather information on employees? If so, what did these comments refer to?

Affidavit _U_
Page _2_ of _20_

WILLIAM ATKINS          AFFIDAVIT QUESTIONS          #66-000-0053-05          3

15. If you concurred with the June 19, 2005 denial of the complainant's request to be placed back in her bid job, what policy or procedure supported your concurrence? How was it supported? <u>Please provide a copy of this policy or procedure.</u>

16. If you concurred with the June 19, 2005 denial of the complainant's request to be placed back in her bid job, did you do so due to her race? If so, why?

17. If you concurred with the June 19, 2005 denial of the complainant's request to be placed back in her bid job, did you do so based on her sex? If so, why?

18. If you concurred with the June 19, 2005 denial of the complainant's request to be placed back in her bid job, did you do so based on her alleged medical condition? If so, why?

19. If you concurred with the June 19, 2005 denial of the complainant's request to be placed back in her bid job, did you do so in retaliation for her participation in protected activity? If so, why?

20. If you concurred with the June 19, 2005 denial of the complainant's request to be placed back in her bid job, did you do so in retaliation for the complainant signing a petition in February 2003 regarding management employees, or participating in a June 2003 meeting with management investigating the petition? If so, why?

21. If you concurred with the June 19, 2005 denial of the complainant's request, did you concur with the denial of any other employee's request to be placed back into his/her bid job? If so, what happened and when? Please list the employee's name, race, sex, job title, supervisor's name and your awareness of his/her disability and participation in protected activity.

22. If you concurred with the June 19, 2005 denial of the complainant's request, did you concur with granting any other employee's request to be placed back into his/her bid job? What happened and when? Please list the employee's name, race, sex, job title, supervisor's name and your awareness of his/her disability and participation in protected activity.

23. Specifically address Kelly Miller and Anita Cabano. Did you concur with granting or denying Kelly Miller's request to be returned to his/her bid position? Did you concur with granting or denying Anita Cabano's request to be removed from her supervisory position? If so, what happened and when? Why did you or did you not concur with the decision made? Please list the employee's race, sex, job title, supervisor's name and your awareness of his/her disability and participation in protected activity.



WILLIAM ATKINS          AFFIDAVIT QUESTIONS          #66-000-0053-05          4

24. Did you concur with allowing the following employees, who were on a detail, to return to their bid position: K. O'Leary, Anita Cabano, Wanda Smith, Rita Perada, Carole Edwards, Florita Andres, Alice Abe, Teresita Venegas? If so, why? When did this occur? Were these employees treated differently than the complainant? If so, why? Please list the employee's name, race, sex, job title, supervisor's name and your awareness of his/her disability and participation in protected activity.

### Accepted Issue #4: Informed of scheduling for fitness for duty and placement on administrative leave

25. What was your involvement in informing the complainant that she would be scheduled for a fitness for duty examination and was being placed on administrative leave? Did you make this decision? If not, who did?

26. Was any other management person involved in either making the decision or informing the complainant that she would be scheduled for a fitness for duty examination and placed on administrative leave? If so, what was his/her involvement and when was he/she involved? Please list the name, job title and contact information for the person(s) involved.

27. Why was the decision made to schedule the complainant for a fitness for duty examination and place her on administrative leave? What reason was the complainant given for this?

28. The complainant alleges she was not scheduled for a fitness for duty evaluation for more than 30 days after being placed on administrative leave and was only scheduled after she filed a pre-EEO complaint. Please respond. Were you responsible for scheduling the fitness for duty evaluation? If so, what length of time between placement on administrative leave and a fitness for duty evaluation is considered acceptable or usual? What happened in the complainant's case?

29. What policy or procedure supported the decision to schedule the complainant for a fitness for duty examination and place her on administrative leave in July 2005? How was it supported? Please provide a copy of the policy or procedure with your affidavit.

30. Was the complainant informed she would be scheduled for a fitness for duty examination and placed on administrative leave due to her sex? If so, why?

31. Was the complainant informed she would be scheduled for a fitness for duty examination and placed on administrative leave due to her race? If so, why?

32. Was the complainant informed she would be scheduled for a fitness for duty examination and placed on administrative leave due to her alleged medical condition? If so, why?

Affidavit _D_
Page _4_ of _20_



33. Was the complainant informed she would be scheduled for a fitness for duty examination and placed on administrative leave in retaliation for her prior participation in protected activity? If so, why?

34. Was the complainant informed she would be scheduled for a fitness for duty examination and placed on administrative leave due to signing a petition in February 2003 or due to the complainant's participation in a meeting with management in June 2003? If so, why?

35. What other employee did you inform or decide he/she would be scheduled for a fitness for duty examination and placed on administrative leave after making a statement about hurting himself/herself? What happened and when? Please list the employee's name, race, sex, job title, supervisor's name and your awareness of his/her disability and protected activity.

36. What other employee did you not inform or decide he/she would be scheduled for a fitness for duty examination and placed on administrative leave after making a statement about hurting himself/herself? What happened and when? Please list the employee's name, race, sex, job title, supervisor's name and your awareness of his/her disability and protected activity.

37. Did the complainant file an appeal regarding being informed that she would be scheduled for a fitness for duty examination and placed on administrative leave? If so, what is the status of the appeal? What was the result?

38. What other relevant information would you like to include? Please support the information with documentation, if available.

