# Exhibit L

CARROLL M. BRODSKY, M. D.
A PROFESSIONAL CORPORATION
350 PARNASSUS AVE.. SUITE 508
SAN FRANCISCO. CALIFORNIA 94117
TELEPHONE (415) 566-6300
FAX  415) 566-6305

Tax ID # 94-2503589

September 8, 2005

Ms. Pamela Dixon
Acting Manager
Safety and Health Assessment
U.S. Postal Inspection Service
Two Gateway Center, 9th Floor South
Newark, New Jersey 07175-0002

> RE:    Marilyn N. Lee
>        IS Operations Coordinator

Dear Ms. Dixon:

At your request and the request of Ibrahim Farid, M.D., Associate National
Medical Director for the U.S. Post Inspection Service, I conducted a Qualified
Medical Evaluation (psychiatric) and Fitness for Duty Examination of Ms.
Marilyn N. Lee on August 23, 2005, at my office at 350 Parnassus Avenue in San
Francisco. Prior to examining her, I informed Ms. Lee that I am a psychiatrist and
that I would be conducting a psychiatric examination and sending a report to you.
I explained that nothing she told me would be considered confidential and that I
was not authorized to treat her or to refer her to anyone for treatment. She agreed
to continue with the examination.

## HISTORY AS RELATED BY THE PATIENT:

Exhibit  13
Page  1  of 27

Ms. Lee is 51 years of age, having been born on May 31, 1954. She gave
her occupation as that of secretary, which her "my official title" with the U.S.
Postal Inspection Service. Ms. Lee became tearful as she made that statement and
I asked her why that statement made her cry. She indicated that she was crying
because of "the circumstances that they put me through – they're trying to take my

title away." She is "a secretary as far as I'm concerned." She was detailed to a
supervisory position and her employers are "trying to stick me with a supervisor
position." but she considers herself to be a secretary.

She went to work for the U.S. Postal Inspection Service 25 years ago, in
1980, when she was hired as a stenographer in San Francisco. She estimated that
she worked as a stenographer for about five years.

At the time that she was hired by the U.S. Postal Inspection Service in
1980, she was in good health, with no physical and no mental problems.

After five years, she became an AIDS operator, that is, an Automatic
Information Data Systems operator. In that position, she "ran criminal history
on....wanted persons." She was working for the U.S. Postal Inspection Service,
which is a law enforcement agency, and her job involved doing security checks
and background checks on employees to make sure that they did not have any
criminal records. She was responsible for those checks for the "entire Post Office
of the West Coast."

She worked in that position for about seven years, and her work went well
during that period. She was subsequently promoted to the position of secretary,
and she has held that title for "the longest time," since approximately 1991 or
1992. She believed that she was "doing fine" in that position.

In 2003, a petition was being circulated at work concerning "fraud, abuse of
authority, mismanagement." Ms. Lee did not initially sign that petition, which
was being circulated by another employee in the San Francisco Division of the
U.S. Postal Inspection Service. There were about 150 postal inspectors and
support staff in her division, in addition to postal police officers, who generally
worked on the night shift and were kept separate from the other employees. Of the
150 people on the day shift, approximately 50 people signed the petition. The
petition did not name any specific management personnel in its allegations of
fraud and abuse of authority, but instead complained about "just management in
general."

Ms. Lee eventually signed the petition because she believed that there was
"discrimination" at work when an African-American female promoted another
African-American female to "a higher level position." Ms. Lee had worked as a
secretary there for a long time and "I see a lot, I know a lot" about the work
environment, "and I just thought this was unfair treatment."

Exhibit 13
Page 2 of 27

The names of those who signed the petition were "supposed to be kept
confidential" and she signed the petition on the basis of that one incident of

discrimination. She felt that the African-American female supervisor favored the African-American female co-worker "over everyone else." She felt that "it didn't matter" if there was a specific person who should have been promoted instead, and instead she felt that this incident showed the supervisor giving preferential treatment to the African-American female employee "and that was not right." There were other individuals who were qualified for the position and Ms. Lee did not care who was appointed to that position, and because of that situation, she signed the petition.

Although the names on the petition were supposed to be kept confidential, they were not in that "my name was the only name that was released." (Ms. Lee became tearful while discussing this incident.) She does not know what happened to the other names on the petition, but her name was released. She found out about this when the African-American female manager came to her and told her that she had to talk to the Inspector in Charge, Ms. Lee's "boss," about her having signed the petition.

At that point, Ms. Lee called the ombudsman and told him that "my name was being released" with respect to the petition. The ombudsman did not do anything other than to tell her to "confide in one of the acting managers in there," but Ms. Lee felt that she "couldn't trust" the acting manager because she was aware that this individual had already had dinner with the African-American female manager. She felt that she could not go to him because of his social relationship with the African-American female manager, and she therefore did not go to talk to him.

She felt that she was "very vulnerable" in that situation and that "I was left all alone" in that there was "no one to help me and I had no one to go to." She would be "crying at my desk" and everybody at the office "knew what was going on," but nobody helped her. It was "very upsetting to me" that her name had been released because the petition was supposed to be confidential and she was upset that "now I have to go up and explain it to my boss."

Someone else in the Division called the ombudsman again and "told them what happened, that they'd better do something" about the situation. At that point, the ombudsman decided to come to the office to talk to the people who had signed the petition in order to "speak to them about their issues." Ms. Lee agreed to meet with the ombudsman with the understanding that "I won't be retaliated, I won't be removed from my position and I won't be demoted."

Exhibit _13_
Page _3_ of _7_

The ombudsman, Inspector Birch, asked to meet with the employees on behalf of "headquarters management," and he asked them to talk to "him and his team." Ms. Lee told him that she would only speak with them "if those things

were promised to me," that is, that there would be no retaliation, demotion or reassignment. Inspector Birch did promise her that, and she therefore met with him. She did not want to meet with him in the office because of the other employees who were involved, and instead she arranged to meet him at a hotel, so that "people would not know that I was one of the people who came up to speak to him."

She met with Inspector Birch in approximately August of 2003, and she described "what my issues were." She was told that they would "look into the issue" and that they were "sorry that no one came to me." They told her that they felt that someone else who had signed the petition was the person who had released her name, "that's what they told me – I don't believe them." She felt that the ombudsman had already told her to "go to someone who they believed was supposed to be neutral, and he's collaborating with the manager by having dinner with her." That incident occurred before Ms. Lee signed the petition, and she felt that she could not trust that individual because of that incident.

She felt "secure that they would not do anything to me" after meeting with the ombudsman.

A new manager, Bill Atkins, came to her office after the three managers at the office were removed from those positions at some point in 2004. Inspector Atkins was transferred from Seattle to San Francisco at that time, and he became the Inspector in Charge, for whom Ms. Lee worked directly. She felt that "everything was fine" after that and that she and Inspector Atkins worked well together

Inspector Atkins kept asking her to be "detailed as a supervisor" in the "Admin Center," a pool of employees who did various tasks. She "definitely was not interested in that job," but Inspector Atkins wanted her to be "detailed as a supervisor." That did not represent a promotion in that the supervisory position was at the same level as that of secretary, but Inspector Atkins told her that it would be a "good experience for me" in terms of "upward mobility" for future positions. She had worked as a secretary for a long time and would like to be promoted to "something else," however. It was her understanding that being "detailed" to a position was a voluntary and temporary assignment and that she would "still maintain my title as a secretary as soon as my detail was over." She therefore "felt safe in that regard." She felt that maintaining her title as a secretary was important because "I didn't want to be demoted." The supervisory position was not a demotion, but "you never know with the Inspection Service," and that was why she wanted to "make sure it was a detail," that is, a temporary assignment that would enable her to keep her title as a secretary.

Exhibit _13_
Page _7_ of _27_

I asked her how she could be demoted if she took that assignment, and Ms. Lee noted that she was concerned because she "suspected that they could change the position." However, after Inspector Atkins requested her to accept the supervisory position in the Admin Center on several occasions, she agreed to take that position. She discussed its temporary nature with him, and at first she was "under the impression" that the position would last for less than six months.

When she took that job, she no longer reported to Inspector Atkins directly but instead reported to an administrative specialist, Sheila Castor, who in turn reported to Inspector Atkins. After she took the job, Ms. Castor told her that she would "be there for a year," including six months as the "admin support supervisor" and another six months supervising "another group." Ms. Lee was "kind of surprised" about that assignment.

