Daniel Ray Bacon, Esquire, SB # 103866
LAW OFFICES OF DANIEL RAY BACON
234 Van Ness Avenue
San Francisco, California 94102-4515
Telephone: (415) 864-0907
Facsimile:  (415) 864-0989

ATTORNEYS FOR PLAINTIFF
MARILYN N. LEE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MARILYN N. LEE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JOHN E. POTTER, POSTMASTER<br>GENERAL,<br><br>　　　　Defendant.<br>_____ | Case No. C 07-2540 SBA<br><br>DECLARATION OF DANIEL<br>RAY BACON IN SUPPORT<br>OF PLAINTIFF 'S MEMORANDUM<br>OF POINTS AND AUTHORITIES  IN<br>OPPOSITION TO DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT |

Date:　　　　September 16, 2008
Time:　　　　1:00 P.M.
Courtroom:　#3
Judge:　　　Hon. Saundra Brown
　　　　　　　　Armstrong

I, DANIEL RAY BACON, do hereby declare as follows:

1.     I am an attorney licensed to practice law in the State of California in both the State and Federal courts.  I own and operate The Law Offices of Daniel Ray Bacon and am an attorney for the Plaintiff in the above captioned matter.  I declare  that the contents of this declaration are true of my own personal knowledge or based upon my review of the records, documents, and pleadings in this action.

2.     On January 2, 2008, I was present when Plaintiff Marilyn Lee's deposition was taken.  Attached hereto and incorporated herein as Exhibit A to my declaration are true and correct copies of pages of the deposition of Marilyn Lee.

3.     On April 18, 2008, I took the deposition of William Atkins in this matter.  Attached hereto and incorporated herein as Exhibit B are true and correct copies of certain pages of the deposition of William Atkins.

4.     On May 22, 2008, I  took the deposition of Kathleen Mary O'Leary in this matter.  Attached hereto and incorporated herein as Exhibit C are true and correct copies of certain pages of the deposition of Kathleen Mary O'Leary.

5     On May 29, 2008, I  took the deposition of Michael Ahern in this matter.  Attached hereto and incorporated herein as Exhibit D are true and correct copies of certain pages of the deposition of Michael Ahern.

6     On May 29, 2008, I  took the deposition of Kaycee Graham in this matter.  Attached hereto and incorporated herein as Exhibit E are true and correct copies of certain pages of the deposition of Kaycee Graham.

7.     On May 30, 2008, I  took the deposition of Sheilah Castor in this matter.  Attached hereto and incorporated herein as Exhibit F are true and correct copies of certain pages of the deposition of Sheilah Castor.

DEC. OF DRB IN SUPPORT OF
MEMORANDUM OF P.& A.
 IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

1

2          I declare under penalty of perjury under the Laws of the State of California and the

3    United States that the foregoing is true and correct and that this declaration was executed in San

4    Francisco, California on August 26, 2008.

5

6    August 26,   2008                          LAW OFFICES OF DANIEL RAY BACON

7

8                                               DANIEL RAY BACON
                                               ATTORNEY FOR PLAINTIFF
9                                              MARILYN N. LEE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   DEC. OF DRB IN SUPPORT OF
     MEMORANDUM OF P.& A.
27    IN OPPOSITION TO DEFENDANT'S
     MOTION FOR SUMMARY JUDGMENT
28                                        2

# Exhibit A

No. C-07-2540 SBA
Marilyn Lee, Plaintiff

Vs.

John E. Potter, United States Postmaster General
United States Postal Service
(Capital Metro Area), Agency
United States of America
Defendants


Deposition of

Marilyn N. Lee

Wednesday, January 2, 2008

1        UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4    - - - - - - - - - - - - - - - - - -

5    MARILYN LEE,                    )    CASE NO.

6          Plaintiff,               )    C07 2540 SBA

7    V.                              )

8    JOHN E. POTTER, POSTMASTER GENERAL, )

9          Defendant.               )

10   - - - - - - - - - - - - - - - - - -

12         DEPOSITION OF MARILYN LEE

13       WEDNESDAY, JANUARY 2, 2008

21        BEHMKE REPORTING & VIDEO SERVICES

22   BY: CHRISTINE L. JORDAN, CSR NO. 12262, RPR

23          160 SPEAR STREET, SUITE 300

24        SAN FRANCISCO, CALIFORNIA 94105

25              (415) 597-5600

CERTIFIED COPY

CERTIFICATE OF REPORTER

1

2

3        I hereby certify that the witness in the
4   foregoing deposition, MARILYN LEE, was by me duly
5   sworn to testify to the truth, the whole truth and
6   nothing but the truth, in the within-entitled cause;
7   that said deposition was taken at the time and place
8   herein named; that the deposition is a true record of
9   the witness's testimony as reported by me, a duly
10  certified shorthand reporter and a disinterested
11  person, and was thereafter transcribed into
12  typewriting by computer.

13        I further certify that I am not interested
14  in the outcome of the said action, nor connected with
15  nor related to any of the parties in said action, nor
16  to their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my
18  hand this 13th day of January, 2008.

19

20

21

22  *Christine L. Jordan*

23  CHRISTINE  L. JORDAN, CSR #12262

24  STATE OF CALIFORNIA

25

211

1    ask her, "Why are you at my house?"

2        A.    I know why she came.

3        MR. BACON:    Listen to his question.

4    BY MR. SCHARF:

5        Q.    Did you ask her?

6        A.    No.

7        Q.    Did she tell you why she went to your house?

8        A.    Well, she told me she was concerned for me.

9        Q.    Okay.

10            And you feel she was lying and she was just

11    covering her butt?

12        A.    Yes.

13        Q.    Got it.

14            But she did fess up and tell you that she

15    told management about the statements that you made?

16        A.    Yes.

17        Q.    It was her job to tell management about

18    those kinds of issues?

19        A.    Well, you know what, I was going to be

20    removed through the medical note also.    So she didn't

21    have to.

22        Q.    It helped though, didn't it?    Wasn't it --

23    in retrospect, wasn't it helpful that management knew

24    you had made these statements such that they would be

25    more likely to take you seriously, your request for

                                                            182

 1   detailed to the Post Office.

 2       Q.   Did you present that information

 3   administratively in support of your claim?

 4       A.   I -- I did in your discovery items.

 5       MR. BACON:  He's talking about earlier.

 6   BY MR. SCHARF:

 7       Q.   So to the agency.

 8       A.   No.  No.  I just -- I just said that I knew

 9   that Katie O'Leary was detailed, but I didn't have

10   any information, you know, proof then.

11       Q.   So you -- I do remember I looked at the

12   response -- your documents that you produced, and I

13   did see an FOIA-type letter.  That's what you're

14   referring to?

15       A.   Yes.

16       Q.   So this is some information that you

17   obtained that you did not present administratively

18   but you did provide me in response to your discovery

19   obligations?

20       A.   Right.

21       Q.   Okay.

22            And what did that -- refresh my

23   recollection.  What did you learn from your Freedom

24   of Information Act request?

25       A.   They put down that Katie O'Leary and Sheilah

1  Castor were on paid details of the Post Office.  I

2  mean, the Post Office was actually paying for their

3  details while they're still employees of the

4  Inspection Service.

5      Q.    Okay.

6          Can you think of any -- are you aware of any

7  other employees that prove your claim in that they

8  were detailed out with the agency picking up your --

9  picking up their salary while they were detailed out

10  to a separate entity?

11          Is it just Katie and Sheilah that you

12  believe support your claim or are there other

13  individuals?

14      A.    Well, I didn't believe when I got the

15  response from the agency so I called Katie O'Leary

16  up.

17      Q.    All right.

18          But you mentioned Katie and Sheilah.  Are

19  there any other people, examples that you feel prove

20  your claim that they could have detailed you out, to

21  your knowledge?

22      A.    Not right now.

23      Q.    Okay.  So let's talk a little more about

24  Katie and Sheilah.  I think we asked you some

25  questions about Katie.

31

1    promotion there is in Inspection Service would have

2    been Sheilah Castor's job, which is an Admin

3    Specialist.

4         Q.    Okay.

5              But just as a general statement, were

6    you interested in developing your resumé, taking on

7    additional assignments and developing skills so you

8    could get a promotion?

9         A.    Yes.

10        Q.    And had you ever expressed that to your

11   supervisors?

12        A.    Yes.

13        Q.    Very good.

14             And did you initially perceive that being

15   assigned the supervisor job would be a way of

16   building your resumé and developing additional skills

17   such that you would be more qualified to receive a

18   promotion?   Initially, was that how you looked at it?

19        A.    No.

20        Q.    No.

21             You never wanted that?

22        A.    Not the supervisory position.

23        Q.    Never.   You never wanted it?

24        A.    No.

25        Q.    You never asked for it?

44

1    A.    No.

2    Q.    And they forced you to take it?

3    A.    Yes.  Not forced me.  They asked me.

4    Q.    Okay.  Did you take it?

5    A.    Yes.

6    Q.    Why did you -- so you accepted it?

7    A.    Yes.

8    Q.    You could have said no?

9    A.    I did say no.

10    Q.    Initially?

11    A.    Yes.

12    Q.    How many times did you say no?

13    A.    I just -- first time I said no.  And then he

14  just kept asking me and asking me, and he's my INC.

15    Q.    How many times did he ask you before you

16  said yes?

17    A.    The fourth time.

18    Q.    Okay, the fourth time you said yes?

19    A.    Yes.

20    Q.    So you said no three times?

21    A.    Yes.

22    Q.    And on the fourth time you said yes?

23    A.    Yes.

24    Q.    Why did you say yes the fourth time?

25    A.    Because I knew that he was asking me, and

1    A.    Yes.   I was --

2    Q.    When did you become supervisor?

3    A.    June 2004.

4    Q.    And then when did you separate?

5    A.    July.

6    Q.    Of what year?

7    A.    2005.

8    Q.    Okay.

9          So, I'm sorry, something about the Monterey

10   conference leads you to believe that Atkins knew of

11   your prior activity?

12   A.    Yes.

13   Q.    What about the Monterey conference?

14   A.    There was postings of Investigative Analyst

15   that had just came out, and there were high levels.

16   I was given training as Investigative Analyst for

17   OWCP on that desk, and I really liked it.

18         So that -- there was a deadline for the

19   position, the Investigative Analyst that Friday that

20   the conference ended.   So the conference ended, and I

21   was in the office on Sunday working to meet all the

22   expenses to -- and to submit it to headquarters.

23         And I talked to Atkins that day and I asked

24   him, I said, "Do you know if there's any more

25   Investigative Analysts positions going to be made

52

 1  available because I really don't want the External

 2  Crimes or the Internal Crimes positions, but I will

 3  apply for it if they're the only positions that are

 4  going to be made available."

 5          And he told me, "Yes, there's going to be

 6  more Investigative Analyst positions."  Because I

 7  wanted the OWCP.  I mean, I didn't want to be stuck

 8  in a position that I did not want.

 9      Q.    So how does any of this lead you to believe

10  that Atkins knew about you signing the petition or

11  your meeting with the managers?

12      A.    Because I remember then that his comment

13  was, "Well, they're going to think that you didn't

14  want to move up."  And I didn't say anything -- or,

15  you know, he implied that, you know, I didn't want

16  any movement.

17          And I go, "No.  I just don't want this

18  position, these positions, unless they're the only

19  ones going to be made available."

20      Q.    Why does his statement so that -- so people

21  will think that you don't want to move up --

22      A.    Well, where would he get that?

23      Q.    -- suggest to you that you signed the

24  petition or participated in a meeting regarding a

25  petition?

1   unhappy, and he said he didn't care.  He says as long

2   as everybody else was happy.

3        Q.   Do you think, did you develop bad chemistry

4   with Atkins?

5        A.   I didn't think so.

6        Q.   Initially you got along with him?

7        A.   Yes.  So that's why I trusted him.

8        Q.   But ultimately, the relationship

9   deteriorated?

10       A.   Yes.  After I became a supervisor and after

11  that conversation, he didn't speak to me.

12       Q.   Did you develop a personality conflict with

13  him?

14       A.   He didn't speak to me.  I mean, what do you

15  expect?  I was his personal secretary and then got

16  put in supervisor, and he never spoke to me after

17  that, after I complained to him again.

18       Q.   Okay.

19            You were ultimately scheduled for a

20  fitness-for-duty examination, correct, a

21  fitness-for-duty examination?

22       A.   Yes.

23       Q.   That was after a conversation you had with

24  Sally about the "what do I have to do, hurt myself

25  and blame Atkins," it was after that conversation?

