1          don't even know what the reason for writing it was.

2     Q.    Who asked you to write this?

3     A.    I don't recall.

4     Q.    Do you know why you were asked to write this?

5     A.    No.

6     Q.    The second paragraph you make reference to -- you say

7           "Marilyn had obviously been crying"?

8     A.    M-hm.

9     Q.    "I brought her into my office and shut the door and

10          asked her to tell me the problem."

11               This sounds consistent with what you said earlier

12          today when you first -- you're talking about when you

13          first got here?

14    A.    M-hm.

15    Q.    That a yes?

16    A.    Yes.

17    Q.    You say there, you go on to the latter part of that

18          paragraph.  "I assured her I wanted her as my

19          secretary.  I told her the past was the past, and I

20          did not care about those issues.  And I advised her

21          if she decided she wanted some other job, that I

22          would support her decision."

23               What did you tell her specifically about wanting

24          her as your secretary?  Is this the first week you

25          were there?  Is this what you're talking about?

                                                              184

WILLIAM ATKINS - APRIL 18, 2008

1  A.    Yes.

2  Q.    Then the next paragraph.  "I reassigned her to the

3       inspection service operations coordinator position

4       where she was responsible for the supervision of

5       approximately seven administrative associates.  She

6       appeared to like her new assignment."

7           Why do you say "She appeared to like her new

8       assignment"?

9  A.    Because of the obvious lack of liking it later.

10  Q.    So that comment there about "appeared to like it" is

11      simply because in the end she didn't like it, and you

12      assumed that she liked it initially?

13  A.    I assumed she did.  She was doing good things, and

14      there were no complaints initially, so I assumed she

15      liked her job.

16  Q.    And the last sentence in that paragraph says, "She

17      turned out to be an excellent supervisor, and there

18      was a harmonious relationship with those she

19      supervised, so she was advised she would be the

20      permanent supervisor."

21         When again was that?

22  A.    I didn't do it, so I don't know the date.  It was

23      Sheilah Castor.

24  Q.    And then you say "Her desire to return as the

25      inspector in charge secretary did not become an issue

WILLIAM ATKINS - APRIL 18, 2008

1    until it was decided to move Kaycee Graham into the

2    position."

3         What position are you talking about?

4    A.   Secretary position.

5    Q.   So you're claiming that Marilyn didn't complain about

6    not wanting to be a supervisor until Kaycee Graham

7    had actually been put in the secretary position?

8    A.   What I'm saying is that the two incidents coincided.

9    Q.   Then you say "These two individuals dislike each

10   other intensely"?

11   A.   M-hm.

12   Q.   "And I believe jealousy might have been a significant

13   motivation."

14        What caused you to conclude that these two

15   individuals dislike each other intensely?

16   A.   Input from my supervisors and general observations on

17   my part.

18   Q.   What did your supervisor say that caused you to

19   believe that they intensely disliked each other?

20   A.   That they hated each other.

21   Q.   Who told you that?

22   A.   Sheilah.

23   Q.   Anyone else tell you that?

24   A.   I don't recall.

25   Q.   You said from your observations they hated or they

186

WILLIAM ATKINS - APRIL 18, 2008

1   A.    Every year.

2   Q.    Did you give her a cash award?

3   A.    Yes.

4   Q.    There was some testimony about a corner office.

5         Where was her office when she was secretary?

6   A.    It was in a cubicle out of my door.

7   Q.    And then at some point she was assigned to a corner

8         office?

9   A.    Correct.

10  Q.    And did the corner office have a view?

11  A.    Yes.

12  Q.    What was this view off?

13  A.    Downtown San Francisco.

14  Q.    Why was she assigned to a corner office?

15  A.    She came to me and told me that in her cubicle people

16        were looking over her shoulder and confidential

17        information, and that she didn't have enough security

18        out there, and she wanted to get into a office.  So I

19        converted a conference room that we currently had

20        that was basically unused into an office, and we

21        moved her into it.

22  Q.    At all relevant times, she was a Level 14?

23  A.    Yes.

24  Q.    And as part of being a Level 14, is it expected that

25        a Level 14 person may be assigned to supervisory

206

# Exhibit C

No. C-07-2540 SBA
Marilyn Lee, Plaintiff

Vs.

John E. Potter, United States Postmaster General
United States Postal Service
(Capital Metro Area), Agency
United States of America
Defendants

Deposition of

Kathleen Mary O'Leary

Thursday, May 22, 2008

1           UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   --oOo--

4   MARILYN LEE,

5           Plaintiffs,

6           vs.                          No. C-07-2540 SBA

7   JOHN E. POTTER, UNITED STATES
    POSTMASTER GENERAL, UNITED
8   STATES POSTAL SERVICE,
    (CAPITAL METRO AREA), AGENCY,
9   UNITED STATES OF AMERICA,

10          Defendants.
    _____/

11

12

13                  DEPOSITION OF

14              KATHLEEN MARY O'LEARY

15              Thursday, May 22, 2008

16

17

18

19  REPORTED BY:

20  DEBRA J. SKAGGS, CSR 7857            COPY

21  ----------------------------------------------------

22              JAN BROWN & ASSOCIATES
              CERTIFIED SHORTHAND REPORTERS
23              701 Battery Street, 3rd Floor
              San Francisco, California 94111
24                  (415) 981-3498

25

                                                        1

1    STATE OF CALIFORNIA )    SS.

2         I, DEBRA J. SKAGGS, CSR No. 7857, a Certified

3    Shorthand Reporter, do hereby certify that the witness in

4    the foregoing deposition was by me duly sworn to testify

5    to the truth, the whole truth, and nothing but the truth

6    in the within-entitled cause; that said deposition was

7    taken at the time and place therein stated; that the

8    testimony of said witness was reported by me, a Certified

9    Shorthand Reporter and a disinterested person, and was

10   under my supervision thereafter transcribed into

11   typewriting, and when so transcribed was carefully read

12   to or by the said witness, and, being in every desire,

13   was thereafter by the said witness duly subscribed; that

14   if unsigned by the witness, signature has been waived in

15   accordance with stipulation between counsel for the

16   respective parties.

17        And I further certify that I am not of counsel

18   or attorney for either or any of the parties to said

19   deposition nor in any way interested in the outcome of

20   the cause named in said caption.

21        IN WITNESS WHEREOF, I have hereunto set my

22   hand and affixed my signature this 4th day of June,

23   2008.

24   _____
     DEBRA J. SKAGGS, CSR No. 7857

25

                                            103

1  out of the division.

2           MR. SCHARF:  I wasn't listening.  Would you

3  read back the last answer.  I was reading the document.

4           (Record read by the Reporter as follows:

5           "A.  Well, I'm sure if he asked, he

6           would, but I doubt that it would be

7           something that he would look at on a

8           daily basis.  Ultimately, the inspector

9           in charge has access to anything and

10          everything that comes in and out of the

11          division.")

12          MR. BACON:  Q.  So basically the last

13 many, many years of your employment you were in a

14 detailed assignment, correct?

15 A.        Correct.

16 Q.        Was your job that you took; for example, as

17 security control officer, was that a temporary

18 assignment or was that a permanent assignment?  Or do

19 the words "temporary" or "permanent" not even apply?

20 A.        Indefinite was what was said to me.

21 Q.        And what was your understanding of indefinite?

22 What that meant?

23 A.        Well, this was the third time I had been in

24 this position on a detail.

25          The first time it was supposed to be a year;

27

1 because of the ombudsman that had to report to him; the

2 ombudsman being Jim Birch.

3       And knowing how D.C. operates, I would lay

4 money on the fact that all the deputies knew and all the

5 upper echelon back in D.C. knew. Because you don't get

6 rid of three people in one division, all in leadership,

7 and not have an explanation as to why. That has never

8 happened before, ever, in any division anywhere in the

9 country.

10       MR. SCHARF: Okay. Those are all the

11 questions I have.

12       Do you have anything more?

13       MR. BACON: I just have one. I want to mark

14 this email from the chief. It was after you left, but I

15 want to mark it and call your attention to a sentence on

16 the second page.

17             (Plaintiff's Exhibit 13 marked

18             for identification.)

19      FURTHER EXAMINATION BY MR. BACON

20       MR. BACON: Q. Looking at Exhibit 13. If

21 you'll take a look at the second page in the middle,

22 it says: Our focus for 2007. And the Chief Postal

23 Inspector, Alexander Lazaroff says: We will

24 eliminate the rift with the OIG. It has become an

25 obsession that distracted us from our real mission.

101

1  And nobody wanted to go through what I was going

2  through, I'm sure.

3  Q.        You just used the phrase EEOs.  You filed

4  other EEOs other than the one you testified to?

5  A.        I filed a second one.

6  Q.        When did you file that one?

7  A.        I believe it was 2003.

8  Q.        And what was that EEO concerning?

9  A.        That was for a job I put in for that I was

10  probably the most qualified.  And someone who had worked

11  for me, who was not very qualified, was given the job.

12  And then I was lied to and I was told that the person

13  who -- by two different individuals.  The person who was

14  the selecting official was the inspector in charge and

15  that wasn't supposed to have been the case.  And three

16  individuals that were in prominence in the organization

17  told me that.  And then when my EEO came around,

18  amazingly he had no knowledge of anything.

19  Q.        What do you mean he had no knowledge?  No

20  knowledge of what?

21  A.        He had no knowledge that I was even in the

22  panel.  He had no knowledge of why would I be in the

23  package, but then, gee, he wouldn't have selected me

24  anyway because I was a rotten employee, but then he gave

25  me awards.

35

1          It was so totally, totally confusing and

2    contradictory that it now is laughable, but it certainly

3    wasn't at the time.  And that is another reason why not

4    having anything to do with the postal inspection service

5    is very healthy for me.

6    Q.          When you say "he", who are you talking about?

7    A.          He, Inspector Alan Kiel.

8    Q.          And the person who you're talking about that

9    got the job, is that Wanda Smith?

10   A.          That is correct.

11   Q.          Did you also sign a petition regarding that?

12   A.          Not regarding that specifically, but yes, I

13   did sign the petition.

14          MR. BACON:  I'd like to mark this Plaintiff's

15   next in order.  Is it 10?

16          THE REPORTER:  Yes.  10.

17          MR. BACON:  Document dated January 2003 to

18   Inspector Birch.  And this is a copy with Marilyn Lee's

19   signature on it.

20                    (Plaintiff's Exhibit 10 marked

21                     for identification.)

22          MR. BACON:  Q.  Is this the petition you

23   were talking about?

24   A.          Yes.

25   Q.          Did you sign this petition?

36

1    A.        I certainly did.

2    Q.        It says -- I'm sorry.

3    A.        I might add that 59 other people, along with

4    me, signed this petition.

5    Q.        When you signed the petition, were there other

6    names on it at the time, or just yours?

7    A.        No, there were other names.

8    Q.        About how many other names?

9    A.        I can't remember.

10   Q.        And you also mentioned the number 59.  How do

11   you know there were 59 signatures on it?

12   A.        Because Inspector Birch was a friend.  And

13   when he received this -- he was our ombudsman for the

14   organization.  And when he received this -- or when it

15   got to him, he called me, because we had known each

16   other and worked with each other, and asked me what was

17   going on, and I got the number from him.

18           And we spoke on the phone for -- I believe it

19   was four hours, and I was telling him everything that

20   went on.

21   Q.        It says in here many things, one of them

22   being, kind of the middle of the first paragraph, about

23   fair and impartial treatment of employees.

24           Do you know what that was referring to?

25   A.        Well, I think --

37

1      MR. SCHARF:  I think that's calling for

2  speculation.  I think all she is competent to testify as

3  to what was on her mind when she signed the petition.

4      MR. BACON:  Q.  Let me lay a foundation.

5      Do you know who wrote this petition?

6  A.      No, I don't.  I have a suspicion, but I don't

7  know for sure.

8  Q.      Who asked you to sign the petition?

9  A.      You know, to be perfectly honest, I can't

10  remember.

11  Q.      Did you sign this petition before or after

12  Wanda was promoted to her position?

13  A.      This was before, I believe.

14  Q.      Did you ever have a meeting with your manager

15  in 2003 where you discussed some of these issues

16  concerning -- for example, your EEO you say you filed

17  regarding Wanda Smith.  Did you ever have a meeting with

18  your managers where you discussed that issue with him?

19  Headquarter managers.

20  A.      I do not recall having a meeting, but I was

21  already out of the division in the detail in March.

22  March 10th of this year.  Of 2003.

23  Q.      Do you know if the inspector in charge reviews

24  or sees the EEOs that are filed?

25  A.      I would guess that he does if he's involved in

                                                        38

1  punishing.   There were favoritism things going on.

2           Wanda, for instance, Wanda Smith --

3  Q.        Did you talk about Wanda Smith with him in

4  that meeting when you said all the issues?

5  A.        Yes, because she was -- she was -- and it

6  wasn't about the job at that time, because I'm not

7  really sure that it was posted at that time.

