1    A    Exactly what it says -- it was a reduction in force.

2    Q    How many employees lost their job from the reduction?

3    A    I believe there were 20 something.  I don't remember the

4         exact number.

5    Q    Were employees offered a voluntary early retirement?

6    A    Yes, sir.

7    Q    Was the secretary position that Marilyn Lee had previously

8         held, was it affected at all by this reduction in force or

9         the voluntary retirement, if you know?

10   A    I don't understand the question.

11   Q    Well, did the RIF affect the secretary position that

12        Marilyn Lee had?

13   A    That position still exists.

14   Q    In the years that you worked at the Inspection Service,

15        did you ever have any personal problems working with

16        Marilyn Lee?

17   A    No.

18   Q    Was there any jealousy on your part with Marilyn Lee?

19   A    No, sir.

20   Q    So if Mr. Atkins said that you were jealous about Marilyn

21        Lee, would he be mistaken?

22   A    Yes, sir.

23   Q    Do you know of any employees who filed an EEO against

24        Mr. Atkins while you were employed in the Inspection

25        Service?

67

1    review that she had been placed in that position at his

2    request and not Marilyn Lee's request?

3  A    I never saw any review.

4  Q    So after Marilyn Lee left the administrative center

5    supervisor position, was there disruption in the Service?

6  A    Yes, sir.

7  Q    How so?

8  A    Because there was a lot of talk and there was work not

9    getting done and there was nobody to supervise them at the

10    time.

11  Q    So they left that position vacant?

12  A    For a very short period to my knowledge, yes.

13  Q    And then who took the position?

14  A    I believe that was assigned to Barbara Mendes.

15  Q    So did assigning Barbara Mendes to that position cause

16    disruption in the service?

17  A    There was some disruption in the beginning, but things

18    started to run smoothly again.

19  Q    Do you know who's Linda Ng, N-G?

20  A    Yes.

21  Q    Wasn't she the person that was put in the administrative

22    center supervising position after Marilyn Lee left?

23  A    That would have been a temporary assignment yes.

24  Q    How long was Ms. Ng in that position?

25  A    I don't recall.

71

1  A    No, sir.

2  Q    Did you actually supervise any person with respect to the

3      domicile support group?

4  A    No, sir.

5  Q    And were you surprised by Marilyn's departure?

6  A    Yes, sir.

7  Q    Did you have a conversation with Mr. Atkins as to whether

8      you should be placed in the position of supervisor?

9  A    No, sir.

10  Q    Was that conversation before Marilyn was placed in that

11      position?

12  A    Yes, sir.

13  Q    Can you tell us a little about that conversation?

14  A    We discussed who would be best suited for that position.

15  Q    Was there any conversation -- did you have any

16      conversations about whether you were qualified to serve as

17      supervisor?

18  A    Yes.  I told him that if he wanted me in that position, I

19      would go to that position.  I did not feel it was a good

20      position for me, to which he agreed.

21  Q    And that's because of what you told us about your

22      communication issues?

23  A    Yes, sir.

24  Q    Okay.  Now, you worked as Mr. Atkins' secretary?

25  A    Correct.

73

1    question.

2                    MR. BACON:

3  Q    Do you not understand the question?

4  A    I understand the question.

5  Q    What is your answer?

6                    MR. SCHARF:  One more objection.  The question

7    is unfair because it assumes facts not in evidence that

8    Marilyn would have been aware at that time that her

9    position was unaffected by the RIF.

10                    THE WITNESS:  That would be my answer.

11                    MR. BACON:  You let the attorney answer for

12    you?

13                    MR. SCHARF:  It was such an unfair question.

14                    THE WITNESS:  That would be my answer.  At the

15    time that Ms. Lee requested to be put in a position with

16    supervisory responsibility to enhance her employment

17    attributes -- is the only way I can phrase this -- we did

18    not know which positions were or were not affected by the

19    upcoming RIF that we do not know or would not occur.

20                    MR. BACON:

21  Q    You never heard Marilyn Lee ever ask at any time to take

22    this supervisor position of the administrative center,

23    correct?

24  A    No, sir.

25  Q    And Marilyn Lee never told you that she had requested to

                                                          81

# Exhibit F

No. C-07-2540 SBA
Marilyn Lee, Plaintiff

Vs.

John E. Potter, United States Postmaster General
United States Postal Service
(Capital Metro Area), Agency
United States of America
Defendants

Deposition of

Sheilah Castor

May 30, 2008

SHEILAH CASTOR - MAY 30, 2008

1        IN THE UNITED DISTRICT COURT OF THE STATE OF CALIFORNIA

2                    IN THE NORTHERN DISTRICT

3

4   MARILYN LEE,                      )
                                      )
5        Plaintiff,                   )
                                      )
6                                     )
         vs.                          )        Case No. C-07-2540SBA
7                                     )
                                      )        Volume 1
8   JOHN E. POTTER, UNITED STATES     )
    POSTMASTER GENERAL, UNITED        )
9   STATES POSTAL SERVICE (Capital    )        Pages 1 thru 108
    Metro Area) AGENCY, UNITED        )
10  STATES of AMERICA,                )
                                      )
11                                    )
         Defendants.                  )
12                                    )
                                      )
13  _____      )

14

15                       Deposition of

16                       SHEILAH CASTOR

17                       May 30, 2008

18

19  Reported by:

20  Colleen Alvarado CSR # 11987

21  ----------------------------------------------------------------

22              JAN BROWN & ASSOCIATES

23            CERTIFIED SHORTHAND REPORTERS

24  701 Battery Street, 3rd Floor, San Francisco, California 94111

25                     (415) 981-3498

                                                                    1

1  STATE OF CALIFORNIA      )  SS

2          I do hereby certify that the witness in

3  the foregoing deposition was by me duly sworn to

4  testify to the truth, the whole truth, and nothing

5  but the truth in the within-entitled cause; that

6  said deposition was taken at the time and place

7  therein stated; that the testimony of said witness

8  was reported by me, a certified shorthand reporter

9  and a disinterested person, and was under my

10  supervision thereafter transcribed into typewriting,

11  and when so transcribed was carefully read to or by

12  the said witness, and, being in every desire, was

13  thereafter by the said witness duly subscribed; that

14  if unsigned by the witness, signature has been

15  waived in accordance with stipulation between

16  counsel for the respective parties.

17          And I further certify that I am not of

18  counsel or attorney for either or any of the parties

19  to said deposition nor in any way interested in the

20  outcome of the cause named in said caption.

21          IN WITNESS WHEREOF, I have hereunder subscribed my

22      hand this 19th day of June 2008.

23

24                        COLLEEN ALVARADO
                      Certified Shorthand Reporter
25

SHEILAH CASTOR - MAY 30, 2008

1    A    Yes, sir.

2    Q    And then in August '91, you started at the Inspection

3         Service.  What was your position there?

4    A    Forfeiture specialist.

5    Q    And can you just briefly tell me what your duties were as

6         a forfeiture specialist?

