1   Daniel Ray Bacon, Esquire, SB # 103866
    LAW OFFICES OF DANIEL RAY BACON
2   234 Van Ness Avenue
    San Francisco, California 94102-4515
3   Telephone: (415) 864-0907
    Facsimile: (415) 864-0989
4
    ATTORNEYS FOR PLAINTIFF
5   MARILYN N. LEE

6

7                   UNITED STATES DISTRICT COURT

8                  NORTHER DISTRICT OF CALIFORNIA

9                       OAKLAND  DIVISION

10

11  MARILYN N. LEE,                    )    Case No. C 07-2540 SBA
                                       )
12          Plaintiff,                 )    PLAINTIFF 'S DECLARATION IN
                                       )    SUPPORT OF PLAINTIFF'S
13      v.                             )    MEMORANDUM OF POINTS AND
                                       )    AUTHORITIES  IN OPPOSITION TO
14  JOHN E. POTTER, POSTMASTER         )    DEFENDANT'S MOTION FOR
    GENERAL,                           )    SUMMARY JUDGMENT
15                                     )
            Defendant.                 )    DATE:      September 16, 2008
16  _____ )    TIME:      1:00 P.M.
                                            Courtroom: No. 3
17                                          JUDGE:     SANDRA BROWN
                                                       ARMSTRONG
18

19

20

21

22

23

24

25

26

27

28

1

2

3    I, MARILYN LEE, declare:

4    1. I am the Plaintiff in the above-referenced matter.

5    2. If called as a witness in this case, I could and would testify competently to the matters

6    set forth below.

7    3. I was hired by the United States Postal Inspection Service in February, 1980 as a

8    stenographer.

9    4. In February of 2003, I as a United States Postal Inspection Service [USPIS] Employee

10    for over 25 years, and 48 other employees, signed a petition against management for Fraud,

11    Waste, Abuse of authority, Mismanagement, discrimination based on the race of the employee,

12    and retaliation.

13    5. I signed the petition because management was showing favoritism and

14    discrimination in promoting employees. Each of us who signed the petition was promised

15    confidentiality. Although I was promised confidentiality by Headquarters [HG] and local

16    management, in approximately May 2003, someone released my name to Assistant Inspector in

17    Charge, Juliana Nedd, and Inspector in Charge, Alan Kiel. The two managers approached me  in

18    a public work area in May 2003 and told me they were aware that I signed the petition.   HQ and

19    local managers, which included Deputy Chief Michael Ahern and Ombudsman James Birch,

20    then met with me and others individually to hear our complaints. The managers promised me

21    that I would suffer no retaliation, no transfer, no demotion, no reassignment if I met with them.

22    The meeting was at the Marriott Hotel Conference Room in June 2003. Subsequently the local

23    managers, Inspectors Kiel, Nedd and Gamache were removed from the Division and the interim

24    Inspector in Charge position was assigned to W. P. Atkins.

25    6. After INC Atkins arrived in San Francisco, he stated to me that I had no privacy when

26    working with confidential documents.  Prior to INC Atkins arrival, my desk had been right

27    outside the INC's door and this arrangement of the office layout was to enable the Inspector in

28

1

1   Charge to monitor their secretary's work and have easy access to their secretary for the INC's

2   needs.   I was moved to the enclosed corner office, formerly a conference room,  and told that the

3   move was necessary because confidentiality of sensitive documents, even though my desk had

4   been right outside the INC's office for eleven years.

5       7.  INC Atkins asked me on four occasions to take a detail assignment which I did not

6   want.  Finally I agreed to take the temporary detail assignment which temporarily  removed me

7   from my position by Inspector in Charge W. P. Atkins as a Secretary [Level EAS-14] and I was

8   placed in the position of Inspection Service Operations Coordinator (aka Supervisor) of the

9   Administration Center in approximately June 2005.   The request to take the supervisory position

10  was at Atkins request only and was not an assignment or detail that I had requested.  See Ex. 27,

11  my evaluation dated November, 2004 which was written by Atkins.

12      8.  After approximately six months of working in the detailed assignment, I  requested to

13  be returned to my regular assignment, but INC Atkins refused.  My evaluation completed in

14  October, 2004 verifies that I made this request.  See exhibit 26 to my declaration which is

15  attached hereto.   Atkins stated that he needed me to remain in the supervisory position in the

16  Administration Center and I continued to reluctantly obey him believing that it was a mere

17  extension of my temporary detailed assignment.  Atkins told me that he did not care if I was

18  unhappy as long as everyone else was happy.  However, the stress of dealing with problem

19  employees and being forced to continue supervising them was causing me harmful stress and I

20  would emotionally lose control and cry.    I continued to perform my duties as a supervisor

21  despite the harm it was causing me because I always understood that the detailed work

22  assignment was temporary and that I would eventually be returned to my secretary job.  I did not

23  realize that Atkins was never going to return me to my position of Secretary until Sheila Castor

24  in June of 2005 told me that I had been "reassigned."

25  Atkins gave false reasons for his refusals to return me to my position, such as

26      9.  I  complained of this refusal to return me from my temporary detail of Supervisor on

27  several occasions from October 2004 through July 2005.

28                                                        2

1    10. I was told by Sheila Castor that I could take another detailed assignment out of the

2    inspection service beginning in October 2005.

3    11. After repeated requests to Inspector in Charge Bill Atkins; Acting Assistant

4    Inspector in Charge Sally Diaz and Administrative Specialist Sheilah Castor I was told that I

5    would be given a detail to OIG. This detail was offered because of my complaints, and I was

6    offered a detail with the OIG and the new Ombudsman Toogood informed Chief Heath of my

7    OIG detail.

8    12. My OIG detail was eventually cancelled because nether the OIG nor the Inspection

9    Service would pay for my detail and Chief Heath had a personal dislike for the OIG. See

10    Exhibits 48 through 51 attached hereto.

11    13. I was suffering from the supervisor detail and incurring injury from the stress of

12    dealing with seven to nine problem employees.  Top-level managers knew of my desire to be

13    removed as a supervisor and did not intervene, giving false reasons, such as 1) I was needed

14    there for the good of the service; 2) I was the only competent supervisor; 3) supervisory

15    experience will enhance my opportunities for promotion; and 4) the detail was temporary.

16    14. On July 27, 2005, I filed EEO charges of discrimination and retaliation with the

17    Equal Employment Opportunity Commission. See **Exhibit 77**, my pre-complaint Counseling

18    form.

19    15. As part of my filing an EEO, I was requested to file an affidavit which detailed the

20    retaliatory actions of my managers.

21    16. On August 10, 2005, I filed with the United Stated Department of Labor for the

22    injuries I sustained while working as a supervisor and on January 30, 2006, the Department of

23    Labor found that I had been injured while working as a supervisor.  Attached hereto as exhibit

24    39 is a copy of the DOL's finding that I had suffered an industrial injury.

25    17. I have been treated in a manner different from all other employees who have been

26    permitted to return to their regular assignments from details such as Sheila Castor, Anita Cabano,

27    Wanda Smith, Rita Perada, Carole Edwards, Florita Andres, Alice Abe, and Teresita Venegas,

28    

3

1 and thus Defendant United States Postal Service is subjecting me to disparate treatment based

2 on my complaint (petition) and the subsequent meeting I had with management in June, 2003.

3     18. Defendant is treating me in a discriminatory/retaliatory manner which violates

4 federal and state law. I exhausted my administrative remedies and pursued this complaint in

5 federal court after the EEOC did not permit me a hearing.

6     19. I have been a postal employee for 25 years. In June 1985 I was promoted to the

7 position of Secretary (EAS 14) for the Regional Chief Postal Inspector in Charge and later

8 transferred as Secretary to the Inspector in Charge (INC) of the San Francisco Division.

9 **EXHIBIT 1** is my PS Form 50 listing me as a Secretary.

10     20. I held the Secretary position until June 2004, when I was "detailed" to the

11 Supervisor of the Administration (Admin) Center (EAS 14) (aka Operations Coordinator or

12 ISOC). **EXHIBIT 2** is the job description for the Secretary position.

13     21. While I was the INC Secretary I reported directly to the Inspector in Charge (INC)

14 and the two Assistant Inspector in Charges (AICs). My duties included typing correspondence

15 and performing other clerical functions, disseminating emails, answering the telephone, making

16 travel arrangements, organizing, scheduling and coordinating meetings, conferences and

17 retirements. **EXHIBIT 3** is a job description of the Admin Supervisor position.

18     22. I never received an unsatisfactory performance merit while in this position, and in

19 fact received numerous awards for my job performance over the years and as the INC Secretary,

20 I was not responsible for supervising any employees as stated in **EXHIBIT 4**.

21     23. In February 2003, I and others in the San Francisco Division of the U. S. Postal

22 Inspection Service signed a petition **EXHIBIT 5.** The names of approximately 49 signatories to

23 the petition were to be kept confidential and not revealed to the San Francisco managers about

24 whom the complaints were written. As secretary to San Francisco's Inspector in Charge (InC)

25 Alan Kiel, I was particularly vulnerable but felt the Inspection Service would honor the

26 confidentiality we had requested and also felt I had an obligation to support my coworkers

27 because I agreed with their comments.

28

24. The petition was sent to HQ by Inspector Judy McDermott. McDermott provided me copies of correspondence between her and Ombudsman Birch. See **EXHIBITS 6-12**

25. Judy McDermott provided me a copy of her Information for Pre-Complaint Counseling **EXHIBIT 13** mailed October 14, 2003, in which she states on Page 3, paragraphs 2 and 3 "…..I asked that someone from the Department of Justice investigate the allegations in the petition. David Fineman released the letter and exhibits to the USPIS, even though it was specifically requested that he not do that due to known acts of retaliation…"

26. Judy McDermott in her Pre-Complaint Counseling form states that she is positive (Katz) discussed her letter and its ramifications with Chief Inspector Heath as it was released right when the Postal IG, Karla Corcoran, was asked to step down from her position….." See **EXHIBIT 14**.

27. Judy McDermott provided me a copy of a pre-complaint EEO dated 10/20/03. On page 3, under the heading Retaliation for Whistle Blowing on Fraud, Waste, Abuse and Mismanagement…., the first paragraph reads "After the petition was sent to Inspector Birch, it was learned that INC Kiel approached Marilyn Lee on at least two different occasions stating that he knew she signed the petition that went to Inspector Birch and he (Kiel) wanted to know why…" See **EXHIBIT 15**.

28. Instead of the promised confidentiality, my name was released. InC Kiel and Assistant Inspector in Charge Juliana Nedd approached me shortly thereafter in a public area at Division Headquarters regarding the petition. Witnessing the ensuing conversation were Postal Inspectors Kathy Herzog Evans and Ben Derderian. Both spoke to me after the incident. I was visibly upset and Herzog Evans asked if I was okay and Derderian assured me that as a secretary, I had as much right to lodge a complaint as anyone else. Someone had informed Kiel that I signed the petition. Because my workplace is situated in an open area, employees witnessed how upset I was and in tears. As InC Secretary, my work area is situated in an open area located directly outside the offices of the InC, two AICs and Admin Specialist.

29. I called Ombudsman Jim Birch at National Headquarters to complain about the release of my name but no one came to my assistance. I called Judy McDermott who initiated the

5

1   petition for assistance. I spoke with Ombudsman Birch again and he told me to speak directly to

2   Postal Inspector John Wisniewski as he was detailed as Acting Inspector in Charge and was a

3   confidant to the Chief. Birch indicated Wisniewski could be trusted and was sent to San

4   Francisco Division by the Chief. I did not speak with Inspector Wisniewski because I learned he

5   had gone to the home of discriminating official Juliana Nedd for dinner and felt his objectivity

6   was compromised. See **EXHIBIT 16** – 3/19/03 National Communications – Detail Assignments

7   – AIC San Francisco Division.

8       30. Ombudsman Birch informed me that Chief Postal Inspector Heath was sending him

9   and other managers, (**EXHIBIT 17),** to the San Francisco Division to meet with the signers of

10  the petition. Inspector Birch asked me to spread the word to other signers that they could meet

11  with him to discuss their complaints. He also asked to meet with me personally and indicated

12  there would be others from Headquarters with him at our meeting which was held approximately

13  around the week of June 16, 2003. Both before and during my meeting with Inspector Birch, he

14  promised me verbally and with emails, that there would be no retaliation of any kind against me

15  because I signed the petition or aired my complaints.

16      31. Also attending the meeting were Deputy Chief Inspector Michael Ahern,

17  Inspector/Attorney Lawrence Katz, Ombudsman Jim Birch, and Inspector John Wisniewski. See

18  **EXHIBIT 18**.

19      32. They all witnessed Inspector Birch's promise to me that there would be no retaliation

20  of any kind (no reassignment, no demotion, no removal, etc.) for meeting with them and

21  speaking up about my complaints of discrimination. I brought my notes (**EXHIBIT 19**) so that I

22  won't forget the facts or stammer. I told those managers that I overheard conversations

23  regarding Wanda Smith and Juliana Nedd which were discriminatory actions. We met during

24  the week of June 15, 2003. In 2007, I learned that Katie O'Leary filed an EEO based on

25  discrimination of Wanda Smith being selected for the ad hoc recruitment specialist position.

26  Management knew all this time that my discrimination complaint had merit. I seem to recall that

27  Inspectors Donnelly and Greg Campbell attended the meeting at the Marriott, but in their EEO

28

1    affidavits responded, "They were not involved in the meeting."

2        33. Because of the complaints made against InC Kiel, Assistant Inspectors in Charge

3    Juliana Nedd, and Greg Gamache, these managers left the San Francisco Division shortly after

4    the meeting: Kiel to retirement (**EXHIBIT 20**), the other two to other assignments. I had

5    received comments from other people that I was partially to be blamed for their removal.

6        34. Again, through therapy, I was able to recall that PPO Sgt. Kirby Apps called me one

7    day to say that he had spoken to Chief Heath directly. I was shocked for Apps to tell me that he

8    personally called Chief Heath to say that my involvement in removing Nedd should be

9    acknowledged (**EXHIBIT 21**). I knew that Apps had filed an EEO naming Nedd as a

10   discriminating official. I also recalled receiving many phone calls from others in and outside the

11   San Francisco Division as well as from my former Inspector in Charge, Don Davis, inquiring

12   about the three managers.  In my career with the Postal Inspection Service, which has been over

13   25 years, there has never been a time where three managers were removed from a Division at

14   one time.

15       35. Approximately in May 2003, Chief Heath sent Inspectors Wisniewski and Donnelly

16   to run the office until he selected Inspector William (Bill) Atkins and Robert Bethel as San

17   Francisco's Inspector in Charge and Assistant in Charge (AIC) respectively. Greg Campbell and

18   Sally Diaz served as Acting AICs during Atkins' tenure.  Chief Heath chose Atkins personally.

19   The San Francisco Division had a high number of EEOs.  Judy McDermott provided me a copy

20   of her Information for Pre-Complaint Counseling mailed October 14, 2003, in which she states

21   on Page 4, paragraph 1, ……."He (Atkins) stated EEOs in this Division were the highest in the

22   nation, and went on to repeatedly mention EEOs.. …." In Atkins' first speech to the Division

23   employees, I understood that because of the high EEOs, any issues an employee has should be

24   discussed with their immediate supervisor before it is brought up to upper management. If the

25   employee is not satisfied with management responses, then that employee should file an EEO.

26   See Atkins deposition, Pages 45, Lines 17-25; Page 46, Lines 1-22.  I understood that since I

27   was detailed as the Admin Center supervisor, I would report to Sheilah Castor and follow

28

1     protocol when making complaints. I have not been provided the requested documentation of my

2     detail announcements through discovery. An email from Anita Cabano with copies to Castor is

3     documentation that it was common knowledge that I was "detailed" as the Admin Center

4     Supervisor. See **EXHIBIT 22**.

5        36. When InC Kiel left, I became InC Atkins' personal secretary. Atkins told me that I

6     knew a lot operationally and commenting to me that that many people knew me. At the time, I

7     thought his comment was odd, because why would he be talking to people about me, and how

8     did he know I had a lot of operational knowledge unless he discussed me with someone. Atkins

9     testified that I told him I signed the petition shortly after he arrived to SF. My memory is vague

10    about this meeting with Atkins and at times nonexistent. Atkins read the survey results--he

11    returned them to me and asked me to file them (**EXHIBIT 23**). Chief Heath read those surveys

12    as well. They were exceptionally critical of Division management. Atkins also saw that I was

13    working in an open area where sensitive documents could be accessed by others, although I had

14    always been very careful leaving documents locked and turning my computer screen off.

15    Privacy or confidentiality had never been an issue because of the area I worked at while I was

16    the secretary for prior Inspectors in Charge. Atkins then moved me into the enclosed corner

17    office area next to his office.

18        37. I have witnessed Atkins' anger among other employees. Atkins was angered when

19    coworkers of Inspector Efren Santos who had an affair requested leniency for Inspector Santos.

20    Inspector Santos was removed from the agency. Although Atkins was investigated for having

21    an alleged affair, he was allowed to retire. I did not want to upset Atkins and he was my InC. I

22    reluctantly took the supervisory detail to appease him. I thought Atkins would keep his word

23    that I would be returned as a secretary as it was clear to me that I accepted a "detail" which was

24    deemed as temporary. Throughout Atkins deposition, he states he spoke to me several times

25    telling me he needed me as a supervisor. After our discussion regarding my 2004 yearend

26    evaluation in October/November 2004, I only spoke to him directly one time regarding Wanda

27    Smith. Our next talk was in April 2005 when I asked Kaycee Graham to arrange a meeting with

28

1  Atkins to discuss the supervisory position. That was the meeting when Atkins asked Kaycee

2  Graham to sit through our meeting. There was no need to bring another person into a meeting if

3  Atkins continually talked to me about the supervisory position. Once I started to complain about

4  the supervisory position, Atkins went out of his way to avoid me and shun me. When Inspector

5  Jim Woo was put on administrative leave because Woo pulled out his gun as a joke, prior InC

6  Hagberg kept in contact with Inspector Woo by phone and even went to his house to talk to him

7  personally. As Hagberg's secretary, I was informed of the Woo situation. I cannot understand

8  why Atkins would not have done the same unless he was advised by Headquarters management.

9  In the prior incident with Woo, Katz was the legal counsel then and reports to the Chief.

10  Throughout Atkins' EEO affidavit, he indicates as the Inspector in Charge, he has a right to

11  "reassign" me for the needs of the service. However throughout his deposition, he changes his

12  position to "keeping me as the supervisor" and no longer refers to the term "reassigned" for the

13  needs of the service. Regardless, Atkins would not return me to my "bid" position as secretary.

14  Even the term "bid position" to is used contradictory in his EEO affidavit and deposition.

15      38. Chief Heath, InC Atkins and Inspector Diaz were aware of the petition and the

16  results of a survey **(EXHIBIT 23)** conducted by InC Kiel and distributed to staff of the San

17  Francisco Division. The survey was done in done to assess the level of satisfaction with the way

18  the Division was being run. The survey results were very critical of management. Inspector Diaz

19  was also aware that I had been approached by InC Kiel regarding the petition. In Diaz' EEO

20  affidavit, PS Form 2568-B, Page 1, "If the protected activity you refer to is the signing of a

21  petition, I seem to recall knowing Marilyn Lee signed it, after it was all said and done, but I do

22  not recall how I became aware. I was not involved in this activity." On page 2, she indicates,

23  "....I vaguely recall Marilyn Lee telling me about a meeting with management investigating the

24  petition. I do not recall when.... she was expressing how unhappy she was in her supervisory

25  position. She was telling me how she could not support the Inspector in Charge and we were

26  discussing how openly she had been crying among coworkers.

27

28

39. Therefore, I told her that if I was the Inspector in Charge, I would remove her as supervisor but that I would assign her as a Level 11 since she was not acting like a supervisor should...." See **EXHIBIT 24**.

40. Atkins began to ask me to take supervisory details "to increase my promotional opportunities."   The supervisory position and the secretary position were the same level and would not give me an increase in pay, although the secretary got paid for overtime and had no supervisory responsibilities. After several times of asking me, to appease him I finally and reluctantly agreed. He lulled me into believing the detail was both temporary and voluntary and at its end, I would return to my position as his secretary.  I felt like the INC (who controlled the entire Division) was asking me, and I had to agree or he could make it difficult for me.   Saying no to Atkins was not a realistic option, especially given the ongoing acts of retaliation and harassment against others that I had seen in the Division in the past. I had witnessed Atkins' attitude towards others who spoke up or disagreed with him (Inspectors Saluta, Abad, Hernandez, Herzog, and Beppu).   Approximately 3 months after being in the supervisory position, I was sent to supervisory training at the Career Development Division (CDD).

41. Completed Training Courses, Page 5 of 10, Inspector Donnelly, who was detailed at SF as an AIC, was also there receiving supervisory training.  I also saw Katz and Chief Heath walking together towards me at CDD, but I did not say hello as they seemed engrossed in conversation. See **Exhibit 25**.

42. Shortly after I took the detail, I became depressed and could not sleep, and realized I was not suited to the extreme stress of a supervisory job.  My detail was being extended without my agreement or ever being discussed.  I did not want to offend management but I did not like confrontation with employees and found it difficult to apply disciplinary actions.  Also, the responsibilities of their work quality and timeliness fell on me, something which I did not like to be accountable for or be blamed for.   In my 2004 merit evaluation, I wrote I would return to my position as secretary once the temporary detail was over. See **EXHIBIT 26**.

1    42. But Atkins refused to reinstate me as his secretary, claiming I was a "good

2    supervisor" and therefore had to remain in that job (see **EXHIBIT 27**). As time passed, the

3    stress of the supervisory job was so enormous on several occasions that I developed panic

4    attacks, insomnia, and crying spells. I told Castor, Diaz and Atkins I was in dismal condition

5    and asked that them to return to me to my old job or put me in another that was non-supervisory.

6    Instead, Castor offered information on vacancies outside the agency and told me to look for a

7    detail elsewhere.

8    43. Ms. Sheilah Castor, the Division Administrative Specialist, had served with Atkins

9    in the Seattle Division and was his right hand since his arrival in San Francisco late in 2003. She

10    socializes and is a personal friend of Atkins.   I received a phone call from Kiel after he retired

11    in June 2003. Kiel was looking for Castor. Because many people blamed me for his exit, I

12    thought that was strange he would call and speak to me and that he left Castor a voice mail

13    message. Kiel and I exchanged pleasantries - talked about family, etc. and then Kiel mentioned

14    that he would stop by to see me when he sees Castor. I remembered this remark as I thought it

15    was awfully strange after all that had happened, he would stop by in the very same building to

16    see me and run into the other employees who made complaints against him and his management.

17    Castor was sporadically in and out of the office due to her daughter's gastric bypass surgery.

18    Castor was expected in that day and I asked Kiel if he wanted me to leave a message for

19    Castor. Kiel said he would call Castor later. When I met with Castor, I told her that Kiel was

20    looking for her and I made the comment that "I was surprised to hear from him (Kiel) after I

21    signed the petition regarding Wanda." We then talked about Castor's daughter's health that day.

22    We continued to talk about her daughter's health issues thereafter. Castor was crying and very

23    concerned over her daughter's health and finally left to take care of her. Management approved

24    an employee from Los Angeles, Donna Forrest, to be detailed as the Admin Specialist in

25    Castor's absence. It suddenly dawned on me why Kiel called – Kiel testified for the agency on

26    Katie O'Leary's EEO case and Kiel was going to be in the building to see Castor. Katie

27    O'Leary had to file her EEO 45 days after the selection of Wanda Smith which was sometime in

28

11

early 2003.   The 991 applications for the ad hoc recruitment position in which Wanda Smith

was selected had to be provided to Kiel, Castor and Inspector in Charge Stinchfield for their

EEO testimony.  One of those 991 applications was mine.  Castor advised Atkins that she

testified in the EEO trial of Katie O'Leary based on Wanda Smith's selection and Atkins was

aware that I signed the petition.  In fact, O'Leary's EEO decision was final in 2005, the year that

I left the agency and Castor reported to Atkins.  The agency made detail accommodations to help

Castor but not for me when I asked to be removed as supervisor.  Kiel's call was made after his

retirement in June 2003 and when Donna Forrest may have started her Admin Specialist detail in

SF around August 2003 so that Castor can be with her daughter.     Katz reports to the Chief.

