#7a:

--Did you observe Lee stressed performing as the Admin Center supervisor? If yes, what did you observe and how often did you observe it?  *n/A*

--Were you aware of the reasons Lee was stressed?  If yes, what were they?
*Yes management attitude toward her*

--Did you ever see Lee stressed, crying and/or appearing upset while performing her job as a secretary? If yes, explain.  *No*

--Were you aware of any individuals in the Admin Center that were upset when they did not receive a monetary award from Lee? If yes, who?  *No*

--Did the rotating phone schedule and absences affect the workload distribution in the Admin Center? If yes explain.  *No*

#7b:

--Were you aware of which employees that Lee relied heavily on to perform the work in the Admin Center? If yes, who?  *No*

--Do you know why Lee relied heavily on the above people?  Explain.  *No*

--Did you ever tell Lee that you felt frustrated or stressed from answering the phones, the amount of work assigned to you, and/or the assignment given to you? If yes, what did you say to Lee?  *No*

#7c:

--Were you aware of the reason Anita Cabano was removed as Admin Supervisor prior to Lee? If yes, explain.  *No*

--Did Lee ever discuss with you any problems she had with your work and/or attendance? If yes, what problems did she discuss with you?  *No*

--What did Lee say were her concerns regarding the above issues regarding work and/or attendance? Explain

--Did Lee ever give you a negative job performance in writing?  *No*

#7d:

--Were you aware of the timekeeping issue where all employees on higher level details were not paid the higher level pay, and their pay had to be readjusted going back for a two year period? If yes, who was responsible for not entering the appropriate higher-level pay?  *Yes, but not through Ms. Lee.*

--Were the pay readjustments going back two years time-consuming? Explain.  *n/A*

2

#7e:

--Were you aware of any employee in the Admin Center who stated they may have to take time off for surgery? If yes, who?  *Yes, Tom Gamez*

--Would an employee on extended leave affect the workload for the Admin Center? If yes, how?  *?*

--Did you ever complain to Lee about difficult customers on phone calls or additional work she gave you? If yes, what did you say to her?  What was Lee's response?  *No*

#7f.

--Was it your perception that management showed favoritism and/or discrimination toward certain employees? If yes, who?  *Yes Don't want to name NAMES, but there are about 4 employees*

--For each person listed above, what special treatment did the above individuals receive?

--Did you ever observe favoritism and/or discrimination regarding work details? Parking spaces? Preferred assignments? Reporting time? If yes to any of these, explain.  *Yes again the same Fear*

--Did you ever complain to Lee about the favoritism and/or discrimination you observed? If yes, what did you complain to Lee about?  *Yes, But we know it was no good to address the problem without retaliation*

--What was Lee's response to you about the favoritism and/or discrimination towards certain employees?  *Upset, but could do nothing about it*

#7g:

--Did you feel that the NLECC transition was stressful? If yes, why? Explain.  *NA*

--When NLECC transitioned, did some of the work transfer to the Admin Center? If yes, what extra work?  *NA*

--Did the extra workload cause pressure on the Admin Center to get the work done? If yes, explain.  *NA*

--Were you aware of any emergency calls handled by any Admin Center employees that were not handled properly? If yes, who?  How were you aware of this? Explain.  *NA*

--Were you aware of problems with phone messages left on the NLECC phone extensions? If yes, explain.  Is this why the buddy phone log was implemented by Lee?  *NA*

#7h:

--Were you aware of personality conflicts among employees in the Admin Center? If yes, what were their issues?  *No not really, we all have our bad days*

--Did you ever discuss with Lee any problems you had with other employees? If yes, what was discussed?  *No*

#7i:

--Were you aware that Lee was not included in the team leader meetings, or in some of the management decisions? If yes, how were you aware of this? *Yes, she told me.*

--Did Lee, being excluded from the above meetings or management decisions impact the Admin Center with last minute changes? If yes, explain? *Yes but not sure in what areas*

#7j:

--After the NLECC transition, were you aware of the direct support employees and/or inspectors sending extra work to the Admin Center? Explain. *NA*

--Was the extra work from the direct support employees and/or inspectors discussed by any of the employees as being problematic? If yes, why was it problematic? *NA*

--Were you aware that Lee was trying to get out of the supervisory job? If yes, how were you aware of this? *She told me several times she wanted a promotion to get out of supervisory wk.*

--Did you know why Lee wanted out of the supervisor job? If yes, explain why and how you knew.

--Do you fear retaliation from management for answering these questions? If yes, why? *Yes, because that's the way it is here.*

## I CERTIFY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

NAME OF PERSON COMPLETING THIS FORM (Printed): *Ellena Bailey*

SIGNATURE OF PERSON: *Ellena Bailey*

TITLE: *ISOT*

DATE: *11-4-05*

# EXHIBIT 71

September 14, 2007

Chief Counsel
Customer Programs
U. S. Postal Service
475 L'Enfant Plaza, SW
Washington DC  20260-1135

RE:  FOIA and Privacy Act Request for Records  - Appeal
     (Freedom of Information Act, 6 U.S.C. Section 552(a))
     EEO  Case 66-000-0053-05

To Whom It May Concern:

I previously sent a FOIA dated July 18, 2007 requesting the following information and received
by letter dated August 22, 2007, that the Agency denied two of the requests (Nos. 7 and 8 below).
We are appealing the Agency's refusal to provide relevant requested information.

The information is requested because I was discriminated and retaliated by the managers of the
San Francisco Division when they refused to pay for my detail to the OIG after I signed a petition
that resulted in the removal of the top three SF manager in 2003 and thus removed from my job
of record as secretary when promised no retaliation by HQ managers and suffered stress because I
was reassigned as supervisor.  We are questioning some of the information as erroneous or
missing, and that your agency further validate the information.  Information will be used for
discovery in trial.  The request for records are as follows:

1)      The names of San Francisco Division support technicians who were on details in 2005,
the length of their details; their pay level while on detail, and whether the Postal Service or the
Inspection Service paid for their workhours while on detail.

The worksheet received is inaccurate.  Although Katie O'Leary was on detail in 2005, I was
employed and present at SF DHQ when Ms. Katie O'Leary was detailed to the post office since
2003.  Also, Teresita Venegas was detailed as an Information Technician in 2005 and was
omitted from the worksheet.  I was present at SF at DHQ when Ms. Sheilah Castor was detailed
to Bala Cynwyd, PA from April 2, 2005 to June 10, 2005 (as mentioned in agency's letter dated
August 22, 2007 as Item #4) as a Level 23 in the Purchasing & Administrative Services Center
and will request under separate FOIA or discovery records to prove that her detail was paid by the
Inspection Service, San Francisco Division.  Witnesses and records will prove that the San
Francisco Division of the Inspection Service paid for Ms O'Leary's and Ms. Castor's details to
other units.

2)      Sheilah N. Castor's 2005 eDiary calendar information.

We find that questionable that Ms. Castor has no eDiary information for 2005.  There is
Inspection Service policy on support employees of Level 17 and above to submit eDiary
information.  We will ask under discovery what the policy is who must submit eDiary
information.

3)    Sheilah N. Castors' 2005 travel vouchers.

Your letter of August 22, 2007 indicates that no travel vouchers were filed for Ms. Castor when detailed to the position in Bala Cynwyd, PA, as indicated on the attached worksheet is suspicious. We are requesting a copy of the Inspection Service regulations wherein physical copies of travel vouchers are to be kept. These regulations may be obtained either through the Inspection Service or OIG so that we may request copies of the 2005 travel vouchers of Sheilah Castor. Please send a copy of the mentioned PS Form 1723, Assignment Order which has no finance number that was for Ms. Sheliah Castor.

Ms. Castor must also file her voucher(s) on the eTravel network and copies can be obtained through the eTravel network. To prove that Ms. Castor submitted travel vouchers, please provide a management copy of the 2005 travel expense reports for Bala Cynwyd, PA or 2005 San Francisco Division's travel expense reports listing any travel expense check(s) paid out to Ms. Castor in 2005.

4)    Sheilah N. Castor's 2005 detail(s), and the unit that paid for her workhours and travel expenses, and the pay level of all these details.

The worksheet submitted by your office indicates that the Postal Service paid for her detail. We question the validity of the unit that paid for her workhours. Please provide management payroll reports for the San Francisco Division Inspection Service for the period April 2-June 10, 2005 or Bala Cynwood's payroll reports that supposedly paid for Castor's workhours for the 2005.