Affidavit _D_
Page _5_ of _20_

| U.S. Postal Service | | | Page No.  1 | No. Pages | File No  66-000-0053-05 | |
|---|---|---|---|---|---|---|
| **EEO Investigative Affidavit (Witness)** | | | | | | |
| 1. Affiant's Name (Last, First, MI)  HTKins, William P | | | 2. Employing Postal Facility  POSTAL Inspection Service | | | |
| 3. Position Title  Inspector in Charge | 4. Grade Level  ISES - 1 | | 5. Postal Address and Zip +4  P.O. Box 882528, SF, CA94188 2528 | | 6. Unit Assigned  San Francisco | |

**Privacy Act Notice**

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

**USPS Standards of Conduct**

Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 666)

7 Statement (Continue on Form 2569 if additional space is required)

See ATTACHED Statement

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature  W. P. Atkins | Affidavit D  Page 6 of 20 | Date Signed  12/29/05 |
|---|---|---|

PS Form 2568-B, March 2001



Marilyn Lee Affidavit, EEO File # 66-000-0053-05

1.     My name is William P. Atkins. I am a Caucasian male, and I am the Inspector in Charge of the San Francisco Division. I had no supervisory relationship to Marilyn Lee in 2005.

2.     Ed Lawee is my legal representative. Ed is an inspector/attorney located at 390 Main St., 3rd floor, San Francisco, CA, 94188-2528; 415-778-5958.

3.     I became aware of complainant's sex and race when I first reported to the San Francisco Division in September 2003 as the Inspector in Charge (INC). She was the INC's secretary at that time and therefore my secretary.

4.     I am unaware of any medical condition suffered by Ms. Lee until she filed a work-related stress claim in mid-August 2005 after she was placed on administrative leave on July 15, 2005.

5.     I am unaware of what prior protected activity to which this question refers. I was aware that Ms. Lee signed a petition in 2003 when she came into my office during the first week I was assigned to the division in September 2003 to advise me of this fact. During that first week, I noticed she was upset and asked her into my office. I don't recall the specifics but it was generally about her dissatisfaction working for the prior INC and at some point she mentioned signing a petition.

6.     See response to #5, above. As clarification, no employees were removed as a result of that petition. The INC, Alan Kiel, chose to retire which I think was sometime during July 2003. One Assistant Inspector in Charge (AIC) was promoted to INC at HQ, and one AIC was reassigned as a performance manager reporting directly to the Deputy Chief Inspector.

7.     I had no involvement with the complainant signing the petition, as I was not even part of the San Francisco Division during at that time. I was not part of the San Francisco Division when that petition was circulated, and I was not adversely affected by that petition. As a result of the vacancy created by the retirement of INC Kiel I was promoted as INC of the SF Division and I reported in September 2003, as indicated above. Prior to my promotion, I was the AIC of the Seattle Division from 1998-2003.

8.     Since reporting to the San Francisco Division in September 2003, none of my actions have been influenced by that petition. Since I have been INC, Ms. Lee has never been the subject of any adverse actions. Ms. Lee's Postal IG detail was not cancelled as a result of her signing a petition. It was canceled because the IG Special in Charge (SAC) refused to assume Ms. Lee's salary. This occurred in April or May 2005. Ms. Lee was not removed from her INC secretary position which is an EAS Level-14 position. She was assigned to another Level 14 position as the



*lupe*
*11/29/05*

Administrative Support Center supervisor in June 2004, based on her request for a detail for a supervisory position to be more competitive for a higher level position.

9.    I was unaware of any management meeting in June 2003 investigating the petition until Ms. Lee referenced it in her documentation in support of her work-related stress claim submitted in August 2005.

10.    I was not involved in a June 2003 meeting between Ms. Lee and management. I did not arrive at the San Francisco Division until September 2003 and as stated in #9 above, I was not aware of any such meeting taking place in June 2003 until Ms. Lee disclosed that fact in August 2005.

11.    See my answers to #8, 9 and 10, above.

12.    In this question, you refer to the "secretary" position as a "bid job". As clarification, there are no bid positions in the Postal Inspection Service. Bid positions apply to craft employees and not to non-bargaining unit employees such as EAS level employees. Sheilah Castor, Administrative Specialist, and I discussed Marilyn's request to return to the secretary position in June 2005. We agreed Marilyn was our best supervisor of people, and we had no feasible replacement for her as a supervisor. Ms. Lee had requested the detail to her supervisory position so that she could enhance her skills so that she would be more competitive for a higher level position. I complied by giving her that opportunity in June 2004. Marilyn proved to be so effective as a supervisor, that we felt compelled to keep her in that capacity. Ms. Castor and I also felt Marilyn's skills had far surpassed those required to be a secretary, and we felt she would eventually be bored if she returned. For the good of the division, Sheilah and I made the decision that she should remain as the administrative support center supervisor.

13.    I believe Ms. Lee only began to complain about returning to the job of INC secretary when I moved Kaycee Graham into that position in September 2004. Ms. Lee and Ms. Graham do not like each other, and I believe there was considerable jealousy that was developed by Marilyn at this time. I spoke to Marilyn numerous times about the fact that I needed her to supervise the administrative staff; I explained I had no one nearly as good to replace her in that position; and I told her I did not think the secretary position would satisfy her after being a supervisor. Ms. Lee acknowledged she was the best supervisor, but still wanted to return to the secretary position. In December 2004, I gave Marilyn an achievement award for her work as the admin. ctr. supervisor. Ms. Lee never told me and I was not aware her mental and physical health had deteriorated as a result of her supervisory role.