After about three months, she realized that she was not "cut out to be a supervisor." She had problems concerning "personnel issues as a supervisor." She felt that the job was not what she had thought it would be, but she "stuck it out" because she thought it was a temporary assignment. After six months, she completed her evaluation and gave it to Inspector Atkins. In that evaluation, she informed him that she felt the assignment was "a promotional opportunity" and indicated that she wanted to return to her previous position as a secretary.

Inspector Atkins told her that she was "doing a great job" in the supervisory position, however, and indicated that he could not return her to her former job as a secretary because she was "doing a great job as a supervisor." Ms. Lee "started to cry" and told him that she was not happy in that job, but Inspector Atkins told her that "he didn't care if one person was unhappy when the rest of the people are happy." (Ms. Lee became tearful while describing this conversation with Inspector Atkins.)

She "knew I was in trouble then," but she continued to do the supervisory job, although there were "a lot of stresses with a supervisory job." She was told that she would not be moved to the second position after six months and that instead she would continue to work as the supervisor at the Admin Center.

Exhibit _13_
Page _5_ of _27_

She told Ms. Castor "several times" that she needed to be removed from the supervisory position because "it was stressful and I was unhappy," but Ms. Castor just told her to "go look for a detail" if she did not like her current position. Ms. Lee thought that comment was "very odd" and "I suspected that it was because of the petition." At that time, she "just had suspicions" and did not have verification of those suspicions, but she wondered "why should I look for a detail when I already have a job?" Someone else had been detailed to her secretarial job and she felt that "they can put that person back" in his or her former position. However,

she told Ms. Castor that she would "look for a detail," and she did find such an assignment, although Ms. Castor "made me look on my own."

She found an assignment with the Office of the Inspector General in a position where she was "doing investigative work" and helping investigators in their work. She has a lot of knowledge and experience to offer, and her supervisors there "loved to have me." She was involved in case management and in assisting inspectors in their investigations, work that she had done in the past as well. She "loved" that job, which she began in April of 2005.

That was a 90-day assignment, but eventually positions were expected to become available in that department and she "would have loved to join" that department. She worked in the Office of the Inspector General from April to July of 2005.

In April of 2005, an Inspector in Charge who was a friend of Ms. Lee's. happened to call Ms. Lee's boss and obtained Ms. Lee's number in the course of that conversation. He subsequently called her, and she told him that she was "no longer a secretary. I was detailed as a supervisor." He asked her how that was. and she started crying as she told him that "I hated it" because she had to deal with "personal issues and people don't want to work." She had to "call the police behind their backs" at times in her job as well.

Her friend indicated that he would talk to Inspector Atkins about that situation. but Ms. Lee asked him not to do so and she thought that he would not talk to Inspector Atkins. However, her friend did talk to Inspector Atkins and "apparently. I guess, things did not work out too well" because the next thing that she knew, she was receiving a call from the new ombudsman, Inspector Toogood. She does not trust the ombudsman anymore because of the earlier incident with that office.

Inspector Toogood asked her about her work situation, and she indicated that she was not happy with the supervisory job. but that this was "okay because I got a detail to the Inspector General," which had been approved. Inspector Toogood indicated that he had to "talk to the chief" about that, and she wondered what he would talk to the chief about because the conversation was supposed to be confidential. Inspector Toogood told her that the conversation "never happened," meaning that it was confidential. but "I didn't believe him, of course."

After that, the detail was canceled and her supervisor, Ms. Castor, called her to tell her that. She also complained that Ms. Lee was "badmouthing my boss."

Exhibit _13_
Page _6_ of _27_

Ms. Lee called Inspector Toogood and asked why the detail had been canceled. Ms. Castor had told her that her regular unit "would not pay for my detail" and that instead the Office of the Inspector General had to pay for it, but "that was a poor excuse" as far as Ms. Lee was concerned and "I couldn't accept that." She felt that there "must have been some underlying reason for that" and she therefore called Inspector Toogood, but he told her that "you need to speak to your boss," meaning Inspector Atkins. She felt that this meant that he had talked to Inspector Atkins and "the trust factor is lost again" as a result of that.

She wanted to know why the detail was not approved and Inspector Toogood told her it was because the Office of the Inspector General was "an outside agency," which Ms. Lee had not known. The Postmaster General had sent everyone a mandatory videotape that involved "building relationships with the OIG," and she thought that the Office of the Inspector General was part of the U.S. Postal Service and part of the U.S. Postal Inspection Service.

She was upset when Inspector Toogood told her that this was an outside agency, and because her detail was canceled, she had to return to work as a supervisor in the Admin Center. (Ms. Lee became tearful while discussing this situation.)

After that, she was given "more people to supervise," which placed "more stress on me." She continued to work as a supervisor, however, because "I had to." One employee was transferred, which was "traumatic for me" because Ms. Lee did not agree with the reasons that management was transferring the individual but as a supervisor, she had to tell that person that she was being transferred. That incident "took everything out of me as a supervisor," and she knew that she could not do that job and that "I had to get out of there" at that point.

She talked to Inspector Atkins in April of 2005. She had worked as his secretary and felt that she could "confide in him" because of their previous working relationship, and she therefore met with him at that time. His acting secretary was also serving as an acting supervisor and Inspector Atkins "had her step into the office, which blew me away" because she felt that by doing so, he meant that "he couldn't trust me." She felt that she could not say what she wanted to say because of that.

Exhibit _13_
Page _7_ of _27_

Inspector Atkins told her that her detail to the Office of the Inspector General was not approved because his unit could not pay for it, and she "understood that." She told him that she did not want to stay as a supervisor, but he told her that she had the "capabilities of being a good supervisor" and that he needed her in that job. He told her that if she complained and cried about the

situation, and if she continued in "my behavior, this unhappiness as a supervisor," then he would start "disciplinary action as insubordination." He told her that "right there, in front of her," that is, the acting secretary. Ms. Lee "could not say anything at that point," and the meeting ended at that time.

The following week, in May of 2005, another manager, Ms. Sally Diaz, who was the Acting Assistant Inspector in Charge at that time, came up to her and noticed that Ms. Lee was distressed and that "the stress was starting to show." She asked Ms. Lee about that and although she knew that Inspector Atkins did not want her to say anything, she felt that Ms. Diaz was expressing concern for her and therefore spoke to her and "told her everything." Ms. Diaz said that she would speak to Inspector Atkins, but "that was another mistake." After talking to Inspector Atkins, Ms. Diaz came back to her and told Ms. Lee that she was going to be "looking for a detail for me." Ms. Lee wondered why she would be looking for another detail "unless Bill (Atkins) was very unhappy with me." Ms. Diaz called her later that day, however, and told Ms. Lee that she could not help her find a detail.

Ms. Lee felt that she needed to start looking for jobs elsewhere "for my wellbeing" at that point, meaning that she wanted to look for a job outside the U.S. Postal Inspection Service. She knew that there was a hiring freeze in effect in the U.S. Postal Service. but felt that she could look for another job in "the federal sector."

She spoke to Ms. Castor about this plan, and Ms. Castor "even helped me find some jobs." Ms. Lee knew that "there was some underlying problems for me to be out of that secretary position" (sic), but Ms. Castor helped her to find some jobs and she applied for some of them. Most government jobs have a waiting period of 90 days after the application is received, however, and in the interim she has continued to do her supervisory job in the Admin Center. She was "trying to keep the stress level low," but she was "crying at night" and could not sleep because of her problems at work. (Ms. Lee became tearful at this point in the examination.)

She reached a point where she would start crying "before I even came in" to work. when she saw the building in which she worked. She had to "compose myself" in order to go into the office and then would start crying again in the office. Her employees "even noticed it" and on one occasion, one of her employees came in and told her to "pull myself together." She did manage to pull herself together on that occasion. "but that wasn't the first time."

She continued to work and "I did my job like I was supposed to do."

Exhibit _13_
Page _8_ of _27_

There was "animosity" between the Office of the Inspector General and the U.S. Postal Inspection Service, but she "didn't realize that" at the time that she found the detail to that office. She subsequently learned that if she had been assigned to the Office of the Inspector General, "that would set a precedent for other inspectors" to be detailed to that office. She "didn't realize what I had done by asking for a detail" to that office, which "caused embarrassment for everyone, including myself."