89

```
 1        THE WITNESS:  Can you --
 2   BY MR. SCHARF:
 3        Q.   It's a long way of saying:  Did you do
 4   anything else that you feel that management was
 5   retaliating you --
 6        A.   No.
 7        Q.   -- from doing (sic)?
 8             So we're just talking about filing the
 9   petition?
10        A.   Petition and meeting.
11        Q.   I'm sorry, signing the petition and meeting
12   with people regarding the petition?
13        A.   Right.
14        Q.   You weren't involved in any other protected
15   EEO activity?
16        A.   No.
17        Q.   Now, how many people signed the petition?
18        A.   Forty-nine.
19        Q.   And do you know -- do you have any personal
20   knowledge that any of the other 48 people suffered
21   adverse job action as a result of retaliation because
22   they participated in that petition?
23        A.   Judy McDermott, because she initiated the
24   petition.
25        Q.   Right.
```

119

# Exhibit B

No. C-07-2540 SBA
Marilyn Lee, Plaintiff

Vs.

John E. Potter, United States Postmaster General
United States Postal Service
(Capital Metro Area), Agency
United States of America
Defendants


Deposition of

William Atkins

April 18, 2008

1

2

3                    UNITED STATES DISTRICT COURT

4          FOR THE NORTHERN DISTRICT OF CALIFORNIA

5                    SAN FRANCISCO DIVISION

6

7  MARILYN LEE,                      )
                                     )
8                   Plaintiff,       )        Case No.
                                     )        C07 254 SBA
       vs.                           )
9                                    )        Volume I
   JOHN E. POTTER, UNITED STATES     )
10  POSTMASTER GENERAL,              )
                                     )
11                                   )     Pages 1 thru 214
                    Defendant.       )
12  _____ )

13

14                        Deposition of

15                        WILLIAM ATKINS

16                        April 18, 2008

17

18

19  Reported By:

20  CYNTHIA J. POLISERI CSR # 11448

21  --------------------------------------------------------------

22                    JAN BROWN & ASSOCIATES

23               CERTIFIED SHORTHAND REPORTERS

24  701 Battery St., 3rd Floor, San Francisco, California 94111

25               (800) 522-7096   (415) 981-3498

1

STATE OF CALIFORNIA )    SS.

        I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was correctly reported by me, a certified shorthand reporter and a disinterested person, and was under my supervision thereafter transcribed and when so transcribed was carefully read to or by the said witness, and, being in every desire, was thereafter by the said witness duly subscribed; that if unsigned by the witness, signature has been waived in accordance with stipulation between counsel for the respective parties.

        And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition nor in any way interested in the outcome of the cause named in said caption.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of May , 2008.

                                     Cynthia J. Poliseri
                                     Certified Shorthand Reporter

WILLIAM ATKINS - APRIL 18, 2008

1  A.    I don't remember.

2  Q.    When did you first learn that you were going to be

3        deposed today?

4  A.    Um, a week ago, two weeks ago.  I don't recall.

5  Q.    After you knew that you were going to be deposed, did

6        you talk to anyone who either worked with the postal

7        service or used to work with the postal service about

8        Marilyn Lee at all?

9              MR. SCHARF:  Other than counsel.

10             MR. BACON:

11 Q.    Other than counsel?

12 A.    No.

13 Q.    When you received this promotion from Mr. Heath in

14       Washington, DC, were you told how it was that you

15       came to be selected for this position?

16 A.    No.

17 Q.    Did you apply for this position at all?

18 A.    No.

19 Q.    And when you came to San Francisco then, who did you

20       report to?

21 A.    I did not report to anyone.  I was the boss.

22 Q.    Were you interviewed at all for the

23       inspector-in-charge position here in San Francisco?

24 A.    No.

25 Q.    When you were promoted here in San Francisco, to San

17

1       Francisco, were you advised of any problems or

2       concerns of the San Francisco division?

3   A.   Yes.

4   Q.   And what were you apprised of?

5   A.   I was advised that it was an unhappy division with

6       bad morale, bad productivity and bad management.

7   Q.   And who told you that?

8   A.   I believe Mr. Heath told me that, and I believe

9       Mr. Ahern also told me that.

10   Q.   Can you recall anything more about the bad morale?

11       Were you told anything about why there was, why it

12       was an unhappy division or why there was bad morale?

13   A.   I don't recall the specifics, but I know it was -- or

14       at least in my mind I felt it was because of bad

15       management.

16   Q.   And you mentioned bad management.  Was that what

17       Heath or Ahern told you?

18   A.   I don't recall specifically who told me what, but

19       that was the impression I was left with.

20   Q.   Did you talk to anyone else other than Heath or Ahern

21       about San Francisco prior to coming to San Francisco?

22   A.   I wouldn't recall that.  I don't know.

23           MR. SCHARF:  Are you talking about the

24       office, not the city?

25           MR. BACON:  Correct.

18

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   And did you know Mr. Ahern before you came to San

2        Francisco?

3   A.   Yes.

4   Q.   And how about Mr. Heath?  How long did you know

5        Mr. Heath prior to coming to San Francisco?

6   A.   Well, I think 10 to 15 years, but I don't recall

7        exactly.

8   Q.   How about Mr. Wisniewski?  Did you know him before

9        you came to San Francisco?

10  A.   No.

11  Q.   How about Mr. Donnelly?  Did you know Donnelly

12       beforehand, before coming to San Francisco?

13  A.   No, I didn't.

14  Q.   Or Greg Campbell?  Did you know Greg Campbell before?

15  A.   No.

16  Q.   Larry Katz, did you know Larry Katz before coming to

17       San Francisco?

18  A.   Yes.

19  Q.   Where did you meet Larry Katz?

20  A.   Larry's been in headquarters for years as a manager,

21       and everybody knows Larry Katz.

22  Q.   Where was Katz located?

23  A.   Washington, DC.

24  Q.   And when you talked to Heath and Ahern about San

25       Francisco, did anyone mention to you at all who would

                                                        19

WILLIAM ATKINS - APRIL 18, 2008

1          be your secretary?

2     A.   No.

3     Q.   Were you told anything about Marilyn Lee prior to

4          coming to San Francisco by anyone?

5     A.   No.

6     Q.   And do you know Sheilah Castor?

7     A.   Yes.

8     Q.   And who is Sheilah Castor?

9     A.   Sheilah Castor was my admin specialist.

10    Q.   In Seattle or San Francisco?

11    A.   Both.

12    Q.   So when you received this promotion to San Francisco,

13         how was it that Sheilah Castor then came to San

14         Francisco, if you know?

15    A.   Sheilah Castor was there before me.  She left Seattle

16         to come to San Francisco a year or two before I got

17         here.

18    Q.   What was her title in San Francisco -- in Seattle?

19    A.   She was an admin specialist.

20    Q.   What is an admin specialist?

21    A.   That's the person that's in charge of all of the

22         administrative staff.  They're in charge of the

23         budget, training, all of the administrative duties in

24         the division.

25    Q.   And then when Castor had come to San Francisco, she

                                                            20

WILLIAM ATKINS - APRIL 18, 2008

1          kept the same title?

2    A.    She bid on the same job in San Francisco and got it,

3          so she transferred as an admin specialist.

4    Q.    How soon before you came here did Castor come, if you

5          know?

6    A.    It was at least a year.  I don't recall exactly.

7    Q.    And then she reported to you both in Seattle and then

8          also in San Francisco when you came here?

9    A.    Yes.

10   Q.    Were you a social friend with Sheilah Castor?

11   A.    No.

12   Q.    Has she ever been to your house or visited socially?

13   A.    She has once at a party I had.

14   Q.    Did Sheilah Castor tell you anything about San

15         Francisco before you arrived since she had come here

16         first?

17   A.    I don't recall that she did.

18   Q.    And AIC Gamache, G-A-M-A-C-H-E, do you know who that

19         is?

20   A.    Yes, I do.

21   Q.    Who is that?

22   A.    He was one of the AICs in San Francisco before I got

23         here.

24   Q.    And was he removed from his position, if you know?

25   A.    He was not.  No, he was not.

                                                              21

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   And was he your predecessor?

2   A.   No.

3   Q.   What was he in San Francisco?

4   A.   I don't know.

5   Q.   Prior to your being here?

6   A.   Yes.

7   Q.   Did anyone ever tell you that Gamache had been

8        removed from his position in San Francisco?

9   A.   No.

10  Q.   And do you know a person named Nedd, N-E-D-D?

11  A.   Yes, I do.

12  Q.   Who is that?

13  A.   She was the other AIC in San Francisco prior to my

14       arriving.

15  Q.   And do you know if she was removed from her position?

16  A.   She was not removed.

17  Q.   Do you know what circumstances led to her leaving San

18       Francisco?

19  A.   She got a promotion.

20  Q.   Where to?

21  A.   Washington, DC.

22  Q.   Who was the inspector-in-charge right before your

23       arrival here?  Do you know?

24  A.   Allan Kiel, K-I-E-L.

25  Q.   Did you know Allan Kiel before you came to San

                                                            22

WILLIAM ATKINS - APRIL 18, 2008

```
 1         Francisco?

 2    A.   Yes.

 3    Q.   And how long did you know Allan Kiel?

 4    A.   Ten years.

 5    Q.   Did you talk to Allan Kiel at all before you had your

 6         position in San Francisco?

 7    A.   No.

 8    Q.   And do you know the circumstances how Kiel left San

 9         Francisco?

10    A.   No.

11    Q.   You don't know if he retired or transferred?

12    A.   I know he retired.

13    Q.   When did he retire?

14    A.   I believe it was June of 2003.

15    Q.   Do you know why he retired in June of 2003?

16    A.   No, I do not.

17    Q.   Do you know if his retirement was voluntary or

18         involuntary?

19    A.   Don't know.

20    Q.   Did anyone ever tell you that Kiel was forced to

21         resign or forced to retire?

22    A.   No.

23    Q.   No one ever told you that?

24    A.   Nope.

25    Q.   Were Nedd and Kiel and Gamache all serving in San
```

23

WILLIAM ATKINS - APRIL 18, 2008

1          Francisco at the same time or different times, if you

2      know?

3   A.   There were all there at the same time before I

4      arrived.

5   Q.   And all three managers left prior to your arrival,

6      correct?

7   A.   Correct.

8   Q.   Have you ever known three managers to all leave their

9      positions from one division before?

10  A.   I can't think of an example, no.

11  Q.   Did you ever have any conversations with Heath about

12      these three individuals, Nedd and Kiel and Gamache?

13  A.   I don't believe I did, no.

14  Q.   Do you know if you ever looked at any surveys that

15      had been sent to employees in the San Francisco

16      division shortly after you arrived?

17  A.   I do not.

18  Q.   I don't know that you have this.  I think there's

19      some other documents you wanted from Marilyn's

20      deposition, and I'm putting that together.

21          I'd like to show you -- we might as well mark

22      this as Plaintiff's 1.

23                    (Whereupon a letter dated May 28, 2003
                  attached to an employee evaluation
24                form was marked for identification as
                  Plaintiff's Exhibit No. 1.)

25

                                                          24

1                    MR. BACON:

2    Q.    Have you ever seen this document before?

3    A.    I don't believe so, no.

4    Q.    Do you know what this document is?

5    A.    It says "Employee Evaluation Form."

6    Q.    So you've never seen this, the evaluation form cover

7          letter or the form that's attached to it before?

8    A.    I don't remember ever seeing this, no.

9                    MR. SCHARF:  Looks like there are two

10    separate surveys attached as the same document, and I

11    can't tell from this document whether both of the

12    surveys were attached to the May 28th cover letter?

13                    MR. BACON:  Yeah.  This comes out of the

14    agency file, the investigation file.

15   Q.    And you never saw any responses to the survey, I

16          guess this evaluation form either I take it?

17   A.    That's correct.

18   Q.    When you came to San Francisco, did anyone ever

19          mention to you anything about Wanda Smith being

20          selected for the ad hoc recruitment position?

21   A.    I believe that appointment was made before I got

22          there.

23   Q.    Did you ever have any discussions with anyone about

24          that appointment?

25   A.    If I did, I don't remember.

                                                          25

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    Do you know if anyone had made any complaints about

2          the selection?

3    A.    I don't remember specifics, no.

4    Q.    Do you recall anything generally?

5    A.    There's always a grumbling when someone gets promoted

6          and someone doesn't.  I don't remember who did the

7          grumbling and what was said, but that's typically

8          done in the inspection service.

9    Q.    So you were aware that some people were unhappy about

10         it?

11   A.    Well, you're saying unhappy; I say grumbling.  I

12         don't know that anyone was unhappy.  They were

13         grumbling.

14   Q.    Who was grumbling?

15   A.    I don't recall.

16   Q.    Did you ever talk to Marilyn Lee about Wanda Smith?

17   A.    Um, if I did, I don't remember.

18   Q.    Did you ever make comments to anyone in the San

19         Francisco division that they were not to cooperate or

20         work with the OIG?