8           But my recollection is that they had taken

9  Wanda out of her position as -- what were we called.

10  God, I can't remember what we were called.  Operation

11  support analysts, or whatever that title was.  They had

12  taken her out of her position and given her this really

13  cushy job working up with the leadership of the

14  division, which was Inspector in Charge Kiel, Assistant

15  Inspector in Charge Nedd, and Assistant Inspector in

16  Charge Gamache.

17           And, as a result, I not only had my two teams;

18  I picked up her two teams.  So I was supporting almost

19  40 inspectors, and she was waltzing around doing

20  nothing.  It was just terribly unfair.  And that was one

21  issue relating to Wanda.

22  Q.        Do you know if Julianna Nedd assisted Wanda

23  Smith in getting her promotion that was in issue?

24  A.        Rumor around the office was that Julianna had

25  written Wanda's 991.  Wanda used to work for me, and I

41

1    think I was pretty versed in her capabilities as far as

2    writing skills.  And I did see the 991 as the course of

3    my EEO.  And I would not think that Wanda was capable of

4    writing that.

5    Q.        So it was your conclusion that someone else

6    wrote it?

7    A.        Yes.

8    Q.        And when you say 991, was that the

9    application?

10   A.        It's what we have in the postal service.  It's

11   the document we use when you bid on a job.

12   Q.        What was the position she got?  Was it an

13   ad hoc recruitment specialist position?

14   A.        I can't remember if that was the title or not.

15   It was ad hoc something.  It was another made-up

16   position.

17   Q.        Was it posted?

18   A.        That was posted, yes.

19             And the reason that I wrote my EEO -- or filed

20   my EEO on this position debacle was that I had hoped

21   that the selecting official -- because it stated it on

22   the 991 -- or on the vacancy announcement -- that the

23   selecting official was going to be done -- the selecting

24   official was going to be from the career development

25   division, which was out of Potomac.  Back in D.C.  And

42

1  employees?

2  A.        I'm familiar with the position, yes.

3  Q.        Do you think you were qualified to fill that

4  position, if you had been asked?

5  A.        Yes.

6  Q.        Would you have been available to be reassigned

7  to that position in 2003 or 2004?

8  A.        Available?  I was on the detail at the time.

9  They could have pulled me back any time to be put in

10  that position, if they had really needed me.

11  Q.        Did the inspection service have the authority

12  to return you to their unit in the inspection service?

13  A.        Yes.  They had done so once before.

14  Q.        Do you recall being in attendance when Bill

15  Atkins first arrived at the division and made a

16  welcoming speech?

17  A.        I don't.

18  Q.        You don't remember?

19  A.        I don't recall being there.  I tried, really,

20  at that point, to be invisible to the inspection

21  service.  So unless I was specifically requested to be

22  there, I did not volunteer my presence.

23  Q.        So you don't recall whether you were there, or

24  you recall that you weren't there when you first came?

25  A.        I do recall being at an event when he was

45

1  your EEOs?

2  A.        In the first one I did, and he was worthless.

3         And the second one I went on my own and I

4  actually got further without him than I did with the

5  first guy being there.  And it cost me less money.

6  Q.        Do you remember Mr. Atkins ever making any

7  comments about the relationship between the office of

8  inspector general and the inspection service?

9  A.        I kind of recall in an offhanded way a comment

10 that was made by him with regard to the lookout

11 galleries and turning over the keys to the lookout

12 gallery to the office of inspector general.  Or

13 office -- yeah, whatever.  OIG.

14 Q.        Was there a problem -- working relationship

15 problem between OIG and the inspection service?

16 A.        From the inception of the inspection -- the

17 OIG, yeah.

18 Q.        And how would you describe that?

19 A.        I think most of the inspection service

20 personnel -- and I believe it went to support people as

21 well -- felt that it was a redundancy.  They were a

22 mirror image of our organization, and they were usurping

23 our compliment to fill their ranks.  And it was just not

24 a really good working relationship.

25 Q.        Did you ever have a situation where you

                                                      47

KATHLEEN MARY O'LEARY - MAY 22, 2008

1  A.        No.

2  Q.        So you didn't even know about that position?

3  A.        No.

4  Q.        Did you ever know that Marilyn Lee had asked

5  to be removed from that supervisory admin center

6  position?

7  A.        I think she had told me when I had ran into

8  her at one point over at the EPC.

9  Q.        When was that, approximately?  What year?

10 A.        You know, I don't remember.  I don't remember.

11 Q.        Did you ever see Marilyn Lee in a stressed

12 position emotionally?

13 A.        Yeah, the last few times I had been at the EPC

14 when Marilyn was still working, I thought she looked

15 rather stressed.

16 Q.        Did you talk to her about it?

17 A.        Seems to me we took our lunch -- we went up to

18 the -- whatever floor that was.  Fourth floor at the EPC

19 and had lunch.  And I think she kind of gave me a brief

20 kind of overview what was going on.

21 Q.        Did she tell you that she wanted out of that

22 position?

23 A.        I believe so.

24 Q.        Did she tell you why?

25 A.        If she did, I can't remember.

                                                        55

1  Q.        And while you've worked at the inspection

2  service, did you ever hold a supervisory position?

3  A.        Yes.  For 14 years.

4  Q.        And which position was that?

5  A.        Supervisor, central testing unit.

6  Q.        How many people did you supervise in that

7  unit, approximately?

8  A.        Seven, off and on, at a time.

9  Q.        Do you know if this administrative center

10 supervisor position was considered an undesirable

11 position or did you know anything about that?

12 A.        I don't think I knew that it was available.

13 Q.        But the position itself.  Was it a position

14 that was desirable by other people or not desirable?  If

15 you know.

16 A.        Well, I personally wouldn't have wanted it.

17 Q.        Why not?

18 A.        Because it was -- it was over the -- what used

19 to be, like, the secretarial pool.  And that's not my

20 thing.  I tend to be more into, like, investigative.

21 And straight typing -- I'm a crummy typist.

22 Q.        Are there other support supervisor positions

23 other than the administrative center supervisor position

24 that existed at that time in the inspection service?

25 A.        Yeah, there was one that Barbara Mendes had

56

1  of the house who to send the stuff to.

2  Q.        Did Marilyn Lee, or anyone else, ever tell you

3  that Mr. Atkins had threatened Marilyn Lee with charges

4  of insubordination?

5  A.        I think she told me that when we had lunch.

6  Q.        Did she tell you why she was being accused of

7  insubordination?

8  A.        I don't recall.

9  Q.        And Marilyn Lee left her employ before you

10  did, correct?

11  A.        I believe so, yes.

12  Q.        Do you recall what you were told by anyone as

13  to why she had left her employment?

14  A.        I was not privy to -- I mean I heard things

15  after the fact.  And I think it was not -- it was a

16  couple weeks or so after she had left before I even knew

17  she had left.

18  Q.        Do you think that anything happened to you

19  adversely as a result of you signing this petition?

20  A.        I think things happened to me because I --

21  because I said what I thought.

22  Q.        You felt they retaliated against you because

23  of free speech?

24  A.        Uh-huh.  Yes.

25  Q.        What happened after this petition was signed?

58

1  Was anyone removed?

2  A.        Well, as I said, Inspector Birch called me.

3  And we were on the phone for about four hours one point

4  in time, and then a second time he called shortly

5  thereafter and we were on the phone a couple more hours.

6           And at one point he asked me if I thought it

7  would be best if we -- if they; "they" being the

8  leadership in HQ, if they did a surgical removal or do

9  it one by one.  And I said I thought a surgical removal

10 would be best.

11          And I remember telling him that whoever they

12 put in had to be squeaky clean and had no baggage from

13 any other place because they would never survive and the

14 problem would keep going.  That they had to

15 address -- they had to put fair individuals in it.

16          Also I remember telling him that the one

17 individual of the administration that was not a problem

18 but was a collateral damage person was Inspector

19 Gamache.  And he just happened to be in the wrong place

20 at the wrong time.  He did, as far as I knew, nothing to

21 be lumped into this other than the fact that he was part

22 of administration.  And I had worked with him for five

23 years at the ISOG and he was nothing but a wonderful

24 supervisor.

25 Q.        So you were on the phone for six, seven hours

                                                            59

1  prior to you retiring and you can kind of get a whiff of

2  all the stuff that, you know, you should be thinking

3  about.  I didn't have that.  And I didn't even have what

4  the inspection service employees had as far as

5  information that was being trickled down.  So I kind of

6  went in cold.  Very cold.

7          MR. BACON:  Q.  So I take it you didn't

8  get a full retirement, then?

9  A.        No.  I took a hit.  Yeah.

10  Q.       I've put this in front of you.  This is marked

11  as Exhibit 12.

12          And have you ever seen this employee

13  evaluation form before?

14  A.        I never saw this.

15  Q.        And do you recall who became the supervisor of

16  the admin center after Marilyn Lee had left the employ

17  on this date?

18  A.        I have no idea.

19  Q.        Was Casey Graham a competent supervisor?

20  A.        No.

21  Q.        How about Cabano?  Was Cabano a --

22  A.        No.

23  Q.        Was Mendes a competent supervisor?

24  A.        Yes.

25  Q.        Why do you say Mendes was a competent

1  supervisor?

2  A.        Barbara had a very even personality.  If she

3  didn't know how to do something, she would find out how

4  to do it.  She might have done it on Hawaiian time, but

5  she would get back to you eventually.  And she was

6  pleasant to work with.

7          I worked alongside of her in the same room for

8  the two years, I believe, when I was doing the case

9  jacketing.  She was very pleasant to work with.

10  Q.        But Cabano and Graham, they were also

11  supervisors though, correct?

12  A.        Yes.

13  Q.        You just don't feel they were competent?

14  A.        No.

15  Q.        And you felt you were a competent supervisor,

16  correct?

17  A.        Yes.

18  Q.        And you felt that Barbara Mendes was, correct?

19  A.        Yes.

20  Q.        Do you know if any Level 11s, EAS11s, were

21  ever detailed or served as acting in the administrative

22  center supervisor position while you were supervising

23  the CTU?

24  A.        I have no clue.  I'm --

25  Q.        Do you know if any Level EAS11s were ever

63

KATHLEEN MARY O'LEARY - MAY 22, 2008

1    Q.          That's one of the top three?

2    A.          Oh, that's number one.

3    Q.          And you didn't get that job that Wanda

4    ultimately got.  Would you put that at the top three?

5    A.          Yeah.

6    Q.          Okay.  All right.

7    A.          May I also --

8    Q.          You still feel, to this day, that PIS treated

9    you unfairly.

10   A.          Yes, I do.

11   Q.          Okay.  Now --

12   A.          May I also, since you asked, I would --

13   Q.          You could add a fourth, if you want.

14   A.          I'll add four and five, probably six and

15   seven.

16              I was told -- and I will go back to -- and I

17   won't say who said it.  But somebody very high up in the

18   organization, in another part of the country, told me

19   that if I initially made my EEO complaint valid and I

20   filed it, that I would spend the rest of my career with

21   the postal service paying for that decision.

22              And he asked me, at that time, how many years

23   I had left.  And I told him.  I believe at the time it

24   was 12 or 13.  And he said they are going to be

25   miserable years.

76

1   A.          No, I don't believe she did.

2   Q.          Now -- okay.  You wanted the deployment to the

3   postal service?

4   A.          Yes.

5   Q.          The deployment.  The detail.

6   A.          Yes.

7   Q.          Okay.  And that occurred after you signed the

8   petition?

9   A.          Yes.

10              But also, may I add, that the person

11  who -- and I can't remember her name that was handling my

12  EEO at that time regarding the Wanda EEO -- called me and

13  said to me on the phone:  If Inspector Kiel signs your

14  detail and let's you go to the detail at the postal

15  service, will you not sign the EEO?  And I said:  Hm.

16              And then I emailed her back because my word

17  and her word saying this was actually what had taken

18  place was of no use.  And I tried to get her to email

19  it, and then she rescinded on that.

20  Q.          Here is the point I'm trying to make.

21              You sign a petition; just like Marilyn and 58

22  other people, correct?

23  A.          Correct.

24  Q.          And she's claiming in this case, because she

25  signed the petition and participated in an interview

82

KATHLEEN MARY O'LEARY - MAY 22, 2008

1  following up on the petition, that Atkins wouldn't

2  reassign her back to her old job and kept her as a

3  supervisor.

4           You understand that that's the argument she's

5  making in this case?

6  A.        Uh-huh, uh-huh.

7            MR. BACON:  Is that a "yes"?

8            THE WITNESS:  Yes.  I'm sorry.

9            MR. SCHARF:  Q.  Now you signed that

10  petition, right?

11  A.        Yes.

12  Q.        You wanted to get detailed to OIG.  I mean,

13  sorry.  To postal service.  Correct?

14  A.        Correct.

15  Q.        Kiel approved that, correct?

16  A.        Correct.

17  Q.        In other words, didn't retaliate, didn't

18  punish you for signing the petition but authorized you

19  to get the detail that you wanted, correct?