7    A    I handled all of the paperwork associated in seizures the

8         Inspection Service made in criminal cases where the

9         Inspection Service had forfeiture authority.

10   Q    And then what was -- how long did you work in that

11        position as a forfeiture specialist position?

12   A    Until July of '98.

13   Q    And July '98 is when you came to San Francisco?

14   A    No.

15   Q    What was your next position in Seattle?

16   A    Administrative specialist.

17   Q    And did you work with Mr. Atkins when you were

18        administrative specialist in Seattle?

19   A    Yes.

20   Q    When did you first meet Mr. Atkins?

21   A    When I was working as administrative specialist in

22        Seattle.

23   Q    So you first met him around July of 1998?

24   A    Right.

25   Q    And then how long did you remain administrative specialist

                                                              11

1  A    Yes, sir.

2  Q    And you were still here when he retired?

3  A    Yes, sir.

4  Q    When did he retire, if you know?

5  A    Summer of 2003.

6  Q    And then after Mr. Kiel retired, who did you report to?

7  A    Bill Atkins.

8  Q    And did Mr. Bill Atkins write reviews or performance

9       reviews for you?

10 A    Yes.

11 Q    And when did Mr. Atkins actually arrive in San Francisco,

12      if you recall?

13 A    I don't recall precisely when.

14 Q    Was it sometime in the fall of 2003?

15 A    Yes, sir.

16 Q    And I take it you said before you had known Mr. Atkins

17      before he came to San Francisco; correct?

18 A    Yes, sir.

19 Q    Were you yourself a personal friend of Mr. Atkins?

20 A    Yes, sir.

21 Q    Did you socialize with him at his home or anything?

22 A    I have.

23 Q    In Seattle or San Francisco or both?

24 A    Both.

25 Q    And did you meet Marilyn Lee when you came first to San

15

1      about the position, sure.

2   Q  Well, it says here that she took over the supervisory

3      duties at his personal request.

4           Is that your recollection -- that Marilyn took

5      over that task at his personal request?

6   A  I don't think that that accurately describes it but

7      that's --

8           MR. SCHARF:  Just go with your recollection.

9      This not a document you authored.  Maybe you've never seen

10     it before.  Have you seen this document before?

11          THE WITNESS:  I don't remember it.

12          MR. SCHARF:  Okay.  Well, anyway, I instruct you

13     to go with your personal knowledge or personal

14     recollection.  If that's not accurate, you can tell him in

15     what way is it not accurate.

16          THE WITNESS:  I discussed with Mr. Atkins the

17     fact that we needed a supervisor in the admin center, and

18     we discussed having Marilyn take the job.

19          As her supervisor at that time, Bill would have

20     discussed it with her and may have made the request, but

21     I wasn't there.

22          MR. BACON:

23   Q  And why did you tell Mr. Atkins that the administrative

24     center needed a supervisor?

25   A  Because the supervisor that we had in there at that time

18

1       was an autocratic person who was causing a lot of dissent

2       in the center.

3    Q   And who was it that had the job previously?

4    A   Anita Cabano.

5    Q   And when Marilyn was put in this supervisor position,

6       where did Anita Cabano go?

7    A   She went to the secretary position.

8    Q   And was that the secretary position that Marilyn Lee had

9       had previously?

10   A   Yes.

11   Q   And how did Ms. Cabano preform in the secretary position?

12   A   I don't know.

13   Q   Were you her supervisor in that position?

14   A   No.

15   Q   Who was?

16   A   Mr. Atkins.

17   Q   Did Mr. Atkins ever criticize Ms. Cabano's performance in

18      that secretary position?  Did he ever mention any

19      complaints about performance in that secretary position?

20   A   No.

21   Q   How long did Ms. Cabano stay in that secretary position,

22      if you recall?

23   A   I don't recall precisely how long it was.

24   Q   But she didn't stay there permanently; correct?

25   A   No, sir.

19

SHEILAH CASTOR - MAY 30, 2008

1  Q    And who was the next person to be in the secretary

2       position after that?

3  A    Kaycee Graham.

4  Q    This Exhibit 2, it also says in next sentence,

5       subsequently Marilyn Lee has proven herself to be

6       indispensable to the organization in this role.

7            Do you have any knowledge as to what Mr. Atkins

8       meant when he said "indispensable"?

9            MR. SCHARF:  Objection.  Calls for speculation.

10      You can answer to the extent of your personal knowledge,

11      or if he ever told you what he meant by that phrase.

12           THE WITNESS:  No, he never -- he never, and I

13      never talked about Marilyn being indispensable in the

14      role.

15           MR. BACON:

16  Q    Did you have any involvement in Marilyn Lee taking the

17      supervisor's position in the administration center?

18  A    Yes.

19  Q    Was Marilyn Lee informed at the time she was put in that

20      position that she would be reassigned as a supervisor in

21      that position?

22  A    Not specifically, no.

23  Q    What do you mean not "specifically"?  Was she generally

24      informed or what?

25  A    No, but at one point in time -- I don't know exactly what

                                                              20

SHEILAH CASTOR - MAY 30, 2008

1       the time line was -- I had thought to have Marilyn switch

2       jobs with the -- between the admin center position and the

3       supervisor of direct support position.

4    Q  So you were going to switch her to another position?

5    A  Yes, sir.

6    Q  And when was that?

7    A  I had planned to do it at the end of the fiscal year.

8    Q  Had you told Marilyn Lee of that fact?

9    A  I don't know.

10   Q  And when Marilyn Lee took over the supervisor position in

11      the administration center, was she simply detailed to that

12      position and remained a secretary?  Or was she actually

13      transferred into that position?

14              MR. SCHARF:  Objection.  The word "detailed"

15      seems ambiguous.  Different witnesses have different ideas

16      what that term means.  Maybe the witness can define her

17      understanding before she answers that question.

18              THE WITNESS:  The secretary position and the

19      operations coordinator position, which was the actual

20      title of the admin center supervisor, are the same level.

21      They don't have the same responsibilities, but they were

22      the same level.

23              When Marilyn went into the admin center

24      supervisor position, there was no Form 50 cut, which was

25      a personnel action form.  So there was no permanent

                                                              21

1      placement of her in the position.

2             MR. BACON:

3  Q   So although Marilyn Lee held the secretary position and --

4      was her position interchangeable with the other level 14

5      ISOC positions?

6             MR. SCHARF:  Objection.  Ambiguous as to the

7      word "interchangeable."

8             MR. BACON:

9  Q   Could they have been switched?

10  A   Could they have been switched?

11  Q   Yes.

12  A   Meaning what?

13            MR. SCHARF:  For purposes of what?  Identical

14      skill sets or benefit purposes?

15            MR. BACON:  Let me rephrase the question.

16  Q   Did she -- would she have to be reassigned, or did she

17      remain simply detailed to that position, as you say, on

18      a -- not on a permanent basis, but on a temporary basis?

19  A   She was in the ops coordinator position on a temporary

20      basis.