Katz was aware that Katie O'Leary filed an EEO re the selection of Wanda Smith based on

discrimination.  Katz advised Chief Heath since managers are advised of the status of EEO

complaints filed at their Division.   Management was aware of my complaint of discrimination

regarding the selection of Wanda Smith and that it had merit and that Judy McDermott

mentioned me in her EEO complaint(s).

44. The EEOC response of March 16, 2007, page 2, stated "...management further

testified that it denied complainant's requests to be reassigned out of that position because she

was doing an excellent job and there was no viable replacement.   The agency noted that

complainant performed better in this position than her predecessor.  The agency also noted that it

could not reduce the effectiveness and operational efficiency of the division just to cater to

complainant's preferences."

45. Documentation has proven that I was not the only competent supervisor and it was

not a mandatory or emergency situation.  In fact, when I left the office, the employee who was in

the secretarial position, Kaycee Graham, was assigned as a supervisor and received an award.

See **EXHIBITS 29-30**.

46. Kaycee Graham  is officially a supervisor and could easily replace me.  Barbara

Mendes was a supervisor and did replace me.  See **EXHIBITS 31-32**.

47. Then there was Anita Cabano who was the former supervisor before I was detailed to the Admin Center in which Atkins and Castor complained about as an incompetent supervisor. Atkins and Castor gave Anita Cabano a higher level detail working as a Forfeiture Specialist and she received an award for that job.   Katie O'Leary was detailed to the Post Office after she lost her job as a supervisor and filed her first EEO.  Barbara Mendes, Anita Cabano and Kaycee Graham all held the same level EAS-14 and title "Operations Coordinator."   Their positions were interchangeable just like the Level EAS-11's who are Operation Technicians because they all hold the same level and title.  See **EXHIBITS 29, 31 and  33,** Personnel Briefs of Graham, Mendes and Cabano..

48. Because the Secretary is a unique position and is a different title, if vacant, the secretary position should be posted.  See **EXHIBIT 34**.

49. There were other employees, as well as lower level employees who also were detailed to the Admin Center supervisory position.  See **EXHIBITS 35-38**.

50. Also as previously mentioned above, management allowed an employee from outside the SF division to be detailed to replace an absent employee.  Management saw how distraught I had become as a supervisor and did not care.  Atkins threatened me and my stress became worst. The stress was work related and DOL saw it fit to approve it.  See **EXHIBIT 39**.

51. See FOIA of Sally Diaz where claimant was under stress for over a year as a supervisor (see **Exhibit 24**).  Sally Diaz' EEO affidavit, Page 2, states "….we were discussing how openly she had been crying among coworkers….."  Written witness testimonies, and oral testimonies through discovery have proven that claimant was stressed as a supervisor.  Because I was not returned to my position as secretary and left in a supervisor position, I suffered stress which was approved by DOL, <u>due to retaliation of my signing a petition against management in 2003.</u>  See **EXHIBITS 40-42**.

52. I have obtained a copy of notes from an Admin Center Support Meeting held July 25, 2003 headed by Admin Specialist Sheilah Castor.   These notes were posted on the Division's computer system on their shared drive.  On Page 3 of these notes, it states, "Once the IA

13

1  positions take effect, there will be no more Admin Center to do the clerical functions.  The IA

2  position will take care of all the team's needs…"  Castor and management knew since 2003 that

3  there would not be a need for an admin center and therefore no need for an admin center

4  supervisor.   On Page 2, third paragraph, it states, "….It was asked when the new InC would be

5  reporting to the Division.  He has meetings to attend and should be in the beginning of

6  September.  Inspector Jim Donnelly and John Wisniewski's last day will be September 12."

7  Atkins EEO Affidavit,, Page 10, 4th paragraph, 9th line "…….However, after a Headquarters

8  Resource Deployment Review.." indicates that Atkins was given information on the support

9  staffing complement by Headquarters management.  See **EXHIBIT 43**.

10       53.  Atkins would not release me from the supervisory position even though I was told it

11  was obvious to everyone I was emotionally distraught. My staff and others witnessed my

12  repeated panic attacks.  No one intervened or reported my condition, fearing retaliation. Atkins,

13  Castor and Diaz told me I had to remain in the detail because I was needed as the Administrative

14  Center supervisor, yet they made the following comments to me:

15  "It doesn't matter if you aren't happy, as long as everyone else is happy."

16  "Look for another job."

17  "Look for another detail."

18  "Fake it until you get out of the position."

19  "Smile"

20  "Stop crying."

21  "If people ask you what's wrong, tell them you're okay."

22  "Take a walk around the block."

23  "If you complain about being a supervisor to anyone, disciplinary action for insubordination will

24  be taken against you."

25  "File an EEO."

26

27

28

14

1    Any manager who wants to keep a supervisor who is doing a 'good job' will not tell them

2    to "find another job," "get another detail," "fake it until you get out of the position," or threaten

3    them with disciplinary action if they complain.

4    54. In 2005, when Castor told me to "find a detail," I burst into tears. I was already on a

5    supervisory detail. Castor **never** told me detail work hours had to be paid by the unit to which I

6    would be detailed. I managed to find one with the Office of the Postal Inspector General (OIG)

7    and InC Atkins and the OIG granted it. See **EXHIBITS 44-45**.

8    55. Inspector in Charge Ray Hang called me directly during April 2005 as he was

9    looking for Atkins. Hang was surprised that I was no longer the secretary and asked how I liked

10    being the supervisor. I told Hang I didn't like being a supervisor and Ray said that he will speak

11    to Bill about it. I told him not to because I was afraid of any retaliation. Ray was at an Inspector

12    in Charge Meeting and spoke to Atkins about it anyway. Whatever conversations Hang and

13    Atkins had, Hang called Ombudsman Toogood who replaced Birch. I was surprised Inspector

14    Toogood called me. Toogood said he had heard the supervisory job had caused me to be

15    depressed from another manager outside the San Francisco Division. I felt uncomfortable, did

16    not trust him, and I said I never called him. Toogood said from the beginning that he would treat

17    our conversation "as though it never happened" and kept repeating it throughout the

18    conversation. I told him I was happy to be detailed to the OIG and did not trust him. Although

19    all conversations with agency ombudsmen are to be confidential, at the end of our conversation,

20    Toogood lied to me. Before he hung up, he reiterated that this conversation was between him

21    and me, followed with the comment that he was going to tell the Chief (Heath) about our

22    conversation and hung up. I was left speechless but knew Toogood was lying. The next day, my

23    OIG detail was cancelled.

24    56. On Friday, April 22, 2005, Sheilah Castor called me up and told me I could not go on

25    the detail because the IG refused to pay for it and that I needed to speak to Atkins. I called

26    Inspector Toogood on Friday, April 22, 2005 and asked him why I couldn't go on the detail. He

27    said I had to speak to Bill Atkins. In Toogood's EEO Affidavit, Question 3, Toogood was asked,

28

1   "Are you aware of the complainant's race and/or sex?  If so, how did you become aware and

2   when?"  Toogood response is found on Affidavit F, Page 3 - "I am aware the complainant's sex

3   but not race.  I became aware of the complainant's sex during a telephone conversation in

4   June/July 2005."   This response indicates that I first spoke to him in June or July 2005 and not

5   in April after I found out that my OIG detail was cancelled. I then asked Kaycee Graham to set

6   up a meeting with Atkins and me.

7          57.  On April 25, 2005, Ms. Graham arranged for me to meet with Atkins that day.  After

8   I met with Atkins to discuss my 2004 yearend evaluation in October/November, I met with him

9   once more thereafter in 2004 to discuss Wanda Smith's request for early reporting times at 6

10  a.m.  I did not speak with Atkins again until April 25, 2005.  On that day, April 25, 2005,

11  Acting InC Secretary Kaycee Graham stayed in the room. Ms. Graham testified that Atkins

12  requested her to sit in during our meeting.  During the meeting Atkins told me neither the OIG

13  nor the Inspection Service would pay for my detail to the OIG. I said I had asked for the detail

14  because Castor instructed me to do so.  Ms. Graham interjected Castor had done that because I

15  was complaining so much. Ms. Graham's comment made it clear Castor had spoken to her about

16  my situation, something Castor should not have done given Ms. Graham was now in my job.  I

17  felt that Atkins no longer trusted me as he had to have Ms. Graham in the same room with me.  I

18  thought Atkins and I could talk and clear the air amongst ourselves.  With Ms Graham present, I

19  could not speak as freely.  Though I had no ill feelings toward her, I was uncomfortable with her

20  there--she and I were the same pay level, and on a personal basis, I did not trust her. In his EEO

21  affidavit and deposition, InC Atkins claims I was jealous of Ms. Graham.  I was not. My issue

22  was that he should have had an unbiased, higher level manager in our meeting rather than Ms.

23  Graham who had a vested interest in supporting his decision to leave me in the supervisory

24  position. I was not asked if I could have anyone present in the room with me.  Castor testified

25  that she talked with Teresita Venegas who indicated I no longer felt important or valued as a

26  secretary because Kaycee Graham was doing a good job as secretary.   Venegas is a personal

27  friend of Castor whose personal opinions regarding me should have not influenced Castor.

28
                                           16

1   Castor then relayed Venegas' opinions of "jealousy" to Atkins.

2       58.  Atkins then accused me of speaking to an INC and speaking ill of him (I knew he

3   was talking about my conversation with Ray Hang).  Atkins indicated he cannot have anyone

4   working with management who would go against him.  I felt he was alluding again to what

5   happened with the petition.  I had not done anything to be disloyal to him and that I only told the

6   other INC that I was unhappy about the stress as a supervisor and that I did not say anything bad

7   about Atkins.   I did not name that InC as Kaycee was in the room.

8       59.   Atkins told me that he could not have me crying all the time about my assignment as

9   a supervisor.  He said he needed me to do the job as a supervisor and not to take it personally.

10  Atkins, told me that we all have personal problems.  He said he was going through a divorce and

11  he doesn't cry about it.   He also said that he was going to take disciplinary action against me for

12  insubordination if I continued the type of behavior I had been exhibiting.  Atkins told me not to

13  say anything more about my unhappiness as a supervisor to anyone.  Atkins told me to smile

14  more. He said if I was feeling unhappy I should walk around the block.  I could not believe what

15  I heard.  But he had threatened me with disciplinary action and that was now hanging over my

16  head.  His comments to me, in front of Graham, and his threat of disciplinary action just added to

17  my stress.  Shortly thereafter, I told Ellena Bailey about the meeting and she advised me that the

18  next time I meet with Atkins, to bring a witness along.

19      60.   That day, April 25, 2005, I sent Ray Hang an email thanking him for his concern but

20  "I got hell from Atkins" and I was still in the same situation.  Hang called me and said that he

21  told Bill Atkins that I liked him and was only trying to help me.  Hang said that he forwarded my

22  email that I sent to him to Ombudsman Toogood.

23      61.   On Wednesday, April 27, 2005, EAS-11 support personnel and their supervisors

24  attended lunch for Admin Support Day.   Andrew Clemmons, Deputy Chief Inspector, who was

25  Atkins' boss, also attended the luncheon with InC Atkins.  Some OIG people were also at the

26  same restaurant and approached Atkins at the end of the luncheon.  Henry Kimble told me that

27  several OIG people went to Atkins and asked about my "detail" to the IG.  The OIG people

28

1    didn't know that my OIG detail was cancelled and thus created more embarrassment for Atkins.

2    Deputy Chief Inspector Andrew Clemmons reports to Chief Heath directly.

3        62. Had Castor told me in the first place my unit (the Inspection Service) must pay for

4    my work hours, I would have saved the OIG, the agency, and myself embarrassment. Later, in

5    filing my EEO, I learned that my unit had been paying for support person Katie O'Leary's detail

6    to the post office for a number of years. It appears the "unit pay for work hours 'regulation' is

7    flexible enough to accommodate those management wishes to accommodate. I requested an

8    FOIA for the details of SF support employees. The FOIA response from the agency was

9    erroneous and I did not believe the information to be truthful. I called Katie O'Leary who

10   provided me documentation and the truth that she was detailed to the US Postal Service for

11   nearly 4 years at a higher level and that the San Francisco Inspection Service unit had been

12   paying her salary. See **EXHIBITS 46-47**.

13       63. The attitude of the Inspection Service towards the OIG has been one of non-

14   cooperation. [See **Exhibit 28**]   Chief Heath and InC Atkins in general meetings with staff have

15   been vocal in their criticism of the OIG (see **EXHIBITS 48-51**) and have discouraged

16   cooperation with that office, even though we were all given mandatory instructions to view a

17   video from U. S. Postmaster General Potter to build positive relations with the OIG. See

18   **EXHIBIT 52**.

19       64. This attitude has have been documented in team notes and meetings. The

20   cancellation of my detail not only reflected the Inspection Service's attitude but also was

21   punitive in nature. Inspector Toogood informed the Chief and Chief Heath knew about my

22   protected status. On January 12, 2007, an email was forwarded to me containing a message

23   from the new Chief Inspector Alexander Lazaroff. Postal Inspector Chief Lazaroff indicated in

24   his message that he was going to end the OIG rift with the Inspection Service. See **EXHIBIT 53**.

25       65. Shortly after my April meeting with Atkins, Kaycee Graham came to me with two

26   assignments. Those assignments were from Atkins and she asked me to look them over. One

27   assignment was a Diversity assignment/training and another was a six month assignment/detail

28

1    to work with Inspector Ken Jones on the East Coast.    Inspector Ken Jones is/was the Deputy

2    Chief Inspector and use to be the Inspector in Charge of the Philadelphia Division.  Inspector

3    Wisniewski came from the Philadelphia Division either worked with or reported to him. See

4    **EXHIBITS 54-55.**

5         66.  Graham told me to let her know the next day which assignment I wanted as she

6    would inform Ellena Bailey that the Diversity assignment would be available.  Ellena Bailey had

7    worked on diversity projects in the past.    The diversity assignment was only one week.

8    Although I would have like to take on the six month assignment away from the office as a

9    diversion from the stress of a supervisor, I felt I was not healthy enough to be away from a

10   supportive family for that long.    So I chose the diversity assignment and notified Kaycee

11   Graham of my decision.  I attended the Diversity training and completed the assignment.

12   Before I left for the Diversity assignment, I told Ellena Bailey about the details that Atkins

13   offered me and that I decided upon the Diversity assignment.  Ellena was disappointed with that

14   news as she had served as Diversity Coordinator for the Division and was looking forward in

15   continuing that role.  See **EXHIBIT 56**.

16        67.  I was told that management found me to be indispensable to the Admin Center, yet

17   offering me a six month assignment, a detail to the OIG, assisting on a national audit, and

18   sending me for Investigative Analyst, Supervisory, and ISIIS training are contradictory.

19        68.  On Wednesday, May 4, 2005, I had to give an  ISCOM to Sally Diaz, who was

20   Acting AIC for Bethel.   She asked me how I was.  Sally  exhibited real concern and I broke

21   down and told her.  After all she was acting AIC and I felt I  could trust her.   I told her how hurt

22   I felt when I went into the room to talk to Atkins and Kaycee  was there.  I also told her that I

23   took the detail only to get supervisory skills and to be competitive  for upward mobility.  She

24   said she would speak to Atkins.  Approximately Monday, May 9, 2005, Diaz said that she

25   spoke to Atkins.  She did not say what they discussed.  Diaz said she  would help me get a detail.

26   I asked her if Atkins was angry when she talked to him about me.  She said she was unaware of

27   him being angry.  I asked Diaz this because Atkins had previously  told me not to talk to anyone

28

1   about me not wanting to be a supervisor.  I then asked Diaz if Atkins asked her if I was the one

2   that brought up the subject to Diaz.    Diaz said that Atkins did  ask her who brought the subject

3   up, but Diaz told me that she explained to Atkins that she (Diaz) was the one who brought up the

4   subject.    I was afraid that Atkins would even be  angrier with me for speaking to Diaz.  That

5   same day Diaz called me up and said, "Sorry, I can't get you a detail.  She didn't say why.  I told

6   Diaz that I felt like I just needed to find a job outside the Inspection Service because of all the

7   stress.  Everyone at DHQ by this time knew I was stressed, and kept commenting on my

8   appearance and how I was acting.

9        69.   In one of my meetings with Castor, I discussed with Castor that I noticed that I was

10  never given a detail to her position during the time I was a supervisor and I told her management

11  may think I might not be a good choice.   However, other than supervising, I felt that I was

12  capable to do the tasks of the Admin Specialist with regards to finances, vehicles, phones, etc.  I

13  also told her that if I was not selected for a detail to her position, why wasn't Ms. Barbara

14  Mendes (who was also a supervisor) not afforded the same opportunity? (See **EXHIBIT 57**).

15  Castor said nothing.  I also told Castor that my supervisory detail was a sham.  Castor allowed

16  Kaycee Graham to replace her as Admin Specialist during her details, but Castor never allowed

17  me to return as secretary to replace Kaycee Graham.

18  I  remembered at another meeting with Castor wherein I made a request to be removed as a

19  supervisor and again in tears.  Again she told me she could not release me.  I then requested to

20  take 3 months of leave.  I have never taken more than 2 weeks off consecutively and was one of

21  the few employees with excellent attendance and plenty of unused sick and vacation leave.

22  Castor didn't even ask why I would take 3 months of leave and just said that she would only

23  grant me one month.  There were others who could have replaced me.  Yet Atkins approved my

24  OIG detail for 3 months and I could not take 3 months of annual leave for my health.

25       70.   Approximately June 8, 2005, Sheilah Castor gave me my midyear evaluation over

26  the phone.  When Castor gave me the evaluation, I again broke down crying.  She indicated that I

27  was rude to management and that I "badmouthed" to another manager about Atkins.  The only

28

1  remark I made was to a manager outside the Division that I was depressed as a supervisor. That

2  was the worst merit evaluation I have ever received in my 25 year career. I suspect that my 2005

3  midyear evaluation is less than outstanding. The agency has not provided me a copy of my 2005

4  mid-year evaluation and rating which I requested under discovery. I was upset that after 25

5  years, someone would say such bad things about me in my evaluation. That had never happened

6  before. I told Castor I needed to speak to her in person about my midyear evaluation and the

7  hostile work environment. I told her I needed to leave the Inspection Service. She told me I had

8  to, "Fake it and smile until I got out of the situation." She knew I was looking for another job

9  since I told her I had to get out of the position I was in as the supervisor.

10     71. On June 21, 2005, Sheilah Castor and I met to discuss my merit and the hostile work

11  environment I told Castor that it was a hostile work environment. She said that was my

12  perception. I got upset and told her, "No, Sheilah this is a hostile work environment. I am in a

13  hostile work environment." I explained to her about my meeting with Atkins and Kaycee, and

14  how Kaycee stayed in the room and Atkins' attitude and anger toward me. I told Castor that I

15  lost respect for Atkins. I told her I had not been rude and had not badmouthed anyone. I told her

16  Atkins got angry when he found out I spoke to Diaz. I told Sheilah that if I cannot even go to a

17  manager to make a complaint who can I go to? I told her that I didn't want to be a supervisor,

18  and that I couldn't take it anymore and that I had to get out of the position. Castor said that I

19  was a natural supervisor and everyone was happy with me. She said the Admin Center is

20  productive and employees are happy. Castor also told me that I have acquired skills beyond that

21  of a Secretary and "I could not return to that position" (meaning the secretary position). Castor

22  said there were no other positions available for me (I said to myself they can put me back in the

23  INC Secretary position). Castor's comments made it clear to me that they were not going to

24  returning me to the INC Secretary position. This was the first time anyone came out and directly

25  told me that I would not be going back to that position. I was never told by anyone that I was

26  not functioning adequately as the INC Secretary. This reinforced my suspicions that I would

27  have to leave the Inspection Service to get out of the supervisor job. Additionally, the fact that I

28

21

1    just received the worst merit of my career disturbed me, knowing it could affect my chances of

2    getting a job elsewhere.  I told Castor I would continue to apply for outside jobs.  I could not say

3    anything more about it, no one was listening and no one cared how I was being affected by the

4    job.  I felt totally frustrated and desperate to get out of the supervisor job.  I did not know how

5    much longer I could function in that position.  Management was not addressing my concerns that

6    the supervisor position was causing me physical and mental stress.  I could not file an EEO due

7    to known acts of retaliation against many who have filed EEOs in this Division and who have

8    had their careers destroyed.  There was nothing I could do. I told Castor that , "It was a hostile

9    work environment and I have to get out of here, I can't take it any more." I had to get out of the

10   Inspection Service.  She did nothing.

11           72.  After my meeting with Castor, I had lunch with Al Abad.  He had just retired as a

12   Postal Inspector.  He commented he knew I was depressed as a supervisor and I told him that I

13   just had a conversation with Castor telling her that I was in a hostile environment because I

14   could not return as a secretary.  He advised me that by telling any manager that I was in a hostile

15   environment that management had been warned of my situation.

16   Sometime in early July, Acting AIC Sally Diaz, asked me what I was telling people when they

17   came up to me seeing how stressed I was and asking me how I was doing.  I told Diaz that I was

18   telling them that I was Ok.  She said, "It's good that you are saying you are ok and that you are

19   not telling people you are unhappy."   I told her I haven't said anything to anybody since I spoke

20   to Atkins.   I told her that when someone asks how I am doing, I just respond, "OK", because I

21   know I will get in trouble and Atkins may discipline me.  Diaz said people were commenting to

22   her how stressed I looked.  How can a manger tell me what I have to say?  It is outrageous for

23   them to dictate to me what I say, and to tell me to put a "smile on my face," when I am stressed.

24   That is not addressing the problem.  Diaz told me she received comments from many people

25   indicating how "stressed" I looked.  Inspector/Attorney Lawee had come to her complaining

26   about my stressed looks.  She said that if she was the INC she would remove me from the

27   supervisor job.  I told her I was working on some job applications to get out of this stressed

28

1   environment.  Sally asked me other than the prestige of being the INC's secretary, what is the
2   difference between that and the Admin Supervisor position.  I told her it was the supervisory
3   responsibilities and I told her that I found it stressful to get others to do the job when I can do it
4   myself and dealing with the other issues as a supervisor.  I told her again I don't want to be a
5   supervisor.  Diaz asked me what other positions I could do.  I told her that I could be detailed as
6   an Investigative Analyst (IA), Victim Witness Coordinator or any non-supervisory position.
7   Diaz said if she was InC she would have assigned me to the Internal Crimes (IC) desk.  I told
8   her I was willing to take the IC desk and the External Crimes (EC) desk or any lower level
9   position to get out of the stressful supervisor job.  She hesitated and said she understood.  I also
10   told Diaz that a management communication just came out and that the Inspection Service is
11   looking into upgrading their executive secretary positions (INC Secretary) from a level 14 to a
12   Level 16 (see **EXHIBIT 58**).  I told her that since the INC Secretary is my job, and it is a bid
13   position, that I should be getting that level pay if the position upgrade is approved.  I also told
14   Diaz that if the InC Secretary job was upgraded, I did not need to go on a detail or look for a
15   promotion because my bid job would then be a higher level.  Diaz said if the secretary job was
16   posted, Atkins would do the right thing.  I don't know what she meant by that comment, but the
17   manner and tone that she said it made me feel that if the secretary position was posted, Atkins
18   would not select me.

19         73.  It was clear to me I was incredibly stressed.  I could not continue as a supervisor.  I
20   knew my health was deteriorating as I started to suffer panic attacks and my crying spells got
21   worst and my depression was affecting my relationship with my family.  I was crying at the drop
22   of a hat, I could not sleep and I was constantly worried and upset. I felt like I needed to seek
23   medical attention.  On July 12, 2005, I called a doctor and made an appointment to talk to them
24   about my mental and physical condition.  My appointment was scheduled for July 15, 2005, with
25   Dr. Ann Porzig, UCSF Medical Center, San Francisco. See **EXHIBIT 59**.