5)    The names of individuals who were detailed to Sheilah N Castor's position in San Francisco as the Administrative Specialist in 2005 while Castor was on her detail(s).

I agree that Kaycee Graham was the only individual who was detailed as Admin Specialist while Castor was on detail.

6)    The starting and ending dates for Katie O'Leary's detail to the USPS, her pay level during this detail, and whether the Inspection Service or the Postal Service paid for this detail.

This is erroneous as Ms. Lee was present at SF DHQ when Ms. O'Leary was detailed to the post office in 2003, 2004, and 2005. Ms. O'Leary continued to be on detail to the post office in 2006. She was paid a Level 20 during her detail and the San Francisco Division of the Inspection Service paid for her workhours. Please provide payroll reports for the San Francisco Division Inspection Service or for the post office that allegedly paid for Katie O'Leary's workhours for the years 2003-2005.

7)    Copies of personnel briefs indicating positions held in their careers of Barbara Mendes, Kaycee Graham, Anita Cabano and Katie O'Leary.

This information is critical to our case because these individuals had supervisory experience and could have replaced me as supervisor when she was suffering stress. I have been an employee of the Inspection Service for over 25 years and was present when these individuals served as a supervisor for the Inspection Service at some point in their careers.

8) Copies of any 2003, 2004, 2005, or 2006 award evaluations given to either Barbara Mendes, Kaycee Graham, Anita Cabano or Katie O'Leary.

It is not of personal interest that this information is needed, but to justify that these individuals were competent supervisors, as well as employees, who received awards recognized by management. We are requesting award writeups or Minneapolis award reports naming these individuals receiving awards for either 2003, 2004, 2005 or for 2006. Under discovery, we will ask for all awards, certificates of appreciation, etc. for their entire career.

8)  Names of individuals who were detailed as Supervisor for the Administrative Center in the San Francisco Division after I was placed on administrative leave and the length of their detail.

This is erroneous, as Ms. Linda Ng was detailed as the Administrative Center Supervisor after I was placed on administrative leave and before Barbara Mendes was assigned as supervisor for the Administrative Center. Also, Kaycee Graham was then removed from the Secretary position and placed in another supervisory position.

9)  Names of individuals who were detailed or assigned as Secretary in San Francisco after Marilyn Lee was removed from her job of record as Secretary in 2004.

This is also erroneous as I was present at DHQ when Ms. Florita Andres was detailed as Secretary and Anita Cabano served as Secretary when Ms. Kaycee Graham was made a supervisor.

10) Names of individuals who were detailed or assigned as Secretary in San Francisco after Marilyn Lee was removed from her job as Secretary in 2004

This is erroneous as Anita Cabano served as Secretary and was not included on the list.

Please provide me the status of my request and the reason(s) for such a delay or denial.

Any assistance in this matter will be appreciated.

Thank-you.


Marilyn Lee
951 Bradley Drive
Daly City CA  94015

cc:  Attorney Dan Bacon

September 13, 2007

Betty White
Information Disclosure Specialist
USPIS
1735 N. Lynn St.. 5th Floor
Arlington. VA 22209

RE:  FOIA and Privacy Act Request for Records - Appeal
     (Freedom of Information Act, 6 U.S.C. Section 552(a))
     EEO  Case 66-000-0053-05

To Whom It May Concern:

I previously sent a FOIA dated July 18, 2007 requesting the following information by letter and
the Agency denied two of the requests in a letter dated August 22, 2007. We are appealing the
Agency's refusal to provide relevant requested information.

The information is requested because I was discriminated and retaliated by the managers of the
San Francisco Division when they refused to pay for my detail to the OIG after I signed a petition
that resulted in the removal of the top three SF manager in 2003 and thus removed from my job
of record as secretary when promised no retaliation by HQ managers and suffered stress because I
was reassigned as supervisor.  We are questioning some of the information as erroneous or
missing, and that your agency further validate the information and return to me the most current
and correct information.  Besides the information previously asked, I am asking for more
information to further validate documentation recent information provided by your office.
Information will be used for discovery in trial. The request for records are as follows:

1)      The names of San Francisco Division support technicians who were on details in 2005,
the length of their details, their pay level while on detail, and whether the Postal Service or the
Inspection Service paid for their workhours while on detail.

The worksheet received is inaccurate.  Althugh Ms. Katie O'Leary was detailed to the post office
in 2005, I was employed and present at SF DHQ when Ms. Katie O'Leary was detailed to the
post office since 2003.  Also, Teresita Venegas held a detail in 2005 as an Information Technician
and was omitted from the worksheet.  I was present at SF at DHQ when Ms. Sheilah Castor was
detailed to Bala Cynwyd, PA from April 2, 2005 to June 10, 2005 (as mentioned in agency's
letter dated August 22, 2007 as Item #4) as a Level 23 in the Purchasing & Administrative
Services Center and will request under separate FOIA or discovery records to prove that her
detail was paid by the Inspection Service, San Francisco Division.   Records will prove that the
San Francisco Division of the Inspection Service paid for Ms O'Leary's and Ms. Castor's details
to other units.

2)      Sheilah N. Castor's 2005 eDiary calendar information.

We find that questionable that Ms. Castor has no eDiary information for 2005. There is
Inspection Service policy on support employees of Level 17 and above to submit eDiary
information.  We are asking what the policy is who must submit eDiary information to further

substantiate that Ms. Castor was either not following regulations and that management failed to report her as not following regulations in completing eDiary information.  If there is no eDiary information, then please tell me why there is none reported

3)      Sheilah N. Castors' 2005 travel vouchers.

Your letter of August 22, 2007 indicates that no travel vouchers were filed for Ms. Castor when detailed to the position in Bala Cynwyd, PA, as indicated on the attached worksheet which is suspicious.  We are requesting a copy of the Inspection Service regulations wherein physical copies of travel vouchers are to be kept.  These regulations may be obtained either through the Inspection Service or OIG so that we may request copies of the 2005 travel vouchers of Sheilah Castor.  Please send me a copy of the mentioned PS Form 1723, Assignment Order which has no finance number that was for Ms. Sheliah Castor.

4)      Sheilah N. Castor's 2005 detail(s), and the unit that paid for her workhours and travel expenses, and the pay level of all these details.

The worksheet submitted by your office indicates that the Postal Service paid for her detail.   We question the validity of the unit that paid for her workhours.  Please provide management payroll reports for the San Francisco Division Inspection Service for the period April 2-June 10, 2005 and Bala Cynwood's payroll reports for April 2-June 10, 2005.

5)      The names of individuals who were detailed to Sheilah N. Castor's position in San Francisco as the Administrative Specialist in 2005 while Castor was on her detail(s).  This is the only information I agree upon and that it was Kaycee Graham.

6)      The starting and ending dates for Katie O'Leary's detail to the USPS, her pay level during this detail, and whether the Inspection Service or the Postal Service paid for this detail.

This is erroneous as I was present at SF DHQ when Ms. O'Leary was detailed to the post office in 2003, 2004, and 2005.  Ms. O'Leary continued to be on detail to the post office in 2006.  She was paid a Level 20 during her detail and the San Francisco Division of the Inspection Service paid for her workhours.    Therefore, please provide payroll reports for the San Francisco Division Inspection Service or for the post office that supposedly paid for Katie O'Leary's workhours for the years 2003-2005.

7)      Copies of personnel briefs indicating positions held in their careers of Barbara Mendes, Kaycee Graham, Anita Cabano and Katie O'Leary.

This information has been forwarded to Chief Counsel on September 13, 2007 and is critical to our case because these individuals had supervisory experience and could have replaced me as supervisor when I was suffering stress.  I have been an employee of the Inspection Service for over 25 years and was present when these individuals served as a supervisor for the Inspection Service at some point in their careers.  Also, Kaycee Graham was then removed from the Secretary position and placed in another supervisory position.

8)      Copies of any 2003, 2004, 2005, or 2006 award evaluations given to either Barbara Mendes, Kaycee Graham, Anita Cabano or Katie O'Leary.

This information has been forwarded again to Chief Counsel on September 13, 2007.  It is not of personal interest that this information is needed, but to justify that these individuals were

competent supervisors, as well as employees, who received awards recognized by management. We are requesting management award evaluations naming these individuals receiving awards in the San Francisco Division for either 2003, 2004, 2005 or for 2006. Under discovery, we will ask for all awards, certificates of appreciation, etc. for their entire career.

9)    Names of individuals who were detailed as Supervisor for the Administrative Center in the San Francisco Division after I was placed on administrative leave and the length of their detail.