14.    As discussed above, I did not even know about a management meeting in 2003 until Ms. Lee filed her stress claim in August 2005. I did not want her back as the INC secretary because she was doing an excellent job as the admin center supervisor. No other factors played a role in my decisions about Ms. Lee. Ms. Lee did a good job as a secretary, but her replacements did as well or better when given the opportunity. However, Ms. Lee excelled as a supervisor, and she did better

Affidavit  *Ṭ*
Page  *8*  of *30*

2



12/29/05
upa—

than her predecessor or anyone else I had available. I could not reduce the effectiveness and operational efficiency of the division just to cater to Ms. Lee's preferences. As the Inspector in Charge of the San Francisco Division, it is my responsibility to make decisions that place personnel in positions that will enable them to be productive, and that will enhance the performance of the division. That is what was done when I put Ms. Lee in the supervisory position. I never made a comment that I could not allow an employee to "turn on me".

15.    See my responses to #s 12, 13 and 14 above. I will also reiterate that within the Postal Inspection Service, there are no bid positions. As a Level 14 employee, Ms. Lee could be assigned to any Level 14 position at the division. In fact any support employee (or inspector or Team Leader for that matter), can and do have their assignments changed, as long as it is within the same pay level.

16.    My denial to her request to return as the INC secretary was for the reasons discussed in my responses to #s 12, 13 and 14 above. It was not because of her race.

17.    See response to #16, above. It was not because of her gender.

18.    See response to #16, above. I was not aware of any medical condition on June 19, 2005 nor do I believe she had a medical condition at that time.

19.    See response to #16, above. As I stated above, I'm unaware of what protected activity this question refers to. If it is referring to her signing a petition in 2003, Ms. Lee made me aware of it in September 2003. Also, this fact was never discussed again until Ms. Lee went on sick leave claiming stress in August, 2005 and alleging that her signing the petition in 2003 is the reason I denied her request to return as secretary in June 2005. I denied her request for the reasons stated in #12, 13 and 14, because she was doing an excellent job as the administrative support center supervisor. The fact that she signed a petition involving prior management is a piece of information about Ms. Lee that has absolutely no significance to me.

20.    See response to #19, above concerning Ms. Lee signing the petition. As for the meeting in June 2003, as I have stated, I was not even aware of it when I denied Ms. Lee's request to return as INC secretary in June 2005.

21, 22, 23 and 24:  These four questions seem to overlap in their reference to the reassignments of other employees and those specifically referenced in 23 and 24. So I will collectively respond to the four questions. Ms. Lee is the only employee I have encountered who demanded or insisted on being returned to a particular position. Other employees have been reassigned including being directed to transfer domiciles, probably not to their liking or preference, but no one has demanded or insisted they be placed in a particular location or assignment. Personnel changes are based on various factors but primarily the needs of the division. Additionally, virtually all of the individuals referenced in questions 23 and 24 are Level 11

Affidavit 1)
Page 9 of 30

3





Inspection Service Operations Technicians (ISOTS), which is the level of support staff that Ms. Lee supervised. Anita Cabano is the only other Level 14 employee referenced. One other individual listed, Carole Edwards was the Level 16 (now Level 18) Forfeiture Specialist for the Division.

Concerning Kelly Miller, referenced in question 23, she is a Level 11 ISOT. She was initially assigned to the San Jose Domicile but was transferred to the Oakland Domicile in April 2004 when Elizabeth Karp (Level 11) was transferred to SF DHQ from the Oakland Domicile. Ms. Miller is Asian, and I am not aware that she has any disability or participated in prior protected activity. She did not request the transfer and would have probably preferred remaining in San Jose but operationally, it was necessary for her to be transferred to Oakland. Her present supervisor is Kaycee Graham.

Concerning Anita Cabano, referenced in Questions 23 and 24, she was the administrative center support supervisor, prior to Ms. Lee. For approximately one year from September 2004 to September 2005, she had a detail as the forfeiture specialist when Ms. Edwards was assigned to large-scale mail fraud case to develop the forfeiture aspects of the investigation. When that assignment ended, Ms. Edwards, as the only Level 16 in the division, necessarily reverted back to her normal duties as the division Forfeiture Specialist. Ms. Cabano was then reassigned and has been the INC's secretary since around September 2005. I am not aware that Ms. Cabano (Hispanic) has any disabilities or participated in prior protected activity. Her supervisor is Sheilah Castor, Administrative Specialist.

In fact, even though the other Level 14s are not named, there are a total of four Level 14 employees in the division, including Ms. Lee, Ms. Cabano, Ms. Barbara Mendes (Asian) and Ms. Kaycee Graham (Caucasian). I referenced Ms. Graham above as I believe a reason for Ms. Lee's dissatisfaction with the supervisory position coincided with Ms. Graham being assigned as the INC's secretary around September 2004 because they dislike each other. Ms. Graham was replaced by Ms. Cabano in September 2005. I will also state that Ms. Graham was previously the support employee assigned to the Oakland Domicile and had been there for several years. However, after a Headquarters Resource Deployment Review determined that a Level 14 could not be at a domicile below a certain number of inspectors, she was reassigned to SF DHQ. It is also likely this was not to her liking because of the added commute. During the spring 2005, Ms. Graham was the administrative specialist when Sheilah Castor was on a detail to Bala Cynwyd PA. With Ms. Lee being placed on administrative leave and now on sick leave pending her workers compensation stress claim with the Department of Labor, Ms. Mendes is presently the administrative support center supervisor. Previously, she supervised the Level 11 ISOTs who were assigned to support specific investigative team of inspectors. With Ms. Mendes being reassigned as administrative support center supervisor, Ms. Graham supervises those ISOTs. Both are supervised by Sheilah Castor as the Administrative Specialist. I reference all four Level 14 employees to show that they are all subject to reassignment and are assigned to the various Level 14 positions in the division, as necessary. These moves are made periodically, that reflect the changing needs of the division and I place the personnel where I feel they will best serve the division.