She continued working until July 18, 2005. Between May and July, Ms. Diaz kept asking after her because she continued to be concerned. Ms. Lee told her that there was nothing that she could do, and Ms. Diaz "knew that," but "gave me indications that they didn't want me" to work as a secretary. Nobody told her why that was the case, but "I got that message very well." She believes that legally, her position is that of secretary, but her superiors did not want her back in that position.

At one point, Ms. Castor gave her an evaluation and complained that Ms. Lee "badmouthed my supervisor," that is, Inspector Atkins, and that she was "rude" to management personnel. She was never rude to anyone, and the only incident that she could recall that might be construed as rudeness was that one morning she was "rushing" to work and did not say "good morning" to everybody, although she did say "good morning" to one or two people." She also told Ms. Castor that the only "badmouthing" she had done was to tell her superiors that she did not want to be a supervisor, which she felt was "a true assessment of my feelings" and not an issue of "badmouthing" her superiors.

She complained that she was working in a "hostile environment," but Ms. Castor indicated that this was "my perception" only. She felt that it was a hostile environment because she could not "express myself, I can't go to anybody." (Ms. Lee became tearful when discussing the hostile environment at work.) She complained to the manager about the stress she was under, but nobody intervened to help her.

Exhibit _13_
Page _9_ of _27_

Ms. Diaz wanted things to be better for her and kept talking to her about her situation. Ms. Lee had an appointment with her physician on July 15, 2005, because she knew that she was "very stressed out and I needed to see a doctor." She told Ms. Diaz that she was going to see her doctor because "it was affecting me and my family" and because she could not sleep. Ms. Diaz "told me I should go shopping," but Ms. Lee did not want to do that. Ms. Diaz wondered if she had problems with her family, but she indicated that "I don't have any problems with my family, it's this job," and Ms. Diaz "understood" that situation. Ms. Lee indicated that she would obtain a letter from her doctor requesting that she be removed from the supervisory position, but Ms. Diaz thought that even with such

a letter, she did not think that Ms. Lee would be returned to her former position as a secretary. Ms. Lee indicated that if that was the case, she would "have to file with EEO" (sic). She noted that she had "told everybody" that she needed to be removed from that position, but nobody did anything about it, and Ms. Diaz "agreed with me." She wondered what she had to do and asked, "do I have to hurt myself to make them believe this?" Ms. Diaz told her that "you wouldn't do that," and Ms. Lee replied, "of course not – but I said that as a cry for help."

That conversation occurred at the beginning of the week in early July, and on the Thursday of that week, Ms. Diaz came back to her and told her that she was "worried about what you said." Ms. Lee realized that she should never have made that comment because doing so "sent bells everywhere." She pointed out to Ms. Diaz that she was planning to see her doctor on the following day, and she invited her to go to the doctor's office with her if it would make her feel better, but Ms. Diaz told her to "just call me."

She "didn't trust' Ms. Diaz after that and called her and asked to whom she had spoken about the comment that she, Ms. Lee, had made. Ms. Diaz indicated that she talked to Inspector Atkins about it and that they were planning to meet with her on the following Monday. However, Inspector Atkins "didn't bother to show up" for that meeting and the meeting did not take place.

Her superiors "locked me out of my computer" on that Monday (July 18, 2005), and she was taken to the office of the other Acting Assistant Inspector in Charge, Rob Bessel, where she met with Mr. Bessel, Ms. Diaz and Ms. Castor. In that meeting, she was told that she was being placed on administrative leave "due to the alleged stressful environment." She was asked to gather her belongings and "everybody saw me walk out of there like I was being fired." (Ms. Lee became tearful at this point in the examination.)

She asked to be taken to her husband's workplace, which was not far away, so that he could take her home, and they did that.

She filed a "stress claim" after that incident.

She went to see her primary care physician at Kaiser, whom she preferred not to name, on July 15, 2005, the Friday before she was placed on administrative leave. Her physician diagnosed a "major depressive disorder" and prescribed an anti-depressant medication, Lexapro. She did not know the dosage of that medication. Her physician also wrote a note to Ms. Lee's employer and Ms. Lee provided that note to her superiors at work.

Exhibit _13_
Page _10_ of _27_

Ms. Lee was "due for a vacation" during the week of July 18, 2005, and her vacation had been planned for some time prior to that. She took that vacation and went to Las Vegas with her family, and she began taking the Lexapro when she returned from that vacation the following week. Her family complained that she "ruined" their vacation because she was "so depressed about being on admin leave and the situation."

The letter placing her on administrative leave gave her title as that of Acting Detailed Operations Coordinator instead of Secretary, and all of the material in the computer gave her a supervisory title. She felt that "they took" the secretarial title "away from me" by doing that. She felt that her superiors "didn't even recognize me as a secretary."

When she returned from her vacation, she realized that she had to file a stress claim. She found a psychologist through her health insurance, who told her that she needed to see a psychiatrist. Ms. Lee asked why she needed to see a psychiatrist, and the psychological told her that she needed to do so "for the case" in that "she doesn't handle my types of case." She looked for a psychiatrist through her health insurance, and found one, whose name she preferred not to give.

She is "very happy" with the psychiatrist who is treating her at present. She has had two visits with him and has to call his office "tomorrow" to "make sure my claim has gone through...the process." That treatment is expensive, but she paid for the first two visits herself so that she could "get some help."

She started taking Lexapro around July 22, 2005, and she noticed a difference when she started taking it in that she was able to sleep better. That medication "relaxed me" and she could "stop talking about it," that is, about her work situation, whereas before she began taking Lexapro, she could not stop talking about her problems at work. She feels that she is "no longer that depressed about it because I could talk about it." Before Lexapro was prescribed, she could not sleep and was "trembling very much." She has been taking the Lexapro for about a month.

She has not returned to work since July 18, 2005.

At present, she feels "good" and "better that I don't have to go back to a hostile work environment." She feels good about filing her claim because she is "doing something about it," and she feels good that she found "a doctor that cares about me, that's working with me to get better." She feels "a whole lot better" overall. She has a "great family that supports me."

Exhibit _13_
Page _11_ of _27_

She is okay physically at present.

She believes that she needs to continue in psychiatric treatment because of depression, but she feels that she could return to work as a secretary if that job became available for her. She knows that she could do the work of that position and feels that she could go back to that job immediately.

She asked her superiors if there were non-supervisory positions that she could be offered. She feels that the person working in her secretarial position was "detailed" to that job and that it would be easy to switch their jobs, but her superiors "didn't offer that." Because of that, she knows that "they just don't want me back." Nobody ever said that she was not functioning adequately as a secretary, and nobody ever said that she was not functioning adequately as a supervisor. She felt that the supervisory job had a cost to her health, however.

Her memory was bad "when I was stressed" and she "kept forgetting things." but that has improved since she stopped working.

At present, she gets along well with the people with whom she interacts, and she "always did" get along well with others. She felt that she got along well with Inspector Atkins, but he has not spoken to her since the meeting in April of 2005.

She is taking Lexapro at present. She is not taking any other medications at present.

Her appetite is impaired and she has lost almost 10 pounds over the past four or five weeks. She had weighed 155 pounds and now weighs 147 pounds, and she is 61 inches tall. She had tried to lose weight in the past, but never lost as much weight as quickly and "I don't want to lose it like this, in this manner."

She does not smoke, and never has.

She drinks socially and might have a glass of wine six times a year at most.

At present, she goes to bed at about 10:00 PM and gets up at 7:00 AM. She is able to fall asleep and is able to sleep through the night, although she might wake up once during the night when she thinks about her work situation. When she was working, she would "cry myself to sleep," but "now I don't have to cry anymore." She might remain awake for half an hour when she wakes up during the night

Exhibit 13
Page 12 of 27

She recently told her friends and family about "what happened to me." and she sees this as "part of my recovery – I have to do something about it, I can't hide this because this is not going away in a day or two or a month."

She does not generally take naps during the day. She found that when she filed her stress claim, that act "took all my energy" and "took a toll on me." She had never filed a claim before and her family complained that filing the claim took time away from them and "they didn't like it." She was "agitated" during that time and missed her husband's birthday and neglected her family. She did not go out socially either during that period. She "wanted to get this done because I wanted to make sure it's done right," meaning her stress claim. (Ms. Lee became tearful while discussing this.)

Her sexual function is impaired in that "I have no interest at this time." She indicated that "I don't wish to discuss" this issue.

She has been married for 31 years. Her husband is 55 years of age and in good health. He works full time as a salesperson at present.