21   A.    No, I did not.

22   Q.    You said that you were told, I guess, three things;

23         that it was an unhappy division, there was bad morale

24         and bad management about San Francisco.

25               Were you told also that --

26

WILLIAM ATKINS - APRIL 18, 2008

1   defining that phrase.  Can you define it for him?

2           MR. BACON:  I would define it listed in the

3   EEO rules and regulations that you mentioned earlier.

4   Q.   Have you ever heard the phrase "hostile work

5   environment" before?

6   A.   Yes.

7   Q.   What does a hostile work environment mean to you?

8   What is the definition of that according to your

9   understanding?

10          MR. SCHARF:  Objection, calls for

11   speculation.  You can answer.

12          THE WITNESS:  I can answer?

13          MR. SCHARF:  You can.

14          THE WITNESS:  A situation that causes stress

15   and anxiety based on arbitrary or ineffective

16   management style or technique.

17          MR. BACON:

18   Q.   And had anyone ever told you that there were people

19   complaining that San Francisco was a hostile work

20   environment for them?

21   A.   Uh, I probably have heard that, yes.

22   Q.   And do you know who was complaining about that or who

23   you heard it from, either one?

24   A.   I don't remember specifically, but a lot of people

25   felt that it was probably a tense division.

28

WILLIAM ATKINS - APRIL 18, 2008

1       signed in San Francisco before you arrived in San

2       Francisco?

3  A.    Yes.

4  Q.    Who told you about the petition?

5  A.    I believe it was probably Mike Ahern.

6  Q.    And how soon before you came to San Francisco were

7       you told by Mike Ahern about this petition?

8  A.    Once I got the promotion and showed up in San

9       Francisco, it was sixty days.  So sometime in that

10      60-day period.

11  Q.    What did he say about the petition, Mr. Ahern?

12  A.    He did not have a lot of detail about the petition,

13      just that a group of employees signed a petition

14      indicating there were poor -- there was poor

15      management, poor morale in the San Francisco

16      division.  And they wanted it looked into.

17  Q.    Was Wanda Smith mentioned at all in conjunction with

18      that petition?

19  A.    No names were mentioned in association with that

20      petition.

21  Q.    Well, you say he told you "a group of employees."

22      How did he know it was a group of employee as opposed

23      to one employee?

24          MR. SCHARF:  How did he, Ahern, know?

25          MR. BACON:  Yeah.

31

1          MR. SCHARF:  Objection, calls for

2     speculation.

3          MR. BACON:

4  Q.   If you know.  Did he tell you how he knew it was a

5     group of employees?

6  A.   I didn't ask; he didn't say.

7  Q.   Did you ask who any of the individuals were that had

8     signed the petition?

9  A.   No.

10 Q.   Did you ever ask anyone who had signed the petition?

11 A.   No.

12 Q.   Did you ever see the petition?

13 A.   No.

14 Q.   Did Mr. Ahern tell you why he was telling you about

15     the petition?

16 A.   He told me because he wanted to give me a background

17     on some of the issues that involved the division,

18     some of the things I would be walking into and some

19     of the things I needed to address as the new

20     inspector in charge.

21 Q.   What were some of the issues that you learned in your

22     discussion with Ahern that you would have to face

23     coming to San Francisco?

24 A.   Like I said, bad employee morale, bad productivity,

25     inefficient management practices, all of those

                                                            32

1      Marilyn Lee to be your secretary?

2  A.   No, I didn't.

3  Q.   Did anyone ever suggest to you or talk to you about

4      removing Marilyn Lee as your secretary?

5  A.   No.

6  Q.   Prior to coming to San Francisco, you had not met

7      Marilyn Lee, correct?

8  A.   I may have met her just at a training session or

9      something, but I don't recall.  I didn't know her.

10  Q.   How did she perform as a secretary?

11  A.   Very good.

12  Q.   Were you satisfied with her work?

13  A.   Yes, I was.

14  Q.   How would you rate her as an employee, as a

15      secretary?  Did you give her an evaluation?

16  A.   Yes, I did.

17  Q.   This would be, I guess, Number 2.

18

19              (Whereupon a year-end evaluation dated
                 November 5, 2004 was marked for

20              identification as Plaintiff's Exhibit
                 No. 2.)

21

22        MR. SCHARF:  Let's give him time to read it.

23        MR. BACON:  Just let us know when you finish

24      reading it.

25

                                    34

WILLIAM ATKINS - APRIL 18, 2008

1                    (Witness reads Exhibit 2.)

2

3                    THE WITNESS:   Okay.

4                    MR. BACON:

5    Q.    Did you write this?

6    A.    Yes.

7    Q.    And is this your signature at the bottom left, right

8          above your name, "W.P. Atkins"?

9    A.    Yes, it is.

10   Q.    And did you write this on or about November 5, 2004?

11   A.    That's what it says, yes.

12   Q.    Is that your recollection?

13   A.    M-hm.

14   Q.    Is that a yes?

15   A.    That's a yes.

16   Q.    And is everything in here accurate?

17                   MR. SCHARF:   As of the date that it was

18         written?

19                   MR. BACON:  Yes.

20                   THE WITNESS:   Except for the "at my personal

21         request she took over the supervisory duties."  Yes,

22         everything else is accurate.

23                   MR. BACON:

24   Q.    So you're saying in the third paragraph where it says

25         "Marilyn took over her supervisory duties at my

                                                            35

WILLIAM ATKINS - APRIL 18, 2008

1       personal request, comma, and not because it was a

2       position she desired," you're saying that's not

3       accurate?

4   A.  No, I'm not saying -- that is, it sounds as -- it's

5       written as though it's my suggestion that she move

6       over there.

7           MR. SCHARF:  I think he wants to explain

8       what he meant by that sentence.

9           THE WITNESS:  I would like to explain.

10          MR. BACON:  Okay.

11  Q.  Well, it says here that -- first of all, let me

12      understand what you're talking about.  "Marilyn took

13      over her supervisory duties."

14          What are you referring to as supervisory duties?

15  A.  The job that she was -- the job -- I can't remember;

16      the correspondence center coordinator, or whatever

17      the supervisory job that she was sent to.

18  Q.  Okay.  And it says, "She took over the supervisory

19      duties at my" meaning "your," "personal request"?

20  A.  M-hm.

21  Q.  Are you saying that's not accurate?

22  A.  It doesn't tell the whole story.  It's accurate, but

23      it doesn't tell the whole story.

24  Q.  That's you what you wrote at the time on November 5

25      of '04.

36

WILLIAM ATKINS - APRIL 18, 2008

1           MR. SCHARF:  Objection, argumentative.  You

2     don't have to answer that question.

3           MR. BACON:

4  Q.   You wrote this, and it's all accurate as of November

5     5 of 2004 except for this sentence.  You don't agree

6     with this sentence for some reason, correct?

7           MR. SCHARF:  Objection, asked and answered.

8     Do you want to ask him what he meant by the sentence

9     or, "Why do you not agree with it?"

10          MR. BACON:  I want to pin down first of all

11    what he's saying that what he wrote is somehow

12    inaccurate.

13  Q.   Are you saying that everything else --

14          MR. SCHARF:  Let me just --

15          MR. BACON:

16  Q.   In this document -- I'll let you clarify in a minute,

17    but I want to find out first of all, you know, is

18    there any -- that's the first sentence of the third

19    paragraph.

20        Is there anything else in this document that

21    we've marked as Plaintiff's Exhibit 2 that is

22    inaccurate?

23          MR. SCHARF:  Objection, asked and answered.

24    You don't have to answer that.  He's already

25    testified that it's accurate except for that one

                                                        37

WILLIAM ATKINS - APRIL 18, 2008

1    sentence, and you've requested an opportunity to

2    explain what you meant by that sentence.

3              THE WITNESS:  Yes.

4              MR. SCHARF:  So let's move on to the next

5    question.

6              MR. BACON:

7  Q.   So you're saying that you did not -- that Marilyn Lee

8       did not take the supervisory duties at your personal

9       request?

10  A.   What I'm saying is that I did not fully detail every

11       aspect of her moving into that assignment in her

12       evaluation for various management reasons.  So taken

13       by itself, it looks different than what actually

14       happened.

15  Q.   Well, did you write this Exhibit 2 prior to filling

16       out what we're going to mark later -- might as well

17       go ahead and mark this as Plaintiff's Exhibit 3.

18

19                        (Whereupon a 20-page document entitled
                          "Investigative Questions for William
20                        Atkins" was marked for identification
                          as Plaintiff's Exhibit No. 3.)
21

22              MR. BACON:

23  Q.   So you wrote Exhibit 2 before you created Exhibit 3,

24       correct?

25  A.   That's correct.

38

WILLIAM ATKINS - APRIL 18, 2008

1              MR. SCHARF:  Okay.  You've answered the

2      question on the table.  I need to take a break now,

3      okay?

4              MR. BACON:  All right.

5              MR. SCHARF:  It'll just take a second.

6

7                  (Off the record at 10:54 a.m. and

8                  back on the record at 10:56 a.m.)

9

10             MR. SCHARF:  Let's go back on the record.

11             MR. BACON:  Back on the record.

12  Q.  Before the break, we were talking about this

13      Exhibit 2, and I had asked you if everything was

14      accurate.  And everything is accurate except you want

15      to clarify or talk further about the first paragraph

16      or the first sentence of paragraph 3.  The first

17      sentence says, "Marilyn took over her supervisory

18      duties at my personal request and not because it was

19      a position she desired."

20          That's what you wrote in November 5 of 2004.

21          Why is that not accurate?

22  A.  It's not accurate simply because it doesn't tell the

23      entire story.  It doesn't explain how that assignment

24      came to be and how she asked for the assignment.  And

25      I gave her the assignment at her request to help

                                                        39

WILLIAM ATKINS - APRIL 18, 2008

1        develop her resume so she could qualify for

2        promotional opportunities.

3    Q.   Well, are you finished?

4    A.   No, I'm not finished.

5    Q.   Okay.

6    A.   The entire idea for her to go to supervisory role,

7        she wanted to develop her resume.  She wanted to

8        qualify for higher level positions.  I told her at

9        that time the only job I had was a supervisory

10       position.  Now, she wasn't crazy about being a

11       supervisor, but she decided to take the job because

12       she wanted to be promoted.  So I gave her the job,

13       which is why I say it wasn't the position that she

14       really wanted, but it was a job she decided to do

15       because she wanted to be promoted.  I didn't make her

16       take the job.

17   Q.   Why do you say "She was not crazy about being a

18       supervisor"?  Why do you say that?

19   A.   Because that's what she told me.

20   Q.   Well, she told you she wasn't crazy about being a

21       supervisor, or did she tell you that she didn't want

22       to be a supervisor?

23   A.   That's a subtle difference, and I don't know which

24       way she said it.  I don't remember the exact

25       conversation, but she decided she would take the job

                                                        40

WILLIAM ATKINS - APRIL 18, 2008

1      as supervisor.

2   Q.   Well, who suggested that this job be taken in the

3        first instance?

4            MR. SCHARF:  Are you talking about the

5        particular job?

6            MR. BACON:  The supervisory job.

7            THE WITNESS:  There was only one job.  That

8        was the only job.  If she wanted a promotional

9        opportunity, that was the job she had to take.  So

10       that's the job that she took.

11           MR. BACON:

12  Q.   And these discussions you're recollecting with

13       Marilyn Lee, when did they take place?

14  A.   Before she took the job.

15  Q.   Was the position vacant at the time you were

16       discussing that with Marilyn Lee?

17  A.   No.

18  Q.   Who had the position at the time you were discussing

19       this with Marilyn Lee?

20  A.   Anita Cabano.

21  Q.   So why would that be a position that would be

22       available if Ms. Cabano already had the position?

23  A.   Because Ms. Cabano was a bad manager, and I needed to

24       replace her.

25  Q.   Was Cabano eventually put back in the position?

41

1    A.    No, she was not.

2    Q.    Was she given a promotion later?

3    A.    No, she was not.

4    Q.    You also say in the second sentence after that in the

5          third paragraph, "Subsequently, Marilyn has proven

6          herself to be indispensable to the organization in

7          this role."

8               Why did you say she was indispensable?

9    A.    I said she was indispensable because she was the best

10         that I had as a supervisor, and I had no one near her

11         abilities to replace her.

12   Q.    You say, "I have nothing but high praise for her

13         contributions as secretary."

14              If she was such a good secretary, why have her

15         leave the secretary position?

16   A.    Because it's much easier to fill a secretary position

17         than it is a supervisory position.

18   Q.    Were you afraid of Marilyn Lee being your secretary

19         because she had signed this petition?