20  A.        Kiel was getting rid of me.  I was getting out

21  of his hair.

22  Q.        And then --

23  A.        It was a benefit for him to send me away.

24  Q.        Okay, but then Atkins became the INC, correct?

25  A.        Correct.

83

KATHLEEN MARY O'LEARY - MAY 22, 2008

1  Q.        And Atkins, you said, had the authority, or

2  the power, to pull you away from your detail.

3  A.        He could have.

4  Q.        Right.  But he didn't.

5  A.        But I had a good relationship with him from

6  our days when he was back in Chicago.

7  Q.        Okay.  Do you think that Marilyn had a bad

8  relationship with him?

9  A.        I don't think it was as good as the

10 relationship I had with him.

11 Q.        You think that -- from your conversations with

12 Marilyn, did you ever form the opinion that Atkins was

13 not giving back -- giving her back her old job because

14 she signed the petition?  Did that thought even cross

15 your mind?

16 A.        I don't know that it did, no.

17 Q.        No.

18        And was your thought that maybe the reason why

19 Atkins is not giving Marilyn what she wants, or as

20 Atkins is letting you stay in your assignment and your

21 detail, is because maybe you have a better relationship

22 with Atkins than Marilyn does?

23 A.        But that's not fair.  If it works for one

24 person, then it should work for everybody.  And that's

25 why we -- that's part of why this --

84

1   Q.          But we're not here --

2              MR. BACON:  Let her finish.

3              MR. SCHARF:  Go ahead.

4              THE WITNESS:  That's part of why this

5   petition, wherever it was, was written in the first

6   place.

7              Just because I have a better relationship than

8   you do, we shouldn't be treated differently.  If you

9   have this opportunity, then I should have this

10  opportunity if I have the ability to have that.  And the

11  favoritism shouldn't be a part of it.  And if it is,

12  then that's wrong.

13             MR. SCHARF:  Q.  But they're not suing

14  because this was an unfair decision.  They're suing

15  because they think it's an unlawful employment

16  discrimination in that Atkins retaliated against

17  her.  Punished her by keeping her in that supervisor

18  position because she signed the petition and --

19             MR. BACON:  That's a statement; it's not a

20  question.

21             MR. SCHARF:  Q.  I know.

22             And participated in the follow-up interview.

23             Do you have any personal knowledge that

24  supports her claim in this case that Atkins punished her

25  because she signed the petition and participated in a

                                                      85

1  follow-up interview?

2  A.         No, I don't.  But let me also say that Alan

3  Kiel and I had had a good working relationship before he

4  got to the division where he became the inspector in

5  charge.  I never did anything to him, but I do believe,

6  because it's been a way of life at the inspection

7  service, that it didn't matter whether Atkins did

8  anything, or she did anything to Atkins, or she did it

9  to Kiel, or she did it to Gamache, or she did it to

10  anybody.

11         I believe that it comes down from on high.

12  And they are told -- I really believe that.  Because I

13  never did anything to Kiel.  I had been a direct report

14  to him.  And I hadn't seen him in years.  And when he

15  left, we were really not great friends, but we were

16  cordial to one another.  And then I am the big, bad,

17  ugly -- I'm the lousiest employee he's ever had.  What

18  did I do?  I never did anything to him.

19         But it came down from on high because that's

20  how this organization works.

21  Q.         You have some strong feelings about this.

22  A.         You betcha I do.  Because I have not only seen

23  it with me, with her -- excuse me.  I have seen it with

24  a number of other people.

25  Q.         Can you give me the name of any one of the

1  signatory -- of the 60 signatories to the petition who

2  you believe, and have personal knowledge to support that

3  belief, suffered an adverse employment action in

4  retaliation to their petition?  Signing the petition or

5  participating in a follow-up interview from that

6  petition?

7  A.       Yeah, I can see their face.  Sorry?

8           She's a blond inspector.

9           MR. SCHARF:  I don't need you to help her.

10          MR. BACON:  No, no.

11          MR. SCHARF:  Q.  But I need you to tell

12  me, of those 60 people, can you give me a name of

13  somebody that you have personal knowledge suffered

14  an adverse employment action which was retaliatory

15  from that person signing the petition or

16  participating in the petition process.

17          Can you give me that person's name?

18  A.       Judy McDermott.

19  Q.       Okay.  Was she the person that put together

20  the petition?

21  A.       I can't remember for sure, but I think maybe

22  she was.

23  Q.       Okay.  So -- you were just a signatory.

24  A.       Correct.

25  Q.       Right?

87

KATHLEEN MARY O'LEARY - MAY 22, 2008

1 having to come here and talk about this --

2 A.        Yes.  Because it -- you know -- and if I had

3 heard this from somebody before, I would have thought

4 they were whacked.  But -- because -- because I'm tough.

5 I don't cry.

6          I spent 1999 through 2003 and I didn't even

7 recognize myself.  And if I could beat myself up for

8 anything, it's that -- Marilyn stop it.  That -- that I

9 didn't keep pushing.  But it got to the point where it

10 was either I was going to die or I was going to let it

11 go.  And, you know, maybe -- and that's how I looked at

12 this whole retirement thing.  Let it go, leave it, get

13 the hell away from those people.

14 Q.        Do you know if these managers in the

15 inspection service from different parts of the country

16 regularly meet and discuss a lot of issues?

17 A.        Oh, yeah.

18 Q.        How do you know that?

19 A.        Because someone inadvertently gave

20 me -- somebody that is a friend that is -- that was in

21 management gave me a packet from one of the meetings

22 prior to the CTU closing that outlined it in detail.

23 And --

24 Q.        Outlined what in detail?

25 A.        The CTU closing, the eventual closure of the

95

1   levels of management out of Washington D.C. as to what

2   actions to take with employees?

3   A.          I would guess.  You know, even with the whole

4   thing with Wanda and her job -- and that job.  I mean,

5   this is how convoluted this gets.

6           When -- excuse me.  When I presented --

7   because I didn't have an attorney, I presented the -- I

8   don't know all the legal stuff.  But they were going to

9   throw the case out, and so I presented the, whatever, to

10  the judge saying, look, this statement is all full of

11  holes and let me back it up here.

12          And all of a sudden things that they couldn't

13  remember, and nobody could -- nobody was on the witness

14  list, and, geez, it was:  Oh, yeah, it was so far ago,

15  we can't remember anything.  Geez, all of a sudden when

16  I pointed out all these little things, this paper

17  mysteriously appeared.

18          Inspector Stinchfield, who I thought had been

19  a friend, ended up, oh, remembering all kinds of stuff.

20  And I was in the -- I was never even part of the packet.

21  Alan Kiel never said this.

22          I mean, these people manufacture.  And they

23  flew people out here to sit and testify.  And at the

24  deposition, I was sitting there going:  I can't -- I

25  can't believe you are not telling the truth.  In fact,

                                                            98

# Exhibit D

No. C-07-2540 SBA
Marilyn Lee, Plaintiff

Vs.

John E. Potter, United States Postmaster General
United States Postal Service
(Capital Metro Area), Agency
United States of America
Defendants

Deposition of

Michael Ahern

May 29, 2008

1   IN THE UNITED DISTRICT COURT OF THE STATE OF CALIFORNIA

2      IN THE NORTHERN DISTRICT

3

4 MARILYN LEE,        )

5   Plaintiff,     )

6            )

7   vs.        )  Case No. C-07-2540SBA(e

8 JOHN E. POTTER, UNITED STATES   )   Volume 1

  POSTMASTER GENERAL, UNITED    )

9 STATES POSTAL SERVICE (Capital  )  Pages 1 thru 84

  Metro Area) AGENCY, UNITED    )

10 STATES of AMERICA,      )

11           )

12   Defendants.     )

13            )

14

15       Deposition of

16       MICHAEL AHERN

17       May 29, 2008

18

19 Reported by:

20 Colleen Alvarado CSR # 11987    COPY

21 -----------------------------------------------------

22     JAN BROWN & ASSOCIATES

23    CERTIFIED SHORTHAND REPORTERS

24 701 Battery Street, 3rd Floor, San Francisco, California 94111

25      (415) 981-3498

                   1

1    STATE OF CALIFORNIA        )  SS

2            I do hereby certify that the witness in

3    the foregoing deposition was by me duly sworn to

4    testify to the truth, the whole truth, and nothing

5    but the truth in the within-entitled cause; that

6    said deposition was taken at the time and place

7    therein stated; that the testimony of said witness

8    was reported by me, a certified shorthand reporter

9    and a disinterested person, and was under my

10   supervision thereafter transcribed into typewriting,

11   and when so transcribed was carefully read to or by

12   the said witness, and, being in every desire, was

13   thereafter by the said witness duly subscribed; that

14   if unsigned by the witness, signature has been

15   waived in accordance with stipulation between

16   counsel for the respective parties.

17           And I further certify that I am not of

18   counsel or attorney for either or any of the parties

19   to said deposition nor in any way interested in the

20   outcome of the cause named in said caption.

21           IN WITNESS WHEREOF, I have hereunder subscribed my

22       hand this 17th day of June 2008.

23

24                    _____
                          COLLEEN ALVARADO
25                     Certified Shorthand Reporter

84

1       level 23 position?

2  A   Well, while at 23, I was detailed to Indianapolis,

3       Indiana.  Someone there had been transferred to New York

4       City, and they wanted someone to take his place.  I was

5       just arbitrarily transferred to Indianapolis, Indiana.

6            I was initially detailed there for approximately

7       three months working armed robberies and external crimes.

8       Then they transferred -- then they named it a mail fraud

9       position.  It was equivalent to what was called at the

10      time team leader, because I had other people providing me

11      reports, but I didn't have the team leader grade.  And

12      before I could permanently settle there, I bid on a

13      position in Washington, D.C.

14  Q   When you said "detailed," what do you mean by that?

15  A   A "detail" means you're taken out of your normal

16      assignment and placed in another assignment as too --

17      based on the needs of the Service.

18          So in this particular case I was actually

19      detailed from Detroit, Michigan to Indianapolis,

20      Indiana.

21  Q   Does detail imply a temporary assignment?

22  A   Yes.

23  Q   Why is that?

24  A   Because it's -- it's different than a transfer.  When

25      you're transferred to another assignment, that's your

13

1    assignment.  When you're detailed, it's for a period of

2    time usually set ahead of time, but not always, depending

3    on the needs of the Service.

4         A detail is with the understanding you will

5    eventually come back.  The assistant inspector in charge

6    at that time told me I was going to be detailed there,

7    but then I was also going to be permanently transferred

8    there because they had needs down there, and they wanted

9    me to go there.

10   Q    So when you're detailed, you actually don't lose your

11   position you came from?  You still keep that title and are

12   simply detailed in that position you had, to some other

13   location or other tasks?

14   A    You keep the same title and you have the same title at the

15   new location.  And in this particular case, they told me

16   they were going to transfer after a period of time --

17   after a period of time of the detailed time.

18        It was a little unusual in the sense that I was

19   detailed there, then they told me, we're going to put you

20   there or place you there.

21   Q    When you were detailed to Indianapolis, do you recall the

22   year?

23   A    That was September of 1980.

24   Q    And then you said you -- you said you bid on the job in

25   Washington, D.C.?

                                                              14

1    Q    You referred to the executive board.  What is the
2         executive board?
3    A    The executive board is the chief postal inspector, deputy
4         chiefs, general counsel of the Inspection Service.
5    Q    How many people were on that board approximately?
6    A    It may have varied in sizes because, like I said
7         initially, there were two field deputy chiefs.
8              Let's see, I believe they were five deputy
9         chiefs, one general consul, chief postal inspector.  We
10        had a non-inspector join the executive board at a later
11        time.  I think that her title still included deputy
12        chief.  That would be -- that would be about it.  What do
13        I have?  Approximately seven or eight.
14             And, again, I've been retired now for four years,
15        but the makeup may have changed.  And, you know, at times
16        they considered different issues and have presentations
17        made to the executive board.
18   Q    Were these board members from different parts of the
19        country?
20   A    Not all.  The majority -- what do you mean?  By their
21        backgrounds or their work assignments?
22   Q    Their work assignments.
23   A    Most were from -- stationed in Washington, D.C.
24   Q    So in other words, the board -- did they have regular
25        meetings?

20

1    A    Yes, they meet anywhere from six to eight to nine times a

2         year.   Sometimes it would be -- could be once a month,

3         other times it would be six weeks or two months.

4    Q    And most of the executive board members would live in the

5         D.C. area?

6    A    Well, yes.

7    Q    So you were in this position in April of 2000 where you're

8         in the D.C. position but working in Chicago.

9              How long did you remain in that position?

10   A    Until I retired.

11   Q    What was your title when retired?

12   A    Department chief inspector.

13   Q    And was Mr. Heath your boss during that last few years of

14        your employment?

15   A    Last few years?

16   Q    Yeah.

17   A    Yes, yes.

18   Q    How long was he actually your boss, approximately?

19   A    Approximately two and a half years, maybe a little more --

20        two years, eight months, or something like that.