21  Q   Is that what it was called when she was the supervisor of

22      the administrative center, an admin operator?

23  A   Operations coordinator.

24  Q   Operations coordinator.  What I'm trying to get at is

25      how -- when Marilyn Lee was put in this supervisor

22

1       position, what was she told to your knowledge as to how

2       long she would be in that position, if anything?

3  A    I don't know that we set an end time.  It was considered a

4       developmental opportunity for her.

5  Q    What do you mean it was a "developmental opportunity"?

6  A    Marilyn had been in the position of secretary for many

7       years.  It was my understanding that she was interested in

8       a higher-level position or positions that would require a

9       different skill set than the one she had development as

10      secretary.  And this was an opportunity to help her

11      towards that.

12  Q   How would you state her position if it was temporary and

13     she still held the secretary level position?  Was she

14     detailed into that supervisor position, temporarily

15     assigned?  What words would you use to describe it?

16  A   She was temporarily assigned to the operations coordinator

17     position in the admin center.

18  Q   And to your knowledge was it ever officially changed so

19     that she was permanently in that position?

20  A   No, sir.

21  Q   And during the time that Marilyn Lee was working there in

22     San Francisco prior to her leaving, did you supervise her

23     the whole time?

24  A   No, sir.

25  Q   Did you supervise her at all?

23

SHEILAH CASTOR - MAY 30, 2008

1   A    Yes, sir.

2   Q    When?  What time period were you her immediate supervisor?

3   A    During the time that she was in the admin center.

4   Q    So during the time that she was the secretary to

5        Mr. Atkins, you didn't have any involvement in supervision

6        at that time?

7   A    No, sir.

8   Q    And do you recall when she was -- when Marilyn Lee was put

9        into that supervisor position in the administration

10       center?

11  A    I don't recall the exact date.

12  Q    And after Marilyn Lee was in the secretary -- or in the

13       admin center position, did Marilyn Lee ever request that

14       she be returned to the secretary position?

15  A    Yes, sir.

16  Q    Did she make that request on more than one occasion?

17  A    Yes, sir.

18  Q    How many times did she make the request?

19  A    More than once.

20  Q    More than five times?

21  A    I couldn't say exactly how many.

22  Q    Less than 10?

23  A    Possibly.

24  Q    And did she make that request to you on any occasion?

25  A    Yes, sir.

24

```
 1              MR. BACON:

 2   Q    Was Barbara Mendes qualified to be a supervisor in the

 3        admin center position in 2005?

 4   A    Yes.

 5   Q    Was there any reason why she couldn't have assumed the

 6        position that Marilyn Lee had asked to get out of?

 7   A    Yes, sir.

 8   Q    What was that?

 9   A    She was already supervising 13 people assigned to direct

10        support.

11   Q    Well, eventually Marilyn Lee left in 2005; correct?

12   A    Yes, sir.

13   Q    And when she left, who took over the position?

14   A    I believe we rotated it among people for awhile and then

15        moved Mendes into it.

16   Q    So eventually you put Mendes in that position that Marilyn

17        Lee had asked to get out of; correct?

18   A    Yes.

19   Q    Who did you put in that position on a rotating basis prior

20        to Mendes?

21   A    I believe I rotated through the people who were in the

22        admin center.

23   Q    And who were those that held the positions?

24   A    Sandy Schoonmaker, Judith Smith -- I know those two for.

25   Q    How long was Sandy Schoonmaker in the position?
```

28

SHEILAH CASTOR - MAY 30, 2008

1  A    I don't know.  I think we did it for 30 days at a time.

2  Q    Was it posted at all after Marilyn Lee was out of the

3       position?

4  A    Was what posted?

5  Q    The position of the supervisor in the admin center?

6  A    No.

7  Q    What about Kaycee Graham?  Was she qualified to be a

8       supervisor in the admin center position in 2005?

9  A    Yes, sir.

10 Q    Was there any reason she couldn't have been assigned to

11      take over the supervisor position in 2005?

12 A    In 2005 she was detailed to the INC secretary position.

13 Q    How about Katie O'Leary?  Do you know Katie O'Leary?

14 A    Yes.

15 Q    Was Katie O'Leary qualified to be a supervisor in the

16      admin center?

17 A    She had prior supervisory experience, yes.

18 Q    And do you know if she was capable of being reassigned

19      into that position in 2005?

20 A    She was already on a detail assignment to the Postal

21      Service.

22 Q    She was detailed to the Postal Service, but she was still

23      an employee of the Inspection Service?

24 A    Yes, sir.

25 Q    And do you know how Ms. O'Leary was paid when she was

29

1      detailed to the Postal Inspection?  In other words, was

2      she paid by the Inspection Service or the Postal Service?

3  A   She was paid by the Inspection Service.

4  Q   So would that be correct that when an employee from the

5      Inspection Service is detailed somewhere else, that the

6      agency they come from is the agency that actually pays for

7      the salary?

8  A   Not always.

9  Q   Do you recollect any employees of the Inspection Service

10     who were detailed somewhere else where they were not paid

11     by the Inspection Service?

12  A   I'm sorry.  Say it again.

13           MR. BACON:  Can you read that back?

14

15          (Whereupon the record was read.)

16

17           THE WITNESS:  I don't recall.

18           MR. BACON:

19  Q   Then how long did Ms. Mendes stay in that position as a

20     supervisor in the admin center?

21  A   Until she retired.

22  Q   When did Mendes retire?

23  A   At the end of September.

24  Q   Then who took over the position after Mendes retired?

25  A   I don't know.  I wasn't there.

30

1       that job under any circumstances?

2    A  I don't know that I would have said under any

3       circumstances.  But, yeah, I believe that that would have

4       been something I said -- that she wouldn't go back to the

5       secretary job.

6    Q  So during the time that you were still in San Francisco,

7       you never -- you're not aware that that secretary position

8       of Marilyn Lee's was ever made available to her as far as

9       returning to it?

10   A  I'm sorry.  What?

11   Q  In other words, during the time you were here, Marilyn was

12      always told that she was not going to be returned to the

13      secretary position; correct?

14   A  I don't think she was told that consistently.  I think she

15      was told consistently that she we needed her to supervise

16      in the admin center.

17   Q  Did you ever witness Marilyn Lee making a request of

18      Mr. Atkins that she be returned to the secretary position?

19   A  No.

20   Q  Did you have any discussions with Mr. Atkins about Marilyn

21      Lee's request to be returned to the secretary position?

22   A  I believe I discussed it with Mr. Atkins one of the times

23      that Marilyn had asked me.

24   Q  And when was that approximately?

25   A  I couldn't say specifically when.

32

1      something she could do.  That sort of thing.

2   Q  So was it clear to you that Marilyn Lee wanted to be

3      removed from the supervisor position?

4   A  It was clear to me that Marilyn wanted the secretary job

5      back.

6   Q  Which means that she wanted out of the supervisor

7      position; correct?

8   A  But I don't think it was as much that she wanted out of

9      the supervisor position as she wanted the secretary job

10     back.