26         74.  On July 12th or July 13th , 2005, Diaz came to talk to  me and asked me how I was
27   doing. I ask her if she was really concerned about my health.  Diaz  apologized that she couldn't

28
                                                        23

1  help me when she spoke to me last, but said she had good intentions. I told her now I couldn't

2  trust her and I started to cry. Diaz told me that Atkins told her that he was happy with the job I

3  was doing as the Supervisor of the Admin Center. I told Diaz that I had repeatedly told Atkins

4  and Castor that I don't want to be a supervisor, that I am stressed, and yet nothing is being done.

5  Management is well aware of the toll the job has had on me. Sally acknowledged the fact that

6  management is not addressing my situation. I told Diaz that I could not sleep at nights and that I

7  end up crying telling my husband how upset I was because of the job. I told her my husband

8  asked me what I had done to deserve this. I asked Diaz what I did wrong to deserve this. She

9  said that I did not do anything wrong. Diaz said, "As a supervisor, I am not suppose to tell you

10  this, but if I were you I would file an EEO." She said that my health is taking a toll. She could

11  see for herself that I needed to file an EEO due to the harassment and hostile work environment

12  and management's failure to intervene. I told her that I have done everything to advise

13  management about my job stress and nothing is being done. She acknowledged that. I did not

14  want to file an EEO due to what I had seen happen to others. I said to her words to the effect,

15  "Literally, what do I have to do, do I have to hurt myself to make it clear that I have to be

16  removed from the supervisory position?" Diaz said to me, "You wouldn't that." I told Diaz that

17  I knew I was stressed, that I recognized the signs, and that I needed to see a doctor. I told Diaz I

18  was going to the doctor that Friday, July 15, 2005. I told her I and hoped to get a medical release

19  from the supervisory position because of the physical and emotional problems I was

20  suffering. Diaz said a medical note would not release me as a supervisor and told me to file an

21  EEO. I felt if I brought a medical note and gave it to Atkins, he would remove me from the

22  supervisory position and **I would not have filed a stress claim or an EEO**.

23       75. I know that management could have accommodated me to a position that was less

24  stressful for me. Management can make accommodations, create positions, put employees in

25  lower level jobs, but they refused to intervene on my behalf, due to retaliation against me.

26  Additionally, management could have brought Katie O'Leary back to the USPIS Admin Center,

27  and placed me in O'Leary's position. Management could have, and should have accommodated

28

24

1    me when I asked to be removed as a supervisor, especially given my stress level.  In August

2    2005 Wanda Smith was detailed to work on a special project for recruitment by Sally Diaz.

3    When Castor cried and had concerns over her daughter's health in 2003, management allowed an

4    employee outside the SF Division, Donna Forrest from the Los Angeles Division, to be detailed

5    to her position.  See **EXHIBITS 60-64** listing other details.

6         76.  On Thursday, July 14, 2005, Diaz came to me and said that she was bothered by the

7    comment I made about me hurting myself.  I realized then that what I said to Sally could mean

8    that I was "unstable".  When I made the comment I was frustrated and overwhelmed because

9    management continued to ignore my pleas to be removed from the supervisor position, even

10   though they witnessed for themselves the physical and emotional affect it was having on me.

11   They did not care what was happening to me.  It was wrong that my repeated pleas to managers

12   at every level, Castor, Diaz and Atkins, were ignored. I had done nothing wrong to deserve this. I

13   had been a good employee for 25 years.  I again told Diaz that I was going to see the doctor on

14   Friday.  Diaz promised me that she would not say anything if I went to the doctor.  I told her

15   that I was going and told her she could come along.  Diaz made me promise that I would go to

16   the doctor and call her after the doctor's appointment.  She said she would not say anything to

17   anyone about the comment I made about hurting myself.

18        77.  On July 15, 2005, I went to Dr. Porzig, UCSF, and told her that I was stressed as a

19   supervisor and I broke down crying.  She asked me questions about my work situation and how I

20   was affected.  She explained that I had the symptoms of stress and depression.  I did not tell her

21   about the comment I made to Diaz about hurting myself, because I was embarrassed and I only

22   made the comment because I was so overwhelmed.  Dr. Porzig said that she would write a letter

23   asking management to remove me from supervisor duties.  She gave me medication for my

24   depression.  I have never had to take this type of medication in the past.  I was scheduled to be

25   out of town beginning the following Wednesday, for a two week period.  She provided me a

26   phone number to help me find a psychologist.  Either they did not return my calls, or the ones

27

28
                                          25

1  that did return my call do not handle work-related stress.   The agency has been provided access

2  to my health records.

3       78.  On Saturday, July 16, 2005, I had an uneasy feeling that Diaz told Atkins about my

4  comment about hurting myself.  I called Diaz that day and she admitted that she told Atkins what

5  I said about hurting myself.  I hung up on Diaz because I was upset that she did not keep her

6  word.  A short while later, Diaz came to my house to see if I was ok.  Diaz told me she had an

7  obligation, as a manager, to report my comment to Atkins.  I told her fine, that I would tell

8  management that she was the one that said my health was taking a toll and that I needed to file

9  an EEO.  She told me to do what I had to do.  She said that she and Atkins would meet with me

10  the following Monday.

11       79.  On Monday, July 18, 2005, I walked into the office at 7:30 a.m., and tried to sign on

12  to my work computer.  I found that I was locked out of my work computer (my computer had all

13  the dates of incidents regarding what had been happening relative to my job situation).  Several

14  people knew that I was locked out, including Agnes Montano and Linda Ng.  It was

15  embarrassing and humiliating.  Castor came and told me that she and AIC Bethel needed to talk

16  to me.  Atkins and Diaz did not show up at this meeting.  I remembered Ellena Bailey's advice to

17  get a witness.  As I went to speak to Bethel and Castor, I asked Inspector Ben Derderian to come

18  to the meeting as my witness.  See **EXHIBIT 65**.

19       80.  In the meeting Bethel said I was being placed on admin leave due to "recent events."

20  He never mentioned my comment that I made to Diaz about hurting myself.   In fact the letter he

21  provided me placing me on admin leave stated I was being placed on admin leave, "While the

22  Inspection Service reviews the circumstances surrounding your alleged stressful work

23  environment."  I was placed on administrative leave effective 7/18/2005.  See  **EXHIBIT 66**.

24       81.  I asked him how long I was being placed on admin leave and he said indefinitely.

25  He read a letter addressed to me which stated I was to call Castor every day from 8-9 a.m., and to

26  be available from 8 to 4 p.m. every day.  Bethel said that the Inspection Service is paying me

27  admin time and I should be made available for those hours in case the IS needs me and I was not

28

to go "shopping,"and if I had to I had to do it on my own time.  I commented to Bethel that I would be a prisoner at my home and could not leave.  He said those are the conditions.  Bethel then said that I would also have to take a Fitness for Duty (FFD) medical exam.  When I asked Bethel why it was necessary to send me for a FFD medical exam Castor responded that they needed to ensure that I was ready to come back to the job. Castor said, "Remember Marilyn that you said: I have to get out of here, I can't take it any more. I did not respond to her. (I made this comment to Castor over one month prior, why wasn't it addressed then if it now was so important)? During this meeting, no one mentioned anything about me having to go to a FFD exam due to the comment I made to Diaz about hurting myself, nor was the comment I made to Diaz mentioned in the letter provided to me.  See **EXHIBIT 67**.

    82.  I asked Bethel if I returned to work, would I be returning to the same supervisor position.   Bethel said that would be Atkins's decision.  I was given the letter and Castor gave me EAP information.   I had to turn in my work keys, employee badge and government credit card. It was humiliating and degrading.  I picked up my personal items from my work area.  Bethel gave me a ride to my husband's workplace.  Later, when I got home I re-read the letter I was given.  In the letter they addressed my title as "Operations Coordinator," not as Secretary and not <u>Acting</u> Operations Coordinator.  I felt like they had stripped me of my Secretary title and position, and it made me feel helpless and vulnerable regarding where I stood with my job.

    83.   Sending me for a Fitness for Duty medical exam was not about the comment I made, but a convenient opportunity to get rid of me from the workplace due to the petition I signed.  I feel I am being harassed and retaliated against and it is a hostile work environment.  Diaz knew I would not hurt myself, and if she thought I would hurt myself, she waited over six days to address it.

    84.  After several calls to Diaz, Diaz finally admitted she had told InC Atkins that I might hurt myself. I was angry with Diaz as management was not concerned about my health the entire time as a supervisor but only when I was so frustrated and made that comment and then suddenly Inspector Diaz came to see me. Bethel did not even mention the comment I made about hurting

myself when he placed me on admin leave on 7/18/05, nor is the comment mentioned in the letter placing me on admin leave. Additionally, Bethel made the comment that I was being placed on admin leave due to "**recent events**," and the letter I was provided states on was being placed on admin leave until the, "**Inspection Service reviews the circumstances surrounding your alleged stressful work environment.**" Neither Bethel nor Castor mentioned my comment about hurting myself in this meeting. <u>If Atkins was genuinely concerned, he would have taken steps to alleviate the basis for my stress.</u> Since I was his personal secretary, he could have shown his concern for me by a phone call or could have spoken to me before and/or after the incident. He didn't; instead he took great pains to avoid me. Not only did management ignore the warning signs, they did not instruct me or demand for me to go to Employee Assistance Program (EAP) at any time before this meeting. I took a detail to the (Fraudulent Workers Compensation) FWC team in early 2004 to learn the operations of the FWC technician in order to be more competitive when the Investigative Analyst positions (EAS Level 15) were posted. The detail lasted about six weeks and then I returned to my position as the INC Secretary. These details were given to support personnel interested in the upcoming Investigative Analyst (IA) positions that were going to be posted. I was not the only employee given details for IA training. While learning the FWC desk, I learned then that EAP records were not kept confidential as Inspectors had access to them and therefore did not want to file with EAP.

85. The letter putting me on administrative leave does not mention my comment about me hurting myself but after I filed the stress claim, the agency required that I submit to a Fitness for Duty examination. Management believed I had a mental impairment and sent me for duty for fitness examination. If they were so concerned about my wellbeing, the agency should have had me examined immediately, <u>not nearly a month later.</u> As secretary, I had access to a list of doctors who can perform a Fitness for Duty examination immediately and the agency's excuse for finding a convenient doctor schedule is inexcusable. Dr. Shaw, a postal physician, was available on site at the Evans facility located nearby.

86.  A copy of the letter placing me on administrative leave was not in my personnel file which was produced to me in discovery in this matter, nor was the letter regarding my required fitness for duty.

87.  The Administrative Leave letter was written on Friday, July 15, 2005, the date I went to the doctor and before I came back to work the following Monday.   Any manager could have told me what had been decided and not to come to work--that I was being placed on Administrative Leave--and the entire matter could have been handled quietly and less stressfully. Clearly, management wanted to "stage" the disciplinary action in front of my coworkers for maximum effect on them and me.

88.  The Administrative Leave letter also addressed my title as Inspection Service Operations Coordinator (aka Supervisor) and not as "Secretary" or "Detailed ISOC" or "Detailed Supervisor," each of which would have been appropriate. They also labeled me as a supervisor in all of the directories, though my official title was still secretary.

89.  I was scheduled to participate on a national audit of confidential funds headed up by HQ management in the latter half of July 2005.   I was working on preparation of that national audit while I was detailed as the Admin Center Supervisor.  I would have been absent from the office approximately a week or two.   Because I was placed on Admin Leave, I could not go on the national audit scheduled that week but completed the preparation for the audit.   I then arranged for the documentation to be forwarded to the audit team to continue.

90.  Throughout my EEO, Atkins and Castor alleged they did not receive any "accommodation requests" from me. I went to them repeatedly in tears requesting them to remove me as a supervisor.   In my 2004 evaluation, I indicated I expected to be returned as secretary.   In Atkins written 2004 evaluation of me, he indicated he kept me as a supervisor at his request.  I told Diaz on many occasions what management could do to "accommodate" me but nothing was done.  Previous organization charts and the current complement report (see **EXHIBIT 68**), support my claim accommodations could have been made (see national communication of Accommodation. See **EXHIBIT 69**.   The timing of this information was

1  relayed nationally only after I filed my stress and EEO complaints.   Witnesses saw me in

2  distress and no one (including managers) intervened on my behalf. Looking back on the

3  situation, I felt as though I was asking for mercy each time I asked to be removed from the

4  supervisory position and the managers had no compassion or remorse for my requests.  Their

5  intentions were malicious, calculating, with reckless indifference.

6      91.  My former attorney, Fasano, sent a survey (see **EXHIBIT 70),** on my behalf to the

7  Admin Center employees to support my stress claim as requested by DOL.   Many of my

8  coworkers did not complete the survey; they were intimidated and feared retaliation because they

9  were told by Supervisor Barbara Mendes that they would be subpoenaed, according to what I

10  was told by my other co-workers.   They witnessed what management did to me and feared for

11  themselves.   Lawee's letter objects to the question asked of support people "Do you fear

12  retaliation from management for answering the survey?" One employee responded affirmatively

13  and returned the survey.   As info, that employee was one of the few employees who did not

14  receive a $250 merit bonus and did not stay employed with the Inspection Service.  She was

15  ostracized from the rest of the Inspection Service employees.  When the reduction in force (RIF)

16  was applied to the Inspection Service support employees, she was forced to accept retirement.

17  Her knowledge of my case prevented her from filing an EEO for further fear of retaliation and

18  could jeopardize her getting another job.  She told me that after accepting retirement, she

19  reapplied for a post office position and was told she and others who were RIF'd cannot reapply

20  for USPS positions.  So she reluctantly and ultimately chose retirement.

21      92.  Because of the admin letter placing me on leave and fitness for duty letter, I was very

22  disappointed that management vehemently opposed my stress claim after all that I suffered with

23  plenty of witnesses.  My stress claim was approved January 30, 2006 with a date of injury to be

24  July 15, 2005.

25      93.  I was not given "preferential treatment" when sent  to St. Louis for Investigative

26  Analyst training. Other employees received the same training, just  not in St. Louis. The entire

27  training cost was approximately $10,000 and the St. Louis Division  had already paid for their

28

1  training spots but had one vacancy.  I had told Atkins I was interested,  so he chose to send

2  me. This was not 'preferential treatment.'  As one of the Division credit cardholders of record, I

3  paid Division fees for employee training so I am aware of who received it (I also logged the

4  training in their personnel training briefs).  My Citibank credit card records and employee

5  training briefs show others attended similar Investigative Analyst training sessions. It is true I

6  have taken on special projects and I have been commended for the job I've done in each project.

7  I was experienced in these were assignments and they were undertaken at my request.  I

8  participated in national audits of NCIC/CLETS, case management, confidential funds,

9  confidential informants and work hours.  There were individuals who were experienced

10  supervisors and could have easily stepped in to do the job – Barbara Mendes, Kaycee Graham,

11  Anita Cabano and Katie O'Leary.  In the absence of a supervisor, the Admin support personnel

12  also experienced supervisory details – Linda Ng, Sandy Schoonmaker, Nila Dancoff, and Judith

13  Smith.  Also, Donna Forrest, a Los Angeles Inspection Service employee, was detailed to

14  Castor's position in her absence.   Management could have done the same for me.

15      94.  I held a position as an Automated Information Data Specialist for many years,

16  retrieving NLETS, CLETS and NCIC (criminal information). I passed on the knowledge I had

17  on these subjects to my subordinates. I was comfortable teaching these subjects, because the task

18  wasn't accompanied by the stress of supervising.  I did not have to deal with attendance,

19  confrontation, disciplinary problems and poor performance.

20      95.  There were others, including Administrative Specialist Sheilah Castor, given details

21  by InC Atkins, but they were returned to their original positions when their details were over.  In

22  her EEO affidavit, Castor admitted there was never any intention of bringing me back to my

23  secretarial position following my supervisory detail.  Had I known that once I left my secretarial

24  job I could not return to it, I would not have taken the supervisory detail. I did not seek it and

25  took it only because I was pressured by Atkins to do so.  Castor never informed me that my

26  detailed work hours had to be paid by the other unit before my  search for a detail, only after the

27  OIG detail was approved.

28

96. If management had wished to correct the hostile work environment, they had within their power to do so every step of the way. No harm would have come to the Service or to me if they had returned me to my secretarial position or put me in another non-supervisory position. No harm would have come to the Inspection Service had someone else supervised the Administrative Center – they've had to do that anyway now that I am gone.

97. My FOIAs (see **EXHIBIT 71**), and EEO had to go through the Legal Dept. of the USPIS. Inspector/Attorney Lawrence Katz apprised Chief Heath of the situation. Katz reports directly to the Chief. Atkins testified that he was informed of my OIG detail and of my stress claim as well as the EEOs filed by me, Judy McDermott and Katie O'Leary. Our EEOs were in relation to the petition. Although O'Leary signed the same 2003 petition, her EEO re discrimination of Wanda Smith being selected proves that my discrimination complaint had merit and was valid.

98. Nearly every month, Atkins attends leadership meetings in which Wisnewski, Katz, Heath, and Donnelly attend. These leadership meetings can last a week and they socialize after hours. Atkins alleges he knew nothing of my protective activity as he knew that I signed the petition. If he knew I signed the petition, it is retaliatory of him to remove me from my secretary position. Wisnewski and Katz attended the meeting in which I was promised no reassignment, no demotion, no transfer and no retaliation. As the interim InC for the San Francisco Division, Inspectors Heath, Katz, and Wisniewski had the responsibility of protecting me and should have spoken to Atkins about my protective status. If they claim they did not, then they failed to protect me and thus I suffered retaliation. Also when I heard from Inspector Toogood about my OIG detail, he said he would tell the chief. Since Chief Heath was offended with my detail to the OIG, he must have spoken directly to Atkins. Again, if Chief Heath did not tell Toogood or Atkins about my protective status, then he is to blame for the retaliation. Atkins admits in his affidavit that he knew that I signed the petition. Donnelly attended the same supervisory training as I did and Donnelly knew I signed the petition per his EEO affidavit.

99. In getting witness testimony for my stress claim, Admin Center employees told me that they feared retaliation and were intimidated so would not answer my survey. They were told they would be subpoenaed. Additionally, support employees were and still are more fearful than ever to give information for they may not be chosen for jobs or possibly be RIF'd again. The Inspection Service was in the process of a RIF, a "transformation phase" intended to limit the number of jobs available to support personnel. Since the employees feared being out of a job entirely, they are doubly cautious and more compliant than ever to management issues. Had I been reassigned as a supervisor, under the 2006 RIF, I would have been eliminated from a job, but as secretary I was not effected.

100. Management failed to follow ELM procedures in reassigning me to the supervisory position. See ELM regulations which are attached hereto as Exhibit 78. The detail to which I was assigned was not posted, no temporary assignment forms were completed, and no proper notification given to higher management or HR. I was not the only competent candidate for the supervisory job; there were other more experienced staff who could have taken the assignment. The supervisory detail was neither mandatory nor emergent. Atkins denied me the right to return to my secretarial position recorded on my job of record, Form 50, and arbitrarily assigned me to a position that caused me stress.

101. There is a pattern of a hostile work environment harassment and it is continuing with me. Additionally, after I met with the managers in the June 2003 regarding the petition issues, I named Inspector Judy McDermott as the only one in the Division that came forward to "offer me assistance." Two weeks after this June 2003 meeting, where I made this comment about Inspector McDermott, she was punitively transferred (her EEO regarding the punitive transfer was accepted by the OFO for investigation). I just recently learned that her punitive transfer fell within two weeks of my comment to these managers in the June 2003 meeting. Until now, I did not realize my comment to those managers could have contributed to Inspector McDermott's punitive transfer. Because Judy McDermott assisted me in regards to the 2003 petition and with my DOL and EEO filings, the agency further retaliated against both of us as

33

1  demonstrated in emails from Inspector/Attorney Ed Lawee. I found out in 2007 that Katie

2  O'Leary was subsequently detailed to the Postal Service for nearly 4 years after she filed a

3  previous EEO and then filed another EEO based on retaliation and discrimination regarding

4  Wanda Smith being selected for the recruitment position, which is proof that my discriminatory

5  complaints to the managers were valid and that their acts are retaliatory towards employees who

6  file EEOs. See **EXHIBITS 72-73**.

7          102.  Until these events, I never filed a stress claim, an EEO complaint or any other

8  negative action against the Service.   In fact, I scheduled a doctor's appointment hoping to get a

9  medical diagnosis that I should be relieved from the supervisory position as it was causing me

10  stress and present it to Atkins. I had hoped he would honor the medical note and it would end

11  there. Instead he escalated the stressful situation by putting me on admin leave.   Many people

12  will confirm my work ethic is beyond reproach and I have a record of exemplary job

13  performance, demonstrated by the fact I earned one of the highest merit ratings (12 percent) and

14  received $1,000 merit bonus from Atkins in 2004 as his secretary and have received many

15  awards for superior service. Atkins testified he gave me a "2" rating which is less than what I

16  would have normally got as an employee. I have not been provided the write-up documentation

17  of my 2005 midyear evaluation to substantiate the retaliation claims.   I know the documentation

18  can be retrieved through their computer systems, and if so, I know that other information such as

19  emails can be retrieved.   As a secretary and supervisor, I called up the HQ computer techs and

20  would make requests to re-install certain emails or documents, especially when one of the Admin

21  Center employees would delete a whole program accidentally.

22          103.  I had been an exemplary Inspection Service for more than 25 years, receiving

23  consistently high merit ratings and several commendations for my work. To be portrayed as "just

24  another disgruntled employee" is not simply unfair, it is demeaning.   Atkins did not trust me as

25  he moved me to a corner office so I can "hear" management conversations; removed me from the

26  secretary position in a guise of a detail; was not invited to management meetings; approved me

27

28
                                                    34

1  to go on a OIG detail and then later rescinded it; offer me other assignments; and then reassigned

2  me as a supervisor so that I can be removed during the RIF (reduction in force).

3  104.  In the EEOC letter of March 16, 2007, Page 3, …."the Commission concludes that

4  the agency properly dismissed claims one and two for untimely EEO counselor contact.  The

5  record reflects that the alleged discriminatory acts occurred in February and June 2003, but

6  complainant did not seek EEO counseling until August 2005, which is beyond the 45-day

7  limitation period.  We find no adequate justification in the record to warrant an extension of

8  time."  I did not file an EEO until I believed I was being discriminated/retaliated against - which

9  was the date I found out that I was not returning to my job as secretary.  That is the date I

10  became aware of the discrimination and that is when you contacted a EEO counselor (within 45

11  days).  The issue is that I signed a petition, but did not realize I was retaliated against until they

12  did not give me my job back.

13  105.  In the EEOC letter of March 16, 2007, page 6, it indicates that I was reassigned as a

14  supervisor.  Throughout my EEO, I was given the impression that I was on a detail and not to be

15  reassigned.  Yet the EEOC was told that the agency reassigned me without notification or

16  agreement.

17  106.  Contract employee Merino who worked at Inspection Service DHQ suffered a heart

18  attack, PPO Captain Spencer Chew suffered a heart attack, Postal Inspector Michael Cassidy

19  died from a heart attack, Support Technician Florita Andres suffered a panic attack, and

20  Inspector Judy McDermott's stress claim was accepted by the Dept. of Labor.  InC Atkins

21  assigned Inspector Cassidy to be the team leader for two Fraudulent Workers Compensation

22  (FWC) teams.   Cassidy had to travel and manage territories that included all of Hawaii and its

23  islands, Guam, all of northern California including Reno and Bakersfield.  This grueling

24  assignment was stressful and when Cassidy came home, he suffered a heart attack.  These

25  medical injuries are the ones I know of and are very serious.  These injuries occurred under

26  Atkins' management.

27

28

107. Employees Tom Gamez, Nila Dancoff, Socorro Frias, Wanda Smith, Sandy Schoonmaker, Liz Kibizoff, Henry Kimble, Linda Ng, and Ellena Bailey witnessed my crying and stressed condition throughout the year while I served as supervisor. I later learned that some of these employees reported my "stressed condition" to management, but they did nothing. Although Ellena Bailey responded to the survey to support my stress claim, the others did not answer my survey in fear of retaliation. The survey reflects a response from Ms. Bailey indicating that I told her on several occasions that Atkins requested me to take the supervisory position and that she feared retaliation for responding to the survey.