This is erroneous, as Ms. Linda Ng was detailed as the Administrative Center Supervisor after I was placed on administrative leave and before Barbara Mendes was assigned as supervisor for the Administrative Center.   Also, Kaycee Graham was then removed from the Secretary position and placed in another supervisory position.

10)    Names of individuals who were detailed or assigned as Secretary in San Francisco after Marilyn Lee was removed from her job of record as Secretary in 2004.

This is also erroneous as I was present at DHQ when Ms. Florita Andres was detailed as Secretary and Anita Cabano served as Secretary when Ms. Kaycee Graham was made a supervisor.

11)    Copy of 2005 Outlook Calendar for Sheilah N. Castor to prove dates of her detail and actual physical appearances in the SF division.

12)    Copies of all leave slips submitted by Sheilah N. Castor for the month of June 2005 to prove dates of actual physical appearances at the SF Division.

13)    Copies of 2005 eTravel vouchers of Sheilah N. Castor to prove that her detailed workhours were paid by either Bala Cynwood or the San Francisco Division.  Ms. Castor must also file her voucher(s) on the eTravel network and copies can be obtained through the eTravel network.

14)    To prove that Ms. Castor submitted travel vouchers, please provide a management copy of the 2005 travel expense reports for Bala Cynwyd, PA or 2005 San Francisco Division's travel expense reports listing any travel expense check(s) paid out to Ms. Castor in 2005.

15)    2005 travel expense reports for Bala Cynwood, PA or 2005 travel expense reports for San Francisco to identify which unit paid for Sheilah Castor's detail

16)    2005 management payroll records for Sheilah N. Castor and Katie O'Leary to prove that detailed workhours were paid by the San Francisco Division

17)    Copies of all 2005 credit card(s) slips belonging to Sheilah Castor to prove that she charged lodging and airfare while on her detail.

18)    Copies of either San Francisco or Bala Cynwood Management report of Sheilah Castor's 2005 usage of credit card(s) used, payments made, and reimbursements.

Please provide me the status of my request and the reason(s) for such a delay or denial.

Any assistance in this matter will be appreciated.

Thank you.


Marilyn Lee
951 Bradley Drive
Daly City CA  94015

cc:  Chief Counsel
     Customer Programs
     U. S. Postal Service
     475 L'Enfant Plaza, SW
     Washington DC  20260-1135

     Attorney Dan Bacon

UNITED STATES POSTAL INSPECTION SERVICE

OFFICE OF COUNSEL

August 22, 2007

Ms. Marilyn Lee
951 Bradley Drive
Daly City, CA  94015-3667

RE: FOIA No. 2007-FPIS-00296

Dear Ms. Lee:

This is in further reference to your letter dated July 18, 2007, requesting, pursuant to the Freedom of Information/Privacy Acts, access to certain records that may be in the custody of the U.S. Postal Inspection Service regarding personnel and activities of the San Francisco Division.

In response to your query listed as Item #1:  *"The names of San Francisco division support technicians who were on details in 2005, the length of their details, their pay level while on detail, and whether the Postal Service or the Inspection Service paid for their workhours while on detail,"* please see the attached spreadsheet.

In response to your query listed as Item #2:  *"Sheilah N. Castor's 2005 eDiary calendar information,"* you are advised that no records exist during the specified timeframe.

In response to your query listed as Item #3:  *"Sheilah N. Castor's 2005 travel vouchers,"* you are advised that no records exist concerning this subject.

In response to your query listed as Item #4:  *"Sheilah N. Castor's 2005 detail(s), and the unit that paid for her workhours and travel expenses, and the pay level of all these details,"* you are advised that Ms. Castor was detailed to Bala Cynwyd, PA, from April 2, 2005 to June 10, 2005.  The detail was to the position of the Purchasing and Administrative Services Center at a level 23.  In response to the "unit that paid for her workhours and travel expenses," you are advised that there was no finance number listed on the Form 1723, Assignment Order.

In response to your query listed as Item #5:  *"The names of individuals who were detailed to Sheilah N. Castor's position in San Francisco as the Administrative Specialist in 2005 while Castor was on her detail(s),"* you are advised that Ms. Kaycee E. Graham was detailed to cover Sheilah N. Castor's position while she was away on her detail to Bala Cynwyd.

In response to your query listed as Item #6: *"The starting and ending dates for Katie O'Leary's detail, and whether it was paid by the Inspection Service or the Postal Service,"*

1735 N. LYNN STREET, ROOM 4039
ARLINGTON, VA  22209-4039
TELEPHONE: 703-292-3944
FAX: 703-292-4083

-2-

you are advised that Kathleen M. O'Leary's detail started January 3, 2005, and ended December 20, 2005, and was paid out of Postal Service funds.

In response to your query listed as Item #7: "Copies for personnel briefs indicating positions held in their careers of Barbara Mendes, Kayce Graham, Anita Cabano and Katie O'Leary," you are advised that this material is exempted from release in accordance with section 552(b)(6), where release of personnel and similar files would constitute a clearly unwarranted invasion of personal privacy.

In response to your query listed as Item #8: "Copies of any 2003, 2004, 2005, or 2006 award evaluations given to either Barbara Mendes, Kaycee Graham, Anita Cabano or Katie O'Leary," you are advised that this material is exempted from release in accordance with section 552(b)(6), where release of personnel and similar files would constitute a clearly unwarranted invasion of personal privacy.

In further response to Items #7 and #8, although you may have a strong personal interest in obtaining the information, the FOIA requires that we balance the individual's private interest against the interest of the public in general and not the particular interest of the requester.

In response to your query listed as Item #9: "Names of individuals who were detailed as Supervisor for the Administrative Center in the San Francisco Division after Marilyn Lee was placed on administrative leave and the length of their detail," you are advised that Barbara Mendez was detailed to replace you until the Inspection Service "reorganization" for all support personnel ended the detail.

In response to your query listed as Item #10: "Names of individuals who were detailed or assigned as Secretary in San Francisco after Marilyn Lee was removed from her job of record as Secretary in 2004," you are advised of the following individuals who replaced you in order:

Kaycee Graham
Sandra Schoonmaker
Jacquelin Grimsley
Kit Tang

As provided in title 39, Code of Federal Regulations, part 265, you have a right to appeal this decision. A copy of the appeal procedure is also enclosed.

Sincerely,

M. Renee Baxter
Information Disclosure Technician

Enclosure

|    | NAME | DETAIL TIMEFRAME | PAY LEVEL | DETAIL PAID BY |
|----|------|------------------|-----------|----------------|
| 1  | Kathleen M. O'Leary | January 3, 2005 to December 30, 2005 | EAS-20 | USPS |
| 2  | Jay T. Lim | July 2, 2005 to September 30, 2005 | EAS-23 | USPIS |
| 3  | Carole L. Edwards | November 5, 2005 to December 9, 2005 | EAS-21 | USPS |
| 4  | Florita V. Andres | October 31, 2005 to February 24, 2006 | EAS-18 | USPIS |
| 5  | Sandra E. Schoonmaker | August 20, 2005 to September 30, 2005 | EAS-14 | USPIS |
| 6  | Kaycee E. Graham | April 2, 2005 to June 10, 2005 | EAS-21 | USPIS |
| 7  | Sheilah N. Castor | April 2, 2005 to June 10, 2005 | EAS-23 | USPS |
| 8  | Linda S. Ng | July 23, 2005 to August 19, 2005 | EAS-14 | USPIS |
| 9  | Anita S. Cabano | July 9, 2005 to August 5, 2005 | EAS-18 | USPIS |
| 10 | Anita S. Cabano | June 11, 2005 to July 9, 2005 | EAS-16 | USPIS |
| 11 | Sandra E. Schoonmaker | May 28, 2005 to June 3, 2005 | EAS-14 | USPIS |
| 12 | Anita S. Cabano | December 11, 2004 to June 10, 2005 | EAS-16 | Unknown |

APPEAL PROCEDURE  (Title 39, Code of Federal Regulations, Part 265)

If a request to inspect or copy a record is denied, or a request for expedited processing of a request, is denied, in whole or in part; if no determination is made within the period prescribed by this part; or if a request for waiver of fees is not granted; the requester may appeal to the *Chief Counsel, Customer Programs, U.S. Postal Service, 475 L'Enfant Plaza, SW, Washington, DC 20260-1135.*

The requester shall submit his appeal in writing within 30 days of the date of the denial or of the other action complained of, or within a reasonable time if the appeal is from a failure of the custodian to act.  The Chief Counsel may, in his discretion, consider late appeals.