Affidavit ___D___
Page ___/0___ of ___20___

4

I must also reiterate that Ms. Lee was assigned as the administrative center supervisor in June 2004 at her request for supervisory experience to enhance her promotability. It is unfortunate that she had an expectation that she could revert back according to her schedule or convenience. The fact is she did an excellent job as a supervisor. She had the ISOTs cross-trained and due to her interpersonal skills there was a more harmonious working atmosphere in the center. I felt it would have been imprudent not to have her remain as the supervisor. I should also add that during July 12-16, 2004, she attended training for Investigative Analysts at St. Louis MO that no other support employee at the division received. During the week of October 4, 2004, she attended a Supervisor Training Program at the Career Development Division (CDD) in Potomac VA. As indicated above, in December 2004, I gave her an achievement award for her work as the administrative center support supervisor.

Concerning the employees listed in question #24, all of them except Anita Cabano and Carole Edwards are Level 11 ISOTs. I have discussed Ms. Cabano and Ms. Edwards (Caucasian) above. Ms. Edwards is the Forfeiture Specialist which was a Level 16 position, now a Level 18. As I stated, she resumed her regular duties after her assignment in the mail-fraud investigation ended around September 2005. However, as a Level 16, I'm not sure how she is a comparable employee to Ms. Lee. When Ms. Edwards resumed as the division forfeiture specialist, Ms. Cabano who had the forfeiture specialist detail, assumed the INC's secretary position in September 2005. Just as Ms. Lee had requested a supervisory detail which I accommodated, Ms. Cabano requested a detail as a forfeiture specialist which was also accommodated. However, as a Level 16 employee and the only Level 16 in the division, Ms. Edwards was entitled to resume her position as the Forfeiture Specialist. I am not aware that Ms. Edwards has any disabilities or that she participated in prior protected activity. Her supervisor used to be Fraud Team Leader Bea Moore. But incident to the level upgrade, all the Forfeiture Specialists nationwide report to a manager at Headquarters.

The other individuals listed in Question 24, are all Level 11 employees. K. O'Leary (Caucasian) is on a detail with the Postal Service. Wanda Smith (African-American) was a recruitment specialist on an approximate two year detail reporting to Headquarters. At the conclusion of that detail she reverted back to her Level 11 position and was at the admin. ctr. She transferred to the Postal Service as the Stockton Plant Manager's secretary effective December 12, 2005. Rita Perada (Caucasian) also had a detail as the forfeiture specialist from approximately April 2004 to August 2004 and then resumed her Level 11 ISOT duties in support of an investigative team. Florita Andres (Asian) had a detail as the INC's secretary during the summer of 2004 and at the conclusion of the detail resumed her Level 11 ISOT duties also in support of an investigative team. Ms. Perada and Ms. Andres are presently supervised by Ms. Graham. Alice Abe (Asian) was a Level 11 mail cover technician for several years. When that operation was to be transferred to Chicago and the Level-15 Mail Cover specialist retired in January 2005, she took over that detail for that transitional period. When the mail cover transition to Chicago was finalized, she resumed her Level 11 ISOT position around May 2005 which is presently at the administrative support center supervised by Ms. Mendes. Teresita

Venegas (Hispanic) is presently on a detail as a Level-19 Information Technology Specialist (IT) as of November 14, 2005.

I am not aware of any of them having any disabilities. I am not aware of any of them engaging in protected activity except K. O'Leary.

All the Level 11 employees reverted back, or will revert back, to their Level 11 positions after completing the higher level details for developmental or operational purposes. However, all Level 11 ISOTS can and are reassigned to any other Level 11 position within the division. This occurs periodically, just as the reassignments of the Level 14 personnel and the inspectors.

25.    Administrative Specialist Sheilah Castor and AIC Rob Bethel informed Ms. Lee that she was to be placed on administrative leave pending a fitness for duty examination as a result of comments Ms. Lee made to Acting AIC Sally Diaz concerning her intention to cause herself harm. I made the decision to put Ms. Lee on administrative leave as a result of my concern for Ms. Lee's personal safety.

26.    See response to #25, above.

27.    See response to #25 above.

28.    While the request for the fitness for duty exam was initiated by me, the scheduling for the exam is handled by the agency's medical personnel that does not involve the division. It is my understanding that the agency physician was not immediately available to review the request which caused the delay.

29.    A copy of the July 15, 2005 letter placing Ms. Lee on administrative leave is attached. It was based on statements made by Ms. Lee during a July 13, 2005 conversation with Acting Assistant Inspector in Charge Sally Diaz indicating intent to harm herself.

30.    Ms. Lee was not informed she was being placed on administrative leave and scheduled for a fitness for duty because of her sex.

31.    Ms. Lee was not informed she was being placed on administrative leave and scheduled for a fitness for duty because of her ~~gender.~~ RACE.

32.    Ms. Lee was not informed she was being placed on administrative leave and scheduled for a fitness for duty because of an alleged medical condition and I was not aware of any alleged medical condition when she was advised of these personnel actions on July 15, 2005.

33.    Ms. Lee was not informed she was being placed on administrative leave and scheduled for a fitness for duty as retaliation for her prior participation in protected activity.

34.    Ms. Lee was not informed she was being placed on administrative leave and scheduled for a fitness for duty exam due to signing a petition in February 2003 or

 

due to Ms. Lee's participation in a meeting with management in June 2003. While I was aware of her signing a petition I was not aware of the management meeting when she was advised of these personnel actions on July 15, 2005.