They own their home in Daly City.

She has two adult sons. Her 25-year-old son is in good health and works as a chemist. Her 23-year-old son is in good health and is also a chemist. Both of them are living at home in the family's in-law apartment.

She drives an automobile at present.

On a typical day at present, she gets up at about 7:00 AM and feels that she is "under house arrest" during the day because she is on administrative leave from work. She was told that she had to "make myself available' to her employer from 8:00 AM to 4:00 PM every day. She asked what would happen if she wanted to go shopping during the day and she was told that "you can't do that because you have to make yourself available." As a result, "I feel I'm under house arrest." She cannot do the shopping because of that situation, but she does the cooking and cleaning. Otherwise, she works on her stress claim. If she wants to go to the gym, she has to "get up earlier or later," and she might do some of the shopping later in the day. She gives herself an hour off for lunch and she will go out to get a sandwich "just to get out" of the house.

She likes to read. She reads the newspaper and has been reading the latest Harry Potter book. She likes to read adventure books.

Exhibit _13_
Page _13_ of _27_

She watches television, and might watch the news and programs like "Law and Order." She watches programs concerning criminal behavior and notes that "I'm in law enforcement, what do you expect?"

She and her husband are planning to start playing tennis. She goes swimming and was advised to do that because it is relaxing for her. She did not have much time for swimming when she was working.

She does not belong to any formal social organizations.

She has friends with whom she is close, and she has maintained some friendships for a long time. She is family oriented and spends a lot of time with her family and other relatives.

I asked her about her plans for the future, and Ms. Lee indicated that she plans to "get over this." She wants her job back and "I want my dignity back." If her superiors will not give her back her secretarial job, then "I want something comparable." She wants to work in a "non-hostile environment." She cannot understand why her superiors would not want her back in her regular job. She hopes that she can find another secretarial job, but she is concerned that the U.S. Postal Inspection Service might "make it difficult" for her. At one point, her sons wondered if she had done something "criminally wrong," and Ms. Lee became tearful when she discussed that question.

At the end of the interview, Ms. Lee noted that if she could have performed the duties of a supervisor, "we wouldn't be here today." She believes that "everyone would be happy" and that "I wouldn't be put in this situation" if she was able to do that job, but she "couldn't do the job." (Ms. Lee became tearful while discussing this.)

I asked her what would help her the most at present, and Ms. Lee indicated that she would be most helped if she could "go back to work." She wants her secretarial position back or to be given a comparable position at the U.S. Postal Inspection Service. People ask her what happened to her because they know that she did not do anything wrong, and she wonders what her employers told others about her.

Exhibit _13_
-Page _14_ of _37_

I noted that one of the things triggering this examination was that her superiors thought that she was suicidal and I asked her about that. Ms. Lee indicated that she did not feel suicidal, but that her superiors might have thought that she was after she "made that comment" about possibly having to hurt herself. She feels that she said that "out of desperation because I could not get out of the situation." She talked with Ms. Diaz and "just happened to say that as a cry for

help," and she believes that Ms. Diaz "took that literally." Ms. Diaz did not think about her comment until "two days later" and then management reacted to that comment "seven days later."

She would think that management personnel would call her to check on her because she would expect them to be concerned about her, but they have not done so. That is "okay with me" because she has good family support and "it doesn't bother me," but she questions "what kind of a place that I work for, the management that I serve" because of the fact that they have not called her since she was placed on administrative leave.

She felt that "everything was okay" until she was detailed to the supervisory position, but she believed that the petition had a role in her being placed in that assignment. She believed that the supervisory position was a temporary one and that it was designed to help her obtain higher level positions later on. When she found that she was unhappy in that position and felt that she could not do the job because of personnel issues, but when she asked to return to her former job or to an equivalent one, she was told that she was good at the supervisory role and had to stay in that position. It was at that point that she became depressed. She was taken off work because of the incident where she suggested that she might harm herself, and she has been feeling better since she began taking Lexapro and since she has been "away from a hostile environment" at work. She would like to go back to work and feels that she could return to work in the secretarial position that she held or an equivalent job, in a non-hostile environment.

## PAST ILLNESSES:

I went through an extensive review of illnesses, and she replied negatively to most of them.

She had measles and chicken pox as a child.

She cannot eat spicy foods, but she does not have specific food allergies.

She had surgery to remove a cyst near the wrist of the left hand, which was carried out 20 years ago or more. She recovered from that surgery and has had no residuals from that cyst. Her hand was placed in a cast for some time after that operation and she was taken off work during that period, which she feels was "the best thing" to aid in her recovery. She also had surgery for "pink eyes." She has not had any other operations.

Exhibit _13_
Page _15_ of _27_

She was never in any accident in which she suffered significant injuries.

She was never treated by a mental health professional prior to the time that she consulted the psychologist in approximately July of 2005.

She was never treated by a chiropractor.

## SOCIAL HISTORY:

She was born in the Philippines, and the family moved to San Francisco when she was 4 or 5 years of age.

Her father was an elevator man while Ms. Lee was growing up. He died when Ms. Lee was 11 years old, at the age of 66. He had suffered leg wounds during World War II and those wounds resulted in a heart condition, and he eventually died from the effects of that.

Her mother is 82 years of age and in good health. She did not work outside the home while Ms. Lee was growing up.

She is the third of four siblings, and has two older brothers and one younger brother, all of whom are in good health. Her youngest brother moved to Australia.

She grew up with both parents until her father's death when Ms. Lee was 11 years of age. She described her father as "Westernized" and "very educated," but he was unable to find an appropriate job after the war because of his health problems. She had "a lot of respect for him" and he was "very dignified." She described her mother as a very good mother while Ms. Lee was growing up.

She remembers growing up as being a happy time, and she had friends. Her family was poor, but she did not realize that until she was in high school

She did not have any nervous habits or special fears while she was growing up.

She did not have any problems when she started school, and did not have any problems in school. She did not have any learning difficulties or behavior problems in school. She graduated from high school when she was 16 or 17 years of age, and earned "C's" in high school because "I didn't try." She worked in sales jobs, selling clothes, while she was in high school.

Exhibit __12__
Page __16__ of __27__

After completing high school, she attended a secretarial school associated with San Francisco City College. She attended school for about two years and earned an Associate of Arts degree. She "did okay" and passed her classes, but she "didn't care for it" because her goals then were to marry, raise a family and own a house, "and that's exactly what I did."

She subsequently went to work as a secretary at the Bank of America, and worked there for a couple of years, until she was offered a better job with Arthur Young, a CPA firm that "showed me how to live." That was "one of the Big 8 accounting firms" and she was invited to "a lot of their parties," which were lavish. She worked there for a couple of years, and left that job when she was hired by the U.S. Postal Inspection Service in 1980. She felt that she learned good social skills at the accounting firm, which helped her in terms of planning meetings and other work activities.

She has been married once, and her marriage has gone well, with no separations. There are two grown sons of that marriage, who are 25 and 23 years of age respectively at present, and she has had no problems with them.

## MENTAL STATUS:

Ms. Lee is a well developed, well nourished Filipina-American female who was neatly dressed and groomed. She arrived early for her appointment and we started the examination shortly after she arrived. She was fully cooperative. She was tearful initially for a short while, but during most of the examination was not tearful and at times smiled.

There was no evidence of any sensory defect or of any motor defect. There were no involuntary movements. Her sensorium was clear. She was fully oriented as to time, place and person. Her memory for remote and recent events was intact.

There was no evidence of hallucinations, delusions or ideas of reference. Her speech was well within normal limits. Her chain of associations was intact.

She did not appear to be depressed, but stated that she still has periods of depression when she thinks about her job.

She performed well on all tests of intellectual function. She could subtract 7's serially without difficulty. She could provide abstract interpretations of proverbs. She could do comparisons.

Exhibit __13__
Page __17__ of __27__



Her knowledge of common facts was good.

Her memory was good when tested by digit span.

In order to test her ability to convert a set of directions into visual-motor work, I asked her to draw a clock and to write the words, "State of California." The clock she drew was symmetrical and a sample of her handwriting showed that it was neat.

## MMPI:

Ms. Lee's responses to the MMPI-2 were interpreted by the National Computer Systems, Inc., on August 25, 2005. This interpretation was made by the National Computer Systems and was not paraphrased or altered by Dr. Brodsky.