20   A.    Absolutely not.

21   Q.    Were you afraid that she might make a complaint about

22         you?

23   A.    No.

24   Q.    So she eventually did make a complaint about you

25         though, didn't she?

42

WILLIAM ATKINS - APRIL 18, 2008

1   A.   The only thing I can remember that she said was

2        something about employees did not have her work

3        ethic, so it was frustrating for her.

4   Q.   Did she tell you it was causing her stress?

5   A.   No.

6   Q.   First paragraph of this Exhibit 2 says "Marilyn

7        served approximately half the year as my personal

8        secretary, then volunteered to serve as the ISOC for

9        the remainder of the fiscal year."

10       What does ISOC stand for?

11  A.   Inspection service operation center.

12  Q.   Well, if she had volunteered for this position, why

13       could she not return to it?

14  A.   She couldn't return to it because I needed her where

15       she was at, and the needs of the division have to

16       override the personal interest of the individuals.

17       In this case, that's what happened.

18  Q.   But this wasn't a case where it was just a personal

19       preference.  It was causing her stress, right?

20  A.   I had no knowledge of that.

21  Q.   Didn't you say and tell the investigators in this

22       case that you had seen Marilyn Lee crying?

23  A.   I saw Marilyn Lee crying from the day when she was my

24       secretary the first week.  Marilyn Lee cries a lot.

25  Q.   And you don't see that as some kind of evidence as

44

WILLIAM ATKINS - APRIL 18, 2008

1    stress?

2                    MR. SCHARF:    Objection, calls for expert

3    opinion.    Unless I instruct you not to answer a

4    question, you have to answer the question.

5                    THE WITNESS:    Okay.

6                    MR. BACON:

7    Q.    You did not see her crying as some indication that

8          she was having stress, dealing with stress somehow on

9          the job?

10   A.    At first I thought maybe that was the case, but it

11         soon became evident that she used that as a way to

12         manipulate.

13   Q.    So you think she was a manipulative employee?

14   A.    Yes.

15   Q.    So you don't think she was a very good secretary then

16         if she was very manipulative, correct?

17   A.    I did not say that.

18   Q.    So a person can be very manipulative and still be a

19         very good employee?

20   A.    She attempted to manipulate.

21   Q.    Oh, now she attempted.    What do you mean "she

22         attempted to manipulate"?

23   A.    Using tears to express her points to get her your --

24         or her way of manipulating, trying to manipulate.

25   Q.    You don't have any medical training, do you?

                                                            45

WILLIAM ATKINS - APRIL 18, 2008

1    A.    It's my opinion.

2    Q.    But you don't have any medical training, do you?

3    A.    No, I don't.

4    Q.    Did you ever consult with any doctors at all about

5          seeing Marilyn Lee tear up and cry and so forth?

6    A.    No.

7    Q.    You say "Marilyn has proved" -- this is in the second

8          paragraph.  "Marilyn has proved she can address

9          significant problem areas and come up with equitable

10         solutions."

11             What problems area did she address, and what did

12         she come up with?

13   A.    Morale issues; she solved morale issues.

14         Organizational issues; she reorganized more equitable

15         distribution of the workload.  She just came up with

16         better ways to do the job that was more fair to the

17         employees, and they appreciated that.

18   Q.    Were you appreciative of what she did and how she

19         worked?

20   A.    Yes.

21   Q.    So why didn't you consider her request to be returned

22         to the secretary position?

23   A.    I did consider it.

24   Q.    How did you consider it?

25   A.    I considered my options as to her replacement and how

46

WILLIAM ATKINS - APRIL 18, 2008

1        the division would suffer if I did take her out of

2        that position, and I could not afford to do that.

3    Q.   Now, I want to understand here, and again on the

4        third paragraph -- at the time you wrote this, you

5        say that she took over this at your personal request.

6            What do you mean by that in context of your

7        earlier clarification?  What was your personal

8        request that you were talking about there?

9    A.   My personal request was that, if you want a

10       promotional opportunity, here it is.  This is the

11       job.

12   Q.   And then what did you mean at the time you wrote it

13       when you said, "and not because it was a position she

14       desired"?

15   A.   Like I said, she had reservations about supervising

16       people.

17   Q.   Didn't she tell you she didn't want to take the

18       supervisory position?

19   A.   I left it up to her.

20   Q.   Well, was it a request, or was it a mandate from you

21       to take this position?

22   A.   A request is not a mandate.

23   Q.   I said, is it a request, or is it a mandate?

24   A.   It was a request.

25   Q.   So it wasn't a mandate.  So why would you not

47

WILLIAM ATKINS - APRIL 18, 2008

1    consider her concerns later on three or four months

2    later when she said she wants to go back to being a

3    secretary?  Why would you mandate then that she

4    cannot return?

5              MR. SCHARF:  Objection, vague and ambiguous,

6    compound.  I think also there's an ambiguity in your

7    phrase "consider."  I think you're talking about

8    consider meaning reject as opposed to think about it.

9              MR. BACON:  No, consider meaning, listen to

10   her request to go back to being a secretary.

11             MR. SCHARF:  Okay.  Could you break it down

12   to focus just on that specific question so it's not

13   compound?

14             MR. BACON:

15   Q.   Well, if it was only a request, why not allow her to

16        be considered?  Why not consider her request in the

17        view of, well, she volunteered for this, and it was

18        merely a request.  It wasn't a mandate.

19        So why not look at it in that context and say,

20        "Well, since I'm not mandating it, I'll let you go

21        back."

22             MR. SCHARF:  Objection, argumentative, vague

23   and ambiguous and compound.  I'm not so sure -- I

24   think you're debating with the witness on this point.

25

48

WILLIAM ATKINS - APRIL 18, 2008

1                    MR. BACON:

2    Q.    I want to know why, if it's not a mandate, that you

3          mandated she stay in the position?

4    A.    I answered that question.  I talked with my

5          administrative supervisor.  I discussed it with

6          everybody involved, and we all came to the

7          realization that there was just nobody to replace

8          her.  I explained that to Marilyn.  There was nobody

9          competent to replace her.  I was not going to leave

10         that very valuable position open when I had a

11         competent replacement as her secretary.  That would

12         leave me vulnerable.  I could not do that.

13   Q.    Well, it left you vulnerable later on, correct, when

14         she was removed from the position?

15                    MR. SCHARF:  Objection, argumentative.  You

16         can answer.

17                    THE WITNESS:  I couldn't foresee that.

18                    MR. BACON:

19   Q.    Maybe her behavior wasn't manipulative then, right?

20                    MR. SCHARF:  Objection, argumentative.  You

21         definitely don't need to answer that question.

22                    MR. BACON:

23   Q.    Why do you say she was manipulative?

24   A.    Because she would only cry when she wanted something.

25   Q.    How many times did you see her crying during this

                                                              49

WILLIAM ATKINS - APRIL 18, 2008

1      three- or four-month period that she had first

2      started working as a supervisor?

3  A.  I don't think I did.

4  Q.  Did you talk to her at all during that three or four

5      months while she was working as a supervisor?

6  A.  Absolutely.

7  Q.  How many times a day would you talk to her?

8  A.  I can't give you a number, but I'd stop by daily.

9  Q.  Who was the administrative supervisor you mentioned

10     that you talked to about this?

11  A.  Sheilah Castor.

12  Q.  Did Sheilah Castor tell you that she saw Marilyn Lee

13     exhibiting signs showing severe stress on the job?

14  A.  She did not say that, no.

15  Q.  She never said that to you?

16  A.  She did not.

17  Q.  How many EEOs were filed naming you as a

18     discriminating official while you were in San

19     Francisco?

20  A.  I don't know.

21  Q.  More than ten?

22  A.  I don't know.  I doubt it.  I don't think so.

23  Q.  How many EEOs were filed against you naming you as a

24     discriminating official in your whole career?

25  A.  I'm sorry?

50

1    Q.    During your whole career.

2    A.    I don't know that number either.

3    Q.    Were there a high amount of EEOs in San Francisco

4          according to your discussions with Ahern and Heath

5          prior to taking the job?

6                MR. SCHARF:  Objection, the word "high" is

7          ambiguous.  You can answer.

8                THE WITNESS:  They said there was a -- they

9          used the word "high," but I don't know what the

10          number is.

11                MR. BACON:

12    Q.    Who in particular told you that there was a high

13          number of EEOs in San Francisco?

14    A.    Either Ahern or Heath.

15    Q.    Have you ever filed an EEO yourself?

16    A.    No.

17    Q.    And Marilyn Lee filed a stress claim while you were

18          the person in charge in the San Francisco division,

19          correct?

20    A.    That's correct.

21    Q.    And were you apprised of that stress claim?

22    A.    Yes.

23    Q.    Who told you about it?

24    A.    Probably Ed Lawee.

25    Q.    And when you were told by Ed Lawee about the stress

1       claim of Marilyn Lee, what was your response?

2                   MR. SCHARF:  Since Ed is agency counsel, I'm

3       going to instruct the witness not to testify as to

4       any statements he made to Ed or that Ed made to him.

5       Independent of that privileged and confidential

6       conversation, you may answer the question.

7                   THE WITNESS:  What was my reaction?

8                   MR. BACON:

9   Q.  Yeah.

10  A.  Was that the question?  I was surprised.

11  Q.  Why?

12  A.  Because I was unaware that things had gotten to that

13      point.

14  Q.  And what do you mean when you say "things had gotten

15      to that point"?  To what point?

16  A.  She's alleging she was stressed.  I didn't realize

17      she was stressed.  So it was a surprise to me.

18  Q.  Did anyone else file any stress claims while you were

19      in San Francisco other than Marilyn Lee?

20  A.  I don't think so.

21  Q.  Do you know who Spencer Chew was?

22  A.  I know the name.

23  Q.  Did he ever file an EEO to your knowledge?

24  A.  Against me?

25  Q.  Against anyone in San Francisco?

52

WILLIAM ATKINS - APRIL 18, 2008

1   Q.   But Cassidy was to oversee both Hawaii and San

2        Francisco operations?

3   A.   Correct.

4   Q.   Did he ever complain that he felt he was overworked?

5   A.   Not that I recall.

6   Q.   Do you know if Inspector Cassidy ever made any

7        complaints of working conditions or filed an EEO?

8   A.   Not to my knowledge.

9   Q.   Now, you say you saw Marilyn Lee crying.  How often

10       would you see her crying?

11              MR. SCHARF:  During what period of time?

12              MR. BACON:

13  Q.   During the whole time she worked there.  How often

14       during that time period?

15  A.   Four or five, four or five times.

16  Q.   And during the four or five times that you saw her

17       crying -- let's start with the first time.  Did you

18       have a discussion with her and she started crying?

19       How was it that you saw her crying?

20  A.   It was my first week on the job, and she was outside

21       my office crying.  So I called her into the office to

22       talk with me.

23  Q.   Did you ask her why she was crying?

24  A.   Yes, I did.

25  Q.   What did she say?

54

WILLIAM ATKINS - APRIL 18, 2008

1  A.   Something about the prior inspector in charge and how

2       he didn't trust her anymore because she had signed a

3       petition.  That's about all I remember.

4  Q.   A petition that you had already been told about,

5       correct?

6  A.   Yes.

7  Q.   Did any of the times you saw Marilyn Lee crying occur

8       during the time she was a supervisor?

9  A.   No, 'cause she had her own office, and I didn't -- I

10      didn't see her crying in her office, no.

11 Q.   But you said you saw her almost daily, correct?

12 A.   M-hm, yes.

13 Q.   And so you're saying that during the whole time that

14      she was working as a supervisor, you never saw her

15      crying at all?

16 A.   I don't believe I did, no.

17 Q.   But yet you say you saw her four or five times crying

18      while she was your secretary, correct?

19 A.   Yes.

20 Q.   Well, when she was crying when she was your

21      secretary, did you ever advise her to go to the

22      employee assistance program or seek any assistance?

23 A.   I would -- I would talk to her and ask her what the

24      issues were, and we would talk about the issues.  And

25      she seemed to be better after we talked about

55

WILLIAM ATKINS - APRIL 18, 2008

1        whatever it was that was bothering her at the time.

2  Q.    But did you ever direct her to see the employee

3        assistance program?

4  A.    I don't believe I did.

5  Q.    As inspector in charge, how often would you meet with

6        headquarter managers?

7  A.    In San Francisco?

8  Q.    Anywhere.

9  A.    Monthly.

10  Q.    And at these monthly headquarter manager meetings, is

11        that how you met Mr. Ahern and Mr. Heath?

12  A.    No.

13  Q.    Was there a usual place for these monthly meetings?

14  A.    No.

15  Q.    What were some of the places that you met?

16  A.    All over the country.

17  Q.    And these headquarter meetings, these are your

18        counterparts, managers from all over the country?