21   Q    And see seated to my left is Marilyn Lee.

22             First of all, you know Marilyn Lee; correct?

23   A    Yes.

24   Q    And how long have you known her?

25   A    I think I have probably known Marilyn Lee almost 20 years

                                                            21

1      yes.

2  Q   And what did Mr. Heath tell you about this petition to the

3      best of your recollection?

4  A   That individuals had signed a petition very critical of

5      management in the San Francisco division.

6          Now, let me add, it may have been General

7      Counsel, Larry Katz.  I'm just -- best of my

8      recollection, it was either the chief or Larry Katz.

9      Just can't recall which one may have called me.

10  Q   Were you ever shown the petition?

11  A   I don't recall seeing the petition, no.

12  Q   Did you ever see any correspondence from Inspector Judy

13      McDermott regarding the petition?

14  A   No, I don't recall any.

15  Q   What did Inspector Heath or Larry Katz -- if you recall

16      either one -- tell you about the petition in particular?

17  A   Just that some people had signed -- a number of people had

18      signed a petition.  It was critical of management.  And I

19      just recall that it was critical of management decisions.

20  Q   Were you told who initiated the petition?

21  A   No, I don't think so.  I don't recall that.  Again, you

22      know, it's five years or what ago so --

23  Q   Do you know who had initiated the petition?

24          MR. SCHARF:  Just so we're clear you're asking

25      for his knowledge independent of anything that he may have

24

1    learned from agency counsel or me; correct?

2                    MR. BACON:  Yes.

3                    THE WITNESS:  Could you repeat the question,

4    please?

5                    MR. BACON:

6  Q  Were you ever told who -- as you sit here today, do you

7     recall anyone telling you who had initiated the petition,

8     other than attorneys may have told you?

9  A  As I sit here today, other than attorneys anybody -- I'm

10    having difficulty recalling.  I do know that I sat in a

11    meeting with the ombudsman who was talking to Marilyn Lee.

12    And my presence, from what I understand, was requested by

13    Marilyn to be there.

14          And I have a vague memory of -- when you

15    mentioned Judy McDermott, that that may have been

16    mentioned by her that she started it.  "She" being Judy

17    McDermott.

18          You know, I just don't recall that much about the

19    petition at this time.  You know, perhaps, Larry Katz

20    should have mentioned it to me, but I would be, you know

21    it's -- I just don't recall that.

22  Q  You said you were requested by Marilyn Lee to be in the

23    meeting.  How did she make that request; do you recall?

24  A  I believe to the ombudsman.  The -- the ombudsman was

25    going to talk to Marilyn Lee.  My understanding of our

                                                            25

1    A    Any of them?  Marilyn Lee said she said signed the

2         petition, and she may have mentioned other people at that

3         time, but I don't recall other names.  Other than Judy

4         McDermott may have initiated it.

5    Q    Did you ever see the petition?

6    A    I don't recall ever seeing the petition, no.

7    Q    You don't recall seeing any correspondence that was sent

8         from Judy McDermott about the petition?

9    A    To whom was it addressed?

10   Q    To Mr. Birch.

11   A    No, I don't recall seeing that.

12   Q    Were there some requirements or rules that would prohibit

13        the ombudsman with sharing that response with --

14   A    His decision with supposed to be confidential, between

15        one-on-one with the employee to bring issues to the upper

16        management and to the chief about policies that may be

17        impacting negatively on the overall operations of the

18        Inspection Service.

19   Q    And just by the way, are you still involved with the

20        Inspection Service at all in any capacity now even though

21        you're retired?

22   A    No.  When you say "capacity," once a year I sometimes play

23        in a golf tournament of retired inspectors.  In California

24        last year it was Mora Bay -- and some are current

25        inspectors.  Is that what you mean?

27

1        operations or selections or something like that.  And

2        my -- from Mr. Birch, yes, that's what I recall.

3  Q    Would you say he described it as employees complaining

4        that there was a hostile work environment?

5  A    The word "hostile work environment" may have come up as an

6        allegation, yes.

7  Q    And as a result of this petition, was there any action

8        taken to change the management structure in San Francisco?

9  A    Eventually, yes.

10  Q    And what do you mean by that?

11  A    What I mean by that is that some of the things I believe

12        were looked into by the ombudsman during interviews.  I

13        have a vague recollection that he interviewed some people

14        in San Francisco and tried to get a feel for what some of

15        the issues were.

16             He got back to the chief and the chief talked to

17        me.  And, you know, that's -- we talked about ways we

18        could improve the management and the overall performance

19        of the division.

20  Q    Was Alan Kiel one of the managers that was complained

21        about in this petition?

22  A    Alan Kiel was the inspector in charge.  Alan has some

23        excellent skill sets on the administrative side and

24        headquarter's side.

25             I believe he had been out in the field for quite

                                       29

1         a number of years when he was appointed, I believe, by

2         Chief Postal Inspector Ken Weaver.  And I know that --

3         that's it.

4    Q    Was he eventually removed from his position?

5    A    No, he retired.

6    Q    Was he forced to retire?

7    A    No.

8    Q    Was he asked to retire?

9    A    No, not be me, no.  I'm unaware of anyone asking him to

10        retire.

11   Q    How about Greg Gamach?  Was he removed from his position

12        as as a result of this petition?

13   A    I had some discussions with Greg Gamach, yes, about going

14        to either headquarters or working for me.

15   Q    Did he eventually leave his position in San Francisco?

16   A    Yes.

17   Q    Why, if you know?

18   A    He left his position to work for me.  He had a lateral --

19        I don't know if that was a lateral transfer or not,

20        because I think the pay was the same.  Anyhow, if he took

21        a level 24 -- I can't remember if he went to a level 24

22        with the cost of living in San Francisco, he made the same

23        as AICI.  I can't remember the pay scales at that time.

24   Q    Was he asked to leave his position, if you know?

25   A    Well, again, Mr. Gamach has some skill sets more

                                                              30

1           group that supported a number of divisions operationally.

2    Q      Did --

3    A      Administratively, excuse me.

4    Q      Did Ombudsman Birch advise you that there were criticisms

5           about Mr. Gamach?

6    A      I don't recall.

7    Q      Were there criticisms about Juiliana Nedd in the petition?

8    A      Yes.

9    Q      What were the criticisms of her?

10   A      I don't recall all of them, but I remember -- I remember

11          Marilyn, in the meeting with the ombudsman and myself with

12          Marilyn -- the one I was requested to sit in on -- I

13          remember Marilyn discussed some of the things that -- and

14          I can't remember if she had a piece of paper which were

15          either notes or something like that is my recollection.

16               And I actually remember when she was describing

17          some things about the petition and Juiliana Nedd, she

18          become emotional.  But you're asking me what specifically

19          they were, I think it was possibly her management style,

20          I guess you could call it.  It was -- I guess the

21          description would be kind of "a bull in a China shop"

22          description.

23   Q      Was there any discussion with Marilyn Lee about Juiliana

24          Nedd's involvement in Wanda Smith's receiving a particular

25          position?

32

1       occur after our conference or meeting whatever we were

2       there for.  I just don't recall the reason why we were in

3       San Francisco, but I recall I was here on some other

4       issues.

5   Q   Was Birch out here with you on those other issues?

6   A   It was -- I think we had a meeting.  It could have been an

7       executive board meeting or a -- I don't know if it was an

8       inspector-in-charge meeting.  Very likely he was out here

9       on that too.

10  Q   And --

11  A   Because he would address groups and the executive board

12      from time to time.

13  Q   Was Birch located in D.C.?

14  A   His position was located in D.C.  But he lived in

15      Philadelphia as I recall.

16  Q   So Mr. Birch was in this meeting --

17  A   I think he worked out of an office in Philadelphia, but it

18      was a Washington, D.C. job.

19  Q   So Mr. Birch was in the meeting; correct?

20  A   With Marilyn?

21  Q   Yes.

22  A   Yeah.

23  Q   Marilyn was in the meeting?

24  A   Yes.

25  Q   You were in the meeting?  Who else was in the meeting?

35

1  A    I don't recall anyone else.

2  Q    Was Larry Katz in the meeting?

3  A    In the meeting with Marilyn Lee?

4  Q    Yes.

5  A    I don't recall Larry Katz in the meeting, no.

6  Q    Was Mr. Wisniewski in the meeting?

7  A    I have a vague recollection of him possibly being there

8       now that you mention it.  I just don't -- was this June of

9       '03?

10 Q    Yes.

11 A    I just don't recall right now.  He could have been.  I

12      don't recall.

13 Q    How about Jim Donnelly -- was he in this meeting?

14 A    If he was I don't recall.  He could have been.

15 Q    Who is Jim Donnelly?

16 A    Jim Donnelly was from the East Coast, I believe, out of

17      New Jersey, and he was detailed out here as assistant

18      inspector in charge.

19 Q    And who is Wisniewski?

20 A    John Wisniewski, he was detailed here as inspector in

21      charge.

22 Q    When was he inspector in charge?

23 A    He was detailed as inspector in charge.

24 Q    When was that?  Is that prior to Atkins?

25 A    Oh, yes, yes.  This was -- I can tell you after Alan Kiel

36

1          retired.

2    Q     How long was Wisniewski in the position in San Francisco?

3    A     The detailed position?

4    Q     Yes.

5    A     I'd say approximately -- approximately six months to the

6          best of my knowledge.

7    Q     And then who is Mr. Katz?  He was an attorney for the

8          agency?

9    A     Mr. Katz is the general counsel.

10   Q     Did he participate in the executive board or --

11   A     Yes, yes, he was in executive board meetings.

12   Q     And you don't recall whether he was in that meeting in San

13         Francisco or not?

14                MR. SCHARF:  Objection.  Ambiguous.  Can you

15         clarify what you mean.

16                MR. BACON:

17   Q     The June of '03 meeting.

18   A     I don't recall.  He could have been.  I just remember

19         Birch was there, and my focus was on listening to Marilyn

20         Lee.  I was really kind of focussed on Marilyn Lee.

21                I just don't -- I don't recall a big crowd being

22         there, but I was there and I was oblivious.  I just don't

23         recall with the passage of time

24   Q     Do you recall if Greg Gamach was there?

25                MR. SCHARF:  All these questions are the meeting

                                                              37

1    with the Marilyn?

2              MR. BACON:  In June of '03.

3              MR. SCHARF:  There may have been meetings with

4    other people that day.  We're talking about the meeting

5    with Marilyn.  Do you understand that that's what he was

6    talking about?

7              THE WITNESS:  Right, June of 2003.  Was Greg

8    Gamach in the meeting?  I don't recall.

9              MR. BACON:

10   Q    And was this meeting held at the Marriott Courtyard Hotel?

11   A    Yes, I think it was, yes.  I think I recall it being

12        off-site, yes.

13   Q    Who do you recall speaking in the meeting besides Marilyn

14        Lee?

15   A    Speaking?  I recall Jim Birch speaking.

16   Q    Anyone else you recall speaking besides Mr. Birch and

17        Ms. Lee?  Did you say anything in the meeting?

18   A    I was there to listen, but I introduced myself, hello

19        Marilyn.  I would have gone through the introduction type

20        thing.

21   Q    Did Marilyn -- do you recall Marilyn telling you what the

22        purpose for the meeting was?

23   A    I think she wanted to clarify her role with the petition

24        or something like that.  That's -- I think that's what she

25        was doing.

38

1          I had no idea she had signed any petition, but

2      she mentioned that at that meeting.  So, again, I was

3      just there listening and, you know, I just know that she

4      was emotional at times when she was reading something.

5  Q   Did she cry during the meeting?

6  A   I believe she -- yes.  Not the entire meeting, no, but

7      were there periods of time when she reached certain things

8      she was discussing -- and like I said, she got emotional

9      and occasionally in that discussion she would cry.  She

10     was visibly upset.  But by that I don't mean she was out

11     of control or anything like that.

12 Q   Did she mention in this meeting in June of 2003 that

13     Inspector In Charge Kiel had discussed with Ahern signing

14     the petition?

15 A   I honestly don't recall.

16 Q   Did she say that she was fearful of being retaliated

17     against for signing the petition?

18 A   I don't recall her saying that.  But, you know, her body

19     language, you know, being emotional, you know, that's

20     maybe something that, you know -- no, I just don't recall

21     that word being discussed at that time.  Again, this is

22     something that happened five years -- four, five years

23     ago.  I just don't remember all the details.

24 Q   If Marilyn Lee said that Jim Birch, Larry Katz, you,

25     Wisniewski, and Campbell and Donnelly were in this

                                                              39

1        meeting, do you have any knowledge that she would be

2        incorrect or --

3  A    No, I have no knowledge.  If she said they were there, I

4        would take it they would be there.  I just remember my

5        focus was with Mr. Birch because he was the ombudsman.  I

6        think he asked some questions, and I was listening very

7        closely and my focus was on Marilyn.

8  Q    Have you ever known Marilyn Lee to be dishonest about

9        anything?