11  Q  Why do you say that?

12  A  Because I believe that's what the case was.

13  Q  But she had already told you that she was having problems

14     performing her duties as a supervisor in the admin center;

15     correct?

16  A  Right.

17  Q  So it was clear to you that she wanted out of that job;

18     correct?

19  A  I believe she wanted the secretary job back.  I think that

20     her perception of how she was doing in the supervisor job

21     was sort of skewed.  That it wasn't really a matter of her

22     wanting to be out of the supervisor job as she wanted back

23     to the secretary job.

24  Q  What do you mean by it was "skewed"?

25  A  I think that she was facing some situations in the admin

35

```
 1                  MR. SCHARF:  Objection.  Incomplete
 2        hypothetical.  Go ahead.  You can answer.
 3                  THE WITNESS:  No.
 4                  MR. BACON:
 5   Q    Why not?
 6   A    Because I think that when you're asking for developmental
 7        opportunities, that that type of development comes from a
 8        from a number of difference places, and one of them is
 9        learning on the job.
10   Q    Were there any problems with the administrative center
11        before Marilyn Lee took the position?
12   A    What would you define as a "problem"?
13   Q    Well, did you feel there was a problem in them being
14        properly supervised prior to Marilyn taking the position?
15   A    Are you asking me do I feel that you were properly
16        supervised?
17   Q    Yes.
18   A    Yes.
19   Q    So why put Marilyn Lee in the position if they're already
20        being properly supervised?
21   A    The person who was supervising them was creating dissent
22        within the center, and we needed to make a switch.
23   Q    So there was a problem in the supervision prior to Marilyn
24        Lee going into it; correct?
25   A    There was a problem with the supervisor.
```

                                                                    39

SHEILAH CASTOR - MAY 30, 2008

1  Q     Right.   The supervision wasn't good enough of those people

2        in the admin center; right?

3               MR. SCHARF:  Hold on.  Objection.

4        Argumentative.  Asked and answered.  And the word

5        "supervising" is ambiguous.  I think you're talking about

6        two different concepts.

7               MR. BACON:

8  Q     Well, if you're saying there was a problem with the

9        supervisor, aren't you in effect saying that they weren't

10       being properly supervised?

11              MR. SCHARF:  Objection.  Argumentative.  Go

12       ahead and answer if you.

13              THE WITNESS:  I don't think so.

14              MR. BACON:

15 Q     Why not?

16 A     Because the problem the supervisor had was more of an

17       inner-personal relationship, as opposed to supervising.

18       Supervising meaning, you know, monitoring productivity,

19       making sure that work was done, processing time and

20       attendance, that sort of thing.

21 Q     Did Marilyn Lee ever tell you that the employees in the

22       admin center were not performing well at all, any of them?

23              MR. SCHARF:  Objection.  Vague as to time.

24       Before she become a supervisor or after?

25              MR. BACON:

40

1  Q    After Marilyn Lee took the position, did Marilyn Lee tell

2       you that the employees that were being supervised in the

3       admin center were having problems in their performance?

4       In other words, having problems doing their job?

5  A    At some point in time she did indicate that to me, yes.

6  Q    What did she say about that?

7  A    I don't recall specifically what she said, but I knew that

8       there were problems with attendance in one case.  Someone

9       else who may have been having problems with accuracy.

10      That's what I remember.

11  Q    Would you characterize the employees of the admin center

12      as problem employees?

13            MR. SCHARF:   Objection.   The word "problem" is

14      ambiguous.   Can you clarify what you mean by "problem"?

15            MR. BACON:

16  Q    Did you ever use the phrase "problem employees" in

17      reference to the employees in the admin center?

18  A    I don't recall specifically saying problem employees.

19  Q    Do you recall saying anything to the effect that employees

20      were difficult employees in performing their jobs and

21      attending their job and so forth?

22  A    I believe that there was certain challenges among the

23      employees in the admin certain, yes.

24  Q    What do you mean by challenges with the employees?   What

25      kind of challenges?

41

SHEILAH CASTOR - MAY 30, 2008

1  A    As I previously stated, I know there was one person who

2       had a problem showing up or showing up on time.  And

3       another who appeared to be having problems with accuracy

4       in her work.

5  Q    Did Marilyn Lee ever tell you that one of the employees in

6       the admin center was yelling at her?

7  A    I don't recall.

8  Q    Did Marilyn Lee ever recommend that some of the employees

9       in the admin center be terminated?

10 A    I don't remember her specifically saying that.

11 Q    Do you remember her saying something generally relating to

12      that?

13 A    I think we all did at one point in time or another.

14 Q    How did you characterize that?

15 A    I think they should all be fired.

16 Q    So you put Marilyn Lee in a supervisor position

17      supervising a group of employees that you all felt should

18      be fired?

19            MR. SCHARF:  Objection.  Argumentative and

20      mischaracterizes her testimony.  Take it out of context.

21            MR. BACON:

22 Q    Is that correct?

23            MR. SCHARF:  You can take this opportunity to

24      explain what you meant when you said -- when you referred

25      to various people making the comment "I think they should

                                                              42

1        disciplined?

2    A   I don't remember that.

3    Q   Do you ever recall her requesting that employees in the

4        admin center be disciplined?

5    A   I'm sorry.  Did she ever ask for them to be disciplined?

6    Q   Yes.

7    A   It would have been her job to initiate any kind of

8        disciplinary action.

9    Q   But you don't recall her doing that?

10   A   I don't think so.

11   Q   Was that part of the problem she expressed to you when she

12       said that she's having problems performing her supervisory

13       duties?

14   A   I don't remember.

15   Q   Did you ever tell Marilyn Lee at that time she was asking

16       to get out of the supervisor position, did you ever tell

17       her to look for another job?

18   A   I believe that was during a period of time when, as an

19       agency, there was word that there was going to be cutbacks

20       and there were a number of people who were looking for

21       other jobs, including myself.  And I believe I did say

22       that to Marilyn that I think specifically I recommended

23       her going U.S.A. Jobs.  I do remember that.

24   Q   What do you mean by U.S.A. Jobs?

25   A   U.S.A. Jobs is a website for federal employment.

                                                              44

SHEILAH CASTOR - MAY 30, 2008

1  Q    Did your telling her to look for other jobs have anything

2       to do with her telling you that she was having trouble

3       performing her supervisory duties?

4  A    No.

5            MR. BACON:  We have been going over an hour.

6       Let's take a short break.

7            MR. SCHARF:  Off the record.

8

9            (Recess taken.)

10

11           MR. BACON:   Okay.

12 Q    Why did you recommend her looking at this particular

13      website?

14 A    Because it was a resource of federal jobs.  That way she

15      preserved her federal service.

16 Q    And did you make this recommendation after she had asked

17      to be removed from her supervisor position and put back in

18      her secretary position?

19 A    Yes.

20 Q    Did you ever detail Ms. Cabano to a forfeiture specialist

21      position?

22 A    I didn't assign her, but I know she was assigned to the

23      forfeiture specialist position.