108. There were job postings with the Inspection Service and the OIG which were Investigative Analysts positions with earnings up to $80,000. These positions were not supervisory positions. Although I was a qualified candidate for these jobs, I could not apply for the jobs fearing I may be subjected being set up for further harassment, such as Katie O'Leary.

109. As Inspector Diaz suggested, I filed an EEO complaint based upon retaliation for my exposure as a signer of the petition and met with managers that led to the removal and retirement of Kiel, Nedd and Gamache.

110. After the 2004 Monterey Division Conference, I came into the office on a Sunday to record and prepare conference expenses. I also contacted Atkins in Honolulu about the Investigative Analyst (IA) positions. I asked him if there were more IA positions postings in the future as I was more interested in getting an IA position in OWCP (Workers Compensation). I told him if there were no more IA positions being posted, I would apply for the present IA positions which were in the areas of Internal Crimes and External Crimes and would need time to complete the applications. The posting deadlines were that coming Friday and I was concerned as I needed to schedule the completion of my 991 application as well as complete the tracking of Division Conference expenses. Atkins told me there would be more IA positions and then remarked that he would get in trouble for telling me that there would be future IA positions. With that remark, I suspected that Atkins was given instructions then to remove me from the secretary position but dismissed it because he told me that there were more IA postings to come.

1  Chief Heath and Katz were at the Monterey Conference and spoke with Atkins.  When I was
2  placed on admin leave, Ms. Graham confirmed in her deposition that she told others that I was
3  not selected for any of the IA positions.  Graham had conversation with someone regarding me
4  as that information is erroneous.  **I did not apply for the IA positions**.  I will never get
5  promoted and have lost out on the Level 17 and higher positions that were posted.  I know I was
6  qualified to do all the assignments for that job.  Not only was I removed as secretary, but lost all
7  future promotional opportunities.

8      111.   After several months of psychotherapy treatment, I now find it also humiliating
9  that doctors employed by the USPS repeatedly ask me why I cannot go back to work.   It is not
10  my work ethic that is being questioned.  I was removed from my position as secretary and
11  management caused my stressed condition.   I was being punished by being placed in another
12  position that I did not ask to be in, feel threatened by others, and have lost all sense of safety and
13  security in any job I accept.   No doctor wants a patient to return to a job that initiated stress,
14  mistrust and hostility.  You cannot simply put a person in another job in the same agency and
15  pretend the problem never happened.   This is what the USPS/IS is trying to do and I find it
16  unacceptable that I have to return to work to any USPS department or its affiliates.   Their arms
17  of authority to deceive and protect their own stretch so long that **I am alone, vulnerable, and no**
18  **one can protect me.**

19      112.  On December 4, 2006, Attorney Bacon notified me that InC Atkins managed to get
20  a detail for me in Oakland, CA.  Not once did Atkins personally try to find me another detail
21  while I was in the supervisory position and yet while on OWCP leave, he took interest in finding
22  me a detail in Oakland.  My doctor did not release me to work and Attorney Bacon notified
23  Inspection Service Inspector Attorney Lawee of Dr. Bercun's medical report.  Atkins or the
24  agency did not want me back at the Inspection Service regardless. See **EXHIBIT 74**.

25      113.  I would think the email of protective status specifically indicates the following
26  words "no transfer, no reassignment, no removal, no demotion, and no retaliation" says it all.  I
27  was lured under the pretense it was a detail and therefore should never been reassigned.  As

28

Atkins claims not to have known about my protective status, then upper management failed to inform him of my rights - Wisniewski, Katz, Heath, Birch, and Ahern.   Atkins knowing I signed the petition, reassigning me as supervisor was a retaliatory act. Therefore I was set up for retaliation and caused me stress.

114.  **EXHIBITS 75 and 76**, show Castor's and Atkins' comments attempting to refute my stress claim.

115.  Attached as Exhibit 77 is a copy of my Information for Pre-Complaint Counseling.

116.  Attached as Exhibit 78 is a copy of the USPS Employment Labor Management Regulations dealing with Assignment, Reassignment, and Promotion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed in San Francisco, California on August 26, 2008

MARILYN LEE

Exhibits to Declaration of Marilyn Lee

1.  PS Form 50, Notification of Personnel Action (1 page)
2.  Secretary, EAS-14 Requirements (2 pages)
3.  Inspection Service Operations Coordinator, EAS-14 (2 pages)
4.  ISIIS Brief Display of Marilyn Lee (3 pages)
5.  January 2003 Petition (1 page)
6.  February 22, 2003 Birch Ltr Ref Conditions in the SF Div (4 pages)
7.  March 4, 2003 Birch Ltr (21 pages – Page 10 references W. Smith)
8.  March 6, 2003 Birch Ltr to McDermott (2 pages)
9.  March 22, 2003 Birch email to McDermott (1 page)
10. May 1, 2003 McDermott email to Birch (2 pages)
11. May 7, 2003 Birch email to McDermott (1) page
12. May 14, 2003 Birch email to McDermott (2 pages)
13. McDermott's EEO Pre-Complaint (10 pages)
14. August 20, 2003 OIG Quits (2 pages)
15. McDermott's EEO Complaint (10 pages)
16. 3/29/03 Detail Assignments of Wisniewski & Donnelly (1 page)
17. 6/11/03 McDermott email to Birch re visits by HQ managers (1 page)
18. 6/13/03 Birch email to M. Lee re no retaliation (1 page)
19. Notes from M. Lee meeting w/Birch (6 pages)
20. 5/19/03 email re Kiel's announcement to retire 6/30/03 (1 page)
21. 3/13/03 National Communication – Nedd being detailed out of SF (1 page)
22. 8/11/04 email from M. Lee to Cabano/Castor re Detail (2 pages)
23. 5/28/03 Kiel's survey to Division (5 pages)
24. 2/16/06 FOIA request for Diaz' PS Form 2492 Report on M. Lee
25. ISIIS records on M. Lee dated 7/21/05 (11 pages)
26. M. Lee's FY2004 Yearend Accomplishments (3 pages)
27. Atkins' FY2004 Yearend Evaluation of M. Lee (1 page)
28. 3/12/04 Diaz Email re OIG non-cooperation
29. ISIIS Job Assignment of Kaycee Graham (1 page)
30. SF Division Awards for FY06 for Graham and Cabano (1 page)
31. ISIIS Job Assignment of Barbara Mendes (1 page)
32. SF Organization Structure Posted on Computer Shared Drive 8/8/05 (2 pages)
33. ISIIS Job Assignment of Anita Cabano (1 page)
34. ISIIS Job Assignment of M. Lee (11 pages)
35. 9/23/05 email from Castor re Admin Support Organization (2 pages)
36. 4/26/07 email from Diaz re Secretary detail (1 page)
37. Award writeup on Sandy Schoonmaker re Admin Supv detail
38. 7/18/05 email announcing Linda Ng will be Acting Admin Center Supv. (1 page)
39. 1/30/06 DOL ltr accepting M. Lee stress claim (5 pages)
40. McDermott's ltr re M. Lee stress (2 pages)
41. 8/8/05 Anonymous Ltr re M. Lee to support her stress (1 page)
42. 07/26/05 Linda Ng's writeup re M. Lee supporting her stress (1 page)
43. 7/25/03 Admin Support Meeting Notes posted on computer shared drive (3 pages)
44. 8/18/05 Email from OIG A. Davidson of OIG detail (1 page)

45. Statement of M. Lee ref OIG detail (4 pages)
46. Copy of K. O'Leary's paystub (1 page)
47. 8/28/07 K. O'Leary's email re USPS detail and listing of awards (1 page)
48. 7/12/04 Team Leader Meeting Notes (3 pages)
49. 9/20/04 Team Leader Meeting Notes (3 pages)
50. 6/1/05 J. Rodriguez' Transfer to OIG and luncheon details (3 pages)
51. 8/29/06 National Leadership Team Notes (4 pages)
52. FY2005 National VOE/WEI Training Requirements on OIG/IS relations (1 page)
53. 1/12/07 Email from Chief Lazaroff re OIG rift (3 pages)
54. April 2008 Inspection Service Newsletter re K. Jones (2 pages)
55. National Communications on Wisniewski (1 page)
56. 4/25/05 Diversitiy Liaison Training Program (3 pages)
57. Support Org Chart dated 11/17/04 posted on computer shared drive(1 page)
58. 6/28/05 Management Communication re Secretary level (1 page)
59. 8/5/05 Dr. Porzig' Ltr confirming M. Lee's stress claim (1 page)
60. List of Detailed Support employees who were returned to original jobs (1 page)
61. Award Writeups re Perada and Linda Ng (1 page)
62. 12/14/05 Aware Writeup for Cabano as Forfeiture Specialist (1 page)
63. 3/4/05 Postal Detailed Employees to Inspection Service (1 page)
64. Detail Assignments Chart from HQ
65. Derderian's Statement (1 page)
66. 7/15/05 M. Lee letter placing her on Admin Leave (1 page)
67. 8/16/05 M. Lee Duty for Fitness Letter (2 pages)
68. Support Org Chart after M. Lee left (1 page)
69. 8/25/05 email on Reasonable Accommodations (6 pages)
70. Bailey's Survey Response to Support M. Lee's Stress Claim (4 pages)
71. FOIAs requested by M. Lee (12 pages)
72. 5/5/06 email from Lawee to Crespo and Mattes of Legal Counsel (1 page)
73. 3/22/07 email from Lawee to Katz (1 page)
73. 11/15/06 emails re M. Lee's status to return to work (2 pages
75. Castor's responses to DOL re M. Lee's stress claim
76. Atkins' response to DOL re M. Lee's stress claim
77. M. Lee Information for Pre-Complaint Counseling
78. USPS Rules & Regulations (Employee Labor Manual [ELM])

# EXHIBIT 1

| 01 | Effective Date | NOTIFICATION OF PERSONNEL ACTION | 02 | Social Security Number |
| --- | --- | --- | --- | --- |
| | 01-08-2005 | | | 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 |

U. S. Postal Service

**EMPLOYEE INFORMATION**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 03 | Employee Name-Last | LEE | 39 | FLSA Status | N - NON-EXEMPT |
| 04 | Employee Name-First | MARILYN | 40 | Pay Location | 200 |
| 05 | Employee Name-Middle | N | 41 | Rural Carrier-Route | |
| 06 | Mailing Address Street/Box/Apts | 951 BRADLEY DR | 42 | Rural Carr-L-Rte ID | |
| | | | 43 | Rural Carr-Pay Type | |
| 07 | Mailing Address-City | DALY CITY | 44 | Rural Carr-Tri-Weekly | |
| 08 | Mailing Address-State | CA | 45 | Rural Carr-FLSA | |
| 09 | Mailing Address-Zip+4 | 94015-3667 | 46 | Rural Carr-Commit | |
| 10 | Date of Birth | 05-31-1954 | 47 | Rural Carr-EMA | |
| 11 | Veterans Preference | 1 - NO PREFERENCE | 48 | Rural Carr-Hours | |
| 12 | Sex | . | 49 | Rural Carr-Miles | |
| 13 | Minority | | 50 | Job Sequence | 1 |
| 14 | Disability | | 51 | Occupation Code | 0318-2042 |
| 15 | Leave Comp Date | 02-09-1980 | 52 | Position Title | SECRETARY |
| 16 | Enter on Duty Date | 02-09-1980 | 53 | Labor Dist Code | 8100 |
| 17 | Retirement- Comp Date | 02-09-1980 | 54 | Designation/Activity | 11/9 |
| 18 | Serv Anniversary PPYR | | 55 | Position Type | 1 - FULL TIME |
| 19 | TSP Eligibility | Y - ELIGIBLE WITH DEDUCT | 56 | Limit Hours | |
| 20 | TSP Service Comp Date | 01-01-1984 | 57 | Allowance Code | |
| 21 | Prior CSRS Service | Y | 58 | Employment Type | |
| 22 | Frozen Csrs Time | 07/09/26 | | **SALARY INFORMATION** | |
| 23 | Leave Data-Category | 8 - HOURS/PP | 59 | Pay Rate Code | A - ANNUAL RATE |
| 24 | Leave Data-Chg PPYR | | 60 | Rate Schedule Code | E - EAS |
| 25 | Leave Data-Type | 1 - ADVANCED AT BEGINNING | 61 | Grade/Step | 14/ |
| 26 | Credit Military Serv | | 62 | Base Salary | 52,181 |
| 27 | Retired Military | | 63 | Cola | |
| 28 | Retirement Plan | A - FERS WITH FROZEN CSRS | 64 | Cola Roll-In Ind | R - COLA ROLL-IN |
| 29 | Employee Status | | 65 | Next Step PPYR | |
| 30 | Life Insurance | C0 - Basic Only | 66 | Merit Anniv Date | 02-2006 |
| 31 | Special Benefits | | 67 | Merit Lump Sum | 1,773 |
| | **POSITION INFORMATION** | | 68 | Special Salary Code | |
| 32 | Employ Office-Fin No | 05-8526 | 69 | Protected RSC | |
| 33 | Employ Office-Name | INSP FLD DIV-SAN FRAN | 70 | Protected Grade/Step | |
| | | | 71 | Expiration PP/YR | |
| 34 | Employ Office-Address | SAN FRANCISCO CA 94188-2000 | 72 | Protected RC Hours | |
| | | | 73 | Protected RC Miles | |
| 35 | Duty Station-Fin No | 05-8526 | 74 | RC Guaranteed Salary | |
| 36 | Duty-Station-Name | INSP FLD DIV-SAN FRAN | 75 | Annuity Amount | |
| 37 | Appt Expiration Date | | 76 | Red Circle Code | 0 |
| 38 | Probation Expir Date | | | | |

**NATURE OF PERSONNEL ACTION**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 77 | Nature of Action Code | 892 | 78 | Authority | 39 USC SECT. 1001 |
| 79 | Description | PAY FOR PERFORMANCE | 80 Code | 81 Code | 82 Code | 83 Code |
| 84 | Remarks | | | | |

FY 2004 PAY FOR PERFORMANCE AWARD

| | | | | |
| --- | --- | --- | --- | --- |
| 85 | Authorization STEPHEN A. LEAVEY, MANAGER CORPORATE PERSONNEL MANAGEMENT | 86 | Processed Date | 01-13-2005 |
| | | 87 | Personnel Office ID | XT10 |
| | | 88 | OPF Location | XT10 - ISOSG SAN BRUNO |

PS Form 50, March 1990 (Exception to Standard Form 50)    2 - OPF COPY

EXHIBIT 2

## Secretary, E.A.S.-14

### Standard Position Description

### Functional Purpose

Provides standard and advanced secretarial support for an executive and, as required, his/her staff. Exercises independent judgment with regard to routine matters, and provides administrative support in accordance with established policy and procedure.

### Duties and Responsibilities

1. Produces reports, letters and other documentation using word processing equipment, and monitors peripheral equipment.

2. Accesses, retrieves and/or updates files and other data maintained on personal or mainframe computers.

3. Sends and receives electronic messages, files, management directives, and other documentation via the local area network.

4. Produces charts, tables and other documentation using various graphics packages.

5. Compiles information on a variety of subjects; summarizes information, and briefs supervisor or produces reports.

6. Coordinates meetings including, scheduling, developing agendas and program materials, and travel arrangements.

7. Reviews materials prepared for manager's signature for accuracy, completeness, and format.

8. Answers telephones and generally acts independently providing information and/or referral.

9. Screens, logs, and routes office mail, and reads, as appropriate, provides background information or a draft response for the supervisor.

10. Performs clerical duties including, operating standard office equipment, requisitioning supplies, printing, maintenance, and other services.

11. Performs other administrative support duties, maintaining a variety of reports, such as; time and attendance, correspondence and budget records.

SUPERVISION

Manager of unit to which assigned

### Requirements (KSAs)

Position Description

1. Knowledge of requirements for formatting and preparing documents such as letters, reports, proposals, graphs, figures, and charts.

2. Knowledge of English composition, grammar, punctuation, and spelling.

3. Ability to operate programmed or programmable keyboard devices or systems such as word processing systems or data entry computer terminals.

4. Ability to establish and maintain office filing systems and to accurately file and retrieve individual records.

5. Ability to compile and summarize oral or written information and to state or write a brief summary of important facts.

6. Ability to efficiently plan, schedule, and arrange meetings, travel, and lodging.

7. Ability to locate, read, and comprehend written reference materials such as handbooks, manuals, bulletins, and directives.

8. Ability to review written materials for accuracy and completeness.

9. Ability to work cooperatively and interact positively with co-workers and customers, exercising courtesy, discretion, and self-control.

10. EXAMINATION REQUIREMENTS: a) Applicants must demonstrate clerical and verbal abilities. This must be demonstrated by successful completion of Postal Service Test 710. b) Applicants must demonstrate the ability to type 45 net words per minute for 5 minutes on a computer terminal. This must be demonstrated by successful completion of Postal Service Test 712.

OccupatiQn Code:

0318-2042

# EXHIBIT 3

# Inspection Service Operations
# Coordinator, E.A.S.-14

## Standard Position Description

## Functional Purpose

Leads and participates in the conduct of a variety of administrative and clerical functions and processes in support of the investigative and operational activities, plans, and programs of an Inspection Service organizational unit.

## Duties and Responsibilities

1. Leads and participates in the work of performing a variety of support services, including timekeeping; receptionist duties; answering telephones; typing; data entry and retrieval and mailroom functions.

2. Develops work schedules to ensure adequate office coverage and arranges for temporary assistance, as required; provides technical assistance and training; sets work priorities and assigns work to subordinates; takes disciplinary action; and approves leave.

3. Ensures that case, correspondence, office files and records are maintained in accordance with established procedures. ·

4. Coordinates purchase, use, storage, and inventory of all capital equipment, supplies and materials.

5. Analyzes and interprets Postal Service instructions; ensures that such instructions are properly implemented; analyzes administrative systems and procedures; modifies and revises administrative procedures; and makes recommendations to streamline administrative functions.

6. Resolves questions and problems, referring unusual and/or technical problems to the appropriate official.

7. Arranges meetings and conferences, and advises participants of time, place, and related information; assembles associated background material; attends meetings, takes notes, and prepares reports on proceedings.

8. Makes travel and hotel arrangements; prepares itineraries and travel vouchers, and arranges schedules and advises host organizations or officials of scheduled visits.

SUPERVISION

Manager, Operations Support Group, Manager, Internal Affairs Group, or Manager to which assigned

## Requirements (KSAs)

Position Description

utilization, storage and inventory of all capital and personal equipment, supplies and materials.

2. Ability to motivate and lead a small group of allied support employees by providing technical assistance, training, setting priorities for work to be performed, assigning work, and taking disciplinary action when appropriate.

3. Ability to maintain a system of records.

4. Ability to communicate orally and in writing sufficient to ensure instructions are properly implemented.

5. Ability to independently analyze systems and procedures utilized in a variety of administrative areas, modify and revise new administrative procedures, make recommendations to promote efficiency and effectiveness.

6. Ability to arrange for meetings and conferences including coordination with participants and assembling background material.

7. Ability to make travel arrangements, prepare itineraries, travel vouchers and arrange schedule of visits.

Occupation Code:

0341-5055

# EXHIBIT 4

Home Help

## ISIS
## Resource Management System (RMS)

| Jobs | Employee | Training | Organization | Reports | Delegations |

Display Employee   Search Employee   Re-assign Direct Reports

DISPLAY EMPLOYEE                    Update Skill Set   Display Accountable Property   Display Accountable Property   Employee Brief

Employee Name: LEE, MARILYN N                              WRN:
SSN: ***-**-****                                           EIN: 0101S045
Date of Birth: 05/31/1954                                  Pay / Job Level: E-14 / E-14
Occupation Code: 0318-2042                                 Title: Secretary
Entered USPS Date: 02/09/1980                              Entered USPIS Date: 02/09/1980
Service Comp. Date: 02/09/1980                             Finance # / Duty Finance #: 05-8526 / 05-8526
Division: SAN FRANCISCO                                    Team:
Domicile/Facility: SAN FRANCISCO DHQ                       Employment Status: CAREER EMPLOYEE
Home Address: 951 BRADLEY DRIVE                            Mailing Address: 951 BRADLEY DR
City: DALY CITY                                            City: DALY CITY
State: CA   Zip Code:94015-3667                            State: CA   Zip Code:94015-3667
Home Phone: (650) 755-1443                                 Work Phone: (415) 778-5894
Work Cell Phone:                                           Work Pager:
Emergency Contact: Manford Lee                             Contact Phone: (415) 652-8192

**Separate Employee**

List of Job Assignments                     List of Collateral Duties
List of Skills                              List of Direct Reports
Self Nominations for Detail Assignments     List Courses Taken/Scheduled
                                            List Active Directory Information

United States Postal Inspection Service

Resource Management System

Restricted Information

Report Name: Employee Brief for LEE, MARILYN N as of 7/21/2005

## Current Assignment

Job No.: M-33088

Assignment Name: SECRETARY

Qualified Assignment: ADMINISTRATIVE SUPPORT

Division: SAN FRANCISCO

Job Level: 14

Rate Schedule: E

Pay Level: 14                    Pay Step: 00

Domicile / Facility: SAN FRANCISCO DHQ

Effective Date: 06/26/1993

Team No.:

## Office Address

Office Address: 390 MAIN ST FL 3 - EPC SAN FRANCISCO, CA 94105-2014

Individual Phone: (415) 778-5894          General Office Phone: (415) 778-5800

Fax: (415) 778-5822                       24-Hour Phone: (415) 778-5900

United States Postal Inspection Service

Resource Management System

Restricted Information

Report Name: Employee Brief for LEE, MARILYN N as of 7/21/2005

## Prior Inspection Service Assignments

| Date | Job No. | Rate Schedule | Pay Level | Pay Step | Job Level | Assignment Name | Division | Domicile / Facility |
|---|---|---|---|---|---|---|---|---|
| 04/04/1992 | M-18169 | E | 14 | 09 | 14 | SECY/STENO | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |
| 06/11/1983 | M-18730 | E | 12 | 09 | 12 | OTHER ADMIN | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |
| 06/11/1983 | M-18730 | E | 12 | 08 | 12 | OTHER ADMIN | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |
| 06/11/1983 | M-18730 | E | 12 | 07 | 12 | OTHER ADMIN | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |
| 06/11/1983 | M-18730 | E | 12 | 06 | 12 | OTHER ADMIN | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |
| 06/11/1983 | M-18730 | E | 12 | 05 | 12 | OTHER ADMIN | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |
| 06/11/1983 | M-18730 | E | 12 | 04 | 12 | OTHER ADMIN | ISOSG S SANFRAN | S SAN FRAN ISOSG(SBG1) CA |

Print Date: 07/21/05
Print Time: 11:12

# EXHIBIT 5

January 2003

Inspector Birch:

We, the undersigned, are concerned about the negative morale in the Division, which appears to be a result of management decisions based on personal agendas and biases, rather than the best interests of the Division and its employees. Numerous management decisions appear to lack consideration of: Division resources, territory constraints, budgetary concerns, the realistic need for certain teams in the Division, fair and impartial treatment of employees, and treating employees with dignity and respect. We do not feel that employees are valued and respected for their knowledge and experience, nor can we freely express an opinion which differs from management, without fear of retaliation.

We respectfully request an independent investigation into the underlying reasons for the low morale, and the less than optimum working conditions in Division. We believe many people agree with our concerns but are afraid to come forward. We request that our names remain confidential, but will willing speak to someone regarding our specific knowledge of conditions and behavior in this Division which have contributed to the negative climate.

SIGNATURE                                    PRINTED NAME

*[signature]*                                Marilyn Lee

EXHIBIT 6

February 22, 2003

Jim Birch
Executive Ombudsman
U.S. Postal Inspection Service
PO Box 3000
Bala Cynwyd, PA  19004-3609

REF:  Conditions in the San Francisco Division of the Postal Inspection Service.