In the event of the denial of a request or of other action or failure to act on the part of a custodian from which no appeal is taken, the Chief Counsel may, if he considers that there is doubt as to the correctness of the custodian's action or failure to act, review the action or failure to act as though an appeal pursuant to this section had been taken.

A letter of appeal should include, as applicable:

a.   A copy of the request, of any notification of denial or other action, and of any other related correspondence;

b.   A statement of the action, or failure to act, from which the appeal is taken;

c.   A statement of the reasons why the requester believes the action or failure to act is erroneous; and

d.   A statement of the relief sought.


ACTION ON APPEALS

The decision of the Chief Counsel or his designee constitutes the final decision of the Postal Service on the right of the requester to inspect or copy a record.  The decision will normally be made within twenty working days from the time of the receipt by the Chief Counsel.  The 20 day response period may be extended by the Chief Counsel or his designee for a period not to exceed an additional ten working days when reasonably necessary to permit the proper consideration of an appeal, under one or more of the unusual circumstances set forth in part 265.7.

Revised 5/17/2007

The decision on the appeal shall be in writing. If the decision sustains a denial of a record, in whole or in part, it shall state the justification therefore and shall specify any exemption or exemptions relied on and the manner in which they apply to the record withheld, and shall inform the requester of his right to judicial review. An indexed file of decisions on appeals shall be maintained by the Chief Counsel and be made available to the public.

If not prohibited by or under law, the Chief Counsel or his designee may direct the disclosure of a record even though its disclosure is not required by law or regulation.

The Chief Counsel's opinion is the final decision of the Postal Service on the requester's rights of access pursuant to their FOIA request for records. If the requester still wishes to contest the matter, they may seek judicial review of the Chief Counsel's decision by bringing suit for review in the U.S. District Court for the district in which they reside or have their principle place of business; or in the district in which the records are located; or in the District of Columbia.

Revised 5/17/2007

EXHIBIT 72

## Lawee, Edward

| | |
|---|---|
| From: | Lawee, Edward |
| Sent: | Friday, May 05, 2006 1:02 PM |
| To: | Crespo, Elvin J; Mattes, Robert E |
| Cc: | McMillan, Joyce |
| Subject: | FW: From the officeJet 9100 all-in-one |

Attachments:            scan.pdf



scan.pdf (5 MB)

          To all:
Forwarding the 109g decision dismissing the Marilyn Lee complaint. She was INC Atkins'
secretary who was moved to the admin ctr supervisory position in the summer of 04. She
didn't like it but was not allowed to resume as secretary. In July 05, she made comments
about harming herself and was placed on admin lv. (unfortunately OWCP accepted her stress
claim). Anyway, she is a McDermott protégé and alleged that INC Atkins transferred her as
the secretary in retaliation for having signed the petition against SF Div INC Kiel and
his AICs in 2003 (none of which Atkins had any involvement in as he was still AIC in
Seattle). Anyway, the significance of this case is only because of its connection to the
McDermott issues and I could see McDermott's imprint in Lee's, or her counsel's response
to the AJ. I provided a copy to the AIC.

-----Original Message-----
From:
Sent: Friday, May 05, 2006 5:51 AM
To: Lawee, Edward
Subject: From the officeJet 9100 all-in-one


Please open the attached document.
This document was sent to you using an HP Officejet 9100 series all-in-one.

    Sent by:
    Attachment file format:        Adobe PDF

To view this document you need to use the Adobe Acrobat Reader.
To download a free copy of the Acrobat Reader, visit:

    http://www.adobe.com

For more information about this all-in-one, visit:

    http://www.hp.com

# EXHIBIT 73

.awee, Edward

| | |
|---|---|
| **From:** | Lawee, Edward |
| **Sent:** | Thursday, March 22, 2007 10:00 AM |
| **To:** | Katz, Lawrence |
| **Cc:** | Mattes, Robert E; Marcantonio, Sandra L |
| **Subject:** | RE: M. Lee |

Larry,
This was McDermott's protégé who advised Lee to claim that because signed the petition in 2003 against the Kiel and his AICs, that Atkins assigning her to the admin cts supv position in the summer of '04 and not allowing her to return as the INC secretary as reprisal. In fact the only reason Atkins knew Lee had signed is because she told him within a week of when he reported as INC in 9/03. Then approx 9 mos later he moves her to the admin supv position, because she wanted other assignments, recognizes her for it, sends her to training that no else received and left her in the position because she was doing a great job. Yet McDermott misadvises her to claim that he did not want her back as INC secretary because she signed a petition over issues that Atkins had nothing to do with and that occurred several months ago. McDermott not only stirs her up her own hate and discontent but she misleads other employees into thinking they have a case, even paying an attorney (although I would swear his ridiculous arguments were written by McDermott) because of McDermott's warped sense of reality that they believe. He did file an OFO appeal to which I responded to 8/18/06 - so thanks for the decision.

---

**From:** Katz, Lawrence
**Sent:** Thursday, March 22, 2007 5:26 AM
**To:** Lawee, Edward
**Cc:** Mattes, Robert E; Marcantonio, Sandra L
**Subject:** M. Lee

<< File: Document (4).pdf >>

Favorable decision  - OFO upholds FAD in Lee/SFO matter.

*Lawrence Katz*
Chief Counsel/Inspector In Charge
Tel: (202)268-7732
Fax: (202)268-7316
Cell: (202)320-7764
LKATZ@USPIS.GOV

# EXHIBIT 74



**From:** Lawee, Edward
**Sent:** Wednesday, November 15, 2006 12:27 PM
**To:** Dixon, Pamela
**Subject:** FW: Marilyn lee

Pam,
Forwarding the msg below re Marilyn Lee.  The Postal HR specialist seems to put us in an untenable position.
She claims the position has to be within the IS.  But the only position is the Level 14 Secretary position which is
not possible.

**From:** Diaz, Araceli S
**Sent:** Tuesday, November 14, 2006 10:21 AM
**To:** Lawee, Edward
**Cc:** Atkins, William P; Post, Marian K
**Subject:** FW: Marilyn lee

Ed:
Please read below and provide your input.
Thanks,
Sally

**From:** YENCHO, JULIA A - Washington, DC [mailto:julia.a.yencho@usps.gov]
**Sent:** Tuesday, November 14, 2006 5:52 AM
**To:** Diaz, Araceli S
**Subject:** RE: Marilyn lee

Finding her the alternate position will be done at the local level now that the USPIS is under
Headquarters.  The position will need to be within the IS and following the attached priority of
work assignment.  We can go into the specific when the time comes.

# Julia A. Yencho
Human Resources Specialist
Headquarters, Corporate Personnel Management
475 L'Enfant Plaza, SW Room 1831
Washington, DC  20260-4261
(202) 268-5678
FAX:  (202) 268-5496

-----Original Message-----
**From:** Diaz, Araceli S [mailto:ASDiaz@uspis.gov]
**Sent:** Thursday, November 09, 2006 6:41 PM
**To:** YENCHO, JULIA A - Washington, DC
**Subject:** RE: Marilyn lee

Hi Julia:

Thank you for the reply.

I do have one question. I was under the impression when the USPIS handled our own matters that HR



would be seeking a job opportunity for Marilyn Lee outside of her regular secretarial position (due to not being able to work with her supervisor). Will your office be seeking a position for Marilyn to possibly agree to go to or is that something we need to initiate at the local level? Your assistance is appreciated.

Thank you,

Sally Diaz
Assistant Inspector in Charge
(415) 778-5839

**From:** YENCHO, JULIA A - Washington, DC [mailto:julia.a.yencho@usps.gov]
**Sent:** Thursday, November 02, 2006 7:43 AM
**To:** Diaz, Araceli S
**Cc:** Bellinger, Vivian J; Leavey, Stephen A - Washington, DC; Qualters, Janet R - Washington, DC; Katanik, Paul J - Washington, DC; Stewart, Cheryl Ann - Washington, DC
**Subject:** RE: Marilyn lee

AINC Diaz and Vivian,

I have reviewed the file and have contacted OWCP regarding a return to work and have left a voice message for a return call. Ms. Lee was capable of returning to work in March 2006. The last correspondence in the file is dated June 29, 2006 from Ms. Dixon indicating a question of whether the return to work meant the Secretarial position or to the detail position. Ms. Dixon alluded to Ms. Lee being able to return to her secretarial position under a new supervisor. No further correspondences or entries in the control register after that date. The 2nd opinion indicates her condition has resolved.