35.    I am not aware of any employees in my 25 year Postal Inspection Service career who have made a statement that they wanted to harm themselves. Had such statements been brought to my attention, as a manager, I would have had an obligation to place them on administrative leave pending a fitness for duty as I did with Ms. Lee.

36.    See response to #35 above

37.    I am unaware of any appeal filed by Ms. Lee regarding her fitness for duty examination.

38.    There is no other additional information, at this time.

I declare under penalty of perjury that the foregoing is true and correct.

W. P. Atkins

W. P. Atkins                                    Date:  12 - 13 - 05
Inspector in Charge
San Francisco Division

Affidavit  D
Page  13 of 20

7




**U.S. Postal Service**
**Certification**

| Case No. |
|---|
| **66-000-0053-05** |

I have read the proceeding attached statement, consisting of ___ pages, and it is true and complete to the best of my knowledge and belief. In making this statement, I understand Section 1001, Title 18 of the U.S. Code which states:

> "Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."

### Privacy Act Notice

Privacy Act Notice  The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for Investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for the Postal Service employees and other witnesses.

### USPS Standards of Conduct

Postal Service Regulations require all postal employees to cooperate in any postal investigation.

Failure to supply the requested information could result in disciplinary action. (ELM 666)

### Oath Affirmation

Subscribed and (sworn) (affirmed) before me on the _____ day of _____, 20___.

*(Affiant, sign in the presence of an EEO Complaints Investigator.)*

| Signature of EEO Complaints Investigator | Signature of Affiant |
|---|---|
| | |

### Declaration

I declare under penalty of perjury that the foregoing is true and correct.

*(Affiant, sign and date if attached statement was not completed in the presence of an EEO Complaints Investigator.)*

| Signature of Affiant | Date Signed |
|---|---|
| *li.r. Erekung* | *12/29/05* |

Affidavit _D_
Page _14_ of _20_

PS Form **2571**, March 2001

 

## ROBERTA LUDWIKOWSKI

*Contract EEO Complaints Investigator*

December 19, 2005

William Atkins, INC
US Postal Inspection Service
P.O. Box 882528
San Francisco, CA 94188-2528

Delivery Notification
0304 1560 0003 6321 3663

Subject:  Signature Needed
Agency Case No. 66-000-0053-05

Dear Mr. Atkins:

I have received your affidavit response in the above named EEO complaint.  Upon reviewing your affidavit statement, I became aware that you did not sign and date each page of your affidavit as previously instructed, nor did you complete PS Form 2568-B, EEO Investigative Affidavit (Witness).  In addition, a signed and dated PS Form 2571, Certification, indicating your affidavit is true and complete was not included in your affidavit response.  I also noticed that your answer to affidavit question number 31 referred to the complainant's gender when this question was about her race.

The agency requests that each affidavit page be signed and dated by the affiant.  Your unsigned and undated affidavit pages are enclosed with this letter.  Please sign and date each of the enclosed affidavit pages.  In addition, PS Forms 2568-B and 2571 are enclosed.  Please fill in the information requested at the top of PS Form 2568-B and sign and date the bottom of the page.  Please sign and date PS Form 2571 in the "Declaration" section of the form.

Please review your response to affidavit question number 31.  Did you intend to state "race" rather than "gender" in your response?  If so, please make the correction on your affidavit prior to returning it to me.

Return your completed or corrected, signed and dated affidavit pages, PS Form 2568-B and PS Form 2571 to me **no later than five calendar days** from delivery of this package.  Please mail your response to me at:

Roberta Ludwikowski
Contract EEO Complaints Investigator
P.O. Box 330
New London, WI 54961-0330

Affidavit _D_
Page _15_ of _20_

 

If you have any questions or concerns regarding this request, please call me at (920) 982-6699. Thank you for your cooperation and timely response.

Sincerely,

Roberta Ludwikowski
Contract EEO Complaints Investigator

Enclosed:  6 affidavit pages
         PS Forms 2568-B and 2571
         Affidavit questions – page 4

Affidavit _D_
Page _16_ of _30_

 

## ROBERTA LUDWIKOWSKI

*Contract EEO Complaints Investigator*

November 30, 2005

William Atkins
US Postal Inspection Service
P.O. Box 882528
San Francisco, CA 94188-2528

Subject: **Witness Affidavit**
Agency Case No. 66-000-0053-05

Dear Mr. Atkins:

I have been assigned to conduct the EEO investigation into Marilyn N. Lee's allegation(s) of discrimination. (See enclosed authorization letter.) Specifically, she alleges that she was discriminated against based on her race, sex, disability and in retaliation for prior protected activity when: (1) in February 2003, she signed a petition that resulted in the removal of three USPIS managers; (2) in June 2003, she participated in a meeting with managers investigating the petition; (3) on June 19, 2005, her request to be placed back into her bid job was denied; and, (4) on July 15, 2005, she was informed that she would be scheduled for a fitness for duty examination and was being placed on administrative leave.

The attached affidavit questions need to be answered so I may continue with the EEO investigation. You are required to answer these questions separately and fully in writing, under oath (sign and date PS Form 2571), and to forward your responses to me **no later than seven (7) days from receipt of this request.** You should respond to these questions in a narrative format, and fully respond to each question and sub-part.

Be advised that an affidavit is a written declaration made under oath and can be entered as evidence in a court of law. Also, be advised that anyone completing an affidavit has the right to representation should he/she so choose.