### Profile Validity

The client has responded to the MMPI-2 items by claiming to be unrealistically virtuous. This test-taking attitude weakens the validity of the test and shows an unwillingness or inability on the part of the client to disclose personal information. Many reasons may be found for this pattern of uncooperativeness: conscious distortion to present herself in a favorable light, lack of psychological sophistication, or rigid neurotic adjustment.

### Symptomatic Patterns

Scales D and Pa were used as the prototype to develop this report. The client is quite depressed at this time and feels very inadequate and pessimistic. She may be reacting to a stressful situation, although her anger and resentment may result partly from her chronic tendency to misunderstand the motives of others. Her depressed mood may improve over time or with intervention. However, paranoid personality features are likely to persist. She is somewhat angry at others, feeling that they have harmed her and are partially responsible for her present depression. She has a very low level of energy, may be having difficulty keeping up with her daily affairs, feels tense and irritable, and is quite preoccupied with her problems.

Exhibit _13_
Page _13_ of _31_

In addition, the following description is suggested by the content of the client's item responses. She has difficulty managing routine affairs, and the items she endorsed suggest a poor memory, concentration problems and an inability to

make decisions. She appears to be immobilized and withdrawn, and has no energy for life. She views her physical health as failing and reports numerous somatic concerns. She feels that life is no longer worthwhile and that she is losing control of her thought processes. She views the world as a threatening place, sees herself as having been unjustly blamed for others' problems, and feels that she is getting a raw deal out of life.

Profile Frequency

Profile interpretation can be greatly facilitated by examining the relative frequency of clinical scale patterns in various settings. The client's high-point clinical scale score (D) occurs in 7% of the MMPI-2 normative sample of women. However, only 4.4% of the women have D scale peak scores at or above a T score of 65, and only 2.1% have well-defined D spikes. This elevated MMPI-2 profile configuration (2-6/6-2) is very rare in samples of normals, occurring in less than 1% of the MMPI-2 normative sample of women. Relatively few women in the military have a high-point D scale score. This peak score occurs in only 1.1% of the sample of military women (Butcher, Jeffrey, et al., 1990). Furthermore, less than 1% of the women in the sample have D scale scores at or over a T score of 65.

Profile Stability

The relative elevation of her clinical scale scores suggests that her profile is not as well defined as many other profiles. That is, her highest scale or scales are very close to her next scale score elevations. There could be some shifting of the most prominent scale elevations in the profile code if she is retested at a later date. The difference between the profile type used to develop the present report and the next highest scale in the profile code was 1 point. So, for example, if the client is tested at a later date, her profile might involve more behavioral elements related to elevations on Hs. If so, then on retesting, extensive expression of physical complaints might become more prominent.

Interpersonal Relations

Mistrustful, shy and introverted, she avoids interpersonal relationships and sees herself as quite vulnerable to hurt. She harbors a great deal of resentment and anger about her loneliness but seems unable to express it appropriately. Her mistrusting and jealous behavior may place strain on her marriage. Individuals

Exhibit 13
Page 19 of 27

with this profile are often petulant and testy in relationships. She is likely to quarrel a great deal and continually bring up old issues in arguments.

## Diagnostic Considerations

She appears to be suffering from a depressive disorder and may receive a diagnosis of Dysthymic Disorder or Major Affective Disorder. The possibility of a thought disorder or paranoid thinking should also be evaluated.

## Treatment Considerations

Individuals with this profile are very distressed and may need symptom relief for their depression, possibly through anti-depressant medication. Because she may not trust a therapist easily, treatment could prove difficult at first.

## REVIEW OF THE RECORDS:

I reviewed the following records:

1. The letter prepared by Ibrahim Farid, M.D., on August 16, 2005.

2. A 3-page "Instructions for Psychiatric Fitness-for-Duty Examination" from the U.S. Postal Inspection Service.

The following are pertinent excerpts from the records:

## SUMMARY AND CONCLUSIONS:

Exhibit _13_
Page _20_ of _27_

Ms. Lee is a 51-year-old woman who went to work for the U.S. Postal Inspection Service in approximately 1980. During most of her employment, she worked in a secretarial capacity. She reports no significant problems on the job until 2003, when she and co-workers signed a petition or a complaint against one of their supervisors because they believed that the supervisor had unfairly promoted a co-worker and in that way had discriminated against other employees. Ms. Lee believed that the names of those who signed would never be revealed, but her name became known to management and she was upset about this. She was asked to discuss this matter with superiors and she did so when they promised that there would be no retaliation or demotion or reassignment. After meeting with

superiors, she once again felt that the promise of confidentiality had been broken and that others had learned of the content of the meeting.

Ms. Lee reports that as a result of the petition, there was a change in management and a new manager was appointed. The new manager asked Ms. Lee to take the position of supervisor of the administrative center, a position at the same level as the one Ms. Lee was already holding. When she protested that she did not want to be in a supervisory position and did not want to change jobs, she was told that it would be good experience for her and would increase her chance for promotion. Ms. Lee was to be detailed to this new position and she felt that being detailed was a voluntary move and that she would maintain her title of secretary when the detail was over. She was told that she would spend six months in one supervisory position and then would be detailed to another position.

Shortly after she took the supervisory job, she found it enormously stressful because of personnel issues and decided that she wanted to return to her job as secretary. When she talked to her superiors, she was told that she was doing a great job and that she could not be returned. She started crying, and she reports that this was the beginning of a long period of depression.

One of her superiors helped her look for another position, for another detail. and in April of 2005, she was detailed to the Inspector General's office, but she soon learned that this was not an administratively feasible detail and the detail was canceled. She went back to her supervisory job, but was depressed and continued to complain about the job. At one point, she reports that her supervisor threatened to charge her with insubordination if she did not stay in the supervisorial position and do the job. At one point in a discussion with one of her supervisors, she spoke in a way that suggested that she was desperate and that she might harm herself if she was not given some relief. Shortly thereafter, she was put on administrative leave.

She went to see her physician. whose name she was unwilling to give me, and her physician prescribed an anti-depressant, Lexapro, 20 milligrams. The prescription was written on July 15, 2005, but Ms. Lee did not start taking it until she returned from a week of vacation in Las Vegas. She found that the medication helped in that she was able to sleep and that it relaxed her. She found that she could talk about her problems on the job without crying or without crying as much.

At present, she is feeling much better and reports that she believes that she could go back to work as a secretary or to an equivalent job as long as the atmosphere is not hostile.

Exhibit _13_
Page _21_ of _37_

She reports that her spirits are much higher than they were. She indicates that at no time did she really plan to commit suicide, but instead saw her statement as a "cry for help." She reports that her memory has improved. Her appetite is better. She sleeps better.

Based on the observations I made in the course of my psychiatric evaluation of Ms. Lee, I would conclude that she is an intelligent and articulate woman. I saw no evidence of cognitive impairment of any kind. There was no evidence of a Schizophrenic Disorder. She believes that she was mistreated and dealt with unfairly, but there was no evidence of a true Paranoid Disorder. I saw nothing in her behavior that suggested an organic mental disorder.

She still becomes tearful when she talks about the loss of her title, "Secretary," and the position to which it refers.

She continues to take Lexapro, 20 milligrams a day, and has found a psychiatrist who will treat her. As I noted above, she was unwilling to give me the names of any of her physicians.

She has filed a stress claim.

Integrating the data I have available, including the results of the MMPI-2, I would attach a *DSM-IV* Axis I diagnosis of Adjustment Disorder with Depression. I use that diagnostic label because the depression seems to have been caused by an identifiable event in her life, the assignment to a position that she did not want.

I would attach no definite Axis II diagnosis, that is, of a Personality Disorder

Her MMPI-2 profile is suggestive of these Axis I and Axis II diagnoses.

There is no evidence of an Axis III diagnosis, that is, of a physical disorder.

Although her depressive symptoms have subsided, she continues to be markedly aversive to working in the supervisorial position she held, and although she wants to go back to work, she does not want to do so in that position. She reports that she had no problems on the job during the brief period of time during which she was detailed to the Inspector General's office.

I would recommend against reassignment to the job to which she is aversive. It is unlikely that she would function comfortably with her former manager, Inspector Atkins, and her fear of some sort of retaliation would make her feel that she was working in a "hostile environment."

Exhibit _13_
Page _22_ of _27_

At the time of this dictation, Ms. Lee has been on anti-depressant medication for one month and has had a few visits with a psychotherapist. I would recommend that an effort be made to find a new position for her, one that does not require her to supervise others and one in which she is not supervised by the manager who was her superior when she worked as a "secretary." Otherwise, I would attach no restrictions to a prospective job assignment.