19  A.    Counterparts and my bosses, the upper levels.

20  Q.    Who is your boss?

21  A.    Mike Ahern.

22  Q.    How long would the meetings usually last, two days,

23        three days, week, what?

24  A.    One, two, or three days.

25  Q.    Would you socialize or meet with headquarter managers

56

WILLIAM ATKINS - APRIL 18, 2008

1              before, during or after these conferences?

2     A.    Yes.

3     Q.    Did you socialize or meet with Chief Heath?

4     A.    Very occasionally.

5     Q.    Would you socialize or meet with Chief Heath before

6              or after these conferences or leadership meetings?

7     A.    Yes, occasionally.

8     Q.    Did you ever socialize or meet with Mr. Katz?

9     A.    Only if he was part of a group.

10    Q.    How about Mr. Wisniewski?

11    A.    No.

12    Q.    Mr. Donnelly?

13    A.    I don't think so, no.

14    Q.    Greg Campbell?

15    A.    Um, yeah, he worked for me.  So, yeah, we'd go out

16             occasionally.

17    Q.    When you would socialize or on the occasions you did

18             with Chief Heath, would Larry Katz usually be

19             included in that?

20    A.    Yes.

21    Q.    As an inspector in charge, would you communicate

22             frequently with headquarter managers through email,

23             phones, meetings and so forth?

24    A.    No.

25    Q.    How often did headquarter management contact you?

57

1           How much in contact were you with them?

2    A.     Probably monthly.

3    Q.     How often would you contact the chief?

4    A.     Not that often.

5    Q.     Once a month maybe?

6    A.     No.

7    Q.     Once --

8    A.     Once every three months maybe.

9    Q.     How about the deputy chief inspectors?  How often

10          would you contact them?

11   A.     Probably weekly.

12   Q.     So you feel as the inspector in charge that when you

13          were named here to go to San Francisco that you were

14          pretty much well-informed or apprised of the

15          situation before you came here?

16   A.     I felt like I had adequate information to do my job.

17   Q.     Would you get any statistical reports from various

18          managers or from the San Francisco division regarding

19          the operations of the division?

20   A.     Yes.

21   Q.     What kind of statistical reports would you get?

22   A.     There were dozens of them.  There were work hours,

23          costs, personnel time and attendance, arrests,

24          convictions, prosecutions, state arrests versus

25          federal arrests.  We were kept well-informed of

58

WILLIAM ATKINS - APRIL 18, 2008

1           statistical evidence.

2    Q.    Did you get statistical reports also on the EEOs that

3          were filed?

4    A.    No.

5    Q.    No one ever brought any report to you showing you

6          what EEOs had been filed in San Francisco?

7    A.    No.

8    Q.    Did you ever comment when you came here at all about

9          EEOs in your introductory remarks?  Did you ever

10         mention anything about the EEOs that had been filed?

11   A.    Yes.

12   Q.    What did you say?

13   A.    I made the comment that I had learned that there were

14         a lot of EEOs filed in the San Francisco division,

15         that I considered the filing of EEO -- EEO cases that

16         were -- I thought there was a lack of communication

17         and that I wanted to improve in communication at all

18         levels of the inspection service in San Francisco and

19         that I wanted the opportunity as the new leadership

20         team in San Francisco to at least have the

21         opportunity to try to resolve some of these issues

22         before they escalated into the EEO process, that if

23         they didn't get satisfaction from their manager, they

24         should go to an AIC.  And if they still didn't get

25         satisfaction, they should come to me.  And if that

                                                            59

1      didn't work, file your EEO, and that's your right.

2  Q.   Did you ever say in those remarks that people should

3      not file EEOs?

4  A.   Never.

5  Q.   When you made those remarks, did you get any

6      responses from anyone afterwards about that

7      particular point?

8  A.   None that I remember.

9  Q.   And I take it you also got evaluations in your

10     performance, correct?

11  A.  Correct.

12  Q.  Were the headquarter managers satisfied, you know,

13     your boss and so forth, with your performance here in

14     San Francisco?

15         MR. SCHARF:  Objection, calls for

16     speculation.  You can answer.

17         THE WITNESS:  Yes, I believe they were.

18         MR. BACON:

19  Q.  When you -- let me strike that.

20      When Marilyn Lee was put in the supervisory

21     position, was that a detail, an assignment, a

22     transfer?  How would you describe that?

23  A.  She was reassigned to that position on a temporary

24     basis.  It was not intended to be a full-time basis,

25     but the problem was I did not have anybody to replace

1      her.  So even though I tried to explain to her that I

2      had to wait for one of those three ladies to retire

3      before I could get me a competent supervisor, she had

4      to wait.  I did not have anybody to replace her.

5  Q.  So when you reassigned her to that position, you told

6      her it was on a temporary basis?

7  A.  I don't think I probably told her that.  That was my

8      intent.

9  Q.  Do you know if she said anything that acknowledged

10     that that was her understanding, that it was a

11     temporary assignment?

12 A.  I don't remember if she did or not.

13 Q.  And when you reassigned Marilyn Lee to that position,

14     did you inform anyone at headquarters that Marilyn

15     Lee had been reassigned as a supervisor?

16 A.  I wasn't required to contact anybody that she had

17     been reassigned, so I don't think that I did, no.

18 Q.  You don't have any recollection of doing that as you

19     sit here today?

20 A.  I do not have any recollection of doing that.

21 Q.  And then we've mentioned Larry Katz.  What's his

22     title or was his title?

23 A.  He still is.  He's the chief legal counsel.

24 Q.  And he's out of DC?

25 A.  Washington, DC.

61

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    And what's his responsibilities, just briefly, as the
2          chief legal counsel?
3    A.    All of the legal representatives in the field report
4          to him, and I really -- I think he helps make policy
5          and procedures for the inspection service.
6    Q.    Was he out here in San Francisco at all at any time
7          to assist you either when you first came out or
8          during the time you served in San Francisco?
9    A.    He's been out several times.
10   Q.    And then at one point you had also assigned Marilyn
11         Lee to an OIG detail.  Do you recall that?
12   A.    She was never assigned to an OIG detail.
13   Q.    Now, what word would you put there to say she was
14         what to the OIG detail?
15   A.    I don't understand what you're saying.
16   Q.    Well, did you ever tell her that she was going to be
17         placed in an OIG detail?
18   A.    I agreed with the SIC for the OIG that she could go
19         on that detail, yes.
20   Q.    And what is that called, detailing the person?  Or
21         what word do you use?
22   A.    We use detail because it was outside the agency.
23   Q.    Did you ever contact anyone at headquarter management
24         regarding Marilyn Lee's OIG detail?
25   A.    Yes, I did.

62

WILLIAM ATKINS - APRIL 18, 2008

1  Q.    And who did you contact?

2  A.    My boss.

3  Q.    Mr. Ahern?

4  A.    I -- I don't know if it was Mike Ahern at that time

5        or if it was Tom Brady.  I don't recall.

6  Q.    And why did you contact them about that?

7  A.    To ensure that I was following proper procedures with

8        OIG details.  They had specific guidelines as to how

9        that was supposed to work, so I had to check to make

10       sure I was following those guidelines.

11  Q.    What did they tell you?

12  A.    Told me I couldn't do it unless the OIG picked up her

13       hours.

14  Q.    And when you say "picked up her hours," you mean the

15       other agency has to pay for it?

16  A.    They had to pay her salary.

17  Q.    Have you ever had occasion while you were in San

18       Francisco where someone was detailed to another

19       agency and San Francisco actually paid for the

20       detail?

21            MR. SCHARF:  While he was working in San

22       Francisco?

23            MR. BACON:  Correct.

24            THE WITNESS:  No.

25

63

WILLIAM ATKINS - APRIL 18, 2008

1           MR. BACON:

2      Q.   Did Marilyn Lee ever tell you she wanted to be

3           returned to the secretary position?

4      A.   Yes.

5      Q.   And I apologize if I asked, but I think you said

6           three to four months she didn't like being

7           supervisor.  Would you say it's three or four months

8           into it the first time she complained about being a

9           supervisor?

10     A.   As I recall.

11     Q.   Did you ever contact anyone at headquarter management

12          regarding Ms. Lee's request to be removed from the

13          supervisory position?

14     A.   No.

15     Q.   Why did you not report this to anyone in upper

16          management?

17     A.   It was my decision to make.

18     Q.   But you had earlier said that you contacted them to

19          make sure you were following the rules and

20          regulations.  Why didn't you contact them in this

21          instance when she had asked to be returned?

22     A.   Like I said, we had new specific rules as to details

23          with the OIG, and I wanted to make sure those rules

24          were followed.

25     Q.   Did you ever discuss with any manager the fact that

                                                              64

WILLIAM ATKINS - APRIL 18, 2008

1   Marilyn Lee was detailed as the -- or reassigned as

2   the administrative center supervisor?

3 A. I'm sure -- I don't recall.  I think Ahern obviously

4   knew 'cause she wasn't there, but I don't know that

5   there was any discussion.

6 Q. Did you ever have any discussions with Inspector

7   Hang, H-A-N-G, about Marilyn Lee being the

8   administrative center supervisor?

9 A. Inspector Hang called me one time inquiring about

10   Ms. Lee.

11 Q. What did she inquire about?  What did she say?

12 A. He.

13 Q. He.  What did he say?

14 A. He was speaking on her behalf to try to get me to

15   send her back to the secretary position.

16 Q. What did he say in particular?

17 A. Don't recall, but I told him it was really none of

18   his business and it was inappropriate that he was

19   calling me.  And I said that I would have to deal

20   with it as the inspector in charge and do the right

21   thing for the division.

22 Q. And how long into her working as a supervisor did you

23   hear from Inspector Hang?

24 A. I really don't remember.

25 Q. So you told Inspector Hang that he shouldn't be

WILLIAM ATKINS - APRIL 18, 2008

1  Q.    And you said she was a very good employee.  But do

2         you know if she had any training to be a supervisor

3         prior to being reassigned?

4  A.    I don't recall.

5  Q.    Wouldn't that be important to know whether or not she

6         had training in order to deal in the supervisory role

7         with problem employees?

8  A.    They weren't necessarily problem employees.  They

9         were employees that were not properly supervised.

10 Q.    Well, they were employees who were not being

11        productive and had low morale and they were an

12        unhappy division, right?

13              MR. SCHARF:  Objection, mischaracterizes

14        prior testify, assumes facts not in evidence.  But

15        you can ask that in a new question.

16              MR. BACON:  Could you read that last

17        question?

18              (Record read as requested.)

19

20              MR. BACON:

21 Q.    These employees that she was going to be supervising,

22        they were not performing well, correct?

23 A.    They were not performing to expectations, correct.

24 Q.    And do you know if she had any training and

25        supervision prior to being put in that role with

67

WILLIAM ATKINS - APRIL 18, 2008

1           those employees who were not producing --
2    A.     I do not know.
3    Q.     But wouldn't that be important to know, if you're
4           going to make a proper assignment, whether the person
5           was actually qualified and prepared for the job?
6    A.     Not in this instance.
7    Q.     Why not?
8    A.     Because in this instance I had four people to choose
9           from.  And I knew all four of them very well.  And
10          she was -- she had the inter-personal skills; she had
11          the organizational skills; and she had the knowledge
12          of the inspection service much and far superior to
13          the other three.  So given that she had all of these
14          other factors that the other three didn't possess,
15          even without supervisory skills, she was still going
16          to be better, I felt, than the other three.
17   Q.     Just so we're clear, you said she was better than the
18          other four, did you say?
19   A.     Three.  There were four total.
20   Q.     What are the names of the other people you're talking
21          about?
22   A.     Anita Cabano, Kaycee Graham, and I forgot the third.
23          I forget the third name.
24              MR. SCHARF:  If you want us to help, we can
25          figure it out.

                                                            68

WILLIAM ATKINS - APRIL 18, 2008

1          can answer that.

2                    THE WITNESS:  No, I don't.

3                    MR. BACON:

4     Q.   And then why is Mendez -- why was Mendez not

5          qualified for that position as a supervisor?

6     A.   'Cause she's basically a basic incompetent.

7     Q.   So you had a lot of people working under you who were

8          autocratic, dictatorial and incompetent.  Is that

9          your testimony?

10    A.   I'd say those three, yes.

11    Q.   Anyone else that would fit those descriptions of

12         people who worked in San Francisco at the time you

13         were there?

14    A.   Nobody comes to mind.

15    Q.   Do you know if Donnelly ever intended -- strike that.

16                   After Marilyn Lee became a supervisor, did you

17         offer training for supervisory work then?