10  A    No.

11  Q    Do you know a Marsha Frezo?

12  A    Yes.

13  Q    Who is she?

14  A    Marsha Frezo is an Inspection Service employee, and she

15        was an inspector.  She was in the management ranks, and

16        she became I believe -- she may have become -- I believe

17        she was an ombudsman at a later time.  I don't know if she

18        was a successor for Jim Birch or not.  I think she may

19        have succeeded Jim Birch in that role.

20            And prior to that time, I know her from working

21        with her at the training academy.  I mentioned working at

22        CDD or CDB in those days.  And she worked at the training

23        academy, did some teaching, and she worked with --

24        bringing computers into the Inspection Service years ago.

25  Q    Where did she work out of at that time?

40

1    refreshed but independent actual memory of her making that

2    statement.

3         THE WITNESS:  I believe she had -- I remember

4    her saying she was upset at Alan, yes.  It was like a --

5    that he became aware of some things he shouldn't have been

6    become aware of, yes.  This does refresh my memory when

7    she mentions that.  As to the specifics mentioned in the

8    paragraph there, not every specific.

9         MR. BACON:

10   Q    Did you ever learn how Mr. Kiel found out that Marilyn had

11        signed the petition?

12   A    No.

13   Q    Now, you said that it refreshed your recollection

14        somewhere on some of the issues.  And you said that you

15        recall Marilyn saying that she was upset with Juiliana

16        Nedd in some of her decisions.

17             Do you recall specifically at all that one of the

18        decisions she was upset about was with reference to Wanda

19        Smith?

20   A    I don't recall Wanda Smith.  I recall something about a

21        position that went to somebody else.

22   Q    Do you know if Mr. Gamach was aware of this petition that

23        had been signed by these employees in San Francisco?

24   A    That would be an assumption on my part.  I don't know.

25   Q    Did you ever have any discussions with anyone that --

                                                          45

1   where you were informed that Nedd or Castor knew about

2   this 2003 petition?

3   A   Well, I can surmise and put facts together and say if the

4   ombudsman had talked to everyone in the division, probably

5   with them, they probably would be aware.   I'm putting

6   facts together on the ombudsman doing that.

7   Q   Did the ombudsman --

8   A   That's how I would --

9   Q   Did the ombudsman ever mention to you that he had

10  discussed this petition with Kiel, Nedd, or Gamach?

11  A   No, I don't recall that.

12  Q   Did you ever have any discussions with Sheilah Castor in

13  June of 2003 regarding Marilyn Lee?

14  A   No, I don't recall any specific discussions with Sheilah

15  Castor regarding Marilyn Lee in 2003.

16  Q   Do you recall any other discussions with Ms. Castor about

17  Marilyn Lee at any time?

18  A   Sure.

19  Q   What did you discuss with Ms. Castor about Marilyn Lee?

20  A   I would tell her that Marilyn Lee is a very good employee.

21  And what I mentioned earlier -- that she's a trusted

22  employee and a confidential secretary who can be counted

23  on.

24  Q   Do you have any knowledge --

25  A   But I don't know a date I would have discussed that.

46

1    Q    Do you have any knowledge as to why the Inspection Service
2         did not allow Marilyn Lee to return to her secretary
3         position?
4    A    I'm unaware that -- no, I don't have any knowledge because
5         I guess this happened after I retired.  I have no
6         knowledge of things that happen after I retired other than
7         what you tell me or what --
8              MR. SCHARF:  Counsel.
9              THE WITNESS:  -- comes out -- counsel.
10             MR. BACON:
11   Q    Was Marilyn Lee promised anything at the end of the
12        meeting in June of 2003 regarding issues of her being
13        transferred or reassigned as a result of her signing the
14        petition?
15   A    Could you repeat the first part of the question?
16             MR. BACON:  Could you read that back?
17             THE WITNESS:  I'm sorry.

19             (Whereupon the record was read.)

21             THE WITNESS:  The document mentions something
22        about she wanted things strictly confidential.  The
23        ombudsman was there.  You refreshed my memory that other
24        people were there.
25             But I believe the ombudsman's program, he keeps

                                                              47

1   things confidential to the point where he only discusses

2   it with executive management in trying to rectify a

3   problem.   So that's all I can recall, I mean --

4           MR. BACON:   I'd like to mark next in order.

5

6           (Whereupon and e-mail string was marked

7           Plaintiff's Exhibit 24 for identification.)

8

9           MR. BACON:

10  Q   This is Exhibit 24 is an e-mail from James Birch to

11      Marilyn Lee, June 13, 2003, regarding guarantee.

12          Did you ever see this e-mail before?

13  A   No.

14  Q   So were you ever advised by Mr. Birch that had guaranteed

15      Marilyn Lee that she would not be demoted, reassigned, or

16      removed as a result of her meeting with you in June of

17      2003?

18  A   I don't recall Birch saying words like that to me.   Is

19      that the question?   No.

20  Q   Okay.   Did you ever become aware that such a guarantee had

21      been made to Marilyn?

22  A   I don't recall.

23  Q   Do you know why Marilyn Lee was detailed to the supervisor

24      position in the administrative center in San Francisco?

25  A   No.   From discussions, this occurred after I retired.

48

1    organization starting.

2         Of course, this goes back after a period of time.

3    I think they started -- legislatively I think I was Ruby

4    Ridge or something.  Must have been 1996.  The

5    legislation came in in '97.  They started to build up.

6         The initial OIG was a woman named Corcoran, who

7    was -- I guess, she would be described as a "bull in a

8    China shop" type manager also, and there was some

9    conflicts I think with any new organization starting.

10        As time developed on, there was some discussions

11    about who has jurisdiction over certain items.  So there

12    was some jurisdiction questions.  And I believe the

13    executive board had some kind of conduit between the

14    executive board and the IAG office to work on eliminating

15    or identify who would have jurisdiction in certain areas.

16        And this was a new organization that was going

17    through some forming, norming type challenges and unsure

18    maybe about some of the things that they could do and

19    what they couldn't do and pushing in the areas that might

20    get more publicity and things like that.  That would

21    cause some -- some discussion between the two agencies

22    that you may describe as a rift.

23        MR. BACON:

24 Q  Well, did anyone from the Inspection Service, any

25    inspectors ever refer to the OIG/Inspection Service rift?

50

1    Service?

2  A  That would have to be between June '03 and the end of

3     September '04.  No.

4  Q  I take it after September '04, you had retired and didn't

5     have any contact with Marilyn Lee; would that be accurate?

6  A  Yes.  This is the first time I've seen Marilyn Lee since I

7     retired.

8  Q  And I'd like to ask you a few questions about the

9     ombudsman.

10         Did the ombudsman have authority to give

11    instructions or directions to San Francisco management at

12    all regarding any of these issues that were discussed?

13  A  Ombudsman reported directly to the chief postal inspector.

14    He did not report directly to me.  The chief postal

15    inspector, Lee Heath, sometimes would make some decisions

16    without always, you know, consulting the deputy chief

17    inspector.

18         That may be because you're inaccessible, you're

19    in travel mode or, you know, out of the country or on

20    leave or something like that.  So sometimes those things

21    would happen.  But, you know, I don't know if he was

22    speaking for the chief, you know.  He reported to the

23    chief.  I don't know what the chief directed him to do.

24  Q  What role, if any, did Mr. Katz play in dealing with the

25    complaints or issues that had been raised in this petition

56

1       in 2003?

2   A   None other he's general counsel to the Inspection Service

3       and the chief inspector.  None that I know of.

4   Q   Was -- could I accurately -- would it be accurate to

5       describe you as the boss of Mr. Atkins?

6   A   At what time?

7   Q   During the time that he was in San Francisco as the INC.

8   A   As the INC he reported to me, yes.

9   Q   Did you actually review his performance?

10  A   Yes, but I'm not sure when he was appointed.  I'd have to

11      have some records because I think it was just for one

12      fiscal year or something like that but before I retired.

13  Q   Did you ever learn -- strike that.

14          Did Mr. Kiel ever notify anyone at headquarters

15      about his talking to Marilyn Lee regarding this petition

16      that had been signed, if you know?

17  A   No, I don't know.

18  Q   And after this meeting in June of 2003, did you or anyone

19      else to your knowledge have any meetings with Mr. Kiel

20      about his questioning of Marilyn Lee?

21  A   No, I don't recall that.

22  Q   Did Mr. Birch mention to you at all either in a meeting or

23      prior that Marilyn Lee had contacted him complaining about

24      Kiel questioning her regarding signing the petition?

25  A   I don't remember.  I do know that he didn't say

                                                        57

1          Ms. McDermott -- were you aware of any other employees in

2          San Francisco who had signed the petition?

3     A    I don't recall any.  And Marilyn may have mentioned some

4          at that meeting at that time, but I just -- period of time

5          here I don't remember.

6     Q    Do you know of any other employees in San Francisco who

7          ever complained about the selection of Wanda Smith as an

8          ad hoc recruitment specialist?

9     A    No.

10    Q    When an Inspection Service employee would file an EEO in

11         San Francisco, were you advised of those EEO filings?

12    A    Not always, no, not always.

13    Q    When would you be advised of that?

14    A    Occasionally perhaps in a discussions with General Counsel

15         Katz it may be mentioned.  But generally day-to-day that

16         would not be and it's not something necessarily discussed

17         individually.

18              I think at the executive board Mr. Katz might

19         have kept a -- kind of a log that he discussed once where

20         certain divisions had more complaints than others, but

21         nothing was identified as to individuals.

22              In other words, case log -- number of cases type

23         thing.  This could include postal police or support

24         and -- you know, got big divisions like New York, as

25         compared to a smaller division like Seattle.

59

1   Q     Did San Francisco have a high amount of EEO filings to

2         your knowledge?

3                 MR. SCHARF:  Objection.  The word "high" is

4         ambiguous.

5                 MR. BACON:

6   Q     Did it have a large number of EEO complaints in comparison

7         to others?

8   A     My recollection is there is one individual -- I believe it

9         was Judy McDermott -- who was continually filing

10        complaints.  I don't know if that was considered high.  I

11        realized they seem to have more than some other divisions.

12        And most of those were attributed to one individual from

13        my recollection.

14  Q     Was Chief Heath ever told of the meeting you had with

15        Marilyn Lee to your knowledge?

16  A     He was not told by me, no.

17  Q     Do you know if anyone else told him?

18  A     I don't know.  That would be an assumption on my part.

19  Q     You don't know if Mr. Birch had discussed that with the

20        chief or not -- the meeting that he had with Marilyn?

21  A     I would assume so, but that's an assumption on my part.

22        He reports directly to the chief, so, you know --

23        accounting for his time and things.  But was I there when

24        he mentioned it?  I don't recall.  I don't recall if I was

25        in the room.

                                                                60

1    Q    If Marilyn Lee had been promised that she would not be

2         demoted, reassigned, or removed by Mr. Birch, how would

3         that guarantee be passed on or -- you know, how would a

4         new INC coming to San Francisco know about what employees

5         had certain guarantees?

6    A    Well --

7                    MR. SCHARF:  I need to make an objection.  This

8         is the same issue that came up in earlier deposition.  You

9         are referring to a guarantee.  But you're actually --

10                   MR. BACON:  I'm only referring to what Mr. Birch

11        said.

12                   MR. SCHARF:  But it's a guarantee.  If you look

13        at it --

14                   MR. BACON:  I'm just looking at the title.  It

15        says "guarantee."

16   Q    My question is:  If Mr. Birch made a guarantee, how would

17        the incoming INC know of this guarantee?

18                   MR. SCHARF:  The objection is ambiguous.

19        Because the word "guarantee" doesn't say in your question

20        what the guarantee is.  And the document that you're

21        looking at, the last sentence says, "meeting with myself,

22        Acting INC or DCI or any combination will not result in

23        demotion, reassignment, or removal."

24                   So the guarantee that you're referring to is not

25        just a blanket guarantee, but a guarantee that the

61

1    can't recall when it was started, but it was in the

2    21st Century.

3  Q  But Marilyn Lee didn't assault anyone or do anything --

4  A  No.

5  Q  -- as a result?

6  A  I have -- I don't mean to imply that.  I have nothing but

7     full respect and confidence with Marilyn Lee as an

8     individual and a professional.

9          But the sentence there is saying that Birch can

10    speak that about any meeting with myself, he says or --

11    so, you know, meeting with a DCI cannot result in

12    demotion, reassignment, or removal -- well, it would be

13    highly unlikely but, how can he give a guarantee on

14    somebody's else interaction with an individual.

15          Now, if he's talking about specifically about the

16    meeting on June 3rd that we were going to have at

17    5:00 o'clock or 6:00 o'clock or whatever time it was, and

18    that the acting INC will be there and DCI will be there

19    will not result -- I think he would have authority to say

20    that based on that meeting.

21  Q  Did you understand that Marilyn Lee received this e-mail

22     and understood she was not going to be reassigned?