24 Q    Who assigned her to that forfeiture specialist position,

25      if you know?

45

1   A      Give me just a sec.

2   Q      Sure.  Why don't you read all of 17 so you have the proper

3          context.

4                  MR. SCHARF:  Thank you.

5                  THE WITNESS:  All right.

6                  MR. BACON:  Okay.

7   Q      So is that the testimony you were talking about earlier,

8          this incident when you said that you were on the phone

9          with Marilyn Lee and she was crying?

10  A      Yes.

11  Q      Okay.  And you say here in 17 that it was your

12         understanding that Marilyn Lee's detail to OIG was

13         disapproved by headquarter's personnel.  How did you learn

14         that?

15  A      I think I talked to Mr. Atkins about it.

16  Q      And Mr. Atkins informed you?

17  A      Yes.

18  Q      Did he tell you who at headquarters had disapproved it?

19  A      Not specifically, no.

20  Q      Did you ever learn who had disapproved it at headquarters?

21  A      No.

22  Q      Then you write, "Mrs. Lee was hysterical during at least

23         two phone calls stating over and over again, 'I need to

24         get out of here'."

25                 Do you recall Marilyn Lee telling you she needed

                                                              50

SHEILAH CASTOR - MAY 30, 2008

1       to get out of the supervisor position?

2 A   Well, I assumed that's what she meant by "I need to get

3       out of here."

4 Q   Do you recall what you said to Ms. Lee when she mentioned

5       that in another one of these phone calls?

6            MR. SCHARF: Objection. Asked and answered.

7       Other than what you already told us about what you told

8       her, was there anything else that you told her?

9            THE WITNESS: No.

10           MR. BACON:

11 Q   Then you write she was increasingly more -- increasingly

12       more emotional and upset.

13           Was she very emotional and upset in both of the

14       telephone calls you reference here?

15 A   Well, she was upset during at least two phone calls.

16 Q   Assuming that Ms. Lee had been detailed to OIG, who would

17       have replaced her or performed her duties as a supervisor

18       in the admin center at that point, if you know?

19 A   I would have had to go back and take a look at what the

20       staffing was like at that specific time.

21 Q   Look the next one, number 18, and you say here that

22       Marilyn Lee "appeared emotionally fragile and cried

23       often."

24           What was your basis for saying she was

25       emotionally fragile?

51

1          MR. SCHARF:  I think you didn't read the first

2     sentence where you just read a fragment of that sentence.

3     If you could read the whole sentence.

4          MR. BACON:  Let me rephrase that.

5  Q  Apparently you're being told by someone else in the agency

6     that Marilyn Lee appeared emotionally fragile and cried

7     often.

8          Was this something that was told to you by

9     support employees after you had returned to Seattle?

10 A  No.  It was during the time that I was out of the office

11    from April 1st through June 10.

12 Q  Where were you during this time?

13 A  I was detailed to Bala Cynwyd, B-A-L-A C-Y-N-W-Y-D.

14 Q  What were you doing on that detail?  Was it training?

15 A  No, it was a program specialist in administrative

16    programs.

17 Q  Who told you that Marilyn Lee appeared emotionally fragile

18    and cried often?

19 A  Several support employees, a couple of employees from

20    admin center, the support person who supported admin, not

21    in the admin center -- not from the admin center.  I think

22    that's all can I remember specifically.

23 Q  Do you recall the names of the employees?

24 A  Sandy Schoonmaker, Judith Smith, Teresita Venegas.

25 Q  Did Mr. Atkins tell you that?

52

1    A    I don't think that he said -- I don't think that he was

2         one of the managers who mentioned that to me at that point

3         in time.

4    Q    And then it says here that Marilyn Lee asked to take three

5         months off.  When did she make that request?

6    A    Just before I left in April.

7    Q    And was the request made to you or someone else?

8    A    No, she asked me.

9    Q    I'm sorry?

10   A    Actually, she didn't request it.  She asked -- made the

11        comment that she would like to take some time off, and I

12        said how much time.  She said three months.  That would

13        have been the same 90 days that I would have been gone to

14        Philly.  And so I said, you know, you could probably take

15        some time off, but I can't let you go for three months.

16   Q    Well, she had gotten an OIG detail, she would have been

17        out of that position at that point; correct?

18   A    Out of the position in the admin center?

19   Q    Yes.

20   A    Yes.

21   Q    So you couldn't let her go -- take time off, but you could

22        let her go to a detail at OIG?

23   A    A detail opportunity is another developmental opportunity,

24        and I wouldn't want -- if she could get a detail, then,

25        you know, we would make due in terms of covering the admin

                                                                53

1    center supervisor.

2  Q    Looking at number 25, you mentioned here you have no

3    direct knowledge of the petition.  What petition are you

4    talking about there?

5        MR. SCHARF:  You know, it's -- I believe those

6    are questions that concerned -- I mean, these are answers

7    that correspond to questions.  And the actual question

8    there's a reference to the petition.  She doesn't have a

9    copy of the questions.

10        MR. BACON:  Let me rephrase it.

11  Q    Do you recall an issue coming up where a petition was

12    submitted to an ombudsman regarding the San Francisco

13    division?

14  A    I understood that there was, yes.

15  Q    And you say here you had no direct knowledge.  How did you

16    learn of that petition if you didn't have any direct

17    knowledge?

18  A    Ms. Lee provided this information.  I have no direct

19    knowledge of the petition referred to.

20  Q    When did you first learn of this petition?

21  A    When I read about it in Marilyn's application with CA-2.

22  Q    What's a CA-2?

23  A    OWCP form, non-injury being off work.

24  Q    Did you have -- so I take it that you had no discussions

25    with Marilyn Lee at all before she left her employment

54

1    headquarters, and the other was being reassigned to a

2    performance job.

3 Q  In looking over at number 34 -- again, I'm asking on this

4    Exhibit 29 -- there you say that you met with Ms. Lee with

5    the Assistant Inspector In Charge Bethal on Monday, July.

6    18.   That would have been in 2005?

7 A  Yes, sir.

8 Q  And what was the purpose of that meeting?

9 A  At that time I gave Ms. Lee a letter placing her on

10   administrative leave, and I requested a fitness for duty

11   exam.

12 Q  Are you familiar with the regulations dealing with fitness

13   for duty?

14 A  Not specifically.

15 Q  Whose decision was it to place Marilyn Lee on

16   administrative leave and require a fitness for duty exam?

17 A  I don't know specifically who made the decision.

18 Q  Do you have any idea who made the decision?

19 A  I'd have to guess.

20        MR. SCHARF:  We don't want you to guess or

21   speculate.

22        MR. BACON:

23 Q  Do you have any input as to the decision that was made to

24   place Marilyn Lee on administrative leave and require a

25   fitness for duty?

56

1   A   No.

2   Q   Who told you that Marilyn Lee was to be placed on

3       administrative leave?