Dear Inspector Birch:

Enclosed please find five pages containing almost 50 signatures of employees (and
former employees) in the San Francisco Division who have concerns regarding the
current management team, their knowledge, skills, and abilities, the decisions they make,
their treatment of employees, and the all-time low morale.  Many of us have united
together in an attempt to bring attention to the deteriorating state of affairs in the San
Francisco Division, which is having a detrimental affect on the employees, our morale,
and our ability to effectively perform our jobs.  We believe this Division can no longer
function under the current management team and leadership style, and immediate
intervention is necessary.  We respectfully request that someone investigate our concerns
in the most expedient manner possible.  **Additionally, it is imperative that the enclosed
names remain confidential.  I can not stress this last request enough.**

We believe this matter is serious enough to warrant an impartial party meeting with
Division employees individually, to obtain specific information relevant to our concerns.
Additionally, I believe it would be beneficial to contact everyone in the Division
regarding their concerns, not just the enclosed individuals.  Several people did not sign
the enclosed sheets, not because they did not agree with what was stated, but due to fear
of retaliation, a common practice in this Division.  Additionally, the many new inspectors
in the Division were not contacted to participate, for fear they would be retaliated against
in the future.

I suggest that an initial survey be sent to all Division employees to determine the total
extent of concern within the Division, followed by personal contact with inspectors,
support staff, and postal police.  Enclosed are some possible questions for a survey that
can be used if you decide to take that course of action.  Additionally, if it is determined
that someone from Internal Affairs, or elsewhere, will interview employees, senior
inspectors with extensive investigative experience, including interviewing and
interrogations skills should be used, not inexperienced inspectors.  Experienced
inspectors can ask tough questions of management to determine whether rationale they
provide for decisions they have made are credible and can be substantiated by facts.

We defer to you and your judgment and expertise as to the best approach to proceed with
this matter.  Hopefully, someone will understand that there are serious problems in this

Division which need to be addressed immediately if this Division is to get back on track where it needs to be. We do not believe this can occur under the current management team.

The behavior that has been allowed to occur in this Division has been occurring far too long and we can no longer remain silent.   Any intervention on your behalf to rectify our situation would be appreciated. I am forwarding the enclosed signatures on behalf of the listed employees.  I would appreciate an email from you acknowledging receipt of this letter.  We all look forward to hearing from you in the near future.  Thank you in advance for your assistance.

Respectfully submitted,

Judy McDermott

Judy McDermott
Postal Inspector
San Francisco Division
510/528-9708

Enclosures

January 2003

Inspector Birch:

We, the undersigned, are concerned about the negative morale in the Division, which appears to be a result of management decisions based on personal agendas and biases, rather than the best interests of the Division and its employees. Numerous management decisions appear to lack consideration of: Division resources, territory constraints, budgetary concerns, the realistic need for certain teams in the Division, fair and impartial treatment of employees, and treating employees with dignity and respect. We do not feel that employees are valued and respected for their knowledge and experience, nor can we freely express an opinion which differs from management, without fear of retaliation.

We respectfully request an independent investigation into the underlying reasons for the low morale, and the less than optimum working conditions in Division. We believe many people agree with our concerns but are afraid to come forward. We request that our names remain confidential, but will willing speak to someone regarding our specific knowledge of conditions and behavior in this Division which have contributed to the negative climate.

SIGNATURE                              PRINTED NAME

PROPOSED QUESTIONNAIRE TO BE SENT TO EMPLOYEES WITHIN THE DIVISION: POSTAL INSPECTORS, SUPPORT STAFF, AND POSTAL POLICE

--Do you have confidence in the abilities of the current management team?
        YES     NO     SOMEWHAT

--Do you believe the current management team has the knowledge and experience to lead the Division?
        YES     NO     SOMEWHAT

--Do you believe management decisions are based on personal agendas rather than the best interests of the Division?
        YES     NO     SOMEWHAT

--Do you believe employees are treated with dignity and respect?
        YES     NO     SOMEWHAT

--Do you believe employees are valued?
        YES     NO     SOMEWHAT

--Do you believe teams are formed according to the needs and resources in the Division?
        YES     NO     SOMEWHAT

--Do you believe teams are located in the domiciles which are most beneficial to the Division?
        YES     NO     SOMEWHAT

--Do you believe staffing of critical teams is adequate?
        YES     NO     SOMEWHAT

--Do you believe merits and awards are fairly distributed?
        YES     NO     SOMEWHAT

--Do you believe promotional opportunities and details are fairly distributed?
        YES     NO     SOMEWHAT

--Do you believe problem individuals are adequately addressed?
        YES     NO     SOMEWHAT

--Do you think retaliation is a common practice in this Division?
        YES     NO     SOMEWHAT

--Do you believe morale in the Division is at an all-time low?
        YES     NO     SOMEWHAT

--Do you believe the morale on the Division is affecting the work performance?
        YES     NO     SOMEWHAT

ADDITIONAL COMMENTS:

EXHIBIT 7

March 4, 2003

Jim Birch
Executive Ombudsman
U.S. Postal Inspection Service
PO Box 3000
Bala Cynwyd, PA  19004-3609

REF:  Conditions in the San Francisco Division of the Postal Inspection Service.

Inspector Birch:

This letter is being sent to notify you of my personal concerns regarding the operation of the Northern California Division of the Postal Inspection Service, under the direction of Alan Kiel, INC, and AICs Juliana Nedd and Greg Gamache.  The comments and observations made are my own and are not meant to reflect the opinions of others, although I believe many would agree with my comments and observations.  I believe numerous people in the Division have no confidence in our current "leadership" team, and question their leadership skills, knowledge, and ability to make decisions that will benefit the Agency.  Many of the decisions the current management team has made do not benefit the Postal Service or the Postal Inspection Service, but appear to be based on personal agendas, regardless of the cost to the Division or the Agency. I believe immediate intervention into the working conditions in the Division is needed, and an evaluation of the abilities and motives of the current management team and their treatment of employees be conducted at the earliest possible opportunity.  Additionally, I believe there are serious integrity issues with this management team.

Management's decisions appear to be made to:  punish those that disagree with their decisions, to enhance promotibility of those they are mentoring, and to enhance their own promotibility.  The best interests of the Division and getting the job done do not appear to be factors for their decisions, nor does rewarding those that are truly deserving. Management has made numerous decisions that have negatively impacted the organization and its employees, and how the Inspection Service is viewed by postal managers, the public, local law enforcement, and the U.S. Attorney's office.  Many of their decisions have resulted in unnecessary additional costs to the Agency, a waste of resources, and a workforce whose morale has deteriorated to an all-time low. Under the current management team, I do not see how things will ever improve due to the total lack of respect and trust many have towards them.

Two of the three managers have been career auditors and have almost no criminal experience to draw on to manage this Division (Kiel and Gamache).  Many wonder what duties these two perform for this Division, especially INC Kiel, as it appears most decisions he defers to AIC Nedd, who everyone feels runs the Division.  The third manager (Nedd), appears to make decisions based on who she is trying to "reward", or who she is upset with on any given day. She is known for making rash decisions without reason, and regularly belittling and degrading those she supervises, and retaliating against those who disagree with her ideas.

The management team does not look to their team leaders or inspectors for input or advice on key decisions, even though they themselves lack the experience and knowledge to make those decisions.  I believe the inspectors, support staff, and PPOs in this Division want to be able to perform their jobs with a leadership team that is knowledgeable and supportive of the

organization and those in the field. I would like to see this organization back on track as federal law enforcement officers with our mission of protecting the postal service and its assets, guided by competent managers that also have that goal uppermost in their mind.

There is a need to see decisions made that benefit the Division, including:

--A management team that performs their jobs as they were hired to do. A fair days pay for a fair days work;
--Managers working towards developing and maintaining liaison with postal managers, law enforcement, and U.S. Attorneys, to enable those of us in the field to perform our jobs more effectively;
--Teams staffed and located in cities where it is most efficient and cost effective to have those teams, and comprised of the number of team members to accomplish the goals;
--Teams that were blatantly formed to reward certain team leaders abolished where they are deemed unnecessary and do not benefit the Division;
--Team leaders promoted who are qualified, have integrity, and have a working knowledge of their assignments;
--The practice of unnecessarily promoting team leaders to manage 3-4 people be abolished;
--Stability on teams maintained in order to enhance the effectiveness of those teams;
--Problem team leaders addressed appropriately, including removal from their team leader responsibilities if warranted;
--Decisions based purely on hidden agendas and retaliation abolished;
--People treated with dignity and respect, and inappropriate comments and actions by managers addressed via disciplinary action as appropriate;
--Independent oversight of the merit and award program and the integrity of submissions;
--Dishonesty and lack of integrity dealt with harshly;
--Favoritism abolished; and
--Promoting and rewarding those that deserve such promotions and awards, not those that fit management's personal agendas.

Listed below are examples of management decisions and behavior which concerns me. Where I have personal knowledge of decisions and behavior I have so indicated. Where decisions and behavior can be substantiated by others, I have included their names for follow-up verification. I encourage follow-up investigation and inquiries to verify the accuracy of items listed and the extent of the problems in the Division.

# I.    QUALITY AND ABILITIES OF THE MANAGEMENT TEAM

I question the duties of our INC and AIC. An overview of tasks performed by the three managers and the need for three mangers in this Division should be conducted, especially since we lost all of our Audit functions several years ago. In 2002, we had an INC, two AICs and someone who was detailed for almost a year as a "third AIC" to help the INC/AICs with special projects. This year someone again is being detailed as a 3rd AIC (**Exhibit 1**). I question what our management team is doing and their abilities to run the Division. They do not appear to conduct liaison with the U.S. Attorney's office or law enforcement agencies. Cases languish at the U.S. Attorney's office for years with no intervention from management to move cases along. In the past, we have been asked to provide cases that have been stalled at the U.S. Attorney's office, yet it appears no action has been taken by management to intervene or implement changes. In Oakland and San Francisco, it is normal for the AUSAs not to return phone calls once you call them on a case,

even after your have called them numerous times. Management has been made aware of this problem, yet relations have not improved. I am aware of serious problems with the AUSA's in San Francisco (due to the San Francisco PO robbery case (*Ben Louie, Jimmy Woo, Alan Anderson, Ken Hudgens, Janet Stout*) and the AUSA's office in San Jose and Fresno (due to an FWC case and a letter a manager sent to them, and the mail bomb murder case two years ago – *Dave Guerra, Greg Crabb, Linda Russo, Greg Gamache, Mike Cassidy, Terry Fail*), however, it appears liaison is not being conducted by our managers. Everyone in the Division constantly asks what INC Kiel and AIC Gamache do in their positions. Gamache is known for his expansive spreadsheets and not much else. He recently had to come to the Richmond BMC and did not know how to get to the domicile. He has been in this Division for over 10 years. No one knows what INC Kiel does in his position. They do talk about his afternoon lattes. In a recent meeting regarding the Oakland Airport Review, two inspectors were talking about an upcoming review that our Agency was conducting. High level postal managers and supervisors were present. INC Kiel attended, but according to the two inspectors present (*Wilhelmus and Fussell*) he did not make any comments or suggestions during the meeting, nor did he attempt to conduct any type of liaison appropriate of an INC. Nedd, while having more knowledge and experience than the other two, appears to be out of control, speaks without thinking, behaves unprofessionally, and appears driven by personal agendas and vendettas (*my personal observations and discussions with others*). *I do not believe she has the temperament to be a manger, as her people skills are well below the acceptable level.*

## II.    LOCATION AND STAFFING OF TEAMS

In this Division we have 4 main large cities: San Francisco, San Jose, Oakland and Sacramento. Our territory stretches from the Oregon Border almost down to LA, and now includes the Reno, NV area. Previously we had multifunction teams in Sacramento and San Jose (which included the outlying domiciles of Fresno and Bakersfield). We recently staffed two positions in the Stockton area based on increased population and crime growth in the area (much of the population is moving from the Bay area to the Stockton and Sacramento areas). Over a year ago, management made the decision to disband the multifunction teams in San Jose and Sacramento (based on what appeared to be personal agendas against Terry Fail and his team and the retirement of Mark Aasmundstad doing away with his position). Currently, instead of having a team of EC/ IC Inspectors to rely on to work cases in San Jose and Sacramento, there is one EC inspector (another one was recently added) one IC inspector in San Jose, and there has been no IC inspector in Sacramento for almost two years. When IC help is needed in San Jose or Sacramento, others have to travel from the other outlying cities to assist. The closest help when assistance is needed is a minimum 1–2 hours away, and sometimes 3 hours or more (one way) depending on traffic. A recent IC test in San Jose took some inspectors who assisted 3 hours from their residence to get to San Jose and 3 hours after the test to return. Another test in Sacramento took some inspectors 3 hours to commute to Sacramento and 3 hours back. This year I have personally had to travel out of town, staying in hotels in Bakersfield, Fresno and Redding. Prior to disbanding the multi-function teams, I never had to stay out of town over-night for IC cases.

Abolishing critical teams in outlying cities is a poor utilization of resources, time, and mismanagement of our budget. Multi-functional teams in San Jose and Sacramento could draw from resources right in their own cities, as they previously did, reducing the costs of hotels, per diem, and commute time involved. We need multi-function teams in San Jose, Sacramento and Stockton. They make more sense with regard to budget, resources, and cost of living for new

4

inspectors to the Division. Someone needs to evaluate the population centers and volume of crime, and determine where personnel is best utilized.

Inadequate staffing of key teams and the wasteful use of already limited resources impairs our ability to respond to complaints, and minimizes our abilities and effectiveness in the eyes of postal management, the public, and law enforcement. If postal management and the public feel we are not necessary, we soon may not be. IC teams are understaffed, the EC and IC team in San Jose is understaffed, and the Mail Fraud team was almost completely obliterated (the Mail Fraud team was recently re-established due to pressure by the U.S. Attorney's office). Yet, we have three security teams. Multi-function teams in key outlying cities should be reinstated to maximize resources and increase efficiency in accomplishing our goals.

--This Division currently has three "security" teams. I question why we have 3 security teams when other teams are so seriously understaffed (*Mail Fraud, EC and IC to name three*). Management had four inspectors giving speeches at local police departments in Sacramento for several months in 2002 regarding the large amount of volume attacks (**Exhibit 2**). These were not EC people who work with the local police, but other individuals from various teams, many from San Francisco. This went on for months and months and appeared to be a wasteful use of our limited resources. The INC or AICs could, and should have, been conducting liaison at police departments or police meeting to let these agencies know what they should be aware of, however, that did not happen. Also, EC inspectors could and should relay the same information to police departments as they work cases in territories involved. It appears that this "project" may have been someone ticking off a checklist for their year-end goals, regardless that it was of no apparent benefit to the Division as a whole. The need for 3 security teams should be re-evaluated and a decision made as to whether some of the duties performed could be better addressed by individuals already working cases in their territories and on other teams. An inspector recently drove all the way from San Francisco to Fresno (*3 hours*) to give a 15 minute speech on security. We have 3 inspectors domiciled in Fresno that could have just as easily performed this task. The wastefulness of our resources should be addressed and the reasonableness of some of the things done in this Division re-evaluated.

--The management team had the entire Division involved in giving speeches to outside agencies and all post offices in the Division during the anthrax crisis, as well as manning hotlines and responding to suspect anthrax parcels in 2002. Some of this is understandable: speaking to the public, manning hotlines, and responding to suspected anthrax parcels. However, the benefit of going to each post office when the INC or AICs could have put out a hot sheet or gone to the area postal managers and provided information would have alleviated tying up 100 inspectors for weeks on an "unnecessary project". AIC Nedd made a comment to me that other Divisions were not doing this type of project. My response to her was that maybe they were not doing it because it was not necessary. Resources could and should have been used more wisely. Again, it appears that someone may have had a checklist for year-end goals and 991s, and no thought went into need vs. resources.

--In 2002, the management team formed a Response team in this Division which initially consisted of a team leader and two team members. They relocated the EC team leader (*Terry Fail*) from San Jose to San Francisco for a special project. The motive was not the need for a Response team, as in a crisis everyone responds, but to punish the San Jose team leader at the time (*Terry Fail*) by relocating him to San Francisco (*Mitch Herzog, Terry Eto, Mike Wilson, Efren Santos, Quan Howard*). Management accomplished their objective as he soon retired, earlier than expected. Management immediately moved the Response team leader position to San

Jose and gave it to a female team leader (*Janet Stout*) so she could pursue her Masters' Degree at a college in San Jose, allegedly on company time and with the use of the company car, and allegedly at the expense of the organization. She is eligible to retire in less than six months. Considering the resources in this Division, we question why a Response team was implemented, whether it was formed to benefit Stout, whether it is needed, and if it is needed why it isn't centrally located to the population in the Division and/or where past high profile crimes have occurred – San Francisco and Richmond. The need for this team, consisting of a team leader and 2 team members is questionable, and need vs. resources must be evaluated. Additionally, a recent robbery in the Division in the Fresno area was addressed by the Fresno team, not the Response team. Another recent robbery in San Francisco was responded to by inspectors in the San Francisco office who were much closer to the crime scene than the Response team in San Jose. The Response team definitely was not the first to arrive on the scene (**Exhibit 3**). If the Response team is found to be under-utilized or unnecessary it should be abolished, and resources from that team placed where they are more efficient to the needs of the Division. We already have a group of individuals designated as "emergency response" who respond in an emergency. *It appears the Response Team may not be needed, especially given the relatively low number of these types of cases in this Division. Teams should not be formed to reward one person and serve their own personal agenda, especially when there is no value to the Division.*

I believe many in the Division want to be able to perform the jobs they were hired to do and receive support from managers who also have that goal in mind. We want to be able to provide input and speak up without fear of retaliation. We want to see decisions made for the good of the Division, not for personal agendas. We want to see resources used in a manner that will get this Division on track to where it should be, with managers that have that same goal in mind. *The mindset of management, that employees are too ignorant to understand the reasons for their decisions are not valid. We are trained investigators and we know how to ferret out liars and B.S. artists, and we know when someone is not being honest with us. Additionally, we most certainly know more about the intricacies in the Division and what is going on behind the scenes than they do. For them to treat us as if we are stupid and ignorant is insulting. I don't think I am alone in thinking this way.*

## III. QUALITY OF TEAM LEADERS/PROBLEM TEAM LEADERS

This Division has some of the worst Team Leaders I have ever seen in my 17 years as an Inspector. This is a result of the underlying faults inherent in our hiring practices, promotional guidelines, promotional and hiring panels, biased merits and awards, and biased promotional and detail opportunities. Many team leaders are not knowledgeable in their assignments, have serious integrity issues, can not get along with people, and are not motivated. **I am aware of numerous qualified people who have withdrawn from the management program in this Division due to the current management team. They do not want to be a part of it in any way.** This needs to be rectified. I can not think of one individual who is currently in the Division management program or the Level 15 pool that is respected by their peers in this Division.

**Level 15 Pool** - Janet Stout and Guy Cottrell have been selected for participation in the AIC program. Neither of these inspectors is widely respected in this Division, and it is disheartening to see them chosen as our future "leaders". Janet Stout can not get along with anyone and Guy Cottrell is incapable of independent thought (*my personal opinion*). It does not give us much hope for the future. There needs to be a complete over-haul of our hiring and promotional

6

policies and procedures if things are ever to improve in this organization. Something I do not anticipate happening during my career.

Why aren't those of us in the field who work with these individuals being asked to evaluate team leaders and managers so there is at least something to use to gauge whether people will make good supervisors or managers? It is obvious to me that the powers to be can not see past the rhetoric being spun by those aspiring to be promoted and those mentoring those aspiring to be promoted. Perhaps input from those of us working with these people and privy to their knowledge, decision making abilities, integrity, and behavior towards others could be beneficial. If management and supervisors were respected, maybe Headquarters could take their word as to who they believe should be promoted. **HOWEVER, MANAGEMENT AND MANY TEAM LEADERS IN THIS DIVISION ARE NOT RESPECTED; therefore, I question those they are mentoring. I can not emphasize that enough. San Francisco needs to cease putting managers in this Division who are from this Division.** No one currently in the Level 15 pool or aspiring to be in the Level 15 pool can be taken seriously because they are not valued nor respected by many of us in the Division (my personal opinion).

Additionally, how can people that are not respected for their integrity as inspectors or their abilities be allowed to participate in any portion of the hiring and promotional processes, including panels at CDD, candidate interviews, and promotional panels? The people in this Division that participate in the screening process are not respected by their peers, why are they allowed to participate in such important processes? *Until the entire system changes regarding who we are hiring, who participates in the hiring and promotional panels, and the integrity of of merits and awards, we will continue to have inept people hiring and promoting inept people (my personal opinion).*

**Janet Stout** - Janet Stout can not get along with almost all the individuals she supervises. She has had serious problems with George Burns (who left the Agency for the IG), Ben Louie (who was going to leave the Agency until they transferred him off her team), Jimmy Woo, and Jennifer Lim. She has had verbal altercations with Mitch Herzog and Quan Howard. She does not have the ability or the temperament to manage people. Her contact with others on her team is demoralizing to those assigned to her team. Most recently, John Hummel put his name on the transfer list to Sacramento to escape her, even though it means a loss of his "high three" retirement salary since he is due to retire in another three years or so. I have nothing against Janet personally, but she has no business being a team leader if she can not modify her behavior to allow her to interact functionally with those she supervises. Period. She should not be allowed to continue to demoralize person after person in the Division, yet it has been allowed for years. Stout is friends with Nedd, having jointly filed an EEO. The perception in the Division is that Nedd is "taking care" of Stout, regardless of the effect on others. Additionally, there is a perception that a Response team is not needed in this Division but that it was implemented specifically to benefit Stout by placing her in San Jose (*which is not central to the Division*), in order to allow Stout to go to school to obtain her Masters' degree. Additionally, all EC teams report to AIC Gamache, yet Stout reports to Nedd.

**Guy Cottrell –** I personally do not believe he is a mean, vicious, person, or that he is not capable, however, I believe he can not make any decision on his own without first seeing what management's opinion is. Ask anyone in the Division about his relationship with Nedd and I am sure they will mention that they are attached at the hip. *We do not need any more supervisors like this – we have enough of them. We should be mentoring and promoting smart, independent*

*thinkers with enthusiasm and integrity who are not afraid to have opinions different from their managers.*

**Kevin Koski** - Another team leader that needs to be addressed is Kevin Koski in Sacramento. Again, I have nothing personal against him, however, due to Koski's past behavior, the two support clerks in Sacramento *(Bouillez and Nevison)* can no longer report to him but have to report to Patricia Ford-Smith, a Level 13 Inspector. Koski has had problems with Pam Bouillez *(filed a sexual harassment complaint naming him)*, Gerry Tokarski *(filed a sexual harassment claim against him)*, Linda Russo *(he made sexual harassment claims against her)*, Patricia Ford-Smith, and Bob Lieske. The Sacramento domicile is one of the most dysfunctional in the Division. Several of the Inspectors do not report to work until 11:00 a.m. or later. There are two new inspectors in this domicile working EC that are not being given any guidance *(Montalvo and Palomar)* because Koski has no EC experience. When one person upsets the entire domicile, questions need to be asked by management to determine why, and the problem needs to be addressed. That is not being done, nor has it been done in this Division. *Again, problem team leaders need to be addressed before they are allowed to disrupt and demoralize numerous employees.*

**Mark Aasmundstad** - was another team leader that was a problem in this Division. Four females filed EEOs naming him yet his behavior was never addressed. Even though he was a blatant repeat sexual harassers, he was rewarded up until the time he retired from this Division. Again, he was close friends with Nedd.

**Mike Cassidy** -- Mike Cassidy was demoted from a Level 14 to a 13 and investigated for his unethical behavior while on the FWC team in 2001. He has since been promoted again, to a team leader position. He was placed on the FWC team which is a slap in the face to everyone in this Division given his behavior of investigating his wife while he was on the FWC team, and from which he benefited. Additionally, many people do not want to work for him, and in fact will not work for him because of his attitudes and behavior, including his attitude toward females. He is currently aspiring to be a Level 15. On paper I am sure he looks like a star. Another reason for the need to address merit and award integrity. Last year he attempted to coerce a postmaster into changing his mind about not taking disciplinary action on an employee (Joe Eddie MacDonald, *El Sobrante Postmaster, Judy McDermott)*. I brought this to Nedd's attention and nothing was done.