Title 5 U.S.C. §8151(b)(1)  Under regulations issued by the Office of Personnel Management – the department or agency which was the last employer shall immediately and unconditionally accord the employee, if the injury or disability has been overcome within one year after the date of commencement of compensation or from the time compensable disability recurs if the recurrence begins after the injured employee resumes regular full-time employment with the United States, the right to resume his former or an equivalent position, as well as all other attendant rights which the employee would have had, or acquired, in his former position had he not been injured or disabled, including the rights to tenure, promotion, and safeguards in reductions-in-force procedures, and (2) the department or agency which was the last employer shall, if the injury or disability is overcome within a period of more than one year after the date of commencement of compensation, make all reasonable efforts to place, and accord priority to placing, the employee in his former or equivalent position within such department or agency, or within any other department or agency.

As Ms. Lee is capable of returning to work, her original Secretarial position must be made available to her to return to. She cannot be removed from the rolls as she has a working capacity and the ELM 546.142a, Priority for Assignment of Limited Duty requirements must be followed.


Julia A. Yencho

EXHIBIT 75

My name is Sheilah Nichols Castor; I am the Administrative Specialist for the San Francisco Division of the Postal Inspection Service. I have been employed in my current position since June 2001. As Administrative Specialist I am responsible for all administrative support employees except those who report directly to team leaders or to an Assistant Inspector in Charge (Information Technology Specialists, Forfeiture Specialists, Physical Security Specialists and Technical Surveillance Specialists). Marilyn Lee is employed by the Postal Inspection Service as a Secretary, level EAS-14. I am her supervisor.

I am providing this information at the request of the Inspection Service Human Resources Service Center Workers Compensation Unit, in response to the Statement of Marilyn Lee "Detail of Events" submitted with her Form CA-2, Notice of Occupational Disease and Claim for Compensation.

1. The Secretary position is an EAS-14 position, as is the Operations Coordinator position.

2. I had no knowledge of the information provided in this paragraph.

3. I had no knowledge of the information provided in this paragraph.

4. I had no knowledge of the information provided in this paragraph.

5. No response.

6. I had no knowledge of the information provided in this paragraph. The office move to which Mrs. Lee refers occurred while I was out of the office on a detail assignment. My understanding of the reason for the move, which was shared with me by the acting Administrative Specialist, was that Mrs. Lee had expressed concern that division employees were "looking over" her work in her prior, open work area; and that moving to a private office would afford her more confidence that confidential material would not be compromised. It was my understanding that Mrs. Lee fully supported this move and actively participated in its planning.

Responses to Form CA-35G – Marilyn Lee

7. Item 5 (Describe changes or other sources of stress in your personal life occurring in the same time frame): Mrs. Lee has had several life changes in the last couple of years. I do not recall the exact date, but I know that Mrs. Lee's elderly mother returned to the Phillipines to live. This move was unexpected and though it appeared to go well Mrs. Lee was somewhat anxious about the change. Her adult brother became homeless and she felt responsible for ensuring he was taken care of. She exhibited a fair amount of emotional stress during this period because of her role as a caring daughter and sister. Finally, during the last six to nine months the second of Mrs. Lee's two sons made his final move from the family home to independent living. She is very close to her sons and while this change is not particularly adverse it represented a significant change in her life and that of her husband.

8. Mrs. Lee's duties were to supervise the Administrative Center staff; monitor, evaluate and distribute workload; develop work schedules and assign work to staff members; approve leave requests; oversee timekeeping, budget tracking, bill payment, receptionist and mailroom duties; serve as one of two division Inspection Service Integrated Information System (ISIIS) coordinators; develop standard operating procedures for important tasks; and field inquiries from Inspectors and other division personnel relating to administrative functions. Mrs. Lee functioned very well with her Administrative Center duties and was chosen for the ISIIS Coordinator training and function because she felt comfortable sharing information with those working for her. Her duties and responsibilities were the same as those performed by the other Operations Coordinator in the division who has supervisory responsibilities, except that the other Operations Coordinator has more people to supervise (i.e., 13 vs. 7-9).

9. At her request, Mrs. Lee was afforded a developmental detail opportunity to the position of Operations Coordinator, Acting Supervisor in the Administrative Center, effective June 15, 2004. This was not an adverse action.

10. Mrs. Lee worked eight hours per day, five days per week, with little or no overtime.

11. Leave record since 7/15/2005:

| | | |
|---|---|---|
| 7/15: 8 Sick | 7/18  8 Admin Lv | 7/19  8 Admin Lv |
| 7/20  8 Admin Lv | 7/21  8 Annual Lv | 7/22  8 Annual Lv |
| 7/25  8 Annual Lv | 7/26  8 Admin Lv | 7/27  8 Admin Lv |
| 7/28  7 Admin Lv, 1 Sick Lv | 7/29  6 Admin Lv, 2 Sick Lv | |


7. Mrs. Lee was given developmental and training opportunities to enable her to be more competitive for planned higher level opportunities within the division.

8. Developmental detail opportunities are offered to employees as often as possible to enable them to be more competitive for new opportunities. They are not offered with any assurance that successful completion would automatically lead to a higher level or different position. Those decisions are based on the needs of the division.

9. Mrs. Lee was assigned to the Operations Coordinator in the division Administrative Center, supervising employees in the Center, the reception area and the mailroom. She successfully completed Phases I and II of the Inspection Service Supervisory Training Program (STP) developed by the Career Development Division which provided 40 hours of online training in addition to 40 hours of off-site training at the training center at Potomac, MD. In addition, to add to her investigative support skills she was chosen as the only San Francisco Division representative to attend a one-week Investigative Analyst Training course sponsored by the St. Louis Division.

10. Mrs. Lee did not indicate to me that her supervisory responsibilities were becoming "too much" or "too stressful" for her. For the most part she seemed content with the work; she spoke often about the plans she was implementing in the Center and the cross training that was being accomplished. Mrs. Lee received an award at the 2004 year end for her performance in the Administrative Center.

11. I was not present during the evaluation to which Mrs. Lee refers. My understanding of the circumstances wasn't as much that Mrs. Lee wanted "out" of the Administrative Center as much as she wanted to return to her "old job" of Secretary.

12. I was aware Mrs. Lee was often times upset, but as noted in #11 above, my understanding of the circumstances wasn't as much that

Mrs. Lee wanted "out" of the Administrative Center as much as she wanted to return to her "old job" of Secretary.

13. See #12 above.

14. The examples cited by Mrs. Lee are typical of those encountered by a first-line supervisor. She discussed many of them with me at the time they were occurring. At no time did Mrs. Lee indicate the situations in the Administrative Center were becoming "too much" or "too stressful" for her. She did indicate on several occasions she wanted to return to her prior Secretary position.

15. In February 2005 Mrs. Lee indicated she wanted "out" of the supervisor position to return to the Secretary position. I told her she was needed in the Admin Center, but if she wanted a different job she should consider going on a detail assignment. Because the support person temporarily assigned to the Secretary position was going back to her team, I assigned Kaycee Graham to the Secretary position on a temporary basis. I planned to assign Anita Cabano to the Secretary position but her detail assignment to Forfeiture had been extended because of the needs of an investigation. Ms. Graham was assigned to the Secretary position on a temporary basis until such time as Mrs. Cabano could take assume those responsibilities.

16. No response.

17. Mrs. Lee's proposed detail assignment to the Office of the Inspector General (OIG) had been approved by Inspector in Charge Atkins and OIG Special Agent in Charge Anita Davidson. While finalizing the details of the assignment, I contacted Inspector Thomas Brady who was acting as a liaison between the Inspection Service and the OIG. I informed Inspector Brady of the planned detail assignment and asked him if there would be any problem with the detail going forward as planned. He told me he would get back to me or to division management. I then contacted the Human Resources Service Center at Newark, NJ to determine how Mrs. Lee's workhours would be transferred against the OIG budget. While I was awaiting a response, I received a call from Mrs. Lee (I was on


a detail assignment in Bala Cynwyd, PA) who was very upset and crying. She stated the detail assignment had been disapproved. She was under the impression that INC Atkins had disapproved the assignment; my understanding of the circumstances was actually that the assignment had been disapproved by Headquarters personnel. Mrs. Lee was hysterical during at least two phone calls, stating over and over again, "I need to get out of here." I have no knowledge of Mrs. Lee's conversations or exchanges with INC Atkins relating to this issue. I did tell Mrs. Lee that sometimes these things happen, that plans get made and then fall through. She was increasingly more emotional and upset. I attributed this to her disappointment in not going on the detail assignment.