In answering the following questions, state your answer to the question on the **enclosed PS Form 2568-B**. PS Forms 2569, Affidavit Continuation Sheets, should be used if additional space is needed to answer the questions. Answer the questions in the order set forth in the enclosed document. Please print or type your questions and answers. You should keep a copy of your affidavit for your records. Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 666)

Affidavit _D_
Page _17_ of _30_

 

The affidavit and certification forms can be e-mailed to you if you would prefer to complete them with the use of a personal computer. These forms will need to be printed out, signed, dated and returned to me when you have completed your affidavit. Please let me know if you would like me to e-mail the forms to you. If I am not available when you call, please leave a message that includes your e-mail address with the USPS.

Please mail your affidavit and any supporting documents to:

Roberta Ludwikowski
Contract EEO Complaints Investigator
P.O. Box 330
New London, WI 54961-0330

If you have any questions or concerns regarding this process or these questions, please give me a call at (920) 982-6699. Thank you for your cooperation and timely response.

Sincerely,

Roberta Ludwikowski
Contract EEO Complaints Investigator
P.O. Box 330
New London, WI 54961-0330

Enclosed:  Authorization Letter
            Certification of Mailing
            Instructions for completing affidavit
            Affidavit questions
            PS Form 2568-B
            PS Form 2569
            PS Form 2571

Affidavit  _D_
Page _18_ of _30_

 

# CERTIFICATE OF MAILING

For timeliness purposes, it will be presumed that this request for an affidavit and documentation was received as indicated through delivery notification, or, failing that, within five (5) calendar days after it was mailed. I certify that on this date, this request for an affidavit and documentation was mailed to the following parties:

William Atkins
US Postal Inspection Service
P.O. Box 882528
San Francisco, CA 94188-2528

Roberta Ludwikowski
Contract EEO Complaints Investigator
PO Box 330
New London, WI 54961-0330
Phone: (920) 982-6699
Fax: (920) 982-6609

11/30/05
DATE

Affidavit _D_
Page _19_ of _30_




# CERTIFICATE OF SERVICE

For timeliness purposes, it will be presumed that this request for an affidavit and documentation was received as indicated through delivery notification, or, failing that, within five (5) calendar days after it was mailed. I certify that on this date, this request for an affidavit and documentation was mailed to the following parties:

William Atkins
US Postal Inspection Service
P.O. Box 882528
San Francisco, CA 94188-2528

Roberta Ludwikowski                           11/30/05
Roberta Ludwikowski                           DATE
Contract EEO Complaints Investigator
PO Box 330
New London, WI 54961-0330
Phone: (920) 982-6699
Fax: (920) 982-6609

Affidavit  D
Page  20 of 30

# Exhibit J

13-2136039

September 16, 2005



**EXHIBIT**
6
Poliseri-Atkins

To Whom it May Concern:

I am making this written statement relative to allegations made by Marilyn Lee that she was the recipient of discriminatory treatment when reassigned to the ISOC position because she signed a petition against the Inspection Service management team in February, 2003. She alleges a hostile work environment and discrimination based on race, gender and disability (stress).

I did not know Marilyn Lee signed a petition against the management team in San Francisco, and I was only vaguely aware that such a petition existed. Marilyn took it upon herself to advise me of this fact approximately 2 days after I arrived in San Francisco on September 8, 2003 as the new Inspector in Charge (INC). I saw her at her desk acting agitated and upset, and I inquired if anything was wrong. Marilyn had obviously been crying. I brought her into my office and shut the door and asked her to tell me the problem. She stated she did not know if she wanted to be the INC's secretary because of the problems she had with the previous INC, who was Alan Kiel. When I asked what those problems were, she told me about signing the petition against Alan, and how hurt he had been by that act. She reported he never trusted her thereafter, and their relationship was strained. She felt she had been passed over on training and promotional opportunities on many occasions, and felt her good work was not appreciated. I assured her I wanted her as my secretary; I told her the past was the past and I did not care about those issues; and I advised her if she decided she wanted some other job that I would support her decision. After about 30 minutes she left, and the issue did not resurface until this current situation developed.

Approximately one year ago, Marilyn approached me and stated she would like a developmental opportunity so that she would more easily qualify for an investigative analyst position when it was offered. I agreed to provide her a developmental opportunity, and shortly thereafter, in June 2004, I reassigned her to the Inspection Service Operations Coordinator (ISOC) position where she was responsible for the supervision of approximately seven (7) administrative associates. She appeared to like her new assignment, as she made changes to operations that improved efficiency and timeliness, and was given at least one monetary achievement award. Marilyn turned out to be an excellent supervisor and there was a harmonious relationship with those she supervised so she was advised she would be the permanent supervisor.

I had many private talks with Marilyn concerning her supervisory abilities, and she agreed she was the best person for that job, and agreed that if she was the INC, then she was the person she would assign to work as the supervisor. Her desire to return as the INC's secretary did not become an issue until it was decided to move Kaycee Graham into the position. These two individuals dislike each other intensely, and I believe jealousy may have been a significant motivation for Marilyn

wanting to return. Marilyn never told me the stress of supervising seven people was too much for her, she simply repeated over and over that she wanted her old job back. That move was not possible, as I did not have a qualified individual available to replace her as a supervisor. I will also state that Kaycee was only temporarily in that position and another individual is presently the INC's secretary.