In her August 17, 2005, letter of referral, Pamela Dixon, Acting Manager of Safety and Health Assessment, posed questions. I have answered many of those questions in the above pages.

I was asked if I had reviewed additional medical records in conjunction with my independent medical evaluation. I had no medical records of any kind available.

I indicated that the employee's diagnosis was that of an Adjustment Disorder with Depression. The condition is mild at present and it is likely that it is being controlled by anti-depressant medication and by her removal from the job.

I was asked if the employee was able to meet the requirements of the job description "at this time," and I indicated that I did not believe that she could meet those requirements at present.

I was asked what job restrictions or limitations Ms. Lee has. I imposed limitations that restrict her from supervisorial work and that recommend against returning her to work with a former supervisor who she believes treated her unfairly.

I was asked what accommodations would be required for the employee to perform all the functions of the job, and I indicated that she would not be capable of doing the supervisorial work that she was doing at the time she left.

I was asked if the employee was capable of performing any type of work, and I would respond that she is almost ready to return to a job that had the duties that she had in her former secretarial position or similar duties.

The prognosis for her eventual return to work is good if the accommodations suggested above are made.

Exhibit _13_
Page _23_ of _27_

There were a series of questions listed on Pages 14 and 15 in the "Instructions for Psychiatric Fitness-for-Duty Examination." Although some are not directly applicable to Ms. Lee's situation, I will attempt to answer them:

1) Is there a diagnosable physical condition or mental disorder that would affect the person's performance of his or her job?

Ms. Lee has the residuals of an Adjustment Disorder with Depression. There is no evidence of any other Axis I mental disorder.

2) Is the employee abusing prescription medications or using illegal substances?

She is not abusing prescription medications or using illegal substances.

3) What is your assessment of the reasons for the unusual behavior and the psychological dynamics related to their job functioning?

She is reacting to what she considers to be an unfair transfer from the position she liked to one that carried responsibility that she found stressful. She is mourning the loss of her "secretarial" position.

4) Is the employee capable of responding appropriately to supervision?

Yes, she is capable of responding appropriately to supervision.

5) Is the employee suffering from a mental disorder that may be causally related to his or her work?

In my opinion, her mental disorder is causally related to the events in the workplace. I looked for other factors that might be causing her Adjustment Disorder, and none were revealed in the history that she gave. As I noted above, I had no medical records.

6) Are there non-occupational psychosocial and environmental problems that may be causally related to the behavior?

I have no knowledge of non-occupational psychosocial or environmental factors.

7) Is there any focused anger or focused fear that could be translated into anger that might be problematic in terms of risk to self or others?

I found no evidence that she was ever a risk to others, and I found credible her report that she was not a risk to herself.

Exhibit 13
Page 24 of 27

8) What is the current level of affective control and the individual's self-control mechanisms? How might they be compromised?

Her affective control is good, except when she talks about the job. Her self-control mechanisms are generally intact. They would be compromised by being put back in her supervisorial job.

9) How, by professional intervention, might the individual's self-control mechanisms be strengthened?

I would recommend that she continue on anti-depressant medication for at least six months and continue in psychotherapy during that time.

10) Is the employee a potential risk to the safety and health of him- or herself or others? Is there any clear and direct threat to an identifiable target or targets?

As I noted above, she is not a potential risk to the safety or health of herself or others. and there is no evidence of any clear and direct threat to an identifiable target or targets.

11) What, if any, is the require remediation?

I have described the required remediation in the above comments.

12) Are there indications of threat potential that, although not "clear and direct." are nonetheless identifiable and valid cause for concern? If so, discuss.

The only threat potential was to herself, and at least at present, that seems to be absent, although one can never rule out self-destructive acts.

13) If work restrictions or accommodations are needed for a return to work. what are they and how long will the restrictions or accommodations be needed? Please advise if no accommodation will allow a return to work at this time.

I believe that she will not be able to return to her job as a supervisor. However, I believe that the accommodations that I mentioned above will allow her to return to work to her secretarial job or to a similar position.

14) Has the employee previously received a diagnosis of a condition that would require psychiatric treatment?

Exhibit _B_
Page _25_ of _37_

Ms. Lee has no history of previous psychiatric contact.

15) Is the employee still under care for the condition, and does this care include the use of psychotropic medications or agents?

Yes. I had no records from the psychiatrist and she was unwilling to name him.

16) If the employee is not under care, when was he or she last seen, and did the treatment include the use of psychotropic medications or agents?

Not applicable.

17) What psychotropic medications or agents have been or are being used in the employee's care? (Please list.)

The only medication she is taking is an anti-depressant, Lexapro, 20 milligrams.

18) Are drowsiness, loss of attention, decreased reflexes or response time, increases in aggressive behavior, or anxiety documented side effects of taking the medication?

I would expect no loss of attention or drowsiness, or decreased reflexes. I would expect no increase in aggressive behavior or anxiety to affect Ms. Lee's performance on the job.

19) Will the individual be able to work at heights, work with or around machinery, or operate a motor vehicle while under the influence of the medication?

Yes.

20) What is the expected length of time that the individual will be taking the medication?

Six months.

21) Is the employee fit for duty?

Yes, with modifications and continuing treatment for six months.

Exhibit _13_
Page _26_ of _27_

22) Are there further recommendations concerning the status of this case or evaluation?

I would recommend that her return to work in a position such as I described be expedited.

Thank you very much for referring Ms. Lee to me. Please let me know if you have any questions about this report.

Very sincerely yours.

Carroll M. Brodsky, M. D.

CMB:ac
Enclosures

cc:    Ms. Marilyn N. Lee                Ibrahim Farid, M.D.
       951 Bradley Drive                 130 El Bonito Way
       Daly City, California 94015-3667  Millbrae, California 94030

Exhibit _13_
Page _17_ of _27_

# Exhibit M

Statement of Marilyn Lee ref June 2003 Birch Meeting

## JUNE 2003 MEETING REFERENCE THE 2003 PETITION

The petition signed by 49 employees, Support, Inspectors and Postal Police, was submitted to Birch in February 2003. Subsequently I was exposed as one of the signers. INC Kiel came up to me on two separate occasions wanting to know why I signed the petition. It was upsetting to have him approach me and I did not know what to say to him. I was shocked he knew that I signed the petition. It was to have been confidential. I had to work with him and did not want things to be difficult working with him. I gave him vague answers when he approached me. I was crying and upset that Kiel approached me. I called Ombudsman Birch asking for his help, but he would not give me any help. I was in tears. Birch told me to go to Wisniewski and said I could trust him. I was shocked when Birch said this because I found out that Wisniewski just went to AIC Nedd's house for dinner. How could I go to Wisniewski when he was supposed to be out here addressing the issues with the managers and he had gone to their house for dinner? Birch never followed up on my status regarding Kiel approaching me, as if he didn't care. I was extremely stressed about INC Kiel approaching me and broke down crying several times. I was in a panic and felt a lot of tension in the office. I did not know what to do. An Inspector intervened on my behalf, sending Birch an email about Kiel's behavior. Kiel later announced his retirement.

In June 2003 Inspector Birch asked me to send an email to those people whom I thought would like to meet with him and other managers in June 2003, to discuss their complaints on the petition. I did send an email to those people whom I thought would like to meet with him and even made a few phone calls. Those people were hesitant and I knew they were afraid of retaliation.

I told Birch the only way I would meet with him was if I met with Inspector Birch and his "team" offsite. He agreed. I arranged for a meeting at the Marriott Courtyard, because I did not want to meet at the office. Others that met with Birch at the office were "monitored." I was afraid of retaliation.

I arranged for a meeting at the Marriott Courtyard Hotel in a conference room, and around 4:30 p.m., I left the office early and it was there that I made my statements to those present about how management had been operating in San Francisco and my concerns. I believe the people at the meeting were Jim Birch, Ombudsman; Larry Katz, Chief USPIS Legal Counsel; Mike Ahern, Deputy Chief Inspector -Western Area; John Wisniewski, Acting AIC (at the time); and Greg Campbell, Acting AIC.