18    A.   I don't believe while she was supervisor any

19         supervisory training came available.

20    Q.   So you don't have any knowledge of Marilyn Lee ever

21         attending any supervisory training courses?

22    A.   I do not.

23    Q.   Did you ever have any discussions with Donnelly about

24         supervisory training?

25    A.   No.

                                                              71

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    Did Donnelly ever ask you if Marilyn was reassigned
2          as a supervisor?
3    A.    Donnelly wasn't even in the division.  Donnelly was
4          gone before I got there.
5    Q.    Did you have any discussions with Donnelly at all
6          while Marilyn Lee was working for you?
7    A.    No, I don't think so.
8    Q.    Did your bosses at all suggest removing Marilyn Lee
9          as a secretary?
10   A.    No.
11   Q.    Where did the idea come to remove Marilyn Lee from
12         the secretary position?
13   A.    Marilyn Lee approached me and asked for an
14         opportunity to expand her resume so that she would be
15         more promotable, more competitive in the higher-level
16         opportunities that she knew were coming down the
17         road.  I told her that the only opportunity I had for
18         her was this supervisory job, to think about it and
19         let me know what she decided.  I was not going to
20         place her in a job unless she agreed to go.  I could
21         have, but I did not.
22   Q.    You said in the evaluation you wrote, which is
23         Exhibit 2, that she had -- her strength was her
24         supervisory abilities.
25              Why did you say that?  Why do you say that she

72

WILLIAM ATKINS - APRIL 18, 2008

1   A.   Just one.

2   Q.   Who was that?

3   A.   Marilyn Lee.

4   Q.   So during the whole time you were in San Francisco,

5        you never discussed with anyone, other than Marilyn

6        Lee, about this petition.  Is that your testimony?

7   A.   That's correct.

8   Q.   Did you ever hear Mr. Kiel say he knew who had signed

9        the petition?

10  A.   I never saw Mr. Kiel, never talked to Mr. Kiel.

11  Q.   Did you ever hear from anyone else that Mr. Kiel had

12       approached Marilyn Lee about signing the petition?

13  A.   Yes, I heard it from Marilyn Lee.

14  Q.   Anyone else did you hear it from?

15  A.   No.

16  Q.   Did you do anything to inquire as to whether

17       Marilyn's statement was correct or not, whether

18       Mr. Kiel had inquired of her about the petition?

19  A.   No.

20  Q.   And when you talked about the petition before you

21       came to San Francisco, did anyone ever tell you that

22       they were upset about the petition or concerned about

23       the petition?

24  A.   I don't understand what you mean by "concerned."

25  Q.   Well, did anyone ever say that the petition raised

75

WILLIAM ATKINS - APRIL 18, 2008

1       concerns for them about the issues contained in the

2       petition?

3   A.  They were obviously upset about the concerns that

4       they didn't want those concerns to exist, but they

5       were glad to be notified of those concerns so they

6       could deal with them.

7                   MR. SCHARF:  I need to take a break, okay?

8

9                       (Off the record at 11:47 a.m. and

10                      back on the record at 11:53 a.m.)

11

12                  MR. BACON:

13  Q.  Was there any discussion about whether the petition

14      played any role in the prior managers leaving San

15      Francisco?

16  A.  Yes.

17  Q.  What was that?

18  A.  That it was a factor in their at least recognizing

19      that there was a situation in San Francisco, and I

20      think it helped initiate this interest in resolving

21      those problems.

22  Q.  When you say that Marilyn Lee told you that she had

23      signed the petition, did she tell you what the

24      petition was about?

25  A.  I think she just assumed I already knew.  I don't

76

WILLIAM ATKINS - APRIL 18, 2008

1   think she explained what the petition was, but I knew

2   what she was talking about.

3 Q. What was she talking about that you knew?

4 A. The petition that we were just discussing about prior

5   management.

6 Q. Did she mention anything about Wanda Smith being

7   selected for a position as part of the petition?

8 A. I don't recall anything about Wanda Smith.  I didn't

9   even know Wanda Smith at that time, so if she

10   mentioned it, it wouldn't have stuck in my head.

11 Q. You don't recall whether she did or not?

12 A. I do not recall.

13 Q. Did you ever ask her in those discussions why she had

14   signed this petition?

15 A. No, she volunteered the information.

16 Q. What did she say as to why she signed it?

17 A. It was kind of a -- it wasn't really a concise direct

18   reason, but I think it boiled down to that things had

19   just become intolerable morale-wise in the division,

20   and things were so inefficient and a lot of

21   favoritism going on that she felt like she had to

22   speak up.

23 Q. Did you ever learn from anyone that there were

24   complaints about the selection of Wanda Smith for her

25   position?

77

WILLIAM ATKINS - APRIL 18, 2008

```
 1   A.   If I did, I didn't really pay attention because that
 2        was before me, and I had nothing to do with it.
 3   Q.   Do you know what the complaints were regarding the
 4        selection of Wanda Smith?
 5   A.   I believe somebody said that she wasn't a senior to
 6        somebody else, or that's all I recall.
 7   Q.   Were you concerned about those issues that people had
 8        with her selection?
 9   A.   No.
10   Q.   Why not?
11   A.   Because the promotion of Wanda Smith or the detail of
12        Wanda Smith was a headquarters decision that had
13        nothing to do with me.  She reported to headquarters
14        and she was in my division, but she wasn't really a
15        part of my division, so it didn't concern me.
16   Q.   Do you know who had put Wanda Smith in that position?
17   A.   No, this was all done before I got there.
18   Q.   And the position was ad hoc recruitment position.  Is
19        that what it was, if you know?
20   A.   That sounds right.
21   Q.   During the whole time that you worked with Marilyn
22        Lee, did you feel that she was a trustworthy
23        employee?
24   A.   Yes.
25   Q.   Even after she filed the EEO complaint?
```

78

1   A.   After she filed and left, I didn't give it any

2        thought.

3   Q.   Did you ever hear a discussion about anyone else who

4        may have signed this petition?

5   A.   No.

6   Q.   Did you ever become aware of any correspondence from

7        Inspector Judy McDermott to Birch in 2003 that

8        referenced the petition?

9   A.   Any correspondence that went to Birch was

10       confidential, and he never shared with anybody, so

11       I've never seen any correspondence addressed to

12       Mr. Birch.

13  Q.   And do you know who Fineman is?

14  A.   No.

15  Q.   Did you ever hear of a letter that Mr. Fineman wrote?

16  A.   I don't know Mr. Fineman.  Never heard of a letter.

17  Q.   Did you ever hear Judy McDermott's name ever

18       mentioned in relation to any of the discussions you

19       had on the petition?

20  A.   No, I don't think so.  But everybody just assumed

21       that she was probably part of it because she filed on

22       everything, so it was general knowledge that she was

23       probably involved.

24  Q.   Why do you say "it was general knowledge"?

25  A.   She filed on everything.  She's a chronic EEO filer.

79

WILLIAM ATKINS - APRIL 18, 2008

1    MR. SCHARF:  No, you did characterize it.

2  You read it, and then you gave your own

3  characterization or you said, "and this means that

4  she was promised that she would never be reassigned."

5  And that is not a fair characterization of the last

6  sentence in that document.  But go ahead, ask a

7  question.

8    MR. BACON:

9 Q. So you were never told by anyone the particulars of

10  that meeting that Marilyn had?

11 A. That's correct.

12 Q. So you were unaware that management had made certain

13  assurances to her in that meeting regarding her

14  future in the postal service.  You were never told

15  anything about those assurances or anything about

16  that meeting?

17 A. No.

18 Q. Are you aware now that Marilyn Lee's understanding

19  was that she would not be reassigned from her

20  position?

21    MR. SCHARF:  Objection, calls for

22  speculation.

23    MR. BACON:

24 Q. If you know.

25 A. I don't know of any guarantees that she would never

83

WILLIAM ATKINS - APRIL 18, 2008

1     be reassigned, no.

2  Q.   Do you think it was important to discuss with

3     Mr. Ahern or Mr. Birch or other managers in the

4     division about Marilyn Lee being reassigned prior to

5     reassigning her?

6  A.   I believe that if promises were made by upper

7     management to Marilyn Lee, then they would have been

8     brought to my attention.

9  Q.   Why do you say that?

10  A.   Because we discussed many division matters.  That was

11     never discussed.

12  Q.   They never told you that Marilyn Lee had had a

13     meeting with certain managers regarding what she

14     would be doing in the future?

15  A.   No.

16  Q.   Well, after Marilyn Lee asked to go back to her

17     secretary position, did you then go back and

18     re-discuss it at all with Mr. Ahern or anyone else?

19  A.   Mr. Ahern retired.

20  Q.   Well, when Marilyn Lee complained about the

21     supervisory position, at that point did you discuss

22     it with anyone else?

23  A.   No.

24  Q.   Her request?

25  A.   No.

84

WILLIAM ATKINS - APRIL 18, 2008

1  Q.   Why not?

2  A.   It was my decision.

3  Q.   Don't you think that's being autocratic without

4       discussing it with anyone else in the division?

5            MR. SCHARF:  Objection, argumentative.  You

6       can answer.

7            THE WITNESS:  Sheilah Castor was kept in the

8       loop of all of the details going on with Marilyn Lee

9       as were my ASEs, and the four of us spoke.  But the

10      decision was mine to keep her where she's at.  And

11      Sheilah Castor agreed with me at that point.  And

12      that was our best option, our only option and the

13      only thing we could do at that time.

14           MR. BACON:

15 Q.   When did you learn that Marilyn Lee's stress claim

16      had been granted by the Department of Labor?

17 A.   Probably when Ed Lawee told me.

18 Q.   You say "probably."  Do you recall being told

19      specifically?

20 A.   No.

21 Q.   Do you recall when you were informed of that or when

22      you learned of that?

23 A.   No.

24 Q.   Did anyone in management ever discuss with you any of

25      the meetings between Birch, the other managers and

85

WILLIAM ATKINS - APRIL 18, 2008

1          any of the San Francisco employees?

2     A.   No.

3     Q.   Do you think it would be important to know some of

4          the history of the department in order to solve some

5          of the issues and problems that you said you were

6          apprised that you were going to face when you came to

7          San Francisco?

8     A.   No.

9     Q.   Why not?

10    A.   Because in my opinion, many of those grievances were

11         probably accurate, and I didn't want to know the

12         specifics that happened.  I thought that was an

13         incompetent management team myself.  I benefited from

14         this whole petition.  I got promoted because of their

15         inability to run a division.  They got booted out.  I

16         came in.  So I didn't care about the specifics.

17    Q.   Well, if you don't know what the specifics are as to

18         the complaints, how would you be able to solve some

19         of the grievances or issues to avoid the EEO filings

20         you mentioned, you had said upon your arriving in San

21         Francisco?

22    A.   Like I told you before, the EEO issues involved a

23         lack of communication and poor management.  I didn't

24         plan to make those two mistakes.

25    Q.   But the only ones you communicated to about Marilyn

                                                          86

WILLIAM ATKINS - APRIL 18, 2008

1          that she's been thinking about hurting herself, and

2          that she's going to leave a note that blames me for

3          her death.

4     Q.   Did you do anything to attempt to verify these

5          comments yourself by talking to Marilyn Lee?

6     A.   No.

7     Q.   Why not?

8     A.   Because that's -- I talked to legal counsel, and we

9          did what we did based on advice from legal counsel.

10    Q.   Well, since you already considered her a manipulative

11         employee, why would you think this is not

12         manipulation in this instance?

13    A.   I can't determine intent.  When an employee issues

14         forth those particular words, I have to take them

15         seriously, whoever it is.

16    Q.   But you didn't take the crying seriously, though,

17         when you saw her before, did you?

18              MR. SCHARF:  Objection, argumentative,

19         mischaracterizes his prior testimony.  You can

20         answer.

21              THE WITNESS:  Yes, I took them seriously.

22              MR. BACON:

23    Q.   So why didn't you have her evaluated for a

24         fitness-for-duty exam when you saw her crying many

25         months earlier?

92

WILLIAM ATKINS - APRIL 18, 2008

1  the administrative claims?

2         MR. LAWEE:  (Mr. Lawee nods.)

3         MR. SCHARF:  It would all be privileged and

4  confidential.

5         MR. BACON:  Okay.

6  Q.  If someone wants to file an EEO complaint against you

7  as the head of the agency here in San Francisco, can

8  they do that anonymously, or do they have to -- you

9  have to sign your name?

10 A.  I don't think so.  I'm not -- in my opinion, no

11 because I would have to respond to any questions

12 involving the EEO, so I would say no.

13 Q.  Now I asked you earlier about the petition.  You said

14 that you learned of it from Marilyn Lee, and you've

15 mentioned some of that discussion.