23          MR. SCHARF:  Objection.  Calls for speculation

24    as to what was on Marilyn's mind -- how she construed that

25    statement that she was not going to be reassigned.

65

1          THE WITNESS:  Marilyn Lee was not reassigned

2     during my tenure as deputy chief to my knowledge.  But,

3     you know, I don't know the dates.  But I don't recall her

4     being reassigned.

5          I don't know what time she was -- if she was

6     reassigned, I don't recall if I was the deputy chief or

7     retired at that time because we're talking about

8     different periods of time.

9          And I know you reference something earlier that

10    happened in -- after I left the Inspection Service and

11    federal government.

12         MR. BACON:

13  Q  Did you ever hear anyone say that three San Francisco

14    managers were removed as a result of this petition in

15    2003?

16  A  No, I haven't heard anyone say that, no.  I don't recall

17    anyone saying that.

18  Q  When these three individuals:  Kiel, Gamash, and Dol left

19    the agency --

20  A  And who's the other one I'm sorry.

21  Q  Nedd -- I'm sorry -- left the San Francisco division, did

22    that cause any disruption to the agency operation?

23  A  Alan Kiel retired.  We had an acting INC.  So you're

24    asking was there disruption?  What do you mean by

25    "disruption"?

                                                              66

1   A     Okay.

2   Q     If an Inspection Service employee declined to take a

3         detail, would they suffer any consequences from that?

4               MR. SCHARF:  Objection.  Calls for speculation.

5         Incomplete hypothetical.  You know, what manager?  What

6         employee?  What detail?

7               THE WITNESS:  Could you repeat the question

8         please, I'm sorry?

9               MR. BACON:  Could you read that back?

10

11              (Whereupon the record was read.)

12

13              THE WITNESS:  Well, I guess depends on local

14        management.  I would like to say no, but, you know,

15        sometimes the needs of the Service, somebody is detailed

16        to a location.  And now if you're refusing a direct order,

17        a detail order, you can be disciplined, yes.

18              MR. BACON:

19  Q     Did you ever learn from Marilyn Lee in your discussions

20        with her in that meeting that she felt that her name was

21        unfairly leaked because Mr. Kiel had questioned her?

22  A     That was Exhibit 23 that I read earlier and made reference

23        to the six pages there?

24  Q     That was from the meeting, the notes, yes.

25  A     The meeting from the notes.  I remember she was upset.  I

                                                        69

1    remember she was upset about Juiliana Nedd, and I remember

2    her mentioning Alan's name.  And Alan -- yes, I guess,

3    Alan was aware.  Yes, I remember her mentioning Alan's

4    name.

5  Q  You never learned, though, how Alan Kiel found out that

6    she had signed the petition?

7  A  No, I don't know how Alan found out.

8  Q  After that meeting that you had with Marilyn Lee and the

9    other managers, did you meet with Marilyn Lee again the

10   next day, if you recall?

11 A  I don't recall.

12 Q  You don't recall her the next day meeting with you in a

13   conference room at the San Francisco headquarters division

14   and asking you whether she would be transferred,

15   reassigned, or demoted in any way as a result of her

16   signing this petition and meeting with you about the

17   petition?

18 A  I just don't recall that incident, no.  I don't recall

19   that.

20 Q  Did you ever discuss any of the issues of this meeting

21   with Chief Heath?  And, again, talking about the meeting

22   in June of '03 with Marilyn Lee.

23 A  No, I think -- no.  I believe I was briefed by somebody

24   else.

25 Q  Based on your experience in working in the Inspection

70

1    Service, could it be said that an employee who signed a

2    petition complaining of management that that could be seen

3    by management as betraying management and being opposed to

4    management?

5              MR. SCHARF:  Objection.  Calls for speculation.

6              THE WITNESS:  You know, I guess you're talking

7    human nature here and individual managers.  You know, as

8    Inspection Service managers, everybody is different.  We

9    have all gone through different management training and,

10   you know, situations like this could be considered -- like

11   a whistleblower situation.  And I think it's pretty clear

12   to me on whistleblowers, there's not supposed to be any

13   retaliation.

14             That doesn't mean things can't be misperceived at

15   a later time.  Because, you know, when you treat everyone

16   alike, sometimes you'll have one who wants to be treated

17   differently because, you know, they fit into this

18   category.

19             I don't mean to confuse the issues.  I'm aware of

20   an incident where somebody complained about something and

21   then they didn't want to be held to the same guidelines

22   as everybody else.

23             MR. BACON:

24  Q  Do you know how it came to be that Mr. Atkins was selected

25   to replace his predecessor in San Francisco as the INC?

71

1  A    How it came to be?

2  Q    Yes.

3  A    We discuss it with the executive board, and the chief

4       usually discussed issues and takes things into

5       consideration, and he makes the final decision.  He would

6       ask if certain people are ready to take the next step.

7            And he did ask me my opinion of Mr. Atkins, who

8       was AIC, assistant inspector in charge, in Seattle.  And

9       he has a fairly strong operational background.  And I

10      spoke to the extent that I think he could handle it since

11      operational expertise would be a benefit to the San

12      Francisco division.

13           Subsequent to that, the chief wanted to make up

14      his own mind.  My recollection is he detailed Mr. Atkins

15      to headquarters, and he was in a management position

16      there.  And I don't know what they called the position or

17      what they called it then because they changed the names.

18      But it was something like inspector in charge of external

19      crimes or programs or something like that.

20  Q    Were you ever made aware of Mr. Kiel distributing a survey

21       to the San Francisco employees?

22  A    I think Alan told me before he would -- had distributed a

23       survey.

24  Q    Do you know what the purpose of that survey was?

25  A    Specifically, no.  From management's viewpoint there may

72

1     be some management reasons to do something like that.

2               MR. BACON:  I'd like to mark this next exhibit

3     in order.

4

5               (Whereupon a document dated May 28, 2003

6               Was marked Plaintiff's Exhibit 25 for

7               Identification.)

8

9               MR. BACON:

10    Q    Have you ever seen this survey before that we marked as

11         Exhibit 25?

12    A    I don't recall seeing this survey before, no.

13    Q    Would Mr. Kiel need to seek approval from his superiors in

14         Washington in order to submit this or is that something he

15         could do on his own?

16    A    I believe he would be empowered to do this on his own.

17    Q    Did he ever discuss with you this survey?

18    A    I think he said he was having a survey conducted, and he

19         discussed it at a later date or whatever.

20    Q    And did you discuss it at a later date with reference to

21         what had happened as a result of this?  In other words,

22         who responded or how many responded?

23    A    I don't recall.

24    Q    Do you know if Chief Heath ever reviewed the surveys that

25         were submitted to employees here reflected in Exhibit 25?

73

1   A      I don't know.

2   Q      In your board meetings was it ever discussed at all

3          regarding the petition of 2003 that was submitted in San

4          Francisco?

5   A      The general counsel might have just mentioned it, but

6          there was no specifics as to individuals as best I can

7          recall.

8   Q      Did you have any input as to who would be selected as the

9          next inspector-in-charge position in San Francisco after

10         Mr. Kiel left?

11  A      Yes.

12  Q      Did you recommend anyone in particular?

13  A      I can't remember how many individuals we discussed.

14         Usually we discussed individuals who are assistant

15         inspectors in charge within your area.  And you could also

16         bring up other individuals who were in other areas.  I

17         remember recommending Mr. Atkins, but the chief wanted to

18         see him -- well, to form his own opinion.  As I mentioned

19         earlier, he subsequently detailed him to headquarters.

20  Q      Do you know if he was apprised of the petition that had

21         been submitted or the issues of the petition prior to

22         Mr. Atkins being sent to San Francisco?

23              MR. SCHARF:  Objection.  Compound.  To the

24         extent you asked both petition or issues of the petition,

25         and who knows what the issues of the petition were.  So

74

1   A   I don't know.  I mean, I mentioned earlier the chart that
2       was discussed at one time but, no, I don't know.
3   Q   What was discussed about that chart that I think you said
4       Mr. Katz had created?
5   A   I think there was -- I shouldn't use the word "chart."
6       Sheet of paper just listing divisions by numbers, and
7       Atkins wasn't in those meeting.  It was just the executive
8       board for our own knowledge to be aware of climate issues,
9       you could you say, within your area of responsibility.
10  Q   Do you know if Mr. Katz or anyone else talked about those
11      number of EEOs that had been filed in San Francisco with
12      Mr. Atkins before he came out here?
13  A   No, I don't know.  Again, for clarification, although I
14      had a headquarter's position, I had an office in Chicago,
15      and I was travelling much of the time throughout the
16      western -- well Detroit, Chicago, and everything west of
17      the Mississippi.  And one time then it was down to four
18      divisions west of the Mississippi
19  Q   If an Inspection Service employee were filed an EEO, is
20      that something Mr. Katz would be informed about?
21  A   Yes, I believe so.  When it gets to a certain level, yes,
22      I believe so, yeah.
23  Q   Did Mr. Katz then advise the chief about these EEOs?
24  A   I don't know.
25  Q   Who did Mr. Katz report to?

76

1  A     Mr. Katz reported to the chief.

2         MR. BACON:  Why don't we're take a short break.

3         THE WITNESS:  Thank you.

4

5         (Recess taken.)

6

7         MR. BACON:  Back on the record.

8  Q     Do you know if headquarters took any steps to protect the

9         individuals who had signed this petition?  Was there any

10        discussion about taking steps to protect the individual

11        signers of this petition?

12 A     I don't recall.  I know that -- well, that might be an

13        assumption on my part that they wouldn't take steps

14        against them.

15 Q     Was that discussed in the meeting at all back in

16        Washington?

17 A     No, no, not specifically regarding that point, no.

18 Q     And you had mentioned the phrase whistleblower earlier in

19        your testimony.  Did you consider this petition a type of

20        whistleblowing?

21 A     You're asking me my opinion was this petition

22        whistleblowing?

23        MR. SCHARF:  I think we have to ask him what he

24        means by the word "whistleblowing."

25        MR. BACON:

                                                              77

1   Q   What do you mean by whistleblowing?

2   A   Well, whistleblowing to me means bringing something up

3       to -- I guess, like a chief financial officer or to an

4       organization bringing to their attention fraud, waste, and

5       abuse.

6   Q   Or bringing any violation of any law, rule, or regulation?

7   A   I guess it could be perceived that way.  My first reaction

8       is fraud, waste, and abuse.  And maybe that's from the

9       legal standpoint involving companies and things like that.

10      And occasionally with the government, too, because Defense

11      Department has had problems with those things I believe.

12  Q   Do you know if the Postal Inspection Service ever provided

13      any enhancement of whistleblower protection for its

14      employees?

15  A   What do you mean by "enhancement."

16              MR. BACON:  Next in order.

17

18              (Whereupon a document entitled Enhancement of

19              Whistleblower Protection for Postal Employees

20              Was marked Plaintiff's Exhibit 26 for

21              Identification.)

22

23              MR. BACON:

24  Q   I marked -- I don't know if it's a memo -- it's called a

25      Postal Bulletin Regarding Enhancement.

1   A    Right.  This goes to -- it's actually -- it says from the
2        Postmaster General.  It's not only distributed internally,
3        I believe some people can subscribe to it on the outside.
4        It maybe available at other locations.  I think you can
5        subscribe to it.
6   Q    So does that refresh your recollection of whether the
7        Postal service had some enhancement of whistleblower
8        protection for its employees?
9   A    Yes.
10  Q    Do you consider or did you consider Marilyn Lee as a type
11       of whistleblower with her concerns that she had addressed
12       to you in the meeting of June of 2003?
13  A    You may be able to define it that way.  But at the time it
14       was brought up, I wouldn't say I necessarily thought of
15       the word "whistleblower" at that time.  I thought of it in
16       her mind being conscientious, bringing this to the
17       attention of management in reference to the meeting that
18       we had on in June of '03.
19  Q    Do you have any knowledge as to whether individuals who
20       filed EEO complaints --
21  A    I'm sorry.  Excuse me.  I'm sorry.
22  Q    If an employee in the Inspection Service filed an EEO,
23       would they receive any type of treatment that could be
24       considered retaliatory or dispared by the agency in your
25       knowledge?

79

1  A    No, they are not supposed to be.  There's not to be

2       supposed any retaliation.  I think in management

3       conferences, any discussion or training they have on EEO

4       or things like, that it would be brought up.  So it would

5       be discussed in a training-conference mode so --

6            MR. BACON:  I have no further questions.  Thank

7       you.

8

9            EXAMINATION BY MR. SCHARF

10           MR. SCHARF:  I just have a few.

11 Q    You were asked questions about what you were told about

12      the petition.

13           Were you ever told that the petition was alleging

14      unlawful employment discrimination practices?

15 A    No.

16 Q    You participated in this meeting with Marilyn and

17      Mr. Birch and others, did you understand the major focus

18      on her complaint to be an allegation that the agency

19      engaged in unlawful employment discrimination practices?

20 A    No.

21 Q    Did you ever tell Mr. Atkins that Marilyn participated in

22      that interview?