4   A   I believe it was Inspector Bethel that morning.

5   Q   And who was Inspector Bethel?

6   A   Assistant inspector in charge.

7   Q   So it would have been -- I want to just get the hiearchy.

8       It was Atkins, and then it was Bethel under Atkins?

9   A   Yes, sir.

10  Q   And was Bethel your supervisor?

11  A   No, sir.

12  Q   Atkins was your supervisor?

13  A   Yes, sir.

14  Q   Okay.  What did Mr. Bethel tell you about Marilyn Lee

15      being placed on administrative leave and requiring a

16      fitness for duty exam?

17  A   I believe that's all he said was that we're -- we're going

18      to put Marilyn on admin leave, and I had filled out a form

19      for a fitness for duty exam.

20  Q   And did you fill out the form for the fitness for duty

21      exam?

22  A   Yes, sir.

23  Q   When did you do that?

24  A   That day.

25  Q   And do you know if Marilyn Lee, in fact, had a fitness for

57

SHEILAH CASTOR - MAY 30, 2008

1      administrative leave?

2   A   No, sir, I don't.

3   Q   And did Marilyn Lee say why she wanted this vacation time,

4      if you recall?

5   A   No, I don't remember.

6   Q   Was there a request made to you or someone else?

7   A   I think she just mailed in the leave request forms.

8   Q   And it says here that if she failed to report, it would be

9      viewed as an act of insubordination and could result in

10      her having disciplinary action, including removal.

11          Hadn't she already been removed?

12   A   No, sir.

13   Q   Why was she locked out then if she hadn't already been

14      removed?

15   A   If she were removed, she wouldn't be getting paid.

16   Q   So the removal is really with reference to the position

17      and not the fact that she had been removed from doing her

18      work at the agency?

19   A   Right.

20   Q   And when you left San Francisco, what was the status of

21      Marilyn's employment at that time?  Had there been an

22      application for benefits under the Department of Labor at

23      that point or did that happen after you left?

24   A   No.  I believe that she had applied for benefits before I

25      left.

1  Q    And then it says while she was on non-duty status, if she

2       had intended to leave the local community area for any

3       reason, that Marilyn Lee had to contact you in advance.

4            Did that ever happen?

5  A    I don't recall that happening.

6  Q    And says here, failure to comply would -- could result in

7       her being charged absent without leave, being AWOL.

8            That never happened either to your knowledge did

9       it?

10 A    To my knowledge, no.

11 Q    How would you describe Marilyn Lee's performance as an

12      employee overall?

13           MR. SCHARF:   Vague as to time.

14           MR. BACON:

15 Q    During the time that you were in San Francisco.

16 A    Good.

17 Q    Did you have any criticism of her performance that you can

18      recall as you sit here today?

19 A    No.

20 Q    Was Marilyn Lee always courteous and polite to you during

21      the time that you worked with her in San Francisco?

22 A    Yes.

23 Q    Was there anything that Marilyn Lee did that you would

24      consider unprofessional?

25 A    No.

68

1  Q   Had you ever known Marilyn Lee to be dishonest about
2      anything?
3  A   No.
4  Q   Did Marilyn Lee ever receive any unsatisfactory for
5      performance merits?
6  A   Not to my knowledge.
7  Q   Now, I asked you about the supervisory position that
8      Marilyn had in the admin center.
9          How long had Cabano been in that position, to
10     your knowledge, at the time Marilyn was asked to take it?
11 A   Probably about a year, a year and a half maybe.
12 Q   Was there any discussion you had with Atkins about the
13     employees in the admin center before Marilyn was placed in
14     that position?
15 A   Not that I recall.
16 Q   So you never discussed with Mr. Atkins anything about the
17     employees being difficult to supervise or the fact that
18     the employees were lacking in the ways you already
19     described prior to Marilyn taking that position?
20 A   I discussed some of the issues among the employees that
21     existed among the employees in the admin center with
22     Mr. Atkins.  But I don't recall whether that was before,
23     during, or after Marilyn was in there.
24 Q   What issues do you recall actually discussing with
25     Mr. Atkins regarding those employees?

69

1   A      Ever?

2   Q      Ever.

3   A      The high rate of absenteeism, people coming in late.

4   Q      In other words, all the issues you already testified?

5   A      Yeah.

6   Q      Okay.

7                  MR. BACON:   Why don't we take a short break.

8

9                  (Recess taken.)

10

11                 (Whereupon the record was read.)

12

13                 MR. BACON:

14  Q      Did Marilyn Lee ever tell you that she felt she was

15         dealing with a hostile environment in her employment?

16  A      No.

17  Q      Do you know if Ray Hang ever had any discussions with

18         Mr. Atkins about Marilyn Lee as a supervisor?

19  A      I did not know directly, no.

20  Q      Did Mr. Atkins tell you or Mr. Hang tell you about

21         discussions that they had about Marilyn Lee?

22  A      No.

23  Q      Did you hear from someone else that Mr. Hang had

24         discussions about Marilyn Lee as a supervisor with

25         Mr. Atkins?

70

1    A    Yes.

2    Q    And what did you say and what did he say about that?

3    A    It was Marilyn who told me.

4    Q    What did Marilyn tell you about discussions with Ray Hang?

5    A    She told me that she had talked to Ray Hang, and that she

6         expressed that she wasn't happy in the position that she's

7         in.  That Ray Hang said he could talk to Bill, and she

8         told him that he didn't have to do that.

9    Q    And I just want to be clear about your testimony regarding

10        this petition.

11              Is it your testimony that you didn't know about

12        any petition at all until after Marilyn Lee had left and

13        she had filed her Department of Labor request for

14        benefits?

15   A    I had no direct knowledge of the petition until Marilyn

16        said something about it in her application.

17   Q    Does that imply you had some indirect knowledge?

18   A    I had heard a rumor of some petition being signed.  I

19        didn't know what it was about, never saw it, didn't know

20        who had signed it.  I just heard something about a

21        petition going to headquarters.  I thought it had gone to

22        headquarters.  I did not know it went to the ombudsman.

23   Q    Can you tell me what this rumor was that you heard?

24   A    Just that -- that there was some petition went to

25        headquarters and a bunch of people signed it.

71

1    Q    Did you ever have any discussions with Mr. Atkins about

2         this petition?

3    A    No.

4    Q    When you heard the rumors, you never talked to anyone

5         about the petition?

6    A    No.

7    Q    Have you ever seen the petition?

8    A    No.

9    Q    Did you ever tell Marilyn Lee that she should seek any

10        other detail?  We talked earlier about the OIG detail that

11        Marilyn Lee had requested.

12             Did you ever tell her she should seek any other

13        detail assignments?

14   A    I don't recall that specifically.

15   Q    Do you recall generally telling her?

16   A    I may have.  I may have suggested exploring that with the

17        post office.

18   Q    And what do you mean by that?  Exploring what?

19   A    To see if there was any detail opportunity.  We had a

20        number of people at that point in time who were trying to

21        get details to the post office.