**Anita Beppu** -- was transferred from Hawaii for allegedly lying in an EEO hearing involving Keith Silva. She is still a team leader. *People that do not have integrity should not be team leaders. If an inspector is not honest, then what can they represent for the Agency?*

**There needs to be an avenue where problem team leaders are addressed.**

## IV.    SAFETY ISSUES

--One of the numerous task forces is the Apprehension Task Force formed with the U.S. Marshalls' office to arrest those with outstanding warrants *(non-postal related)*. In a recent team meeting Alan Anderson stated he would not participate due to safety issues which have not openly been discussed or addressed. Another inspector participated and stated there was no pre-planning on the entry and they were arresting people with DWIs, *(Terry Eto)*. My concerns are that we are having the new inspectors participate with apparently no concern for their safety. Because they are new, they do what they are told and participate because they may deem it as

exciting, however, when safety issues are involved we are not looking out for their best interests. Additionally, do we really have the personnel to participate in this type of task force or is someone trying to enhance their 991.

--On an EC case Mike Cassidy went with another inspector to interview a suspect and he was not wearing his gun. The other inspector (*Greg Campbell*) had to draw his weapon because the suspect came at him with a knife. Management appeared to do nothing to Cassidy even though someone could have been killed. What they did do was move Campbell from Oakland to San Francisco. Rumor was that if he did that quietly they would promote him, which they shortly did. After this incident, I personally saw Cassidy working without wearing his gun while he was still on the EC assignment. *The message is that this is acceptable behavior, and that other inspector's safety is not a concern. This incident should have been dealt with harshly to send a message to others in the Division the importance of safety.*

--We are so short handed in IC that many times two people go out to test suspects. It is just a matter of time before someone gets hurt.

## V. DECISIONS MADE FOR PERSONAL AGENDAS

--Janet Stout to the Response Team in San Jose,
--Total break-up of the San Jose Team,
--Mike Wilson detailed to another domicile for a year,
--Quan Howard being made to commute to San Francisco and not being allowed to work in San Jose when others are not monitored like this,
--Mitch Herzog placed on a security team in San Francisco instead of being allowed to remain on a team in San Jose,
--Terry Fail moved to San Francisco,
--Frank Ducar promoted to a Team Leader in Fresno where there are only two inspectors domiciled there and already there are too many team leaders in this Division, many of whom only supervise a few people.
--Greg Crabb being detailed to head up a portion of the San Jose Bomb Case, the anthrax JOC, the Secret Service Task Force, and the witness protection in the San Francisco Robbery Case, to help promote him and enhance his 991,
--The preferential details given to MacMillan to help promote him and enhance his 991,
--Monetary Award given to Stout for the botched SF Robbery case,
--Devon Hall detailed to Sacramento to work EC (he has little to no experience) and a month later after he is just getting started in his assignment, being detailed to Fresno as the EC team leader (again, he has no experience in this assignment). Fresno has two experienced EC team members.
--:Using numerous individuals in the Division to give speeches on volume attacks instead of EC inspectors in their territories or management making the contacts they should be making.

## VI. TEAM SIZES AND UNNECESSARY TEAMS

The teams in this Division need to be reassessed, and the need and efficiency of said teams evaluated. Is it feasible to have someone drive three hours from San Francisco to Fresno CA to give a 15 minute security speech when someone in Fresno can do it? Is it feasible for numerous inspectors traveling to Fresno and Bakersfield staying over-night with per diem and hotel when those in the area can respond to IC cases? Is it more feasible to have an IC team in Sacramento rather than people driving from San Francisco to investigate cases? Is a Response team needed in

this Division, and if so, should it be in San Jose or central to the Division? Should team leaders only have to supervise 3-4 people? Why were 3 new team leaders promoted in 2002 for such small teams? Were there hidden agendas regarding who managers wanted to promote? A year ago 3 Level 13 inspectors were promoted even though some only had 2-4 people to supervise on their teams *(Campbell and Cassidy)*. Do other federal Agencies supervisor such a small number of people? And when a supervisor has such a small number of people to supervise, why aren't team leaders asked to perform more of the ad hoc duties instead of making Level 13 inspectors perform these duties, detracting from the time they spend performing their jobs? *Managers and supervisors need to start doing their jobs so that inspectors in the field can do their job, and the practice of team leaders supervising 2-4 people abolished.*

## VII. INSPECTORS PERFORMING SUPPORT WORK

Inspectors are being paid large salaries to perform secretarial/support duties. Inspectors are accessing Autotrack, PACER, TACS, DOIS. Recently at the BMC I was responsible for calling the copier repairman, filling the copier and fax with toner, calling the water man, waiting for the man that reads the meter, shredding old documents, and calling maintenance and waiting for them to clean the offices. I have had to sort through hundreds of 1510s to sort out the ones for my territory **(Exhibits 4 & 5)**. I can not believe that we do not have more support so that we can be working cases in the field. Additionally, it seems we are not getting the support we need in the field at the cost of someone checking off their accomplishments --like constructing a Division web page **(Exhibits 6 & 7)**. I have been trying for several years to obtain employee garnishments to assist in our IC investigations, as well as explaining to CTU the need for Carrier Route Information (CRIS) access for information we need to support us. To no avail. We have time to construct a Division web page that no one cares about but we can't get the help we need. Our support at the BMC was recently taken away even though the two inspectors domiciled there *(Anderson and myself)* obtained more IDs than the rest of the IC team together.

## VIII. FAVORITISM and TREATING EMPLOYEES WITH DIGNITY AND RESPECT

Management appears to be very vindictive if someone speaks up and disagrees with them. When someone speaks up against their decisions, they have been known to: threaten to relocate individuals to another city *(Linda Russo)*, detail individuals to another domicile *(Keith Silva)*, threaten to send individuals for a fitness for duty *(Judy McDermott)*, move them to another team (Bill *Kienzle, Jeff Kovacs, Terry Fail, Herzog, Howard, Eto)*, tell people they need to "fly under the radar screen" *(Mike Wilson and Efren Santos)*, make derogatory comments about individuals in front of other people *(Quan Howard at Sally Diaz's shower, Judy McDermott)*, yell and scream at people in front of others *(Marius Greenspan, Sally Diaz)*, tell individuals they will never work a specific assignment while they are in charge *(Quan Howard)*, taint people's reputation to others in the Division *(Eto)*, tell that people don't work quality cases *(San Jose Inspectors)*, that they are not doing a good job in their Ad Hoc positions *(Elena Bailey, Lowery)*, and other general derogatory and intimidating type comments and behavior.

*Individuals should feel free to come to management when there are disagreements about the decisions being made, without fear of retaliation. A competent management team should welcome input from those of us in the field that have the knowledge and experience and not feel threatened by it. The whole organization would benefit if management were more accepting of*

*constructive comments made to them, especially when it is evident they lack the knowledge, experience, and skills to manage the Division. Additionally, management, particularly Nedd, lacks common decency toward others.*

**Wanda Smith** – AIC Nedd, a black female, helped Smith, a black female with her 991, and Smith was awarded an Ad Hoc position when others with more experience appeared to be passed over (*I believe EEOs have been filed*). The perception was that race issues were involved, causing discord among other support personnel who applied for the job, were more qualified, and did not receive the job. Nedd had everyone interviewed about who was making comments that race was a factor, intimidating people against their freedom of speech. Nedd did not indicate to everyone interested in the Ad Hoc position that she would help everyone with their 991s. Additionally, many of the support people were told they could not put in for this position (*Elena Bailey, Marilyn Lee*). *I believe this is illegal.* Additionally, I was told that some were also told they better not file EEOs (*also illegal*). I have personal knowledge that Nedd has helped some inspectors with their 991s while not helping other inspectors (*Sally Diaz*). *I personally obtained a 991 from another individual (Davenport) to help Diaz with her 991 prior to her being interviewed and promoted because Nedd would not help her while she did help others. If a person in a management position provides assistance to one individual the offer should be made to all individuals to prevent the perception of favoritism and lack of impartiality.*

**Greg Crabb** - In 2002, AIC Nedd held a baby shower at her residence for Inspector Greg Crabb, someone she is personally mentoring, as many in the Division are well aware (**Exhibit 8**). Several months earlier, two baby showers were given at Division Headquarters for two new inspectors to the Division (*Heath and McAlhaney*). I have personally attended several baby showers for employees in the past, none of which were ever held at the AIC's personal residence. Given the perception in the Division that Inspector Crabb is already receiving preferential treatment by management in order to promote him (*via awards, merits and details*), the location of this shower at the AIC's residence, when not provided to others, is highly inappropriate and was the subject of much discussion in the Division. *A member of management should not be giving baby showers for one individual when the same gesture is not made to others in the Division. This behavior causes unnecessary friction within the Division and serves to support the perception that this individual is being given more favorable treatment. Preferential treatment within the Division is a common occurrence.*

**Greg Crabb** – Crabb has been put on a task force with the Secret Service. Nedd sent out an email on his "exceptional performance" he did on the search warrant even though she was not even his AIC and another inspector actually wrote the search warrant (*Brucklacher*). (**Exhibit 9**). By the wording in Nedd's email, you can see that Nedd is setting Crabb up to receive an "exceptional performance" monetary award - again. Another email she sent at the same time involved Jeff Taylor solving a difficult airport case involving theft of registered mail in which two individuals were identified. Her comments about Taylor were not as glowing even though his case had more significance and took more to solve (**Exhibit 10**). The write-ups show the disparity in treatment. Additionally, Crabb's involvement should be scrutinized to see who did what on this case. Taylor, a new inspector, solved two airport cases within a month of each other, quite a feat considering that is twice as many airport cases solved than I have seen in the last 10 years. However, no one is giving him glowing comments, nor has he yet to receive any monetary awards for his efforts which were above and beyond the norm (*yet FI team members received $500 for going to Hawaii and conducting audits*). Additionally, on a case under Nedd's own supervision involving Lester Lee, Nedd had no knowledge of his accomplishments until it was pointed out to her (**Exhibit 11**). Nedd follows what Crabb is doing when she is not his AIC, but

11

doesn't keep up with what her own people under her supervision are doing. She then gives some non-credible reason why she is following Crabb's progress. *There is obvious disparity in those management single out to reward, based not on the quality of the work but on personal agendas. Everyone in the Division sees what is happening and it causes hard feelings. Merits and monetary awards in this Division need to be scrutinized.*

**Quan Howard** – Nedd was upset at the entire San Jose team because they spoke up against her and her decisions and comments she made during the San Jose Bomb case. Nedd moved the entire team around, transferring some to different teams and making some drive from San Jose to San Francisco (*a brutal commute*). She moved Howard from San Jose to San Francisco to work on Jeff Kovacs team. Anyone aware of the commute situation in this area can identify with the punitive nature of the move. When Kovacs allowed Howard to work out of the San Jose domicile and not make the commute, Nedd intervened and moved Howard from Kovacs team to Sally Diaz's team. Nedd told Diaz that Howard had to work in the San Francisco domicile (*per Diaz's comments to me*). Others are not specifically made to work in San Francisco domicile, yet because of Nedd's personal vendetta against Howard, he was singled out. When Greg Campbell was initially transferred from Oakland to San Francisco, he repeatedly worked in an office in Vallejo, close to his residence, with Nedd's knowledge and approval. She had no problem with that. At the time, Campbell was also one of the individuals she was mentoring. Additionally, Nedd has sent numerous emails to Quan that are unprofessional (**Exhibit 12**). *Management can not change the rules based on who management does or does not like or who they are trying to punish. The rationale management will give – that Quan needed to be watched is unfounded and their word alone should not be taken – because they lack integrity.*

**Paul Lowery** - During the same San Jose bomb case, Nedd removed Paul Lowery from the position as PIO shortly after he was transferred to that position. Lowery allegedly said something to the media that management deemed inappropriate. He was removed without any reasonable chance for Lowery to explain his position and comments, and what appeared to be without any justification. In a meeting Lowery had with Nedd regarding this incident, Nedd yelled at him in an unprofessional manner and became "red in the face with her fat jowls shaking" (*per Lowery's comments to me*). When the meeting was over and Lowery left, she followed him to his office, pounded on the door and told him to change his voice mail to reflect that he was not the PIO. After removing Lowery from the PIO position, management later attempted to recruit others to the PIO position (*including myself and Paul Wilhelmus*). Due to the unjustified treatment of Lowery by management, we declined the position. Many in the Division were upset at Lowery's treatment during this matter and how he was removed from his position without management gathering the facts of what occurred. About a month ago, in January 2003, Nedd asked Lowery to again be the PIO (*something he has always wanted to do*). Nedd told Lowery that she made a mistake and acted too hastily when he was initially removed him from the PIO position during the San Jose bomb case (*per Lowery's comments to me*). Lowery said Nedd never did apologize to him. *This again shows Nedd's irrational and unprofessional behavior and that she acts without thinking, regardless of the effect on the Division and its personnel and her belief that she need not treat people with common decency.*

**Elena Bailey** – Elena is a support clerk that up until 2002 was in charge of the Division Diversity program. She did an incredible job of organizing speakers for the Division to discuss Diversity issues and was passionate about it, which made her a perfect fit for the job. I don't know of anyone in the Division that did not feel she did anything but an incredible job for the Division as the Diversity Coordinator. In 2002, AIC Nedd told Bailey that she did not like how she handled the Diversity program and the things she was doing. I have no idea where Nedd was coming

12

from, as I believe her comments were totally unjustified (*I think others in the Division will agree with my assessment that Bailey was doing an incredible job*). Bailey, being made to feel totally degraded and inadequate by Nedd's comments, resigned from the position. The Diversity position was then given to Mike Cassidy, an inspector many in this Division do not respect nor trust. Not only did Nedd give the position to Cassidy, but management began to tell team leaders they had to attend the meetings when speakers came to talk about Diversity, began to provide support personnel admin. time to attend, and provided others with training credits. It is my belief they are trying to make it appear there is more interest in the program now that Cassidy has been placed as the coordinator (**Exhibits 13-15**). This could not be further from the truth. Many people now will not go to the Diversity functions because Cassidy is the coordinator, believing the terms Cassidy and Diversity in the same sentence is a joke. It's sort of like putting Mark Aasmundstad in charge of the sexual harassment program or Doug Nunes in charge of the integrity program.

*There was no reason for Nedd's criticism of Bailey, except for Nedd's personal agenda of giving a duty to Cassidy that he can put on his 991 for promotional purposes into the Level 15 pool. I have heard repeatedly from one team leader that Nedd respects Cassidy and if there is a "loophole" he will find it. She also has a bond with him because allegedly someone sent anonymous letters about them to the IG. Nedd's interference in Bailey's program for her own personal agenda and placing Cassidy in charge of Diversity, considering his background, is degrading to all of us in the Division. Bailey should be allowed to resume her position as Diversity coordinator, if she will accept the position.*

**Liz Karp** - Liz is a support clerk who was at the BMC until several months ago, when everyone was taken off the IC Richmond team at the BMC except for me. This is probably the fourth time Liz has been transferred from the BMC to San Francisco. After it was announced that Karp was being transferred from the BMC, I pointed out to management how Inspector Alan Anderson and myself (*both domiciled at the BMC*) obtained more stats for IC during 2002 than the rest of the IC team combined and that it did not appear rationale to take our support (**Exhibit 16**). I received no response to my concerns, Liz was transferred, and Anderson was given a detail to San Francisco. There was no reason to move Karp. She could have performed duties at the BMC in Richmond as well as in San Francisco. Management can say it was her performance, but at no time did her team leader (*Beppu*) come to the BMC to review her work. I believe Karp was moved to deny me the opportunity of support in an attempt to get me to fail at my job so they can do to me what they attempted to do to Keith Silva after he filed EEOs. I have 9 EEOs and in 2002 I had the highest number of IC stats in the Division. Liz was transferred for the umpteenth time with no regard to her feelings that she is not valued and that she can be moved back and forth at management's whim. Additionally, in February 2002, several months after Karp was moved, management is now looking for a support person to perform a detail for IC/EC teams (**Exhibit 17**). Additionally, Karp was recently told by Sheilah Castor that she was being transferred back to the BMC. On 2/26/03 Karp told me she is not returning to the BMC, per Castor. On 2/27/03 I heard Alan Kiel was talking about the petition going around about conditions in the Division. I am wondering if the sudden decision to not return Karp has anything to do with that, and their attempts to once again retaliate against those of us who came forward, by denying support at the BMC, particularly to me. *Treating people like they are expendable and of no value is degrading and demeaning and lowers the morale of employees.*

**Jimmy Woo** - In a large robbery case in the Division, problems arose with the U.S. Attorney due to some procedural issues. Management attempted to "go after" Woo, until inspectors who were outraged spoke up. Woo has a history with the team leader involved (*Janet Stout*). Stout and

AIC Nedd support one another due to an EEO they jointly filed. The suspect involved in the robbery was convicted of witness tampering, not robbery, due to the flaws of the case (**Exhibit 18**). Stout received a large monetary reward for the case and her position was moved to San Jose to benefit her and her personal goal of going to school to obtain her masters' degree. It should be noted that relations with the U.S. Attorney's office in San Francisco are strained due to this case, of which Stout was overseeing (*Alan Anderson, Jimmy Woo, Ken Hudgens, and Ben Louie*), yet she was monetarily rewarded by management for a witness tampering conviction in a robbery case. I question why some individuals are receiving awards for cases that do not appear to warrant it. This is an on-going theme in this Division and is demoralizing to the morale in the division. Awards should be given to those that deserve it or not given at all. They should not be given to someone because they are your friend or you are trying to enhance their 991. This case damaged our reputation with the U.S. Attorney's office, Stout was the team leader involved, and she is rewarded. *If team members are at fault on a case, we have to look to the ability of their team leaders to manage and guide them, and if they are unable to manage they may need to be removed from their jobs. If inspectors are not performing adequately – in the eyes of management – then management also must take responsibility for not doing their jobs of monitoring and training individuals. The fault does not lie solely with the individual inspector. Supervisors and managers need to be held accountable.*

**Greg Crabb** - Several of the witnesses involved in the above robbery case were placed in a witness protection program, with several inspectors guarding them at local hotels. When the robbery case plead out, the witnesses were told they were "out" of the witness protection program. Two witnesses involved had already vacated their home and given away all their belongings. The postal inspector who was over-seeing the protection of these two witnesses (*Greg Crabb*), failed to get anything in writing from the U.S. Attorney or the U.S. Marshalls to protect the witnesses who were willing to testify on the government's behalf. The Postal Inspection service ended up paying the costs to relocate the two witnesses after this fiasco. This happened because Crabb an inexperienced inspector that management was grooming for promotional opportunities, had no experience to draw from on how to document such an important item of the case. I personally heard him say he got nothing in writing and made no notes on the agreement made (Patricia Ford-Smith). This same inspector was also put in charge of a search site in San Jose on a mail bomb murder case that was allegedly the highest priority case in the county at the time. Again, he had relatively no experience in this type of high profile case. He was also put in charge of a portion of the Anthrax response at the time of that crisis even though team leaders headed up other portions (**Exhibit 19**). Additionally, Crabb recently attempted to recruit people and set up a recruitment fair even though that in no way falls under his dutie, and the PIO who had already had a job fair where Crabb was again trying to set one up (**Exhibit 20**). My belief is that this is just one more attempt to enhance his 991. *The Division needs to put experienced and qualified individuals in charge of "projects" not those whose 991s they are trying to enhance, or the result will be a negative reflection on the organization. Additionally, changes in the Division need to occur so those with experience and knowledge will want to be promoted. Currently, most people are so disgusted with the current management team that many of the qualified individuals have taken their names out the management program. The ones left in the program are not respected by many people in the Division even though they are supported by management – Greg Crabb, Matt MacMillan, Guy Cottrell, Mike Cassidy, and Janet Stout.*

**Greg Gamache** - In a recent meeting of Bill Kienzle's Security team AIC Gamache referred to employees as "resource units" (*per Paul Wilhelmus' comments to me*). This comment is degrading and humiliating to employees and shows the mentality and lack of sensitivity of the manager involved. We are individuals, with value, thoughts, and experience, not "resource

units". *Comments like this do not endure employees to this management team, nor does it motivate employees to perform their jobs when that is the level of value they are given.*

**Susan Baughan** – This year two FWC teams were formed and it was stated these were the highest priority teams. Baughan is a FWC SME and just got back from teaching a FWC class. She was taken off the team allegedly because Mike Cassidy did not want her on the team, thinking she sent an anonymous letter about his unethical conduct the last time he was on the FWC team. Baughan was told by management that it was time she moved to another assignment because she had been on FWC for too long, (*even though Baughan preferred to stay on FWC*). Baughan has more FWC knowledge than almost all FWC inspectors in this Division combined. Additionally, there are others who have been on the same assignment longer, yet they have not been moved off their teams: Bob Dortch, Candace Wilkes, Pat Dorn. If FWC is such an important team why would you move the SME off that team? *Making changes due to the whims of a team leader, at a detriment to the team and the Division is inefficient and disparate. And, if the reason management gave for the move is that she has been on the assignment too long, they should ensure that others on teams for an extended period of time are also moved Not doing this is disparate treatment and opens the agency up to more EEOs being filed.*

**James Rickher**- Inspector Ricker had a dying brother in Chicago and asked for a hardship to return to Chicago. The hardship was denied, and his brother died. I have heard rumors that Rickher is not a favorite with management. I can understand their attitude as he is not my favorite either; however, management still must do the human thing when circumstances as this arise. Inspector Jose Morales was given a hardship from Seattle to Bakersfield because of a sick mother-in-law. Inspector Richard Holman was given allowances with his job because of problems he was having with his kidneys and being placed on dialysis. Janet Stout was moved to San Jose to pursue school. Kathy Herzog was allowed to work at home while off on "maternity leave" so as not to have to take leave. Jocelyn Pastrana was given a hardship detail to New York. *Was the reason Inspector Richer not given his hardship request due to management's dislike of him? It is inexcusable that he was denied this hardship given the types of hardships granted in the past..*

**Mike Ramos** – A new inspector was promised a monetary amount when he was hired from another Agency to this Agency. Now INC Kiel is saying he can not recall their discussion and Ramos has lost a lot of money by coming to this Agency. *This behavior does not endure employees to this organization and it shows the level of integrity of our managers.*

**Marius Greenspan**- Juliana Nedd was screaming at Greenspan in the hallway at DHQ while others were present. Someone reported her behavior to Alan Kiel because they were offended by her outburst. Nedd sent out an email to those she though might have witnessed her outburst after Kiel spoke to her. In her email she never did really apologize for her behavior **(Exhibit 21)**. This is not the first time she has been known to react irrationally and unprofessionally in her interactions with others (*Judy McDermott, Paul Lowery, Mike Wilson, Efren Santos, Mitch Herzog, Terry Eto, Linda Russo, Quan Howard, Elena Bailey*). *This behavior is unacceptable coming from anyone, especially a manger and should not be tolerated. This is not the type of behavior that can be condoned.*

***Bill Kienzle*** – Bill Kienzle was moved from team to team to team, apparently because he has been vocal to management. Additionally, he was supportive of me after Nedd threatened to send me for a Fitness for Duty in 2002. Shortly after, he was removed from his position as IC

Richmond team leader (*against his wishes*). I believe this occurred in retaliation for Kienzle's support of me after this encounter with Nedd.