18. I was out of the office from April 1 through June 10, 2005 and did not personally witness Mrs. Lee's emotional condition, though I was told by several support employees and managers that she appeared emotionally fragile and cried often. Prior to my leaving she made a comment that she would like to take three months off (this was the length of time I would be gone). I told her if she needed some time off she could have it, but not three months' worth. She did not share with me what was going on during this time. During this timeframe Mrs. Lee was afforded another training opportunity working with the Diversity program; in that regard she traveled to Chicago to meet with Inspection Service Diversity Coordinators from other divisions. She seemed happy with this assignment and looked forward to sharing her ideas with Headquarters and other division personnel.

19. I was not in the office when these events took place. When I had conversations with division personnel many indicated Mrs. Lee was basically "shutting out" people, not responding when spoken to, spending much of her time with her office door shut, etc. On at least two occasions I spoke with her on the phone and I asked her what was going on. She simply told me, I'll wait until you come back.

20. I was not in the office when these events took place.

21. I was not in the office when these events took place.

22. I was not in the office when these events took place.

23. I gave Mrs. Lee her midyear evaluation by phone during the week of June 6, 2005. I provided a copy of my written evaluation to her, and then discussed what I had written with her on the phone. At no time did I accuse her of "badmouthing" management. I shared with her some of the remarks I had received from other support personnel and from the managers about her being "rude" in her demeanor, not responding when spoken to, etc. She again broke down, crying, and stated "I need to get out of here." At no time during this evaluation did she indicate the supervisor position was causing her stress. She did start using the term "hostile work environment."

24. On June 19 after I returned from my detail assignment, I had a long conversation with Mrs. Lee. She shared some of what had happened (as she referred to in preceding paragraphs). I told Mrs. Lee if she was truly that unhappy with her position in the Inspection Service, then she should seek another position. She indicated she wanted to go back to the Secretary position; I told her that her skills were beyond those of a Secretary and that we needed her as a supervisor. I told Mrs. Lee that I was looking for a position that would allow me to relocate to Seattle and that I had posted a resume on the USAJOBS.GOV website; I suggested she work on a resume to post there to identify positions within other agencies that would preserve her Federal benefits. She was very emotional and crying that she needed to "get out of this hostile work environment." I told her she had years of experience that had helped her become more competitive for other positions. After our conversation she came to me at least two other times to ask questions about resume preparation, the USAJOBS website, etc. Mrs. Lee indicated she had found a couple of promising prospects. On one of the occasions where we discussed the job website she asked if her midyear evaluation had been rated "poor." I indicated it had not. She told me then she had never actually read the evaluation.

25. Until Mrs. Lee provided this information in her CA-2 application, I had no direct knowledge of the "petition" referred to in this paragraph. The "removal of managers" she refers to was actually, to my knowledge, the reassignment of an AIC to a Performance Manager position; the promotion of an AIC to an Inspector in Charge position; and the retirement of the Inspector in Charge. My



- 6 -

decision to not return Mrs. Lee to the Secretary position was based
on the operational needs of the Inspection Service and her own
desire to be given detail opportunities to make herself more
competitive for other positions.

26. I have no knowledge of the contact related in this paragraph.

27. I have no knowledge of the contact related in this paragraph. The
San Francisco Division has no open Investigative Analyst positions
to which an employee can be detailed. There is no Victim Witness
Coordinator position allocated to the division. The Inspection
Service did not have a plan to "upgrade" the Secretary positions.
The Secretary position to which Mrs. Lee was assigned is not a
"bid" position; as non-bargaining employees we do not have "bid"
positions. Both the Secretary and the Inspection Service
Operations Coordinator positions are EAS-14.

28. No response.

29. No response.

30. No position was created for Kaycee Graham in 2003. In 2004
Kaycee Graham, who is an EAS-14 Operations Coordinator, was
reassigned from the Oakland Domicile to San Francisco Division
Headquarters. She remains in that position at this time. There is
no "Management ISOT" position; Wanda Smith functioned as a
support person for the prior management team but it was
determined that position was not needed. I have no knowledge of
other "employees placed into lower level jobs" since I was not in the
division when those actions took place. The postal detail positions
to which Mrs. Lee refers are auxiliary assistance being provided by
light duty postal employees who can be "taken back" by the Postal
Service at any time. As previously stated, Mrs. Cabano's detail to
Forfeiture was extended because of the needs of an investigation.
When I was detailed in 2005, Kaycee Graham was placed in the
Acting Administrative Specialist position. I did not believe Mrs. Lee
would have been able to handle overall administrative supervisory
responsibility for the entire division along with my administrative
duties (budget, bill certification, etc.) while I was gone. At no time
did Mrs. Lee indicate the supervisor position was causing her
stress; my understanding was that she simply wanted the Secretary
job back from whoever was currently performing it. Wanda Smith

was _not_ detailed to a special project; she was given a project to work on in conjunction with her assignment in the Administrative Center. Finally, as previously planned, when Mrs. Cabano's Forfeiture detail was ended she was reassigned to the Secretary position, and Ms. Graham reassumed her previous assignment as Operations Coordinator. Management has not "created" or "eliminated" positions at whim.

31. No response.

32. No response.

33. No response.

34. I met with Mrs. Lee and Assistant Inspector in Charge Bethel on Monday, July 18. At that time Mrs. Lee was given a letter placing her on administrative leave. I told her I was requesting a Fitness for Duty examination for her and she would be receiving information from the Human Resources Service Center in that regard.

35. No response.

36. Mrs. Lee was placed on administrative leave pending a review of my request for a Fitness for Duty Examination by USPS medical personnel, and determination by medical personnel whether a Fitness for Duty examination was required, as the result of events beginning July 13, 2005 through July 14, 2005.

37. As previously indicated, I had no direct knowledge of the "petition" referred to. I have no direct knowledge of any EEO complaint filed by an Inspector. I had no knowledge of any meeting with managers that Mrs. Lee participated in during 2003. I have no knowledge of any transfer, punitive or otherwise, of any Inspector, since I am not involved in any aspect of that process.

38. No response.

39. See paragraph #36.

40. Mrs. Lee never provided any information relating to her reported depressive order, to her seeing a doctor relating to this condition, or contacting a psychologist or psychiatrist. The letter included as Exhibit 16 was never provided to me or, to my knowledge, anyone else within the Inspection Service, prior to the submission of her Form CA-2.

41. No response.

*Sheilah N Castor* 8/29/2005

Sheilah N. Castor
Administrative Specialist

EXHIBIT 76

13-2136039

September 16, 2005

To Whom it May Concern:

I am making this written statement relative to allegations made by Marilyn Lee that she was the recipient of discriminatory treatment when reassigned to the ISOC position because she signed a petition against the Inspection Service management team in February, 2003. She alleges a hostile work environment and discrimination based on race, gender and disability (stress).

I did not know Marilyn Lee signed a petition against the management team in San Francisco, and I was only vaguely aware that such a petition existed. Marilyn took it upon herself to advise me of this fact approximately 2 days after I arrived in San Francisco on September 8, 2003 as the new Inspector in Charge (INC). I saw her at her desk acting agitated and upset, and I inquired if anything was wrong. Marilyn had obviously been crying. I brought her into my office and shut the door and asked her to tell me the problem. She stated she did not know if she wanted to be the INC's secretary because of the problems she had with the previous INC, who was Alan Kiel. When I asked what those problems were, she told me about signing the petition against Alan, and how hurt he had been by that act. She reported he never trusted her thereafter, and their relationship was strained. She felt she had been passed over on training and promotional opportunities on many occasions, and felt her good work was not appreciated. I assured her I wanted her as my secretary; I told her the past was the past and I did not care about those issues; and I advised her if she decided she wanted some other job that I would support her decision. After about 30 minutes she left, and the issue did not resurface until this current situation developed.

Approximately one year ago, Marilyn approached me and stated she would like a developmental opportunity so that she would more easily qualify for an investigative analyst position when it was offered. I agreed to provide her a developmental opportunity, and shortly thereafter, in June 2004. I reassigned her to the Inspection Service Operations Coordinator (ISOC) position where she was responsible for the supervision of approximately seven (7) administrative associates. She appeared to like her new assignment, as she made changes to operations that improved efficiency and timeliness, and was given at least one monetary achievement award. Marilyn turned out to be an excellent supervisor and there was a harmonious relationship with those she supervised so she was advised she would be the permanent supervisor.