I have no knowledge about the petition Marilyn signed against Alan Kiel and his management staff in February, 2003. None of the three individuals were personal acquaintances, and the fact that Alan decided to retire in June, 2003 may or may not have been related to the petition, but did in fact create a position for which I benefited, as I was selected to replace him. I did not get to the San Francisco Division until September, 2003, and I took no interest in events occurring in the division prior to my arrival. As I stated earlier, I only became aware of Marilyn signing the petition when she told me after I had just reported to the division. There is simply no basis for her claim that I retaliated against her for having signed that petition. I was not affected by the petition in any way, except in a positive way, as I was chosen to become the Inspector in Charge in San Francisco.

Marilyn also alleges that I kept her from a detail assignment with the Office of the Inspector General (OIG). This is patently false. I agreed to the detail as a developmental opportunity for her. Following my agreement to allow Marilyn to participate in the OIG detail, I was advised by my Deputy Chief Inspector, Andrew Clemmons, that Marilyn could go on the detail, but that the OIG would have to pick up her work hours. I spoke with OIG Special Agent in Charge Anita Davidson about this issue, and was told the OIG could not pick up the hours because they were not authorized a support position in San Francisco. Based upon that fact, and that fact alone, I was forced to cancel the detail opportunity and rescind my approval for Marilyn to participate.

No hostile work environment was ever created in San Francisco in regards to Marilyn Lee or any other employee. The fact that I was forced to say no to Marilyn was based upon exigent needs of the division, and not personal feelings against her. Marilyn served in a position where I had no qualified people available to provide for her replacement. She was given that lateral detail assignment at her request and, as it turned out, performed excellently. She was given a significant amount of specialized training not offered to other employees in order to make her more qualified for promotion. For instance, in July 2004 she was sent to one week's training for the Investigative Analyst position in St. Louis. There were only to be a limited number of these positions posted throughout the Inspection Service divisions nationwide and the applicants would be very competitive. However, within the San Francisco Division she was the only one of the support staff to receive that training. She also received cross-training to support criminal assignments such as workers compensation fraud investigations.

As the INC, I have the discretion to reassign or transfer personnel that benefit and promote the efficiency of the division and individuals including inspectors and support periodically have their assignments changed. I initially lateralled Marilyn to

13 - 2136039

the operations coordinator position at her request and she turned out to be the ideal individual for that position. I did not anticipate Marilyn's reaction to these changes which I felt were beneficial to her as well as the division. Regardless of her expectations to return as the INC's secretary, for the reasons discussed above, my decisions were not made in bad faith or because of some retaliatory motive based on her relationship with prior management with which I had absolutely no involvement.

W.P. Atkins
Inspector in Charge
San Francisco Division

# Exhibit K

| U.S. Postal Service | Page No. | No. Pages | Case No |
|---|---|---|---|
| EEO Investigative Affidavit *(Witness)* | 1 | 7 | 66-000-0053-05 |

| 1. Affiant's Name (Last, First, MI) | 2. Employing Postal Facility |
|---|---|
| DiAZ, Araceli S. | San Francisco Division Headquarters (USPIS) |

| 3. Position Title | 4. Grade Level | 5. Postal Address and Zip +4 | 6. Unit Assigned |
|---|---|---|---|
| Postal Inspector/ Team Leader | ISLE-14 | P.O. Box 882528, SF CA 94188-2528 | |

## Privacy Act Notice

**Privacy Act Notice** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other

benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## USPS Standards of Conduct

Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 666)

7. Statement *(Continue on Form 2569 if additional space is required)*

I, Araceli Sally Diaz, Hispanic Female, Postal Inspector Team Leader, had no direct supervisory relationship with Marilyn N. Lee in June and July 2005. At the time I was serving as the Acting Assistant Inspector in Charge, San Francisco Division. My representative is Ed Lawee, Postal Inspector Attorney, P.O. Box 882528, San Francisco, CA 94188-2528, (415) 778-5958. Marilyn Lee is a female - Filipino descent. I know this due to the many years we have been employed in this agency (USPIS). Marilyn Lee told me via telephone on July 15, 2005 that her personal physician had diagnosed her as suffering depression. If the protected activity you refer to is the signing of a petition, I seem to recall knowing Marilyn Lee signed it, after it was all said and done, but I do not recall how I became aware. I was not involved in this activity.

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed |
|---|---|---|
| Araceli Sally Diaz | Affidavit C Page 4 of 17 | 12/15/05 |

PS Form 2568-B, March 2001

185

**UNITED STATES POSTAL SERVICE**®

**EEO Investigative Affidavit** (Continuation Sheet)

| Page No. | No. Pages | Case No. |
|---|---|---|
| 2 | 7 | 66-000-0053-05 |

Please refer to previous sentence and question. I did not have any involvement in Marilyn Lee signing the petition. I was not involved in this issue. I vaguely recall Marilyn Lee telling me about a meeting with management investigating the petition. I do not recall when. I was not involved in the June 2003 meeting. Again, I was not involved in this issue. I was not involved in denying Lee's request to be placed back in her "bid" job. I was aware Lee did not wish to be an Administration Center Supervisor. Marilyn told me during one of our conversations —exact date unknown. I was not involved or responsible for Marilyn Lee's physical and mental health deteriorating due to stress. It was not my decision to remove or not remove her from her supervisor job. I was not involved in this issue. Marilyn Lee and I were having a conversation in which she was expressing how unhappy she was in her supervisory position. She was telling me how she could not support the Inspector in Charge and we were discussing how openly she had been crying among coworkers. Therefore, I told her that, if I was the Inspector in Charge I would remove her as supervisor but that I would assign her as a Level II since she was not acting like a supervisor should. This conversation may have occurred sometime in June or July 2005. I did not inform Marilyn Lee that she was scheduled for a fitness for duty examination and being placed on administrative leave. I did not make the decision to place her on administrative leave or scheduling her for the fitness for duty exam.