I prepared six pages of notes and took the notes to the meeting, because I didn't want to leave anything out. When I spoke, I read my notes and they just listened (See **Attached six pages**). I started out stating, "I would like to make it clear that from this meeting, all details are to be kept strictly confidential and that I receive no retaliation before I begin That means I will not be demoted, removed or reassigned." They agreed. I read my six page comments, which I felt addressed as favoritism at the time. It may actually have been more than that.

Exhibit 10B

1

Statement of Marilyn Lee ref June 2003 Birch Meeting

No one made any comments until I was done. At the end, Inspector Birch indicated that
maybe someone who signed the petition gave my name out. (I was not convinced that
HQ kept my name confidential. Inspector Dermott informed me that on the page of the
petition I signed, only three people signed the petition after my signature and could have
seen my name.) Birch said he was sorry that no one came to my help. He said he would
address my concerns and thanked me for coming in to speak with them. I recalled that
shortly after this whole incident I went to a doctor for a regular checkup and mentioned
the stress from my work. It was not to the level that I have been at since going to the
supervisor position.

*Marilyn Lee*

Marilyn N. Lee
8/10/05

I like to thank you for giving me the time to see you and telling chronicle of events that has happened to me. I'd like to make it clear that from this meeting, all details are to be kept strictly confidential and that I receive no retaliation before I begin. That means I will not be demoted, removed or reassigned.

Before we start, I want to know the following:

Is this meeting being taped? If so, I want a copy of the exact tape.

Will a report be done on this meeting? If so, I would copies of this meeting and who typed it and I would like the names of the people who will have access to this report. I also want to keep this confidential and want everyone who has a copy of the report to sign and return the signed copies to the ombudsman who in turn will provide me a copy of the signed sheets.

If a report is being prepared, can my name and title be substituted with a Code Name or alias?

I am asking DCI Mike Ahern to be here as moral support. I'd rather that Mike considered as an independent person and not be involved in this meeting. Since I know, respect and trust Mike Ahern, I would just want him to be here to listen and I feel I need a friendly face. If Mike feels uncomfortable in this decision, then please excuse yourself. I would understand.

I must apologize for reading my notes but I want to provide you with the most exact information on hand.

My issue is strictly favoritism and I chose to sign the petition because of the actions committed, which I felt were unjust. When I signed the petition it was my understanding that my complaint would be kept confidential and that there would be no retaliation. I expected the ombudsman or committee to review my complaint and weigh its own credibility. Being realistic, I am sure the ombudsman receives many complaints on a daily basis regarding favoritism, unsafe practices, overwork, etc. For example, I heard that there were several complaints re the ad hoc position selections at the divisions. The ombudsman/committee may find my complaint unactionable or unreasonable. But at least if I filed my complaint, it would be a matter of record. I was confident that someone else in the Division would complain sooner or later on the same issue of favoritism and that one day the ombudsman would have to listen. I also expected that my details of my experience could be twisted and interpreted as "unsubstantial or frivolous". At that time, I didn't know until the petition was formally filed that a number of the Division employees had "issues" and not necessarily the same reason as mine.

After hearing my concerns, you may also want to side with Alan, Juliana and Greg. But my point is at least I got someone to listen to my issue and have my complaint file. That is the intention of my signing the petition – someone other than local management (Alan, Juliana and Greg) to review, listen and file my complaint.

1 of 6
Marilyn Lee
Exhibit 10A

Let me get on with the events that occurred. Let me warn you that this maybe another Level 19 ad hoc selection issue which you may have heard before. Sometime in 2002, the support had to submit a write-up of what they wanted to do for Management and turn it in to the Admin. Specialist Sheilah Castor. My interpretation of that order was what my goals are and what I would like to do. I indicated that I would like to be in a training position of some sort but that there is no position available in that area at our Division at this time. I expected that if we turned it in, Management was going to read what our desires are. My feeling is that I don't think they even read it otherwise they may have considered my feelings about the recruitment ad hoc position.

Juliana discussed with Alan and Greg (mainly Alan) to create a support position and that support person would gather the reports that management needed on an interim basis. They assigned Wanda Smith for that position. I don't think the position was offered to anyone else. During the time Wanda was assigned to this newly created position, she did not have enough work to do and was asked to assist the Admin. Center. Although she was assigned to the Management Team, she reported directly to AIC Nedd, including when she was absent. I asked Wanda is she would like to be my backup as she was not that busy and she said she was not interested.

Socorro Frias reluctantly filled as a backup for me. No one else would volunteer as they felt that unless I got promoted, no one had a burning desire to learn my job and no one wanted to deal with AIC Juliana Nedd. As an employee working for her directly, I am of the opinion that AIC Juliana Nedd has an overbearing personality towards her subordinates. My opinion of her is that she is smart, innovative, fun loving, and at the same time she is loud, overbearing, intimidating, has no patience, or appropriate delivery. She also is very direct and critical to the point that sometimes it hurts. Some employees try to avoid her at all costs by not coming to DHQ.

When news of the ad hoc Recruitment Level 19 was developing, Juliana took Wanda into her office, researched and gave her information about the position, and helped her with her 991. These events were all out in the open, with Juliana keeping her door open and talking very loudly as usual. Juliana did not offer this same treatment to anyone else and it was very clear by her actions Juliana wanted Wanda in that position. I was disappointed because the position was in the area of what I desired and expressed which was filed with management. No one mentioned or considered me for it. I told Alan I was going to apply for it and he indicated with approval. And just that. With approval. Alan knew that Wanda got assistance from Juliana. It was happening in front of him. If he didn't know, then he is just as guilty of favoritism.

However, when the 991s deadline expired, Juliana went to Alan's office and asked out loud if a decision has been made re the ad hoc position as she only heard that Wanda was the only one applied. An Inspector happened to be there and informed Juliana that there were other employees who applied, including me. You can hear Juliana in "silent mode." I can only imagine her eyes rolling when the Inspector told her I applied.

2 of 6

Marilyn Lee

Exh. No. 16 A

Later Sheilah Castor called me in and told me that Wanda got the Ad Hoc Level 19 position. I was not happy with the decision as I thought there were others who were more qualified in that area other than Wanda. Again, this was my opinion and I returned to work.

I had to prepare the merit and award forms for the year. Juliana had put in Wanda for an "outstanding" merit rating and Management approved it. The write-up included her work on the recruitment process, which she just got recently assigned to within the 2-3 months. I question this management decision as in my opinion outstanding merits were based on performance for the entire year or continually.

Now I have prepared awards for many years. Wanda has worked for several supervisors and has not been recognized to that extent to receive that type of recognition. I can name several other stellar support people who, because of their work performance, will receive recognition no matter who they work for and are more deserving for an "outstanding" merit. Maybe she should get an award but an "outstanding" merit?? I am of the opinion that if another support person had been assigned to the ad hoc position other than Wanda, it is highly unlikely that person would get an "outstanding rating." Again this is my opinion.

I also got an "outstanding" merit. But I believed I truly deserve it. I worked for it and I am sure most of the people in the Division will vouch for my work ethics. I did not "smooze" to Management to get this rating.

I was very disappointed with management decisions, clearly thinking that Juliana had all along shown favoritism towards Wanda and that there was nothing to do but continue doing my work. Alan would come up to me and often said I do great work. Not only him, but I was surprised of the number of employees that came up to me and said they were sorry I did not get the position but I do great work. I said thank you to everyone. I guess it got to me because just about every day someone would say kind things to me. The more they said it, the more difficult it was for me to accept it. During this time a petition was going around. I passed up on signing it. The fact that some people thought I was wronged and offered the petition should have told me what they thought of the decision made by management.

One day an Inspector approached me and told me that management has directed an investigation to inquire employees who may have said the selection was racially motivated meaning Juliana Nedd wanted to promote Wanda Smith because she was black and my name was mentioned. The thought crossed my mind, however I never spoke to anyone about it. Others may have come to the same conclusion and one can interpret this action as management trying to cover up that the decision wasn't racially motivated. I didn't think much of it then. It just showed how much time and energy management was wasting.

One day, that petition came around and I decided to sign it based on my issue of favoritism of the selection process for the ad hoc Recruitment Level 19.