16        Is there anything that Marilyn Lee told you as to

17 why she signed the petition that you have not

18 mentioned or recalled yet?

19 A.  Nothing that I remember.

20 Q.  Did anyone else ever tell you that the petition

21 related at all to Wanda Smith?

22 A.  Never.

23 Q.  'Cause Marilyn Lee, you say, you don't recall whether

24 she mentioned Wanda Smith or not, correct?

25 A.  Correct.  No, I don't, no.  I didn't even know who

95

1       Wanda Smith was, so it would have meant nothing to

2       me.

3  Q.    Now, when you offered this reassignment to Marilyn

4       Lee as the administrative center supervisor, how long

5       was it, at that time you had that discussion with

6       her, had she been your secretary?

7  A.    I think around ten months.

8  Q.    And this discussion, who initiated the discussion on

9       this position?  Was it you or was it Marilyn Lee or

10      do you recall?

11  A.    It was Marilyn Lee.

12  Q.    What did she say specifically about that?

13          MR. SCHARF:  You know, he's already

14       testified about this, but --

15          MR. BACON:  Let me rephrase it.

16  Q.    What did she say specifically about her desires that

17       you have not already mentioned before?

18          MR. SCHARF:  You can repeat your testimony.

19          THE WITNESS:  Well, the only thing that

20       maybe I didn't mention was that she said she's

21       getting near the end of her career, that she said she

22       wanted to get her high three, that getting a

23       promotion would allow her to get a better retirement,

24       so she wanted to be more, more competitive on these

25       positions that were coming up.  And she knew that

96

WILLIAM ATKINS - APRIL 18, 2008

1    there were several jobs that were going to come up at

2    a higher level.  And she, as a secretary, did not

3    have qualifications to apply for those jobs.

4        She wanted me to give her a position where she

5    could get some experience that would then qualify her

6    for those higher-level positions.

7  Q.  Did she mention some of the positions she was

8    interested in?

9  A.  Yes.

10  Q.  What were those?

11  A.  Investigative analyst job I believe was one.  I think

12    she had an interest in the admin specialist job.  I

13    don't recall what else.

14  Q.  And just so I can be clear, you know, those in the

15    federal service use a lot of phrases.

16        Could you explain what you mean by "the high

17    three"?  In order she was --

18  A.  Oh.

19  Q.  What is the "high three"?

20  A.  The retirement is based on an average of your high

21    three salaries.  So if your high three salaries is

22    50,000, then you get more retirement than if your

23    high three salary was 40,000.

24  Q.  Did she say she wanted experience to help her just to

25    get the high three, or did she say she wanted

1          supervisory experience, or do you recall

2          specifically?

3     A.    It was more toward her retirement.  That was the

4          thrust.

5     Q.    And do you recall when this discussion occurred.  Ten

6          months in would have been June '04 or what?

7     A.    Probably somewhere around there.

8     Q.    And I think your testimony was you had mentioned it

9          was to be reassigned on a temporary basis.  But as

10          you sit here, you still don't recall whether you

11          explained that to her or not or whether she discussed

12          that with you on the temporary basis issue?

13    A.    I know I told her I could not get a competent

14          supervisor in here until one of them retired, and she

15          knew very well the retirement dates of these other

16          people involved, so.  To my recollection, that's the

17          extent of what I talked about as far as temporary.

18    Q.    Did she tell you at all that she was concerned about

19          being a supervisor?  In other words, reluctant to be

20          a supervisor?

21    A.    She said she never supervised, so it was a challenge

22          for her.  And I told her about her qualities that I

23          explained to you, that she possessed all of these

24          qualities, and I felt certain that she would be

25          perfect in the job, and she was.

98

WILLIAM ATKINS - APRIL 18, 2008

1              demotion?  How would you describe it?

2    A.    I don't recall what level it was.  I think it was

3          probably a -- I don't know.  I don't know.

4    Q.    When Marilyn Lee came to you and said after three or

5          four months that she wanted to go back to being

6          secretary, was there any discussion about why she had

7          changed her mind or why she felt that this was what

8          she wanted to do?

9    A.    We had many lengthy conversations.

10   Q.    Did she mention that in those lengthy conversations?

11   A.    I'm sorry?

12   Q.    Did she mention any of that in those lengthy

13         conversations as to why she had changed her mind, why

14         she didn't want to be a supervisor?

15   A.    She didn't like supervising.

16   Q.    And it's your testimony that in all of those

17         conversations you had with her where she said she

18         didn't want to be a supervisor, she never teared up

19         or cried at all?

20   A.    She may have.  I don't recall.

21   Q.    Now, I want to be clear because if that's how she

22         manipulated, as you say, why would she not cry or

23         anything after she became the supervisor and wanted

24         to go back to being the secretary?  In your mind, why

25         would she do that, if you know?

                                                              101

1      rules and regulations regarding people that are put

2      in temporary positions?

3  A.    Those rules apply to postal service employees, not

4      inspection service employees.  These are not bid

5      positions, and there's a difference.

6  Q.    So what rules and regulations regulate the inspection

7      service employees if the employee labor manual does

8      not?

9  A.    At any level, any employee can be reassigned at the

10     direction of the inspector in charge, any employee.

11  Q.   And it sounds like you're almost quoting something.

12     Is that from some other manual or regulation for

13     inspection service employees?

14  A.   These are non-bid positions, and we have to have the

15     flexibility because we have a small work force.  I

16     don't know where that -- I don't know what rule or

17     regulation would apply to that, but that's -- that's

18     the way it is.

19  Q.   So you're aware that there are regulations in the

20     employee labor manual for regulating temporary

21     assignments, but your testimony is that those

22     employees manual rules and regulations do not apply

23     to Marilyn Lee because she was an inspection service

24     employee; is that correct?

25  A.   That's what I'm saying.

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    And you can't cite any procedure or rule that says

2          any inspection service employees can be reassigned by

3          management in its discretion?

4    A.    I can't cite it, no.

5                    MR. SCHARF:  Why don't we take a little

6          break?  We'll be back in a minute.

7

8                            (Off the record at 12:33 p.m. and

9                            back on the record at 12:37 p.m.)

10

11                           (Whereupon a complaint for damages was
                             marked for identification as
12                           Plaintiff's Exhibit No. 5.)

13

14                   MR. SCHARF:  Let's go back on the record.

15                   MR. BACON:

16   Q.    Counsel has just stated that you want to clarify or

17         change your answer somehow -- can you.

18                   MR. SCHARF:  I said "clarify," not "change"

19         his testimony about the manual.

20                   THE WITNESS:  Could you read my answer back

21         to me?

22                           (Record read as requested.)

23

24                   MR. BACON:  Let me go back and I'll --

25   Q.    I had asked you earlier about the employee labor

                                                              104

WILLIAM ATKINS - APRIL 18, 2008

1    manual regulations and rules regarding people being

2    put in temporary positions, and your answer was that

3    it did not apply because it did not apply to

4    inspection service employees.

5         Do you wish to clarify that?

6  A.   Yes, I do.

7  Q.   What?

8  A.   The clarification would be that the citation that you

9    stated does not specifically apply to the inspection

10   service because these employees are EAS employees,

11   and they're not whatever the postal service is at

12   that time.  There are very clear rules in the ENLM

13   that allow me to transfer my EAS employees to any

14   comparable position.

15 Q.   And do those rules require you to fill out paperwork

16   in order to do that?

17 A.   No, I don't believe they do.

18 Q.   So if you say that the agency has a need and you make

19   assignments, whether they're temporary or not,

20   there's no requirement to fill out any paperwork?

21 A.   That's correct.

22 Q.   So when someone is removed from a position and

23   reassigned, if there's no paperwork to reflect that,

24   how do you -- how do you account for the person being

25   paid in a different position or being recognized in

105

1   Q.   Did you approve or know of her being escorted out of

2        the service that day?

3   A.   Yes.

4   Q.   And you approved of it even though you were not

5        there?

6   A.   Once again, there are prescribed ways of planning

7        situations like this.  And as far as I know, the

8        prescribed methods of handling it were followed.

9   Q.   Where were you at the time that she was there the

10       last day?

11  A.   I don't remember.

12  Q.   Did you know the day before or any time before that

13       day that she was going to be escorted out?

14  A.   When Sally Diaz told me of the conversation, my first

15       phone call was to legal.  And I was advised,

16       according to them, as to the steps to take.

17  Q.   Did you ever use the word -- when Marilyn Lee was

18       reassigned as a supervisor, did you ever use the

19       phrase "transferred to the supervisor position"?

20  A.   I don't know.

21  Q.   Does that have any significance in the postal service

22       if someone's transferred as opposed to reassigned?

23  A.   No, it doesn't.

24  Q.   How many times would you say Marilyn Lee complained

25       to you?  I think you said it was initially after

                                                            109

WILLIAM ATKINS - APRIL 18, 2008

1    A.    You've asked that five times, and I've told you no
2          the other four, no.
3    Q.    She never brought that up?
4    A.    If she did, I don't remember.
5    Q.    Did Sheilah Castor tell you that she had complaints
6          from Marilyn Lee about staying in that supervisory
7          position?
8    A.    Complaints?  Yes, she did.
9    Q.    And what did Sheilah Castor tell you about Marilyn
10         Lee's complaints?
11   A.    Just that she was complaining about being a
12         supervisor.  She didn't want to be a supervisor.
13   Q.    Did Sheilah Castor tell you that she saw signs of
14         stress from Marilyn Lee?
15   A.    No.
16   Q.    And when you had this discussion with Diaz, did
17         Ms. Diaz tell you that Marilyn Lee had complained
18         prior to her about being in the supervisory position?
19   A.    Marilyn complained to everybody, yes.
20   Q.    When you say she complained to everybody, did she
21         complain to everybody about being in the supervisory
22         position?
23   A.    Yes.
24   Q.    Doesn't it sound like she was unhappy in that
25         position?

111

WILLIAM ATKINS - APRIL 18, 2008

1   A.   She was not satisfied with her position.  I knew

2       that.

3   Q.   And still you didn't bother to discuss it with your

4       superiors at all about Marilyn Lee's complaints --

5               MR. SCHARF:  Objection.

6               MR. BACON:

7   Q.   -- about being in the supervisory role?

8               MR. SCHARF:  Objection, asked and answered.

9       No, you don't have to answer that question.  You've

10      already testified that you have not spoken to your

11      supervisors --

12             THE WITNESS:  No.

13             MR. SCHARF:  -- about her request.

14             MR. BACON:

15   Q.   And is that true for all five, six times she

16      complained?  You never once talked to anyone in

17      upper-level management even though she had complained

18      all six times?

19   A.   I did not talk to my managers about her complaints,

20      no.

21   Q.   Well, you said she complained to everybody.  Who else

22      do you know that Marilyn Lee complained to about

23      being in the supervisory position?

24   A.   She spoke to anybody that she thought could influence

25      me to bring her back as secretary.

112

WILLIAM ATKINS - APRIL 18, 2008

```
1              Lee seemed very emotionally upset that you haven't
2         mentioned already?
3    A.   Not that I recall.
4    Q.   Did you ever threaten Marilyn Lee with
5         insubordination?  I mean that she would be considered
6         insubordinate if she continued to ask to be returned
7         to her secretary position?
8    A.   I don't recall that, no.
9    Q.   Did you ever make the threat of charges of
10        insubordination at any time to Marilyn Lee during the
11        time you were in San Francisco?
12   A.   I don't threaten people.
13   Q.   Did you ever say that you were going to consider her
14        insubordinate for any of her actions at any time
15        while you were in San Francisco?
16   A.   Marilyn Lee got insubordinate in her conversation.
17        She was disrespectful.  I don't remember if I said
18        the word insubordinate, but she was disrespectful.
19   Q.   Why would you say she was disrespectful?
20   A.   The way she spoke with me.
21   Q.   How did she speak that was disrespectful?
22   A.   With a lack of respect.
23   Q.   Like how?  Can you give my an example --
24   A.   No.
25   Q.   -- of what she said?
```

120

WILLIAM ATKINS - APRIL 18, 2008

1    A.    I don't recall the specifics.

2    Q.    And I'm not clear of your testimony on the

3          insubordination issue.  You said something she

4          said --

5    A.    I don't know if I said that word.

6    Q.    Did you ever consider any of her actions

7          insubordinate?

8    A.    Yes.

9    Q.    What?

10   A.    Her conversation with me.

11   Q.    So talking to you would be considered being

12         insubordinate?

13   A.    The way she talked to me.  She would walk away when I

14         would call her name.  Those types of things.  That's

15         insubordinate.