23 A    No.

24 Q    Did -- to your knowledge, did anybody ever tell Mr. Atkins

25      that Marilyn participated in that interview?

80

```
 1              MR. BACON:   What interview are you talking
 2         about?
 3              MR. SCHARF:
 4   Q    The one where she met with the ombudsman and Mr. Ahern, I
 5        guess --
 6   A    So any other?
 7   Q    -- perhaps others as a follow up with the petition.
 8   A    Am I aware -- could you repeat the question?
 9   Q    Do you have personal knowledge that anybody told
10        Mr. Atkins that Marilyn participated in that --
11   A    No, I don't have any knowledge of that.  My recollection,
12        Atkins wasn't an INC until months after that -- appointed
13        INC until months after that.  You said that's the meeting
14        of June 2003?
15   Q    June 2003.  Did you ever tell Atkins that Marilyn signed
16        the petition?
17   A    No.
18   Q    And do you have any personal knowledge as to -- that
19        anybody ever told Atkins that Marilyn had signed the
20        petition?
21   A    I don't have any personal knowledge that anyone else said
22        that to Mr. Atkins.
23              MR. SCHARF:   Okay.  Those are all the questions
24        I have.
25
```

81

# Exhibit E

No. C-07-2540 SBA
Marilyn Lee, Plaintiff

Vs.

John E. Potter, United States Postmaster General
United States Postal Service
(Capital Metro Area), Agency
United States of America
Defendants


Deposition of

Kaycee Graham

May 29, 2008

1    IN THE UNITED DISTRICT COURT OF THE STATE OF CALIFORNIA

2            IN THE NORTHERN DISTRICT

3

4  MARILYN LEE,             )

5      Plaintiff,      )

6                     )

7      vs.            )   Case No. C-07-2540SBA(e

8                     )     Volume 1

9  JOHN E. POTTER, UNITED STATES  )
POSTMASTER GENERAL, UNITED     )   Pages 1 thru 85
STATES POSTAL SERVICE (Capital )

10  Metro Area) AGENCY, UNITED    )
STATES of AMERICA,         )

11                    )

12      Defendants.     )

13  _____)

14

15               Deposition of

16              KAYCEE GRAHAM

17             May 29, 2008

18

19  Reported by:

20  Colleen Alvarado CSR # 11987       COPY

21  ---------------------------------------------------------

22         JAN BROWN & ASSOCIATES

23      CERTIFIED SHORTHAND REPORTERS

24  701 Battery Street, 3rd Floor, San Francisco, California 94111

25          (415) 981-3498

1

1 STATE OF CALIFORNIA        )  SS

2          I do hereby certify that the witness in

3 the foregoing deposition was by me duly sworn to

4 testify to the truth, the whole truth, and nothing

5 but the truth in the within-entitled cause; that

6 said deposition was taken at the time and place

7 therein stated; that the testimony of said witness

8 was reported by me, a certified shorthand reporter

9 and a disinterested person, and was under my

10 supervision thereafter transcribed into typewriting,

11 and when so transcribed was carefully read to or by

12 the said witness, and, being in every desire, was

13 thereafter by the said witness duly subscribed; that

14 if unsigned by the witness, signature has been

15 waived in accordance with stipulation between

16 counsel for the respective parties.

17          And I further certify that I am not of

18 counsel or attorney for either or any of the parties

19 to said deposition nor in any way interested in the

20 outcome of the cause named in said caption.

21          IN WITNESS WHEREOF, I have hereunder subscribed my

22     hand this 16th day of June 2008.

23

24          _____
             COLLEEN ALVARADO
25          Certified Shorthand Reporter

85

1  A    He advised me that she had requested to come back to the

2       position, and I advised him that I would have no trouble

3       giving the position up if he made a decision to return her

4       there.

5  Q    And what did he say when you told him that?

6  A    He advised me that that would not be beneficial to the

7       Service.  He appreciated that I made the offer.

8  Q    Did he tell you why it would not be beneficial to the

9       Service?

10 A    Basically, things were going well the way they were, and

11      he didn't see any need for the disruption.

12 Q    Did he explain what the disruption would be if Marilyn Lee

13      was allowed to return to the secretary position?

14 A    No, sir.

15 Q    And just for clarification:  All your years at the Post

16      Office, the Postal Inspection Service, was all in the

17      Northern California, San Francisco division?

18 A    Yes, sir.

19 Q    And what was the last job you had when you retired from

20      the Postal Inspection Service?

21 A    I was secretary to the inspector in charge.

22 Q    In other words, you were in that secretary position up

23      until the time you retired?

24 A    Yes.

25 Q    And was this assignment you had as the secretary, was that

                                                        13

1          a detailed assignment?

2    A     Yes, sir.

3    Q     And were you detailed in 2005 for that position?

4    A     I don't remember.

5    Q     If I said it was in 2005, you don't have any knowledge

6          that I'm incorrect on that date, do you?

7    A     No.

8    Q     Okay.  And just so you know, since you stated you're a

9          little confused, I want you just to relax and listen to my

10         questions.  It's not a sin to not recall.

11              And given your length of history, it's common --

12         I mean, if I took his deposition or someone took my

13         deposition and was going back into the '70s, that's when

14         I was -- I got out of high school a year after you did.

15              So it's very difficult to go far.  And if you

16         can, just listen to my questions.  If you don't

17         understand it or don't recollect, just let me know.

18         Okay?

19   A     Okay.

20   Q     Okay.  How did you obtain this job as a secretary -- this

21         detailed position?

22   A     The inspector in charge requested that I take over the

23         position.

24   Q     Who was that that as asked you?

25   A     That would be Inspector In Charge Atkins.

                                                              14

1  Q    Well, did you ever hear any discussion about a problem in
2       working with the OIG from the Inspection Service?
3  A    From the Inspection Service?
4  Q    Yes.
5  A    Yes.
6  Q    What was that?
7  A    When the chief postal inspector spoke to us, that there
8       was not a working cooperation at the time that I was there
9       between the OIG and the Inspection Service.  That is my
10      understanding.
11 Q    Do you have any knowledge as to why there was a problem
12      with the working relationship between the two agencies?
13 A    No.
14 Q    Was this working-relationship issue with OIG ever
15      discussed in any of the meetings or announcements that you
16      recall while you were employed with the Inspection
17      Service?
18 A    Be more specific.
19 Q    Do you have any recollection of this working-relationship
20      issue between OIG and the Inspection Service ever being
21      discussed in any meetings while you were employed at the
22      Inspection Service?
23 A    Yes.
24 Q    What was said about it in those meetings?  What do you
25      recall?

18

JAN BROWN & ASSOCIATES  (415) 981-3498

1        (Whereupon a document entitled National

2        VOE/WEI Training Requirements was marked

3        Plaintiff's Exhibit 17 for identification.)

4

5        MR. BACON:

6  Q    This Exhibit 17 talks about a video regarding the

7      relationship between the Inspection Service and the OIG

8      stressing the need for communication and cooperation

9      between the two entities.

10      Do you recall viewing this particular video?

11  A    Yes, I do.

12  Q    And did you observe it?

13  A    Yes, I did.

14  Q    Do you recall anyone telling you why this video was

15      mandatory?

16  A    No.

17  Q    Do you recall when you saw this video?  What year?

18  A    No, I do not.

19  Q    Did you know at all about Marilyn Lee being given a detail

20      to the OIG?

21  A    Yes.

22  Q    Do you know what happened to that detail of Marilyn Lee to

23      OIG?

24  A    It was denied.

25  Q    Do you know why it was denied?

24

1               MR. SCHARF:  She's -- you're allowed -- if

2    somebody told you, you're allowed to repeat what they told

3    you.

4               THE WITNESS:  Okay.

5               MR. SCHARF:  But we don't want you to speculate

6    if you have no basis to know it was denied.

7               THE WITNESS:  I was told it was because the OIG

8    would not pay her salary.

9               MR. BACON:

10  Q   Do you have any knowledge as to why OIG would have to pay

11      for Marilyn Lee being detailed to OIG from the Inspection

12      Service?

13  A   No.

14  Q   Who told you that the OIG would not pay for Marilyn Lee's

15      salary?

16  A   I do not remember specifically.

17  Q   Do you know if Atkins ever told you that?

18  A   I don't remember.

19  Q   Do you know if Mr. Atkins ever contacted headquarters

20      regarding Marilyn Lee's OIG detail?

21  A   To my knowledge, yes.

22  Q   How do you know that?

23  A   I would have to say it would be standard operating

24      procedure.

25  Q   Do you know who Mr. Atkins spoke with at headquarters

25

1           regarding Marilyn Lee's OIG detail?

2    A      No, I do not.

3    Q      Do you recall any e-mail that was sent out regarding

4           Marilyn Lee's detail as to the administrative center

5           supervisor?

6    A      I don't remember.

7    Q      Was the administrative center supervisor detail position

8           ever posted or announced to your knowledge?

9    A      No, not to my knowledge.

10                  MR. SCHARF:  You're referring -- when you say

11          detail, you're referring to her assignment as the

12          supervisor?

13                  MR. BACON:  I'm just asking if the admin center

14          supervisor position was ever posted.

15                  MR. SCHARF:  You used the word "detail."  I

16          think that's ambiguous.  We've been using the word

17          "detail" in deposition to mean being assigned to some

18          other entity.  Now you're talking -- I just was confused

19          by your usage of the word "detail" in that particular

20          question.

21                  MR. BACON:

22   Q      How would you describe your assignment to the

23          administrative center supervisor position?  Was that a

24          detail or an assignment?  Or how would you have described

25          it?

26

1  where she would supervise people so that she could have
2  supervisory responsibility for her applications, future
3  jobs.
4  Q    And who told you that?
5  A    She did, and Inspector Atkins.
6  Q    Do you know if Marilyn Lee ever requested to be returned
7  to her secretary position?
8  A    I was told that, yes.
9  Q    Who told you that?
10 A    Inspector Atkins.
11 Q    What did Inspector Atkins tell you about Marilyn Lee's
12 request to be returned to the Inspection secretary
13 position?
14           MR. SCHARF:    Objection.    Asked and answered.
15 This is how you began the deposition.    Do you want her to
16 repeat?
17           MR. BACON:
18 Q    Do you recall when he said that?
19 A    No, sir, I do not.
20 Q    Do you recall when the San Bruno human resources
21 department was disbanded?
22 A    No, sir, I do not.
23 Q    Do you know if any of the other employees in the
24 Inspection Service had come from the San Bruno unit when
25 it was closed down?

29

1  A    They oversee the administrative duties of the division.

2  Q    Was there ever a support supervisor position for the field

3       domicile support staff for this -- strike that.

4            Was the administrative specialist position a

5       supervisor position?

6  A    Yes, sir.

7  Q    How many employees did you supervise when you were

8       detailed to the administrative specialist position?

9  A    I don't remember exactly.

10 Q    You did supervise employees, though?

11 A    Yes, sir.

12 Q    More than five?

13 A    Possibly.

14            MR. SCHARF:   Can we take a break for a second?

15

16       (Recess taken.)

17       (Attorney Client conference)

18

19            MR. SCHARF:   It was not more than five people.

20            THE WITNESS:   It was not more than five people.

21            MR. BACON:

22 Q    And in the past while you were at the Postal Inspection

23       Service, did the domicile field support employees report

24       to a team leader or domicile coordinator or both, if you

25       recall?