22             We had people who previously came from the

23        operations support group who were initially detailed or

24        had detail opportunities to sections like labor relations

25        or personnel service.  And since you never know -- I

72

1       position that Marilyn Lee had come out of, if you know?

2  A   No.

3  Q   Why not?

4  A   Because no secretary position nationwide was effected by

5       the RIF.

6  Q   Was the supervise possession that Marilyn Lee was in the

7       admin center, was that effected by the reduction in force?

8  A   Yes.

9  Q   So had Marilyn stayed in that position, she would have

10      probably lost her job under that RIF?

11  A  She would have been considered an effected employee, yes.

12  Q  Assuming that she didn't go out on leave in July of '05

13      and she had stayed there, would the fact that she was

14      still technically in the secretary position have prevented

15      her from being a part of that RIF?

16  A  Yes.

17  Q  Why is that?

18  A  Because the secretary positions weren't effected.

19  Q  So even though she was --

20  A  Even if the position that she was detailed to was an

21      effected position, because her permanent job was

22      secretary, she would not have been effected by the RIF.

23  Q  Thank you.  Did you ever have any discussion with

24      Mr. Atkins about the petition after you had learned about

25      it?

76

SHEILAH CASTOR - MAY 30, 2008

1  A    No.

2  Q    Did you have any discussions with Mr. Atkins about Marilyn

3       Lee after Marilyn Lee was escorted out on July 18, 2005?

4  A    Not -- no, not that I recall.

5  Q    Did the removal of Marilyn Lee in July of 2005 cause any

6       disruption in the Inspection Service?

7  A    What do you mean by "disruption"?

8  Q    I mean --

9  A    Do you mean like -- well, what do you mean?

10 Q    Well, Mr. Atkins said it would cause disruption in the

11      Service to take her out of that position.  So I was

12      curious, do you have any recollection that when she was,

13      in fact, removed from the supervisor position, whether

14      there was any -- any effect in the department after that?

15 A    Well, we didn't have a supervisor in the admin center for

16      a period -- we didn't have a regular supervisor in the

17      admin center for a period of several months until I could

18      put -- until I put Barbara Mendes in it.

19 Q    How long was it not filled even temporarily because right

20      afterwards there was someone else put in there in short

21      order?

22 A    Right.

23 Q    And you already testified as to those people?

24 A    Right, yes.

25 Q    And are you aware of any allegations that Marilyn Lee was

77

SHEILAH CASTOR - MAY 30, 2008

1       her DOL case and not from the Department of Labor.

2                           MR. SCHARF:  Thank you.

3                           MR. BACON:  Sorry for that confusion.

4                           THE WITNESS:  Could you repeat what you just

5       asked me?

6                           MR. BACON:  Can you read that back?

7

8                           (Whereupon the record was read.)

9

10                          THE WITNESS:  No.

11                          MR. BACON:

12  Q   Do you know if Katie O'Leary had made any complaints

13      regarding Wanda Smith for the same reasons?

14  A   No.

15  Q   How about Marilyn Lee?

16  A   No.

17  Q   Have you ever testified in any EEO hearings?

18  A   Yes.

19  Q   Did you ever testify in Katie O'Leary's EEO hearing?

20  A   Yes.

21  Q   Were you questioned at all regarding Wanda Smith in that

22      EEO hearing, if you recall?

23  A   I don't remember the substance of O'Leary's complaint that

24      time.  So I don't remember whether or not it was -- had to

25      do Wanda's selection.

                                                                  81

1  Q    Did you ever learn from anyone that there was complaints

2       about Wanda Smith being selected for ad hoc recruitment

3       specialist position?

4  A    Are you speaking of formal EEO complaints on complaints in

5       general?

6  Q    In general.

7  A    Yes, I know there was complaints in general about Wanda's

8       selection.

9  Q    And how did you learn of those complaints in general?

10 A    I think I just heard from support people in general.

11 Q    You don't have any recollection of anyone specifically

12      telling you about their complaints regarding Wanda Smith?

13 A    Well, I knew that Katie O'Leary wasn't happy with the

14      selection.  I believe that Rita Perata was also someone

15      who had applied, and she wasn't happy about Wanda's

16      selection.  I mean, it's -- I think it's pretty standard

17      that the folks who don't get selected, feel that they

18      should have been.

19 Q    Were you ever told by anyone that the petition dealt with

20      several issues, including the issue of Wanda Smith being

21      selected for that position?

22 A    No.

23 Q    Do you know if a Marion Post ever filed an EEO?

24 A    No, I don't know.

25 Q    And you were never questioned regarding any EEO

82

SHEILAH CASTOR - MAY 30, 2008

1        a short period of time.

2    Q   But when she was detailed, she was still at the level 11

3        operation position?

4    A   Yes.

5    Q   Okay.  Did you ever offer the forfeiture specialist

6        position to Marilyn Lee?

7    A   No.  I didn't offer it to Rita Perata either.

8    Q   You think Marilyn Lee was qualified to be a forfeiture

9        specialist?

10   A   I believe it would have been a developmental opportunity

11       for her, yes.

12   Q   Did anyone ever recommend Marilyn to be a forfeiture

13       specialist, such as Sally Diaz?

14   A   Not that I recall.

15   Q   Did you ever have any discussions with Marilyn Lee about

16       the secretary position being upgraded?

17   A   No.

18   Q   Was the secretary position ever upgraded to your

19       knowledge?

20   A   No.  There was a movement at headquarters to create

21       higher-level secretarial positions, and a secretarial

22       development program for secretaries to executives at

23       headquarters.  And to that end -- this was on the post

24       office side, not on the Inspection Service side.

25                To that end there was a letter that came out

88

1    referencing this developmental program at headquarters,

2    Postal Service headquarters was going to establish.  And

3    that basically they were taking a wait-and-see in terms

4    of how it was going to effect or be implemented for the

5    Inspection Service, if it at all.

6         And to my knowledge it has never been because

7    have they gone through the same cuts that we have.

8  Q  It was an issue of the Inspection Service of, hey, this is

9    what they have done in the Postal Service, and we're

10   looking to do it in the Inspection Service as well?

11 A  They haven't yet determined with it on the Inspection

12   Service side, but Postal never did.  They never upgraded

13   their secretary position.  And we have a secretarial

14   developmental program in place at headquarters only.

15        MR. BACON:  Next in order.

16

17        (Whereupon a document entitled U.S. Postal

18        Service Management Communication was marked

19        Plaintiff's Exhibit 33 for identification.)

20

21        MR. BACON:

22 Q  What I marked as 33, have you ever seen this memo before

23   or management communication before?

24 A  Yes.

25 Q  And is what you were just talking about?

89

1      crying or complaining.  And I didn't have any complaints

2      from inspectors that they lacked support.  From what I

3      could tell, she was doing an excellent job where she was,

4      and there was no reason to move her.

5  Q   And Mr. Atkins seem receptive to your recommendation?

6  A   Yes.

7  Q   What did he say in response?

8  A   He said basically if it's not broke, don't fix it.

9  Q   So at the time you made this recommendation, were you

10     aware that Marilyn had signed a petition?