**Jeff Kovacs** – Jeff Kovacs spoke up against comments Greg Gamache made in 2002 relative to destroying EEO records and subsequently was denied a "far exceeds" merit. I believe this was in retaliation for his coming forward on something he believed was unethical on Gamache's part. *Retaliation is not acceptable, nor are the comments by Gamache indicating that relevant EEO records should be destroyed. This is further compounded by IAD's failure to investigate my allegations naming Gamache – yet another reason I do not have much faith in our Agency to monitor itself.*

**Mike Wilson** - Inspector Wilson (*who consistently obtains a high number of EC arrests*) was not in favor with management because he spoke up against some of their decisions involving the San Jose bombing case. Wilson has been detailed from Bakersfield to another domicile (*Fresno*) with per diem and hotel costs being paid by the government, while another inspector (*Brian Evans*) was detailed from Oakland to Bakersfield to replace him, with per diem and hotel costs being paid to this inspector. Evans was also said to be on management's "list". This is a waste of monetary resources, counterproductive, and deteriorates the morale of inspectors involved as well as the morale of other inspectors who see what has happened and knows why it happened – retaliation for speaking up. Why would we keep an inspector detailed from his family for over a year? There is someone on the Fresno list that could be brought in if there was a need **(Exhibit 22).** Additionally, a team leader was put in Fresno this year when it may have been better to put a working team member there. Also, in 2002, I volunteered for an EC detail to Redding California but was denied the detail because Mark Aasmundstad was the team leader. Instead, Wilson and Santos were detailed to that area, against their wishes. Initially, Nedd told Wilson he was going to be detailed there with a student inspector, but Wilson asked for Santos to go with him. I volunteered for the detail, yet because management was trying to punish these inspectors they were forced to go, with costs associated with plane fare, vehicles, per diem and hotels. *Decisions like this benefit no one and serves to demoralize everyone in the Division, not to mention the cost to the Division.*

**Ed Rox** – Rox was within months of retiring and had a disagreement with a team leader (Mark Aasmundstad). Instead of investigating the matter and determining whether Aasmundstad was at fault, management relocated Rox to DHQ, paying him per diem and housing costs. If Aasmundstad was wrong in his actions, the team member should not have been punished this way at a monetary cost to the Division. Nedd and Aasmundstad are close personal friends. The INC allegedly told someone in the Division that he supports his team leaders regardless of their actions. It is obvious that this mentality has caused many problems in the Division – for years. Additionally, the excuse management gave of non-performance should be scrutinized. If someone has been a non-performer for years, why is he chosen to be punished in the last two months before his retirement. If he was a problem, he should have been addressed long before now and that team leader and AIC should have been held accountable. There was a reason management decided to punish Rox at this late date - he stood up to Mark Aasmundstad – Period. *If a team leader is not right in the decisions they make, management should not support them regardless of the monetary cost and morale to individuals in the Division.*

**Ken Hudgens** – Ken Hudgens had a wife that was dying from cancer. Management moved him from team to team to team, because he was known to speak up when he did not agree with management. He was criticized for handling the San Francisco Robbery case, even though management put him on the case when they knew he had no robbery experience, while others in

the Division did (*Terry Fail*). Management took no responsibility for not selecting someone with experience for such a high profile case (*the same thing happened on the San Jose Mail bombing case which has some serious issues – including a suspect fleeing the country*). Hudgens retired from the Agency, largely due to his treatment. His wife has since passed on. Ken Hudgens was one of the most well-liked and respected inspectors in this Division, yet management's treatment of him was entirely insensitive and unwarranted especially egregious given his person situation. At the same time, other team leaders, who continually messed up were not addressed: Doug Nunes (*lying in an affidavit to the U.S. attorney's office -- Victoria Fussell/Candace Wilkes*), Anita Beppu (*lying in an EEO hearing and tampering with evidence – Keith Silva*), Pat Dorn (*disparity between males and females – Cindy Davenport*), Mike Cassidy (*not wearing his gun on EC, attempting to coerce a postmaster, investigating his wife and then receiving rewards – Greg Campbell, myself*) Kevin Koski (*sexual harassment issues- Pam Boulliez, Gerry Tokarski and Linda Russo*), Mark Aasmundstad (*sexual harassment issues – myself, Bonnie Bone, Gwen Bundy, Cindy Davenport, Linda Russo*).

## IX. MONETARY AWARDS AND MERITS

Monetary awards and merits need to be scrutinized in this Division. They are rarely given to those deserving, but given to those that management has chosen to mentor, regardless of whether accomplishments merit it. MacMillan was given monetary awards in 2002 for a case the entire team worked yet he was singled out by Aasmundstad to receive the award (*Russo, Lieske, Ford-Smith*). Giving awards to those that are undeserving sets them up to be our future leaders. On paper they look like stars, when that couldn't be the furthest from the truth. Crabb has been given so many awards it is hard to keep track of all of them. See the email Nedd sent out about Crabb's "exceptional performance". People should not be awarded for doing their jobs. Last year I received the highest number of IC identifications, yet I received no monetary award or merit.

Recently, management set up a review committee for awards. However, many are so disgusted with the management team that I am not sure who put in for this committee. Additionally, I believe this committee it should not be comprised of volunteers, but that everyone in the Division should nominate 5 trusted individuals to be on this committee. The ramifications of unjust awards and merits has too large an impact to be left to people that have no integrity and are not trusted in the Division. Additionally, I believe management has shown repeatedly that they can not be trusted to make these decisions.

Merits and awards use to be published for all to see until 1998 when I obtained these records as part of an EEO I filed. Once I received these records I saw that Mark Aasmundstad submitted two male team members for monetary awards, for 3 and 5 IDs, while he did not submit me for a monetary award even though I had 14 IDs. I filed an EEO on the disparity. Since then, management has no longer published merits and awards. In fact, they now go to great lengths to hide who is receiving merits and awards. The Far Exceeds for this year have been kept quiet, I believe because several people may not have been deserving, and management knows this.

*An over-haul of merits and awards needs to be conducted. A committee should be formed, consisting of individuals in the Division who have been nominated by their peers to serve on this committee to oversee the integrity of merits and awards. Volunteers should not be put on this committee, to serve as puppets for management. The quality of those we promote and subsequently the quality of the Agency, will not improve until the integrity issue of merits and*

*awards is addressed. Managers who lack integrity, mentoring those that lack integrity, leads to an Agency that lacks integrity.*

# X. TRAINING NEW INSPECTORS/HARDSHIPS

New employees have been thrown out in the field with little to no supervision. How can they when many of our team leaders have no experience working the assignments they supervise. Greg Campbell was promoted to the ICN team leader with no ICN experience and has a new student on his team (*Angela Zinn*). Inspector Beppu was placed on IC, with relatively little IC experience with two new team members (*Jeff Taylor and Mike Ramos*), Kevin Koski was made the EC team leader of Sacramento with all the volume attacks occurring, and he has relatively no EC experience, yet he has two new inspectors on his team (*Montalvo and Palomar*), and Pat Dorn in EC Oakland was given almost a full team of new inspectors. How can we be efficient and effective when new inspectors are left to flounder on their own with no one to turn to for assistance. A recent email to the Division stated that new inspectors stated their training was less than satisfactory (**Exhibit 23**). We are not being fair to these new employees by giving them less than adequate training and supervision nor to the future of the organization.

In a recent IC investigation a new inspector (*Jeff Taylor*) and a post-basic inspector (*Mike Ramos*) were allowed to interview a suspect together. The team leader was present but did not insist that someone with more expertise sit in on the interview. Additionally, while these two new inspectors were in the interview the team leader (*Beppu*) told all of us to leave (*because we had worked all through the night*). When I questioned her and asked if she was sure we should all leave, she saw no problem with leaving two new inspectors alone in an unfamiliar city. *There is no way new inspectors should be interviewing with new inspectors until they have gained experience, and there is no way two new inspectors should be left to fend for themselves without anyone nearby in case problems arise. This is not how our new inspectors should be trained. Team leaders need to take their jobs seriously and be more responsible with our future inspectors. If they don't want to do the job they are paid to do, they should step down as Level 14s.*

--This Division in the past year or so has had many new inspectors transfer to the Division. A "mentor" program was set up and people volunteered to be mentors. One new inspector stated they never heard from their "mentor". All of the "mentors" were in the management program (**Exhibit 24**). I wonder if the reason they became mentors was to put something on their 991s for their own promotional purposes, rather than helping the new inspectors. The new inspectors should be asked how much "mentoring" they received and if it was none, any mention their mentors made on their 991s about being a mentor should be deleted. Additionally, the idea of a mentoring program is good, but mentors should not be people who are not valued and respected as inspectors and who do not follow up with their mentoring responsibilities.

--Many new inspectors can not afford to live here. This issue needs to be addressed or we will soon be losing more of our young, enthusiastic inspectors. I personally know of at least 5 inspectors that are looking to leave the Agency. *This issue has been previously addressed. Openings can be made in the outlying domiciles which would benefit not only the Division but newer inspectors that would be glad to relocate. Already, many of the new inspectors are disillusioned with this Agency because of what they have seen in San Francisco.*

18

# XI. FRAUD WASTE AND ABUSE, AND MISMANAGEMENT

--AIC Nedd had a Sacramento EC team meeting in Reno, NV in May 2002 that lasted for approximately 2 hours. At least 7 individuals had to drive several hours from Sacramento, San Francisco, Stockton, Fresno and Bakersfield to attend. Individuals drove government cars, were paid per diem and lodged over-night in a hotel (*Nedd, Aasmundstad, Harding, Wemyss, Palomar, Wilson, MacMillan, Nunes, Santos*). The real reason they had the meeting in Reno was that one member of the team domiciled in Reno (*Lott Steffey*) was retiring and the meeting was scheduled so that team members could attend a retirement dinner for him, at the government's expense. The meeting lasted less than 2 hours. Additionally, the AIC later had a party at her vacation home nearby that weekend for those to attend. The INC and AIC sanctioning this "meeting" is fraud, waste, and abuse of the system, and mismanagement of budgetary and personnel resources. During 2002 the Division did not have enough money from me to buy a greeting card for an IC test without prior approval, and some inspectors could not join professional organizations necessary for their job, yet money was unnecessarily wasted in this manner under the guise of "work". *These are the type of decisions that need to be questioned and the integrity of those who condoned it, scrutinized.*

--Several months ago management sent an email stating no one could travel to Hawaii without prior approval from management due to budgetary concerns. This was disseminated after Quan Howard indicated he was going to Hawaii for his recruitment efforts (*Nedd has a personal vendetta against Howard*). Shortly after this message was distributed, many members from Mike Cassidy's team, INC Kiel, and a couple from Jeff Kovac's team flew to Hawaii to conduct Audits. Members on Cassidy's team even received $500 monetary awards for their "efforts". Either we have money for travel to Hawaii or we don't. Additionally, the reason Hawaii inspectors are not addressing these issues should be scrutinized. Numerous inspectors traveling to Hawii unnecessarily takes a huge toll on the budget.

--After Bill Kienzle stood up for me regarding a meeting with Juliana Nedd, where she threatened to send me for a fitness for duty, Kienzle was transferred off the IC Richmond team against his wishes. He had only been on the team several months. I believe this was in retaliation for supporting me. Additionally, Nedd later put in writing her reason for threatening me with a Fitness for Duty was that comments I made were not rationale (**Exhibit 25**). Yet, I was never sent for a fitness for duty. If her comments were true, then why didn't she send me for a fitness for duty? I believe her later written comments are a blatant lie to cover her irrational and unethical outburst which she could not substantiate with facts, **Bill Kienzle should be interviewed immediately to determine whether my comments were rationale, and if he says they were rationale, Nedd should be removed from her position immediately for her lack of integrity and her blatant written lies.** *Lack of integrity in a manager can not be tolerated.*

--In 2002, Greg Gamache made comments to Jeff Kovacs, indicating that he should destroy relevant EEO records. Kovacs thought Gamache's comments to him were so unethical and unprofessional that he reported Gamache to the EEO investigator and INC Kiel. Nothing was done. I subsequently sent a letter and exhibits to Internal Affairs and nothing was done. I followed up with an email to the head of legal and Chief Heath and again nothing was done (**Exhibit 26**). This is a blatant abuse and mismanagement of his position and in fact is a violation of law. Gamache should be removed from his position immediately. *Lack of integrity in a manager can not be tolerated. This type of behavior, especially from a manager should not be*

*condoned -- it can not be condoned and swept under the carpet. And if this is the behavior our Agency is allowing to occur, the public needs to be informed.*

--After Jeff Kovacs came forward regarding comments Gamache made in reference to destroying EEO records, he was passed over for a "Far Exceeds" merit in 2002, for which he should have received. *Another example of retaliation that regularly occurs in this Division.*

--Management's response to problems is to form a task force, instead of looking at how the problem can be solved in more efficient ways. In 2002, a task force was formed in Sacramento to address increased volume attacks. The inspector put in charge of the task force (*Matt McMillan*) had a questionable amount of EC experience and knowledge, yet he was put in charge of the task force. Many believe this was done to enhance his 991 as he has been dubbed a "chosen one" by management, especially being mentored by Mark Aasmundstad. The task force went on for months, with people being transferred on for a few months and then replaced by others. There was no stability on the task force and at one point there were 3 individuals on the task force, two of whom had no EC experience (*Jennifer Lim and Victoria Fussell*). When an AIC was questioned about why inexperienced people were being put on the task force the AIC stated they "needed the hours". During the task force, management detailed MacMillan to an acting team leader position in another city (Oakland), again it appears to enhance his 991, yet the task force of three was left intact in Sacramento. An earlier request for Lim to assist the IC team for a couple days met with a resounding "no", she was needed on the task force *(Exhibit 27), (yet the task force leader could be moved off the task force for an acting team leader postion)(Exhibits 28-29).* It appears management may not have been concerned about solving the problem of volume attacks, but only "putting in the hours" or enhancing someones' 991. Most recently, MacMillan was tasked to meet with all employees in the Division to discuss case management, even though he addressed the same issues in a team leader meeting to all the team leaders. He even flew to Hawaii to meet with Inspectors there. I guess saying you spoke to 150 people instead of 10 people looks better on a 991, however, it is a waste of everyone's time and takes away from tasks in the Division and what we need to be focusing our attention on. What are are team leaders paid to do? Was this "project" really necessary or were there hidden agendas? Ask Patricia Ford-Smith where MacMillan got the spreadsheet he supposedly came up with on his own for this project.

Additionally, why was a task force formed to address a problem allegedly significant enough that 4 inspectors were used to give speeches to police departments, and 3 other inspectors were detailed from their teams to the task force, yet the task force leader was detailed off the task force while the task force was still intact? There is some question that the only reason the task force was formed initially, rather than being addressed by the Sacramento EC team, was to make this particular inspector's 991 look more attractive with task force leader experience since he had not been successful in several Level 14 job interviews. At the time, other cities (*Stockton*) had a higher number of volume attacks than Sacramento, but no task force was formed there.

*If a task force is necessary, put qualified people on it with a qualified task force leader to oversee it and get the job done in the most expedient, efficient manner possible. And if a task force is no longer important enough to keep the task force leader on it, maybe the task force is not needed and the involved inspectors should be allowed to return to their teams. Either task forces are needed or they are not. They shouldn't be unnecessarily formed to enhance someone's promotibility at the expense of the performance of the Division and our reputation to local postal management and law enforcement that sees we are not solving the problems.*

Matt MacMillan has been singled out in other ways in attempts to promote him. He was recently tasked with giving an EC training class. Many of the senior EC members would not attend this class (*Wilson, Eto, Santos*). While on the task force there was some question of his knowledge and abilities, including lying on his affidavits, and illegally arresting people just because they were the payee on a stolen check (*Jennifer Lim, Brian Evans*). If individuals are not up to par on what they do, why do we try to promote them? We should be promoting our brightest individuals that have integrity. In 1998 MacMillan embellished his year-end accomplishments beyond recognition (*entire Sacto domicile*). He received a far exceeds merit. *I have a problem with individuals that lack integrity and the agency should have a problem with people that lack integrity.*

--Recently the call signs in the Division were all re-assigned. The reason was that people were changing on the teams so frequently that we now will all have the same call sign forever. Now, instead of easily recalling team member's call signs on surveillances, there is this incredible range of number to recall (Exhibit 30). *An easier solution would have been to quit moving people every six months from team to team. In many assignments it takes time to establish contacts and can not be done when we are constantly being moved from team to team.*

--Numerous retired postal inspectors are being hired for FWC contract fraud analysts. *Are these positions being illegal awarded to "friends" or are positions being posted to the public?*

--In testing an IC suspect, an Inspector (Alan Anderson) wired two parcels with an LB1. The suspect did not show up for work so we could not test him. The suspect was fired for breaking into a vending machine where he worked two weeks earlier. Management was going to fire him earlier but waited until we could try to test him for mail theft. Anderson claimed an ID on this case for theft and rifling of mail (**Exhibit 30**). You don't claim an ID just because you think someone is stealing. This is total fraud since we did not catch the person stealing, yet this ID was approved by team leader Beppu. Anderson is in the management program. These are the types of out-right fraud the IG should be interested in when we are reviewed next year. *Other cases and IDs claimed should be scrutinized either by us or the IG,, including EC blotter arrests, double counting EC arrests both state and federally, and stats claimed coming from task forces. Police reports may need to be obtained to determine the credibility of statements made in case jackets and CARs. Lack of integrity can not be tolerated. Period.*

I could go on and on as I am sure others can. I believe we have serious issues that need to be addressed in order to allow us in San Francisco to perform the jobs we were hired to do. Personally, I don't think our agency is able to monitor and correct our situation in San Francisco. I have concerns that Headquarters does not take our issues seriously, as Ahern was previously made aware of some of the on-going issues as well as Chief Weaver and Chief Heath, yet nothing has been addressed. I believe Ahern should also be held accountable for the condition of this Division. What is his job? Why hasn't he addressed the low functioning level and work performance and the low morale in this Division? It has been on-going long enough. Mangers are accountable from the top on down and should be made accountable for the condition of this Division. I personally am tired of hearing people say the Chief is referring to San Francisco as the "Left Coast". It is degrading. I would like to see the Chief address the problems in this Division not contribute to them by failing to take action when he knows there are problems here.

I ask that information I have provided remain confidential and do not allow you to release any portion of it to anyone. Any information I have provided should be substantiated by an

independent investigation as to its credibility. Any follow-up should be conducted in a manner so that individuals questioned will provide information independently of my statements and comments. My comments are not meant to "target" anyone, but are provided in an effort to ensure integrity is reinstated within this Division (*if there ever was integrity*), and that people are treated with dignity and respect.

Additionally, I am personally appalled at the rumors that Alan Kiel may be promoted to Ahern's job when he retires, that Nedd may be receiving the Germany job, and that Janet Stout and Mike Cassidy may be promoted to Level 15s. People that have allowed the destruction of this Division and the morale, and have been involved in questionable behavior should not be rewarded. I strongly recommend that you review the integrity of those in the management program – level 14s and level 15s via a survey to Division personnel.

I have also heard that you are coming to visit with the team leaders in this Division in three weeks. I sincerely hope that is not your solution to our concerns. I am waiting to hear your response of how your are going to proceed before I make further comments about this, as you said you would let us know this week. I just want to point out that the team leaders in this Division do not represent or speak for the rest of us in the Division and any concerns addressed in the petition I would hope would not be discussed with them. You will note that only two team leaders signed the petition. I listed above the numerous integrity issues involving many of our team leaders, thus you can see our concerns.

I submit this information with the best of intentions of improving the conditions in this Division, and in the future of this Agency, however skeptical I may be. I sincerely hope that someone within the Agency is listening.

Sincerely,

Judy McDermott

Judy McDermott
Postal Inspector
San Francisco Division
510/528-9708

Exhibits
1-31

EXHIBIT 8

| | |
|---|---|
| From: | Birch, James W |
| Sent: | Thursday, March 06, 2003 5:45 AM |
| To: | McDermott, Judy A |
| Subject: | Express Mail Letter |

Good morning Judy,

I received your Express Mail letter yesterday afternoon and just finished reading/digesting your many concerns, observations, and opinions.

I'm not sure where to start. Your passion for the issues and for the Inspection Service to remedy the issues is evident. I appreciate that you put forth these issues in a professional manner and find many of your points with regards to why/how the Inspection Service should improve to be persuasive and critical for our Agency's growth and credibility.     Rather than address each issue you've presented, I'd like to focus on page 21 and offer feedback for your consideration.

Last Paragraph:  ...........''I sincerely hope that someone within the Agency is listening''.



On Tuesday, I met personally with the Chief in DC to discuss the issues in San Fran and the resultant petition.  The discussion was substantive and following are some of the key points/issues/themes that were raised:

- a petition with 50 names is compelling...........a quick, decisive, yet well thought-out response, needs to occur

- any action taken needs to respect both the feelings/sentiments expressed via the petition and the fact that the San Fran Mgmt will no doubt have perspectives that are different.............respect needs to be given to 'both sides' and information sought from both sides

- it is equally critical to get the views of all San Fran personnel in a way that is non-intrusive and confidential

- a range of options from 'doing nothing' to 'overreacting' is what the IS is faced with;   obviously 'doing nothing' is the wrong answer and 'overreacting as a first action' doesnt lend the respect that is owed to all concerned.

- information needs to be shared with the DCI-WFO and San Fran INC as to the severity of sentiments expressed via the petition

Judy, please know that the confidentiality of names was maintained throughout the discussion. Also, I think it is important for you to know that the Chief had no interest in knowing who signed...........the fact that 50 felt that the only way to get something done was to sign a petition was all he needed to hear.  He trusted my judgment as to the severity of issues and has authorized a series of things to happen.

Now, I need to ask a favor.........you have trusted me with your Confidentiality.   I now ask that you trust my judgment when I say that what the IS is planning is timely, responsible, professional, and respectful to all sides. I'm not at liberty to share this now because there are a few loose ends that need to be tied.  There will be several steps taken, some sooner than others.  No one step is the answer to addressing all the issues, but once all steps are taken/completed then I believe relevant resolutions will be apparent and permanent.  I know I'm being circumspect on this, but just as I value your confidentiality, I also value the Chief's.

Next-to-last paragraph:   ''...heard you were coming to visit with T/L's''.

INC Kiel called last Friday and invited me to speak at the T/L meeting. This is not unusual as many INC's have done this at my urging.  The timing was coincidental.   I accepted as there was no need for him to know of the other issues I was addressing.   Now that a course of action on the issues will soon become apparent, I don't believe it is constructive for me to go to this meeting.  I will notify INC Kiel of this today.................again, please don't share this point as I'd like to give the proper courtesies to the INC before he hears from others........thanks.

Third-to-last paragraph:   '.......appalled at rumors!!!!!!!!!!!!''

I don't like comment on rumors as they generally just perpetuate more rumors.  To the extent you agree, I'd ask that you

1

encourage others not to focus on rumors..............very few ever come true!

I welcome a continuing dialogue with you and will answer as many questions as I can regarding what we're doing and why. I'm meeting with Mike Ahern and Alan Kiel next week in St. Louis to discuss much of what the Chief and I discussed. Again, I want to be respectful to both sides..........especially in the early stages where alot more information is needed.

nce you transmitted the petition, I also don't mind if you ask for information on behalf of those who signed the petition. If ou choose to be a conduit of info for them........that's fine with me....your choice.

I know I didnt comment on every issue in your letter. Over time, I'm sure we'll discuss them.

Thanks again for your professionalism, passion for the issues, and obvious desire to have the Inspection Service be around for a long time.   We all have the same goal..........it's just sometimes so hard to agree on the best path.

# EXHIBIT 9



-----Original Message-----
**From:** Birch, James W
**Sent:** Saturday, March 22, 2003 5:12 AM
**To:** McDermott, Judy A
**Subject:** RE: Division Reassignments

Good morning,

I can certainly understand your desire to get answers to the questions in your message. However, to answer each one presents a personal dilemma. I am in the position now of knowing the specific concerns and names of 50 individuals who have professionally put forward serious issues regarding the ethics and effectiveness of the San Fran management team. I also know the specific concerns and strategy that the Chief has personally chosen to begin to address the issues. He, too, has asked that I respect his confidentiality as to why events will unfold as they do. I believe the worst thing I can do at this point is to give additional information to someone on the petition or to the Chief that would intentionally or inadvertently violate either trust. I know there will be suppositions by both parties as to the who, what, where, when, and how of these events and events to come. I see I have two choices: .........1. try to clear up suppositions and run the risk of inadvertently giving out too much information, or ........2. not respond to specific questions that might lead to violating a trust by either group. I will choose number 2.

I can tell you with great certainty that the Chief is fully aware of the issues that have been raised and has personally chosen a strategy to address them. As I mentioned in earlier messages, the 3-point framework that is driving his strategy is:

1. Respect the opinions and concerns brought forward by the petition.

2. Respect the opinions and concerns of San Fran Div Mgmt regarding their views and understanding of the issues.

3. Capture the opinions and concerns of those in the Division that did not sign the petition.

The additional information that I will share with you is that T/L Donnelly and AIC Wisniewski were personally chosen and briefed by the Chief and they are well aware that a petition of 50 San Fran employees expressed serious concern regarding the operations and leadership of the San Fran Div. I have been present at every meeting and briefing regarding San Francisco and can assure you the Chief is taking an active, personal interest in how all events evolve. I'm fully empowered to speak up if any issues appear to be taken out of context or 'spun' to the advantage of either side...........to date, I've not had to speak up.