I had many private talks with Marilyn concerning her supervisory abilities, and she agreed she was the best person for that job, and agreed that if she was the INC, then she was the person she would assign to work as the supervisor. Her desire to return as the INC's secretary did not become an issue until it was decided to move Kaycee Graham into the position. These two individuals dislike each other intensely, and I believe jealousy may have been a significant motivation for Marilyn

wanting to return. Marilyn never told me the stress of supervising seven people was too much for her, she simply repeated over and over that she wanted her old job back. That move was not possible, as I did not have a qualified individual available to replace her as a supervisor. I will also state that Kaycee was only temporarily in that position and another individual is presently the INC's secretary.

I have no knowledge about the petition Marilyn signed against Alan Kiel and his management staff in February, 2003. None of the three individuals were personal acquaintances, and the fact that Alan decided to retire in June, 2003 may or may not have been related to the petition, but did in fact create a position for which I benefited, as I was selected to replace him. I did not get to the San Francisco Division until September, 2003, and I took no interest in events occurring in the division prior to my arrival. As I stated earlier, I only became aware of Marilyn signing the petition when she told me after I had just reported to the division. There is simply no basis for her claim that I retaliated against her for having signed that petition. I was not affected by the petition in any way, except in a positive way, as I was chosen to become the Inspector in Charge in San Francisco.

Marilyn also alleges that I kept her from a detail assignment with the Office of the Inspector General (OIG). This is patently false. I agreed to the detail as a developmental opportunity for her. Following my agreement to allow Marilyn to participate in the OIG detail, I was advised by my Deputy Chief Inspector, Andrew Clemmons, that Marilyn could go on the detail, but that the OIG would have to pick up her work hours. I spoke with OIG Special Agent in Charge Anita Davidson about this issue, and was told the OIG could not pick up the hours because they were not authorized a support position in San Francisco. Based upon that fact, and that fact alone, I was forced to cancel the detail opportunity and rescind my approval for Marilyn to participate.

No hostile work environment was ever created in San Francisco in regards to Marilyn Lee or any other employee. The fact that I was forced to say no to Marilyn was based upon exigent needs of the division, and not personal feelings against her. Marilyn served in a position where I had no qualified people available to provide for her replacement. She was given that lateral detail assignment at her request and, as it turned out, performed excellently. She was given a significant amount of specialized training not offered to other employees in order to make her more qualified for promotion. For instance, in July 2004 she was sent to one week's training for the Investigative Analyst position in St. Louis. There were only to be a limited number of these positions posted throughout the Inspection Service divisions nationwide and the applicants would be very competitive. However, within the San Francisco Division she was the only one of the support staff to receive that training. She also received cross-training to support criminal assignments such as workers compensation fraud investigations.

As the INC, I have the discretion to reassign or transfer personnel that benefit and promote the efficiency of the division and individuals including inspectors and support periodically have their assignments changed. I initially lateralled Marilyn to

the operations coordinator position at her request and she turned out to be the ideal individual for that position.  I did not anticipate Marilyn's reaction to these changes which I felt were beneficial to her as well as the division.  Regardless of her expectations to return as the INC's secretary, for the reasons discussed above, my decisions were not made in bad faith or because of some retaliatory motive based on her relationship with prior management with which I had absolutely no involvement.


W.P. Atkins
Inspector in Charge
San Francisco Division

EXHIBIT 77

| | Certified Mail No. | Date Mailed  *or*  Hand Delivered on |
|---|---|---|
| | 7003 0500 0003 8754 2262 | August 1, 2005 |
| . Postal Service | By *(initials)*  DM | Case No. |

## formation for Pre-Complaint Counseling

On __July 27, 2005_____, you requested an appointment with a Dispute Resolution Specialist.
   *(Month, Day, Year)*

**Important: Please read.** You should complete this form and return it to the EEO office *within 10 calendar days* of receipt. This is the only notification that you will receive regarding the necessity for you to complete this form.

### Requester Information

| | Social Security | Home Telephone No. |
|---|---|---|
| me *(Last, First, MI)* | 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 | 650-755-1443 |
| **Lee, Marilyn** | | |

| ur Mailing Address  Daly City | Finance Number |
|---|---|
| **951 Bradley Drive, Daley City, CA 94015-3667** | 05-8526 |

| | Office Telephone No. |
|---|---|
| ame of Postal Facility Where You Work | (415) 778-5894 |
| *Embarcadero Postal Center* | Email Address |
| ddress of Postal Facility | therefmlee@aol.co |
| *390 Main St. 3rd Flr. San Francisco 94105* | Grade Level  EAS-14 |

| mployment Status *(Check One)* | Position Title | Time In Current Position |
|---|---|---|
| | *Secretary* | 13 Years ___ Months |
| ☐ Applicant  ☐ Casual  ☐ TE  ☒ Career | Off Days *(If Tour I, Show Nights Off)* | |
| ay Location  Tour | Duty Hours | Sat. & Sun | Supervisor's Telephone No. |
| 200  II | 7:30 am - 4pm | | (415) 778-5890 |
| ur Supervisor's Name | Supervisor's Title | |
| *Sheilah N. Castor* | *Administrative Specialist* | |

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

### B. Discrimination Factors

Prohibited discrimination includes actions taken based on your *Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or in Retaliation (actions based on your participation in prior EEO activity).* These categories are referred to on this form as factors.
What factor(s) of Discrimination are you alleging? (Please be specific, i.e., Race-African American, Sex-Female).

    *See attached Statement and Exhibits*

**For Retaliation Allegations Only.** If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity that you feel caused you to be retaliated against.

1. On_____, I engaged in EEO activity. Case No.:_____
   *(Month, Day, Year)*

2. On_____, I engaged in EEO activity. Case No.:_____
   *(Month, Day, Year)*

### C. Description of Incident/Action

Please use the space below to briefly describe the incident or action that prompted you to seek EEO counseling at this time.

On_____, 20____
  *Month, Day*     *Year*

   *See attached Form CA-2 dated*
   *August 10, 2005 and Statement*
   *of Marilyn Lee (24 pages w/ 23 exhibits)*

PS Form 2564-A, March 2001 *(Page 1 of 3)*

                              *Ex. C-1*

## D. Comparisons

Explain why, based on the factors you cited in Section B, you believe that you were treated differently than other employees or applicants in similar situations

**1.**

_____          Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)
(Name of Employee)

was treated differently than I when: _____

_____ _See attached_ _____

**2.**

_____          Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)
(Name of Employee)

was treated differently than I when: _____

**3.**

_____          Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)
(Name of Employee)

was treated differently than I when: _____

## E. Official(s) Responsible for Action(s)

List the name(s) of the official(s) who took the action that prompted you to seek counseling at this time.

| 1a. Name    See attached | b. Title |
| c. Office | d. Grade Level |
| 2a. Name | b. Title |
| c. Office | d. Grade Level |

**Retaliation Allegations Only:** Was/were the official(s) listed in Section D above aware of your prior EEO activity?

☐ No  ☐ Yes  If yes, explain how the official(s) became aware: _____

## F. Resolution

What are you seeking as a resolution to your pre-complaint?   _See attached_

## G. Grievance/MSPB Appeal

On the incident that prompted you to seek EEO counseling, have you:

1. Filed a grievance on the same issue?  ☒No  ☐ Yes   If yes, _____ (Date) _____ (Current Step)

2. Filed a MSPB appeal on this issue?  ☒No  ☐ Yes   If yes, _____ (Date Appeal Filed)

PS Form 2564-A, March 2001 (Page 2 of 3)

## nonymity

have the right to remain anonymous during the pre-complaint process.

ou desire anonymity?  ☒ No  ☐ Yes

## epresentation

have the right to retain representation of your choice. (check one)

☒ I waive the right to representation at this time.  ☐ I authorize the person listed below to represent me.

| | Representative's Title |
|---|---|
| ne of Representative | Telephone Number | Email Address* |
| ganization | | |

iling Address (Street or P.P. Box, City, State and Zip +4)

* Providing this information will authorize the U.S. Postal Service to send your representative important documents electronically.

## Documentation

lease attach any documentation you wish to submit to support your allegation(s). Include a copy of any written action(s) that caused you to seek ounseling at this time.

lote: If you are alleging mental and/or physical disability, it is important for you to submit medical documentation of your disability during the pre-complaint process.