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed |
|---|---|---|
| Araceli Sally Diaz | Affidavit C Page 5 of 17 | 12/15/05 |

PS Form **2569**, March 2001

186

**UNITED STATES POSTAL SERVICE**®

**EEO Investigative Affidavit** *(Continuation Sheet)*

| Page No. | No. Pages | Case No. |
|---|---|---|
| 3 | 7 | 66-000-0053-05 |

However it was comments Marilyn Lee made to me on July 13, 2005 that resulted in her being placed on administrative leave and being referred for a fitness for duty examination. As a correction, the conversation you refer to occurred July 13, 2005 not July 12, 2005 as indicated in your question. The conversation I had with her on the 13th were based upon concerns for her health as she was clearly upset about her circumstances of her returning back to her secretarial job. The statement about a letter from her doctor as causing her to be moved out of her supervisory position is taken out of context. Her concern was whether or not she would be able to obtain outside employment. I responded I did not know if such a letter would impact her getting hired elsewhere in the federal sector. The comment about her hurting herself to make it clear she had to be removed from her supervisory position is also taken out of context. The conversation was generally about her unhappiness with being the Admin. Center supervisor and her wanting to return to her secretarial position. It was clear she was emotionally distraught, was suffering admittedly from anxiety and was having difficulty sleeping. She was describing to me how this situation was affecting her then made the comment that she was even thinking of hurting herself and leaving a letter behind that it was Bill's fault. This was the conversation where I realized how distraught she was and it was a "Cry for help". Initially I would not say anything so

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | Affidavit C Page 6 of 17 | Date Signed 12/15/05 |
|---|---|---|
| Araceli Sally Diaz | | |

PS Form **2569** March 2001

187

**UNITED STATES POSTAL SERVICE** ®

**EEO Investigative Affidavit** *(Continuation Sheet)*

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 4 | 7 | 66-000-0053-05 |

long as she sought medical attention because that was my main concern. I also told her that she was putting me in a very bad position (morally and ethically) as the Acting AIC and explained to her a similar situation which led to a violent assault years prior that was brought to my attention which I failed to act upon. I explained to her that my inaction may have contributed to the assault because I did not report the information. I went home and struggled with the decision to disclose the information to management or not. But I was also very concerned with her health and mental stability and safety. I discussed the matter with my husband and realized I needed to disclose the information. July 16, 2005 was a Saturday. She had called me several times that early afternoon. Finally we had a clear cellular connection in which I told her I had informed the INC about her comments. The purpose of her calls were to find out if I had disclosed the information. She was still sounding emotionally distraught. When I advised her of this fact. I re-explained to her how she had put me in a bad position morally and legally obligating me. She wanted to know what I said to him. I told her Bill and I would talk to her on Monday. She became angry and said, "I'm going to tell him you told me to file an EEO." What I had told her was that she had a right to do whatever she felt

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed |
|---------------------|--|-------------|
| Araceli Sally Diaz | Affidavit C Page 7 of 17 | 12/15/05 |

PS Form 2569, March 2001

188

**UNITED STATES POSTAL SERVICE** ®

EEO Investigative Affidavit *(Continuation Sheet)*

| Page No. | No. Pages | Case No. |
|---|---|---|
| 5 | 7 | 66-000-0053-05 |

Was necessary in response to her saying she was thinking about filing an EEO. She reiterated it would effect her ability to get another job. She began crying again and told me Bill did not believe her about her being stressed. I responded that I believed her then she hung up on me. I was concerned that this may have put her over the edge as I made repeated attempts to call her back but her phone was constantly busy. I decided to drive to her residence to make sure she was ok. When I approached her front door her spouse answered and initially denied knowing if she was home. I happened to see her up on her second floor stairwell and I advised her husband and told him I needed to talk to Marilyn Lee. I had told her spouse Marilyn had hung up on me after I identified myself and that I wanted to make sure she was ok. Marilyn came to the door. I told her I was making attempts to call her back after she hung up on me but I could not get through so I wanted to come over to make sure she was ok. She said she was ok and that now she was just angry because "we could have worked things out." I told her "we" could not work things out because she had placed me in a bad position as the AAIC. She began to quiver a little, her eyes became watery and repeated she was stressed at work and no one believed

I declare under penalty of perjury that the foregoing is true and correct.

| Affiant's Signature | | Date Signed |
|---|---|---|
| Arauli Sally Diaz | Affidavit C Page 8 of 17 | 12/15/05 |

PS Form 2569, March 2001

189

**UNITED STATES POSTAL SERVICE**®

| Page No. | No. Pages | Case No. |
|----------|-----------|----------|
| 6 | 7 | 66-000-0053-05 |

**EEO Investigative Affidavit** *(Continuation Sheet)*

her. I again told her I believed her and that we would talk to her on Monday, that I just wanted to make sure she was ok. She said, "yeah" and closed the door so I left. I advised management because as an Acting Manager I felt I had a legal and moral obligation to report her statements that she could potentially harm herself. See responses above. I did not wait several days. I advised my INC the following day — July 14, 2005. However I advised Marilyn Lee of that fact on Saturday July 16, 2005. The actions I took were based upon my obligations as a Manager and my concerns for Marilyn's health and safety. No other relevant information at this time.

---

**I declare under penalty of perjury that the foregoing is true and correct.**

Affiant's Signature
Araceli Sally Diaz

Affidavit C
Page 9 of 17

Date Signed
12/15/05

PS Form 2569, March 2001

190