On Juliana Nedd's last day before she left for her detail, she asked that I speak to Alan directly as he found out that I signed the petition. I was surprised and unprepared to speak to Alan. I didn't want any confrontation with him as I believed that my issue in comparison to some of the other filers carried more weight than mine. So I walked into Alan's office and told him that Juliana said that I should talk to you about the petition. He asked me why I signed it. My thoughts were racing in my head. I can't tell him everything (like the open favoritism, awards, etc.) which is the main issue of my complaint. He may use the info I gave him and refer to my complaint as "frivolous or unsubstantial, etc." Again, it may be frivolous to some but I wanted someone else to know about what I've been through and I needed that info to present to the ombudsman. I proceeded to tell him about the Inspector who approached me and the investigation of my possibly telling others of the selection as racially motivated. Alan asked me if I thought he would do such a thing. I told him no because he would ask me directly but I would think Juliana would do it. Alan did not say anything. He was very hurt and said that by my signing the petition as his secretary, it reflected on him. Not knowing what to say, I apologized. In my mind I'm sure Juliana had a part in making the ad hoc recruitment decision. But I wasn't going to tell Alan that. Anyway Alan told me that the investigation was not directed on me and then he asked me if that was the only reason why I signed the complaint.

All I could think of was we can't continue like this and I have to work with Alan. I decided to appease him and said my signing the petition was a mistake. What can I say? I had to say that otherwise I could have been working in a hostile environment. Looking back I'm glad I made that decision, as I could not have lasted this long to tell my issue. I did not want to speak to Alan about the issue or give the information I had. Over the weekend, I was very miserable and I decided that the first thing on Monday morning, I was going to contact Mr. Birch.

I called Mr. Birch the first thing Monday morning, but he did not answer and left a message. Then I emailed him and said I need to speak to someone immediately as I was compromised. Finally when I heard from Mr. Birch he told me to speak to John Wisniewski. I asked Birch if John was in Acting AIC capacity or here to validate the complaints of the petitioners. He said John was working for Birch. But John was on his back way to SF and did not arrive until later that morning and Alan walked in. Alan asked to speak to me again. We were in the Kline Conference Room with the blinds open enough so you can see Alan and me. I was hoping that I would have spoken with someone from the ombudsman office before I could speak with him again. Again I had to give him as little info as I could without revealing what I considered "my essential facts to my issue." I knew that I had to tell him something.

I told Alan about how I disappointed with his decision to select Wanda. I told him that there are very few higher-level support positions in the field and this position was a Level 19. A Level 19 is a very high level for a support person. For me, giving that assignment to Wanda was like a ppo moving to a PPO division manager position. But again that is my opinion. The position was a developmental position so if that position

ever became a permanent, she would be the best qualified person and gets that job. Also, higher level jobs at the Division level are very limited. Since I have been InC Secretary, there have been very few higher level support positions at the Division. These positions were opened only because of retirements or transfers – the ISOC, a SET, and the Admin Specialist position. After hearing your speech yesterday that there would be higher levels opening up, was encouraging news to the support. Anyway at that point, Alan said he would give me developmental admin training for 3 months. And I told him I would like that. Regardless of what happened, I told Alan I would continue to do the good work that I do. Our meetings ended with me in tears and I'm sure the word got around. Alan did not approach me to talk about it further after the second incident.

In our conversations, Alan said that most of the petitioners complained about recognition. I said to myself, do you know what they are saying; you can't even recognize your own secretary with a promotion. Alan said he gave me an award. I bit my tongue. What was he thinking? I got the outstanding award based on my job performance. I felt that the award he gave me was like a person who gives his good dog a bone. I was hurt that Alan gave Wanda a promotion and an award, an outstanding award. I'd rather get a promotion than an award.

During my talks with Alan, all I could think of was we can't continue like this and I have to work with Alan. I did not know if anyone from the ombudsman's office was going to come out to speak with me and when. If no one from the ombudsman's office showed up, at least our relationship was not strained. I had to continue to work with him. In the meantime, I decided to keep the facts of my issue to myself.

Later I found out that John Wisniewski and Jim Donnelly went out with the Sullivans and it was my decision not to say anything to John about my case. I hesitated to have John Wisniewski here at this meeting but Mr. Birch advised that you will be acting InC and are to be trusted.

After the incident, the only person who was brave enough to speak to me about the confrontation and offer me assistance was Judy McDermott. She told me I should have never spoken with Alan but it was too late.

The talk of the Division is that the InC Secretary is a whistleblower. You don't know how that feels I'd like to tell you what's life has been since my talk with Alan and the announcement of his retirement. The first remark was, "Marilyn, what did you do to make Alan retire?" Not only did I hear that from one person but from several people. Some petition filers told me that they were happy I signed as they felt they were the bottom of the barrel employees, poor performing employees, misfits or outcasts of the Division and my signing brought attention to their issues. I was surprised that these employees felt that way. Their personal experience with management must have been so traumatic that they honestly believe they were the misfits or outcasts of the Division. Some were disappointed that I signed it. The day I heard from Mr. Birch telling me to inform everyone that wanted to speak with him to send him an email, there was so much tension. I walked into a crowded lunchroom and I can feel the tension. I felt the petition

filers did not want to speak to me to avoid being associated as a filer and the other people did not want to speak to me, as I am a troublemaker.

I am not happy with these comments or situation. Had this issue been handled in a confidential manner I would not be in this situation. What is even worst is that the division is torn in half – those that signed and those that did not. Morale is low and the energy to focus on work is not all there. My signing did not help the build the trust in management.

I asked for this meeting outside the Division so not to attract attention. I feel I should inform the Chief directly of what has been happening. I request that everyone here don't tell Alan of this meeting or the details. It would only hurt him and I would not like to display any awkward feelings between us at his retirement luncheon. Besides I have to continue working for him and I respect Alan as a decent person.

I am worried about the ombudsman program and its credibility. Had I been just another support person who had filed a complaint of favoritism, and there was another complaint filed by another support person in the same division for the same reason, would the ombudsman give those complaints credibility? How many complaints need to be filed before "issues" are brought to light?

I am disappointed that many of the filers did not come to speak to you directly as I can't speak for them. Besides I don't know their personal issues. I am not a complainer, never filed an EEO or signed a petition in my 24 years. After this incident, I can understand why those who filed complaints in the past are not happy with the process. Your credibility and integrity is questioned. However, for those filers not chose not to speak with you directly also compromises my credibility and integrity because they alone can substantiate the events that occurred. The only conclusion I can come up with is that they probably feel nothing positive can come out of this.

I am upset that someone gave Alan my name that I signed the petition. I am upset that he personally had to question me about my signing. Had anyone else signed this petition, no one, no one would have approached that person and question him or her. Team Leaders were not questioned, but an InC Secretary. I am upset that after the incident with Alan, no one from the ombudsman's office came to my assistance to protect me and left me in a vulnerable and possibly hostile environment. I am upset that it took this long to hear from the ombudsman's office. And if my position as InC secretary brought this issue to light, then I am upset that upper management's attitude towards any complaint filed by any other person, regardless of what position, is probably not as important.

# Exhibit N



UNITED STATES POSTAL INSPECTION SERVICE

SAN FRANCISCO DIVISION

July 15, 2005

Marilyn Lee
Inspection Service Operations Coordinator
San Francisco Division
SSN: 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

SUBJECT: Placement on Administrative Leave

You are hereby placed on administrative leave (non-duty status with pay) effective July
18, 2005, while the Inspection Service reviews the circumstances surrounding your
alleged stressful work environment. You will remain in a non-duty status until advised
otherwise by this office.

During this period you are not authorized access to Inspection Service offices. You are
instructed to report by telephone to Sheilah Castor, Administrative Manager, at (415)
778-5890, Monday through Friday, between the hours of 8:00 am – 9:00 am. You
may be called into work and should remain available for contact during the remainder of
the day. Your failure to report as instructed will be viewed as an act of insubordination
and may result in severe disciplinary action being taken against you, up to and including
removal.

If you have scheduled annual and/or sick leave which was previously approved, you will
be charged the appropriate leave per your approved request. For the period of your
approved leave, you are not required to report by telephone as instructed above.

If, while in this non-duty status, you intend to leave the local commuting area or for
any reason you are not available for contact for a specific period, including illness or
injury, you must advise Sheilah Castor, in advance, if practical, and request appropriate
leave. Your failure to comply may result in the applicable day(s) being charged absent
without leave (AWOL).

Annual leave will not be authorized beyond your maximum carry-over for the leave
year. Annual leave above your maximum carry-over at the end of the leave year will be
forfeited. Therefore, you should plan annual leave accordingly.

W.P. Atkins
Inspector in Charge

cc: Manager, Human Resources

PLAINTIFF'S
EXHIBIT
3 1