16   Q.    To walk away when you're having --

17   A.    When I say "Marilyn."  Yes.

18   Q.    And she walks away.  That would be insubordination?

19   A.    Yes.

20   Q.    Why?

21   A.    Like I said, it shows a lack of respect.

22   Q.    Were you ever angry with her?

23   A.    No.

24   Q.    Did you ever raise your voice with her at all?

25   A.    Never.

121

1    Q.    Did you have the authority to return Marilyn Lee to

2          the secretary position?

3    A.    Yes.

4    Q.    Under what authority?

5    A.    I'm the head official, head management official at

6          division headquarters.

7    Q.    So even if you had put her in that position

8          permanently, you have the authority to remove her and

9          put her back into another position?

10   A.    Yes.

11   Q.    So your refusal to put her back in the secretary

12         position was not as a result of any lack of authority

13         on your part, correct?

14   A.    I did not put her back in her job because of the

15         needs of the division.

16   Q.    But it's not because of any lack of authority,

17         correct?

18   A.    I told you.  I had the authority to do that, yes.

19   Q.    Would you have also had the authority to remove the

20         secretary who replaced Marilyn Lee?

21   A.    Refresh my memory.

22   Q.    After Marilyn Lee comes into the supervisory

23         position, you replaced her secretary position with

24         someone else?

25   A.    Okay.

WILLIAM ATKINS - APRIL 18, 2008

1        one week?

2   A.   I think so, yes.

3   Q.   What does that involve?  What's a diversity detail?

4   A.   I don't know.  I didn't go to it.

5   Q.   What is diversity deal with?  Is that EEO issues or

6        do you know at all?

7   A.   I don't know the course content.

8   Q.   Was Marilyn Lee ever offered to work elsewhere for

9        six months?

10  A.   You'll have to clarify that.

11  Q.   Did you ever offer Marilyn Lee a six-month assignment

12       anywhere else?

13  A.   To where?

14  Q.   To anywhere?

15  A.   I don't remember, no.

16  Q.   Do you know who Ken Jones is?

17  A.   Yes.

18  Q.   Who's Ken Jones?

19  A.   Deputy chief postal inspector.

20  Q.   Did you ever offer Marilyn Lee a six-month assignment

21       in Washington, DC?

22  A.   What was the assignment?

23  Q.   Any assignment?

24  A.   I don't recall.

25  Q.   And you mentioned earlier that Marilyn Lee had been

135

1    offered an OIG detail.  However, you explained why

2    that didn't go through.

3        My question is, how could you offer an OIG detail

4    if, in fact, Marilyn Lee was indispensable, as you

5    say in your evaluation?

6  A.    I'm sorry.  Your voice dropped.

7  Q.    I'm sorry.  Can you read that back?

8

9           (Record read as requested.)

10

11       MR. BACON:  And I'm referring to Exhibit 2,

12    his comment.

13       THE WITNESS:  Because Marilyn Lee told me

14    she was interested in possibly transferring to the

15    OIG, and I thought this would be a good opportunity

16    for her to see if she liked it, and if she didn't

17    like it, then she wouldn't transfer.  So it would

18    save her that headache of going to an agency she

19    didn't like and give her a heads-up on the job if and

20    when it was posted after she got the experience.  I

21    was trying to do her a favor.

22  Q.    So, in fact, you would let her go on an OIG detail,

23    but you wouldn't let her go back to being a

24    secretary?

25  A.    Correct.

136

1    them are they interested.  It's always the first

2    thing I ask any employee that leaves the division on

3    a detail.  "Are you interested?"

4         If you're not interested, then you're going to go

5    out there and do a lousy job, and it reflects on me.

6    So never do I send anybody outside the division on a

7    detail without discussing it with that person and

8    getting their approval.

9  Q.    I think I asked you earlier about discussing various

10        assignments that Marilyn could have.  Do you recall

11        that testimony?

12 A.    No.

13 Q.    Did you ever discuss with Marilyn Lee other

14        assignments?  You mentioned the OIG detail and what

15        happened there.  Did you ever talk about any other

16        possible assignments for her?

17 A.    I don't know.  Might have.

18 Q.    The OIG detail assignment, was that offered to her at

19        the time she was a supervisor or as a secretary?

20 A.    I don't remember.

21 Q.    When Marilyn was going to be detailed to OIG, did

22        Marilyn Lee discuss with you why she wanted that

23        detail assignment?

24 A.    Yes.

25 Q.    What did she say?

140

WILLIAM ATKINS - APRIL 18, 2008

1        assignment, who was detailed to the secretary

2        position at that time?

3    A.  Oh, I don't remember.

4    Q.  Would it -- it would have not been Marilyn Lee

5        though, right?  She was already in the supervisor

6        position at that time, or do you know?

7    A.  I don't know the time frame of all these things.  I

8        can't remember what month and year these events all

9        happened.

10   Q.  And the administrative specialist position is a

11       supervisory position, correct?

12   A.  Yes, it is.

13   Q.  Was Marilyn Lee ever offered the administrative

14       specialist detail position?

15   A.  I don't believe so.

16   Q.  Why not?

17   A.  I didn't feel she was qualified.

18   Q.  Why didn't you feel she was qualified?

19   A.  She had no financial background.  She had no

20       supervisory experience.  She just wasn't a good fit.

21   Q.  Well, she had no supervisory experience for the

22       supervisory position she was put in.  What would be

23       the difference for this assignment?

24   A.  Because this is the most important administrative

25       position in the division, and everything that flows

143

1      in the division, flows through her.

2    Q.  Did you ever talk to Marilyn Lee about this

3        administrative specialist position at all?

4    A.  I don't believe I did.

5    Q.  And being in that administrative center supervisor

6        position, would that have prepared her or helped her

7        in getting the administrative specialist position?

8    A.  Might have.

9    Q.  How?

10   A.  Gives her experience with the financial and other

11       aspects of running a division and the supervisor

12       experience.

13   Q.  Did Sheilah Castor ever make any comments to you

14       about this administrative center supervisor position

15       as to whether -- anything at all critical about that

16       position?

17   A.  About the position or the person in it?

18   Q.  The position?

19   A.  I don't know really what you're saying.

20   Q.  Well, if Kaycee Graham was detailed to the

21       administrative specialist position in Castor's

22       absence, why wasn't Marilyn Lee returned as a

23       secretary at that time?

24   A.  'Cause I still didn't have a supervisor.  It's easy

25       to fill a secretary job; it's not easy to fill a

                                                          144

WILLIAM ATKINS - APRIL 18, 2008

1      supervisor job.

2  Q.  Would you say you had trouble keeping a secretary in

3      the position, or is that --

4  A.  Not at all.

5  Q.  -- amount of turnover you had normal?

6  A.  I would say so.

7  Q.  You would say it's normal?

8  A.  Normal.

9  Q.  Besides the administrative specialist position, is

10     there any other higher level support supervisory

11     position in the San Francisco division inspection

12     service that existed at that time?

13  A.  Not in the division, no.

14  Q.  Where would they exist?

15  A.  Headquarters.

16  Q.  And do you know what unit paid for Katie O'Leery's

17     detail to the post office?

18  A.  No.

19  Q.  You don't know whether it's --

20  A.  I don't know anything about Katie O'Leery.

21  Q.  So you don't know how long her detail was and all

22     that?

23  A.  No.

24  Q.  Did you know that the inspection service paid for

25     O'Leery's detail to the post office?

145

1    A.    I have no idea.

2    Q.    Before you came to San Francisco, were you ever

3          apprised of any specific personnel issues for the

4          division employees?

5    A.    Only -- no, not specific.

6    Q.    I mean, other than the general stuff you said

7          earlier?

8    A.    No.

9    Q.    So we talked about other people that I've asked you

10         about whether they could have taken the supervisory

11         position.  You mentioned O'Leery, Cabano, Mendez and

12         Graham.  Was there anyone else that could possibly

13         have been put in the supervisory position?

14   A.    I did not mention O'Leery.

15   Q.    I mentioned O'Leery.

16   A.    And the answer is no.

17   Q.    And while you were the inspector in charge in San

18         Francisco, of those four names, O'Leery, Cabano,

19         Mendez and Graham, didn't they all receive awards

20         while you were the inspector in charge?

21   A.    O'Leery did not work for me.

22   Q.    Did the others receive awards?

23   A.    I don't know about Mendez.

24   Q.    How about Cabano and Graham?

25   A.    They did.

                                                            146

WILLIAM ATKINS - APRIL 18, 2008

1        position, and I needed somebody to fill, so I just
2        moved bodies around.
3   Q.   Do you ever receive complaints that Teresita had
4        received special treatment?
5   A.   Every reassignment or every promotion, somebody
6        complains.
7   Q.   So that's a yes, there were some?
8   A.   No, they don't complain to the inspector in charge.
9        They complain to everybody else, and then you hear it
10       second-hand.
11  Q.   Do you recall what you heard second-hand as to why
12       they felt she was favorably treated?
13  A.   They said that she was a friend of Sheilah's, so she
14       got preferential treatment.
15  Q.   And that would mean because Sheilah is higher in
16       command?
17  A.   Yes.
18  Q.   And they were friends?
19  A.   So they felt like she had influenced the decision to
20       give her the job.
21  Q.   Was Teresita and Sheilah friends?  Was that accurate?
22  A.   Yeah, I think so.
23  Q.   When Marilyn Lee was put on administrative leave,
24       were you in contact with Ms. Diaz at that time, that
25       particular day, or did you find out later?  How did

                                                        150

WILLIAM ATKINS - APRIL 18, 2008

1    Q.    Did anyone ever tell you that Marilyn Lee should not

2          be removed or reassigned from the secretary position?

3                 MR. SCHARF:  I'm pretty sure you asked that

4          before, but you can answer.

5                 THE WITNESS:  And I'm the inspector in

6          charge.  People don't tell me who to move and not to

7          move.  No, nobody told me that.

8                 MR. BACON:

9    Q.    Have you ever heard of the No FEAR Act?

10   A.    No.

11   Q.    When Marilyn Lee complained to you about being in the

12         supervisory position, did you ever tell her to quit

13         her job or to leave the union?

14   A.    No, I valued her work.

15   Q.    What is the role of the inspector general with

16         respect to the inspection service?

17   A.    Oversight function.

18   Q.    Were you afraid at all that if Marilyn Lee was in

19         that position, that could cause problems for your

20         unit?

21   A.    No, not at all.  I agreed to the detail.

22   Q.    When you say oversight, can you explain in more

23         detail how the inspector general has oversight?  What

24         is it that the inspector general can do in dealing

25         with a specific unit it has oversight for?

161

WILLIAM ATKINS - APRIL 18, 2008

1          When Marilyn Lee was placed on administrative

2      leave, and I have the dates of July 18th, 2005.

3          Does that sound about right?

4  A.   Sounds about right.

5  Q.   It was your decision ultimately to put her on

6      administrative leave, correct?

7  A.   Ultimately it's my decision.

8  Q.   And that was based on Sheilah Castor and -- Sally

9      Diaz, is it?

10 A.   Sally.

11 Q.   And it was based on their input they gave you,

12     correct?

13 A.   Her input, Sally Diaz's input.

14 Q.   Whose idea was it to put her on administrative leave

15     as opposed to recommending she go to EAP or simply go

16     for a fitness-for-duty exam?

17 A.   Inspection service has standard procedures.  When

18     someone threatens suicide, they put them on

19     administrative leave immediately.  I talked it over

20     with the legal people and procedures were followed as

21     far as I noted in the letter.

22 Q.   Are you aware that Marilyn Lee has testified in this

23     case that she did not threaten to hurt herself?  She

24     simply said that, "What do you have to do, threaten

25     to hurt yourself before you get anyone's attention?"

                                                        172

1          THE WITNESS:  It wasn't something that I

2    even thought through.  It's when the words are used,

3    the actions are mandatory.  I didn't even have

4    latitude in the issue.  It had to be done.

5        If somebody indicates an intent to harm

6    themselves, whether kidding or not, it's like yelling

7    "bomb" in an airport.  It's not considered kidding.

8    It considered serious, and we take them seriously,

9    and it's for the employee's protection and our own.

10        MR. BACON:

11  Q.    Hadn't Marilyn Lee told you before she was put on

12      administrative leave that she was very stressed in

13      being a supervisor?

14  A.    She did not tell me she was stressed.

15  Q.    And you say you had no choice in the matter and there

16      were these rules, did you discuss with your

17      supervisor at all about this situation prior to

18      making the decision to put her on administrative

19      leave?

20  A.    I talked to Ed Lawee, talked to Larry Katz.  I talked

21      to my supervisor, yes.

22  Q.    And what supervisor are you referring to?

23  A.    Tom Brady.

24  Q.    Do you know if Mr. Katz or Mr. Lawee or Mr. Brady

25      verified the statement that was allegedly made by