31

| | | |
|---|---|---|
| 1 | A | It was a meeting with Inspector In Charge Atkins, Marilyn, |
| 2 | | and myself. |
| 3 | Q | And would that meeting have been the meeting in April of |
| 4 | | 2005? |
| 5 | A | I don't remember the date. |
| 6 | Q | If I represented to you that that meeting you had with |
| 7 | | Marilyn, Mr. Atkins was in April 2005, you don't have any |
| 8 | | knowledge that that's incorrect, do you? |
| 9 | A | No, I do not. |
| 10 | Q | And do you know where that meeting was? |
| 11 | A | In his office. |
| 12 | Q | And who else was there?  Marilyn Lee, you, Atkins -- |
| 13 | | anyone else? |
| 14 | A | No, sir. |
| 15 | Q | What was discussed in that meeting? |
| 16 | A | I don't remember specifics.  I can generally tell you. |
| 17 | Q | What's the general gist of what you recall being discussed |
| 18 | | in this meeting? |
| 19 | A | She was having trouble dealing with being in the position |
| 20 | | she was in. |
| 21 | Q | And that was when she was in the administrative center |
| 22 | | supervisor position? |
| 23 | A | Yes, sir. |
| 24 | Q | What was it that she was having trouble with being in that |
| 25 | | position? |

35

1    A    I don't remember specifics.  I just remember her saying
2         that she was having trouble doing the job.
3    Q    Did Marilyn Lee cry when she was in the meeting?
4    A    Yes, sir.
5    Q    Were you there to be a witness for someone?
6    A    No, sir.
7    Q    Why were you in the meeting?
8    A    Because the inspector in charge requested that I be there.
9    Q    And that's Inspector Atkins?
10   A    Atkins.
11   Q    Did he tell you why he wanted you in that meeting?
12   A    No, sir.
13   Q    Is that customary to normally have someone in as a witness
14        when an inspector in charge is having a meeting with an
15        employee?
16   A    You'd have to rephrase the question.
17   Q    What don't you understand about it?
18   A    Your use of the word "witness."  We don't witness.  We
19        don't attend meetings as witnesses.
20   Q    Okay.
21   A    We attended meetings as requested.
22   Q    Okay.  Was it customary to attend meetings when you would
23        be requested by the inspector in charge?
24   A    Yes.
25   Q    And do you recall Marilyn Lee saying in that meeting she

36

```
 1        wanted to be removed as a supervisor?
 2   A    Specifically, no, but she could have made that statement.
 3        I will admit it's possible.
 4   Q    Do you recall Mr. Atkins ever saying in that meeting that
 5        he was going to consider Marilyn Lee's request
 6        insubordination?
 7   A    Not specifically, no.
 8   Q    Generally do you know?
 9   A    No.
10   Q    Did Mr. Atkins ever say he was going to take any punitive
11        action distance Marilyn Lee for asking to be put back in
12        her secretary position?
13   A    Not to my knowledge.
14   Q    Do you recall what Mr. Atkins said to Marilyn Lee when she
15        asked to be put back in the secretary position?
16   A    In general, he stated that he felt that she was doing a
17        good job where she was and that he wanted her to continue
18        in her position she was in.
19   Q    Do you recall what Marilyn Lee said in response to that?
20   A    No.
21   Q    Was the word "insubordination" ever used in that meeting
22        by anyone?
23   A    Not to my recollection.
24   Q    So you don't recall Mr. Atkins ever saying that he was
25        going to charge Marilyn Lee with insubordination if she
```

37

1    complained to others about not wanting to remain as a

2    supervisor?

3            MR. SCHARF:  Can you repeat the question for me?

4            MR. BACON:  You can read it back.

5

6            (Whereupon the record was read.)

7

8            MR. SCHARF:  He's using the word

9    insubordination.

10           THE WITNESS:  I don't recall this.

11           MR. SCHARF:  Okay.

12           MR. BACON:

13   Q    Do you recall Mr. Atkins ever saying to Marilyn Lee in

14        that position, "If you're stressed, walk around the

15        block?"

16   A    No, sir.

17   Q    Do you recall Mr. Atkins saying to Marilyn Lee, I need you

18        to remain as a supervisor?

19   A    Those words could have been used, yes.

20   Q    But you don't recall?

21   A    I don't recall specifically most of the conversation that

22        day.

23   Q    Do you recall Mr. Atkins telling Marilyn Lee in that

24        meeting, "Don't take it personally.  I'm going through a

25        divorce, and I don't take it personally"?

38

1    A    No, sir, I do not.

2    Q    Do you recall Mr. Atkins ever telling Marilyn Lee in that

3        meeting to stop crying?

4    A    No, sir, I do not.

5    Q    Do you recall Mr. Atkins ever accusing Marilyn Lee of any

6        improper conduct at all in that meeting?

7    A    No, sir, I do not.

8    Q    Do you recall Mr. Atkins ever using the term "turning on

9        him" during that meeting?

10   A    No, sir, I do not.

11   Q    After that meeting that you attended with Mr. Atkins and

12       Marilyn Lee, was there ever any notes or report of any

13       kind made up of that meeting?

14   A    Not to my knowledge.

15   Q    Have you ever known any supervisor in the Inspection

16       Service to ever be removed or disciplined for not getting

17       along with their subordinates?

18   A    Would you repeat the question?

19            MR. BACON:  Can you repeat it back?

20

21            (Whereupon the record was read.)

22

23            THE WITNESS:  No.

24            MR. BACON:

25   Q    After that April 2005 meeting, do you know if Marilyn Lee

39

1        assignment to take?

2  A    I don't recall.

3  Q    Do you ever recall offering any other training to Marilyn

4        Lee other than this diversity training?

5  A    I don't remember.

6  Q    Is it possible you could have offered other assignments

7        for training?

8  A    It would not be in the realm of my responsibility, so I

9        don't --

10  Q    If it wasn't in the realm of your responsibility, why were

11        you the one offering the diversity training to Marilyn

12        Lee?  How did that come about?

13  A    If -- okay.  I'm having trouble with dates now.

14        Specifically, if I was the one who offered her this

15        training, it would seem I would have to be in the position

16        detailed to the administrative specialist.

17            Because then the position of the INC secretary, I

18        don't believe that this would be part of my

19        responsibility, but I don't recall the time frame.  I

20        don't actually recall being the one to offer it to her.

21        It's possible I did.

22  Q    Do you have any recollection at all of ever telling

23        Marilyn Lee to look over certain documents to determine

24        what training that she should take?

25  A    I can vaguely remember something -- I don't --

43

1               MR. SCHARF:  Well, the rule is, don't guess, do

2      not speculate.  If you can estimate, you can approximate.

3      And if you have a vague recollection of something, as long

4      as you qualify it by saying it's a very vague

5      recollection, he's entitled to that information.  Would

6      you agree?

7               MR. BACON:  Yeah.

8               THE WITNESS:  I vaguely remember meeting with

9      Marilyn regarding specific training.

10             MR. BACON:

11  Q    And do you recall whether -- is your recollection just

12      with reference to this diversity?

13  A    No.

14  Q    Or in general you remember some kind of training being

15      offered to her by you?

16  A    I remember a meeting we had, and we discussed training.  I

17      do not recall specifics of that meeting or what I said.

18  Q    And you don't recall whether you gave any documents to

19      her?

20  A    No, sir, I don't.

21  Q    Do you recall if you were having that meeting with Marilyn

22      Lee about training as a result of Mr. Atkins asking you to

23      do that?

24  A    I don't recall.

25  Q    Do you have any recollection of telling Mr. Atkins about

44

1       Marilyn Lee response's to the request for training or that

2       Marilyn Lee was offered training?

3    A  Could you repeat the question, please?

4    Q  I'll try and rephrase.  I'm just wanting to know -- you

5       said it was a vague recollection.  I'm just trying to push

6       it a little further to see if you recall ever reporting

7       back to Mr. Atkins about that meeting.

8    A  No, sir, I don't recall.

9    Q  Did you ever offer training to Ellena Bailey at all?

10   A  Vaguely remember.

11   Q  What do you recall about that with Ellena Bailey?

12   A  I vaguely remember discussions with several employees

13      regarding training.

14   Q  Do you ever advise Ellena Bailey that Marilyn Lee had

15      chosen the diversity training?

16   A  I don't recall.

17   Q  Did you ever recall offering any training to any employee

18      that would have resulted in a six-month training period?

19   A  No, sir.

20   Q  Do you recall anything else Mr. Atkins said about his

21      reasons for not returning Marilyn Lee to the secretary

22      position other than what you already testified to?

23   A  No, sir.

24   Q  Did you have any discussions with anyone else regarding

25      Marilyn Lee's not being returned as a secretary?

45

1       Marilyn Lee's departure other than what you said

2       already -- that she left because she was under stress?

3   A   No, sir.

4   Q   Did you ever hear that Marilyn Lee had signed a petition

5       against management in the Inspection Service?

6   A   Yes.

7   Q   Who told you that?

8   A   I don't recall.

9   Q   Did more than one employee tell you that?

10  A   No.

11  Q   Only one employee told you that?

12  A   It's possible I read it.

13  Q   You read the petition?

14  A   No, I never saw the petition.

15  Q   What do you mean when you say you read it?

16  A   It's possible that I read somewhere that she had signed a

17      petition.  I don't remember ever knowing about the

18      petition except vaguely remembering reading it somewhere.

19  Q   You didn't sign the petition, did you?

20  A   No, sir.

21  Q   Do you know if for a fact that Marilyn Lee signed a

22      petition against management?

23  A   No, sir.

24  Q   What was the context in which you heard that Marilyn Lee

25      had signed this petition?

50

1  A    She had people under her direct supervision.

2  Q    And do you have any opinion one way or the other as to

3       whether Barbara Mendes was qualified as a supervisor in

4       this position?

5  A    I would not be able to comment on that.

6  Q    Was this operations coordinator position that Barbara

7       Mendes held, that is a supervisor's position; correct?

8  A    Correct.

9  Q    Okay.  I just want to make sure I understand your

10      testimony.  Your position as an operations coordinator was

11      also a supervisor position, but you don't recall whether

12      you actually supervised employees --

13  A    Inspections --

14  Q    -- supervise employees that were in these two positions

15      below you?

16  A    Inspection Service operations coordinators would or could

17      not supervise depending on the position they were in.

18  Q    Did you have training as a supervisor?

19  A    Yes.

20  Q    Is this position -- Barbara Mendes says operations

21      coordinator was this a position Barbara held, if you can

22      recall, after Marilyn had left the employment of the

23      Inspection Service?

24  A    Barbara Mendes was an Inspection Service operations

25      coordinator prior to Marilyn leaving them.

57

1    Q    Do you know if Ms. O'Leary had a post office detail?

2    A    Yes, sir.

3    Q    How did you know this?

4    A    It was common knowledge.

5    Q    Do you know what O'Leary's post office detail position

6         was?

7    A    I don't recall specifically.

8    Q    Do you know how long she held the post office detailed

9         position?

10   A    No, sir.

11   Q    Do you know how Ms. O'Leary was paid for her post office

12        detail?

13   A    No, sir.  Can we take a break.

14              MR. SCHARF:  Let's take a break.

15

16              (Recess taken.)

17

18              MR. BACON:

19   Q    In front of you there is Exhibit 21 again.  Is this

20        position that's listed on this sheet here, Exhibit 21, is

21        this the position you had when you retired?

22   A    I was an Inspection's Service coordinator when I retired.

23   Q    Were 11's allowed to be detailed as supervisors of the

24        administrative center, if you know?

25   A    I don't recall.  It's possible, I don't recall.

61

1   Q   Now, you say you were not a good supervisor and you

2       explained why already.

3           Do you know -- if that's the case, why you were

4       actually put in a supervise position?

5           MR. SCHARF:   That question made no sense to me.

6       It was sort of a partial argument was not --

7           MR. BACON:

8   Q   You said that -- your testimony is that you were not a

9       good supervisor because you had communications issues?

10  A   Correct.

11  Q   Do you know why they placed up in positions that had

12      supervision in them?

13  A   Because they wanted to.   I don't know why.

14  Q   Did you ever complain to anyone in the Inspection Service

15      that you shouldn't be placed in a supervisor position

16      because you had communication issues?

17  A   Yes.

18  Q   Who did you complain to?

19  A   Mr. Atkins and Ms. Castor.

20  Q   And what did they say to you when you complained to them?

21  A   They said they understood that, but I needed to work on

22      those communications issues and that I should just do my

23      job.

24  Q   Did they tell you that -- when you complained, did they

25      tell you that you were, in fact, a good supervisor?

62

1   A     No.

2   Q     Did they disagree with your assessment of your skills as

3         far as being a supervisor?

4   A     No.

5               MR. SCHARF:  As to what they told her?

6               MR. BACON:  Yes.

7               MR. SCHARF:  In other words, you're asking her

8         to speculate.

9               THE WITNESS:  They told me they understood I had

10        communication issues.  They requested that I work on those

11        issues.

12              MR. BACON:

13  Q     But they didn't feel that those issues were enough to not

14        allow to you have a supervisor position?

15  A     For --

16              MR. SCHARF:  Objection.  Calls for speculation.

17              MR. BACON:

18  Q     You can answer if you understand the question.

19  A     I'm not sure how to answer the question to be totally

20        honest.

21  Q     Well, put it like this:  When you told them that you had

22        communication issues and they responded, did they tell you

23        that they disagreed with you about your assessment?

24  A     No, sir.

25  Q     And when you were detailed as a secretary and then

63

1   Q    What is the employee labor manual?

2   A    It's exactly what it says.  It's an employee labor manual.

3   Q    Are they regulations for the EAS employees?

4   A    That information may be in there, yes.

5   Q    When you went on a detail, was that in your understanding

6        a temporary assignment?

7   A    Which detail?

8   Q    When you're placed on a detail?

9   A    A detail is a temporary assignment.

10  Q    Thank you.  Did Marilyn Lee ever complain to you about

11       wanting to be removed from her secretary -- removed from

12       her supervisor position and put back in her secretary

13       position?

14  A    Not specifically to me.

15  Q    Was the only recollection you have of her making that

16       request is the meeting you discussed already?

17  A    Yes, sir.

18  Q    You don't recall any other requests that Marilyn Lee made?

19  A    No, sir.

20  Q    Have you ever filed an EEO?

21  A    No, sir.

22  Q    Was there a reduction in force after Marilyn Lee left the

23       Inspection service?

24  A    Yes, sir.

25  Q    And what did that consist of, if you recall?

66