11 A   No.

12 Q   Were you aware that Marilyn had participated in a

13     petition-related interview?

14 A   Is that the meeting?

15 Q   Yeah.  She alleges that after she signed the petition, she

16     met with the ombudsman relating to the petition.

17         Were you aware she either signed the petition or

18     that she participated in an interview with the ombudsman

19     at the time that you made a recommendation to Mr. Atkins

20     to keep her on as a supervisor?

21 A   No.

22 Q   Okay.  Can you give us a little snapshot on what the

23     administrative center was like before Marilyn became

24     supervisor?

25 A   Well, I think that some of the problems in admin center

91

1      utilized correctly.

2             And she started making suggestions about how we

3      could change things and how to check changes, processes,

4      and procedures.  How to standardized procedures so that

5      people were doing things the same way every time.  And

6      she implemented all of those things.

7             I saw a marked improvement in the moral in there.

8      And I thought that Marilyn was flourishing in the

9      position.

10  Q   Now, before you had learned that Marilyn allegedly made

11     some statements about hurting herself, had you ever formed

12     the opinion that she was experiencing serious mental

13     illness as a result of being the supervisor in that unit?

14  A   No.

15  Q   You mentioned something about how the supervisor position

16     would be effected by the reduction in force, but not the

17     secretary position.

18            Are you able to state whether it would have been

19     likely had Marilyn just stayed, as you had asked her to

20     stay, when the reduction in force occurred, would she

21     have been reassigned out of the supervisor job and given

22     some other job?

23  A   She would have gone back to the secretary job because that

24     was her bid position.

25  Q   Now, with respect to the Mr. Atkins, had you ever heard

94

1   to Marilyn's situation?

2 A Well, that's what you have to do.  You take an admin

3   leave, and then you tailor it in terms of who they're

4   supposed to contact, the times they have to call -- that

5   kind of thing.  But, no, that's a standard human recourse

6   generated letter.

7     MR. BACON:  Just to clarify, the letter you're

8   talking about is Exhibit 31?

9     THE WITNESS:  Yes.

10     MR. SCHARF:

11 Q So the -- you had some testimony about details being

12   temporary.

13     Was there any promise or guarantee made to

14   Marilyn as to how long her detail to be supervisor would

15   last?

16 A No.

17 Q And is there any standard -- what is -- if a detail is

18   temporary, how long can a temporary detail last?

19 A A temporary detail can last as few as 14 days, and it

20   could be -- I've seen a detail last up to years.

21 Q You were shown a questionnaire that you had completed

22   regarding Marilyn's EEO complaint -- you called it

23   interrogatory answers?

24 A Yes.

25 Q And you were being truthful and accurate when you

96

SHEILAH CASTOR - MAY 30, 2008

1   Q   So you're a licensed practical nurse.  As a licensed -- as

2       a practical nurse, would the crying indicate to you that

3       Marilyn was having some difficulty in performing her job?

4   A   Well, she stated that she was having difficulty performing

5       her job.  So I mean -- are you asking me could I make a

6       diagnosis of clinical depression?  No.  I just -- you

7       know, went with what she said.

8   Q   Well, did you advise her to go see EAP or seek any other

9       assistance prior to her being removed from the position?

10  A   No.

11  Q   Why not?

12  A   I felt that that was a decision she had to make.

13  Q   So Marilyn Lee never had any opportunity to seek EAP

14      counseling, to your knowledge, prior to actually being

15      removed and told at that time that she could seek EAP

16      assistance?

17              MR. SCHARF:  Objection.  The word "opportunity"

18      is some ambiguous.  Go ahead.  You can answer.

19              THE WITNESS:  Every employee is aware -- every

20      employee in the Postal Service gets a notification at

21      least once a year about EAP.  It's up to the employee, and

22      it's done anonymously.  Even if she had gone to EAP, I

23      never would have known it.

24              MR. BACON:

25  Q   Was Ms. Cabano ever given a letter of warning regarding

101

SHEILAH CASTOR - MAY 30, 2008

1    her performance as a supervisor in the admin center?

2  A    No.

3  Q    Did you ever tell anyone that Ms. Cabano had been issued a

4    letter of warning?

5  A    No.

6  Q    Did you ever hear Mr. Atkins say that there was jealousy

7    between Marilyn Lee and Kaycee Graham?

8  A    I never heard Mr. Atkins say it, no.

9  Q    Did you ever hear anybody else say that?

10 A    Yes.

11 Q    Who?

12 A    Teresita Venegas.

13 Q    What did she say?

14 A    Just that there was a history of -- I think animosity is

15    too strong a word.  But a history of maybe bad feelings

16    between Kaycee and Marilyn.

17 Q    Was Kaycee Graham qualified as a supervisor?

18 A    She had prior supervisory experience, yes.

19 Q    But she was a good performer as a supervisor?

20 A    She didn't work for me in this capacity.

21 Q    You don't have any knowledge as to how she performed as a

22    supervisor?

23 A    No.

24             MR. BACON:  I have nothing further.

25

102

SHEILAH CASTOR - MAY 30, 2008

1   job and, in fact, we did. And we did that up until the

2   time we all left. There was a level 11 who did that job

3   for four months.

4        I couldn't do that on an ongoing basis on a --

5   even on a like a three-month basis. I couldn't put a

6   level 11 in charge of the admin center. That's why I

7   rotated it. Because people at the same level have a hard

8   time telling other people at the same level what to do.

9        I needed a higher-level position, higher-level

10  person in there. That's why when Marilyn said she wanted

11  an opportunity to get a developmental detail, that's why

12  she went in there. And I mean, I could get anybody to do

13  the secretary job. I couldn't get just anybody to do the

14  supervisor job.

15  Q   Well, if the supervisor job was more important in the

16  division than the secretary position, why was the

17  supervisor position RIF'ed and not the secretary position?

18          MR. SCHARF: Objection. Speculation.

19          THE WITNESS: You'd have to talk to human

20  resources about. What they did is they cut 260 positions

21  nationwide. And their feeling now, we don't need the

22  supervisors because we don't have any people to

23  supervisor.

24          Now, in Seattle, I have all the support report to

25  me. I do not have a first-line supervisors, between me

106

SHEILAH CASTOR - MAY 30, 2008

1    and the operations employees.  I do everything.

2         And the same thing in San Francisco.  She has

3    four operations technicians.  Has she no first-lines.

4    Because she cut the staff so much that we do not have

5    that level.  We do not have that whole level of

6    supervision anymore.

7         MR. BACON:

8  Q    But if the secretary position wasn't important, why did

9    they protect that position and not the supervisor

10   position?

11  A    I have no idea.

12        MR. BACON:  I have no further questions.

13        MR. SCHARF:  Thank you very much for your time.

14

15   (Whereupon, the deposition was concluded at

16  1:22 p.m.)

17

18

19                    _____

20                    SHEILAH CASTOR

21                    ---oOo---

22

23

24

25

                                                    107