I hope this helps    Thanks.

Counselor's Report
Page _123_ of _152_

Attachment 6

1



# EXHIBIT 10

McDermott, Judy A

From:        McDermott, Judy A
Sent:        Thursday, May 01, 2003 2:52 PM
To:          Birch, James W
Subject:     Status

Inspector Birch:

I am a little more than a bit disappointed by the speed of action/non-action for this Division regarding our concerns previously provided to you. I told myself I would wait until the end of April to hear from you. My main concerns, (which I believe are also the concerns of many others, and should have been concluded if others were contacted as I believe they should have been by now), include:

1) Alan Kiel still in charge of this Division after allowing the past behavior to occur and after 50 people came forward,
2) Alan Kiel still providing monetary awards and/or gifts to individuals which appear to address personal agendas, and w/o impartial oversight,
3) Alan Kiel intimidating at least one support person for signing the petition (on more than one occasion), and attempting to conduct his own investigation into the matter,
4) Talk regarding new teams and realignments being discussed, yet neither the AICs detailed to this Division or Headquarters, have made any attempt to contact anyone other than team leaders. Level 13s, PPOs and support, have not been solicited to provide input. As I said before, the majority of these team leaders in this Division do not represent us, and in many cases are part of the problem.

When I sent my letter to you, it was to outline some of my concerns which I felt were the same issues and concerns of others. I provided examples of some of the things I was talking about to show that my comments were credible. Some issues I outlined to you, hoping there would be follow-up and verifications (via discussions/contact with others in the Division). That has not occurred. Additionally, it has come to my attention that some items addressed in my letter to you were released (at the very least) to one member of the management team who further released it (I will not comment further on how I know this and ask that you not comment to anyone on this - what is done is done). The purpose of my letter was not to discuss those matters with management (or anyone else for that matter), but to give you information to pursue if/when anyone came to speak to others in the Division (or via a survey) to verify whether there are over-all concerns regarding the same issues I addressed. I still think the issues I outlined in my letter need to be addressed - either inside the Agency or outside the Agency.

If others are contacted and no one else addresses the concerns in my letter, than maybe I am the only one who sees those things as problems and it does not need to be addressed. I believe the petition speaks otherwise. I know that I can not continue to sit by and be silent about some of the things that are occurring when I believe legitimate complaints are not taken seriously or addressed adequately, and especially when I know that a manager has been allowed to intimidate a support clerk without any ramification. How Mr. Kiel can still be in this Division after contacting someone on an anonymous petition is beyond me, especially when that person is a subordinate. IAD should have been here immediately, the individual interviewed, and Mr. Kiel contacted to see who else he contacted in this manner. To my knowledge, that has not been done.

It is degrading for those of us in the Division to have Mr. Kiel still in charge, playing the same games. He is responsible for the condition of this Division, and it has been two months since we came forward with our very serious concerns. I think Mr. Kiel's behavior prior to and after the petition needs to be addressed. Additionally, if Headquarters is serious about improving conditions and morale, I think it is imperative that individuals are contacted immediately about their concerns. I can not stress that enough. The longer period of time that elapses before we are contacted, the less credibility the two AICs to this Division have as being sent here to address/assess concerns outlined in the petition. How can they, we haven't even been asked what we, as a whole, believe the specific problems are. How can concerns be addressed when you only speak to the problem people? They should hear input from everyone in the Division, and then make decisions (or relay information to others to make decisions). To discuss any possible changes with only input from Alan Kiel and team leaders, is counter-productive. I really believe that we need to be listened to, and then whatever decisions are made, we at least know the decisions were based on the "whole" story, not the story provided by management and supervisors. I already feel less willing to discuss matters further, as I don't think we are being taken seriously.

I see where another position has been posted for San Francisco. There is no way Alan Kiel should have any input into the selection. I previously addressed the level of supervisors in this Division and the role they have played in the low morale. To allow him to continue making decisions for this Division, will only further serve to demoralize us, and take this Division

1

Counselor's Report
Page 67 of 153

Exhibit 5A

that much longer to recover. In just looking at some of the last few people filtered out of this Division (as mentored by the past management teams, there are many qualified people who are no longer in the Level 14 management program. I think all promotions in this Division need to be placed on hold until the concerns are addressed. As it is, some team leaders now only have 3-4 people to supervisor. It would not negatively impact the Division to delay further promotions while any aspect of the old management team is still in this Division and until morale improves and qualified people return their names to the management program list. Promoting unqualified people is what has gotten us where we are at today. Someone has to understand that as being the underlying problem.

I think we have been more than patient in waiting to see what happens. However, I personally feel we are not being taken seriously. We have a manager in charge of this Division that has allowed: negative treatment of employees, favoritism, disparity in merits and awards, mis-management of funds, and lack of integrity in statistical reporting. Yet, he is still here. We as a Division have many concerns about the conditions of the Division, yet no attempt has been made to contact us. I am hoping things change soon.

I would ask that this email not be released to anyone and I again ask for confidentiality. I am hoping that you will see the need, in furtherance of raising the morale, to contact the rest of us in the Division in the very near future to give legitimacy to our concerns, and to address Alan Kiel still being in this Division.


Judy McDermott
Postal Inspector

Counselor's Report
Page _68_ of _153_

Exhibit 5A

# EXHIBIT 11

McDermott, Judy A

From:           Birch, James W
Sent:           Wednesday, May 07, 2003 8:15 AM
To:             McDermott, Judy A
Subject:        Status

Hi..........thanks for your patience...........I don't find it real conducive sending substantive messages from hotel rooms........plus, my hands just don't seem to fit the keyboard of the laptop.......everyone should have these problems, right!!!!

Thanks again for sharing your thoughts via your message of May 1st. As I've said before, I recognize the passion of your position and genuine interest in making positive changes happen in the San Fran Division. However, I believe we're at a crossroads of disagreement on several of your concerns.........please consider the following:

Re:  Speed of action/non-action:  I feel the organization responded in a very direct, deliberate, and timely manner with regards to the petition; i.e. my access to the Chief was immediate; the Chief listened to several suggestions from key advisors on the best way to proceed; the Chief took active interest and personally chose a course of action that would evolve in several steps; two San Fran AIC's were diverted to other assignments; two acting AIC's personally chosen by the Chief were sent to San Fran; feedback from DCI-WFO, SF INC, and acting AIC's being evaluated. More steps will follow.

While it is true that we did not choose the course of action that you personally recommended, I believe the course of action chosen is effective, inclusive, and respectful of the many variables at play both inside and outside the San Fran Division.

Re:  Alan Kiel still in charge:  The 50 people who signed the petition presented a valuable service in highlighting conditions in San Fran that pointed to significant questions regarding Division Leadership. Leadership in any Division can be defined as the interplay between T/L's, AIC's, and the INC. At this point, there are two new acting AIC's in place. The dynamics and interplay are obviously different, and time will tell whether different means better.

While it is true that we did not remove the INC as you suggested, I believe that the addition of two new AIC's was the best first step. As info, the addition of the two AIC's has prompted other messages from San Fran personnel to me that implies that they are appreciative of this step and optimistic that we're on the right track.

Re:  INC giving awards:  Division functions are dynamic and on-going and it would not be expected that the INC put all operational decisions and administrative processes, to include awards, on hold. I understand these awards were given at an open ceremony with the merits of the award made known to all who attended. I can't address whether the awards were to perpetuate personal agendas.....I don't know. However, I'd be more inclined to agree with you if awards were given out behind closed doors. I've had no contact with anyone who felt these awards were to perpetuate the INC's personal agenda. I've had one contact that appreciated the fact that awards were made public.

You do make a good point with regards to impartial oversight over awards. Some Divisions have processes that include Awards Comittees or similar oversight procedures that are designed to mitigate any appearance of impartiality. This might be a good suggestion for San Fran. I'd encourage you to make that suggestion.

Re:  INC intimidating a Support employee:  if you are referring to the INC's secretary, then I'd have to say that the in-depth info that I've received on the issue from many people does not corroborate this conclusion. If it is someone else, then I don't know. As far as the INC conducting his own investigation, I've received no info on this regard.  If you want to give me more info, I can make inquiries.

Re:  New teams/alignments :  I understand that the complement challenge is prompting another review of teams and alignments. It is normal and expected that AIC's ask T/L's for input...........it is also normal for T/L's to solicit input from team members, etc. I'm sure your new AIC's expect this to happen. If it doesnt happen, then I'm confused why ISLE-13's and others don't take the initiative to give this input. I understand your points regarding the other AIC's and how approaching them was tenuous at best, hence, the best approach was avoidance. However, based on the many messages I've received regarding the 'breath of fresh air' that seems to be present, I don't understand the reluctance to bring info to the attention of Donnelly and Wisniewski.

T/L's may not represent you or how you 'feel' about the intangibles in the Division; i.e. work environement, communication, etc., but they certainly do represent you in being conduits of info regarding operational decisions. If you have a T/L that doesnt ask for your opinion on team sizes and/or alignments - then let them know.

1

EXHIBIT 12

| From: | McDermott, Judy A |
|---|---|
| Sent: | Wednesday, May 14, 2003 4:39 PM |
| To: | Birch, James W |
| Subject: | Status |

Inspector Birch:

A funny thing about perspective. It appears everyone has a different one. I will just give some of my own thoughts on your comments to allow for a different perspective.

I realize that HDQTRs probably feels they acted promptly and adequately regarding the petition. However, what some of us see is that Chief Heath had to do something due to the seriousness of allegations made and the number of people coming forward. What we see is Chief Heath was given a legitimate opportunity to take action against Nedd, someone who previously filed an EEO against him, and Gamache being moved to legitimize her move. Neither was a punishment. Nedd got the promotion she wanted and Gamache is getting paid to count guns. Of course people are ecstatic that the two AICs are gone, we outlined the state of affairs to you and any change was sure to have been met with enthusiasm...... However, what we also see, is that the person who was actually in charge of the Division and responsible for allowing the deterioration of the Division (and a member of the good old boy club) is still in charge, as if nothing has happened. When a General takes charge of a battle and his troops are slaughtered, since when isn't the General held responsible (not the best analogy, but I am sure you get the picture). A perfect example is the IG - she is on the carpet, not her underlings. Alan Kiel was the INC and he must be held accountable. Not to do so is a mockery, and while management thinks they have done enough - they haven't. You point out the two AICs is the first step and their feedback will be evaluated and more steps will follow. We will see what steps follow and the time-frame.

Petition: This outlined that there were problems, not the specifics of why we believed there were problems, who we believed was ultimately responsible for the problems, and changes necessary to get us back on track. While it is true that Nedd's abrasive personality and erratic management style was paramount to the deterioration of the Division, Alan Kiel sat back collecting $147,000 doing absolutely nothing but allowing her to call all the shots and demoralize the entire Division. He is as responsible as she is, yet no action has been taken against him. If anything, as INC he should have been removed initially with the others to follow. If someone's entire body is infected with gangrene you can cut off their arm and a leg, but you are still left with gangrene. That is what Alan Kiel represents.

Awards: You make a valid point that one person was glad the awards were made public, however, it is the fact that Alan Kiel has no credibility left to give awards and his opinion on who deserves awards is inconsequential. His credibility is shot. While I was not personally there, I was contacted by others disgusted by some of the awards he gave and comments he made. Again, he demoralizes us by any input he provides. As far as my making a suggestion for oversight procedures on the awards, that will not be done while Alan Kiel is in Charge. He is the reason there is a need for oversight. It's a sad day when you cannot trust managers and supervisors to have their own integrity so that a committee has to watch over their every move. This is something the AICs could be soliciting input on since it was in the petition and outlined in my letter to you. A committee could have already been formed if others saw it as a problem and we are trying to address the problems.

Intimidating a Support employee: Yes, I am talking about the INC's secretary, who called you in a panic about Alan Kiel contacting her, and later was observed by many in tears (that's how upset she was by Kiel's contact). Both acting AICs saw her in tears, allegedly knowing we are having problems, yet neither attempted to contact her and find out what was going on. Perhaps it is easier to turn a blind eye to the matter. I personally contacted the secretary prior to and after the incident in question to obtain the facts of what occurred. I also contacted her after I received your last email, and asked her again if she felt intimidated by Kiel - she did. To think it is ok for an INC to contact a signator (who is subordinate to him) on what was to have been an anonymous petition and question her about why her name was on the petition, is totally inappropriate and should have been addressed (via your office) in a manner appropriate to it's seriousness. Again, nothing happened. You may not believe IAD is necessary to address Kiel's unethical behavior, Gamache telling at least one supervisor to destroy EEO records, and individuals falsely claiming stats, but I think others in other venues would disagree.

New teams/alignments: While it is true we have a significant complement problem at this time, team alignment problems were already in place long before all the details, transfers, promotions and military leave occurred, as a result of management's rash decisions. As for us going to the AICs, I believe we came forward via the petition, and it is up to them to come to us for input IF they are serious about understanding the "total" picture and are intent on

1

improving conditions. I can't understand why that has not already been done, unless they are here for their or the Chiefs own benefit, and actually are not really addressing our concerns. If that is being the case, I do believe they are not here to address our concerns, ( the petition letter),  because we are not being asked about our concerns.  The most recent talk of rounding up numerous EC arrests all over the Division (not just volume attack areas) may look good on their 991s when they return to their Divisions, but is it really focusing in on our concerns addressed to you via the petition? No, it's not. First and foremost we need to be heard about our concerns we came forward with and then maybe we can all get on board with whatever agendas managers coming into the Division have in mind.  As for me going to my team leader and the team leader acting as a conduit, I have repeatedly pointed out that most of these team leader do not represent us or our concerns. I previously pointed out my own personal observations of the many team leaders in this Division (again the reason that Alan Kiel should have no further input into promotions in this Division).   A perfect example of notifying my team leader regarding my own personal concerns was the fact that our support clerk at my domicile was transferred from my domicile this year.  I pointed out to my team leader how the two inspectors at this domicile had more IC stats than the rest of the IC team combined in FY02, yet our support was taken away.  It fell on deaf ears.  Currently the stats are down significantly.  I personally went from having the most IC stats in the Division last year to having the least this year.  It doesn't seem to matter to management.  I do not mean to personalize this, but it is an example of what we are up against.  We just had about 20 support clerks from the ISOG transferred to the Division, and there is no one available to provide support at our domicile?  If I had a team leader that "got" the ramification of being without support here, we would still have a support clerk.

As for me accepting responsibility on behalf of the others in the Division, I don't.  I ask that you go to others to get their input.  I am only sending my view to you because I know some people feel the same as I do - I do not represent everyone, nor should I.  I continue dialogue with you because of my knowledge that some others feel as I do, but don't/can't speak up, while I know I have nothing to lose after what I have been through in this Division.  You said the consensus you received was that "Leadership is broken - do something Now". Alan Kiel is our broken leadership.

You suggest that I and others contact the AICs, but if they were actually put out here to address our concerns as we were initially lead to believe, the ball is in their court and they must be the ones to approach us.   If there is a problem, the first step in fixing the problem is finding out what the problems are, and to do that you need to ask the people involved in the problems (and I am not talking about the team leaders).  You can't address the problems until you do that - from my perspective.  Additionally, continued changes (or lack of) should not be based on a generalized petition and one or two letters you may have received from people in this Division.

I think all of us here want to get on with the work at hand, and get enthusiasm back for the job, with an effective and knowledgeable leadership.  The sooner our concerns are addressed, the sooner that can happen.  I think I have been clear about what we expect to happen and you have been reasonably clear about what is happening from your/HDQTRS perspective.   I understand we are not privy to everything going on behind the scenes (and I do hope there is activity behind the scenes), but hopefully you will understand the action and changes that must occur soon.

Thank you for your time in this matter.

Judy McDermott

EXHIBIT 13

Postal Service

**Information for Pre-Complaint Counseling**

| Certified Mail No. 7099 3400 0008 5894 9322 | Date Mailed 10-20-03 | *or* Hand Delivered on |
|---|---|---|
| By *(Initials)* cr | Case No. | |

On _____ 10-14-03 _____, you requested an appointment with a Dispute Resolution Specialist.
*(Month, Day, Year)*

**Important: Please read.** You should complete this form and return it to the EEO office *within10 calendar days* of receipt. This is the only notification that you will receive regarding the necessity for you to complete this form.

## A. Requester Information

| Name *(Last, First, MI)* McDermott, Judy | Social Security 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  572-60-025 | Home Telephone No. (707) 428-6513 |
|---|---|---|
| Your Mailing Address 366 Hibiscus Ln, Suisin City, CA  94585-3813 | Finance Number 10-8204 | |

| Name of Postal Facility Where You Work | | Office Telephone No. (510) 528-9708 |
|---|---|---|
| Address of Postal Facility | *See Attached* | Email Address* |

Employment Status *(Check One)*
☐ Applicant   ☐ Casual   ☐ TE   ☐ Career

| Pay Location | Tour | Duty Hours | Off Days *(If Tour I, Show Nights Off )* | Time in Current Position _ Years _ Months |
|---|---|---|---|---|
| | Position Title | | | Grade Level |
| Your Supervisor's Name | Supervisor's Title | | | Supervisor's Telephone No. ( ) |

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

## B. Discrimination Factors

Prohibited discrimination includes actions taken based on your *Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or in Retaliation (actions based on your participation in prior EEO activity).* These categories are referred to on this form as factors. What factor(s) of Discrimination are you alleging? (Please be specific, i.e., Race-African American, Sex-Female).

*See Attached*

*For Retaliation Allegations Only.* If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity that you feel caused you to be retaliated against.

1. On_____, I engaged in EEO activity.  Case No.:_____
   *(Month, Day, Year)*

2. On_____, I engaged in EEO activity.  Case No.:_____
   *(Month, Day, Year)*

## C. Description of Incident/Action

Please use the space below to briefly describe the incident or action that prompted you to seek EEO counseling at this time.

On_____, 20___
   *Month, Day*          *Year*

*See Attached 9 pages 4 8 exhibits*

PS Form 2564-A, March 2001 *(Page 1 of 3)*

**D. Comparisons**

Explain why, based on the factors you cited in Section B, you believe that you were treated differently than other employees or applicants in similar situations

1.
_____          _____
*(Name of Employee)*                  *Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)*

was treated differently than I when: _____

_____

_____

_____

2.
_____          _____
*(Name of Employee)*                  *Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)*

was treated differently than I when: _____

_____

_____

_____

3.
_____          _____
*(Name of Employee)*                  *Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)*

was treated differently than I when: _____

**E. Official(s) Responsible for Action(s)**

List the name(s) of the official(s) who took the action that prompted you to seek counseling at this time.

1a. Name                                          b. Title

c. Office                                         d. Grade Level

2a. Name                                          b. Title

c. Office                                         d. Grade Level

*Retaliation Allegations Only:* Was/were the official(s) listed in Section D above aware of your prior EEO activity?

[ ] No   [ ] Yes   If yes, explain how the official(s) became aware: _____

_____

**F. Resolution**

What are you seeking as a resolution to your pre-complaint?

_____

_____

**G. Grievance/MSPB Appeal**

On the incident that prompted you to seek EEO counseling, have you:

1. Filed a grievance on the same issue?    [X] No    [ ] Yes    If yes, _____    _____
                                                                      *(Date)*              *(Current Step)*

2. Filed a MSPB appeal on this issue?    [ ] No    [ ] Yes    If yes, _____
                                                                    *(Date Appeal Filed)*

PS Form 2564-A, March 2001 *(Page 2 of 3)*

Anonymity

You have the right to remain anonymous during the pre-complaint process.

Do you desire anonymity?  ☑ No    ☐ Yes

## I. Representation

You have the right to retain representation of your choice. *(check one)*

☑ I waive the right to representation at this time.    ☐ I authorize the person listed below to represent me.

| Name of Representative | Representative's Title | |
|---|---|---|
| Organization | Telephone Number | Email Address* |

Mailing Address *(Street or P.P. Box, City, State and Zip +4)*

* Providing this information will authorize the U.S. Postal Service to send your representative important documents electronically.

## J. Documentation

Please attach any documentation you wish to submit to support your allegation(s). Include a copy of any written action(s) that caused you to seek counseling at this time.

Note: If you are alleging mental and/or physical disability, it is important for you to submit medical documentation of your disability during the pre-complaint process.

## K. Privacy Act Notice

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## L. Authorization

I am aware that the claim(s) contained herein shall by-pass the pre-complaint process *if like or related to a formal complaint that I have already filed, or if the claim(s) constitutes a spin-off complaint.* (A spin-off complaint contests the manner in which a previously filed complaint is being processed.) In completing this PS Form 2564-A, *Information for Pre-complaint Counseling*, I recognize that the Manager, Dispute Resolution will review the claim(s) contained herein and determine how they shall be processed. I will be notified, in writing, if the Manager determines that my claim(s) shall be processed as amendments or appendages to a formal complaint that I have already filed.

Please print your name here      Judy A. McDermott

Your Signature      *Judy A. McDermott*

Date signed      11-4-03

THIS IS A NEW INSTANCE OF RETALIATION - PLEASE DO NOT FRAGMENT.

Please return this form to:

MANAGER OF DISPUTE RESOLUTION
EEO COMPLIANCE & APPEALS
475 L'ENFANT PLAZA SW, 9431
WASHINGTON, DC  20260-4135
FAX: (202) 268-2816

PS Form 2564-A, March 2001 *(Page 3 of 3)*

**November 4, 2003**

## A: Requester Information

Judy McDermott
366 Hibiscus Lane
Suisun City Ca 94585-3813
707/428-6513 home
510/528-9708 work

San Francisco Bulk Mail Center
2501 Rydin Road
Richmond, CA 94804-9751

Career Employee
17+ years as a Postal Inspector, ISLE 13
Supervisor: Sally Diaz, Postal Inspector, 415/778-5900

On September 11, 2003, I was investigated by Internal Affairs Division (IAD) for an alleged threat I made against Linda Ng, ECA Support Clerk, on August 21, 2003. The threat was non-credible. However, I believe I was investigated in retaliation for my participation in the removal of the three managers from their positions in the San Francisco Division of the Postal Inspection Service in 2003, and also for a letter (and 92 exhibits) I sent to David Fineman, Chairman of the Postal Board of Governors, and Dianne Feinstein, Senator, on 8/4/03, which contained examples of on-going fraud, waste, abuse and mismanagement in the Postal Inspection Service. This letter was released to the Postal Inspection Service in August 2003, by David Fineman, after it was stressed that it not to be released to the USPIS.

I previously filed an EEO on 10/20/03 (#66-000-0055-03) after I was punitively reassigned from the Internal Crimes (IC) team in Richmond, CA on July 1, 2003, to the External Crimes Assault (ECA) team in San Francisco, as a result of my participation in submitting a petition w/49 employee signatures in an attempt to have someone address serious issues in the Division including Fraud, Waste, Abuse, and Mismanagement. I outlined in that EEO how I believed that others signing the petition, which led to the removal of the three Division managers, had also been retaliated against and that signators on the petition had been compromised by Jim Birch, Ombudsman.

As outlined in my EEO filed on 10/20/03, in February 2003 I began correspondence with Jim Birch, Ombudsman for the Postal Inspection Service, regarding problems within the San Francisco Division of the Postal Inspection Service. I subsequently helped organized a petition (which was to be confidential) that was sent to Birch containing 49 employee signatures who had concerns with problems in the Division, including a survey to be sent to employees about their concerns. I subsequently sent Birch a letter with 31 exhibits on March 4, 2003, citing examples of concerns addressed in the petition and to give credibility to items addressed in the petition. The letter and exhibits were not included in that EEO due to the highly confidential and sensitive nature of the information.

The petition and subsequent correspondence to Birch resulted in the removal of the top three managers from their positions (Alan Kiel, INC, Juliana Nedd, AIC and Greg Gamache, AIC) in 2003. Shortly after, I was retaliated against by being transferred from the IC team against my