### Privacy Act Notice

rivacy Act Notice.  The collection of this information is authorized by e Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; e Age Discrimination in Employment Act of 1967, as amended, 29 .S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 94a; and Executive Order 11478, as amended.  This information will be sed to adjudicate complaints of alleged discrimination and to evaluate e effectiveness of the EEO program.  As a routine use, this information ay be disclosed to an appropriate government agency, domestic or reign, for law enforcement purposes; where pertinent, in a legal roceeding to which the USPS is a party or has an interest; to a overnment agency in order to obtain information relevant to a USPS ecision concerning employment, security clearances, contracts, censes, grants, permits or other benefits; to a government agency upon s request when relevant to its decision concerning employment, security learances, security or suitability investigations, contracts, licenses,

grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act.  Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## L. Authorization

I am aware that the claim(s) contained herein shall by-pass the pre-complaint process if like or related to a formal complaint that I have already filed, or if the claim(s) constitutes a spin-off complaint.  (A spin-off complaint contests the manner in which a previously filed complaint is being processed.)  In completing this PS Form 2564-A, Information for Pre-complaint Counseling, I recognize that the Manager, Dispute Resolution will review the claim(s) contained herein and determine how they shall be processed.  I will be notified, in writing, if the Manager determines that my claim(s) shall be processed as amendments or appendages to a formal complaint that I have already filed.

Please print your name here
Marilyn N. Lee

Date signed  8/12/05

Your Signature
Marilyn N. Lee

Please return this form to:

MANAGER OF DISPUTE RESOLUTION
EEO COMPLIANCE & APPEALS
475 L'ENFANT PLAZA SW, ROOM 9431
WASHINGTON, DC  20260-4135
FAX: (202) 268-2816

S Form 2564-A, March 2001 (Page 3 of 3)

Ex. C-3

EXHIBIT 78

# Assignment, Reassignment, and Promotion

## 71 Introduction

## 711 Organization

## 714 Selection Definitions and Philosophy

### 714.1 Definitions Applicable to Selection

The following definitions clarify and standardize the terms used in the selection process:

h. *Job posting (bid posting)*. A posting for the filling of bargaining senior qualified bid positions. *Vacancy announcement* refers to the filling of entrance positions, best qualified positions, or nonbargaining positions. The job posting or vacancy announcement contains either a list of requirements needed upon entry to the position, the qualification standard number, or an attached qualification standard. Requirements listed in a vacancy announcement are not considered exhaustive for continued satisfactory performance in the position.

## 716 Positions Filled Temporarily

When a career employee is temporarily absent, his or her position may be filled by temporary assignment, reassignment, or promotion. The applicant must understand the terms of such an assignment - specifically, that when the absent employee returns, the applicant returns to the position he or she occupied prior to the temporary assignment (see 716.23, Preappointment Statement).

### 716.1 Temporary Assignments

*Temporary assignment* is the placement of an employee into an established position for a limited period of time to perform duties and responsibilities other than those contained in the employee's normal position description. A formal reassignment and/or promotion personnel action is not required.

### 716.12 Temporary Assignments to Nonbargaining Positions

The following general policies apply to temporary assignments to nonbargaining positions:

   a. Temporary assignments to nonbargaining positions are made only for the shortest practical time limits and may be used to meet emergencies caused by abnormal workload, a change in mission or organization, or unanticipated absences.

   b. When a nonbargaining employee is absent (except postmaster), every effort must be made to have the duties absorbed by other employees of the same or higher level.

   c. The appointing official or designee may temporarily assign any qualified employee to meet service needs.

   d. Normally, priority is given to unassigned employees (i.e., employees whose positions have been abolished).

   e. A temporary assignment may be terminated at any time, either at management's discretion or at the employee's request.

Ex. A-1

f. Temporary assignment of an employee to a position at the same or lower level should not exceed 90 calendar days unless extended by the next higher level of management above the appointing official. (See 716.144, 120-Day Time Limit, for time limits on temporary assignment to a higher-level position.)

g. Temporary assignments must be documented using Form 1723, *Assignment Order.*

## 716.2 Temporary Promotion

Temporary promotion is limited to situations where it is impractical to fill a higher-level position by other temporary means. Such situations include, but are not limited to, long-term absences of the incumbent or the need to defer the permanent filling of a position for a lengthy period of time.

### 716.21 Selection Procedures

Temporary promotions are filled using competitive promotion procedures. When the position is filled permanently, competitive procedures are used again. An employee who has served in a position through competitive temporary promotion is eligible to recompete, regardless of the duration of the temporary promotion.

### 716.23 Preappointment Statement

Applicants for temporary promotion must be informed of the conditions of the appointment including the expected duration. Persons selected must be assured of return to their regular positions when no longer needed in the temporary assignments, whether or not the expected period has ended. To avoid any misunderstanding at a later date, the following statement should be obtained from any employee *selected* for temporary promotion:

*I understand that my selection for the position of (position title) is temporary and that I will be returned to my present permanent position upon termination of the temporary promotion.*

## 717.1 Reassignment

*Reassignment* is the permanent assignment with or without relocation of an employee to another established position with the same level in the same salary schedule, or to a position with an equivalent level in another salary schedule. The following policies apply to reassignment:

a. *Reassignment to Bargaining Positions.* General policies and procedures governing reassignments to bargaining positions are contained in the appropriate collective bargaining agreement. (See 72, Bargaining Positions, and 76, Bargaining Position Qualification Standards, for detailed policies and procedures.)

b. *Reassignment to Nonbargaining Positions.* Management may reassign nonbargaining employees noncompetitively. Employees with saved grade are considered noncompetitively for positions up to the level of their former position or at any intervening level. Employees who desire reassignment may apply in the same way as employees who desire promotion consideration.

c. *Mutual Exchanges.* Career bargaining employees may exchange positions at the same level if the exchange is approved by management at the installations involved, subject to the provisions of the applicable collective bargaining agreement. An exchange of positions does not necessarily mean that the employees involved take over the duty assignments of the positions

*Ex. A - 2*

individual and the degree of risk for further illness or injury within the next six months. The medical assessment may suggest job modifications or accommodations that would reduce individual risk and allow performance of the essential functions of the job in a safe manner.

*Note:* While medical personnel are responsible for the medical assessment, the final medical suitability determination and hiring decision are the responsibility of the appointing official.

Other events that require a medical assessment include:

    a. *Conversion/promotion/reassignment/transfer.* A new medical assessment is required when an employee changes to a position with more demanding physical requirements than those associated with the employee's present job. A new assessment is not required if an employee is going to a new job with similar duties.

    b. *Reappointment.* An applicant who has had a break in postal service of more than one year must have a new medical assessment. If the break in service is less than one year, a new assessment is not required, provided all the following conditions are met:

      (1) A medical assessment and determination of medical suitability were obtained for the individual's previous employment.

      (2) The duties of the new position for which the applicant was selected are not more physically demanding than those required in the last position.

      (3) The new application and other suitability screening material does not indicate the need for a new medical assessment

# 714 Selection Definitions and Philosophy

## 714.1 Definitions Applicable to Selection

The following definitions clarify and standardize the terms used in the selection process:

*Special conditions.* The conditions that apply to nonbargaining positions only. They describe the circumstances under which the work is performed. Being able to meet a special condition is essential to satisfactory performance at entry. Often conditions pertain to the willingness of the applicant to perform certain duties or tasks (e.g., willingness to travel frequently or to work irregular hours).

### 716.22 Appointment Duration

Temporary promotion may be made for 1 year or less, depending upon need. If the employee's services are still needed in the temporary assignment after the initial period expires, it must be determined whether the situation is still temporary, or whether the position should be filled permanently. A temporary promotion may not be extended beyond 1 year without approval of the district Human Resources manager. No temporary promotion may exceed 2 years. Unless extended, a temporary promotion automatically terminates on a specified date. However, at the discretion of 717.32 Exceptions to Competitive Procedures

The following promotion actions are excepted from competitive promotion procedures:

    a. Promotion of the incumbent to a position reclassified at a higher level without significant change in duties and responsibilities

Ex. A-3

management, it may be terminated at any time prior to the automatic termination date.

## 746 Requests for Exceptions to Policies

Any request for exceptions to the EAS selection policies and procedures must be approved by the area Human Resources manager in coordination with the area vice president, with a copy sent to the vice president, Employee Resource Management.

## 747.3 Human Resources Managers

The Human Resources manager or designee has the following responsibilities:

    a. Maintains the vacancy file for the selecting official after completion of the selection process.

    b. Provides support and guidance to managers on selection, compensation, and personnel action processing.

*Ex. A - 4*